# EXHIBIT 3

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>y35327b5e424b5.txt
<DESCRIPTION>PROSPECTUS SUPPLEMENT
<TEXT>
<PAGE>
```

Filed Pursuant to Rule 424(B)(5)
Registration No. 333-140436-15

PROSPECTUS SUPPLEMENT
(TO PROSPECTUS DATED MAY 15, 2007)

$1,835,617,100 (APPROXIMATE)
MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-3

MORTGAGE LOAN ASSET - BACKED CERTIFICATES,

MERRILL LYNCH MORTGAGE INVESTORS, INC.
DEPOSITOR

FIRST FRANKLIN FINANCIAL CORPORATION      MERRILL LYNCH FIRST FRANKLIN MORTGAGE
SPONSOR                                   LOAN TRUST, SERIES 2007-3
                                          ISSUING ENTITY

----------

INVESTING IN THESE CERTIFICATES INVOLVES RISKS. YOU SHOULD NOT PURCHASE THESE
CERTIFICATES UNLESS YOU FULLY UNDERSTAND THEIR RISKS AND STRUCTURE. SEE "RISK
FACTORS" BEGINNING ON PAGE S-17 OF THIS PROSPECTUS SUPPLEMENT AND PAGE 1 OF THE
ATTACHED PROSPECTUS.

These certificates will be beneficial interests in a trust fund and will be
backed only by the assets of the issuing entity. Neither these certificates nor
the assets of the issuing entity will be obligations of Merrill Lynch, Pierce,
Fenner & Smith Incorporated, LaSalle Bank National Association, Home Loan
Services, Inc. or any of their affiliates. These certificates will not be
insured or guaranteed by any governmental agency or any other entity.

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 will issue
twenty-four classes of certificates, twenty-two of which are offered by this
prospectus supplement and the attached prospectus. The table on page S-4
identifies the various classes of offered certificates and specifies certain
characteristics of each such class, including the class's initial certificate
principal balance, pass-through rate and rating.

Principal and interest will be payable monthly, as described in this prospectus
supplement. The first distribution date will be June 25, 2007. Credit
enhancement for the offered certificates includes excess interest,
overcollateralization, and subordination. In addition, the issuing entity and
supplemental interest trust will own three interest rate corridor contracts and
an interest rate swap agreement, respectively, purchased for the benefit of the
offered certificates. The interest rate swap agreement and the interest rate
corridor contracts will each be provided by The Bank of New York in its capacity
as swap counterparty or cap contract counterparty.

The trust fund will consist primarily of fixed rate and adjustable rate,
sub-prime mortgage loans secured by first liens on real properties that were
originated or acquired by First Franklin Financial Corporation.

The certificates offered by this prospectus supplement will be purchased by
Merrill Lynch, Pierce, Fenner & Smith Incorporated, as underwriter, from Merrill
Lynch Mortgage Investors, Inc., as depositor, and are being offered by the
underwriter from time to time for sale to the public in negotiated transactions
or otherwise at varying prices to be determined at the time of sale. The
underwriter has the right to reject any order. Proceeds to Merrill Lynch
Mortgage Investors, Inc. from the sale of these certificates will be
approximately 99.684% of their initial principal balance before deducting
expenses, which are estimated at $600,000. See "Method of Distribution" in this
prospectus supplement.


NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES
COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED ON THE
ADEQUACY OR ACCURACY OF THIS PROSPECTUS SUPPLEMENT AND THE ATTACHED PROSPECTUS.
ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.


                        MERRILL LYNCH & CO.

          The date of this prospectus supplement is May 29, 2007.


    <PAGE>

                WHERE TO FIND INFORMATION IN THIS PROSPECTUS SUPPLEMENT
                         AND THE ATTACHED PROSPECTUS


       Information about the offered certificates is contained in (a) the attached
    prospectus, which provides general information, some of which may not apply to
    the certificates; and (b) this prospectus supplement, which describes the
    specific terms of the certificates.

       This prospectus supplement and the attached prospectus include cross
    references to sections in these materials where you can find further related
    discussions. The tables of contents in this prospectus supplement and the
    attached prospectus identify the pages where those sections are located.

       In this prospectus supplement, the terms "Depositor," "we," "us" and "our"
    refer to Merrill Lynch Mortgage Investors, Inc.


                        FOR EUROPEAN INVESTORS ONLY


       In relation to each Member State of the European Economic Area which has
    implemented the Prospectus Directive (each, a "Relevant Member State"), the
    Underwriter has represented and agreed that with effect from and including the
    date on which the Prospectus Directive is implemented in that Relevant Member
    State (the "Relevant Implementation Date") it has not made and will not make an
    offer of certificates to the public in that Relevant Member State prior to the
    publication of a prospectus in relation to the certificates which has been
    approved by the competent authority in that Relevant Member State or, where
    appropriate, approved in another Relevant Member State and notified to the
    competent authority in that Relevant Member State, all in accordance with the
    Prospectus Directive, except that it may, with effect from and including the
    Relevant Implementation Date, make an offer of certificates to the public in
    that Relevant Member State at any time:

        (a)  to legal entities which are authorized or regulated to operate in the
             financial markets or, if not so authorized, or regulated, whose
             corporate purpose is solely to invest in securities;

        (b)  to any legal entity which has two or more of (1) an average of at
             least 250 employees during the last financial year; (2) a total
             balance sheet of more than E43,000,000 and (3) an annual net turnover
             of more than E50,000,000, as shown in its last annual or consolidated
             accounts; or

        (c)  in any other circumstances which do not require the publication by the

issuer of a prospectus pursuant to Article 3 of the Prospectus
Directive.

For the purposes of this provision, the expression an "offer of
certificates to the public" in relation to any certificates in any Relevant
Member State means the communication in any form and by any means of sufficient
information on the terms of the offer and the certificates to be offered so as
to enable an investor to decide to purchase or subscribe the certificates, as
the same may be varied in that Relevant Member State by any measure implementing
the Prospectus Directive in that Relevant Member State and the expression
"Prospectus Directive" means Directive 2003/71/EC and includes any relevant
implementing measure in each Relevant Member State.

S-2

<PAGE>

TO UNDERSTAND THE STRUCTURE OF THESE CERTIFICATES, YOU MUST READ CAREFULLY BOTH
THE ATTACHED PROSPECTUS AND THIS PROSPECTUS SUPPLEMENT IN THEIR ENTIRETY.

TABLE OF CONTENTS

<TABLE>
<S>                                                                     <C>
The Series 2007-3 Certificates ....................................     S-4
Summary Information ...............................................     S-5
Risk Factors .....................................................     S-17
Forward-Looking Statements .......................................     S-31
Glossary .........................................................     S-31
The Mortgage Pool ................................................     S-31
   General .......................................................     S-31
   Mortgage Loans ................................................     S-35
Underwriting Guidelines ..........................................     S-35
   General .......................................................     S-35
   First Franklin Financial's Portfolio and Underwriting Guidelines ...  S-35
   Pending Proceedings ...........................................     S-39
Transaction Parties ..............................................     S-39
   The Sponsor ...................................................     S-39
   The Depositor .................................................     S-40
   The Issuing Entity ............................................     S-40
   The Servicer ..................................................     S-41
   The Trustee ...................................................     S-43
   The Cap Contract Counterparty and the Swap Counterparty .......     S-45
Affiliates and Related Transactions ..............................     S-45
Static Pool Information ..........................................     S-46
Administration of the Issuing Entity .............................     S-46
   Servicing and Administrative Responsibilities .................     S-46
   Trust Accounts ................................................     S-48
   Flow of Payments ..............................................     S-49
Servicing of the Mortgage Loans ..................................     S-50
   General .......................................................     S-50
   Servicing Compensation and Payment of Expenses ................     S-50
   Adjustment to Servicing Fee in Connection with Certain Prepaid
      Mortgage Loans .............................................     S-50
   Advances ......................................................     S-51
   Loss Mitigation Procedures ....................................     S-52
   Evidence as to Compliance .....................................     S-52
   Custody of the Mortgage Files .................................     S-53
   Pledge of Servicing Rights ....................................     S-53
Description of the Certificates ..................................     S-54
   General .......................................................     S-54
   Book-Entry Certificates .......................................     S-55
   Payments on Mortgage Loans; Accounts; Supplemental Interest
      Trust ......................................................     S-59

Case 1:19-cv-04800-VSB Document 1-8 Filed 05/23/19 Page 5 of 377

Distributions .......................................... S-60
Example of Distributions .............................. S-64
Fees and Expenses of the Trust Fund ................... S-65
Overcollateralization Provisions ...................... S-66
Distributions from the Supplemental Interest Trust .... S-68
Subordination of the Distributions of the Subordinate
    Certificates ...................................... S-69
Corridor Contracts .................................... S-69
Swap Agreement ........................................ S-72
Calculation of One-Month LIBOR ........................ S-75
Reports to Certificateholders ......................... S-75
Additional Rights of the Holder of the Class R Certificate ......... S-77
Restrictions on Transfer of the Class R Certificate ............... S-78
The Pooling and Servicing Agreement ...................... S-78
General ............................................... S-78
The Issuing Entity .................................... S-79
Assignment of Mortgage Loans .......................... S-79
Amendment ............................................. S-80
Optional Termination .................................. S-81
Events of Default ..................................... S-81
Rights upon Event of Default .......................... S-82
The Trustee ........................................... S-82
Indemnification and Limitation of Liability ........... S-83
Special Servicing Agreements .......................... S-83
Yield, Prepayment and Maturity Considerations ............ S-83
General ............................................... S-83
Prepayments and Yields for the Certificates ........... S-84
Hypothetical Available Funds Cap Table ................ S-112
Additional Information ................................ S-114
Federal Income Tax Consequences .......................... S-114
Taxation of the Basis Risk Arrangements ............... S-115
Original Issue Discount and Amortizable Bond Premium ............ S-116
Special Tax Attributes of the Offered Certificates .... S-117
Prohibited Transactions Tax and Other Taxes ........... S-117
Class R Certificate ................................... S-118
Tax Return Disclosure Requirements ....................... S-119
State Taxes .............................................. S-119
ERISA Considerations ..................................... S-120
Legal Investment ......................................... S-123
Use of Proceeds .......................................... S-123
Method of Distribution ................................... S-123
Legal Matters ............................................ S-124
Ratings .................................................. S-124
Glossary of Defined Terms ................................ S-126
ANNEX I .................................................. A-I-1
Global Clearance, Settlement and Tax Documentation Procedures ...... A-I-1
Initial Settlement .................................... A-I-1
Secondary Market Trading .............................. A-I-1
Certain U.S. Federal Income Tax Documentation Requirements ........ A-I-3
Annex II ................................................. A-II-1
</TABLE>

S-3

<PAGE>

THE SERIES 2007-3 CERTIFICATES

<TABLE>
<CAPTION>

|  | CLASS A-1A | CLASS A-1B | CLASS A-1C | CLASS A-1D | CLASS A-2A |
| --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Initial |  |  |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| Certificate Principal Balance (1): | $285,760,000 | $26,321,000 | $205,174,000 | $33,199,000 | $420,975,000 |
| Pass-Through Rate: | LIBOR +0.040% (2)(3) | LIBOR +0.130% (2)(3) | LIBOR +0.170% (2)(3) | LIBOR +0.210% (2)(3) | LIBOR +0.050% (2)(3) |
| ERISA Eligible (5): | Yes | Yes | Yes | Yes | Yes |
| First Principal Distribution Date (to call) (6): | 06/2007 | 04/2009 | 06/2009 | 11/2013 | 06/2007 |
| First Principal Distribution Date (to maturity) (6): | 06/2007 | 04/2009 | 06/2009 | 09/2014 | 06/2007 |
| Weighted Average Life At Issuance: to call (yrs.) (6): | 1.14 | 2.00 | 3.50 | 6.49 | 1.00 |
| to maturity (yrs.) (6): | 1.14 | 2.00 | 3.52 | 10.24 | 1.00 |
| Expected Maturity (to call) (6): | 04/2009 | 06/2009 | 11/2013 | 11/2013 | 02/2009 |
| Expected Maturity (to maturity) (6): | 04/2009 | 06/2009 | 09/2014 | 06/2023 | 02/2009 |
| Last Scheduled Distribution Date(7): | 06/2037 | 06/2037 | 06/2037 | 06/2037 | 06/2037 |
| Interest Accrual Method (8): | Actual/360 | Actual/360 | Actual/360 | Actual/360 | Actual/360 |
| Payment Delay: | 0 days | 0 days | 0 days | 0 days | 0 days |
| Record Date (9) | RD | RD | RD | RD | RD |
| Minimum Denominations (10) | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Incremental Denominations | $1 | $1 | $1 | $1 | $1 |
| Anticipated Ratings (Moody's/S&P): | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aaa/AAA |
| CUSIP: | 59024V AA 7 | 59024V AB 5 | 59024V AC 3 | 59024V AD 1 | 59024V AE 9 |

&lt;CAPTION&gt;

| | CLASS A-2B | CLASS A-2C | CLASS A-2D | CLASS M-1-1 | CLASS M-1-2 |
|---|---|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Initial Certificate Principal Balance (1): | $210,336,000 | $235,961,000 | $91,182,000 | $35,135,000 | $61,178,000 |
| Pass-Through Rate: | LIBOR +0.130% (2)(3) | LIBOR +0.180% (2)(3) | LIBOR +0.250% (2)(3) | LIBOR +0.300% (2)(4) | LIBOR +0.250% (2)(4) |
| ERISA Eligible (5): | Yes | Yes | Yes | Yes | Yes |
| First Principal Distribution Date (to call) (6): | 02/2009 | 09/2009 | 03/2013 | 11/2010 | 11/2010 |
| First Principal Distribution Date (to maturity) (6): | 02/2009 | 09/2009 | 03/2013 | 11/2010 | 11/2010 |
| Weighted Average Life At Issuance: to call (yrs.) (6): | 2.00 | 3.50 | 6.41 | 4.65 | 4.66 |
| to maturity | | | | | |

|  | | | | |
|---|---|---|---|---|
| (yrs.) (6): | 2.00 | 3.50 | 8.49 | 5.14 | 5.19 |
| Expected Maturity (to call) (6): | 09/2009 | 03/2013 | 11/2013 | 11/2013 | 11/2013 |
| Expected Maturity (to maturity) (6): | 09/2009 | 03/2013 | 11/2022 | 02/2020 | 04/2020 |
| Last Scheduled Distribution Date(7): | 06/2037 | 06/2037 | 06/2037 | 06/2037 | 06/2037 |
| Interest Accrual Method (8): | Actual/360 | Actual/360 | Actual/360 | Actual/360 | Actual/360 |
| Payment Delay: | 0 days | 0 days | 0 days | 0 days | 0 days |
| Record Date (9) | RD | RD | RD | RD | RD |
| Minimum Denominations (10) | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Incremental Denominations | $1 | $1 | $1 | $1 | $1 |
| Anticipated Ratings (Moody's/S&P): | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aa1/AA+ | Aa1/AA+ |
| CUSIP: | 59024V AF 6 | 59024V AG 4 | 59024V AH 2 | 59024V AJ 8 | 59024V AK 5 |

  </TABLE>

  <TABLE>
  <CAPTION>

| | CLASS M-2-1 | CLASS M-2-2 | CLASS M-3-1 | CLASS M-3-2 | CLASS M-4-1 | CLASS M-4-2 |
|---|---|---|---|---|---|---|
| ----- | ------------ | ------------ | ------------ | ------------ | ------------ | ------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial Certificate Principal Balance (1): | $28,590,000 | $49,783,000 | $7,922,000 | $13,795,000 | $9,989,000 | $17,394,000 |
| Pass-Through Rate: | LIBOR +0.320% | LIBOR +0.270% | LIBOR +0.370% | LIBOR +0.290% | LIBOR +0.500% | LIBOR +0.400% |
| | (2)(4) | (2)(4) | (2)(4) | (2)(4) | (2)(4) | (2)(4) |
| ERISA Eligible (5): | Yes | Yes | Yes | Yes | Yes | Yes |
| First Principal Distribution Date (to call) (6): | 09/2010 | 09/2010 | 09/2010 | 09/2010 | 08/2010 | 08/2010 |
| First Principal Distribution Date (to maturity) (6): | 09/2010 | 09/2010 | 09/2010 | 09/2010 | 08/2010 | 08/2010 |
| Weighted Average Life At Issuance: | | | | | | |
| to call (yrs.) (6): | 4.55 | 4.56 | 4.52 | 4.53 | 4.49 | 4.50 |
| to maturity (yrs.) (6): | 5.01 | 5.06 | 4.95 | 4.99 | 4.91 | 4.94 |
| Expected Maturity (to call) (6): | 11/2013 | 11/2013 | 11/2013 | 11/2013 | 11/2013 | 11/2013 |
| Expected Maturity (to maturity) (6): | 03/2019 | 05/2019 | 04/2018 | 04/2018 | 11/2017 | 12/2017 |
| Last Scheduled Distribution Date(7): | 06/2037 | 06/2037 | 06/2037 | 06/2037 | 06/2037 | 06/2037 |
| Interest Accrual | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Method (8): | Actual/360 | Actual/360 | Actual/360 | Actual/360 | Actual/360 |
| Actual/360 | | | | | |
| Payment Delay: | 0 days | 0 days | 0 days | 0 days | 0 days | 0 |
| days | | | | | |
| Record Date (9) | RD | RD | RD | RD | RD | RD |
| Minimum Denominations | | | | | |
| (10) | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $25,000 | | | | | |
| Incremental | | | | | |
| Denominations | $1 | $1 | $1 | $1 | $1 |
| $1 | | | | | |
| Anticipated Ratings | | | | | |
| (Moody's/S&P): | Aa2/AA | Aa2/AA | Aa3/AA- | Aa3/AA- | A1/A+ |
| A1/A+ | | | | | |
| CUSIP: | 59024V AL 3 | 59024V AM 1 | 59024V AN 9 | 59024V AP 4 | 59024V AQ 2 | 59024V |
| AR 0 | | | | | |

<CAPTION>

| | CLASS M-5 | CLASS M-6 | CLASS B-1 | CLASS B-2 | CLASS B-3 | CLASS |
|---|---|---|---|---|---|---|
| R | | | | | | |
| | ------------ | ----------- | ------------- | ------------ | ------------ | -------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial Certificate | | | | | | |
| Principal | | | | | | |
| Balance (1): | $23,607,000 | $16,996,000 | $19,829,000 | $18,885,000 | $23,606,000 | $100 |
| Pass-Through Rate: | | LIBOR | | | | |
| | LIBOR +0.450% | +0.750% | LIBOR +1.350% | LIBOR +2.000% | LIBOR +2.400% | LIBOR |
| +0.040% | | | | | | |
| | (2)(4) | (2)(4) | (2)(4) | (2)(4) | (2)(4) | (2) |
| (3) | | | | | | |
| ERISA Eligible (5): | Yes | Yes | Yes | Yes | Yes | No |
| First Principal | | | | | | |
| Distribution Date | | | | | | |
| (to call) (6): | 08/2010 | 07/2010 | 07/2010 | 07/2010 | 06/2010 | N/A |
| First Principal | | | | | | |
| Distribution Date | | | | | | |
| (to maturity) (6): | 08/2010 | 07/2010 | 07/2010 | 07/2010 | 06/2010 | |
| Weighted Average Life | | | | | | |
| At Issuance: | | | | | | |
| to call (yrs.) (6): | 4.49 | 4.47 | 4.47 | 4.47 | 4.45 | N/A |
| to maturity (yrs.) | | | | | | |
| (6): | 4.90 | 4.84 | 4.79 | 4.73 | 4.61 | N/A |
| Expected Maturity | | | | | | |
| (to call) (6): | 11/2013 | 11/2013 | 11/2013 | 11/2013 | 11/2013 | N/A |
| Expected Maturity | | | | | | |
| (to maturity) (6): | 06/2017 | 12/2016 | 07/2016 | 12/2015 | 04/2015 | N/A |
| Last Scheduled | | | | | | |
| Distribution | | | | | | |
| Date(7): | 06/2037 | 06/2037 | 06/2037 | 06/2037 | 06/2037 | N/A |
| Interest Accrual | | | | | | |
| Method (8): | Actual/360 | Actual/360 | Actual/360 | Actual/360 | Actual/360 | |
| Actual/360 | | | | | | |
| Payment Delay: | 0 days | 0 days | 0 days | 0 days | 0 days | 0 |
| days | | | | | | |
| Record Date (9) | RD | RD | RD | RD | RD | RD |
| Minimum Denominations | | | | | | |
| (10) | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | |
| $100 | | | | | | |
| Incremental | | | | | | |
| Denominations | $1 | $1 | $1 | $1 | $1 | N/A |
| Anticipated Ratings | | | | | | |
| (Moody's/S&P): | A2/A | A3/A- | Baa1/BBB+ | Baa2/BBB | Baa3/BBB- | |
| NR/AAA | | | | | | |
| CUSIP: | 59024V AS 8 | 59024V AT 6 | 59024V AU 3 | 59024V AV 1 | 59024V AW 9 | 59024V |

AZ 2

</TABLE>

(1)  The initial certificate principal balances shown above are subject to a permitted variance of plus or minus 10%.

(2)  Subject to the related available funds cap and the related maximum rate cap. The pass-through rates for these certificates are one-month LIBOR plus the applicable pass-through margin. These pass-through rates are subject to adjustment and your pass-through rate may be lower. See "Description of the Certificates - Distributions - Distributions of Interest."

(3)  If the auction termination does not occur on the first possible distribution date on which it could occur, the margin on each of the class A-1A, class A-1B, class A-1C, class A-1D, class A-2A, class A-2B, class A-2C, class A-2D and class R certificates will increase to 2 times its respective margin shown above on the following distribution date.

(4)  If the auction termination does not occur on the first possible distribution date on which it could occur, the margin on each class of the class M-1-1, class M-1-2, class M-2-1, class M-2-2, class M-3-1, class M-3-2, class M-4-1, class M-4-2, class M-5, class M-6, class B-1, class B-2 and class B-3 certificates will increase to 1.5 times its respective margin shown above on the following distribution date.

(5)  Certificates designated as ERISA Eligible may be acquired by employee benefit plans subject to Title I of ERISA and plans subject to Section 4975 of the Code, subject to the satisfaction of certain requirements. See "ERISA Considerations".

(6)  The information set forth above regarding first principal distribution date, weighted average life at issuance and expected maturity is based on the modeling assumptions defined beginning on page S-152 and 20% HEP for the fixed rate mortgage loans or 100% PPC (a constant prepayment rate of 2% per annum in month 1, building linearly (rounded to the nearest hundredth of a percent) to a constant prepayment rate of 30% per annum in month 12, remaining constant at a constant prepayment rate of 30% per annum from month 13 up to and including month 22, then remaining constant at a constant prepayment rate of 50% per annum from month 23 up to and including month 27 and then remaining constant at a constant prepayment rate of 35% per annum in month 28 and thereafter) for the adjustable rate mortgage loans, as applicable, subject to a maximum prepayment speed of 95% CPR.

(7)  The last scheduled distribution date is the latest maturity date for any mortgage loan plus one month.

(8)  The interest rate index reset date for the offered certificates is two business days prior to the start of each interest accrual period.

(9)  RD= For any distribution date, the last business day of the month preceding such distribution (or in the case of the first distribution date, the closing date).

(10) With respect to initial European investors only, the underwriter will only sell offered certificates in minimum total investment amounts of $100,000.

CREDIT ENHANCEMENT:

    Excess interest
    Overcollateralization
    Subordination

OVERCOLLATERALIZATION REQUIREMENTS:

    Initial overcollateralization amount: approximately 2.80% of the aggregate

outstanding principal balance of the mortgage loans as of the cut-off date.

Targeted overcollateralization amount: 2.80% of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date.

Stepdown overcollateralization amount: 5.60% of the current aggregate outstanding principal balance of the mortgage loans after the stepdown date.

Minimum required overcollateralization amount: 0.50% of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date.

<div align="center">S-4</div>

&lt;PAGE&gt;

<div align="center">SUMMARY INFORMATION</div>

THIS SECTION BRIEFLY SUMMARIZES MAJOR CHARACTERISTICS OF THE CERTIFICATES AND THE MORTGAGE LOANS. IT DOES NOT CONTAIN ALL OF THE INFORMATION THAT YOU NEED TO CONSIDER IN MAKING YOUR INVESTMENT DECISION. TO FULLY UNDERSTAND THE TERMS OF THE CERTIFICATES, YOU SHOULD READ BOTH THIS PROSPECTUS SUPPLEMENT AND THE ATTACHED PROSPECTUS IN THEIR ENTIRETY.

<div align="center">PRINCIPAL PARTIES</div>

<div align="center">ISSUING ENTITY</div>

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3.

See "Transaction Parties--The Issuing Entity."

We are forming the issuing entity to own a pool of sub-prime residential mortgage loans secured by first liens on real properties. The issuing entity will contain both fixed rate mortgage loans and adjustable rate mortgage loans. Each class of certificates represents an interest in the issuing entity. The issuing entity is also referred to herein as the "trust fund."

<div align="center">ORIGINATOR AND SPONSOR</div>

First Franklin Financial Corporation, an operating subsidiary of Merrill Lynch Bank & Trust Co., FSB, whose address is 2150 North First Street, San Jose, California 95131 and whose telephone number is (800) 464-8203, originated or acquired the mortgage loans and will sell the mortgage loans to the depositor.

First Franklin Financial Corporation is an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated, the underwriter, Merrill Lynch Mortgage Investors, Inc., the depositor, and Home Loan Services, Inc., the servicer.

See "Transaction Parties--The Sponsor," "Underwriting Guidelines" and "Affiliates and Related Transactions."

<div align="center">DEPOSITOR</div>

Merrill Lynch Mortgage Investors, Inc., a Delaware corporation whose address is 250 Vesey Street, 4 World Financial Center, 10th Floor, New York, New York 10080 and whose telephone number is (212) 449-0357.

Merrill Lynch Mortgage Investors, Inc. will deposit the mortgage loans in the issuing entity. The depositor is an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated, the underwriter, Home Loan Services, Inc., the servicer, and First Franklin Financial Corporation.

See "Transaction Parties--The Depositor" and "Affiliates and Related Transactions" in this prospectus supplement and "The Depositor" in the

prospectus.

## SERVICER

Home Loan Services, Inc., a Delaware corporation, whose address is 150 Allegheny Center Mall, Pittsburgh, Pennsylvania 15212 and whose telephone number is (800) 346-6437.

The servicer is an affiliate of Merrill Lynch, Pierce, Fenner & Smith Incorporated, the underwriter, Merrill Lynch Mortgage Investors, Inc., the depositor, and First Franklin Financial Corporation.

See "Transaction Parties--The Servicer" and "Affiliates and Related Transactions."

## TRUSTEE

LaSalle Bank National Association, a national banking association whose address is 135 South LaSalle Street, Suite 1511, Chicago, Illinois 60603 and whose telephone number is (312) 904-4839, will be the trustee pursuant to the pooling and servicing agreement.

See "Transaction Parties--The Trustee."

## CAP CONTRACT COUNTERPARTY AND SWAP COUNTERPARTY

The Bank of New York, whose address is 32 Old Slip, 16th Floor, New York, New York 10286 and whose telephone number is (212) 804-5103, is the cap contract counterparty and the swap counterparty. See "Transaction Parties--The Cap Contract Counterparty and the Swap Counterparty."

S-5

<PAGE>

## RATING AGENCIES

Moody's Investors Services, Inc. and Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc. will issue the ratings with respect to the certificates.

## NIMS INSURER

The NIMs Insurer, if any, may issue a financial guaranty insurance policy covering certain payments to be made on net interest margin securities to be issued by a separate trust and secured by all or a portion of two classes of certificates, the class C certificates and the class P certificates, that we are not offering pursuant to this prospectus supplement. In such event, the NIMs Insurer will be able to exercise rights in a manner which could adversely impact the certificateholders.

See "Risk Factors - Rights of the NIMs Insurer, if any, may negatively impact the offered certificates."

The following diagram illustrates the various parties involved in the transaction and their respective functions:

(FLOW CHART)

RELEVANT DATES

CUT-OFF DATE

The cut-off date will be May 1, 2007.

CLOSING DATE

The closing date will be on or about May 30, 2007.

DISTRIBUTION DATE

The 25th day of each month, beginning in June 2007. If the 25th day is not a
business day, then the distribution date will be the next business day after the
25th day of the month.

RECORD DATE

For any distribution date, the last business day of the month preceding the
month of such distribution date (or, in the case of the first distribution date,
the closing date).

FINAL SCHEDULED DISTRIBUTION DATE

The final scheduled distribution date for the offered certificates will be June
2037. The final scheduled distribution date has been determined by adding one
month to the scheduled maturity of the latest maturing mortgage loan in the
trust fund. The actual final distribution date for each class of offered
certificates may be earlier or later, and could be substantially earlier, than
the applicable final scheduled distribution date.

See "Yield, Prepayment and Maturity Considerations--Prepayments and Yields for
the Certificates."

THE SERIES 2007-3 CERTIFICATES

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 certificates
represent ownership interests in the issuing entity, the assets of which will
consist primarily of first lien, adjustable and fixed rate, fully amortizing,
interest only and balloon sub-prime residential mortgage loans.

The certificates represent beneficial ownership interests in the underlying
trust fund assets. The certificates will have the original certificate principal
balance, pass-through rate and other features set forth in the table on page
S-4. The issuing entity will issue the certificates under a pooling and
servicing agreement, dated as of May 1, 2007, among Merrill Lynch Mortgage
Investors, Inc., as depositor, LaSalle Bank National Association, as trustee,
and Home Loan Services, Inc., as servicer.

Any collections on the mortgage loans will be used to pay fees to the servicer
and the trustee, to make net swap payments (if any) owed to the swap
counterparty and the swap termination payment (if any) owed to the swap
counterparty (other than defaulted swap termination

S-6

<PAGE>

payments) and to make interest or principal payments on the certificates. All
principal collections will be paid to one or more classes of the certificates
offered through this prospectus supplement or to other classes of certificates
that we are not offering by this prospectus supplement, based on the outstanding
certificate principal balances and the remaining principal amount of the
mortgage loans. Any interest collections in excess of the amount paid to holders
of the offered certificates (either as interest or principal) and the servicer,
and the amount, if any, paid to the swap counterparty, will be paid to the
owners of the other classes of certificates that we are not offering by this
prospectus supplement, which are entitled to receive those excess amounts.

Neither the class C certificates, which represent a subordinated interest in the
assets of the issuing entity, nor the class P certificates, which represent the
right to receive certain prepayment charges on the mortgage loans, are offered
by this prospectus supplement.

See "Description of the Certificates--Distributions."

INTEREST DISTRIBUTIONS

Interest will accrue on each class of certificates at the pass-through rate for
that class. Interest will accrue on the offered certificates from the prior
distribution date (or the closing date, in the case of the first distribution
date) to the day prior to the current distribution date.

The pass-through rates on each of the offered certificates will be subject to
one of three available funds caps, as described in more detail herein. These
available funds caps limit the pass-through rates on each of the offered
certificates.

The pass-through rates on the class A-1A, class A-1B, class A-1C and class A-1D
certificates, which we refer to collectively herein as the "class A-1
certificates," and the class R, class M-1-1, class M-2-1, class M-3-1 and class
M-4-1 certificates (together with the class A-1 certificates, the "group one
certificates") will be limited by reference to a rate determined by multiplying
(a) 12, (b) an amount obtained by dividing the amount of interest due on the
group one mortgage loans, less certain amounts, including any pro rata amounts
owed to the swap counterparty (other than any swap termination payment that is
the result of an event of default or certain termination events with respect to
the swap counterparty), by the aggregate stated principal balance of the group
one mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period.

The pass-through rates on the class A-2A, class A-2B, class A-2C and class A-2D
certificates, which we refer to collectively herein as the "class A-2
certificates," and the class M-1-2, class M-2-2, class M-3-2 and class M-4-2
certificates (together with the class A-2 certificates, the "group two
certificates") will be limited by reference to a rate determined by multiplying
(a) 12, (b) an amount obtained by dividing the amount of interest due on the
group two mortgage loans, less certain amounts, including any pro rata amounts
owed to the swap counterparty (other than any swap termination payment that is
the result of an event of default or certain termination events with respect to
the swap counterparty), by the aggregate stated principal balance of the group
two mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period.

The pass-through rates on each of the class M-5 and class M-6 certificates,
which we refer to collectively, with the class M-1, class M-2, class M-3 and
class M-4 certificates, as the "class M certificates," and the class B-1, class
B-2 and class B-3 certificates, which we refer to collectively herein as the
"class B certificates," will be limited by reference to a rate determined by the
weighted average of the available funds cap for the group one certificates and
the available funds cap for the group two certificates (weighted in proportion
to the results of subtracting from the aggregate stated principal balance of
each mortgage group, the current certificate principal balance of the group one
certificates, in the case of group one, or the group two certificates, in the
case of group two).

Shortfalls arising from the application of an available funds cap or a maximum
rate cap (described below), subject to certain limitations based upon one-month
LIBOR, the upper collar on the related corridor contract and net swap payments
received from the swap counterparty, will be carried over on a subordinated
basis with accrued interest at the then applicable pass-through rate and paid
from excess cashflow in a later distribution, subject to the related maximum

rate cap and available funds cap, if available.

S-7

<PAGE>

As described below, the issuing entity will own three interest rate corridor
contracts. Amounts received on the group one corridor contract will only be
available to make payments on the group one certificates, amounts received on
the group two corridor contract will only be available to make payments on the
group two certificates and amounts received on the class M-5, class M-6 and
class B Certificate corridor contract will only be available to make payments on
the class M-5, class M-6 and class B certificates, in each case to the extent of
the interest shortfall on such certificates attributable to the related
available funds cap or maximum rate cap subject to certain limitations based
upon one-month LIBOR (as determined under the related corridor contract), the
upper collar on the related corridor contract and net swap payments received
from the swap counterparty (other than any such shortfalls attributable to the
fact that losses are not allocated to the class A certificates after the class M
and class B certificates have been reduced to zero).

See "Description of the Certificates--Distributions--Distributions of Interest."

Any excess of the amount received on the related corridor contract over the
amount needed to pay such shortfalls on the related classes of offered
certificates arising as a result of the related available funds cap (other than
such shortfalls arising from the fact that the pooling and servicing agreement
does not provide for the reduction of the principal balance of the class A
certificates as a result of realized losses) will be distributed to the class C
certificates (which are not offered pursuant to this prospectus supplement).

The pass-through rates on each of the offered certificates will also be subject
to one of three maximum interest rate caps. The pass-through rates on the group
one certificates will be limited by reference to a rate determined by
multiplying (a) 12, (b) an amount obtained by dividing the amount of interest
that would be due on the group one mortgage loans had the group one adjustable
rate mortgage loans provided for interest at their net maximum lifetime rates
and the group one fixed rate mortgage loans provided for interest at their net
mortgage rates, less certain amounts, including any pro rata amounts owed to the
swap counterparty (other than any swap termination payment that is the result of
an event of default or certain termination events with respect to the swap
counterparty), by the aggregate stated principal balance of the group one
mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period.

The pass-through rates on the group two certificates will be limited by
reference to a rate determined by multiplying (a) 12, (b) an amount obtained by
dividing the amount of interest that would be due on the group two mortgage
loans had the group two adjustable rate mortgage loans provided for interest at
their net maximum lifetime rates and the group two fixed rate mortgage loans
provided for interest at their net mortgage rates, less certain amounts,
including any pro rata amounts owed to the swap counterparty (other than any
swap termination payment that is the result of an event of default or certain
termination events with respect to the swap counterparty), by the aggregate
stated principal balance of the group two mortgage loans as of the first day of
the related accrual period and (c) a fraction, the numerator of which is 30 and
the denominator of which is the actual number of days in the related accrual
period.

The pass-through rates on the class M-5, class M-6 and class B certificates will
be limited by reference to a rate determined by the weighted average of the
maximum rate cap for the group one certificates and the maximum rate cap for the
group two certificates (weighted in proportion to the results of subtracting

from the aggregate stated principal balance of each mortgage group, the current certificate principal balance of the group one certificates, in the case of group one, or the group two certificates, in the case of group two). Any interest shortfall due to the related maximum rate cap will not be reimbursed, except under limited circumstances described herein.

See "Description of the Certificates--Distributions--Distributions of Interest."

PRINCIPAL DISTRIBUTIONS

Principal payments to the certificates will generally reflect principal collections on the mortgage loans in the trust fund. The group one certificates will generally receive principal collected on the group one mortgage loans. The group two certificates will generally receive principal collected on the group two mortgage loans. The class M-5, class M-6 and class B certificates will generally receive principal collected on both groups of

S-8

<PAGE>

mortgage loans. Principal payments will also include a portion of interest collections to the extent necessary to maintain or restore overcollateralization to the required level, as described below. See "Description of the Certificates--Distributions--Distributions of Principal."

On each distribution date prior to the stepdown date or on which a stepdown trigger event is in effect, distributions will be made from the portion of the available funds allocable to principal payments on the mortgage loans (as further described in "Description of the Certificate--Distributions--Distributions of Principal" in this prospectus supplement), (i) first, to the class A certificates until their respective principal balances have been reduced to zero, and (ii) second, to the class M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class B-1, class B-2 and class B-3 certificates in that order, until their respective principal balances have been reduced to zero.

On each distribution date on and after the stepdown date and on which a stepdown trigger event is not in effect, distributions will be made from the portion of the available funds allocable to the principal payments on the mortgage loans (as further described in "Description of the Certificate--Distributions--Distributions of Principal" in this prospectus supplement), (i) first, to the class A certificates, the lesser of the portion of the available funds allocable to principal payments on the mortgage loans and an amount equal to the principal distribution entitlement for the class A certificates until their respective principal balances have been reduced to zero and (ii) second, to each of the class M-1, class M-2, class M-3, class M-4, class M-5, class M-6, class B-1, class B-2 and class B-3 certificates, in that order, in each case, the lesser of the remaining portion of the available funds allocable to principal payments on the mortgage loans and an amount equal to the principal distribution entitlement for that class of certificates (each as further described in "Description of the Certificate--Distributions--Distributions of Principal" in this prospectus supplement), until their respective class certificate balances have been reduced to zero.

The "stepdown date" is defined in this prospectus supplement and generally means the earlier to occur of (a) the date on which the aggregate principal balances of the class A certificates have been reduced to zero and (b) the later to occur of (i) the distribution date in June 2010 and (ii) the first distribution date on which the subordination below the class A certificates is greater than or equal to 40.20% of the aggregate stated principal balance of the mortgage loans for that distribution date.

See "Description of the Certificates--Distributions--Distributions of
Principal."

The stepdown trigger event is defined in this prospectus supplement and
generally means with respect to any distribution date on or after the stepdown
date, the circumstances in which (i) the unpaid principal balance of mortgage
loans that are 60 days or more delinquent or (ii) the aggregate amount of
realized losses incurred since the cut-off date, in each case, exceeds the
applicable percentages described in the definition of "stepdown trigger event"
included in this prospectus supplement.

See "Description of the Certificates--Distributions--Distributions of
Principal."

                           CORRIDOR CONTRACTS

The issuing entity will own three interest rate corridor contracts purchased for
the benefit of the group one certificates; the group two certificates; and the
class M-5, class M-6 and class B certificates. Each of the corridor contracts
will be provided by The Bank of New York and will terminate immediately
following the distribution date in November 2007. Each corridor contract will
have a notional balance on each distribution date equal to the lesser of (x) the
aggregate certificate principal balance of the related certificates and (y) the
amount determined according to the schedules described in this prospectus
supplement under the heading "Description of the Certificates--Corridor
Contracts" until it is terminated. The issuing entity will receive a payment
under each corridor contract with respect to any distribution date on which
one-month LIBOR (as determined under the related corridor contract) exceeds the
related lower collar with respect to such distribution date shown in the tables
on beginning on page S-70. Payments received on the corridor contracts will be
available to make payments to the holders of the related offered certificates
only in respect of interest shortfalls on such certificates attributable to the
related available funds cap or maximum rate cap (other than any such shortfalls
attributable to the fact that losses are not allocated to the class A
certificates after the class M and class B certificates have been reduced to
zero). Any amounts received on the corridor contracts on a distribution date
that are not used to pay such shortfalls

                                   S-9

<PAGE>

on such distribution date will be distributed to the holders of the class C
certificates (which are not being offered pursuant to this prospectus
supplement).

                       INTEREST RATE SWAP AGREEMENT

On the closing date, the supplemental interest trust trustee, on behalf of the
supplemental interest trust, will enter into an interest rate swap agreement
with the swap counterparty, for the benefit of the supplemental interest trust.

Under the interest rate swap agreement, with respect to each distribution date
during the period beginning on the distribution date in December 2007 and
terminating immediately following the distribution date in May 2012, the
supplemental interest trust will pay to the swap counterparty a fixed payment at
a per annum rate as set forth in the table on page S-73, calculated on the basis
of a 360-day year assumed to consist of twelve 30-day months and the interest
rate swap counterparty will pay to the supplemental interest trust a floating
payment at a rate of one-month LIBOR (as determined under the interest rate swap
agreement), calculated on the basis of a 360-day year and the actual number of
days elapsed in the accrual period, in each case calculated based on the
scheduled notional amount set forth in the table on page S-73 in this prospectus
supplement for that distribution date. To the extent that the fixed payment

exceeds the floating payment payable with respect to any such distribution date, amounts otherwise available for distributions on the certificates will be applied one business day preceding that distribution date to make a net payment to the swap counterparty, and to the extent that the floating payment exceeds the fixed payment payable with respect to any of those distribution dates, the swap counterparty will make a net payment to the supplemental interest trust one business day preceding that distribution date.

Any net amounts received by or paid out from the supplemental interest trust under the interest rate swap agreement will either increase or reduce the amount available to make distributions on the certificates, as described under "Description of the Certificates--Distributions from the Supplemental Interest Trust." The interest rate swap agreement is scheduled to terminate immediately following the distribution date in May 2012.

See "Description of the Certificates--Swap Agreement" and "--Distributions from the Supplemental Interest Trust."

### DENOMINATIONS

The issuing entity will issue the offered certificates (other than the class R certificate) in minimum denominations of $25,000 in original principal amount and integral multiples of $1 in excess of $25,000. A single class R certificate will be issued in definitive form in a $100 denomination.

### BOOK-ENTRY REGISTRATION

The issuing entity will initially issue the offered certificates (other than the class R certificate) in book-entry form. You may elect to hold your interest in the certificates through The Depository Trust Company in the United States, or Clearstream Banking, societe anonyme or the Euroclear Bank, S.A./N.V. in Europe, or indirectly through participants in these systems.

You will not be entitled to receive a definitive certificate representing your interest except under limited circumstances.

See "Description of the Certificates--Book-Entry Certificates" in this prospectus supplement and "Description of the Securities" in the prospectus.

### MORTGAGE LOAN REPRESENTATIONS AND WARRANTIES

The sponsor will make certain representations and warranties to the depositor concerning the mortgage loans. Those representations and warranties will be assigned by the depositor to the trustee for the benefit of certificateholders under the pooling and servicing agreement. Such representations and warranties will include that none of the mortgage loans in the trust fund will be "high cost" loans under applicable federal, state or local anti-predatory or anti-abusive lending laws.

Following the discovery of a breach of any representation or warranty that materially and adversely affects the value of the mortgage loan, or receipt of notice of that breach, the sponsor will be required either to (1) cure that breach, (2) repurchase the affected mortgage loan from the issuing entity or (3) in certain circumstances, substitute another mortgage loan for the affected mortgage loan.

S-10

<PAGE>

In order to substitute a new mortgage loan for a mortgage loan that has been removed from the trust fund because of a breach of a representation or warranty, (a) substitution must take place within two years from the closing date and (b) a mortgage loan that is materially similar to the deleted mortgage loan must be

available for substitution.

See "The Pooling and Servicing Agreement--Assignment of Mortgage Loans".

                              FEES AND EXPENSES

Before distributions are made on the certificates, the servicer will be paid a
monthly fee calculated as 0.500% per annum on the total stated principal balance
of the mortgage loans (subject to reduction as described in this prospectus
supplement). The servicer will also be entitled to investment earnings on, and
other benefits arising from, the collection and escrow accounts and certain
other fees.

The trustee will receive investment earnings on and other benefits arising from
the certificate account.

Expenses of and other amounts due to the servicer and the trustee will be
reimbursed before payments are made on the certificates.

See "Description of the Certificates--Fees and Expenses of the Trust Fund."

                              CREDIT ENHANCEMENT

Credit enhancement is intended to reduce the harm caused to holders of the
certificates as a result of shortfalls in payments received and losses realized
on the mortgage loans. The credit enhancement for the certificates will consist
of excess interest, overcollateralization and subordination described in this
prospectus supplement.

Excess Interest and Overcollateralization. The overcollateralization amount is
the excess of the aggregate outstanding principal balance of the mortgage loans
over the aggregate principal balance of the offered certificates. On the closing
date, the overcollateralization amount will equal approximately 2.80% of the
aggregate outstanding principal balance of the mortgage loans as of the cut-off
date. Generally, because more interest is required to be paid by the mortgagors
than is necessary to pay the interest accrued on the certificates and the
expenses of the issuing entity, including any net swap payments (if any) owed to
the swap counterparty, there is expected to be excess interest each month. On
each distribution date, the issuing entity will apply some or all of the excess
interest as a principal payment on the most senior class or classes of
certificates then outstanding until the overcollateralization target is reached,
resulting in a limited acceleration of amortization of the offered certificates
relative to the amortization of the mortgage loans. Once the
overcollateralization target amount is reached, the acceleration feature will
cease. If thereafter the overcollateralization amount is reduced below the
targeted overcollateralization amount as a result of losses on the mortgage
loans, the issuing entity will again apply some or all of this excess interest
as principal payments on the most senior classes of certificates then
outstanding until the overcollateralization target is restored, again resulting
in a limited acceleration of amortization of the offered certificates relative
to the mortgage loans. This acceleration feature is intended to restore the
required level of overcollateralization. Once the required level of
overcollateralization is restored, the acceleration feature will again cease,
unless it becomes necessary again to maintain the required level of
overcollateralization. The actual level of overcollateralization may increase or
decrease over time. This could result in a temporarily faster or slower
amortization of the certificates. See "Description of the
Certificates--Overcollateralization Provisions."

Subordination. The rights of the holders of the more junior classes of
certificates to receive distributions will be subordinated to the rights of the
holders of the more senior classes of certificates to receive distributions.

In general, the protection afforded the holders of more senior classes of
certificates by means of this subordination will be effected in two ways:

- by the preferential right of the holders of the more senior classes to
  receive, prior to any distribution being made on any distribution date
  to the holders of the more junior classes of certificates, the amount
  of interest and principal due on the more senior classes of
  certificates and, if necessary, by the right of the more senior
  holders to receive future distributions on the mortgage loans that
  would otherwise have been allocated to the

                                    S-11

<PAGE>

         holders of the more junior classes of certificates; and

- by the allocation to the more junior classes of certificates (in
  inverse order of seniority and pro rata, based on relative principal
  balances, within each numerical designation with respect to the class
  M-1, class M-2, class M-3 and class M-4 certificates) of losses
  resulting from the liquidation of defaulted mortgage loans or the
  bankruptcy of mortgagors prior to the allocation of these losses to
  the more senior classes of certificates, until their respective
  certificate principal balances have been reduced to zero.

See "Description of the Certificates--Subordination of the Payment of the
Subordinate Certificates."

The chart below summarizes the relative seniority of the various classes of
certificates and indicates the initial level of credit support provided to the
various classes of certificates which assumes that the targeted
overcollateralization amount has been reached. The initial level of credit
support includes the initial overcollateralization level of approximately 2.80%.

<TABLE>
<CAPTION>

|              |                 | INITIAL  |
|              | CREDIT          | CREDIT   |
| CLASS(ES)    | SUPPORT         | SUPPORT  |
| ---------    | --------------------- | ------- |
| <S>          | <C>             | <C>      |
| A            | class M-1,      | 20.10%   |
|              | class M-2,      |          |
|              | class M-3,      |          |
|              | class M-4,      |          |
|              | class M-5,      |          |
|              | class M-6,      |          |
|              | class B-1,      |          |
|              | class B-2,      |          |
|              | class B-3       |          |
| M-1          | class M-2,      | 15.00%   |
|              | class M-3,      |          |
|              | class M-4,      |          |
|              | class M-5,      |          |
|              | class M-6,      |          |
|              | class B-1,      |          |
|              | class B-2,      |          |
|              | class B-3       |          |

</TABLE>

<TABLE>
<CAPTION>

|              |                 | INITIAL  |
|              | CREDIT          | CREDIT   |
| CLASS(ES)    | SUPPORT         | SUPPORT  |

| <S>   | <C>                      | <C>     |
|-------|--------------------------|---------|
| M-2   | class M-3,               | 10.85%  |
|       | class M-4,               |         |
|       | class M-5,               |         |
|       | class M-6,               |         |
|       | class B-1,               |         |
|       | class B-2,               |         |
|       | class B-3                |         |
| M-3   | class M-4,               | 9.70%   |
|       | class M-5,               |         |
|       | class M-6,               |         |
|       | class B-1,               |         |
|       | class B-2,               |         |
|       | class B-3                |         |
| M-4   | class M-5,               | 8.25%   |
|       | class M-6,               |         |
|       | class B-1,               |         |
|       | class B-2,               |         |
|       | class B-3                |         |
| M-5   | class M-6,               | 7.00%   |
|       | class B-1,               |         |
|       | class B-2,               |         |
|       | class B-3                |         |
| M-6   | class B-1,               | 6.10%   |
|       | class B-2,               |         |
|       | class B-3                |         |
| B-1   | class B-2,               | 5.05%   |
|       | class B-3                |         |
| B-2   | class B-3                | 4.05%   |
| B-3   | Overcollateralization    | 2.80%   |

</TABLE>


                         OPTIONAL TERMINATION

Subject to restrictions described in this prospectus supplement, before the
first distribution date after the distribution date on which the aggregate
unpaid principal balance of the mortgage loans is reduced to less than or equal
to 10% of the aggregate stated principal balance of the mortgage loans as of the
cut-off date, the trustee will be directed, pursuant to the pooling and
servicing agreement, to attempt to terminate the trust fund through a one-time
auction process mutually acceptable to the trustee and the depositor.

If the trust fund is not terminated because the trustee did not receive a
sufficient purchase price at least equal to the sum of (i) the aggregate
outstanding principal balance of the mortgage loans (or if such mortgage loan is
an REO property, the fair market value of such REO property), plus accrued
interest thereon through the due date preceding distribution of the proceeds,
(ii) any


                                  S-12

<PAGE>


unreimbursed fees and out-of-pocket costs and expenses and indemnity amounts
owed to the trustee or the servicer and all unreimbursed advances and servicing
advances, (iii) any unreimbursed costs, penalties and/or damages incurred by the
issuing entity in connection with any violation relating to any of the mortgage
loans of any predatory or abusive lending law, (iv) all reasonable fees and
expenses incurred by the Trustee in connection with such auction and (v) any
swap termination payment, other than a defaulted swap termination payment, owed
to the swap counterparty, then the NIMs insurer, if any, will have the right to
purchase the mortgage loans at such purchase price. If the NIMs insurer, if any,
fails to exercise its option to purchase all of the mortgage loans, then Home

Loan Services, Inc., as servicer, may, on any distribution date thereafter, purchase all of the mortgage loans, which similarly would result in the termination of the trust fund.

See "The Pooling and Servicing Agreement--Optional Termination" for more information.

### EXCHANGE ACT FILINGS

The issuing entity will file Distribution Reports on Form 10-D, Annual Reports on Form 10-K and (if applicable) Current Reports on Form 8-K with the Securities and Exchange Commission (the "Commission") regarding the certificates, to the extent, and for such time, as it shall be required to do so under the Securities Exchange Act of 1934, as amended. Such reports will be filed under the name "Merrill Lynch Mortgage Investors, Inc" (Commission file no. 333-140436). Members of the public may read and copy any materials filed with the Commission at the Commission's Public Reference Room at 100 F Street, N.E., Washington, D.C. 205449. Members of the public may obtain information regarding the operation of the Public Reference Room by calling the Commission at 1-800-SEC-0330. The Commission maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the Commission. The address of that internet site is http://www.sec.gov.

### LEGAL INVESTMENT

Generally, the offered certificates that are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization will constitute "mortgage related securities" under the Secondary Mortgage Market Enhancement Act of 1984, as amended. The other offered certificates will not constitute "mortgage related securities" under the Secondary Mortgage Market Enhancement Act of 1984, as amended. We make no representation as to the appropriate characterization of the offered certificates under any laws relating to investment restrictions. You should consult your own counsel as to whether you have the legal authority to invest in these securities.

See "Risk Factors--Certain of the offered certificates lack SMMEA eligibility and may lack liquidity, which may limit your ability to resell the certificates" in this prospectus supplement and "Legal Investment" in this prospectus supplement and the prospectus.

### FEDERAL INCOME TAX CONSEQUENCES

For federal income tax purposes, the trust fund, other than the corridor contract account, rights to receive payments on the corridor contracts, the interest rate swap agreement, the supplemental interest trust and the rights to receive prepayment charges, will elect to be treated as multiple real estate mortgage investment conduits ("REMICs") in a tiered structure. For federal income tax purposes, the offered certificates (other than the class R certificate) will represent ownership of regular interests in a REMIC and the right to receive, and the obligation to make, payments under certain non-REMIC contracts. To the extent that the offered certificates (other than the class R certificate) represent regular interests in a REMIC, they will generally be treated as debt instruments for federal income tax purposes. Holders of offered certificates will be required to include in income all interest and original issue discount on the portion of their offered certificates that represents a regular interest in a REMIC, in accordance with the accrual method of accounting. See "Federal Income Tax Consequences" in this prospectus supplement and "Material Federal Income Tax Consequences" in the prospectus for a discussion of the federal income tax treatment of a holder of a regular interest in a REMIC and for a discussion of the federal income tax consequences associated with the deemed rights to receive, and the obligation to make, payments under the non-REMIC contracts.

For federal income tax purposes, the class R certificate will represent the residual interest in each of the REMICs included in the trust fund and the right to

<div align="center">S-13</div>

&lt;PAGE&gt;

receive, and the obligation to make, payments under certain non-REMIC contracts. The class R certificate will not be treated as a debt instrument for federal income tax purposes. The beneficial owner of the class R certificate will be required to include the taxable income or loss of the REMICs in determining its taxable income. All or most of the taxable income of the REMICs includable by the beneficial owner of the class R certificate will be treated as "excess inclusion" income which is subject to special limitations for federal income tax purposes. As a result of this tax treatment, the after-tax return on the class R certificate may be significantly lower than would be the case if the class R certificate were taxed as a debt instrument, or may be negative.

See "Federal Income Tax Consequences--Class R Certificate."

Additionally, the class R certificate will be treated as a "noneconomic residual interest" for tax purposes and, as a result, certain transfers of the class R certificate may be disregarded for federal income tax purposes, with the transferor continuing to have tax liabilities for the transferred certificates.

See "Description of the Certificates--Restrictions on Transfer of the Class R Certificate" and "Federal Income Tax Consequences--Class R Certificate" in this prospectus supplement and "Material Federal Income Tax Consequences--Tax-Related Restrictions on Transfers of REMIC Residual Certificates" in the prospectus.

<div align="center">ERISA CONSIDERATIONS</div>

Under current law, in general, the offered certificates (other than the class R certificate) will be eligible for acquisition by retirement or other employee benefit plans subject to Title I of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended. However, prior to the termination of the interest rate swap agreement, such employee benefit plans or plans subject to Section 4975 may not acquire the offered certificates unless such acquisition and holding will not constitute or result in a non-exempt prohibited transaction under Title I of ERISA or Section 4975 of the Code. Prospective investors should consult with legal counsel regarding the consequences of the acquisition and holding of the offered certificates by such a retirement or other employee benefit plan.

See "ERISA Considerations" herein and in the prospectus.

<div align="center">RATINGS</div>

Moody's Investors Services, Inc. and Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc., will issue the ratings with respect to the offered certificates.

The offered certificates are required to receive the ratings indicated under the heading "Anticipated Ratings" in the chart shown on page S-4 of this prospectus supplement.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by any rating agency. The ratings on the certificates address the likelihood of the receipt by holders of the certificates of all distributions on the underlying mortgage loans to which they are entitled. They do not represent any assessment of the likelihood or rate of principal prepayments or the likelihood that any interest carry forward amount will be paid.

See "Ratings."

                        THE MORTGAGE LOANS

The mortgage loans will be secured by mortgages, deeds of trust and other
security instruments, all of which are referred to in this prospectus supplement
as mortgages.

The statistical information on the mortgage loans presented herein, including
the following table, is based on a statistical pool of mortgage loans having a
total stated principal balance of $1,906,195,808 as of May 1, 2007. It is
expected that the final mortgage pool delivered to the issuing entity on the
closing date will have a total stated principal balance of approximately
$1,888,495,811. As a result, the characteristics in the final mortgage pool as
of the closing date will vary from those presented in this prospectus
supplement. However, such variance shall not be material.

We will divide the mortgage loans into two separate groups referred to as group
one and group two. Group one will consist of first lien, fixed rate and
adjustable rate mortgage loans that had a principal balance at origination of no
more than $417,000 if a single-unit

                              S-14

<PAGE>

property (or $625,500 if the property is located in Hawaii or Alaska), $533,850
if a two-unit property (or $800,775 if the property is located in Hawaii or
Alaska), $645,300 if a three-unit property (or $967,950 if the property is
located in Hawaii or Alaska), or $801,950 if a four-unit property (or $1,202,925
if the property is located in Hawaii or Alaska). Group two will consist of first
lien, fixed rate and adjustable rate mortgage loans that had a principal balance
at origination that may or may not conform to the criteria specified above for
mortgage loans included in group one.

When we refer to percentages of mortgage loans in the following tables, we are
describing the percentage of the aggregate principal balance of the statistical
pool of mortgage loans as of May 1, 2007, based on the total stated principal
balance of $1,906,195,808. The sum of the percentages may not equal 100.00% due
to rounding.

For additional information on the mortgage loans, see "The Mortgage Pool" and
"Annex II--The Mortgage Loans."

                              S-15

<PAGE>

                        THE MORTGAGE POOL

                STATISTICAL MORTGAGE LOAN CHARACTERISTICS

<TABLE>
<S>                                         <C>
Number of mortgage loans                         9,311
Aggregate outstanding principal balance   $1,906,195,808
Percentage of mortgage loans with
   prepayment charges at origination            68.08%
Weighted average prepayment term at
   origination for loans with
   prepayment charges (in months)                  27
</TABLE>

```
<TABLE>
<CAPTION>
```

| | AVERAGE OR WEIGHTED AVERAGE | RANGE |
|---|---|---|
| `<S>` | `<C>` | `<C>` |
| Outstanding principal balance(1) | $204,725 | $31,130 to $1,350,000 |
| Original principal balance(1) | $204,732 | $31,150 to $1,350,000 |
| Current mortgage rates(2) | 8.526% | 5.600% to 13.750% |
| Original loan-to-value ratio(2) | 84.51% | 15.20% to 100.00% |
| Stated remaining term to maturity (in months)(2) | 359 | 177 to 360 |
| Credit score(2) | 645 | 540 to 815 |
| Maximum mortgage rates(2)(3) | 14.454% | 11.600% to 18.800% |
| Minimum mortgage rates(2)(3) | 8.454% | 5.600% to 12.800% |
| Gross margin(2)(3) | 5.659% | 2.750% to 6.750% |
| Initial rate cap(2)(3) | 2.990% | 1.000% to 3.000% |
| Periodic rate cap(2)(3) | 1.000% | 1.000% to 1.000% |
| Months to roll(2)(3) | 27 | 5 to 60 |

```
</TABLE>
```

----------

(1)  Indicates average.

(2)  Indicates weighted average.

(3)  Adjustable rate mortgage loans only.

S-16

`<PAGE>`

RISK FACTORS

NATURE OF SUB-PRIME MORTGAGE LOANS MAY INCREASE RISK OF LOSS

     Some of the mortgage loans may be of sub-prime credit quality; i.e., they
do not meet the customary credit standards of Freddie Mac and Fannie Mae.
Delinquencies and liquidation proceedings are more likely with these mortgage
loans than with mortgage loans that satisfy such credit standards. In the event
these mortgage loans do become delinquent or subject to liquidation, you may
face delays in receiving payment and may suffer losses if the credit
enhancements are insufficient to cover the delays and losses.

RECENT DEVELOPMENTS IN THE RESIDENTIAL MORTGAGE MARKET MAY ADVERSELY AFFECT THE
MARKET VALUE OF THE CERTIFICATES

     Investors should note that the residential mortgage market in the United
States has recently encountered a variety of difficulties and changed economic
conditions that may adversely affect the performance or market value of your
certificates.

     In recent months, delinquencies and losses with respect to residential
mortgage loans generally have increased and may continue to increase,
particularly in the subprime sector. In addition, in recent months residential
property values in many states have declined or remained stable, after extended
periods during which those values appreciated. A continued decline or an
extended flattening in those values may result in additional increases in
delinquencies and losses on residential mortgage loans generally, especially
with respect to second homes and investor properties, and with respect to any
residential mortgage loans where the aggregate loan amounts (including any
subordinate loans) are close to or greater than the related property values.

     Another factor that may have contributed to, and may in the future result
in, higher delinquency rates is the increase in monthly payments on adjustable

rate mortgage loans. Any increase in prevailing market interest rates may result in increased payments for borrowers who have adjustable rate mortgage loans. Moreover, with respect to hybrid mortgage loans after their initial fixed rate period, borrowers may experience a substantial increase in their monthly payment even without an increase in prevailing market interest rates. Borrowers seeking to avoid these increased monthly payments by refinancing their mortgage loans may no longer be able to find available replacement loans at comparably low interest rates. A decline in housing prices may also leave borrowers with insufficient equity in their homes to permit them to refinance, and in addition many mortgage loans have prepayment charges that inhibit refinancing. Furthermore, borrowers who intend to sell their homes on or before the expiration of the fixed rate periods on their mortgage loans may find that they cannot sell their properties for an amount equal to or greater than the unpaid principal balance of their mortgage loans. These events, alone or in combination, may contribute to higher delinquency rates. These general market conditions may affect the performance of the mortgage loans backing your certificates and, even if they do not affect performance, may adversely affect the market value of your certificates.

VALUE OF THE MORTGAGE LOANS MAY BE AFFECTED BY, AMONG OTHER THINGS, A DECLINE IN REAL ESTATE VALUES, WHICH MAY RESULT IN LOSSES ON THE OFFERED CERTIFICATES

No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans. If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any secondary financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. In some

S-17

<PAGE>

areas of the United States, real estate values have risen at a greater rate in recent years than in the past. In particular, mortgage loans with high principal balances or high loan-to-value ratios will be affected by any decline in real estate values. Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area. Any decrease in the value of the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates or notes.

THE OVERCOLLATERALIZATION PROVISIONS OF THE TRUST FUND WILL AFFECT THE YIELDS TO MATURITY OF THE CERTIFICATES

The overcollateralization provisions of the trust fund will affect the weighted average lives of the certificates and consequently the yields to maturity of the certificates. To the extent necessary to maintain the required amount of overcollateralization, net monthly excess interest will be applied as distributions of principal to the most senior class or classes of certificates then outstanding. This application of net monthly excess interest will continue until the required level of overcollateralization is reached (and will resume thereafter if the overcollateralization level is reduced below the required level due to losses on the mortgage loans) and will have the effect of reducing the weighted average lives of the certificates. The actual required amount of overcollateralization may change from distribution date to distribution date, producing uneven distributions of accelerated payments in respect of principal under these circumstances. We cannot predict whether, or to what degree, it will be necessary to apply net monthly excess interest as distributions of principal in order to maintain the required amount of overcollateralization.

Net monthly excess interest generally is the excess of interest collected or advanced on the mortgage loans over the interest required to pay interest on the offered certificates, any net swap payments or swap termination payment to the swap counterparty and the issuing entity expenses. Mortgage loans with higher interest rates will contribute more interest to the net monthly excess interest. Mortgage loans with higher interest rates may prepay faster than mortgage loans with relatively lower interest rates in response to a given change in market interest rates. Any disproportionate prepayments of mortgage loans that have higher interest rates may adversely affect the amount of net monthly excess interest.

As a result of the interaction of these factors, the effect of the overcollateralization provisions on the weighted average lives of the offered certificates may vary significantly over time. See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Yield Considerations- Prepayments-Maturity and Weighted Average Life" in the prospectus.

PREPAYMENTS ON THE MORTGAGE LOANS WILL AFFECT THE YIELDS TO MATURITY OF THE CERTIFICATES

The yields to maturity and weighted average lives of the certificates will be affected primarily by the rate and timing of principal payments (including prepayments, liquidations, repurchases and defaults) of, and losses on, the mortgage loans. Prepayment experience may be affected by many factors, including general economic conditions, interest rates and the availability of alternative financing, homeowner mobility and the solicitation of mortgagors to refinance their mortgage loans. The servicer may solicit or refer to a mortgage originator any mortgagor for refinancing or otherwise take action to encourage refinancing. Any such solicitation or action may cause the rate of prepayments on the mortgage loans to occur at a faster rate than might otherwise be the case. In addition, substantially all of the mortgage loans contain due-on-sale provisions. The servicer is required to enforce these provisions unless enforcement is not permitted by applicable law, in certain other circumstances as described in the pooling and servicing agreement, or, if the servicer, in a manner consistent with accepted servicing practices, determines that the trust fund would benefit by not enforcing these provisions.

S-18

<PAGE>

To the extent permitted by applicable law, unless permitted by acceptable servicing practices, any assumption will not release the original borrower from its obligation under the mortgage loan. See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Certain Legal Aspects of Mortgage Loans-Due-on-Sale Clauses" in the prospectus for a description of the provisions of the mortgage loans that may affect their prepayment experience.

The trustee will be directed in the pooling and servicing agreement to conduct a one-time auction of the assets remaining in the trust fund in an attempt to terminate the trust fund after the aggregate unpaid principal balance of the mortgage loans and any properties that the trust fund acquired in satisfaction of any of the mortgage loans is reduced to less than or equal to 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. If the auction fails to realize a sufficient purchase price, the NIMs Insurer, if any, may purchase all of the mortgage loans. If the auction fails to realize a sufficient purchase price and the NIMs Insurer fails to exercise its purchase option, under certain circumstances, then the servicer may, on any distribution date thereafter, purchase all of the mortgage loans. Any such purchase will cause a termination of the trust fund. A swap termination payment may be owed to the swap counterparty upon the termination of the trust fund. Any such swap termination payment, as well as any unreimbursed fees, out-of-pocket costs, expenses or advances made or owed to the trustee or the

servicer, shall be included in the calculation of the price to be paid in order to effect the auction termination of the trust fund.

The yields on the classes of offered certificates will also be sensitive to the level of one-month LIBOR and the level of the mortgage index. In addition, the yield to maturity of any offered certificates that you purchase at a discount or premium will be more sensitive to the rate and timing of payments thereon. You should consider, in the case of any offered certificates that you purchase at a discount, the risk that a slower than anticipated rate of principal payments could result in an actual yield that is lower than the anticipated yield and, in the case of any offered certificates that you purchase at a premium, the risk that a faster than anticipated rate of principal payments could result in an actual yield that is lower than the anticipated yield. Because approximately 68.08% of the mortgage loans in the statistical mortgage pool contain prepayment charges, the rate of principal prepayments during the term of such prepayment charges may be less than the rate of principal prepayments for mortgage loans that do not contain prepayment charges; however, principal prepayments of the mortgage loans could be expected to increase, perhaps materially, at or near the time of the expiration of such prepayment charges. We cannot make any representation as to the anticipated rate of prepayments on the mortgage loans, the amount and timing of losses on the mortgage loans, the level of one-month LIBOR or the related mortgage index or the resulting yield to maturity of any offered certificates. Any reinvestment risks resulting from a faster or slower incidence of prepayments on the mortgage loans will be borne entirely by the certificateholders as described in this prospectus supplement. See "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Yield Considerations - Prepayments - Maturity and Weighted Average Life" in the prospectus.

THE SERVICER MAY ENTER INTO PROGRAMS THAT COULD LEAD TO THE REFINANCING OF SOME MORTGAGE LOANS

The servicer may enter into programs with third parties that may or may not be affiliated with the servicer or the depositor, which programs may be designed to encourage refinancing. As a result of these programs, the rate of principal prepayments of the mortgage loans in the mortgage pool may be higher than would otherwise be the case.

S-19

<PAGE>

MORTGAGE LOANS ORIGINATED OR ACQUIRED UNDER THE UNDERWRITING GUIDELINES DESCRIBED IN THIS PROSPECTUS SUPPLEMENT CARRY A RISK OF HIGHER DELINQUENCIES

The underwriting guidelines used by First Franklin Financial Corporation in connection with the origination and acquisition of the mortgage loans in the trust fund consider the credit quality of a mortgagor and the value of the mortgaged property. The mortgagors generally do not qualify for loans conforming to Fannie Mae or Freddie Mac guidelines. Furthermore, the underwriting guidelines used in connection with the origination or acquisition of the mortgage loans in the trust fund do not prohibit a borrower from obtaining secondary financing on the mortgaged property. Secondary financing would reduce the borrower's equity in the related mortgaged property.

As a result of the underwriting guidelines used in connection with the origination or acquisition of the mortgage loans in the trust fund, the mortgage loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten to Fannie Mae and Freddie Mac conforming guidelines. Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the mortgage loans than on mortgage loans originated in a more traditional manner. Similarly, an overall general decline in residential real estate values could

cause a particularly severe decline in the value of the mortgaged properties
relating to mortgage loans in the trust fund. We cannot provide any assurance
that the mortgaged properties will not experience an overall decline in value.

THE INTEREST RATE ON THE CERTIFICATES MAY BE CAPPED DEPENDING ON FLUCTUATIONS IN
ONE-MONTH LIBOR AND SIX-MONTH LIBOR

     The pass-through rates on the classes of offered certificates are
calculated based upon the value of an index (one-month LIBOR) that is different
from the value of the index applicable to all of the adjustable rate mortgage
loans (six-month LIBOR) in the mortgage pool as described under "The Mortgage
Pool-General" and are subject to the related available funds caps and maximum
rate caps. In addition, the fixed rate mortgage loans have mortgage rates that
are not dependent on any index.

     The group one available funds cap effectively limits the amount of interest
accrued on the group one certificates to a per annum rate equal to the product
of (a) 12, (b) an amount obtained by dividing the amount of interest due on the
group one mortgage loans, less certain amounts, including any pro rata amounts
owed to the swap counterparty (other than any swap termination payment that is
the result of an event of default or certain termination events with respect to
the swap counterparty), by the aggregate stated principal balance of the group
one mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period. The group two available
funds cap effectively limits the amount of interest accrued on the group two
certificates to a per annum rate equal to the product of (a) 12, (b) an amount
obtained by dividing the amount of interest due on the group two mortgage loans,
less certain amounts, including any pro rata amounts owed to the swap
counterparty (other than any swap termination payment that is the result of an
event of default or certain termination events with respect to the swap
counterparty), by the aggregate stated principal balance of the group two
mortgage loans as of the first day of the related accrual period and (c) a
fraction, the numerator of which is 30 and the denominator of which is the
actual number of days in the related accrual period. The weighted average
available funds cap effectively limits the amount of interest accrued on the
class M-5, class M-6 and class B certificates to a per annum rate equal to the
weighted average of the available funds cap for the group one certificates and
the available funds cap for the group two certificates (weighted in proportion
to the results of subtracting from the aggregate principal balance of each
mortgage group the current principal

                                      S-20

<PAGE>

balance of the group one certificates, in the case of group one, or the group
two certificates, in the case of group two).

     Various factors may cause an available funds cap described above to limit
the amount of interest that would otherwise accrue on the offered certificates.
First, this can result if one-month LIBOR increases more rapidly than six-month
LIBOR. In addition, the pass-through rates on the offered certificates adjust
monthly, while the interest rates on the adjustable rate mortgage loans adjust
less frequently and the interest rates on the fixed rate mortgage loans remain
constant, with the result that the operation of the related available funds cap
described above may limit increases in the pass-through rates for extended
periods in a rising interest rate environment. The adjustable rate mortgage
loans are also subject to periodic (i.e., semi-annual) adjustment caps and
maximum rate caps, and the weighted average margin is subject to change based
upon prepayment experience, which also may result in an available funds cap
described above limiting increases in the pass-through rates for the offered
certificates. Finally, the adjustable rate mortgage loans accrue interest on the
basis of a 360-day year assumed to consist of twelve 30-day months, while

calculations of interest on the offered certificates will be made on the basis of the actual number of days elapsed and a year of 360 days. This may result in an available funds cap limiting the pass-through rates for the related offered certificates in some periods. Consequently, the interest that becomes due on the adjustable rate mortgage loans (net of the servicing fee and the net swap payments (if any) owed to the swap counterparty and the swap termination payment (if any) owed to the swap counterparty (other than defaulted swap termination payments)) with respect to any distribution date may not equal the amount of interest that would accrue at one-month LIBOR plus the applicable margin on the classes of offered certificates during the related period. Furthermore, if the related available funds cap described above determines the pass-through rate for a class of offered certificates for a distribution date, the market value of those certificates may be temporarily or permanently reduced.

In addition, the pass-through rate on each class of offered certificates is subject to the related maximum rate cap, which limits the pass-through rate on each class of certificates based on the related net maximum lifetime mortgage rates on the adjustable rate mortgage loans and the net mortgage rates on the fixed rate mortgage loans. These maximum rate caps may limit increases in the pass-through rates on the offered certificates. This may occur even if there is sufficient interest collected on the mortgage loans in the trust fund, net of trust fund expenses, to pay interest on the offered certificates without giving effect to the related maximum rate cap.

THE PROTECTION AFFORDED TO YOUR CERTIFICATES BY SUBORDINATION IS LIMITED

The rights of each class of the class M-1 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A certificates to receive those distributions; the rights of each class of the class M-2 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A and class M-1 certificates to receive those distributions; the rights of each class of the class M-3 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1 and class M-2 certificates to receive those distributions; the rights of each class of the class M-4 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2 and class M-3 certificates to receive those distributions; the rights of the class M-5 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2, class M-3 and class M-4 certificates to receive those distributions; the rights of the class M-6 certificates to receive distributions with respect to the mortgage loans will be subordinate to the rights of the class A, class M-1, class M-2, class M-3, class M-4 and class M-5 certificates to receive those distributions; the rights of the class B-1 certificates to receive distributions with respect to mortgage loans will be subordinate to the rights of the class A and class M certificates to receive those distributions; the rights of the class B-2 certificates to receive distributions with respect to mortgage loans will be

S-21

<PAGE>

subordinate to the rights of the class A, class M and class B-1 certificates to receive those distributions; and the rights of the class B-3 certificates to receive distributions with respect to mortgage loans will be subordinate to the rights of the class A, class M, class B-1 and class B-2 certificates to receive those distributions. This subordination is intended to enhance the likelihood of regular receipt by higher-ranking classes of certificates of the full amount of the monthly distributions allocable to them and to afford protection against losses.

ALLOCATION OF LOSSES TO THE CLASS M AND CLASS B CERTIFICATES MAKES THE YIELD TO MATURITY ON THOSE CLASSES OF CERTIFICATES SENSITIVE TO DEFAULTS ON THE MORTGAGE

If realized losses are incurred with respect to the mortgage loans to the extent that the aggregate certificate principal balance of the offered certificates exceeds, after distributions on such distribution date, the aggregate stated principal balance of the mortgage loans, the certificate principal balances of the class M and class B certificates will be reduced in reverse order of seniority (first to the class B-3 certificates, second to the class B-2 certificates, third to the class B-1 certificates, fourth to the class M-6 certificates, fifth to the class M-5 certificates, sixth, pro rata, to each class of the class M-4 certificates, seventh, pro rata, to each class of the class M-3 certificates, eighth, pro rata, to each class of the class M-2 certificates, and ninth, pro rata, to each class of the class M-1 certificates) by the amount of the excess until the balance of each such class has been reduced to zero. Consequently, the yields to maturity on each class of the class M and class B certificates will be sensitive, in varying degrees, to defaults on the mortgage loans and the timing of these defaults. Investors should fully consider the risks associated with an investment in the class M and class B certificates, including the possibility that investors may not fully recover their initial investments as a result of realized losses.

DELAYS AND EXPENSES CONNECTED WITH THE LIQUIDATION OF MORTGAGED PROPERTIES MAY RESULT IN LOSSES TO YOU

Even assuming that the mortgaged properties provide adequate security for the mortgage loans, there could be substantial delays in connection with the liquidation of mortgage loans that are delinquent and resulting shortfalls in distributions to you could occur. Further, liquidation expenses, such as legal fees, real estate taxes and maintenance and preservation expenses, will reduce the security for the mortgage loans and thereby reduce the proceeds payable to you. If any of the mortgaged properties fail to provide adequate security for the related mortgage loans, you could experience a loss, particularly if you are a holder of one of the most subordinate classes.

RATINGS ON THE CERTIFICATES DO NOT ADDRESS ALL OF THE FACTORS YOU SHOULD CONSIDER WHEN PURCHASING CERTIFICATES

The rating of each class of offered certificates will depend primarily on an assessment by the rating agencies of the mortgage loans as well as the structure of the transaction. The rating by the rating agencies of any class of offered certificates is not a recommendation to purchase, hold or sell any rated certificates, inasmuch as the rating does not comment as to the market price or suitability for a particular investor. There is no assurance that the ratings will remain in place for any given period of time or that the ratings will not be qualified, lowered or withdrawn by the rating agencies. In general, the ratings address credit risk and do not address the likelihood of prepayments or the likelihood that any floating rate certificate carryover amounts will be paid. See "Ratings."

S-22

<PAGE>

COLLECTIONS ON THE MORTGAGE LOANS MAY BE DELAYED OR REDUCED IF THE SPONSOR OR THE SERVICER BECOMES INSOLVENT

The sale of the mortgage loans from First Franklin Financial Corporation to Merrill Lynch Mortgage Investors, Inc. will be treated as a sale of the mortgage loans. However, in the event of an insolvency of First Franklin Financial Corporation, the conservator, receiver or trustee in bankruptcy of such entity may attempt to recharacterize the mortgage loan sale as a borrowing by the applicable entity, secured by a pledge of the applicable mortgage loans. If this transfer was to be challenged, delays in payments of the certificates and reductions in the amounts of these payments could occur.

In the event of a bankruptcy or insolvency of Home Loan Services, Inc., as servicer, the bankruptcy trustee or receiver may have the power to prevent LaSalle Bank National Association, as trustee, or the certificateholders from appointing a successor servicer. Regardless of whether a successor servicer is appointed, any termination of Home Loan Services, Inc., as servicer (whether due to bankruptcy or insolvency or otherwise), could adversely affect the servicing of the mortgage loans, including the delinquency experience of the mortgage loans.

THE OFFERED CERTIFICATES MAY BE INAPPROPRIATE FOR INDIVIDUAL INVESTORS

The offered certificates may not be an appropriate investment for you if you do not have sufficient resources or expertise to evaluate the particular characteristics of the applicable class of certificates. This may be the case because, among other things:

- The yields to maturity of the offered certificates purchased at a price other than par will be sensitive to the uncertain rate and timing of principal prepayments on the mortgage loans;

- The rates of principal distributions on, and the weighted average lives of, the offered certificates will be sensitive to the uncertain rate and timing of principal prepayments on the mortgage loans and the priority of principal distributions among the classes of certificates, and for that reason, the offered certificates may be inappropriate investments for you if you require a distribution of a particular amount of principal on a specific date or an otherwise predictable stream of distributions;

- You may not be able to reinvest amounts distributed in respect of principal on an offered certificate (which, in general, are expected to be greater during periods of relatively low interest rates) at a rate at least as high as the pass-through rates on the certificates; or

- It is possible that a secondary market for the offered certificates will not develop or that your investment may not be liquid. Lack of liquidity could result in a substantial decrease in the market value of your certificates.

You should also carefully consider the further risks and other special considerations discussed above and under the heading "Yield, Prepayment and Maturity Considerations" in this prospectus supplement, and in the prospectus under the heading "Risk Factors."

ADDITIONAL SUBORDINATE LIENS ON THE MORTGAGE LOANS MAY INCREASE RISK OF LOSS

Certain of the mortgage loans may have been originated simultaneously with a second lien mortgage loan. These second lien mortgage loans are not to be included in the trust fund. With respect to

S-23

<PAGE>

mortgage loans that have junior lien mortgage loans encumbering the same mortgaged property, foreclosure frequency may be increased relative to mortgage loans that do not have subordinate financing behind them because mortgagors have less equity in the mortgaged property. Further, a servicer may declare a default on the junior lien mortgage loan even though the first lien mortgage loan is current, which would constitute a default on the first lien mortgage loan. In addition to the mortgage loans discussed above that have simultaneous

subordinate financing provided by the originator, with respect to certain other mortgage loans, at the time of origination of the first lien mortgage loan, the related mortgaged property was also encumbered by a second lien mortgage loan to a mortgagee other than the related originator. Investors should also note that any mortgagor may obtain subordinate financing at any time subsequent to the date of origination of their mortgage loans from the originator or from any other lender.

CREDIT SCORES ARE NOT AN INDICATOR OF FUTURE PERFORMANCE OF BORROWERS

    Investors should be aware that credit scores are based on past payment history of the borrower. Investors are encouraged not to rely on credit scores as an indicator of future borrower performance. The credit score used for the purpose of this prospectus supplement is the FICO score. The FICO score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit repositories-Equifax, Trans Union and First American (formerly Experian, which was formerly TRW). The FICO scores available from the three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from the 300's to the 900's. Although FICO scores are based solely on the information at the particular credit repository, FICO scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used. FICO scores are used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, and is not a substitute for the underwriter's judgment.

THE GEOGRAPHIC CONCENTRATION OF MORTGAGE LOANS MEANS YOUR INVESTMENT MAY BE ESPECIALLY SENSITIVE TO ECONOMIC CONDITIONS IN PARTICULAR STATES

    As of the cut-off date, approximately 17.47%, 10.32%, 7.20%, 6.72% and 5.34% of the mortgaged properties relating to the mortgage loans in the statistical mortgage pool were located in California, Florida, New York, Illinois and Washington, respectively. An overall decline in the residential real estate market in these states could adversely affect the values of the mortgaged properties securing the related mortgage loans. As the residential real estate market is influenced by many factors, including the general condition of the economy and interest rates, we cannot assure you that the residential real estate markets in these states will not weaken. If the residential real estate markets in these states should experience an overall decline in property values, the rates of losses on the related mortgage loans would be expected to increase, and could increase substantially. Natural disasters affect regions of the United States from time to time, and may result in increased losses on mortgage loans in those regions, or in insurance payments that will constitute prepayments of principal of those mortgage loans. Properties in these states, particularly California and Florida, may be more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as earthquakes and hurricanes, as well as floods, wildfires, mudslides and other natural disasters.

CONFLICT OF INTEREST BETWEEN THE CLASS C CERTIFICATEHOLDER AND THE ISSUING ENTITY

    An affiliate of the servicer will initially, directly or indirectly, own all or a portion of the class C certificates, and any holder of such certificates may enter into an advisory agreement in which the holder may advise the servicer on actions to take regarding specific mortgage loans. The timing of mortgage loan foreclosures and sales of the related mortgaged properties may affect the weighted average lives and

S-24

<PAGE>

yields of the offered certificates. Therefore, there may be a conflict of

interest between the class C certificateholder and the holders of the other classes of certificates.

MORTGAGE LOANS WITH INTEREST-ONLY PAYMENTS MAY EXPERIENCE HIGHER DEFAULT RATES

Approximately 6.40% of the aggregate principal balance of the mortgage loans in the statistical mortgage pool as of the cut-off date provide for payment of interest at the related mortgage rate, but no payment of principal, for a period of five to ten years following the origination of the mortgage loan. Following the applicable period, the monthly payment with respect to each of these mortgage loans will be increased to an amount sufficient to amortize the principal balance of the mortgage loan over the remaining term and to pay interest at the related mortgage rate.

The presence of these mortgage loans will, absent other considerations, result in longer weighted average lives of the offered certificates than would have been the case had these mortgage loans not been included in the trust fund. If you purchase a certificate at a discount, you should consider that the extension of weighted average lives could result in a lower yield than would be the case if these mortgage loans provided for payment of principal and interest on every payment date. In addition, a borrower may view the absence of any obligation to make a payment of principal during the first five to ten years of the term of a mortgage loan as a disincentive to prepayment.

If a recalculated monthly payment as described above is substantially higher than a borrower's previous interest-only monthly payment, then that mortgage loan may be subject to an increased risk of delinquency and loss.

MORTGAGE LOANS WITH BALLOON PAYMENTS MAY EXPERIENCE HIGHER DEFAULT RATES

Approximately 59.76% of the mortgage loans in the statistical mortgage pool as of the cut-off date are "balloon loans" that provide for the payment of the unamortized principal balance of the mortgage loan in a single payment at maturity. The balloon loans provide for equal monthly payments, consisting of principal and interest, generally based on a 30, 40 or 50 year amortization schedule and a single payment of the remaining balance of the balloon loan due approximately 15 or 30 years after origination. Amortization of a balloon loan based on a scheduled period that is longer than the term of the mortgage loan results in a remaining principal balance at maturity that is substantially larger than the regular scheduled payments. We do not have any information regarding the default history or prepayment history of payments on balloon loans. Because borrowers of balloon loans are required to make substantial single payments upon maturity, it is possible that the default risk associated with the balloon loans is greater than that associated with fully-amortizing loans.

THE MORTGAGE POOL MAY CONTAIN DELINQUENT MORTGAGE LOANS, WHICH MAY DECREASE THE AMOUNT OF PRINCIPAL DISTRIBUTED TO YOU

The trust fund may include mortgage loans that are delinquent as of the cut-off date. As of the cut-off date, however, none of the mortgage loans will be greater than 31 days delinquent. If there are not sufficient funds from amounts collected on the mortgage loans, the aggregate amount of principal returned to any class of offered certificateholders may be less than the certificate principal balance of a class on the day that class was issued. Delinquency information presented in this prospectus supplement as of the cut-off date is determined and prepared as of the close of business on the last business day immediately prior to the cut-off date.

S-25

<PAGE>

CERTAIN OF THE CERTIFICATES LACK SMMEA ELIGIBILITY AND MAY LACK LIQUIDITY, WHICH

MAY LIMIT YOUR ABILITY TO RESELL THE CERTIFICATES

The underwriter intends to make a secondary market in the offered certificates, but will have no obligation to do so. We cannot assure you that a secondary market for any class of offered certificates will develop, or if one does develop, that it will continue or provide sufficient liquidity of investment or that it will remain for the term of the related class of offered certificates. Generally, the class R, class M-4-1, class M-4-2, class M-5, class M-6 and class B certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended. Accordingly, many institutions with legal authority to invest in SMMEA securities will not be able to invest in the class R, class M-4-1, class M-4-2, class M-5, class M-6 and class B certificates, thereby limiting the market for such certificates. In light of those risks, you should consult your own counsel as to whether you have the legal authority to invest in non-SMMEA securities such as the offered certificates. See "Legal Investment" in this prospectus supplement and in the prospectus.

PAYMENTS DUE UNDER THE TERMS OF THE CORRIDOR CONTRACTS MAY BE DELAYED, REDUCED OR ELIMINATED IF THE CAP CONTRACT COUNTERPARTY, THE BANK OF NEW YORK, BECOMES INSOLVENT

The trust fund will include three interest rate corridor contracts, each corridor contract to be for the benefit of certain classes of the offered certificates, under which the cap contract counterparty, The Bank of New York, is obligated on any distribution date prior to the termination of the applicable corridor contract to make certain payments to the issuing entity in the event that one-month LIBOR (as determined under the related corridor contract) exceeds the related lower collar shown in the tables beginning on page S-70 with respect to that distribution date. Each of the corridor contracts will terminate immediately following the distribution date in November 2007. However, in the event of the insolvency or bankruptcy of the cap contract counterparty, payments due under the corridor contracts may be delayed, reduced or eliminated. Moreover, any of the corridor contracts may be subject to early termination if either party thereto fails to perform or the corridor contract becomes illegal or subject to certain kinds of taxation. In the event of early termination of a corridor contract, there will not be a replacement corridor contract.

PAYMENTS DUE UNDER THE TERMS OF THE INTEREST RATE SWAP AGREEMENT MAY BE DELAYED, REDUCED OR ELIMINATED IF THE INTEREST RATE SWAP COUNTERPARTY, THE BANK OF NEW YORK, BECOMES INSOLVENT

The supplemental interest trust, for the benefit of the trust fund, will include an interest rate swap agreement for the benefit of the certificates under which the interest rate swap counterparty, The Bank of New York, is obligated in respect of any distribution date on or after the distribution date in December 2007 and on or prior to the distribution date in May 2012 to make certain net payments to the supplemental interest trust in the event that one-month LIBOR (as determined under the interest rate swap agreement) exceeds a per annum rate with respect to that distribution date as set forth in the table on page S-73. Payments on the interest rate swap agreement will begin in connection with the distribution date in December 2007 and terminate immediately following the distribution date in May 2012. However, in the event of the insolvency or bankruptcy of The Bank of New York, payments due under the interest rate swap agreement may be delayed, reduced or eliminated. Moreover, the interest rate swap agreement may be subject to early termination if either party thereto fails to perform or the interest rate swap agreement becomes illegal or subject to certain kinds of taxation. In the event of early termination of the interest rate swap agreement, there may not be a replacement interest rate swap agreement and the supplemental interest trust may be obligated to make a one-time termination payment to the interest rate swap counterparty. In certain circumstances, where the early termination is not the result of an event of default by the interest rate swap counterparty or other certain termination events, payments to certificateholders will be subordinate to the one-time termination payment to the interest rate swap counterparty.

S-26

<PAGE>

RAPID PREPAYMENTS OF THE MORTGAGE LOANS COULD INCREASE RELATIVE AMOUNTS DUE
UNDER THE INTEREST RATE SWAP AGREEMENT AND AFFECT THE YIELD TO MATURITY OF THE
CERTIFICATES

     Any net payment payable to the interest rate swap counterparty under the
terms of the interest rate swap agreement will reduce amounts available for
distribution to certificateholders and may reduce the pass-through rates on the
certificates. If the rate of prepayments on the mortgage loans is faster than
anticipated, the amount on which payments due under the interest rate swap
agreement are calculated (namely, the scheduled notional amount) may exceed the
aggregate scheduled principal balance of the mortgage loans in the pool, thereby
increasing the relative proportion of interest collections on the mortgage loans
that must be applied to make net payments to the interest rate swap
counterparty. The combination of a rapid rate of prepayment and low prevailing
interest rates could adversely affect the yields on the offered certificates.

     In addition, certain swap termination payments arising under the interest
rate swap agreement are payable to the interest rate swap counterparty on a
senior basis and such payments may reduce amounts available for distribution to
certificateholders.

     Any amounts received under the interest rate swap agreement will be applied
as described in this prospectus supplement to pay current interest and interest
carry forward, basis risk shortfalls and unpaid basis risk shortfalls, to
maintain overcollateralization and to pay back realized losses. However, no
amounts will be payable to the supplemental interest trust by the interest rate
swap counterparty unless the floating payment owed by the interest rate swap
counterparty for a distribution date exceeds the fixed payment owed to the
interest rate swap counterparty for that distribution date. This will not occur
except in a period where one-month LIBOR (as determined under the interest rate
swap agreement) exceeds a per annum rate as set forth in the table on page S-73.
We cannot assure you that any amounts will be received under the interest rate
swap agreement, or that any such amounts that are received will be sufficient to
cover interest shortfalls or losses on the mortgage loans, or to maintain the
required level of overcollateralization. See "Description of the
Certificates--Distributions."

FAILURE OF THE SWAP COUNTERPARTY TO PROVIDE INFORMATION REQUIRED OF PROVIDERS OF
DERIVATIVE INSTRUMENTS PURSUANT TO REGULATION AB AND SUBSEQUENT FAILURE TO
REPLACE ITSELF WITH A SWAP COUNTERPARTY THAT CAN PROVIDE SUCH REQUIRED
INFORMATION MAY RESULT IN A SWAP TERMINATION EVENT

     The swap agreement imposes a contractual obligation on the swap
counterparty to provide all information that may be required pursuant to
Regulation AB for providers of derivative instruments. To the extent that the
swap counterparty cannot provide the required information in accordance with the
swap agreement, the swap counterparty is required to replace itself with a swap
provider, or obtain a guarantor, that can provide the necessary information. If
the swap counterparty cannot secure a replacement provider or guarantor, the
failure to comply with the swap agreement will result in an "additional
termination event" under the swap agreement in respect of which the swap
provider will be the sole affected party. In certain circumstances, a swap
termination payment may be owed to the swap counterparty in connection with the
additional termination event described above or in connection with any other
additional termination event or event of default provided for under the swap
agreement. Such swap termination payments will reduce the amounts available to
make payments on the certificates.

FIRST FRANKLIN FINANCIAL CORPORATION MAY NOT BE ABLE TO REPURCHASE DEFECTIVE

MORTGAGE LOANS

First Franklin Financial Corporation has made various representations and warranties relating to the mortgage loans to Merrill Lynch Mortgage Investors, Inc. These representations are summarized in "Description of the Agreements--Representations and Warranties; Repurchases" in the prospectus.

S-27

<PAGE>

If First Franklin Financial Corporation fails to cure in a timely manner a material breach of its representations and warranties with respect to any mortgage loan sold by it, then First Franklin Financial Corporation would be required to repurchase or substitute for the defective mortgage loan. It is possible that First Franklin Financial Corporation may not be capable of repurchasing or substituting for any defective mortgage loans, for financial or other reasons. The inability of First Franklin Financial Corporation to repurchase or substitute for defective mortgage loans would likely cause the mortgage loans to experience higher rates of delinquencies, defaults and losses. As a result, shortfalls in the distributions due on the certificates could occur.

VIOLATIONS OF FEDERAL, STATE AND LOCAL LAWS

Federal, state and local laws regulate the underwriting, origination, servicing and collection of the mortgage loans. These laws have changed over time and have become more restrictive or stringent with respect to specific activities of the servicer and the originator. Actual or alleged violations of these federal, state and local laws may, among other things:

- limit the ability of the servicer to collect principal, interest and servicing advances on the mortgage loans,

- provide the borrowers with a right to rescind the mortgage loans,

- entitle the borrowers to refunds of amounts previously paid or to set-off those amounts against their loan obligations,

- result in a litigation proceeding (including class action litigation) being brought against the issuing entity, and

- subject the issuing entity to actual or alleged liability for expenses, penalties and damages resulting from the violations.

As a result, these violations or alleged violations could result in shortfalls in the distributions due on your certificates. See "Certain Legal Aspects of Mortgage Loans --Foreclosure" in the prospectus. In addition to the limitations on foreclosure described in the prospectus, legislative or regulatory initiatives by federal, state or local legislative bodies or administrative agencies, if enacted or adopted, could delay foreclosure, provide new defenses to foreclosure or otherwise impair the ability of a servicer to foreclose on a defaulted mortgage loan. Various jurisdictions have considered or are currently considering such actions and we cannot predict the nature or extent of limitations on foreclosure that may be enacted. Any such governmental actions that interfere with the foreclosure process could affect yields on the offered certificates, particularly the subordinate certificates.

TERRORIST ATTACKS AND MILITARY ACTION

The Servicemembers Civil Relief Act and comparable state legislation provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active duty after the origination of their mortgage loans. Certain state laws provide relief similar to that of the

Servicemembers Civil Relief Act and may permit the mortgagor to delay or forgo certain interest and principal payments. The response of the United States to the terrorist attacks on September 11, 2001 and to the current situation in Iraq and Afghanistan has involved military operations that have placed a substantial number of citizens on active duty status, including persons in reserve status or in the National Guard who have been called or will be called to active duty. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. The

S-28

<PAGE>

Servicemembers Civil Relief Act provides generally that a mortgagor who is covered by the Servicemembers Civil Relief Act may not be charged interest on a mortgage loan in excess of 6% per annum during the period of the mortgagor's active duty. These shortfalls are not required to be paid by the mortgagor at any future time. The servicer will not advance these shortfalls as delinquent payments and such shortfalls are not covered by any form of credit enhancement on the certificates. Shortfalls on the mortgage loans due to the application of the Servicemembers Civil Relief Act or similar state legislation or regulations will reduce the amount of collections available for distribution on the certificates.

The Servicemembers Civil Relief Act and comparable state legislation also limit the ability of the servicer to foreclose on a mortgage loan during the mortgagor's period of active duty and, in some cases, during an additional three-month period thereafter. As a result, there may be delays in payment and increased losses on the mortgage loans. Those delays and increased losses will be borne primarily by the outstanding class of certificates with the lowest payment priority.

We do not know how many mortgage loans have been or may be affected by the application of the Servicemembers Civil Relief Act or any similar state legislation. See "Certain Legal Aspects of Mortgage Loans-Servicemembers Civil Relief Act" in the prospectus.

HIGH COST LOANS

None of the mortgage loans are covered by the Home Ownership and Equity Protection Act of 1994. In addition to the Home Ownership and Equity Protection Act of 1994, however, a number of legislative proposals have been introduced at both the federal and state levels that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such mortgage loans. In some cases, state law may impose requirements and restrictions greater than those in the Home Ownership and Equity Protection Act of 1994. The failure to comply with these laws could subject the issuing entity and other assignees of the mortgage loans to monetary penalties and could result in the borrowers rescinding such mortgage loans against either the issuing entity or subsequent holders of the mortgage loans. Lawsuits have been brought in various states making claims against assignees of high cost loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts. None of the mortgage loans are "high cost loans" under any state or local laws.

LIMITED OBLIGATIONS

The assets of the trust fund are the sole source of payments on the certificates. The certificates are not the obligations of any other entity. None of the sponsor, the depositor, the underwriter, the trustee, the servicer or any

of their affiliates will have any obligation to replace or supplement the credit
enhancement, or take any other action to maintain the ratings of the
certificates. If credit enhancement is not available, holders of certificates
may suffer losses on their investments.

GOVERNMENTAL PROGRAMS REQUIRING LENDERS TO SUBORDINATE THEIR LIENS

     Certain governmental programs may provide the borrowers with benefits in
the event their homes are subject to disasters. The governmental programs may
require the borrower to file covenants against the property and lenders to
subordinate their liens to these covenants as a condition for the borrower
receiving the benefits. If this were to occur, the servicer may subordinate the
lien of the mortgage to these covenants which may adversely affect the value of
the Mortgage.


                                    S-29

<PAGE>


RIGHTS OF THE NIMS INSURER, IF ANY, MAY NEGATIVELY IMPACT THE OFFERED
CERTIFICATES

     Net interest margin securities may be issued by a separate trust and
secured by all or a portion of the class C and class P certificates issued by
the issuing entity on the closing date. The NIMs Insurer, if any, of such net
interest margin securities will be a third party beneficiary of the pooling and
servicing agreement.

     Pursuant to the terms of the pooling and servicing agreement, unless there
exists a continuance of any failure by the NIMs Insurer to make a required
payment under the policy insuring the net interest margin securities (such
event, a "NIMs Insurer Default"), the NIMs Insurer will be entitled to exercise
extensive rights under the pooling and servicing agreement. Unless there exists
a NIMs Insurer Default, wherever in the pooling and servicing agreement there
shall be a requirement that any person or any communication, object or other
matter be acceptable or satisfactory to or otherwise receive the consent or
other approval of any other person (whether as a condition to the eligibility of
such person to act in any capacity, as a condition to any circumstance or state
of affairs related to such matter, or otherwise), there also shall be deemed to
be a requirement that such person or matter be approved in writing by the NIMs
Insurer. For example, unless a NIMs Insurer Default exists, the NIMs Insurer's
consent will be required prior to any amendment to the pooling and servicing
agreement. Without limiting the foregoing, the NIMs Insurer also has the right
to provide notices of a servicer default, the right to direct the trustee to
terminate the rights and obligations of the servicer in the event of a default
by the servicer, the right to remove the trustee or any co-trustee and the right
to consent to the removal or replacement of the servicer or the trustee.

     Investors in the offered certificates should note that:

          -    the insurance policy issued by the NIMs Insurer, if any, will not
               cover, and will not benefit in any manner whatsoever, the offered
               certificates;

          -    the rights granted to the NIMs Insurer, if any, are extensive;

          -    the interests of the NIMs Insurer, if any, may be inconsistent
               with, and adverse to, the interests of the holders of the offered
               certificates, and the NIMs Insurer, if any, has no obligation or
               duty to consider the interests of the offered certificates in
               connection with the exercise or non-exercise of such NIMs
               Insurer's rights; and

          -    such NIMs Insurer's exercise of the rights and consents set forth

above may negatively affect the offered certificates, and the
existence of such NIMs Insurer's rights, whether or not
exercised, may adversely affect the liquidity of the offered
certificates, relative to other asset-backed certificates backed
by comparable mortgage loans and with comparable payment
priorities and ratings.

COMBINATION OR "LAYERING" OF MULTIPLE RISK FACTORS MAY SIGNIFICANTLY INCREASE
YOUR RISK OF LOSS

     Although the various risks discussed in this prospectus supplement and the
accompanying prospectus are generally described separately, prospective
investors in the offered certificates should consider the potential effects on
those certificates of the interplay of multiple risk factors. Where more than
one significant risk factor is present, the risk of loss to an investor may be
significantly increased. For example, a particular mortgage loan pool may
include loans that not only have relatively high loan-to-value ratios but also
were originated concurrently with second lien loans not included in the trust
fund. Many of these mortgage loans may also have been originated in regions that
are experiencing home price depreciation. An investor in subordinated securities
may be particularly exposed to such a potential combination of risks. There are
many other circumstances in which layering of multiple risks with respect

                                     S-30

<PAGE>

to an asset pool and the related certificates may magnify the effect of those
risks. In considering the potential effects of layered risks, prospective
investors should carefully review the descriptions of the mortgage loans and the
offered certificates.

                            FORWARD-LOOKING STATEMENTS

     In this prospectus supplement and the attached prospectus, we use
forward-looking statements. These forward-looking statements are found in the
material, including each of the tables, set forth under "Risk Factors" and
"Yield, Prepayment and Maturity Considerations." Forward-looking statements are
also found elsewhere in this prospectus supplement and the prospectus and
include words like "expects," "intends," "anticipates," "estimates" and other
similar words. These statements are inherently subject to a variety of risks and
uncertainties. Actual results may differ materially from those we anticipate due
to changes in, among other things:

     -    economic conditions and industry competition;

     -    political, social and economic conditions;

     -    the law and government regulatory initiatives; and

     -    interest rate fluctuations.

     We will not update or revise any forward-looking statements to reflect
changes in our expectations or changes in the conditions or circumstances on
which these statements were originally based.

                                    GLOSSARY

     A glossary of defined terms used in this prospectus supplement begins on
page S-126.

                              THE MORTGAGE POOL

GENERAL

The statistical information on the Mortgage Loans presented herein is based on a statistical mortgage pool consisting of 9,311 conventional Statistical Mortgage Loans evidenced by promissory notes having an aggregate principal balance of approximately $1,906,195,808 as of the Cut-off Date. It is expected that the final mortgage pool to be delivered to the Issuing Entity on the Closing Date will have a total Stated Principal Balance of approximately $1,888,495,811. As a result, the characteristics in the final mortgage pool as of the Closing Date will vary from those presented in this prospectus supplement. However, such variance shall not be material.

The mortgage pool consists of first lien, fixed rate and adjustable rate Mortgage Loans. The mortgage pool will be divided into two groups, referred to as Group One and Group Two.

Group One, representing approximately 36.59% of the statistical mortgage pool, will consist of first lien, fixed rate and adjustable rate Mortgage Loans that had a principal balance at origination of no more than $417,000 if a single-unit property (or $625,500 if the property is located in Hawaii or Alaska), $533,850 if a two-unit property (or $800,775 if the property is located in Hawaii or Alaska), $645,300 if a three-unit property (or $967,950 if the property is located in Hawaii or Alaska), or $801,950 if a four-unit property (or $1,202,925 if the property is located in Hawaii or Alaska). Group Two, representing

S-31

<PAGE>

approximately 63.41% of the statistical mortgage pool, will consist of first lien, fixed rate and adjustable rate Mortgage Loans that had a principal balance at origination that may or may not conform to the criteria specified above for mortgage loans included in Group One.

The Group One Certificates will generally represent interests in the Group One Mortgage Loans. On each Distribution Date, principal and interest received with respect to the Group One Mortgage Loans generally will be applied to pay principal and interest with respect to the Group One Certificates. The Group Two Certificates will generally represent interests in the Group Two Mortgage Loans. On each Distribution Date, principal and interest received with respect to the Group Two Mortgage Loans generally will be applied to pay principal and interest with respect to the Group Two Certificates. The Class M-5, Class M-6 and Class B Certificates will generally represent interests in both the Group One and Group Two Mortgage Loans. On each Distribution Date, principal and interest received with respect to both the Group One and Group Two Mortgage Loans will be applied to pay principal and interest with respect to the Class M-5, Class M-6 and Class B Certificates.

References herein to percentages of Mortgage Loans refer in each case to the percentage of the aggregate principal balance of all of the Statistical Mortgage Loans in the statistical mortgage pool as of the Cut-off Date, based on the aggregate outstanding principal balance of $1,906,195,808, after giving effect to Scheduled Payments due on or prior to the Cut-off Date, whether or not received. References to percentages of mortgaged properties refer, in each case, to the percentages of aggregate principal balances of the related Statistical Mortgage Loans (determined as described in the preceding sentence). The actual final mortgage pool to be delivered to the Issuing Entity on the Closing Date will have a total Stated Principal Balance as of the Cut-off Date of approximately $1,888,495,811.

The mortgage notes are secured by mortgages or deeds of trust or other similar security instruments creating first liens on real properties including single-family residences, two- to four-unit dwelling units, condominiums and planned unit developments. The Issuing Entity includes, in addition to the

mortgage pool, the following:

- certain amounts held from time to time in Accounts maintained in the name of the Trustee under the Pooling and Servicing Agreement;

- any property which initially secured a Mortgage Loan and which is acquired by foreclosure or deed-in-lieu of foreclosure;

- all insurance policies described below, along with the proceeds of those policies;

- rights to require repurchase of the Mortgage Loans by the Sponsor for breach of representation or warranty;

- the Corridor Contracts, which will be held in the Issuing Entity; and

- the Swap Agreement, which will be held in the Supplemental Interest Trust.

The Mortgage Loans to be included in the Trust Fund have been purchased originated substantially in accordance with the underwriting criteria for sub-prime mortgage loans described herein under "Underwriting Guidelines." Sub-prime mortgage loans are generally mortgage loans made to borrowers who do not qualify for financing under conventional underwriting criteria due to prior credit difficulties, the inability to satisfy conventional documentation standards and/or conventional debt-to-income ratios.

S-32

<PAGE>

All of the Mortgage Loans were originated or acquired by First Franklin Financial. The Mortgage Loans were subsequently purchased by the Sponsor from First Franklin Financial in a bulk acquisition. All of the Mortgage Loans will be transferred and assigned to the Depositor on the Closing Date. All of the Mortgage Loans were originated in 2007. All of the Mortgage Loans are currently serviced by HLS.

Scheduled Payments either earlier or later than the scheduled Due Dates on the Mortgage Loans will not affect the amortization schedule or the relative application of these payments to principal and interest. Any Mortgage Loan may be prepaid in full or in part at any time; however, approximately 68.08% of the Statistical Mortgage Loans provided at origination for the payment by the borrower of a prepayment charge in limited circumstances on full or partial Principal Prepayments made during the prepayment charge term. The weighted average prepayment charge term at origination is approximately 27 months with respect to the Statistical Mortgage Loans that have prepayment charges. In general, the related mortgage note will provide that a prepayment charge will apply if, during the prepayment charge term, the borrower prepays the mortgage loan in full or in part. The enforceability of prepayment charges is unclear under the laws of many states. Prepayment charges will not be available for distribution to Holders of the Offered Certificates. See "Certain Legal Aspects of Mortgage Loans" in the prospectus.

Approximately 16.88% of the Statistical Mortgage Loans as of the Cut-off Date are Fixed Rate Mortgage Loans.

Approximately 0.21% of the Statistical Mortgage Loans as of the Cut-off Date are 1/29 LIBOR Loans. The 1/29 LIBOR Loans are subject to a weighted average Periodic Rate Cap of approximately 2.000% with respect to the first Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000% with respect to each Adjustment Date thereafter. The 1/29 LIBOR Loans have a

weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate equal to
approximately 6.000%. All of the 1/29 LIBOR Loans mature in 30 years. All of the
1/29 LIBOR Loans amortize over a 30-year schedule

Approximately 63.67% of the Statistical Mortgage Loans as of the Cut-off
Date are 2/28 LIBOR Loans. The 2/28 LIBOR Loans are subject to a weighted
average Periodic Rate Cap of approximately 3.000% with respect to the first
Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000%
with respect to each Adjustment Date thereafter. The 2/28 LIBOR Loans have a
weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus
approximately 6.000%. All of the 2/28 LIBOR Loans mature in 30 years.
Approximately 32.79% of the 2/28 LIBOR Loans amortize over a 30-year schedule,
approximately 14.62% of the 2/28 LIBOR Loans amortize over a 40-year schedule,
and approximately 52.59% of the 2/28 LIBOR Loans amortize over a 50-year
schedule.

Approximately 17.30% of the Statistical Mortgage Loans as of the Cut-off
Date are 3/27 LIBOR Loans. The 3/27 LIBOR Loans are subject to a weighted
average Periodic Rate Cap of approximately 3.000% with respect to the first
Adjustment Date and a weighted average Periodic Rate Cap of approximately 1.000%
with respect to each Adjustment Date thereafter. The 3/27 LIBOR Loans have a
weighted average Maximum Mortgage Rate equal to the initial Mortgage Rate plus
approximately 6.000%. All of the 3/27 LIBOR Loans mature in 30 years.
Approximately 37.47% of the 3/27 LIBOR Loans amortize over a 30-year schedule,
approximately 14.93% of the 3/27 LIBOR Loans amortize over a 40-year schedule,
and approximately 47.60% of the 3/27 LIBOR Loans amortize over a 50-year
schedule.

Approximately 1.63% of the Statistical Mortgage Loans as of the Cut-off
Date are 5/25 LIBOR Loans. The 5/25 LIBOR Loans are subject to a weighted
average Periodic Rate Cap of approximately 3.000% with respect to the first
Adjustment Date and a weighted average Periodic Rate Cap of

S-33

<PAGE>

approximately 1.000% with respect to each Adjustment Date thereafter. The 5/25
LIBOR Loans have a weighted average Maximum Mortgage Rate equal to the initial
Mortgage Rate plus approximately 6.000%. All of the 5/25 LIBOR Loans mature in
30 years. Approximately 43.48% of the 5/25 LIBOR Loans amortize over a 30-year
schedule, approximately 8.43% of the 5/25 LIBOR Loans amortize over a 40-year
schedule, and approximately 48.09% of the 5/25 LIBOR Loans amortize over a
50-year schedule.

Approximately 0.33% of the Statistical Mortgage Loans as of the Cut-off
Date are Six-Month LIBOR Loans. The Six-Month LIBOR Loans are subject to a
weighted average Periodic Rate Cap of approximately 1.000% with respect to the
first Adjustment Date and a weighted average Periodic Rate Cap of approximately
1.000% with respect to each Adjustment Date thereafter. The Six-Month LIBOR
Loans have a weighted average Maximum Mortgage Rate equal to the initial
Mortgage Rate plus approximately 6.000%. All of the Six-Month LIBOR Loans mature
in 30 years. All of the Six-Month LIBOR Loans amortize over a 30-year schedule.

As of the Cut-off Date, the aggregate original principal balance of the
Statistical Mortgage Loans was approximately $1,906,263,878. As of the Cut-off
Date, the aggregate outstanding principal balance of the Statistical Mortgage
Loans was approximately $1,906,195,808, the minimum outstanding principal
balance was approximately $31,130, the maximum outstanding principal balance was
approximately $1,350,000, the lowest current Mortgage Rate and the highest
current Mortgage Rate were 5.600% and 13.750% per annum, respectively, and the
weighted average Mortgage Rate was approximately 8.526% per annum.

Approximately 6.40% of the Statistical Mortgage Loans as of the Cut-off

Date are Interest-Only Mortgage Loans. Approximately 4.89% of the Group One
Statistical Mortgage Loans as of the Cut-off Date are Interest-Only Mortgage
Loans. Approximately 7.27% of the Group Statistical Two Mortgage Loans as of the
Cut-off Date are Interest-Only Mortgage Loans.

Approximately 59.76% of the Statistical Mortgage Loans as of the Cut-off
Date are Balloon Loans. Approximately 59.27% of the Group One Statistical
Mortgage Loans as of the Cut-off Date are Balloon Loans. Approximately 60.04% of
the Group Two Statistical Mortgage Loans as of the Cut-off Date are Balloon
Loans.

The weighted average Original Loan-to-Value Ratio of the Statistical
Mortgage Loans as of the Cut-off Date was approximately 84.51%. The weighted
average Original Loan-to-Value Ratio of the Group One Statistical Mortgage Loans
as of the Cut-off Date was approximately 84.69%. The weighted average Original
Loan-to-Value Ratio of the Group Two Statistical Mortgage Loans as of the
Cut-off Date was approximately 84.40%.

The weighted average Credit Score of the Statistical Mortgage Loans as of
the Cut-off Date was approximately 645. The weighted average Credit Score of the
Group One Statistical Mortgage Loans as of the Cut-off Date was approximately
639. The weighted average Credit Score of the Group Two Statistical Mortgage
Loans as of the Cut-off Date was approximately 649. The Credit Scores are
generated by models developed by a third party and are made available to lenders
through three national credit bureaus. The models were derived by analyzing data
on consumers in order to establish patterns which are believed to be indicative
of the borrower's probability of default. The Credit Score is based on a
borrower's historical credit data, including, among other things, payment
history, delinquencies on accounts, levels of outstanding indebtedness, length
of credit history, types of credit, and bankruptcy experience. Credit Scores
range from approximately 350 to approximately 900, with higher scores indicating
an individual with a more favorable credit history compared to an individual
with a lower score. However, a Credit Score purports only to be a measurement of
the relative degree of risk a borrower represents to a lender, i.e., that a
borrower with a higher score is statistically expected to be less

S-34

<PAGE>

likely to default in payment than a borrower with a lower score. In addition, it
should be noted that Credit Scores were developed to indicate a level of default
probability over a two-year period which does not correspond to the life of a
mortgage loan. Furthermore, Credit Scores were not developed specifically for
use in connection with mortgage loans, but for consumer loans in general.
Therefore, a Credit Score does not take into consideration the effect of
mortgage loan characteristics on the probability of prepayment by the borrower.
None of the Depositor, First Franklin Financial or the Servicer makes any
representations or warranties as to the actual performance of any Mortgage Loan
or that a particular Credit Score should be relied upon as a basis for an
expectation that the borrower will repay the Mortgage Loan according to its
terms.

As used herein, the Credit Score of a Mortgage Loan is generally equal to
the lower of two credit scores or the middle of three credit scores for two file
and three file credit reports, respectively. For all Mortgage Loans, the credit
report and the related Credit Score are generated during the underwriting of the
Mortgage Loans by the originator and generally within forty-five (45) days of
the origination date.

MORTGAGE LOANS

The tables set forth in Annex II of this prospectus supplement are based on
the statistical mortgage pool having a total Stated Principal Balance of

$1,906,195,808 as of the Cut-off Date. It is expected that the final mortgage pool delivered to the Issuing Entity on the Closing Date will have a total stated principal balance of approximately $$1,888,495,811 as of the Cut-off Date. As a result, the characteristics in the final mortgage pool as of the Closing Date will vary from those presented in this prospectus supplement. However, such variance shall not equal the total indicated due to rounding. The sum of the columns set forth in such tables may not equal the total indicated due to rounding.

## UNDERWRITING GUIDELINES

### GENERAL

All of the Mortgage Loans to be acquired by the Issuing Entity from the Depositor were originated or acquired from third parties by First Franklin Financial. First Franklin Financial originates and acquires fixed and adjustable rate closed-end first lien mortgage loans, fixed rate closed-end second lien mortgage loans, and variable rate home equity lines of credit. First Franklin Financial's loan programs include balloon payment features and interest only payment periods.

### FIRST FRANKLIN FINANCIAL'S PORTFOLIO AND UNDERWRITING GUIDELINES

All of the Mortgage Loans were required to meet underwriting criteria substantially similar to that described in this prospectus supplement.

First Franklin Financial's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by First Franklin Financial require that the mortgage loans of a type similar to the Mortgage Loans were underwritten by the third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin Financial's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property. The Mortgage Loans generally bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, and may experience rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans

S-35

<PAGE>

underwritten in a more traditional manner. Unless prohibited by applicable law or otherwise waived by the third party originator upon the payment by the related mortgagor of higher origination fees and a higher mortgage rate, a majority of the Mortgage Loans provide for the payment by the mortgagor of a prepayment charge on certain full Principal Prepayments made within one to three years from the date of origination of the related Mortgage Loan.

Substantially all of the mortgage loans of a similar type as the Mortgage Loans were acquired by First Franklin Financial based on loan application packages submitted to the third party originators by third party mortgage brokers, which do not fund the mortgage loans. These mortgage brokers must meet minimum standards set by the third party originators and, once approved by the third party originators, the mortgage brokers are eligible to submit loan application packages in compliance with the terms of the mortgage broker agreement with the third party originator.

The third party originators must meet minimum standards set by First Franklin Financial, based on acquisition guidelines that require an analysis of the following information submitted with an application for approval: any

applicable state lending license (in good standing), satisfactory credit report only if no federal income tax identification number, signed broker agreement, signed W-9 and signed broker authorization. Once approved as a third party originator, these companies are eligible to submit loan packages for purchase by First Franklin Financial in compliance with the terms of a signed mortgage loan purchase agreement.

The third party originators may originate mortgage loans for acquisition by First Franklin Financial under an underwriting program called the Direct Access Program. Within the Direct Access Program, there are four documentation programs, the Full Documentation Program, the Limited Income Verification Program (the "LIV"), the Stated Plus Program and the Stated Income Verification Program. In addition, under the responsible party's Blended Access Program, in the case of loans with two or more borrowers, if one of those borrowers with more than 50% of the total qualifying income is underwritten under a full documentation program, then the other borrower or borrowers may be underwritten under a stated documentation program. All of the Mortgage Loans were acquired by First Franklin Financial under the Direct Access Program. While each underwriting program is intended to assess the risk of default, the Direct Access Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score"). The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair, Isaac") and the three national credit repositories Equifax, Trans Union and First American (formerly Experian which was formerly TRW). The Credit Bureau Risk Scores available from the three national credit repositories are calculated by the assignment of weightings to the most predictive data collected by the credit repositories and range from 300 to 850. Although the Credit Bureau Risk Scores are based solely on the information at the particular credit repository, such Credit Bureau Risk Scores have been calibrated to indicate the same level of credit risk regardless of which credit repository is used. The Credit Bureau Risk Score is used as an aid to, not a substitute for, the underwriter's judgment.

The Direct Access Program was developed to simplify the origination process for third party originators. In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, Direct Access relies upon a borrower's Credit Bureau Risk Score initially to determine a borrower's likely future credit performance. Third party originators are able to access Credit Bureau Risk Scores at the initial phases of the loan application process and use the score to determine a borrower's interest rate. First Franklin Financial's acquisition guidelines require that the third party originator approve the Mortgage Loan using the Direct Access Program risk-based pricing matrix.

S-36

<PAGE>

In accordance with First Franklin Financial's guidelines for acquisition, under the Direct Access Program, the third party originators must require that the Credit Bureau Risk Score of the primary wage earner (the borrower that contributes the greatest percentage of overall income) be used to determine program eligibility. Credit Bureau Risk Scores must be obtained from at least two national credit repositories, with the lower of the two scores being utilized in program eligibility determination. If Credit Bureau Risk Scores are obtained from three credit repositories, the middle of the three scores can be utilized. In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Bureau Risk Score or the borrower is not eligible for the Direct Access Program. Generally, the minimum Credit Bureau Risk Score allowed under the Direct Access Program is 540.

The Credit Bureau Risk Score, along with the loan-to-value ratio, is an important tool in assessing the creditworthiness of a Direct Access borrower. However, these two factors are not the only considerations in underwriting a

Direct Access loan. The third party originators are required to review each Direct Access loan to determine whether First Franklin Financial's guidelines for income, assets, employment and collateral are met.

In accordance with First Franklin Financial's guidelines for acquisition, all of the mortgage loans of a type similar to the Mortgage Loans were required to be underwritten by the third party originator's underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, a third party originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

In accordance with First Franklin Financial's guidelines for acquisition, the third party originators' underwriters are required to verify the income of each applicant under various documentation programs as follows: under the Full Documentation Program, applicants are generally required to submit verification of stable income for the periods of six months to two years preceding the application dependent on credit score range; under the LIV Program, the borrower is qualified based on six months of bank statement and applicants are generally required to submit verification of adequate cash flow to meet credit obligations for the six month period preceding the application; the Stated Plus Program allows income to be stated, but requires borrowers to provide verification of liquid assets equaling three months of income stated on the mortgage application; under the Stated Income Program, applicants are qualified based on monthly income as stated on the mortgage application and the underwriter will determine that the stated income is reasonable and realistic when compared to borrower's employment type, assets and credit history. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with a credit score greater than or equal to 540 and not originated in conjunction with a second lien mortgage, bank statements (for 12 months) are acceptable as full documentation. For Direct Access first lien mortgage loans from self-employed or 1099 borrowers with credit scores greater than or equal to 620, regardless of being originated with a corresponding second lien mortgage, twelve months of bank statements are acceptable as full documentation. In all cases, the income stated must be reasonable and customary for the applicant's line of work. Although the income is not verified under the LIV and Stated Income Programs, a preclosing audit should be conducted to confirm that the business exists. Verification may be made through phone contact to the place of business, obtaining a valid business license, CPA/Enrolled Agent letter or through Dun and Bradstreet Information Services.

The applicant generally must have a sufficiently established credit history to qualify for the appropriate Credit Bureau Risk Score range under the Direct Access Program. This credit history is

S-37

<PAGE>

substantiated by a minimum of two repository merged report prepared by an independent credit report agency. The report typically summarizes the applicant's entire credit history, and generally includes a seven year public record search for each address where the applicant has lived during the two years prior to the issuance of the credit report and contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In some instances, borrowers with a minimal credit history are eligible for financing under the Direct Access Program.

The third party originators originate loans secured by one-to-four-unit residential properties made to eligible borrowers with a vested fee simple (or in some cases a leasehold) interest in the property. In accordance with First Franklin Financial's guidelines for acquisition, the third party originators are required to comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by First Franklin Financial. Review appraisals may only be provided by appraisers approved by First Franklin Financial. In some cases, the third party originator may rely on a statistical appraisal methodology provided by a third party.

Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the third party originators. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be an enhanced desk, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises. The review appraisal may be waived by a duly delegated Underwriter.

In accordance with First Franklin Financial's guidelines for acquisition, the third party originators must require title insurance on all mortgage loans secured by liens on real property. The third party originators must also require that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related residential loan or the replacement cost of the property, whichever is less.

The third party originators are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the asset quality audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations must be reviewed by each third party originator.

The loan review is required to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio. In general, higher credit risk mortgage loans are graded in categories which permit higher Debt Ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however these loan programs establish

S-38

&lt;PAGE&gt;

lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in such categories.

"Equity Refinance" transactions are defined as those instances where the borrower receives the lesser of 2% of the new loan amount or $2,000 cash in hand. Funds used for debt consolidation are not included in this amount.

"RapidRefi" is designed to streamline the loan process for borrowers who have demonstrated that their current mortgage has been paid as agreed for at least the prior 18 months. It requires the property to be an owner-occupied primary residence.

The third party originators' origination guidelines under the Direct Access Program generally have the following criteria for borrower eligibility for the specified Credit Bureau Risk Score range.

The Debt Ratio generally may not exceed 50.49% for all credit scores on full documentation and LIV loans. Loans meeting the residual income requirements may have a maximum Debt Ratio of 55.49%. The Debt Ratio for Stated Income loans may not exceed 50.49%.

Generally, First Franklin Financial's acquisition guidelines require that all liens affecting title must be paid at closing. Collections, charge-offs, judgments and liens not affecting title may remain open.

PENDING PROCEEDINGS

There are no material legal or governmental proceedings currently pending or known to be contemplated against First Franklin Financial. To the best of First Franklin Financial's knowledge, there are no material legal or governmental proceedings currently pending or known to be contemplated against First Franklin Financial, which if ultimately decided adversely to First Franklin Financial, would have a material adverse effect on the validity of the Mortgage Loans.

<center>TRANSACTION PARTIES</center>

THE SPONSOR

The Sponsor is First Franklin Financial, a Delaware corporation. First Franklin Financial is an affiliate of the Underwriter, the Depositor and the Servicer and a direct, wholly-owned operating subsidiary of Merrill Lynch Bank & Trust Co., FSB. The executive offices of First Franklin Financial are located at 2150 North First Street, San Jose, California 95131, telephone number (800) 464-8203.

Since its founding in 1981, First Franklin Financial has grown from a small mortgage broker to a full service mortgage lender with a wide variety of products. Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, Home Loan Services, Inc., and the First Franklin business unit NationPoint from National City Bank on December 30, 2006. Simultaneously with the closing of such acquisition, the non-conforming mortgage loan origination business formerly maintained in its First Franklin division was transferred by National City Bank to First Franklin Financial. Therefore, as of such date, the non-conforming mortgage loan origination business of National City Bank and First Franklin Financial was acquired by Merrill Lynch Bank & Trust Co., FSB. A copy of the Purchase Agreement between National City Bank and Merrill Lynch Bank & Trust Co., FSB is publicly available on the SEC website.

In its capacity as Sponsor, First Franklin Financial originates or acquires mortgage loans and initiates their securitization by transferring the mortgage loans to the Depositor or another entity that acts

<center>S-39</center>

<PAGE>

in a similar capacity as the Depositor, which mortgage loans will ultimately be transferred to the issuing entity for the related securitization. In coordination with the Underwriter, First Franklin Financial works with rating agencies, mortgage loan sellers and servicers in structuring the securitization transaction.

First Franklin Financial does not currently service mortgage loans. First Franklin Financial contracts with HLS for servicing the mortgage loans that it originates and acquires from third parties.

First Franklin Financial has been the originator or acquirer of mortgage loans included in securitizations since 1997. The following table sets forth the approximate aggregate initial principal amount of subprime mortgage loans originated or acquired by First Franklin Financial and included in securitizations since 2003:

<TABLE>
<CAPTION>

| YEAR | APPROXIMATE INITIAL PRINCIPAL BALANCE OF CERTIFICATES |
|------|-------------------------------------------------------|
| <S> | <C> |
| 2003 | $ 6,900,000,000 |
| 2004 | $18,500,000,000 |
| 2005 | $18,000,000,000 |
| 2006 | $25,500,000,000 |
| January 1, 2007 through March 31, 2007 | $ 6,900,000,000 |

</TABLE>

THE DEPOSITOR

The Depositor is a Delaware corporation whose offices are located at 250 Vesey Street, 4 World Financial Center, 10th Floor, New York, New York, 10080 and whose telephone number is (212) 449-0357. The Depositor is an affiliate of the Underwriter, the Servicer and First Franklin Financial.

The Depositor has been engaged since its incorporation in 1986 in the securitization of mortgage loans and other asset types included within the description of the Issuing Entity assets in this prospectus supplement. The Depositor is engaged in the business of acting as depositor of trusts that issue series of notes that are secured by, or certificates that represent interests in, the assets of the trust. The Depositor acquires assets specifically for inclusion in a securitization from various sellers in privately negotiated transactions.

The certificate of incorporation of the Depositor limits its activities to those necessary or convenient to carry out its securitization activities. The Depositor will have limited obligations with respect to a series of securities. The Depositor will obtain the Mortgage Loans from the Sponsor and may also assign to the Trustee certain rights of the Sponsor with respect to the Mortgage Loans. In addition, after the issuance of a series of securities, the Depositor may have limited obligations with respect to that series which may include appointing a successor trustee if the Trustee resigns or is otherwise removed and preparing certain reports filed under the Securities Exchange Act of 1934.

THE ISSUING ENTITY

Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, the Issuing Entity, will be formed on the Closing Date pursuant to the Pooling and Servicing Agreement by and among the Depositor, the Trustee and the Servicer. The Issuing Entity will be a New York common law trust with

S-40

<PAGE>

no officers or directors and no continuing duties other than to hold the Mortgage Loans and related assets and issue the certificates. The fiscal year end for the Issuing Entity will be December 31, commencing with December 31, 2007.

THE SERVICER

GENERAL

HLS will act as Servicer of the Mortgage Loans. The Servicer will be required to service the Mortgage Loans in accordance with the Pooling and Servicing Agreement.

The Servicer is a Delaware corporation and a wholly-owned operating subsidiary of Merrill Lynch Bank & Trust Co, FSB. The Servicer is a full-service, non-prime mortgage servicing company headquartered in Pittsburgh, Pennsylvania. The loan servicing portfolio is serviced at offices located in Pittsburgh, Pennsylvania and Upper St. Clair, Pennsylvania. The Servicer has been servicing non-prime mortgage loans for approximately 16 years under various corporate names: American Financial Corporation, Altegra Credit Company and, between 2002 and 2006, under the corporate name of National City Home Loan Services, Inc. The Servicer currently ranks as the ninth (9th) largest U.S. non-prime residential mortgage servicer. The Servicer is an affiliate of the Depositor, the Underwriter and First Franklin Financial.

Currently, substantially all of the Servicer's servicing portfolio consists of non-prime mortgage loans and variable rate home equity lines of credit, consisting of fixed-rate and adjustable-rate first and fixed rate second lien amortizing and balloon payment mortgage loans and variable rate home equity lines of credit. Prior to January 1, 2005, the closed-end first and second mortgage loans in the Servicer's servicing portfolio were originated or acquired by First Franklin Financial and loans originated thereafter were generally acquired by First Franklin Financial from National City Bank and other third-party lenders. The following table reflects the size and composition of Servicer's servicing portfolio of non-prime mortgage loans as of the end of each indicated period.

HOME LOAN SERVICES, INC.'S
NON-PRIME SERVICING PORTFOLIO
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

| AGGREGATE PRINCIPAL BALANCE AS OF DECEMBER 31, 2003 | AGGREGATE PRINCIPAL BALANCE AS OF DECEMBER 31, 2004 | AGGREGATE PRINCIPAL BALANCE AS OF DECEMBER 31, 2005 | AGGREGATE PRINCIPAL BALANCE AS OF DECEMBER 31, 2006 | AGGREGATE PRINCIPAL BALANCE AS OF MARCH 31, 2007 |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| $18,751,589 | $23,049,992 | $37,591,777 | $49,545,071 | $52,578,631 |

</TABLE>

The Servicer began interim servicing for First Franklin Financial and its investor base in August 2002. In December, 2004, the Servicer began to retain servicing for the First Franklin Financial's investors on a permanent basis. As of March 31, 2007, the Servicer serviced approximately 229,449 loans with an aggregate unpaid principal balance of approximately $37 billion included in forty-one (41) outstanding securitizations.

The Servicer is rated "Above Average" as a residential non-prime mortgage servicer and alternative residential mortgage servicer by S&P. The Servicer has an "RPS2" rating as a primary servicer of residential non-prime and Alt-A products and an "RSS2-" rating as a special servicer from

S-41

<PAGE>

Fitch. The Servicer is also rated "SQ1-" as a primary servicer of non-prime loans, SQ2 as a primary servicer of second lien loans and "SQ2+" as a special servicer by Moody's.

Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, Home Loan Services, Inc., and the affiliated business unit NationPoint on December 30, 2006. A copy of the Purchase Agreement between National City Bank and Merrill Lynch Bank & Trust Co., FSB is publicly available on the SEC website.

SERVICER'S DELINQUENCY AND FORECLOSURE EXPERIENCE

The Servicer's portfolio may differ significantly from the Mortgage Loans in the Mortgage Pool in terms of interest rates, principal balances, geographic distribution, types of properties, lien priority, origination and underwriting criteria, prior servicer performance and other possibly relevant characteristics. There can be no assurance, and no representation is made, that the delinquency and foreclosure experience with respect to the Mortgage Loans included in the Issuing Entity will be similar to that reflected in the Servicer's Static Pool Information, nor is any representation made as to the rate at which losses may be experienced on liquidation of defaulted Mortgage Loans. The actual delinquency experience on the Mortgage Loans will depend, among other things, upon the value of the real estate securing such Mortgage Loans and the ability of the related borrower to make required payments. It should be noted that if the residential real estate market should experience an overall decline in property values, the actual rates of delinquencies and foreclosures could be higher than those previously experienced by the Servicer. In addition, adverse economic conditions may affect the timely payment by borrowers of scheduled payments of principal and interest on the Mortgage Loans and, accordingly, the actual rates of delinquencies and foreclosures with respect to the Mortgage Loan Pool. The Servicer's delinquency results are calculated utilizing MBA methodology.

Accordingly, there can be no assurance that the delinquency and foreclosure experience of the Issuing Entity's Mortgage Loans in the future will correspond to the future delinquency and foreclosure experience of the Servicer's one-to-four family conventional residential mortgage loan servicing portfolio.

SERVICER'S POLICIES AND PROCEDURES

The Servicer has established standard policies for the servicing and collection of mortgage loans. The Servicer's procedures for the servicing and collection functions, include the following:

    collecting, aggregating and remitting mortgage loan payments;

    accounting for principal and interest;

    holding escrow (impound) funds for payment of taxes and insurance;

    making inspections as required of the mortgaged properties;

    supervision of delinquent mortgage loans;

    loss mitigation efforts;

    foreclosure proceedings and, if applicable, the disposition of mortgaged properties; and

    generally administering the mortgage loans, for which it receives

servicing fees.

S-42

\<PAGE\>

The Servicer's collection operation is a high touch unit that utilizes the early indicator scoring model, the Avaya autodialer (the "dialer"), and manual calling campaigns. Individual ownership is key to the Servicer's collection philosophy. The purpose of the dialer and the early indicator model is to quickly and efficiently reduce the delinquency so that collectors can manually work their individual portfolios. In managing the liquidation of defaulted mortgage loans, the Servicer generally will have sole discretion to take such action in maximizing recoveries to investors, including selling defaulted mortgage loans and REO properties. The bankruptcy unit's primary responsibilities are to protect the asset while a mortgage loan is going through the bankruptcy process. This responsibility is fulfilled by ensuring that borrowers make payments as required under the Bankruptcy Code. If this cannot be accomplished, the Servicer will seek relief through the bankruptcy court, including filing a motion from relief from the automatic stay, to enable the Servicer to commence foreclosure, as necessary. After a loan has been charged off, the Servicer's recovery team performs all aspects of the collection-related activity, including, but not limited to, borrower contact, credit bureau maintenance and tax reporting, which may result in recovery of the charged-off amount.

Over the past three years, there has been no material change in the Servicer's servicing policies and procedures. The ownership of the Servicer, however was transferred from National City Bank to Merrill Lynch Bank & Trust Co., FSB on December 30, 2006.

PRIOR SECURITIZATIONS

During the three years preceding the date of this prospectus supplement, the Servicer has not been notified and is not aware that any of the residential mortgage loan securitization pools serviced by the Servicer have experienced servicing events of default, termination triggers or early amortization events because of servicing by the Servicer, and the Servicer has not been terminated as a servicer in a residential mortgage loan securitization due to a servicing default or application of a servicing performance test or trigger. During such time, the Servicer also neither has failed to make any required advance with respect to any issuance of residential mortgage backed securities nor disclosed material non-compliance with the servicing criteria applicable to any such securitization.

THE TRUSTEE

LaSalle Bank National Association will be the Trustee under the Pooling and Servicing Agreement. LaSalle Bank National Association is a national banking association formed under the federal laws of the United States of America. Its parent company, LaSalle Bank Corporation, is an indirect subsidiary of ABN AMRO Bank N.V., a Netherlands banking corporation.

On April 22, 2007, ABN AMRO Holding N.V. agreed to sell ABN AMRO North America Holding Company, the indirect parent of LaSalle Bank National Association, to Bank of America Corporation. The proposed sale currently includes all parts of the Global Securities and Trust Services Group within LaSalle Bank engaged in the business of acting as trustee, securities administrator, master servicer, custodian, collateral administrator, securities intermediary, fiscal agent and issuing and paying agent in connection with securitization transactions.

The contract between ABN AMRO Bank N.V. and Bank of America Corporation contains a 14 calendar day "go shop" clause which continued until 11:59 PM New

York time on May 6th, 2007. ABN AMRO Bank N.V. filed a copy of this contract on Form 6-K with the Securities and Exchange Commission on April 25, 2007. The contract provides that the sale of LaSalle Bank National Association is subject to regulatory approvals and other customary closing conditions.

<center>S-43</center>

<PAGE>

The contract referenced above was entered into by ABN AMRO Bank N.V. without shareholder approval. In response to a challenge of the sale by a shareholders group, a judge in the Enterprise Chamber of the Amsterdam Superior Court in the Netherlands ruled on May 3, 2007 that ABN AMRO Holding N.V. was not permitted to proceed with the sale of LaSalle Bank without shareholder approval. As of the date hereof, a shareholder's meeting to vote on the proposed sale of LaSalle Bank National Association has not occurred. Various interested parties have filed or have indicated that they will file an appeal of the ruling. On May 4, 2007, Bank of America Corporation filed a lawsuit against ABN AMRO Bank N.V. and ABN AMRO Holding N.V. in the U.S. District Court for the Southern District of New York (Manhattan) seeking, among other things, an injunction prohibiting ABN AMRO Bank N.V. and ABN AMRO Holding N.V. from negotiating a sale of LaSalle Bank National Association or selling LaSalle Bank National Association to any third party other than as provided for in the contract referenced above, monetary damages and specific performance.

LaSalle has extensive experience serving as trustee on securitizations of residential mortgage loans. Since January 1994, LaSalle has served as trustee, securities administrator or paying agent on over 550 residential mortgage-backed security transactions involving assets similar to the Mortgage Loans. As of March 31, 2007 LaSalle serves as trustee, securities administrator or paying agent on over 500 residential mortgage-backed security transactions. The Depositor and Servicer may maintain other banking relationships in the ordinary course of business with the Trustee. The Trustee's corporate trust office is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois, 60603. Attention: Global Securities and Trust Services - FFMER 2007-3 or at such other address as the Trustee may designate from time to time.

In its capacity as Trustee, LaSalle will hold the mortgage loan files exclusively for the use and benefit of the Issuing Entity. LaSalle will not have any duty or obligation to inspect, review or examine any of the documents, instruments, certificates or other papers relating to the Mortgage Loans delivered to it to determine that the same are valid. The disposition of the mortgage loan files will be governed by the Pooling and Servicing Agreement. LaSalle provides custodial services on over 1,000 residential, commercial and asset-backed securitization transactions and maintains almost 2.5 million custodial files in its two vault locations in Elk Grove, Illinois and Irvine, California. LaSalle's two vault locations can maintain a total of approximately 6 million custody files. All custody files are segregated and maintained in secure and fire resistant facilities in compliance with customary industry standards. The vault construction complies with Fannie Mae/Ginnie Mae guidelines applicable to document custodians. LaSalle maintains disaster recovery protocols to ensure the preservation of custody files in the event of force majeure and maintains, in full force and effect, such fidelity bonds and/or insurance policies as are customarily maintained by banks which act as custodians. LaSalle uses unique tracking numbers for each custody file to ensure segregation of collateral files and proper filing of the contents therein and accurate file labeling is maintained through a monthly quality assurance process. LaSalle uses a licensed collateral review system to track and monitor the receipt and movement internally or externally of custody files and any release or reinstatement of collateral.

Using information set forth in this prospectus supplement, the Trustee will develop the cashflow model for the Issuing Entity. Based on the monthly loan information provided by the Servicer, the Trustee will calculate the amount of

principal and interest to be paid to each Class of Certificates on each
Distribution Date. In accordance with the cashflow model and based on the
monthly loan information provided by the Servicer, the Trustee will perform
distribution calculations, remit distributions on the Distribution Date to
certificateholders and prepare a monthly statement to certificateholders
detailing the payments received and the activity on the Mortgage Loans during
the collection period. In performing these obligations, the Trustee will be able
to conclusively rely on the information provided to it by the Servicer, and the
Trustee will not be required to recompute, recalculate or verify the information
provided to it by the Servicer.


                                      S-44


<PAGE>


     LaSalle and the Sponsor are parties to a custodial agreement whereby
LaSalle, for consideration, provides custodial services to the Sponsor for
certain residential mortgage loans originated or purchased by it. Pursuant to
this custodial agreement, LaSalle is currently providing custodial services for
all of the mortgage loans to be sold by the Sponsor to the Depositor in
connection with this securitization. The terms of the custodial agreement are
customary for the residential mortgage-backed securitization industry providing
for the delivery, receipts, review and safekeeping of mortgage loan files.

     For information describing the Trustee's duties and responsibilities
regarding the Certificates under the Pooling and Servicing Agreement,
limitations on the Trustee's liability, and any other indemnification to which
it will be entitled from the assets of the Issuing Entity and certain other
matters, see "Administration of the Issuing Entity" and "The Pooling and
Servicing Agreement."

THE CAP CONTRACT COUNTERPARTY AND THE SWAP COUNTERPARTY

     There will be three Corridor Contracts provided by The Bank of New York, in
its capacity as Cap Contract Counterparty, and one Swap Agreement provided by
The Bank of New York, in its capacity as Swap Counterparty.

     Founded in 1784, The Bank of New York is a banking organization organized
in the State of New York and headquartered in New York, NY, and is the principal
subsidiary of The Bank of New York Company, Inc. As of the date of this
Prospectus Supplement, the long-term senior unsecured debt of The Bank of New
York is rated "Aaa" by Moody's, "AA-" by S&P, and "AA-" by Fitch.

     The Company provides a complete range of banking and other financial
services to corporations and individuals worldwide through its core
competencies: securities servicing, treasury management, investment management,
and individual & regional banking services. The Company's extensive global
client base includes a broad range of leading financial institutions,
corporations, government entities, endowments and foundations.

     As of the Cut-off Date, the aggregate significance percentage, as
calculated in accordance with Item 1115 of Regulation AB, with respect to The
Bank of New York will be less than 10%.The "significance percentage" for
purposes of Item 1115 of Regulation AB is a percentage that is a reasonable good
faith estimate of the proportion that the maximum probable exposure of the
Corridor Contracts and the Swap Agreement (estimated in substantially the same
manner as that used in the Sponsor's internal risk management process in respect
of similar instruments), on the one hand, bears to the aggregate Stated
Principal Balance of the Mortgage Loans as of the Cut-off Date, on the other.

                       AFFILIATES AND RELATED TRANSACTIONS

     The Depositor, the Underwriter, the Servicer and First Franklin Financial
are all affiliates of each other and have the following ownership structure:

The Depositor is an affiliate, through common parent ownership, of the Underwriter.

The Servicer and First Franklin Financial are affiliates of each other through common parent ownership.

Merrill Lynch Bank & Trust Co., FSB acquired First Franklin Financial, Home Loan Services, Inc., and the affiliated business unit NationPoint on December 30, 2006. A copy of the Purchase Agreement between National City Bank and Merrill Lynch Bank & Trust Co., FSB is publicly available on the SEC website.

S-45

<PAGE>

## STATIC POOL INFORMATION

The Depositor is making available on the internet at http://www.mlabsreports.ml.com information concerning the prior residential mortgage loan securitizations consisting of adjustable and fixed rate subprime mortgage loans secured by first and second lien mortgages or deeds of trust in residential real properties originated or acquired by First Franklin Financial and serviced by the Servicer. On this website, you can view for each of these securitizations, summary pool information as of the applicable securitization cut-off date and delinquency, cumulative loss, and prepayment information as of each distribution date by securitization for the past five years, or since the applicable securitization closing date if the applicable securitization closing date occurred less than five years from the date of this prospectus supplement. Each of these mortgage loan securitizations is unique, and the characteristics of each securitized mortgage loan pool varies from each other as well as from the Mortgage Loans to be included in the Issuing Entity that will issue the certificates offered by this prospectus supplement. In addition, the performance information relating to the prior securitizations described above may have been influenced by factors beyond First Franklin Financial or the Servicer's control, such as housing prices and market interest rates. Therefore, the performance of these prior mortgage loan securitizations is likely not to be indicative of the future performance of the Mortgage Loans to be included in the Issuing Entity related to this offering.

In the event any changes or updates are made to the information available on the website, the Depositor will provide to any person a copy of the information as it existed as of the date of this prospectus supplement upon request who writes or calls the Depositor at 4 World Financial Center, New York, New York 10080, Attention: Mark Jury, securities administrator, telephone number (212) 449-1441.

The information available on the website relating to any mortgage loan securitizations issued prior to January 1, 2006 is not deemed to be part of this prospectus supplement, the accompanying prospectus or the Depositor's registration statement.

## ADMINISTRATION OF THE ISSUING ENTITY

SERVICING AND ADMINISTRATIVE RESPONSIBILITIES

The Servicer and the Trustee will have the following responsibilities with respect to the Issuing Entity:

<TABLE>
<CAPTION>
PARTY:        RESPONSIBILITIES:
------        -----------------
<S>           <C>

| Servicer | Performing the servicing functions with respect to the Mortgage Loans and the mortgaged properties in accordance with the provisions of the Pooling and Servicing Agreement, including, but not limited to: |

-   collecting monthly remittances of principal and interest on the Mortgage Loans from the related borrowers, depositing such amounts in the Collection Account, and delivering all amounts on deposit in the Collection Account to the extent required by the Pooling and Servicing Agreement to the Trustee for deposit in the Certificate Account on the Servicer Remittance Date;

-   making Advances with respect to delinquent payments of

</TABLE>

S-46

<PAGE>

<TABLE>
<CAPTION>

| PARTY: | RESPONSIBILITIES: |
| ------ | ----------------- |
| <S> | <C> |

　　　　principal and interest on the Mortgage Loans, to the extent required by the Pooling and Servicing Agreement and to the extent the Servicer believes such Advances will be recovered;

-   making servicing advances in respect of customary costs and expenses incurred in the performance by the Servicer of its servicing obligations to the extent the Servicer believes such servicing advances will be recovered, including, but not limited to, the cost of (a) the preservation, restoration and protection of the mortgaged property, (b) taxes, assessments and other charges which are or may become a lien upon a first lien mortgaged property to the extent necessary to avoid foreclosure or (c) fire and hazard insurance coverage for a first lien mortgaged property;

-   enforcement of foreclosure proceedings; and

-   providing monthly loan-level reports to the Trustee.

| Trustee | Performing the trustee functions in accordance with the provisions of the Pooling and Servicing Agreement, including, but not limited to: |

-   notifying certificateholders in connection with an event of default under the Pooling and Servicing Agreement;

-   enforcing the Servicer's obligations under the Pooling and Servicing Agreement

-   upon the termination of the Servicer, appointing a successor servicer, and until a successor servicer is appointed, acting as successor servicer;

-   upon the failure of the Servicer to make Advances with respect to a Mortgage Loan and the resulting termination of the Servicer, making those Advances to the extent provided in the Pooling and Servicing Agreement;

-   receiving monthly remittances from the Servicer for deposit in the Certificate Account and distributing all amounts on deposit in the Certificate Account (after the remittance of certain fees, expenses and indemnities) to the certificateholders in

accordance with the priorities described in the Pooling and
Servicing Agreement;

-     depositing any payments received from the Cap Contract
      Counterparty into the Corridor Contract Account;

`</TABLE>`

S-47

`<PAGE>`

`<TABLE>`
`<CAPTION>`
PARTY:      RESPONSIBILITIES:
------      -----------------
`<S>`        `<C>`
-     in its capacity as Supplemental Interest Trust Trustee,
      depositing any Net Swap Payments or Swap Termination Payments
      received from the Swap Counterparty into the Supplemental
      Interest Trust;

-     in its capacity as Supplemental Interest Trust Trustee,
      distributing amounts on deposit in the Supplemental Interest
      Trust to the holders of the related certificates and the Swap
      Counterparty, based solely on the information contained in the
      investor reports, in accordance with the priorities described in
      the Pooling and Servicing Agreement on each Distribution Date or
      the Business Day prior to such Distribution Date, as applicable;

-     preparing and distributing annual investor reports necessary to
      enable certificateholders to prepare their tax returns;

-     preparing and distributing the monthly Distribution Date
      statement to certificateholders based solely on information
      received from the Servicer, the Cap Contract Counterparty and
      the Swap Counterparty and without any independent verification
      of such information;

-     preparing and filing annual federal and (if required) state tax
      returns on behalf of the Issuing Entity;

-     preparing and filing periodic reports with the Securities
      Exchange Commission on behalf of the Issuing Entity with respect
      to the certificates in accordance with the Pooling and Servicing
      Agreement; and

-     holding and maintaining the mortgage loan documents related to
      the Mortgage Loans to be held by it, as custodian, in a
      fire-resistant facility intended for the safekeeping of mortgage
      loan files on behalf of the Issuing Entity.

      See "Descriptions of the Agreement--The Trustee" in the prospectus.
`</TABLE>`

TRUST ACCOUNTS

      All amounts in respect of principal and interest received from the
borrowers or other recoveries in respect of the Mortgage Loans will, at all
times before distribution thereof to the certificateholders, be invested in the
Trust Accounts, which are accounts established in the name of the Trustee. Funds
on deposit in the Trust Accounts may be invested by the party responsible for
such Trust Account in eligible investments, as described under "Description of
the Agreements--Collection Account and Related Accounts" in the prospectus. The
Trust Accounts will be established by the applicable parties listed below, and

any investment income or other benefit earned on each Trust Account will be as
retained or distributed as follows:

S-48

<PAGE>

<TABLE>
<CAPTION>

| TRUST ACCOUNT: | RESPONSIBLE PARTY: | APPLICATION OF ANY INVESTMENT EARNINGS: |
|----------------|--------------------|------------------------------------------|
| Collection Account | Servicer | Any investment earnings or other benefits will be paid as compensation or reserved by, the Servicer and will not be available for distributions to certificateholders. |
| Certificate Account | Trustee | Any investment earnings or other benefits will be paid as compensation to the Trustee and will not be available for distributions to certificateholders. |
| Corridor Contract Account | Trustee | Funds will remain uninvested. |
| Swap Account | Supplemental Interest Trust Trustee | Funds will remain uninvested. |

</TABLE>

FLOW OF PAYMENTS

    The diagram below illustrates the flow of collections and other payments on
the Mortgage Loans through the trust accounts.

(FLOW CHART)

S-49

<PAGE>

SERVICING OF THE MORTGAGE LOANS

GENERAL

    The Servicer will service the Mortgage Loans in accordance with the terms
set forth in the Pooling and Servicing Agreement. The Pooling and Servicing
Agreement may be amended only with the consent of the NIMs Insurer, if any, and
the NIMs Insurer will be a third party beneficiary of the Pooling and Servicing
Agreement. Notwithstanding anything to the contrary in the prospectus, the
Trustee will not be responsible for the performance of the servicing activities
by the Servicer. If the Servicer fails to fulfill its obligations under the
Pooling and Servicing Agreement, the Trustee may, in its discretion, or at the
direction of the NIMs Insurer, if any, or the certificateholders, shall
terminate the Servicer and appoint a successor servicer as provided in the
Pooling and Servicing Agreement, subject to the pledge and assignment to a
servicing rights pledgee as described herein.

    In accordance with the Pooling and Servicing Agreement, the Servicer may
perform any of its obligations under the Pooling and Servicing Agreement through
one or more subservicers, which may be affiliates of the Servicer.
Notwithstanding any subservicing arrangement, the Servicer will remain liable
for its servicing duties and obligations under the Pooling and Servicing
Agreement as if the Servicer alone were servicing the Mortgage Loans.

    The servicing rights with respect to the Mortgage Loans may be transferred

to one or more successor servicers upon the Servicer's default, subject to the conditions set forth in the Pooling and Servicing Agreement, including the requirements that any such successor servicer be qualified to service mortgage loans for Freddie Mac or Fannie Mae, that the NIMs Insurer, if any, approve of such successor servicer, and that each Rating Agency confirm in writing that the transfer of servicing will not result in a qualification, withdrawal or downgrade of the then current ratings of any of the Offered Certificates.

The Servicer may solicit or refer to a mortgage originator any mortgagor for refinancing or otherwise take action to encourage refinancing. Any such solicitation or action may cause the rate of prepayments on the Mortgage Loans to occur at a faster rate than might otherwise be the case.

SERVICING COMPENSATION AND PAYMENT OF EXPENSES

The Servicer will be paid the Servicing Fee. The amount of the monthly Servicing Fee is subject to adjustment with respect to prepaid Mortgage Loans, as described below under "-Adjustment to Servicing Fee in Connection with Certain Prepaid Mortgage Loans." The Servicer is also entitled to receive, as additional servicing compensation, Prepayment Interest Excesses, excess proceeds from REO Property sales and all service-related fees, including all late payment charges, insufficient funds charges, assumption fees, modification fees, extension fees, and other similar charges (other than prepayment charges), all investment income earned on, and benefits arising from, amounts on deposit in the Collection Account, and amounts on deposit in the escrow accounts. The Servicer is obligated to pay certain ongoing expenses associated with the Mortgage Loans in connection with its responsibilities under the Pooling and Servicing Agreement. See "Description of the Certificates - Fees and Expenses of the Trust Fund."

ADJUSTMENT TO SERVICING FEE IN CONNECTION WITH CERTAIN PREPAID MORTGAGE LOANS

When a mortgagor prepays all of a Mortgage Loan between Due Dates, the mortgagor pays interest on the amount prepaid only to the date of the Principal Prepayment. Principal Prepayments in full received during the prior Prepayment Period are included in the distribution to certificateholders on the

S-50

<PAGE>

related Distribution Date thereby causing a shortfall in interest for Principal Prepayments occurring between the 15th day of the month through and including the last day of the month. In order to mitigate the effect of any such shortfall in interest distributions to certificateholders on any Distribution Date, the Servicer is required to deposit Compensating Interest in the related Collection Account for distribution to the certificateholders on such Distribution Date; provided, however, that the amount so deposited with respect to any Distribution Date shall be limited to the product of (i) one-twelfth of 0.25% and (ii) the aggregate Stated Principal Balance of the Mortgage Loans with respect to such Distribution Date. Compensating Interest shall only be paid with respect to Principal Prepayments in full received during the period from and including the 15th day of the month through and including the last day of the month. Any such deposit by the Servicer will be reflected in the distributions to the certificateholders made on the Distribution Date to which such Prepayment Period relates. Any Prepayment Interest Shortfall will be allocated on such Distribution Date pro rata among the outstanding classes of certificates based upon the amount of interest each such class would otherwise be paid on such Distribution Date.

ADVANCES

Subject to the limitations described below, on each Servicer Remittance Date, the Servicer will be required to make Advances from its funds or funds in

the Collection Account that are not included in available funds for such
Distribution Date. Advances are intended to maintain a regular flow of scheduled
interest and principal payments on the LIBOR Certificates rather than to
guarantee or insure against losses.

   The Servicer is obligated to make Advances with respect to delinquent
payments of principal of and interest on each Mortgage Loan (with such payments
of interest adjusted to the related Net Mortgage Rate) to the extent that such
Advances are, in its judgment, reasonably recoverable from future payments and
collections or insurance payments or proceeds of liquidation of the related
Mortgage Loan; provided, however, that the Servicer will not make Advances with
respect to the principal portion of any Balloon Amount but the Servicer will be
required to advance monthly interest on a Balloon Loan until the principal
balance thereof is reduced to zero subject to the Servicer's determination of
nonrecoverability; and, provided further, that the Servicer need not make
Advances with respect to any Mortgage Loan that is 150 days or more delinquent.
In addition, with respect to Interest-Only Mortgage Loans, the Servicer will
only advance payments of scheduled interest. The Servicer shall have the right
to reimburse itself for any such advances from amounts held from time to time in
the related Collection Account to the extent such amounts are not then required
to be so distributed to certificateholders; provided, however, that any funds so
applied and transferred shall be replaced by the Servicer by deposit in the
related Collection Account no later than one Business Day prior to the
Distribution Date on which such funds are required to be distributed. The
Servicer will not cover shortfalls due to bankruptcy proceedings or the
application of the Servicemembers Civil Relief Act or similar state legislation
or regulations. In the event the Servicer previously made Advances which later
are determined to be nonrecoverable, the Servicer will be entitled to
reimbursement of such Advances prior to distributions to certificateholders. If
the Servicer determines on any Servicer Remittance Date to make an Advance, such
Advance will be included with the distribution to holders of the LIBOR
Certificates on the related Distribution Date. In addition, the Servicer may
withdraw from the Collection Account funds that were not included in the
available funds for the preceding Distribution Date to reimburse itself for
Advances previously made. Any failure by the Servicer to make an Advance as
required by the Pooling and Servicing Agreement will constitute an event of
default thereunder, in which case the Trustee or such other entity as may be
appointed as successor servicer, will be obligated to make any such Advance in
accordance with the terms of the Pooling and Servicing Agreement. The Servicer
may reimburse itself from any amounts in the Collection Account for any prior
Advances or servicing advances that have not been reimbursed at the time the
Mortgage Loan is modified.

<div align="center">S-51</div>

<PAGE>

LOSS MITIGATION PROCEDURES

   The Servicer is authorized to engage in a wide variety of loss mitigation
practices. With respect to such of the Mortgage Loans as come into and continue
in default, the Servicer will decide whether to (i) foreclose upon the mortgaged
properties securing those Mortgage Loans, (ii) write off the unpaid principal
balance of the Mortgage Loans as bad debt if no net recovery is possible through
foreclosure, (iii) take a deed in lieu of foreclosure, (iv) accept a short sale
(a payoff of the Mortgage Loan for an amount less than the total amount
contractually owed in order to facilitate a sale of the mortgaged property by
the mortgagor) or permit a short refinancing (a payoff of the Mortgage Loan for
an amount less than the total amount contractually owed in order to facilitate
refinancing transactions by the mortgagor not involving a sale of the mortgaged
property), (v) arrange for a repayment plan, (vi) agree to a modification in
accordance with the Pooling and Servicing Agreement, or (vii) solicit or refer
to a mortgage originator any mortgagor for refinancing or otherwise take action
to encourage refinancing. As to any Mortgage Loan that becomes 120 days

delinquent, the Servicer may obtain a broker's price opinion, the cost of which will be reimbursable as a servicing advance. After obtaining the broker's price opinion, the Servicer will determine whether a net recovery is possible through foreclosure proceedings or other liquidation of the related mortgaged property. If the Servicer determines that no such recovery is possible, it may charge off the related Mortgage Loan at the time it becomes 180 days delinquent. Once a Mortgage Loan has been charged off, the Servicer will discontinue making Advances, the Servicer will not be entitled to Servicing Fees, and the loan will be treated as a liquidated Mortgage Loan giving rise to a Realized Loss. If the Servicer determines that such net recovery is possible through foreclosure proceedings or other liquidation of the related mortgaged property on a Mortgage Loan that becomes 180 days delinquent, the Servicer may continue making Advances, the Servicer shall continue to service the Mortgage Loan and will receive the Servicing Fee therefor, and the Servicer will continue to report the Mortgage Loan to the Trustee as being serviced by the Servicer.

Any Mortgage Loan that is charged off may continue to be serviced by the Servicer for the certificateholders using specialized collection procedures (including foreclosure, if appropriate).The Servicer will not be entitled to any Servicing Fees or reimbursement of expenses in connection with such Mortgage Loans after the date of charge off, except to the extent of funds available from the aggregate amount of recoveries on all such Mortgage Loans. Any such Mortgage Loans serviced in accordance with the specialized collection procedures shall be serviced for approximately six months. Any net recoveries received on such Mortgage Loans during such six month period will be treated as liquidation proceeds and included in the amount available to make distributions on the Certificates. On the date that is six months after the date on which the Servicer begins servicing such Mortgage Loans using the specialized collection procedures, unless specific net recoveries are anticipated by the Servicer on a particular Mortgage Loan, such charged off loan will be released to the majority holder of the Class C Certificates and thereafter, (i) the majority holder of the Class C Certificates (as identified with contact information in writing to the Servicer by the Depositor) will be entitled to any amounts subsequently received in respect of any such released loans, subject to a servicing fee, (ii) the servicing thereof and the servicing fee shall be pursuant to a servicing agreement between the Depositor and the Servicer if the Servicer continues to service such loan and (iii) the majority holder of the Class C Certificates may designate any servicer to service any such released loan and (iv) the majority holder of the Class C Certificates may sell any such released loan to a third party.

EVIDENCE AS TO COMPLIANCE

The Pooling and Servicing Agreement will require the Servicer and any party required by Item 1123 of Regulation AB for each year in which a Report on Form 10-K is required to be filed, to deliver annually to the Depositor and the Trustee an officer's certificate stating that (i) a review of that party's servicing activities during the preceding calendar year and of performance under the agreement has been

S-52

<PAGE>

made under the officer's supervision, and (ii) to the best of the officer's knowledge, based on the review, such party has fulfilled all its obligations under the agreement throughout the year, or, if there has been a failure to fulfill any obligation in any material respect, specifying the failure known to the officer and the nature and status of the failure.

In addition, for each year in which a Report on Form 10-K is required to be filed, the Servicer and each party, if any, that performs a discrete function specified by Item 1122(d) of Regulation AB for more than 5% of the Mortgage Loans will be required to deliver annually to the Trustee, a report (an

"Assessment of Compliance") that assesses compliance by that party with the servicing criteria set forth in item 1122(d) of Regulation AB that contains the following:

- a statement of the party's responsibility for assessing compliance with the servicing criteria applicable to it;

- a statement that the party used the criteria in Item 1122(d) of Regulation AB to assess compliance with the applicable servicing criteria;

- the party's assessment of compliance with the applicable servicing criteria during and as of the end of the prior calendar year, setting forth any material instance of noncompliance identified by the party; and

- a statement that a registered public accounting firm has issued an attestation report on the party's assessment of compliance with the servicing criteria.

Each party that is required to deliver an Assessment of Compliance will also be required to deliver an attestation report of a registered public accounting firm, prepared in accordance with the standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board, that expresses an opinion, or states that an opinion cannot be expressed, concerning the party's assessment of compliance with the applicable servicing criteria.

For each year in which a Report on Form 10-K is required to be filed, the Servicer will cause all such items for itself and its required subcontractors, if any, to be delivered for filing on a Form 10-K.

CUSTODY OF THE MORTGAGE FILES

The Servicer generally will not have responsibility for custody of the Mortgage Loan documents described under "The Pooling and Servicing Agreement--Assignment of Mortgage Loans" below. These documents are generally required to be delivered to the Trustee or the custodian on behalf of the Trustee. The Trustee or the custodian on behalf of the Trustee will hold the related Mortgage Loan documents on behalf of the Issuing Entity. The Mortgage Loan documents related to a Mortgage Loan will be held together in an individual file separate from other mortgage loan files held by the Trustee or the custodian on behalf of the Trustee. The Trustee or the custodian on behalf of the Trustee will maintain the Mortgage Loan documents in a fire-resistant facility intended for the safekeeping of mortgage loan files.

PLEDGE OF SERVICING RIGHTS

The Servicer may pledge and assign all of its right, title and interest in, to and under the Pooling and Servicing Agreement to one or more lenders, or servicing rights pledgees, selected by the Servicer, as the representative of certain lenders. The Trustee and the Depositor will agree in the Pooling and Servicing Agreement that upon delivery to the Trustee by the servicing rights pledgee of a letter signed by the Servicer whereunder the Servicer shall resign as Servicer under the Pooling and Servicing Agreement,

S-53

<PAGE>

the Trustee shall appoint the servicing rights pledgee or its designee as successor servicer, provided that at the time of such appointment, the servicing rights pledgee or such designee meets the requirements of a successor servicer described in the Pooling and Servicing Agreement (including being acceptable to

the Rating Agencies) and that the servicing rights pledgee agrees to be subject to the terms of the Pooling and Servicing Agreement. Under no circumstances will the Trustee be required to act as a backup servicer.

The Pooling and Servicing Agreement will provide that (i) the Servicer may enter into a facility with any person which provides that such person may fund Advances and/or servicing advances, although no such facility will reduce or otherwise affect the Servicer's obligation to fund such Advances and/or servicing advances and (ii) the Pooling and Servicing Agreement may be amended by the parties thereto without the consent of the certificateholders to provide for such a facility.

## DESCRIPTION OF THE CERTIFICATES

GENERAL

The certificates will represent the entire beneficial ownership interest in the Trust Fund to be created under the Pooling and Servicing Agreement. A copy of the Pooling and Servicing Agreement will be attached as an exhibit to the Current Report on Form 8-K of the Depositor that will be available to purchasers of the certificates at, and will be filed with, the Securities and Exchange Commission within fifteen (15) days of the initial delivery of the certificates. Reference is made to the attached prospectus for additional information regarding the terms and conditions of the Pooling and Servicing Agreement.

The following summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the Pooling and Servicing Agreement. When particular provisions or terms used in the Pooling and Servicing Agreement are referred to, the actual provisions (including definitions of terms) are incorporated by reference.

The certificates will consist of:

(1) the Class A Certificates, the Class M Certificates and the Class B Certificates (all of which are being offered hereby); and

(2) the Class C Certificates and the Class P Certificates (which are not being offered hereby).

The Group One Certificates will generally represent interests in the Group One Mortgage Loans. On each Distribution Date, principal and interest received with respect to the Group One Mortgage Loans generally will be applied to pay principal and interest with respect to the Group One Certificates. The Group Two Certificates will generally represent interests in the Group Two Mortgage Loans. On each Distribution Date, principal and interest received with respect to the Group Two Mortgage Loans generally will be applied to pay principal and interest with respect to the Group Two Certificates. The Class M-5, Class M-6 and Class B Certificates will generally represent interests in both the Group One and Group Two Mortgage Loans. On each Distribution Date, principal and interest received with respect to both the Group One and Group Two Mortgage Loans will be applied to pay principal and interest with respect to the Class M-5, Class M-6 and Class B Certificates.

The LIBOR Certificates (other than the Class R Certificate) will be issued in book-entry form as described below. The Definitive Certificates will be transferable and exchangeable through the Trustee. The LIBOR Certificates (other than the Class R Certificate) will be issued in minimum dollar denominations of $25,000 and integral multiples of $1 in excess of $25,000. With respect to initial

S-54

<PAGE>

European investors only, the LIBOR Certificates will only be sold in minimum total investment amounts of $100,000. A single Class R Certificate will be issued in definitive form in a $100 denomination.

BOOK-ENTRY CERTIFICATES

    The LIBOR Certificates (other than the Class R Certificate) will be Book-Entry Certificates. Certificate Owners may elect to hold their Book-Entry Certificates through DTC in the United States, or Clearstream Luxembourg or Euroclear in Europe, if they are participants in such systems, or indirectly through organizations that are participants in such systems. The Book-Entry Certificates will be issued in one or more certificates that equal the aggregate principal balance of the LIBOR Certificates (other than the Class R Certificate) and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream Luxembourg and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream Luxembourg's and Euroclear's names on the books of their respective depositaries which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A. will act as depositary for Clearstream Luxembourg and JPMorgan Chase Bank, N.A. will act as depositary for Euroclear. Investors may hold such beneficial interests in the Book-Entry Certificates in minimum Certificate Principal Balances of $25,000 and integral multiples of $1 in excess of $25,000. With respect to European investors only, the Underwriter will only sell LIBOR Certificates in minimum total investment amounts of $100,000. Except as described below, no person acquiring a Book-Entry Certificate will be entitled to receive a Definitive Certificate. Unless and until Definitive Certificates are issued, it is anticipated that the only certificateholder of the Book-Entry Certificates will be Cede & Co., as nominee of DTC. Certificate Owners will not be certificateholders as that term is used in the Pooling and Servicing Agreement. Certificate Owners are only permitted to exercise their rights indirectly through Participants and DTC.

    The beneficial owner's ownership of a Book-Entry Certificate will be recorded on the records of the Financial Intermediary that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such Book-Entry Certificate will be recorded on the records of DTC (or of a participating firm that acts as agent for the Financial Intermediary, whose interest will in turn be recorded on the records of DTC, if the beneficial owner's Financial Intermediary is not a DTC Participant, and on the records of Clearstream Luxembourg or Euroclear, as appropriate).

    Certificate Owners will receive all distributions of principal of, and interest on, the Book-Entry Certificates from the Trustee through DTC and DTC Participants. While the Book-Entry Certificates are outstanding (except under the circumstances described below), under the Rules, DTC is required to make book-entry transfers among Participants on whose behalf it acts with respect to the Book-Entry Certificates and is required to receive and transmit distributions of principal of, and interest on, the Book-Entry Certificates. Indirect Participants, with whom Certificate Owners have accounts with respect to Book-Entry Certificates, are similarly required to make book-entry transfers and receive and transmit such distributions on behalf of their respective Certificate Owners. Accordingly, although Certificate Owners will not possess certificates, the Rules provide a mechanism by which Certificate Owners will receive distributions and will be able to transfer their interests.

    Certificate Owners will not receive or be entitled to receive certificates representing their respective interests in the Book-Entry Certificates, except under the limited circumstances described below. Unless and until Definitive Certificates are issued, Certificate Owners who are not Participants may transfer ownership of Book-Entry Certificates only through Participants and Indirect Participants by instructing such Participants and Indirect Participants to transfer Book-Entry Certificates, by book-entry transfer, through DTC for the account of the purchasers of such Book-Entry Certificates, which account is maintained with their respective Participants. Under the Rules and in accordance with DTC's normal procedures, transfers of ownership of Book-Entry Certificates

will be executed through DTC and the

S-55

<PAGE>

accounts of the respective Participants at DTC will be debited and credited.
Similarly, the Participants and Indirect Participants will make debits or
credits, as the case may be, on their records on behalf of the selling and
purchasing Certificate Owners.

Because of time zone differences, credits of securities received in
Clearstream Luxembourg or Euroclear as a result of a transaction with a
Participant will be made during subsequent securities settlement processing and
dated the Business Day following the DTC settlement date. Such credits or any
transactions in such securities settled during such processing will be reported
to the relevant Euroclear or Clearstream Luxembourg Participants on such
Business Day. Cash received in Clearstream Luxembourg or Euroclear, as a result
of sales of securities by or through a Clearstream Luxembourg Participant or
Euroclear Participant to a DTC Participant, will be received with value on the
DTC settlement date but will be available in the relevant Clearstream Luxembourg
or Euroclear cash account only as of the Business Day following settlement in
DTC. For information with respect to tax documentation procedures relating to
the Book-Entry Certificates, see "Material Federal Income Tax Consequences -
Grantor Trust Funds - Non-U.S. Persons," "Material Federal Income Tax
Consequences - REMICs - Taxation of Owners of REMIC Regular Certificates -
Non-U.S. Persons" and "Material Federal Income Tax Consequences - Tax Treatment
of Certificates as Debt for Tax Purposes - Foreign Investors" in the prospectus
and "Global Clearance, Settlement and Tax Documentation Procedures - Certain
U.S. Federal Income Tax Documentation Requirements" in Annex I hereto.

Transfers between Participants will occur in accordance with the Rules.
Transfers between Clearstream Luxembourg Participants and Euroclear Participants
will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly
through DTC, on the one hand, and directly or indirectly through Clearstream
Luxembourg Participants or Euroclear Participants, on the other, will be
effected in DTC in accordance with the Rules on behalf of the relevant European
international clearing system by the Relevant Depositary; however, such
cross-market transactions will require delivery of instructions to the relevant
European international clearing system by the counterpart in such system in
accordance with its rules and procedures and within its established deadlines
(European time). The relevant European international clearing system will, if
the transaction meets its settlement requirements, deliver instructions to the
Relevant Depositary to take action to effect final settlement on its behalf by
delivering or receiving securities in DTC, and making or receiving payment in
accordance with normal procedures for same-day funds settlement applicable to
DTC. Clearstream Luxembourg Participants and Euroclear Participants may not
deliver instructions directly to the European Depositaries.

DTC, which is a New York-chartered limited purpose trust company, performs
services for its Participants, some of which (and/or their representatives) own
DTC. In accordance with its normal procedures, DTC is expected to record the
positions held by each DTC Participant in the Book-Entry Certificates, whether
held for its own account or as a nominee for another person. In general,
beneficial ownership of Book-Entry Certificates will be subject to the rules,
regulations and procedures governing DTC and DTC Participants as in effect from
time to time.

Clearstream Luxembourg is incorporated under the laws of Luxembourg as a
professional depository. Clearstream Luxembourg holds securities for Clearstream
Luxembourg Participants and facilitates the clearance and settlement of
securities transactions between Clearstream Luxembourg Participants through

electronic book-entry changes in accounts of Clearstream Luxembourg Participants, thereby eliminating the need for physical movement of certificates. Transactions may be settled in Clearstream Luxembourg in any of 28 currencies, including United States dollars. Clearstream Luxembourg provides to its Clearstream Luxembourg Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities

<div align="center">S-56</div>

<PAGE>

lending and borrowing. Clearstream Luxembourg interfaces with domestic markets in several countries. As a professional depository, Clearstream Luxembourg is subject to regulation by the Luxembourg Monetary Institute. Clearstream Luxembourg Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream Luxembourg is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream Luxembourg Participant, either directly or indirectly.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Euroclear is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium.

The Euroclear Operator holds securities and book-entry interests in securities for participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and Participants of certain other securities intermediaries through electronic book-entry changes in accounts of such Participants or other securities intermediaries. The Euroclear Operator provides Euroclear Participants with, among other things, safekeeping, administration, clearance and settlement, securities lending and borrowing and other related services.

Non-Participants of Euroclear may hold and transfer book-entry interests in the Certificates through accounts with a direct Participant of Euroclear or any other securities intermediary that holds a book-entry interest in the Certificates through one or more securities intermediaries standing between such other securities intermediary and the Euroclear Operator.

The Euroclear Operator is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions. The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants, and has no record of or relationship with persons holding through Euroclear Participants.

Distributions on the Book-Entry Certificates will be made on each Distribution Date by the Trustee to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC Participants in accordance with DTC's normal procedures. Each DTC Participant will be

responsible for disbursing such payments to the beneficial owners of the
Book-Entry Certificates that it represents and to each Financial Intermediary
for which it acts as agent. Each such Financial Intermediary will be responsible
for disbursing funds to the beneficial owners of the Book-Entry Certificates
that it represents.

    Under a book-entry format, beneficial owners of the Book-Entry Certificates
may experience some delay in their receipt of payments, since such payments will
be forwarded by the Trustee to Cede & Co. Distributions with respect to
Book-Entry Certificates held through Clearstream Luxembourg or Euroclear will be
credited to the cash accounts of Clearstream Luxembourg Participants or
Euroclear Participants in accordance with the relevant system's rules and
procedures, to the extent received by the

<div align="center">S-57</div>

<PAGE>

Relevant Depositary. Such distributions will be subject to tax reporting and may
be subject to tax withholding in accordance with relevant United States tax laws
and regulations. See "Material Federal Income Tax Consequences - Grantor Trust
Funds - Non-U.S. Persons," "Material Federal Income Tax Consequences - REMICs -
Taxation of Owners of REMIC Regular Certificates - Non-U.S. Persons" and
"Material Federal Income Tax Consequences - Tax Treatment of Certificates as
Debt for Tax Purposes - Foreign Investors" in the prospectus. Because DTC can
only act on behalf of Financial Intermediaries, the ability of a beneficial
owner to pledge Book-Entry Certificates to persons or entities that do not
participate in the depository system, or otherwise take actions in respect of
such Book-Entry Certificates, may be limited due to the lack of physical
certificates for such Book-Entry Certificates. In addition, issuance of the
Book-Entry Certificates in book-entry form may reduce the liquidity of those
LIBOR Certificates in the secondary market since some potential investors may be
unwilling to purchase LIBOR Certificates for which they cannot obtain physical
certificates.

    Monthly and annual reports on the Trust Fund provided by the Trustee to
Cede & Co., as nominee of DTC, may be made available to beneficial owners upon
request, in accordance with the rules, regulations and procedures creating and
affecting DTC or the Relevant Depositary, and to the Financial Intermediaries to
whose DTC accounts the Book-Entry Certificates of such beneficial owners are
credited.

    DTC has advised the Depositor and the Trustee that, unless and until
Definitive Certificates are issued, DTC will take any action permitted to be
taken by the holders of the Book-Entry Certificates under the Pooling and
Servicing Agreement only at the direction of one or more Financial
Intermediaries to whose DTC accounts the Book-Entry Certificates are credited,
to the extent that such actions are taken on behalf of Financial Intermediaries
whose holdings include such Book-Entry Certificates. Clearstream Luxembourg or
the Euroclear Operator, as the case may be, will take any other action permitted
to be taken by a holder of a Book-Entry Certificate under the Pooling and
Servicing Agreement on behalf of a Clearstream Luxembourg Participant or
Euroclear Participant only in accordance with its relevant rules and procedures
and subject to the ability of the Relevant Depositary to effect such actions on
its behalf through DTC. DTC may take actions, at the direction of the related
Participants, with respect to some Book-Entry Certificates which conflict with
actions taken with respect to other Book-Entry Certificates.

    Definitive Certificates will be issued to beneficial owners of the
Book-Entry Certificates, or their nominees, rather than to DTC, only if:

    (1)  DTC or the Depositor advises the Trustee in writing that DTC is no
        longer willing, qualified or able to discharge properly its
        responsibilities as nominee and depository with respect to the

Book-Entry Certificates and the Depositor is unable to locate a
qualified successor;

(2)   the Depositor, at its sole option, elects to terminate a book-entry
      system through DTC; or

(3)   after the occurrence and continuation of an event of default,
      beneficial owners having not less than 51% of the voting rights
      evidenced by any class of Book-Entry Certificates advise the Trustee
      and DTC through the Financial Intermediaries and the DTC Participants
      in writing that the continuation of a book-entry system through DTC
      (or a successor to DTC) is no longer in the best interests of
      beneficial owners of such class.

     Upon the occurrence of any of the events described in the immediately
preceding paragraph, the Trustee will be required to notify all beneficial
owners of the occurrence of such event and the availability of Definitive
Certificates through DTC. Upon surrender by DTC of the global certificate or
certificates representing the Book-Entry Certificates and instructions for
re-registration, the Issuing Entity will issue

                                     S-58

<PAGE>

Definitive Certificates, and thereafter the Trustee will recognize the holders
of such Definitive Certificates as holders of the LIBOR Certificates under the
Pooling and Servicing Agreement.

     Although DTC, Clearstream Luxembourg and Euroclear have agreed to these
procedures in order to facilitate transfers of certificates among Participants
of DTC, Clearstream Luxembourg and Euroclear, they are under no obligation to
perform or continue to perform such procedures and such procedures may be
discontinued at any time.

PAYMENTS ON MORTGAGE LOANS; ACCOUNTS; SUPPLEMENTAL INTEREST TRUST

     The Pooling and Servicing Agreement will provide that the Servicer, for the
benefit of the certificateholders, shall establish and maintain one or more
accounts, known collectively as the Collection Account, into which the Servicer
is generally required to deposit or cause to be deposited, promptly upon receipt
and in any event within two Business Days of receipt, the payments and
collections described in "Description of the Agreements-Collection Account and
Related Accounts" in the prospectus, except that the Servicer may deduct its
Servicing Fee, and any Advances, servicing advances and any expenses in the case
of liquidating defaulted Mortgage Loans or property acquired in respect thereof.
The Pooling and Servicing Agreement will permit the Servicer to direct any
depository institution maintaining the related Collection Account to invest the
funds in the Collection Account and escrow accounts in one or more investments
acceptable to Moody's and S&P as provided in the Pooling and Servicing
Agreement, that mature, unless payable on demand, no later than the Servicer
Remittance Date. The Servicer will be entitled to all income and gain realized,
or any other benefits derived, from the Collection Account and escrow account,
and the income and gain will be subject to withdrawal by the Servicer from time
to time. The Servicer will be required to deposit the amount of any losses
incurred in respect to the Collection Account investments out of its own funds
as the losses are realized.

     The Trustee will be obligated to establish the Certificate Account, for the
benefit of the certificateholders, into which the Servicer will deposit or cause
to be deposited not later than 1:00 p.m. New York City time on the Servicer
Remittance Date from amounts on deposit in the Collection Account, the Interest
Funds and the Principal Funds with respect to the related Distribution Date.
Subject to the restrictions set forth in the Pooling and Servicing Agreement,

the Trustee is permitted to direct that the funds in the Certificate Account be
invested so long as the investments mature no later than the Distribution Date.
Certain income and gain realized or other benefits arising from any Certificate
Account investment will belong to the Trustee. The Trustee or its designee will
be required to deposit in the Certificate Account out of its own funds the
amount of any losses incurred in respect of any Certificate Account investment,
as the losses are realized.

     The Trustee will be obligated to establish the Corridor Contract Account,
for the benefit of the certificateholders, into which the Trustee shall promptly
deposit upon receipt any amounts received by it and paid pursuant to the
Corridor Contracts. The funds in the Corridor Contract Account shall not be
invested.

     The Supplemental Interest Trust Trustee will be directed to establish the
Supplemental Interest Trust, as a separate trust, the corpus of which will be
held by the Supplemental Interest Trust Trustee, in trust, for the benefit of
the certificateholders. On any Distribution Date, any Swap Termination Payments
or Net Swap Payments owed to the Swap Counterparty will be paid out of and any
Net Swap Payments or Swap Termination Payments received from the Swap
Counterparty will be deposited into the Supplemental Interest Trust. The
Supplemental Interest Trust will not be an asset of any REMIC. On each
Distribution Date, the Trustee will distribute funds in the Supplemental
Interest Trust in the manner described in "Description of the
Certificates--Distributions from the Supplemental Interest Trust." Funds on
deposit in the Supplemental Interest Trust shall be held separate and apart
from, and shall not be

                                  S-59

<PAGE>

commingled with, any other moneys, including, without limitation, other moneys
of the Trustee held pursuant to the Pooling and Servicing Agreement.

DISTRIBUTIONS

     General. Distributions on the certificates will be made by the Trustee on
each Distribution Date, commencing in June 2007, to the persons in whose names
the certificates are registered at the close of business on the Record Date.

     Distributions on each Distribution Date will be made by wire transfer in
immediately available funds to the account specified by such certificateholder
at a bank or other depository institution having appropriate wire transfer
facilities, or, in the case of any certificateholder that has so notified the
Trustee in writing in accordance with the Pooling and Servicing Agreement, by
check mailed to the address of the person entitled to distributions as it
appears on the certificate register; provided, however, that the final
distribution in retirement of the certificates will be made only upon
presentation and surrender of such certificates at the office of the Trustee or
such other address designated in writing by the Trustee. On each Distribution
Date, a holder of a certificate will receive such holder's Percentage Interest
of the amounts required to be distributed with respect to the applicable class
of certificates.

     Distributions of Interest. For each Distribution Date, the interest
distributable with respect to the Certificates is the interest that has accrued
thereon at the then applicable related Pass-Through Rate during the related
Accrual Period less Prepayment Interest Shortfalls, if any.

     All calculations of interest on the LIBOR Certificates will be made on the
basis of a 360-day year and the actual number of days elapsed in the applicable
Accrual Period.

On each Distribution Date (or in the case of any Net Swap Payments owed to the Swap Counterparty, one business day (as determined under the Swap Agreement) prior to such Distribution Date), the Interest Funds for such Distribution Date are required to be distributed in the following order of priority, until such Interest Funds have been fully distributed:

    (1)  to the Class P Certificates, an amount equal to any prepayment charges received with respect to the Mortgage Loans or paid by the Servicer or the Sponsor in respect of prepayment charges during the related Prepayment Period if made in connection with Principal Prepayments in full and during the related calendar period if made in connection with partial Principal Prepayments;

    (2)  to the Supplemental Interest Trust, any Net Swap Payments owed to the Swap Counterparty;

    (3)  to the Supplemental Interest Trust, any Swap Termination Payment owed by the Issuing Entity to the Swap Counterparty (other than Defaulted Swap Termination Payments);

    (4)  concurrently, to each class of the Class A Certificates, the Current Interest and any Interest Carry Forward Amount with respect to each such class; provided, however, that if Interest Funds are insufficient to make a full distribution of the aggregate Current Interest and the aggregate Interest Carry Forward Amount to the Class A Certificates, Interest Funds will be distributed pro rata among each class of the Class A Certificates based upon the ratio of (x) the Current Interest and Interest Carry Forward Amount for each such class to (y) the total amount of Current Interest and any Interest Carry Forward Amount for the Class A Certificates in the aggregate;

<div align="center">S-60</div>

&lt;PAGE&gt;

    (5)  concurrently, to each class of the Class M-1 Certificates, the Current Interest and any Interest Carry Forward Amount with respect to each such class; provided, however, that if Interest Funds are insufficient to make a full distribution of the aggregate Current Interest and the aggregate Interest Carry Forward Amount to the Class M-1 Certificates, Interest Funds will be distributed pro rata among each class of the Class M-1 Certificates based upon the ratio of (x) the Current Interest and Interest Carry Forward Amount for each such class to (y) the total amount of Current Interest and any Interest Carry Forward Amount for the Class M-1 Certificates in the aggregate;

    (6)  concurrently, to each class of the Class M-2 Certificates, the Current Interest and any Interest Carry Forward Amount with respect to each such class; provided, however, that if Interest Funds are insufficient to make a full distribution of the aggregate Current Interest and the aggregate Interest Carry Forward Amount to the Class M-2 Certificates, Interest Funds will be distributed pro rata among each class of the Class M-2 Certificates based upon the ratio of (x) the Current Interest and Interest Carry Forward Amount for each such class to (y) the total amount of Current Interest and any Interest Carry Forward Amount for the Class M-2 Certificates in the aggregate;

    (7)  concurrently, to each class of the Class M-3 Certificates, the Current Interest and any Interest Carry Forward Amount with respect to each such class; provided, however, that if Interest Funds are insufficient to make a full distribution of the aggregate Current Interest and the aggregate Interest Carry Forward Amount to the Class M-3 Certificates, Interest Funds will be distributed pro rata among each class of the Class M-3 Certificates based upon the ratio of (x) the Current

Interest and Interest Carry Forward Amount for each such class to (y)
the total amount of Current Interest and any Interest Carry Forward
Amount for the Class M-3 Certificates in the aggregate;

(8)  concurrently, to each class of the Class M-4 Certificates, the Current
     Interest and any Interest Carry Forward Amount with respect to each
     such class; provided, however, that if Interest Funds are insufficient
     to make a full distribution of the aggregate Current Interest and the
     aggregate Interest Carry Forward Amount to the Class M-4 Certificates,
     Interest Funds will be distributed pro rata among each class of the
     Class M-4 Certificates based upon the ratio of (x) the Current
     Interest and Interest Carry Forward Amount for each such class to (y)
     the total amount of Current Interest and any Interest Carry Forward
     Amount for the Class M-4 Certificates in the aggregate;

(9)  to the Class M-5 Certificates, the Current Interest for such class and
     any Interest Carry Forward Amount with respect to such class;

(10) to the Class M-6 Certificates, the Current Interest for such class and
     any Interest Carry Forward Amount with respect to such class;

(11) to the Class B-1 Certificates, the Current Interest for such class and
     any Interest Carry Forward Amount with respect to such class;

(12) to the Class B-2 Certificates, the Current Interest for such class and
     any Interest Carry Forward Amount with respect to such class;

(13) to the Class B-3 Certificates, the Current Interest for such class and
     any Interest Carry Forward Amount with respect to such class; and

                                  S-61

<PAGE>

(14) any remainder to be distributed as described under
     "--Overcollateralization Provisions" below.

     On each Distribution Date (or prior to such Distribution Date, with respect
to payments to the Supplemental Interest Trust), subject to the provisos in (4)
- (8) above, Interest Funds received on the Group One Mortgage Loans will be
deemed to be distributed to the Group One Certificates, and Interest Funds
received on the Group Two Mortgage Loans will be deemed to be distributed to the
Group Two Certificates, in each case, until the related Current Interest and
Interest Carry Forward Amount of each such class of certificates for such
Distribution Date has been paid in full, and thereafter, Interest Funds not
required for such distributions will be available to be applied, if necessary,
to the class or classes of certificates that are not related to such group of
Mortgage Loans.

     Any payments received under the terms of the related Corridor Contract will
be available to pay the holders of the related classes of the LIBOR Certificates
amounts in respect of any Floating Rate Certificate Carryover (other than any
Floating Rate Certificate Carryover attributable to the fact that Realized
Losses are not allocated to the Class A Certificates). Any amounts received
under the terms of the Corridor Contracts on a Distribution Date that are not
used to pay such Floating Rate Certificate Carryover will be distributed to the
holder of the Class C Certificates. Payments from the proceeds of the related
Corridor Contract in respect of such Floating Rate Certificate Carryover shall
be paid to the related classes of LIBOR Certificates, pro rata, based upon such
Floating Rate Certificate Carryover for each related class of LIBOR
Certificates.

     Distributions of Principal. On each Distribution Date (or in the case of
any Net Swap Payments owed to the Swap Counterparty, one business day (as

determined under the Swap Agreement) prior to such Distribution Date), the
Principal Distribution Amount for such Distribution Date is required to be
distributed in the following order of priority until the Principal Distribution
Amount has been fully distributed:

    (1)  to the Supplemental Interest Trust, any Net Swap Payments owed to the
          Swap Counterparty to the extent not paid pursuant to paragraph (2)
          under "--Distributions of Interest" above.

    (2)  to the Supplemental Interest Trust, any Swap Termination Payment owed
          by the Issuing Entity to the Swap Counterparty (other than Defaulted
          Swap Termination Payments) to the extent not paid pursuant to
          paragraph (3) under "--Distributions of Interest" above;

    (3)  to the Class A Certificates, the Class A Principal Distribution Amount
          will be distributed as follows:

        (a)  the Class A-1 Principal Distribution Amount will be distributed
              as follows: sequentially, to the Class R Certificates until the
              Certificate Principal Balance of such class has been reduced to
              zero, then, to the Class A-1A Certificates, until the Certificate
              Principal Balance of such class has been reduced to zero, then,
              to the Class A-1B Certificates, until the Certificate Principal
              Balance of such class has been reduced to zero, then, to the
              Class A-1C Certificates, until the Certificate Principal Balance
              of such class has been reduced to zero, and then, to the Class
              A-1D Certificates, until the Certificate Principal Balance of
              such class has been reduced to zero; provided, however, that on
              and after the Distribution Date on which the aggregate
              Certificate Principal Balance of the Class M, Class B and Class C
              Certificates has been reduced to zero, any principal
              distributions allocated to the Class A-1A, Class A-1B, Class A-1C
              and Class A-1D Certificates are required to be

                          S-62

&lt;PAGE&gt;

              allocated pro rata, among such classes, based on their respective
              Certificate Principal Balances, until their Certificate Principal
              Balances have been reduced to zero; and

        (b)  the Class A-2 Principal Distribution Amount will be distributed
              as follows: sequentially, to the Class A-2A Certificates until
              the Certificate Principal Balance of such class has been reduced
              to zero, then to the Class A-2B Certificates until the
              Certificate Principal Balance of such class has been reduced to
              zero, then to the Class A-2C Certificates until the Certificate
              Principal Balance of such class has been reduced to zero, and
              then to the Class A-2D Certificates until the Certificate
              Principal Balance of such class has been reduced to zero;
              provided, however, that on and after the Distribution Date on
              which the aggregate Certificate Principal Balance of the Class M,
              Class B and Class C Certificates has been reduced to zero, any
              principal distributions allocated to the Class A-2A, Class A-2B,
              Class A-2C and Class A-2D Certificates are required to be
              allocated pro rata, among such classes, based on their respective
              Certificate Principal Balances, until their Certificate Principal
              Balances have been reduced to zero;

    (4)  to the Class M-1 Certificates, the Class M-1 Principal Distribution
          Amount will be distributed, concurrently, as follows: (x) the Group
          One Principal Distribution Percentage of the Class M-1 Principal
          Distribution Amount will be distributed to the Class M-1-1

Certificates until the Certificate Principal Balance of such class has
been reduced to zero and (y) the Group Two Principal Distribution
Percentage of the Class M-1 Principal Distribution Amount will be
distributed to the Class M-1-2 Certificates until the Certificate
Principal Balance of such class has been reduced to zero; provided,
however, that on and after the Distribution Date on which the
Certificate Principal Balance of either the Class M-1-1 or Class M-1-2
Certificates has been reduced to zero while the other Class M-1
Certificates remain outstanding, then all of the Class M-1 Principal
Distribution Amount will be distributed to the outstanding Class M-1
Certificate until the Certificate Principal Balance of such class has
been reduced to zero;

(5) to the Class M-2 Certificates, the Class M-2 Principal Distribution
Amount will be distributed, concurrently, as follows: (x) the Group
One Principal Distribution Percentage of the Class M-2 Principal
Distribution Amount will be distributed to the Class M-2-1
Certificates until the Certificate Principal Balance of such class has
been reduced to zero and (y) the Group Two Principal Distribution
Percentage of the Class M-2 Principal Distribution Amount will be
distributed to the Class M-2-2 Certificates until the Certificate
Principal Balance of such class has been reduced to zero; provided,
however, that on and after the Distribution Date on which the
Certificate Principal Balance of either the Class M-2-1 or Class M-2-2
Certificates has been reduced to zero while the other Class M-2
Certificates remain outstanding, then all of the Class M-2 Principal
Distribution Amount will be distributed to the outstanding Class M-2
Certificate until the Certificate Principal Balance of such class has
been reduced to zero;

(6) to the Class M-3 Certificates, the Class M-3 Principal Distribution
Amount will be distributed, concurrently, as follows: (x) the Group
One Principal Distribution Percentage of the Class M-3 Principal
Distribution Amount will be distributed to the Class M-3-1
Certificates until the Certificate Principal Balance of such class has
been reduced to zero and (y) the Group Two Principal Distribution
Percentage of the Class M-3 Principal Distribution Amount will be
distributed to the Class M-3-2 Certificates until the Certificate
Principal Balance of such class has been reduced to zero; provided,

S-63

<PAGE>

however, that on and after the Distribution Date on which the
Certificate Principal Balance of either the Class M-3-1 or Class M-3-2
Certificates has been reduced to zero while the other Class M-3
Certificates remain outstanding, then all of the Class M-3 Principal
Distribution Amount will be distributed to the outstanding Class M-3
Certificate until the Certificate Principal Balance of such class has
been reduced to zero;

(7) to the Class M-4 Certificates, the Class M-4 Principal Distribution
Amount will be distributed, concurrently, as follows: (x) the Group
One Principal Distribution Percentage of the Class M-4 Principal
Distribution Amount will be distributed to the Class M-4-1
Certificates until the Certificate Principal Balance of such class has
been reduced to zero and (y) the Group Two Principal Distribution
Percentage of the Class M-4 Principal Distribution Amount will be
distributed to the Class M-4-2 Certificates until the Certificate
Principal Balance of such class has been reduced to zero; provided,
however, that on and after the Distribution Date on which the
Certificate Principal Balance of either the Class M-4-1 or Class M-4-2
Certificates has been reduced to zero while the other Class M-4

Certificates remain outstanding, then all of the Class M-4
Distribution Amount will be distributed to the outstanding Class M-4
Certificate until the Certificate Principal Balance of such class has
been reduced to zero;

(8)　to the Class M-5 Certificates, the Class M-5 Principal Distribution
Amount;

(9)　to the Class M-6 Certificates, the Class M-6 Principal Distribution
Amount;

(10) to the Class B-1 Certificates, the Class B-1 Principal Distribution
Amount;

(11) to the Class B-2 Certificates, the Class B-2 Principal Distribution
Amount;

(12) to the Class B-3 Certificates, the Class B-3 Principal Distribution
Amount; and

(13) any remainder to be distributed as described under "-
Overcollateralization Provisions" below.

EXAMPLE OF DISTRIBUTIONS

The following sets forth an example of distributions on the Certificates
for the Distribution Date in July 2007:

<TABLE>
<S>                       <C>                       <C>
June 1 through
June 30................    Prepayment Period (Principal    Principal Prepayments in part received
                          Prepayments in part):          by the Servicer during the prior
                                                         calendar month will be deposited into
                                                         the Collection Account for remittance
                                                         to the Trustee on the Servicer
                                                         Remittance Date.

June 2 through July 1...   Due Period:                    Payments due on the first day of the
                                                         month of the related Distribution Date
                                                         and partial Principal Prepayments made
                                                         during the preceding calendar month
                                                         from borrowers will be deposited in the
                                                         Collection Account as received and will
                                                         include scheduled principal payments
                                                         plus interest on June 1 principal
                                                         balances of the Mortgage Loans.

</TABLE>

S-64

<PAGE>

<TABLE>
<S>                       <C>                       <C>
June 15 through
July 14................    Prepayment Period              Principal Prepayments in full received
                          (Principal Prepayments in full):  by the Servicer during the related
                                                         Prepayment Period will be deposited
                                                         into the Collection Account as received
                                                         for remittance to the Trustee on the
                                                         Servicer Remittance Date.

June 29................    Record Date                    With respect to all Classes of LIBOR
</TABLE>

| | | | Certificates and the Distribution Date, distributions will be made to certificateholders of record as of the last Business Day of the prior month. |
| July 18................ | Servicer Remittance Date: | | The Servicer will remit to the Trustee collections and recoveries in respect of the Mortgage Loans including any Advances required to be made by the Servicer for that Distribution Date on the later of the (x) the day that is two Business Days after the 15th day of the month in which the related Distribution Date occurs and (y) the 18th day (or if such day is not a Business Day, the immediately succeeding Business Day) of the month in which the related Distribution Date occurs. |
| July 25................ | Distribution Date: | | On the 25th day of each month (or if the 25th day is not a Business Day, the next succeeding Business Day), the Trustee will make distributions to certificateholders. |

</TABLE>

Succeeding months will follow the same pattern. June 2007 will follow the same pattern except that the Record Date will be the Closing Date.

FEES AND EXPENSES OF THE TRUST FUND

In consideration of their duties on behalf of the Trust Fund, the Servicer and the Trustee will receive from the assets of the Trust Fund certain fees and other compensation as set forth in the following table:

<TABLE>
<CAPTION>

| Fee Payable to: | Frequency and/or of Payment: | Amount of Fee and/or Compensation: | How and When Fee and/or Compensation Is Paid: |
| --------------- | ----------- | --------------------------------------- | ------------------------ |
| <S> | <C> | <C> | <C> |
| Servicer deducted by Collection each Mortgage Servicer, amounts to | Monthly | For each Mortgage Loan, a monthly fee paid to the Servicer out of interest collections received from the related Mortgage Loan calculated on the outstanding principal balance of each Mortgage Loan at 0.500% per annum for each Mortgage Loan. | The monthly fee will be the Servicer from the Account in respect of Loan serviced by the before payment of any certificateholders. |
| | | Additionally, any investment earnings on, or benefits derived from, the Collection Account and the escrow accounts will be paid as compensation | |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

|                     | Frequency    |                                          | How and When Fee |
|---------------------|--------------|------------------------------------------|------------------|
| and/or              |              |                                          |                  |
| Fee Payable to:     | of Payment:  | Amount of Fee and/or Compensation:       | Compensation Is  |
| Paid:               |              |                                          |                  |
| ---------------     | -----------  | ---------------------------------------- | ------------------------ |
| -----------         |              |                                          |                  |
| <S>                 | <C>          | <C>                                      | <C>              |
|                     |              | to the Servicer, and will not be         |                  |
|                     |              | available for distributions to           |                  |
|                     |              | certificateholders. As additional        |                  |
|                     |              | servicing compensation, the Servicer is  |                  |
|                     |              | entitled to receive Prepayment Interest  |                  |
|                     |              | Excesses, excess proceeds from REO       |                  |
|                     |              | Property sales, all assumption fees and  |                  |
|                     |              | other similar charges (other than        |                  |
|                     |              | prepayment charges).                     |                  |
|                     |              |                                          |                  |
| Trustee             | Monthly      | Any investment earnings on and other     | Investment earnings will |
| be                  |              |                                          |                  |
|                     |              | benefits arising from the Certificate    | deducted by the Trustee |
| from the            |              |                                          |                  |
|                     |              | Account will be paid as compensation to  | Certificate Account, |
| before payment      |              |                                          |                  |
|                     |              | the Trustee and will not be available for| of any amounts to |
| certificateholders. |              |                                          |                  |
|                     |              | distributions to certificateholders.     |                  |

</TABLE>

     The fees and/or other compensation of the Servicer and the Trustee as set
forth in the table above may not be increased without amendment of the Pooling
and Servicing Agreement as described under "Description of the Agreements
--Amendment" in the prospectus.

     Expenses, fees and indemnity amounts of and other amounts due to the
Servicer and the Trustee will be reimbursed before payments are made on the
Certificates.

OVERCOLLATERALIZATION PROVISIONS

     If on any Distribution Date, after giving effect to any Extra Principal
Distribution Amount, the aggregate Certificate Principal Balance of the LIBOR
Certificates exceeds the aggregate Stated Principal Balance of the Mortgage
Loans, the Certificate Principal Balance of the Subordinate Certificates will be
reduced, in inverse order of seniority (beginning with the Class B-3
Certificates and pro rata within each numerical designation with respect to the
class M-1, class M-2, class M-3 and class M-4 certificates) by an amount equal
to such excess until the Certificate Principal Balance of each such class is
reduced to zero.

     If the Certificate Principal Balance of a class of Subordinate Certificates
is reduced, that class thereafter will be entitled to distributions of interest
and principal only with respect to its Certificate Principal Balance as so
reduced. On subsequent Distribution Dates, however, as described below, Interest
Funds and Principal Funds not otherwise required to be distributed with respect
to principal of and interest on the certificates will be applied to reduce
Unpaid Realized Loss Amounts previously allocated to such certificates in order
of seniority.

On each Distribution Date (or in the case of any Net Swap Payments owed to the Swap Counterparty, one business day (as determined under the Swap Agreement) prior to such Distribution Date), Interest Funds and Principal Funds not otherwise required to be distributed with respect to principal of and interest on the certificates as described above under "--Distributions" will be required to be distributed in respect of the following amounts, without duplication, until fully distributed:

S-66

<PAGE>

(1)  to the Class A Certificates, any amounts due as described and in the same order of priority as set forth in paragraph (4) of "--Distributions of Interest," to the extent unpaid from Interest Funds;

(2)  to the Subordinate Certificates, any amounts due as described and in the same order of priority as set forth in paragraphs (5) through (13) of "--Distributions of Interest," to the extent unpaid from Interest Funds;

(3)  the Extra Principal Distribution Amount;

(4)  to the Class M-1 Certificates, on a pro rata basis for each class of the Class M-1 Certificates based on (x) the Unpaid Realized Loss Amount of such class of the Class M-1 Certificates over (y) the aggregate Unpaid Realized Loss Amount of the Class M-1 Certificates, any Unpaid Realized Loss Amount for such class;

(5)  to the Class M-2 Certificates, on a pro rata basis for each class of the Class M-2 Certificates based on (x) the Unpaid Realized Loss Amount of such class of the Class M-2 Certificates over (y) the aggregate Unpaid Realized Loss Amount of the Class M-2 Certificates, any Unpaid Realized Loss Amount for such class;

(6)  to the Class M-3 Certificates, on a pro rata basis for each class of the Class M-3 Certificates based on (x) the Unpaid Realized Loss Amount of such class of the Class M-3 Certificates over (y) the aggregate Unpaid Realized Loss Amount of the Class M-3 Certificates, any Unpaid Realized Loss Amount for such class;

(7)  to the Class M-4 Certificates, on a pro rata basis for each class of the Class M-4 Certificates based on (x) the Unpaid Realized Loss Amount of such class of the Class M-4 Certificates over (y) the aggregate Unpaid Realized Loss Amount of the Class M-4 Certificates, any Unpaid Realized Loss Amount for such class;

(8)  to the Class M-5 Certificates, any Unpaid Realized Loss Amount for such class;

(9)  to the Class M-6 Certificates, any Unpaid Realized Loss Amount for such class;

(10) to the Class B-1 Certificates, any Unpaid Realized Loss Amount for such class;

(11) to the Class B-2 Certificates, any Unpaid Realized Loss Amount for such class;

(12) to the Class B-3 Certificates, any Unpaid Realized Loss Amount for such class;

(13) to the LIBOR Certificates, on a pro rata basis, the Floating Rate Certificate Carryover in proportion to such amounts;

(14) to the Supplemental Interest Trust, any Defaulted Swap Termination Payment
     to the extent not already paid; and

(15) to the Class C Certificates or the Class R Certificate, the remaining
     amount.


                                    S-67
<PAGE>

DISTRIBUTIONS FROM THE SUPPLEMENTAL INTEREST TRUST

     On or prior to each Distribution Date (or in the case of any Net Swap
Payments owed to the Swap Counterparty, one business day (as determined under
the Swap Agreement) prior to such Distribution Date), funds in the Supplemental
Interest Trust will be distributed in the following order of priority:

     (1) to the Swap Counterparty, all Net Swap Payments, if any, owed to the
         Swap Counterparty for such Distribution Date;

     (2) to the Swap Counterparty, any Swap Termination Payment, other than a
         Defaulted Swap Termination Payment, if any, owed to the Swap
         Counterparty;

     (3) to each class of the Class A Certificates, on a pro rata basis, any
         Current Interest and any Interest Carry Forward Amount with respect to
         such class to the extent unpaid from Interest Funds and Principal
         Funds in proportion to such unpaid amounts;

     (4) sequentially, to each class of the Class M-1, Class M-2, Class M-3,
         Class M-4, Class M-5, Class M-6, Class B-1, Class B-2 and Class B-3
         Certificates, in that order, any Current Interest for such class to
         the extent unpaid from Interest Funds and Principal Funds; provided,
         however that any amounts distributed to the Class M-1, Class M-2,
         Class M-3 and Class M-4 Certificates shall be distributed to each
         class of such Class M Certificates, pro rata, based on Current
         Interest due to each class;

     (5) sequentially, to each class of the Class M-1, Class M-2, Class M-3,
         Class M-4, Class M-5, Class M-6, Class B-1, Class B-2 and Class B-3
         Certificates, in that order, any Interest Carry Forward Amount with
         respect to such class to the extent unpaid from Interest Funds and
         Principal Funds; provided, however that any amounts distributed to the
         Class M-1, Class M-2, Class M-3 and Class M-4 Certificates shall be
         distributed to each class of such Class M Certificates, pro rata,
         based on Interest Carry Forward Amount due to each class;

     (6) to the LIBOR Certificates, to pay principal as described and in the
         same manner and order of priority as set forth in paragraphs (3)
         through (12) of "--Distributions of Principal" in order to maintain
         amounts in respect of the targeted overcollateralization amount, and
         after giving effect to distributions of the Principal Distribution
         Amount for each such Class;

     (7) sequentially, to each class of the Class M-1, Class M-2, Class M-3,
         Class M-4, Class M-5, Class M-6, Class B-1, Class B-2 and Class B-3
         Certificates, in that order, any Unpaid Realized Loss Amount for such
         class to the extent unpaid from Interest Funds and Principal Funds;
         provided, however that any amounts distributed to the Class M-1, Class
         M-2, Class M-3 and Class M-4 Certificates shall be distributed to each
         class of such Class M Certificates, pro rata, based on any Unpaid
         Realized Loss Amount due to each class;

     (8) to the LIBOR Certificates, on a pro rata basis, any Floating Rate
         Certificate Carryover to the extent not paid from Interest Funds or

Principal Funds based on the amount of such unpaid Floating Rate
Certificate Carryover;

(9)  to the Swap Counterparty, any Defaulted Swap Termination Payment owed
to the Swap Counterparty; and

<div align="center">S-68</div>

<PAGE>

(10) to the holders of the Class C Certificates, any remaining amounts.

Notwithstanding the foregoing, however, the sum of all cumulative amounts
distributed pursuant to clauses (6) and (7) above will not exceed the cumulative
amount of all Realized Losses incurred.

Any Floating Rate Certificate Carryover will be paid on future Distribution
Dates from and to the extent of funds available for that purpose as described in
this prospectus supplement. The ratings on the LIBOR Certificates do not address
the likelihood of the payment of any Floating Rate Certificate Carryover.

In the event that the Supplemental Interest Trust receives a Swap
Termination Payment, and a successor Swap Counterparty cannot be obtained with
such Swap Termination Payment, then such Swap Termination Payment will be
deposited into a reserve account and the Supplemental Interest Trust Trustee, on
each subsequent Distribution Date (until the termination date of the original
Swap Agreement), will withdraw the amount of any Net Swap Payment deemed due to
the Supplemental Interest Trust (calculated in accordance with the terms of the
original Swap Agreement) and administer such Net Swap Payment in accordance with
the terms of the Pooling and Servicing Agreement, for the benefit of the Issuing
Entity. Any such reserve account shall not be an asset of any REMIC. Any amounts
remaining in such reserve account shall be distributed to the holders of the
Class C Certificates on the Distribution Date immediately following the earlier
of (i) the optional termination of the Trust Fund as described in "The Pooling
and Servicing Agreement --Optional Termination" herein and (ii) the Distribution
Date in May 2012.

SUBORDINATION OF THE DISTRIBUTIONS OF THE SUBORDINATE CERTIFICATES

The rights of the holders of the Subordinate Certificates to receive
payments with respect to the Mortgage Loans will be subordinated to the rights
of the holders of the Class A Certificates and the rights of the holders of each
class of Subordinate Certificates (other than the Class M-1 Certificates) to
receive such distributions will be further subordinated to the rights of the
class or classes of Subordinate Certificates with higher payment priorities, in
each case only to the extent described in this prospectus supplement. The
subordination of the Subordinate Certificates to the Class A Certificates and
the further subordination among the Subordinate Certificates is intended to
provide the certificateholders having higher relative payment priority with
protection against Realized Losses.

CORRIDOR CONTRACTS

On the Closing Date, the Trustee, on behalf of the Issuing Entity, will be
directed to enter into three interest rate cap transactions with the Cap
Contract Counterparty as evidenced by the Corridor Contracts. The Corridor
Contracts will be entered into in lieu of negotiating an ISDA Master Agreement
and confirmation thereunder, and pursuant to the Corridor Contracts, an ISDA
Master Agreement will be deemed to have been executed by the Trustee, on behalf
of the Issuing Entity, and the Cap Contract Counterparty on the date that each
Corridor Contract was executed. The Corridor Contracts are subject to certain
ISDA definitions. On or prior to the related Corridor Contract Termination Date,
amounts, if any, received by the Trustee for the benefit of the Issuing Entity
in respect of the applicable Corridor Contract will be used to pay Floating Rate

Certificate Carryover (other than any Floating Rate Certificate Carryover
attributable to the fact that Realized Losses are not allocated to the Class A
Certificates) on the related classes of the LIBOR Certificates on a pro rata
basis. Any amounts that are received on the Corridor Contracts that are not used
to pay such Floating Rate Certificate Carryover on the related LIBOR
Certificates will be distributed to the holder of the Class C Certificates.

On the Closing Date, the Cap Contract Counterparty and the Trustee, on
behalf of the Issuing

S-69

<PAGE>

Entity, will enter into a credit support annex in relation to each of the
Corridor Contracts to protect the Issuing Entity from certain ratings downgrades
that might hinder the ability of the Cap Contract Counterparty to continue its
obligations under the Corridor Contracts. The Trustee will establish a
segregated collateral account to hold any collateral amounts required to be
posted by the Cap Contract Counterparty under the credit support annex. Where a
termination event occurs with respect to the Cap Contract Counterparty under the
Corridor Contracts, or where the Cap Contract Counterparty fulfills certain
obligations to the Issuing Entity such as finding a replacement swap
counterparty or a guarantor that meets established criteria of the Rating
Agencies, the Trustee may be required to make payments from the segregated
collateral account to the Cap Contract Counterparty if amounts are due to such
party under the terms of the credit support annex. The Trustee will deposit into
the segregated collateral account any amounts posted by the Cap Contract
Counterparty and will remit interest earned on such amounts to the Cap Contract
Counterparty pursuant to the terms of the credit support annex. Amounts held in
the segregated collateral account will not be part of the Trust Fund and will
not be available for distribution to any investors.

With respect to any Distribution Date on or prior to the related Corridor
Contract Termination Date, in exchange for a fixed payment made to the Cap
Contract Counterparty on the Closing Date, the Cap Contract Counterparty is
obligated to pay to the Issuing Entity for deposit into the Corridor Contract
Account under the related Corridor Contract an amount equal to the product of
(i) the excess, if any, of (x) the lesser of (A) the related Upper Collar as
shown under the heading "1 ML Strike Upper Collar" in the related Derivative
LIBOR Corridor Table appearing below and (B) Derivative LIBOR for such
Distribution Date over (y) the rate with respect to such Distribution Date as
shown under the heading "1 ML Strike Lower Collar" in the related Derivative
LIBOR Corridor Table appearing below, (ii) an amount equal to the lesser of (x)
the related Corridor Contract Notional Balance for such Distribution Date and
(y) the outstanding Certificate Principal Balance for such Distribution Date of
(A) in the case of the Group One Corridor Contract, the Group One Certificates,
(B) in the case of the Group Two Corridor Contract, the Group Two Certificates
or (C) in the case of the Class M-5, Class M-6 and Class B Certificate Corridor
Contract, the Class M-5, Class M-6 and Class B Certificates and (iii) the actual
number of days in such Accrual Period, divided by 360.

The Group One Corridor Contract Notional Balances, Group One Lower Collars
and Group One Upper Collar are as described in the following table:

GROUP ONE DERIVATIVE LIBOR CORRIDOR TABLE

<TABLE>
<CAPTION>

| PERIOD | BEGINNING ACCRUAL | ENDING ACCRUAL | NOTIONAL BALANCE ($) | 1ML STRIKE LOWER COLLAR (%)(1) | 1ML STRIKE UPPER COLLAR (%) |
| ------ | --------- | --------- | ----------- | ------------ | ---------------- |
| <S> | <C> | <C> | <C> | <C> | <C> |

| 1 | 05/30/07 | 06/25/07 | 632,090,000 | 9.057 | 10.810 |
| 2 | 06/25/07 | 07/25/07 | 629,610,597 | 7.824 | 10.810 |
| 3 | 07/25/07 | 08/25/07 | 625,671,610 | 7.565 | 10.810 |
| 4 | 08/25/07 | 09/25/07 | 620,257,159 | 7.565 | 10.810 |
| 5 | 09/25/07 | 10/25/07 | 613,365,403 | 7.824 | 10.810 |
| 6 | 10/25/07 | 11/25/07 | 604,997,446 | 7.567 | 10.810 |

</TABLE>

(1)  With respect to any Distribution Date, if Derivative LIBOR (subject to the
     Group One Upper Collar equal to 10.810% per annum) exceeds the Group One
     Lower Collar, the Issuing Entity will receive payments pursuant to the
     Group One Corridor Contract.


                                    S-70

<PAGE>

     The Group Two Corridor Contract Notional Balances, Group Two Lower Collars
and Group Two Upper Collar are as described in the following table:

              GROUP TWO DERIVATIVE LIBOR CORRIDOR TABLE

<TABLE>
<CAPTION>

|        | BEGINNING | ENDING  | NOTIONAL       | 1ML STRIKE LOWER COLLAR (%)(1) | 1ML STRIKE |
| PERIOD | ACCRUAL   | ACCRUAL | BALANCE ($)    |  | UPPER COLLAR (%) |
| ------ | --------- | ------- | -------------- | ------------ | ---------------- |
| <S>    | <C>       | <C>     | <C>            | <C>          | <C>              |
| 1      | 05/30/07  | 06/25/07 | 1,100,604,000 | 9.040        | 10.270           |
| 2      | 06/25/07  | 07/25/07 | 1,096,107,534 | 7.804        | 10.270           |
| 3      | 07/25/07  | 08/25/07 | 1,089,055,774 | 7.545        | 10.270           |
| 4      | 08/25/07  | 09/25/07 | 1,079,420,365 | 7.545        | 10.270           |
| 5      | 09/25/07  | 10/25/07 | 1,067,200,359 | 7.804        | 10.270           |
| 6      | 10/25/07  | 11/25/07 | 1,052,397,237 | 7.549        | 10.270           |

</TABLE>

(1)  With respect to any Distribution Date, if Derivative LIBOR (subject to the
     Group Two Upper Collar equal to 10.270% per annum) exceeds the Group Two
     Lower Collar, the Issuing Entity will receive payments pursuant to the
     Group Two Corridor Contract.

     The Class M-5, Class M-6 and Class B Certificate Corridor Contract Notional
Balances, Class M-5, Class M-6 and Class B Certificate Lower Collars and Class
M-5, Class M-6 and Class B Certificate Upper Collar are as described in the
following table:

    CLASS M-5, CLASS M-6 AND CLASS B CERTIFICATE DERIVATIVE LIBOR CORRIDOR TABLE

<TABLE>
<CAPTION>

|        | BEGINNING | ENDING  | NOTIONAL     | 1ML STRIKE LOWER COLLAR (%)(1) | 1ML STRIKE |
| PERIOD | ACCRUAL   | ACCRUAL | BALANCE ($)  |  | UPPER COLLAR (%) |
| ------ | --------- | ------- | ------------ | ------------ | ---------------- |
| <S>    | <C>       | <C>     | <C>          | <C>          | <C>              |
| 1      | 05/30/07  | 06/25/07 | 102,923,000 | 7.641        | 7.880            |
| 2      | 06/25/07  | 07/25/07 | 102,923,000 | 6.406        | 7.880            |
| 3      | 07/25/07  | 08/25/07 | 102,923,000 | 6.148        | 7.880            |
| 4      | 08/25/07  | 09/25/07 | 102,923,000 | 6.148        | 7.880            |
| 5      | 09/25/07  | 10/25/07 | 102,923,000 | 6.407        | 7.880            |
| 6      | 10/25/07  | 11/25/07 | 102,923,000 | 6.151        | 7.880            |

</TABLE>

(1)  With respect to any Distribution Date, if Derivative LIBOR (subject to a
     Class M-5, Class M-6 and Class B Certificate Upper Collar equal to 7.880%
     per annum) exceeds the Class M-5, Class M-6 and Class B Certificate Lower
     Collar, the Issuing Entity will receive payments pursuant to the Class M-5,
     Class M-6 and Class B Certificate Corridor Contract.

     Each Corridor Contract is scheduled to remain in effect until the
applicable Corridor Contract Termination Date and will be subject to early
termination only in limited circumstances. Such circumstances include certain
insolvency or bankruptcy events in relation to the Cap Contract Counterparty or
the Issuing Entity, the failure by the Cap Contract Counterparty (after a grace
period as set forth in the related Corridor Contract, after notice of such
failure is received by the Cap Contract Counterparty) to make a payment due
under the related Corridor Contract, the failure by the Cap Contract
Counterparty or the Issuing Entity (after a cure period as set forth in the
related Corridor Contract) to perform any other agreement made by it under the
related Corridor Contract, the termination of the Trust Fund, the reduction in
creditworthiness of a party following a merger event and the related Corridor
Contract becoming illegal or subject to certain kinds of taxation.

     The LIBOR Certificates do not represent an obligation of the Cap Contract
Counterparty. Holders of the LIBOR Certificates will not have any right to
proceed directly against the Cap Contract Counterparty in respect of its
obligations under any Corridor Contract.


                                     S-71


<PAGE>

SWAP AGREEMENT

     On the Closing Date, the Supplemental Interest Trust Trustee will enter
into the Swap Agreement with the Swap Counterparty, The Bank of New York, for
the benefit of the Supplemental Interest Trust.

     The Swap Agreement will be entered into in lieu of negotiating an ISDA
Master Agreement and confirmation thereunder, and pursuant to the Swap
Agreement, an ISDA Master Agreement will be deemed to have been executed by the
Supplemental Interest Trust Trustee and the Swap Counterparty on the date that
the Swap Agreement was executed. The Swap Agreement is subject to certain ISDA
definitions.

     The Swap Counterparty and the Supplemental Interest Trust Trustee will
enter into a credit support annex in relation to the Swap Agreement to protect
the Supplemental Interest Trust from certain ratings downgrades that might
hinder the ability of the Swap Counterparty to continue its obligations under
the Swap Agreement. The Supplemental Interest Trust Trustee will establish a
segregated collateral account to hold any collateral amounts required to be
posted by the Swap Counterparty under the credit support annex. Where a
termination event occurs with respect to the Swap Counterparty under the Swap
Agreement, or where the Swap Counterparty fulfills certain obligations to the
Supplemental Interest Trust such as finding a replacement swap counterparty or a
guarantor that meets established criteria of the Rating Agencies, the
Supplemental Interest Trust Trustee may be required to make payments from the
segregated collateral account to the Swap Counterparty if amounts are due to
such party under the terms of the credit support annex. The Supplemental
Interest Trust Trustee will deposit into the segregated collateral account any
amounts posted by the Swap Counterparty and will remit interest earned on such
amounts to the Swap Counterparty pursuant to the terms of the credit support
annex. Amounts held in the segregated collateral account will not be part of the
Trust Fund and will not be available for distribution to any investors.

     Under the Swap Agreement, with respect to each Distribution Date during the
period beginning on the Distribution Date in December 2007 and terminating

immediately following the Distribution Date in May 2012, the Supplemental
Interest Trust will be obligated to pay to the Swap Counterparty a fixed payment
at a per annum rate as set forth in the table below, determined on the basis of
a 360-day year with twelve 30-day months, and the Swap Counterparty will be
obligated to pay to the Supplemental Interest Trust a floating payment at a rate
of Derivative LIBOR, determined based on a 360-day year and the actual number of
days in the related Accrual Period, in each case calculated based on the
scheduled notional balance set forth in the schedule below. To the extent the
fixed payment owed by the Supplemental Interest Trust exceeds the floating
payment owed by the Swap Counterparty, one business day (as determined under the
Swap Agreement) prior to the related Distribution Date the Supplemental Interest
Trust will make a Net Swap Payment to the Swap Counterparty out of amounts on
deposit in the Certificate Account otherwise available to certificate holders as
described in "Distributions--Distributions of Interest" and "--Distributions of
Principal." To the extent that the floating payment owed by the Swap
Counterparty exceeds the fixed payment owed by the Supplemental Interest Trust,
one business day (as determined under the Swap Agreement) prior to the related
Distribution Date, the Swap Counterparty shall make a Net Swap Payment to the
Supplemental Interest Trust, which shall be deposited in the Supplemental
Interest Trust for the benefit of the Issuing Entity.

                                    S-72

<PAGE>

     The Swap Agreement Notional Balances will be as shown in the following
table:

                     SWAP AGREEMENT NOTIONAL BALANCE TABLE

<TABLE>
<CAPTION>
              BEGINNING    ENDING      NOTIONAL          FIXED
PERIOD        ACCRUAL      ACCRUAL     BALANCE ($)    STRIKE RATE (%)
------        ---------    --------    -------------  ----------------
<S>           <C>          <C>         <C>            <C>
    1         05/30/07     06/25/07                0       N/A
    2         06/25/07     07/25/07                0       N/A
    3         07/25/07     08/25/07                0       N/A
    4         08/25/07     09/25/07                0       N/A
    5         09/25/07     10/25/07                0       N/A
    6         10/25/07     11/25/07                0       N/A
    7         11/25/07     12/25/07    1,677,078,175     5.000
    8         12/25/07     01/25/08    1,645,824,832     5.000
    9         01/25/08     02/25/08    1,613,327,127     5.000
   10         02/25/08     03/25/08    1,578,680,712     5.000
   11         03/25/08     04/25/08    1,538,832,290     5.000
   12         04/25/08     05/25/08    1,495,009,690     5.000
   13         05/25/08     06/25/08    1,443,928,197     5.000
   14         06/25/08     07/25/08    1,396,021,868     5.000
   15         07/25/08     08/25/08    1,351,734,826     5.000
   16         08/25/08     09/25/08    1,310,351,057     5.000
   17         09/25/08     10/25/08    1,271,763,188     5.000
   18         10/25/08     11/25/08    1,235,255,598     5.000
   19         11/25/08     12/25/08    1,200,915,111     5.000
   20         12/25/08     01/25/09    1,168,360,510     5.000
   21         01/25/09     02/25/09    1,137,964,814     5.000
   22         02/25/09     03/25/09    1,108,944,583     5.000
   23         03/25/09     04/25/09      995,870,275     5.000
   24         04/25/09     05/25/09      855,377,999     5.000
   25         05/25/09     06/25/09      734,287,766     5.000
   26         06/25/09     07/25/09      637,611,000     5.000
   27         07/25/09     08/25/09      584,428,709     5.000
   28         08/25/09     09/25/09      544,590,752     5.000

```
        29     09/25/09   10/25/09    513,402,048        5.000
        30     10/25/09   11/25/09    485,255,056        5.000
</TABLE>
```

```
<TABLE>
<CAPTION>
            BEGINNING   ENDING      NOTIONAL           FIXED
 PERIOD     ACCRUAL     ACCRUAL     BALANCE ($)    STRIKE RATE (%)
 ------     ---------   --------    ------------   ----------------
<S>         <C>         <C>         <C>            <C>
        31     11/25/09   12/25/09    459,222,807        5.000
        32     12/25/09   01/25/10    435,630,205        5.000
        33     01/25/10   02/25/10    414,580,121        5.000
        34     02/25/10   03/25/10    395,531,847        5.000
        35     03/25/10   04/25/10    370,436,856        5.000
        36     04/25/10   05/25/10    333,502,210        5.000
        37     05/25/10   06/25/10    299,828,851        5.000
        38     06/25/10   07/25/10    272,308,649        5.000
        39     07/25/10   08/25/10    250,027,729        5.000
        40     08/25/10   09/25/10    231,617,353        5.000
        41     09/25/10   10/25/10    215,439,381        5.000
        42     10/25/10   11/25/10    200,332,175        5.000
        43     11/25/10   12/25/10    187,046,230        5.000
        44     12/25/10   01/25/11    175,032,610        5.000
        45     01/25/11   02/25/11    164,209,425        5.000
        46     02/25/11   03/25/11    154,064,251        5.000
        47     03/25/11   04/25/11    144,127,766        5.000
        48     04/25/11   05/25/11    144,127,766        5.000
        49     05/25/11   06/25/11    144,127,766        5.000
        50     06/25/11   07/25/11    144,127,766        5.000
        51     07/25/11   08/25/11    144,127,766        5.000
        52     08/25/11   09/25/11    144,127,766        5.000
        53     09/25/11   10/25/11    139,176,049        5.000
        54     10/25/11   11/25/11    133,352,369        5.000
        55     11/25/11   12/25/11    127,774,286        5.000
        56     12/25/11   01/25/12    122,528,883        5.000
        57     01/25/12   02/25/12    117,637,309        5.000
        58     02/25/12   03/25/12    113,046,283        5.000
        59     03/25/12   04/25/12    108,506,395        5.000
        60     04/25/12   05/25/12    104,233,444        5.000
</TABLE>
```

        Upon early termination of the Swap Agreement, the Swap Counterparty may owe
the Supplemental Interest Trust a Swap Termination Payment for the benefit of
the Issuing Entity, or the Supplemental Interest Trust may owe the Swap
Counterparty a Swap Termination Payment. Net Swap Payments and Swap Termination
Payments (other than Defaulted Swap Termination Payments) payable to the Swap
Counterparty shall be paid out of the Supplemental Interest Trust on a senior
basis with respect to each applicable Distribution Date. Defaulted Swap
Termination Payments owed to the Swap Counterparty shall be paid out of the
Supplemental Interest Trust on a subordinated basis. See "Description of the
Certificates--Distributions from the Supplemental Interest Trust."

        The Swap Agreement can be terminated upon an event of default under that
agreement or an early termination event under that agreement. Events of default
applicable to either party under the Swap Agreement include, among other things,
the following:

        -    failure to pay;

        -    certain bankruptcy and insolvency events; and

        -    a merger without an assumption of obligations under the Swap
             Agreement.

<PAGE>

Early termination events under the Swap Agreement include, among other things:

-    illegality (which generally relates to changes in law causing it to become unlawful for either party (or its guarantor, if applicable) to perform its obligations under the Swap Agreement or guaranty, as applicable);

-    a tax event (which generally relates to either party receiving a payment under the Swap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax);

-    a tax event upon merger (which generally relates to either party receiving a payment under the Swap Agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax, in each case, resulting from a merger);

-    a credit event upon merger (which generally relates to a reduction in the creditworthiness of a party resulting from a merger);

-    the aggregate Certificate Principal Balance of all certificates outstanding has been reduced to zero;

-    the occurrence of an optional termination as described under "The Pooling and Servicing Agreement--Optional Termination";

-    amendment of the Pooling and Servicing Agreement that adversely affects the Swap Counterparty without its prior consent; and

-    failure by the Swap Counterparty to comply with certain provisions in the Swap Agreement related to Regulation AB; and

-    the occurrence of a Downgrade Termination Event.

If the Supplemental Interest Trust Trustee is unable to or, if applicable, chooses not to obtain a substitute swap agreement in the event that the Swap Agreement is terminated, interest distributable on the certificates will be paid from amounts received on the Mortgage Loans without the benefit of a Swap Agreement or a substitute swap agreement; provided, however, the Trustee shall thereafter administer the Swap Termination Payment received as described under "Description of the Certificates--Distributions from the Supplemental Interest Trust", for the benefit of the Issuing Entity.

On or after the Closing Date and so long as the Rating Agency Condition has been satisfied, (i) the Supplemental Interest Trust Trustee may, with the consent of the Swap Counterparty, assign or transfer all or a portion of the Swap Agreement and (ii) the Swap Counterparty may assign its obligations under the Swap Agreement to any institution.

The Swap Agreement is scheduled to terminate by its terms immediately following the Distribution Date in May 2012, and upon termination of the Swap Agreement no further amounts will be paid to the Swap Counterparty by the Supplemental Interest Trust Trustee and no further regularly scheduled amounts will be paid to the Supplemental Interest Trust Trustee by the Swap Counterparty.

<PAGE>

CALCULATION OF ONE-MONTH LIBOR

On each Interest Determination Date, the Trustee will determine One-Month
LIBOR for the related Accrual Period on the basis of (1) the offered rates for
one-month United States dollar deposits from Reuters, as of 11:00 a.m. (London
time) on such Interest Determination Date (or if such service is no longer
offered, such other service for displaying LIBOR or comparable rates as may be
reasonably selected by the Trustee) or (2) if such rate does not appear on
Reuters as of 11:00 a.m. (London time), the Trustee will determine such rate on
the basis of the offered rates of the Reference Banks for one-month United
States dollar deposits, as such rates appear on the Reuters Screen LIBO Page, as
of 11:00 a.m. (London time) on such Interest Determination Date.

If One-Month LIBOR is determined under clause (2) above, on each Interest
Determination Date, One-Month LIBOR for the related Accrual Period for the LIBOR
Certificates will be established by the Trustee as follows:

        (A) If on such Interest Determination Date two or more Reference
        Banks provide such offered quotations, One-Month LIBOR for the related
        Accrual Period for the LIBOR Certificates shall be the arithmetic mean
        of such offered quotations (rounded upwards if necessary to the
        nearest whole multiple of 0.03125%).

        (B) If on such Interest Determination Date fewer than two
        Reference Banks provide such offered quotations, One-Month LIBOR for
        the related Accrual Period shall be the higher of (x) One-Month LIBOR
        as determined on the previous Interest Determination Date and (y) the
        Reserve Interest Rate.

The establishment of One-Month LIBOR on each Interest Determination Date by
the Trustee and the Trustee's calculation of the rate of interest applicable to
the LIBOR Certificates, for the related Accrual Period for the LIBOR
Certificates shall (in the absence of manifest error) be final and binding.

REPORTS TO CERTIFICATEHOLDERS

On each Distribution Date, the Trustee will prepare and make available on
its website located at www.etrustee.net to each certificateholder, the Servicer,
the Depositor, the Cap Contract Counterparty, the Swap Counterparty and any
other interested party identified in the Pooling and Servicing Agreement a
statement, based on information required by the Pooling and Servicing Agreement
to be delivered by the Servicer, the Cap Contract Counterparty and the Swap
Counterparty and certain calculations by the Trustee, generally setting forth
among other information:

    (1)  the amount of the related distribution to holders of each class of
         certificates allocable to principal, separately identifying (A) the
         aggregate amount of any Principal Prepayments included therein, (B)
         the aggregate amount of all scheduled payments of principal included
         therein and (C) any Extra Principal Distribution Amount, in the
         aggregate and with respect to the Group One Mortgage Loans and Group
         Two Mortgage Loans;

    (2)  the amount of such distribution to holders of each class of
         certificates allocable to interest;

    (3)  the Interest Carry Forward Amount for each class of certificates;

    (4)  the Certificate Principal Balance of each class of certificates after
         giving effect to the distribution of principal on such Distribution
         Date;

S-75

<PAGE>

(5)  the aggregate outstanding principal balance of each class of
     certificates for the following Distribution Date;

(6)  the amount of the Servicing Fee paid to or retained by the Servicer
     and any amounts constituting reimbursement or indemnification of the
     Servicer or the Trustee;

(7)  the Pass-Through Rate for each class of certificates for such
     Distribution Date;

(8)  the amount of Advances included in the distribution on such
     Distribution Date;

(9)  the cumulative amount of (A) Realized Losses and (B) Applied Realized
     Loss Amounts to date, in the aggregate and with respect to the Group
     One Mortgage Loans and the Group Two Mortgage Loans;

(10) the amount of (A) Realized Losses and (B) Applied Realized Loss
     Amounts with respect to such Distribution Date, in the aggregate and
     with respect to the Group One Mortgage Loans and the Group Two
     Mortgage Loans;

(11) the number and aggregate principal amounts of Mortgage Loans (A)
     delinquent (exclusive of Mortgage Loans in foreclosure) (1) 31 to 60
     days, (2) 61 to 90 days and (3) 91 or more days, and (B) in
     foreclosure and delinquent (1) 31 to 60 days, (2) 61 to 90 days and
     (3) 91 or more days, in each case as of the close of business on the
     last day of the calendar month preceding such Distribution Date, in
     the aggregate and with respect to the Group One Mortgage Loans and the
     Group Two Mortgage Loans in accordance with the OTS methodology for
     measuring delinquencies;

(12) with respect to any Mortgage Loan that became an REO Property during
     the preceding calendar month, the loan number and Stated Principal
     Balance of such Mortgage Loan as of the close of business on the last
     day of the preceding calendar month;

(13) whether a Stepdown Trigger Event has occurred and is in effect;

(14) the total number and principal balance of any REO Properties as of the
     close of business on the last day of the preceding calendar month, in
     the aggregate;

(15) any Floating Rate Certificate Carryover paid and all Floating Rate
     Certificate Carryover remaining on each class of the LIBOR
     Certificates on such Distribution Date;

(16) the number and amount of prepayment charges received during the
     related Prepayment Period if made in connection with Principal
     Prepayments in full and for the preceding calendar month if made in
     connection with partial Principal Prepayments in the aggregate;

(17) as of each Distribution Date, the amount, if any, received by the
     Issuing Entity pursuant to each Corridor Contract and the amount
     thereof, if any, to be paid to each class of certificates;

(18) as of each Distribution Date, the amount of any Net Swap Payments or
     Swap Termination Payment paid or received by the Supplemental Interest
     Trust pursuant to the Swap Agreement and the amount of any Defaulted
     Swap Termination Payments paid by the Supplemental Interest Trust;

S-76

<PAGE>

    (19) the number of Mortgage Loans with respect to which (i) a reduction in
        the Mortgage Rate has occurred or (ii) the related borrower's
        obligation to repay interest on a monthly basis has been suspended or
        reduced pursuant to the Servicemembers Civil Relief Act or similar
        state laws, as amended; and the amount of interest not required to be
        paid with respect to any such Mortgage Loans during the related Due
        Period as a result of such reductions in the aggregate and with
        respect to the Group One Mortgage Loans and the Group Two Mortgage
        Loans;

    (20) the amounts distributed as interest in respect of the portion of each
        class of certificates that represents a regular or residual interest
        in a REMIC and the amount of distributions on each class of
        certificates not treated as distributions on a regular or residual
        interest in a REMIC;

    (21) the aggregate amount of all Advances recovered for the applicable
        Distribution Date;

    (22) the allocation to each class of certificates of any Realized Losses
        during the preceding calendar month;

    (23) with respect to each class of certificates, the amount of any
        Compensating Interest shortfalls on such Distribution Date; and

    (24) information regarding any pool asset changes (other than in connection
        with a pool asset converting into cash in accordance with its terms),
        such as additions or removals in connection with pool asset
        substitutions and repurchases (and purchase rates, if applicable).

    Assistance in using the Trustee's website can be obtained by calling the
Trustee's transaction administrator at (312) 904-4839. Parties that are unable
to use the above distribution options are entitled to have a paper copy mailed
to them via first class mail by calling the customer service desk and indicating
such. The Trustee shall have the right to change the way statements are
distributed in order to make such distribution more convenient and/or more
accessible to the above parties and the Trustee shall provide timely and
adequate notification to all above parties regarding any such changes.

    In addition, within a reasonable period of time after the end of each
calendar year, the Trustee will prepare and deliver to each certificateholder of
record during the previous calendar year and the NIMs Insurer, upon its written
request, a statement containing information necessary to enable
certificateholders to prepare their tax returns. Such statements will not have
been examined and reported upon by an independent public accountant.

ADDITIONAL RIGHTS OF THE HOLDER OF THE CLASS R CERTIFICATE

    The Class R Certificate will remain outstanding for so long as the Trust
Fund shall exist, whether or not such Class R Certificate is receiving current
distributions of principal or interest. In addition to distributions of
principal and interest distributable as described under "--Distributions," the
holder of the Class R Certificate will be entitled to receive (i) the amounts,
if any, remaining in each REMIC on any Distribution Date after distributions of
principal and interest on the regular interests and Class R Certificate on such
date and (ii) the proceeds of the assets of the Trust Fund, if any, remaining in
each REMIC after distributions in respect of any accrued and unpaid interest on
such regular interests and Class R Certificate, and after distributions in
respect of principal have reduced the principal amounts of the regular interests

and Class R Certificate to zero. After the Certificate Principal Balance of the Class R Certificate is reduced to zero, it is not anticipated that any material distributions will be made with respect

<center>S-77</center>

<PAGE>

to the Class R Certificate at any time. See "Material Federal Income Tax Consequences--REMICs-Taxation of Owners of REMIC Residual Certificates" in the prospectus.

RESTRICTIONS ON TRANSFER OF THE CLASS R CERTIFICATE

   The Class R Certificate will be subject to the following restrictions on transfer, and the Class R Certificate will contain a legend describing such restrictions.

   The REMIC provisions of the Code impose certain taxes on (i) transferors of residual interests to, or agents that acquire residual interests on behalf of, disqualified organizations (as defined in the prospectus) and (ii) certain pass-through entities (as defined in the prospectus) that have disqualified organizations as beneficial owners. No tax will be imposed on a pass-through entity (other than an "electing large partnership" as defined in the Code) with respect to the Class R Certificate to the extent it has received an affidavit from the owner thereof that such owner is not a disqualified organization or a nominee for a disqualified organization. The Pooling and Servicing Agreement will provide that no legal or beneficial interest in the Class R Certificate may be transferred to or registered in the name of any person unless (i) the proposed purchaser provides to the Trustee an affidavit to the effect that, among other items, such transferee is not a disqualified organization and is not purchasing the Class R Certificate as an agent for a disqualified organization (i.e., as a broker, nominee, or other middleman thereof) and (ii) the transferor states in writing to the Trustee that it has no actual knowledge that such affidavit or letter is false. Further, such affidavit or letter requires the transferee to affirm that it (i) historically has paid its debts as they have come due and intends to do so in the future, (ii) understands that it may incur tax liabilities with respect to the Class R Certificate in excess of cashflows generated thereby, (iii) intends to pay taxes associated with holding the Class R Certificate as such taxes become due, (iv) will not transfer the Class R Certificate to any person or entity that does not provide a similar affidavit or letter and (v) will not cause income from the Class R Certificate to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer.

   In addition, the Class R Certificate may not be purchased by or transferred to any person that is not a U.S. Person (as defined in the prospectus), unless such person holds such Class R Certificate in connection with the conduct of a trade or business within the United States and furnishes the transferor and the Trustee with an effective IRS Form W-8ECI (or any successor thereto).

   The Pooling and Servicing Agreement will provide that any attempted or purported transfer in violation of these transfer restrictions will be null and void and will vest no rights in any purported transferee. Any transferor or agent to whom the Trustee provides information as to any applicable tax imposed on such transferor or agent may be required to bear the cost of computing or providing such information.

   The Class R Certificate may not be acquired by or transferred to a Plan or a person acting for, on behalf of or with any assets of any such Plan. See "ERISA Considerations" in this prospectus supplement and in the prospectus.

<center>THE POOLING AND SERVICING AGREEMENT</center>

GENERAL

      The certificates will be issued pursuant to the Pooling and Servicing
Agreement among the Depositor, the Servicer and the Trustee. The NIMs Insurer,
if any, the Cap Contract Counterparty and the Swap Counterparty will each be a
third party beneficiary of the Pooling and Servicing Agreement. In

                                    S-78

<PAGE>

addition, the NIMs Insurer, if any, will have various rights under the Pooling
and Servicing Agreement. The LIBOR Certificates in certificated form will be
transferable and exchangeable at the office of the Trustee, which will serve as
certificate registrar and paying agent. The Trustee will provide to a
prospective or actual certificateholder, upon written request, a copy (without
exhibits) of the Pooling and Servicing Agreement. Requests should be addressed
to LaSalle Bank National Association, 135 South LaSalle Street, Suite 1511,
Chicago, Illinois 60603, Attention: FFMER 2007-3.

THE ISSUING ENTITY

      Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3, the
Issuing Entity, will be formed on the closing date pursuant to the Pooling and
Servicing Agreement. The Issuing Entity will be a New York common law trust with
no officers or directors and no continuing duties other than to hold and service
the Mortgage Loans and related assets and issue the certificates. The fiscal
year end for the Issuing Entity will be December 31, commencing with December
31, 2007.

      The Trustee and the Servicer will act on behalf of the Issuing Entity in
accordance with the Pooling and Servicing Agreement, and may only perform those
actions on behalf of the Issuing Entity that are specified or permitted in the
Pooling and Servicing Agreement.

      Under the Pooling and Servicing Agreement, the Trustee on behalf of the
Issuing Entity will not have the power to issue additional certificates
representing interests in the Pooling and Servicing Agreement, borrow money on
behalf of the Issuing Entity or make loans from the assets of the Issuing Entity
to any person or entity, without the amendment of the Pooling and Servicing
Agreement by certificateholders and the other parties thereto as described under
"Description of the Agreements--Amendment" in the prospectus.

      If the assets of the Issuing Entity are insufficient to pay the
certificateholders all principal and interest owed, holders of certificates will
not receive all of their expected payments of interest and principal and will
suffer a loss. The Issuing Entity, as a New York common law trust, is not
eligible to be a debtor in a bankruptcy proceeding. In the event of bankruptcy
of the Sponsor, the Depositor or the Originator, it is not anticipated that the
Issuing Entity would become part of the bankruptcy estate or subject to the
bankruptcy control of a third party.

ASSIGNMENT OF MORTGAGE LOANS

      The Mortgage Loans will be assigned to the Trustee, together with all
principal and interest received with respect to the Mortgage Loans on and after
the Cut-off Date, other than scheduled payments due on or before that date. The
Trustee, as authenticating agent, will, concurrently with such assignment,
authenticate and deliver the Offered Certificates. Each Mortgage Loan will be
identified in a schedule appearing as an exhibit to the Pooling and Servicing
Agreement that will specify with respect to each Mortgage Loan, among other
things, the original principal balance and the Stated Principal Balance as of
the close of business on the Cut-off Date, the Mortgage Rate, the scheduled

payment and the maturity date of such Mortgage Loan.

     As to each Mortgage Loan, the following documents are generally required to
be delivered to the Trustee (or its custodian) in accordance with the Pooling
and Servicing Agreement: (1) the related original Mortgage Note endorsed without
recourse to the Trustee or in blank, (2) the original Mortgage with evidence of
recording indicated (or, if the original recorded Mortgage has not yet been
returned by the recording office, a copy thereof certified to be a true and
complete copy of such Mortgage sent for recording), (3) an original assignment
of the Mortgage to the Trustee or in blank in recordable form (except as
described below), (4) the policies of title insurance issued with respect to
each Mortgage Loan,

                                       S-79

<PAGE>

and (5) the originals of any assumption, modification, extension or guaranty
agreements. It is expected that the Mortgages or assignments of Mortgage with
respect to many of the Mortgage Loans will have been recorded in the name of an
agent on behalf of the holder of the related Mortgage Note. In those cases, no
Mortgage assignment in favor of the Trustee will be required to be prepared,
delivered or recorded. Instead, the Servicer will be required to take all
actions as are necessary to cause the Trustee to be shown as the owner of the
related Mortgage Loan on the records of the agent for purposes of the system of
recording transfers of beneficial ownership of mortgages maintained by the
agent. The Pooling and Servicing Agreement does not require the Depositor or any
other party to record the assignments and the Depositor does not expect to cause
the assignments to be recorded.

     On the Closing Date, the Sponsor will make certain representations and
warranties similar to those summarized in the prospectus under the heading
"Description of the Agreements--Representations and Warranties; Repurchases" to
the Depositor pursuant to the terms of a mortgage loan purchase agreement. In
the Pooling and Servicing Agreement, the Depositor will assign such
representations and warranties to the Trustee for the benefit of holders of the
Offered Certificates. Within the period of time specified in the Pooling and
Servicing Agreement following its discovery of a breach of any representation or
warranty that materially or adversely affects the interests of holders of
Offered Certificates in a Mortgage Loan, or receipt of notice of such breach,
the Sponsor will be obligated to cure such breach or purchase the affected
Mortgage Loan from the Issuing Entity for a price equal to the unpaid principal
balance thereof plus accrued interest thereon plus any costs and damages
incurred by the Issuing Entity in connection with any violation by the affected
Mortgage Loan of any predatory or abusive lending laws (or, in certain
circumstances, to substitute another Mortgage Loan).

     To the extent that any Mortgage Loan as to which a representation or
warranty has been breached is not purchased by the Sponsor, and a Realized Loss
occurs with respect to that Mortgage Loan, holders of the Offered Certificates
may incur a loss. See "Risk Factors--First Franklin Financial Corporation may
not be able to repurchase defective mortgage loans."

AMENDMENT

     The Pooling and Servicing Agreement may be amended by the Depositor, the
Servicer and the Trustee with the consent of the NIMs Insurer, if any, without
the consent of certificateholders, for any of the purposes set forth under
"Description of the Agreements--Amendment" in the prospectus and as set forth
under "Servicing of the Mortgage Loans - Pledge of Servicing Rights" herein;
provided, however, that the Swap Counterparty shall be notified of and must
consent to any amendment that will materially affect the Swap Counterparty's
rights or interests under the Pooling and Servicing Agreement. In addition, the
Pooling and Servicing Agreement may be amended by the Depositor, the Servicer

and the Trustee and the holders of a 66 2/3% Percentage Interest of each Class
of certificates affected thereby, with the consent of the NIMs Insurer, if any,
for the purpose of adding any provisions to or changing in any manner or
eliminating any of the provisions of the Pooling and Servicing Agreement or of
modifying in any manner the rights of the certificateholders; provided, however,
that no such amendment may

    (1) reduce in any manner the amount of, or delay the timing of, payments
        required to be distributed on any certificate without the consent of
        the holder of such certificate;

    (2) adversely affect in any material respect the interests of the holders
        of any class of certificates in a manner other than as described in
        clause (1) above, without the consent of the holders of certificates
        of such class evidencing, as to such class, Percentage Interests
        aggregating 66 2/3%;

<div align="center">S-80</div>

<PAGE>

    (3) reduce the aforesaid percentage of aggregate outstanding principal
        amounts of certificates of each class, the holders of which are
        required to consent to any such amendment, without the consent of the
        holders of all certificates of such class; or

    (4) materially affect the Swap Counterparty's rights or interests unless
        the Swap Counterparty has received notice of and consented to such
        amendment.

    In addition, the Pooling and Servicing Agreement may be amended from time
to time by the Depositor, the Sponsor, the Servicer and the Trustee, without the
consent of any of the certificateholders, to comply with the provisions of
Regulation AB.

OPTIONAL TERMINATION

    Promptly after the Initial Optional Termination Date, the Trustee will be
directed, pursuant to the Pooling and Servicing Agreement, to attempt to
terminate the Trust Fund through a one-time auction process, using procedures
that are mutually acceptable to the Trustee and the Depositor, and thereby
effect the retirement of all of the certificates. Pursuant to such procedures,
the Trustee will attempt to auction the remaining Trust Fund assets via a
solicitation of bids from at least three bidders. Any such termination will
occur only if the highest bid received is at least equal to the Optional
Termination Price. Net proceeds (after reimbursement of amounts due to the
Servicer and the Trustee) from the purchase will be distributed to the
certificateholders in the order of priority described herein. Any such optional
termination of the Trust Fund will result in an early retirement of the
certificates. If a sufficient purchase price is not achieved at such auction,
thereafter the NIMs Insurer, if any, may purchase all of the Mortgage Loans at
the Optional Termination Price, which would result in an early retirement of the
certificates and the termination of the Trust Fund. If the auction fails to
achieve a sufficient purchase price and the NIMs Insurer fails to exercise its
option to purchase all of the Mortgage Loans, then HLS, as Servicer, may
purchase all of the Mortgage Loans, at a price described in the Pooling and
Servicing Agreement, which similarly would result in an early retirement of the
certificates and the termination of the Trust Fund.

EVENTS OF DEFAULT

    Events of default will consist of:

    (1) any failure by the Servicer to deposit in the Collection Account or

the Certificate Account the required amounts or remit to the Trustee any payment (including an Advance required to be made under the terms of the Pooling and Servicing Agreement) that continues unremedied for the number of days set forth in the Pooling and Servicing Agreement after written notice of the failure shall have been given to the Servicer, the Trustee and the Depositor by the Trustee or the Depositor, or to the Servicer, the Depositor and the Trustee by the holders of certificates evidencing greater than 50% of the voting rights evidenced by the certificates;

(2) any failure by the Servicer to observe or perform in any material respect any other of its covenants or agreements, or any breach of a representation or warranty made by the Servicer in the Pooling and Servicing Agreement, that continues unremedied for the number of days set forth in the Pooling and Servicing Agreement after the giving of written notice of the failure to the Servicer, the Trustee or the Depositor by the Trustee or the Depositor, or to the Servicer, the Depositor and the Trustee by the holders of certificates evidencing greater than 50% of the voting rights evidenced by the certificates; and

<div align="center">S-81</div>

&lt;PAGE&gt;

(3) insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, and certain actions by or on behalf of the Servicer indicating its insolvency or inability to pay its obligations.

As of any date of determination, (1) holders of the LIBOR Certificates will be allocated 98% of all voting rights, allocated among the LIBOR Certificates in proportion to their respective outstanding Certificate Principal Balances and (2) holders of the Class C and Class P Certificates will be allocated all of the remaining voting rights. Voting rights will be allocated among the certificates of each class in accordance with their respective Percentage Interests.

RIGHTS UPON EVENT OF DEFAULT

So long as an event of default under the Pooling and Servicing Agreement remains unremedied, the Trustee may, or upon the receipt of instructions from the holders of certificates having greater than 50% of the voting rights evidenced by the certificates shall, (and with the consent of the NIMs Insurer, if any) terminate all of the rights and obligations of the defaulting Servicer under the Pooling and Servicing Agreement and in and to the Mortgage Loans, whereupon the Trustee will, within the time period specified in the Pooling and Servicing Agreement, succeed to all of the responsibilities and duties of the Servicer under the Pooling and Servicing Agreement, including the obligation to make Advances, subject to the pledge and assignment to a servicing rights pledgee as described in the Pooling and Servicing Agreement, or will appoint a successor servicer thereunder. No assurance can be given that termination of the rights and obligations of the Servicer under the Pooling and Servicing Agreement would not adversely affect the servicing of the Mortgage Loans serviced by the Servicer, including the delinquency experience of such Mortgage Loans.

No certificateholder, solely by virtue of the holder's status as a certificateholder, will have any right under the Pooling and Servicing Agreement to institute any proceeding regarding an event of default, unless the holder previously has given to the Trustee written notice of the continuation of an event of default and unless the holders of certificates having not less than 25% of the voting rights evidenced by the certificates have made written request to the Trustee to institute such proceeding in its own name as trustee thereunder and have offered to the Trustee, reasonable indemnity and the Trustee for 60 days has neglected or refused to institute any such proceeding.

THE TRUSTEE

The Trustee will be the trustee under the Pooling and Servicing Agreement. The Trustee will be entitled to investment income earned on and other benefits from funds in the Certificate Account. The Trustee will be entitled to reimbursement for certain expenses and indemnification amounts prior to distributions of any amounts to certificateholders. The office of the Trustee is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois 60603, Attention: FFMER 2007-3 or at such other addresses as the Trustee may designate from time to time.

The Trustee will:

(1)  provide administrative services and file reports with regard to the certificates;

(2)  provide reports to the certificateholders regarding the Mortgage Loans and the certificates; and

S-82

<PAGE>

(3)  receive payments with respect to the Mortgage Loans from the Servicer and, in its capacity as paying agent for the certificates, remit the payments to the certificateholders as described herein.

The Trustee will pay certain administrative expenses of the trust from amounts on deposit in the Certificate Account.

INDEMNIFICATION AND LIMITATION OF LIABILITY

The Pooling and Servicing Agreement will provide that HLS, LaSalle, as Trustee and in its individual capacity, and any officer, employee or agent thereof will be indemnified from the assets of the Issuing Entity and will be held harmless against any loss, liability or expense incurred in connection with (1) any audit, controversy or judicial proceeding relating to a governmental authority or any legal proceeding incurred without negligence or willful misconduct on their part, arising out of, or in connection with the acceptance or administration of the trusts created under the Pooling and Servicing Agreement and (ii) the performance of their duties under the Pooling and Servicing Agreement, including any applicable fees and expenses payable under the Pooling and Servicing Agreement, and the costs and expenses of defending themselves against any claim in connection with the exercise or performance of any of their powers or duties thereunder. HLS and LaSalle will also be entitled to reimbursement by the Issuing Entity of all reasonable expenses, disbursements and Advances incurred or made by the Servicer or the Trustee in accordance with the Pooling and Servicing Agreement (including the fees and expenses of its counsel), except any such expenses, disbursements and Advances that are not unanticipated or arise from its negligence, bad faith or willful misconduct.

SPECIAL SERVICING AGREEMENTS

The Pooling and Servicing Agreement may permit the Servicer to enter into a special servicing advisory agreement with a holder of the Class R Certificate and/or one or more other class of subordinate certificates issued by the Issuing Entity or of a net interest margin trust holding certificates issued by the Issuing Entity or an advisor thereto. Pursuant to such agreement, the Servicer may provide such person, in its capacity as special servicer, with loan-level information with respect to the Mortgage Loans, and such person may advise the Servicer with respect to the commencement of foreclosure proceedings or other actions to liquidate such Mortgage Loans and/or any other efforts to maximize recoveries with respect to such Mortgage Loans.

YIELD, PREPAYMENT AND MATURITY CONSIDERATIONS

GENERAL

The weighted average life of and the yield to maturity on each class of the
LIBOR Certificates will be directly related to the rate of payment of principal
(including Principal Prepayments) of the Mortgage Loans. The actual rate of
prepayments on pools of mortgage loans is influenced by a variety of economic,
tax, geographic, demographic, social, legal and other factors and has fluctuated
considerably in recent years. In addition, the rate of prepayments may differ
among pools of mortgage loans at any time because of specific factors relating
to the mortgage loans in a particular pool, including, among other things, the
age of the mortgage loans, the geographic locations of the properties securing
the mortgage loans, the extent of the mortgagors' equity in the related
properties, and changes in the mortgagors' housing needs, job transfers and
employment status, as well as whether the related mortgage loans are subject to
prepayment charges. The Servicer may solicit or refer to a mortgage originator
any mortgagor for refinancing or otherwise take action to encourage refinancing.
Any such refinancings will affect the rate of prepayments on the mortgage pool.

S-83

<PAGE>

The timing of changes in the rate of prepayments may significantly affect
the actual yield to investors who purchase the LIBOR Certificates at prices
other than par, even if the average rate of prepayments is consistent with the
expectations of investors. In general, the earlier the payment of principal of
the Mortgage Loans the greater the effect on an investor's yield to maturity. As
a result, the effect on an investor's yield of Principal Prepayments occurring
at a rate higher (or lower) than the rate anticipated by the investor during the
period immediately following the issuance of the LIBOR Certificates may not be
offset by a subsequent like reduction (or increase) in the rate of prepayments.
Investors must make their own decisions as to the appropriate prepayment
assumptions to be used in deciding whether to purchase any of the LIBOR
Certificates. The Depositor does not make any representations or warranties as
to the rate of prepayment or the factors to be considered in connection with
such determinations.

The weighted average life of and yield to maturity on each class of the
LIBOR Certificates will also be influenced by the amount of Net Excess Cashflow
generated by the Mortgage Loans and applied in reduction of the Certificate
Principal Balances of such certificates. The level of Net Excess Cashflow
available on any Distribution Date to be applied in reduction of the Certificate
Principal Balances of the LIBOR Certificates will be influenced by, among other
factors:

(1)  the overcollateralization level of the assets at such time (i.e., the
     extent to which interest on the related Mortgage Loans is accruing on
     a higher Stated Principal Balance than the Certificate Principal
     Balance of the related LIBOR Certificates);

(2)  the delinquency and default experience of the related Mortgage Loans;

(3)  the level of One-Month LIBOR;

(4)  the Mortgage Index for the Adjustable Rate Mortgage Loans; and

(5)  the provisions of the Pooling and Servicing Agreement that permit Net
     Excess Cashflow to be distributed to the Class C Certificates or the
     Class R Certificate when required overcollateralization levels have
     been met.

To the extent that greater (or lesser) amounts of Net Excess Cashflow are distributed in reduction of the Certificate Principal Balance of a class of LIBOR Certificates, the weighted average life thereof can be expected to shorten (or lengthen). No assurance, however, can be given as to the amount of Net Excess Cashflow distributed at any time or in the aggregate. See "Description of the Certificates--Overcollateralization Provisions."

Any Net Swap Payments owed to the Swap Counterparty will reduce amounts available for distribution to certificateholders and may reduce the Pass-Through Rates on the LIBOR Certificates. If the rate of prepayments on the Mortgage Loans is faster than anticipated, the amount on which payments due under the Swap Agreement are calculated (namely, the scheduled notional amount) may exceed the aggregate scheduled principal balance of the Mortgage Loans, thereby increasing the relative proportion of interest collections on the Mortgage Loans that must be applied to make Net Swap Payments to the Swap Counterparty. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the LIBOR Certificates.

PREPAYMENTS AND YIELDS FOR THE CERTIFICATES

Generally, if purchased at other than par, the yield to maturity on the LIBOR Certificates will be affected by the rate of the payment of principal of the Mortgage Loans. If the actual rate of payments on

S-84

<PAGE>

the Mortgage Loans is slower than the rate anticipated by an investor who purchases LIBOR Certificates at a discount, the actual yield to such investor will be lower than such investor's anticipated yield. If the actual rate of payments on the Mortgage Loans is faster than the rate anticipated by an investor who purchases LIBOR Certificates at a premium, the actual yield to such investor will be lower than such investor's anticipated yield. Because approximately 68.08% of the Statistical Mortgage Loans contain prepayment charges, the rate of Principal Prepayments during the term of such prepayment charges may be less than the rate of Principal Prepayments for Mortgage Loans which do not contain prepayment charges; however, Principal Prepayments on the Mortgage Loans could be expected to increase, perhaps materially, at or near the time of the expiration of the terms of such prepayment charges.

Approximately 16.88% of the Statistical Mortgage Loans in the mortgage pool are Fixed Rate Mortgage Loans. In general, if prevailing interest rates fall significantly below the interest rates on fixed rate mortgage loans, fixed rate mortgage loans are likely to be subject to higher prepayment rates than if prevailing rates remain at or above the interest rates on fixed rate mortgage loans. Conversely, if prevailing interest rates rise appreciably above the interest rates on fixed rate mortgage loans, fixed rate mortgage loans are likely to experience a lower prepayment rate than if prevailing rates remain at or below the interest rates on fixed rate mortgage loans.

Approximately 83.12% of the Statistical Mortgage Loans in the mortgage pool are Adjustable Rate Mortgage Loans. As is the case with conventional fixed rate mortgage loans, adjustable rate mortgage loans may be subject to a greater rate of prepayments in a declining interest rate environment. For example, if prevailing interest rates fall significantly, adjustable rate mortgage loans could be subject to higher prepayment rates than if prevailing interest rates remain constant because the availability of fixed rate mortgage loans at lower interest rates may encourage mortgagors to refinance their adjustable rate mortgage loans to a lower fixed interest rate. In addition, depending on prevailing interest rates, adjustable rate mortgage loans could experience higher prepayment rates at or near the time of any interest rate adjustment. Nevertheless, no assurance can be given as to the level of prepayment that the Mortgage Loans will experience.

Case 1:19-cv-04890-VSB   Document 1-3   Filed 05/24/19   Page 97 of 377

Although the Mortgage Rates on the Adjustable Rate Mortgage Loans are
subject to adjustment, such Mortgage Rates adjust less frequently than the
Pass-Through Rate on the LIBOR Certificates and adjust by reference to the
Mortgage Index. Changes in One-Month LIBOR may not correlate with changes in the
Mortgage Index and also may not correlate with prevailing interest rates. It is
possible that an increased level of One-Month LIBOR could occur simultaneously
with a lower level of prevailing interest rates which would be expected to
result in faster Principal Prepayments, thereby reducing the weighted average
life of the LIBOR Certificates. The Mortgage Rate applicable to substantially
all of the Adjustable Rate Mortgage Loans and any Adjustment Date will be based
on the Mortgage Index value most recently announced generally as of a date 45
days prior to such Adjustment Date. Thus, if the Mortgage Index value with
respect to an Adjustable Rate Mortgage Loan rises, the lag in time before the
corresponding Mortgage Rate increases will, all other things being equal, slow
the upward adjustment of the related Available Funds Cap. Moreover, the Fixed
Rate Mortgage Loans have Mortgage Rates that will not adjust and the presence of
the Fixed Rate Mortgage Loans in the mortgage pool will make the related
Available Funds Cap less likely to adjust either upward or downward. See "The
Mortgage Pool."

The calculation of the Pass-Through Rate on each class of the LIBOR
Certificates is based upon the value of an index (One-Month LIBOR) that is
different from the value of the Mortgage Index applicable to all of the
Adjustable Rate Mortgage Loans (Six-Month LIBOR) as described under "The
Mortgage Pool--General." In addition, the Fixed Rate Mortgage Loans have
Mortgage Rates that are not dependent upon any index.

<center>S-85</center>

<PAGE>

The Group One Certificates are subject to the Group One Available Funds
Cap, which limits the Pass-Through Rate on the Group One Certificates to a per
annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total
scheduled interest on the Group One Mortgage Loans based on the Net Mortgage
Rates in effect on the related Due Date, less the pro rata portion (calculated
based on the ratio of the Group One Mortgage Loans to the total pool of Mortgage
Loans) allocable to the Group One Mortgage Loans of any Net Swap Payment or Swap
Termination Payment (other than Defaulted Swap Termination Payments) owed to the
Swap Counterparty for such Distribution Date; and (y) the aggregate Stated
Principal Balance of the Group One Mortgage Loans as of the first day of the
related Accrual Period and (iii) a fraction, the numerator of which is 30 and
the denominator of which is the actual number of days in the related Accrual
Period.

The Group Two Certificates are subject to the Group Two Available Funds
Cap, which limits the Pass-Through Rate on the Group Two Certificates to a per
annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total
scheduled interest on the Group Two Mortgage Loans based on the Net Mortgage
Rates in effect on the related Due Date, less the pro rata portion (calculated
based on the ratio of the Group Two Mortgage Loans to the total pool of Mortgage
Loans) allocable to the Group Two Mortgage Loans of any Net Swap Payment or Swap
Termination Payment (other than Defaulted Swap Termination Payments) owed to the
Swap Counterparty for such Distribution Date and (y) the aggregate Stated
Principal Balance of the Group Two Mortgage Loans as of the first day of the
related Accrual Period and (iii) a fraction, the numerator of which is 30 and
the denominator of which is the actual number of days in the related Accrual
Period.

The Class M-5, Class M-6 and Class B Certificates are subject to the
Weighted Average Available Funds Cap, which limits the Pass-Through Rate on the
Class M-5, Class M-6 and Class B Certificates to a per annum rate equal to the
weighted average of the Group One Available Funds Cap and the Group Two

Available Funds Cap (weighted in proportion to the results of subtracting from
the aggregate Stated Principal Balance of each Mortgage Group the current
Certificate Principal Balance of the Group One Certificates, in the case of
Group One, or the Group Two Certificates, in the case of Group Two).

    Furthermore, even if One-Month LIBOR and Six-Month LIBOR were at the same
level, various factors may cause an Available Funds Cap to limit the amount of
interest that would otherwise accrue on a related class of LIBOR Certificates.
In particular, the Pass-Through Rate on each class of LIBOR Certificates adjusts
monthly, while the interest rates on the Adjustable Rate Mortgage Loans adjust
less frequently and the interest rates on the Fixed Rate Mortgage Loans remain
constant, with the result that the operation of an Available Funds Cap may limit
increases in the Pass-Through Rates for extended periods in a rising interest
rate environment. In addition, the Adjustable Rate Mortgage Loans are subject to
periodic (i.e., semi-annual) adjustment caps, minimum and maximum rate caps, and
the weighted average margin is subject to change based upon prepayment
experience, which also may result in an Available Funds Cap limiting increases
in the Pass-Through Rate for the related classes of LIBOR Certificates.
Consequently, the interest that becomes due on the Mortgage Loans (net of the
Servicing Fee and any Net Swap Payments owed to the Swap Counterparty or Swap
Termination Payments owed to the Swap Counterparty for the related Distribution
Date (other than Defaulted Swap Termination Payments)) with respect to any
Distribution Date may not equal the amount of interest that would accrue at
One-Month LIBOR plus the margin on each class of LIBOR Certificates.
Furthermore, if an Available Funds Cap determines the Pass-Through Rate for a
class of LIBOR Certificates for a Distribution Date, the market value of such
class of LIBOR Certificates may be temporarily or permanently reduced. Although
the Pooling and Servicing Agreement provides a mechanism to pay, on a
subordinated basis, any Floating Rate Certificate Carryover, there is no
assurance that funds will be available to pay such amount. The ratings assigned
to the LIBOR Certificates do not address the likelihood of the payment of any
such amount.


                                    S-86


<PAGE>

    In addition, the Pass-Through Rate on the Group One Certificates is subject
to the Group One Maximum Rate Cap, the Pass-Through Rate on any class of the
Group Two Certificates is subject to the Group Two Maximum Rate Cap and the
Pass-Through Rate on any class of the Class M-5, Class M-6 and Class B
Certificates is subject to the Weighted Average Maximum Rate Cap. The Maximum
Rate Caps may limit increases in the Pass-Through Rate on the related class of
LIBOR Certificates and any shortfall of interest will not be recovered, except
under limited circumstances described herein.

    The extent to which the yield to maturity on the LIBOR Certificates may
vary from the anticipated yield will depend upon the degree to which they are
purchased at a discount or premium and, correspondingly, the degree to which the
timing of payments thereon is sensitive to prepayments, liquidations and
purchases of the Mortgage Loans. In particular, in the case of the LIBOR
Certificates purchased at a discount, an investor should consider the risk that
a slower than anticipated rate of principal payments, liquidations and purchases
of the Mortgage Loans could result in an actual yield to such investor that is
lower than the anticipated yield and, in the case of the LIBOR Certificates
purchased at a premium, the risk that a faster than anticipated rate of
principal payments, liquidations and purchases of such Mortgage Loans could
result in an actual yield to such investor that is lower than the anticipated
yield.

    The Last Scheduled Distribution Date for each class of LIBOR Certificates
is set forth in the chart appearing on page S-4. The actual final Distribution
Date with respect to each class of LIBOR Certificates could occur significantly
earlier than its Last Scheduled Distribution Date because:

(1) Principal Prepayments are likely to occur and such Principal Prepayments will be applied to the payment of the Certificate Principal Balances thereof;

(2) excess interest to the extent available will be applied as an accelerated payment of principal on the LIBOR Certificates as described herein; and

(3) the Trustee will be directed in the Pooling and Servicing Agreement to conduct a one-time auction for the purchase of all the Mortgage Loans in the mortgage pool when the Stated Principal Balance of the Mortgage Loans and REO Properties at the time of purchase is less than or equal to 10% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date and if such auction fails to achieve the sufficient purchase price, HLS, as Servicer, may, on any subsequent Distribution Date, purchase all of the Mortgage Loans.

Principal Prepayments on mortgage loans are commonly measured relative to a prepayment model or standard. The prepayment models used in this prospectus supplement are based on an assumed rate of prepayment each month of the then unpaid principal balance of a pool of mortgage loans similar to the Fixed Rate Mortgage Loans or Adjustable Rate Mortgage Loans, as applicable. For the Fixed Rate Mortgage Loans, the prepayment model used in this prospectus supplement is HEP. For the Adjustable Rate Mortgage Loans, the prepayment model used in this prospectus supplement is PPC.

As used in the following tables "0% of the prepayment model" assumes no Principal Prepayments on the Mortgage Loans; "80% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 80% of the related prepayment model; "100% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 100% of the related prepayment model; "150% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 150% of the related prepayment model; and "200% of the prepayment model" assumes the Mortgage Loans will prepay at rates equal to 200% of the related prepayment model.

S-87

<PAGE>

There is no assurance, however, that Principal Prepayments on the Mortgage Loans will conform to any level of the prepayment model, and no representation is made that the Mortgage Loans will prepay at the prepayment rates shown or any other prepayment rate. The rate of principal payments on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors, including the level of interest rates. Other factors affecting prepayment of mortgage loans include changes in obligors' housing needs, job transfers, employment status, the solicitation of mortgagors to refinance their mortgage loans and the existence of prepayment charges. The Servicer may solicit or refer to a mortgage originator any mortgagor for refinancing or otherwise take action to encourage refinancing. Any such solicitation or action may cause the rate of prepayments on the Mortgage Loans to occur at a faster rate than might otherwise be the case. In the case of mortgage loans in general, if prevailing interest rates fall significantly below the interest rates on the mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the rates borne by the mortgage loans. Conversely, if prevailing interest rates rise above the interest rates on the mortgage loans, the rate of prepayment would be expected to decrease.

The weighted average lives of each class of LIBOR Certificates set forth on the following tables are determined by (1) multiplying the amount of each assumed principal distribution with respect to such class by the number of years from the date of issuance of the certificates to the related Distribution Date,

(2) summing the results and (3) dividing the sum by the total principal distribution on such class of LIBOR Certificates.

The following tables have been prepared on the basis of the Modeling Assumptions, including the assumption that the Mortgage Loans have the approximate characteristics described below:

S-88

<PAGE>

GROUP ONE FIXED RATE MORTGAGE LOANS

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | NET MORTGAGE RATE(%) | MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST-ONLY TERM (MONTHS) | REMAINING INTEREST-ONLY TERM (MONTHS) | PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 384,300.00 | 9.650 | 9.150 | 360 | 360 | 480 | 480 | 0 | 0 | 12 |
| 1,374,396.34 | 9.055 | 8.555 | 360 | 359 | 480 | 479 | 0 | 0 | 36 |
| 1,305,414.16 | 9.225 | 8.725 | 360 | 360 | 600 | 600 | 0 | 0 | 36 |
| 247,845.65 | 9.008 | 8.508 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 2,954,073.91 | 9.312 | 8.812 | 360 | 359 | 360 | 359 | 0 | 0 | 36 |
| 140,000.00 | 10.050 | 9.550 | 360 | 360 | 300 | 300 | 60 | 60 | 36 |
| 358,422.93 | 7.933 | 7.433 | 360 | 359 | 480 | 479 | 0 | 0 | 36 |
| 2,867,198.11 | 9.000 | 8.500 | 360 | 360 | 360 | 360 | 0 | 0 | 36 |
| 148,000.00 | 11.800 | 11.300 | 360 | 359 | 300 | 300 | 60 | 59 | 36 |
| 356,200.00 | 7.469 | 6.969 | 360 | 360 | 480 | 480 | 0 | 0 | 36 |
| 1,091,608.27 | 9.367 | 8.867 | 360 | 359 | 600 | 599 | 0 | 0 | 36 |
| 150,000.00 | 6.200 | 5.700 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 2,402,507.65 | 8.580 | 8.080 | 360 | 360 | 360 | 360 | 0 | 0 | 36 |
| 296,910.00 | 8.500 | 8.000 | 360 | 360 | 300 | 300 | 60 | 60 | 12 |
| 680,900.00 | 8.867 | 8.367 | 360 | 359 | 300 | 300 | 60 | 59 | 36 |
| 324,674.41 | 9.707 | 9.207 | 360 | 360 | 480 | 480 | 0 | 0 | 24 |
| 824,406.13 | 9.974 | 9.474 | 360 | 359 | 600 | 599 | 0 | 0 | 24 |
| 3,114,606.26 | 8.742 | 8.242 | 360 | 360 | 360 | 360 | 0 | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 0 | 24 |
| 224,954.70 | 8.889 | 8.389 | 180 | 180 | 360 | 360 | 0 | 0 | 36 |
| 413,412.28 | 9.898 | 9.398 | 360 | 359 | 480 | 479 | 0 | 0 | 36 |
| 499,084.20 | 8.805 | 8.305 | 360 | 360 | 600 | 600 | 0 | 0 | 36 |
| 126,596.89 | 10.250 | 9.750 | 360 | 359 | 360 | 359 | 0 | 0 | 24 |
| 1,739,012.64 | 8.967 | 8.467 | 360 | 359 | 360 | 359 | 0 | 0 | 36 |
| 106,500.00 | 7.750 | 7.250 | 360 | 360 | 300 | 300 | 60 | 60 | 36 |
| 126,255.00 | 10.750 | 10.250 | 360 | 360 | 480 | 480 | 0 | 0 | 36 |
| 147,186.37 | 8.800 | 8.300 | 360 | 359 | 600 | 599 | 0 | 0 | 36 |
| 153,600.00 | 6.990 | 6.490 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 815,842.84 | 8.621 | 8.121 | 360 | 360 | 360 | 360 | 0 | 0 | 36 |
| 99,450.00 | 10.600 | 10.100 | 360 | 359 | 300 | 300 | 60 | 59 | 36 |
| 859,049.46 | 9.877 | 9.377 | 360 | 359 | 600 | 599 | 0 | 0 | 36 |
| 273,196.31 | 7.632 | 7.132 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 1,802,104.41 | 9.118 | 8.618 | 360 | 359 | 360 | 359 | 0 | 0 | 36 |
| 1,417,081.64 | 8.884 | 8.384 | 360 | 360 | 480 | 480 | 0 | 0 | 12 |
| 5,371,602.21 | 8.126 | 7.626 | 360 | 360 | 480 | 480 | 0 | 0 | 36 |
| 1,461,389.61 | 8.397 | 7.897 | 360 | 359 | 600 | 599 | 0 | 0 | 12 |
| 11,763,592.03 | 8.447 | 7.947 | 360 | 359 | 600 | 599 | 0 | 0 | 36 |
| 52,000.00 | 7.800 | 7.300 | 180 | 180 | 180 | 180 | 0 | 0 | 12 |
| 1,702,388.50 | 6.744 | 6.244 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 106,914.75 | 7.850 | 7.350 | 240 | 239 | 240 | 239 | 0 | 0 | 36 |
| 5,063,668.56 | 8.827 | 8.327 | 360 | 359 | 360 | 359 | 0 | 0 | 12 |
| 763,484.81 | 8.867 | 8.367 | 360 | 359 | 360 | 359 | 0 | 0 | 24 |
| 25,165,793.71 | 8.029 | 7.529 | 360 | 360 | 360 | 360 | 0 | 0 | 36 |
| 281,000.00 | 8.950 | 8.450 | 180 | 179 | 120 | 120 | 60 | 59 | 36 |
| 458,274.98 | 9.082 | 8.582 | 360 | 359 | 300 | 300 | 60 | 59 | 12 |
| 225,000.00 | 8.450 | 7.950 | 360 | 360 | 300 | 300 | 60 | 60 | 24 |
| 2,283,675.00 | 7.709 | 7.209 | 360 | 359 | 300 | 300 | 60 | 59 | 36 |
| 5,714,909.72 | 9.281 | 8.781 | 360 | 359 | 480 | 479 | 0 | 0 | 0 |

</TABLE>

S-89

<PAGE>

GROUP ONE FIXED RATE MORTGAGE LOANS (CONT'D)

```
<TABLE>
<CAPTION>
                                                ORIGINAL      REMAINING
ORIGINAL
                                               AMORTIZATION  AMORTIZATION    ORIGINAL
REMAINING    MONTHS TO
                        NET    ORIGINAL REMAINING   TERM          TERM      INTEREST-ONLY
INTEREST-ONLY PREPAYMENT
    CURRENT    MORTGAGE MORTGAGE   TERM     TERM   (LESS IO TERM) (LESS IO TERM)    TERM
TERM       PENALTY
  BALANCE ($)  RATE(%)  RATE(%) (MONTHS)  (MONTHS)   (MONTHS)      (MONTHS)       (MONTHS)
(MONTHS)   EXPIRATION
-------------- -------- -------- -------- --------- -------------- -------------- ------------- -----
-------- ----------
<S>           <C>      <C>      <C>      <C>       <C>            <C>            <C>           <C>
<C>
   7,732,154.34  9.160   8.660     360      359        600           599              0
0          0
   1,177,806.74  7.319   6.819     180      180        180           180              0
0          0
  26,076,596.14  8.669   8.169     360      359        360           359              0
0          0
     195,700.00  9.200   8.700     180      179        120           120             60
59          0
   1,950,346.00  9.483   8.983     360      359        300           300             60
59          0
</TABLE>
```

                            S-90

```
<PAGE>
```

            GROUP TWO FIXED RATE MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                                                ORIGINAL      REMAINING
ORIGINAL
                                               AMORTIZATION  AMORTIZATION  ORIGINAL REMAINING
MONTHS TO
                        NET    ORIGINAL REMAINING   TERM          TERM        IO       IO
PREPAYMENT
    CURRENT    MORTGAGE MORTGAGE   TERM     TERM   (LESS IO TERM) (LESS IO TERM)  TERM     TERM
PENALTY
  BALANCE ($)  RATE(%)  RATE(%) (MONTHS)  (MONTHS)   (MONTHS)      (MONTHS)     (MONTHS) (MONTHS)
EXPIRATION
-------------- -------- -------- -------- --------- -------------- -------------- -------- ---------
----------
<S>           <C>      <C>      <C>      <C>       <C>            <C>            <C>      <C>
<C>
     532,259.74 10.458   9.958     360      359        480           479              0        0
36
   1,407,962.35  9.794   9.294     360      360        600           600              0        0
36
     175,400.00  9.657   9.157     180      180        180           180              0        0
36
   4,987,336.86  9.301   8.801     360      359        360           359              0        0
36
     262,150.00 12.224  11.724     360      360        300           300             60       60
36
     309,525.00 10.192   9.692     360      360        480           480              0        0
36
```

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 388,390.34 | 9.497 | 8.997 | 360 | 360 | 600 | 600 | 0 | 0 |
| 36 | | | | | | | | |
| 114,000.00 | 9.550 | 9.050 | 360 | 360 | 360 | 360 | 0 | 0 |
| 24 | | | | | | | | |
| 2,085,772.03 | 8.807 | 8.307 | 360 | 360 | 360 | 360 | 0 | 0 |
| 36 | | | | | | | | |
| 99,766.49 | 7.150 | 6.650 | 360 | 359 | 300 | 300 | 60 | 59 |
| 36 | | | | | | | | |
| 161,980.57 | 10.900 | 10.400 | 360 | 359 | 480 | 479 | 0 | 0 |
| 36 | | | | | | | | |
| 142,995.18 | 11.462 | 10.962 | 360 | 359 | 600 | 599 | 0 | 0 |
| 36 | | | | | | | | |
| 1,099,085.95 | 8.591 | 8.091 | 360 | 359 | 360 | 359 | 0 | 0 |
| 36 | | | | | | | | |
| 161,936.25 | 10.550 | 10.050 | 180 | 179 | 360 | 359 | 0 | 0 |
| 24 | | | | | | | | |
| 753,163.93 | 9.874 | 9.374 | 360 | 359 | 480 | 479 | 0 | 0 |
| 24 | | | | | | | | |
| 2,110,917.44 | 9.457 | 8.957 | 360 | 360 | 600 | 600 | 0 | 0 |
| 24 | | | | | | | | |
| 6,289,924.88 | 9.315 | 8.815 | 360 | 360 | 360 | 360 | 0 | 0 |
| 24 | | | | | | | | |
| 398,000.00 | 10.036 | 9.536 | 360 | 359 | 300 | 300 | 60 | 59 |
| 24 | | | | | | | | |
| 803,320.36 | 10.020 | 9.520 | 360 | 360 | 480 | 480 | 0 | 0 |
| 36 | | | | | | | | |
| 113,588.85 | 8.650 | 8.150 | 360 | 359 | 600 | 599 | 0 | 0 |
| 12 | | | | | | | | |
| 59,494.44 | 9.000 | 8.500 | 360 | 359 | 600 | 599 | 0 | 0 |
| 24 | | | | | | | | |
| 840,002.59 | 10.368 | 9.868 | 360 | 359 | 600 | 599 | 0 | 0 |
| 36 | | | | | | | | |
| 72,210.54 | 9.000 | 8.500 | 360 | 359 | 360 | 359 | 0 | 0 |
| 24 | | | | | | | | |
| 4,402,322.03 | 9.306 | 8.806 | 360 | 360 | 360 | 360 | 0 | 0 |
| 36 | | | | | | | | |
| 480,656.00 | 9.148 | 8.648 | 360 | 359 | 300 | 300 | 60 | 59 |
| 36 | | | | | | | | |
| 360,000.00 | 8.100 | 7.600 | 360 | 360 | 600 | 600 | 0 | 0 |
| 36 | | | | | | | | |
| 384,229.18 | 9.994 | 9.494 | 360 | 360 | 480 | 479 | 0 | 0 |
| 36 | | | | | | | | |
| 375,796.39 | 9.288 | 8.788 | 360 | 360 | 600 | 600 | 0 | 0 |
| 36 | | | | | | | | |
| 1,061,721.83 | 8.869 | 8.369 | 360 | 359 | 360 | 359 | 0 | 0 |
| 36 | | | | | | | | |
| 1,030,614.62 | 8.773 | 8.273 | 360 | 359 | 480 | 479 | 0 | 0 |
| 36 | | | | | | | | |
| 1,773,171.73 | 10.120 | 9.620 | 360 | 359 | 600 | 599 | 0 | 0 |
| 36 | | | | | | | | |
| 55,000.00 | 7.050 | 6.550 | 180 | 180 | 180 | 180 | 0 | 0 |
| 36 | | | | | | | | |
| 143,675.00 | 11.265 | 10.765 | 360 | 360 | 360 | 360 | 0 | 0 |
| 24 | | | | | | | | |
| 6,715,150.64 | 9.624 | 9.124 | 360 | 359 | 360 | 359 | 0 | 0 |
| 36 | | | | | | | | |
| 318,225.00 | 9.993 | 9.493 | 360 | 360 | 300 | 300 | 60 | 60 |
| 36 | | | | | | | | |
| 2,569,878.77 | 9.482 | 8.982 | 360 | 360 | 480 | 480 | 0 | 0 |
| 12 | | | | | | | | |
| 6,620,916.89 | 8.368 | 7.868 | 360 | 359 | 480 | 479 | 0 | 0 |
| 36 | | | | | | | | |
| 3,017,643.53 | 8.974 | 8.474 | 360 | 359 | 600 | 599 | 0 | 0 |
| 12 | | | | | | | | |
| 264,577.67 | 9.680 | 9.180 | 360 | 360 | 600 | 600 | 0 | 0 |

| | | | | | | | | | Prepayment Penalty Exp. |
|---|---|---|---|---|---|---|---|---|---|
| 24 | | | | | | | | | |
| 15,668,994.87 | 8.663 | 8.163 | 360 | 359 | 600 | 599 | 0 | 0 | 36 |
| 135,750.00 | 8.995 | 8.495 | 180 | 180 | 180 | 180 | 0 | 0 | 12 |
| 1,927,141.49 | 7.994 | 7.494 | 180 | 180 | 180 | 180 | 0 | 0 | 36 |
| 76,700.00 | 9.000 | 8.500 | 240 | 240 | 240 | 240 | 0 | 0 | 36 |
| 11,782,689.76 | 9.515 | 9.015 | 360 | 360 | 360 | 360 | 0 | 0 | 12 |
| 396,653.47 | 10.487 | 9.987 | 360 | 360 | 360 | 360 | 0 | 0 | 24 |
| 2,327,172.45 | 8.829 | 8.329 | 360 | 359 | 300 | 300 | 60 | 59 | 12 |
| 2,624,732.00 | 9.286 | 8.786 | 360 | 359 | 300 | 300 | 60 | 59 | 36 |

</TABLE>

S-91

<PAGE>

GROUP TWO FIXED RATE MORTGAGE LOANS (CONT'D)

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | NET MORTGAGE RATE(%) | MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL IO TERM (MONTHS) | REMAINING IO TERM (MONTHS) | ORIGINAL MONTHS TO PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5,592,579.70 | 9.423 | 8.923 | 360 | 360 | 480 | 480 | 0 | 0 | 0 |
| 12,451,392.33 | 9.679 | 9.179 | 360 | 359 | 600 | 599 | 0 | 0 | 0 |
| 1,206,847.77 | 7.379 | 6.879 | 180 | 179 | 180 | 179 | 0 | 0 | 0 |
| 28,319,870.62 | 9.188 | 8.688 | 360 | 359 | 360 | 359 | 0 | 0 | 0 |
| 484,500.00 | 10.700 | 10.200 | 180 | 180 | 120 | 120 | 60 | 60 | 0 |
| 1,657,390.00 | 9.013 | 8.513 | 360 | 360 | 300 | 300 | 60 | 60 | 0 |
| 57,559,181.35 | 8.676 | 8.176 | 360 | 359 | 360 | 359 | 0 | 0 | 36 |

</TABLE>

S-92

<PAGE>

GROUP ONE ADJUSTABLE RATE MORTGAGE LOANS

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 6,149,880.78 | 7.531 | 7.031 | 360 | 359 | 300 | 300 | 60 | 59 |
| 864,467.84 | 8.361 | 7.861 | 360 | 360 | 360 | 360 | 0 | 0 |
| 3,005,795.00 | 8.273 | 7.773 | 360 | 360 | 300 | 300 | 60 | 60 |
| 462,231.42 | 8.364 | 7.864 | 360 | 359 | 360 | 359 | 0 | 0 |
| 351,486.01 | 8.983 | 8.483 | 360 | 360 | 480 | 480 | 0 | 0 |
| 1,361,517.21 | 8.559 | 8.059 | 360 | 359 | 360 | 359 | 0 | 0 |
| 183,959.43 | 6.500 | 6.000 | 360 | 359 | 600 | 599 | 0 | 0 |
| 236,758.12 | 7.100 | 6.600 | 360 | 359 | 600 | 599 | 0 | 0 |
| 103,979.98 | 9.350 | 8.850 | 360 | 359 | 480 | 479 | 0 | 0 |
| 151,132.40 | 7.400 | 6.900 | 360 | 359 | 480 | 479 | 0 | 0 |
| 61,200.00 | 9.900 | 9.400 | 360 | 359 | 300 | 300 | 60 | 59 |
| 100,000.00 | 8.350 | 7.850 | 360 | 360 | 360 | 360 | 0 | 0 |
| 406,000.00 | 8.427 | 7.927 | 360 | 360 | 600 | 600 | 0 | 0 |
| 116,000.00 | 7.100 | 6.600 | 360 | 360 | 600 | 600 | 0 | 0 |
| 200,000.00 | 7.450 | 6.950 | 360 | 360 | 300 | 300 | 60 | 60 |
| 425,913.93 | 8.049 | 7.549 | 360 | 360 | 480 | 480 | 0 | 0 |
| 151,199.51 | 8.050 | 7.550 | 360 | 359 | 360 | 359 | 0 | 0 |
| 536,098.95 | 7.683 | 7.183 | 360 | 360 | 360 | 360 | 0 | 0 |
| 391,200.00 | 8.600 | 8.100 | 360 | 360 | 300 | 300 | 60 | 60 |
| 588,000.00 | 7.229 | 6.729 | 360 | 359 | 300 | 300 | 60 | 59 |
| 27,694,476.46 | 8.511 | 8.011 | 360 | 359 | 600 | 599 | 0 | 0 |
| 302,148.84 | 8.186 | 7.686 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,991,952.42 | 7.577 | 7.077 | 360 | 359 | 360 | 359 | 0 | 0 |
| 527,550.00 | 7.220 | 6.720 | 360 | 359 | 300 | 300 | 60 | 59 |
| 267,372.19 | 8.607 | 8.107 | 360 | 359 | 600 | 599 | 0 | 0 |
| 969,677.94 | 8.763 | 8.263 | 360 | 359 | 600 | 599 | 0 | 0 |
| 449,428.69 | 7.464 | 6.964 | 360 | 359 | 600 | 599 | 0 | 0 |
| 510,000.00 | 8.217 | 7.717 | 360 | 359 | 300 | 300 | 60 | 59 |
| 27,668,291.64 | 8.761 | 8.261 | 360 | 359 | 360 | 359 | 0 | 0 |
| 3,436,536.67 | 7.147 | 6.647 | 360 | 359 | 300 | 300 | 60 | 59 |
| 262,600.00 | 8.301 | 7.801 | 360 | 360 | 480 | 480 | 0 | 0 |

<CAPTION>

| CURRENT BALANCE ($) | GROSS MARGIN(%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | ORIGINAL MONTHS TO PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 6,149,880.78 | 4.422 | 3.000 | 1.000 | 13.531 | 7.531 | 6 | 35 | 6M LIBOR | 0 |
| 864,467.84 | 5.008 | 3.000 | 1.000 | 14.361 | 8.361 | 6 | 60 | 6M LIBOR | 0 |
| 3,005,795.00 | 5.196 | 3.000 | 1.000 | 14.273 | 8.273 | 6 | 24 | 6M LIBOR | 0 |
| 462,231.42 | 5.273 | 1.000 | 1.000 | 14.364 | 8.364 | 6 | 5 | 6M LIBOR | 0 |
| 351,486.01 | 5.283 | 3.000 | 1.000 | 14.983 | 8.983 | 6 | 24 | 6M LIBOR | 12 |
| 1,361,517.21 | 5.310 | 3.000 | 1.000 | 14.559 | 8.559 | 6 | 23 | 6M LIBOR | 12 |
| 183,959.43 | 5.400 | 3.000 | 1.000 | 12.500 | 6.500 | 6 | 59 | 6M LIBOR | 36 |
| 236,758.12 | 5.400 | 3.000 | 1.000 | 13.100 | 7.100 | 6 | 59 | 6M LIBOR | 36 |
| 103,979.98 | 5.400 | 3.000 | 1.000 | 15.350 | 9.350 | 6 | 23 | 6M LIBOR | 36 |
| 151,132.40 | 5.400 | 3.000 | 1.000 | 13.400 | 7.400 | 6 | 35 | 6M LIBOR | 36 |
| 61,200.00 | 5.400 | 3.000 | 1.000 | 15.900 | 9.900 | 6 | 23 | 6M LIBOR | 24 |
| 100,000.00 | 5.400 | 3.000 | 1.000 | 14.350 | 8.350 | 6 | 24 | 6M LIBOR | 12 |
| 406,000.00 | 5.400 | 3.000 | 1.000 | 14.427 | 8.427 | 6 | 36 | 6M LIBOR | 24 |
| 116,000.00 | 5.400 | 3.000 | 1.000 | 13.100 | 7.100 | 6 | 60 | 6M LIBOR | 36 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 200,000.00 | 5.400 | 3.000 | 1.000 | 13.450 | 7.450 | 6 | 24 | 6M LIBOR | 12 |
| 425,913.93 | 5.400 | 3.000 | 1.000 | 14.049 | 8.049 | 6 | 36 | 6M LIBOR | 24 |
| 151,199.51 | 5.400 | 1.000 | 1.000 | 14.050 | 8.050 | 6 | 5 | 6M LIBOR | 12 |
| 536,098.95 | 5.400 | 1.000 | 1.000 | 13.683 | 7.683 | 6 | 6 | 6M LIBOR | 24 |
| 391,200.00 | 5.400 | 3.000 | 1.000 | 14.600 | 8.600 | 6 | 24 | 6M LIBOR | 36 |
| 588,000.00 | 5.400 | 3.000 | 1.000 | 13.229 | 7.230 | 6 | 35 | 6M LIBOR | 12 |
| 27,694,476.46 | 5.429 | 3.000 | 1.000 | 14.511 | 8.511 | 6 | 35 | 6M LIBOR | 0 |
| 302,148.84 | 5.452 | 3.000 | 1.000 | 14.186 | 8.186 | 6 | 36 | 6M LIBOR | 12 |
| 1,991,952.42 | 5.500 | 3.000 | 1.000 | 13.577 | 7.577 | 6 | 59 | 6M LIBOR | 36 |
| 527,550.00 | 5.516 | 3.000 | 1.000 | 13.220 | 7.220 | 6 | 35 | 6M LIBOR | 36 |
| 267,372.19 | 5.545 | 3.000 | 1.000 | 14.607 | 8.607 | 6 | 23 | 6M LIBOR | 24 |
| 969,677.94 | 5.569 | 3.000 | 1.000 | 14.763 | 8.763 | 6 | 23 | 6M LIBOR | 12 |
| 449,428.69 | 5.577 | 3.000 | 1.000 | 13.464 | 7.464 | 6 | 35 | 6M LIBOR | 36 |
| 510,000.00 | 5.592 | 3.000 | 1.000 | 14.217 | 8.217 | 6 | 35 | 6M LIBOR | 24 |
| 27,668,291.64 | 5.598 | 3.000 | 1.000 | 14.761 | 8.761 | 6 | 35 | 6M LIBOR | 0 |
| 3,436,536.67 | 5.609 | 3.000 | 1.000 | 13.147 | 7.147 | 6 | 35 | 6M LIBOR | 36 |
| 262,600.00 | 5.617 | 3.000 | 1.000 | 14.301 | 8.301 | 6 | 36 | 6M LIBOR | 36 |

```
</TABLE>
```

S-93

```
<PAGE>
```

GROUP ONE ADJUSTABLE RATE MORTGAGE LOANS (CONT'D)

```
<TABLE>
<CAPTION>
```

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| 3,817,627.11 | 7.997 | 7.497 | 360 | 359 | 600 | 599 | 0 | 0 |
| 284,981.15 | 8.416 | 7.916 | 360 | 360 | 360 | 360 | 0 | 0 |
| 9,552,004.07 | 8.662 | 8.162 | 360 | 359 | 600 | 599 | 0 | 0 |
| 217,480.88 | 9.208 | 8.708 | 360 | 359 | 480 | 479 | 0 | 0 |
| 43,944,852.56 | 8.955 | 8.455 | 360 | 360 | 360 | 360 | 0 | 0 |
| 367,743.96 | 7.841 | 7.341 | 360 | 359 | 360 | 359 | 0 | 0 |
| 17,111,303.78 | 8.601 | 8.101 | 360 | 359 | 480 | 479 | 0 | 0 |
| 2,034,350.75 | 7.581 | 7.081 | 360 | 359 | 240 | 240 | 120 | 119 |
| 45,620,852.07 | 8.874 | 8.374 | 360 | 359 | 600 | 599 | 0 | 0 |
| 34,301,198.97 | 8.916 | 8.416 | 360 | 360 | 480 | 480 | 0 | 0 |
| 1,249,135.02 | 9.145 | 8.645 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,474,450.00 | 8.196 | 7.696 | 360 | 359 | 300 | 300 | 60 | 59 |
| 29,025,874.92 | 7.775 | 7.275 | 360 | 360 | 600 | 600 | 0 | 0 |
| 348,221.50 | 8.820 | 8.320 | 360 | 359 | 480 | 479 | 0 | 0 |
| 489,265.27 | 9.625 | 9.125 | 360 | 359 | 360 | 359 | 0 | 0 |
| 5,715,365.99 | 7.355 | 6.855 | 360 | 359 | 300 | 300 | 60 | 59 |
| 539,843.77 | 7.739 | 7.239 | 360 | 360 | 360 | 360 | 0 | 0 |
| 4,113,741.43 | 7.672 | 7.172 | 360 | 359 | 600 | 599 | 0 | 0 |
| 694,913.49 | 8.574 | 8.074 | 360 | 359 | 600 | 599 | 0 | 0 |
| 116,229,141.55 | 8.244 | 7.744 | 360 | 359 | 600 | 599 | 0 | 0 |
| 81,582.31 | 8.950 | 8.450 | 360 | 359 | 480 | 479 | 0 | 0 |
| 4,217,699.73 | 8.533 | 8.033 | 360 | 360 | 480 | 480 | 0 | 0 |
| 314,900.00 | 8.265 | 7.765 | 360 | 359 | 300 | 300 | 60 | 59 |
| 965,439.70 | 9.275 | 8.775 | 360 | 359 | 480 | 479 | 0 | 0 |
| 8,260,090.56 | 8.071 | 7.571 | 360 | 359 | 360 | 359 | 0 | 0 |
| 28,756,951.92 | 8.419 | 7.919 | 360 | 359 | 480 | 479 | 0 | 0 |
| 232,150.00 | 7.726 | 7.226 | 360 | 359 | 240 | 240 | 120 | 119 |
| 48,901,926.05 | 8.453 | 7.953 | 360 | 359 | 360 | 359 | 0 | 0 |
| 532,712.35 | 8.320 | 7.820 | 360 | 360 | 480 | 480 | 0 | 0 |
| 3,388,941.39 | 9.210 | 8.710 | 360 | 360 | 360 | 360 | 0 | 0 |

| 565,660.73 | 8.996 | 8.496 | 360 | 360 | 480 | 480 | 0 | 0 |

<CAPTION>

| CURRENT BALANCE ($) | GROSS MARGIN(%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | ORIGINAL MONTHS TO PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 3,817,627.11 | 5.627 | 3.000 | 1.000 | 13.997 | 7.997 | 6 | 35 | 6M LIBOR | 12 |
| 284,981.15 | 5.628 | 3.000 | 1.000 | 14.416 | 8.416 | 6 | 36 | 6M LIBOR | 24 |
| 9,552,004.07 | 5.642 | 3.000 | 1.000 | 14.662 | 8.662 | 6 | 23 | 6M LIBOR | 12 |
| 217,480.88 | 5.646 | 3.000 | 1.000 | 15.208 | 9.208 | 6 | 23 | 6M LIBOR | 24 |
| 43,944,852.56 | 5.655 | 3.000 | 1.000 | 14.955 | 8.955 | 6 | 24 | 6M LIBOR | 0 |
| 367,743.96 | 5.658 | 2.000 | 1.000 | 13.841 | 7.841 | 6 | 11 | 6M LIBOR | 24 |
| 17,111,303.78 | 5.660 | 3.000 | 1.000 | 14.601 | 8.601 | 6 | 35 | 6M LIBOR | 0 |
| 2,034,350.75 | 5.672 | 3.000 | 1.000 | 13.581 | 7.581 | 6 | 59 | 6M LIBOR | 36 |
| 45,620,852.07 | 5.673 | 3.000 | 1.000 | 14.874 | 8.874 | 6 | 23 | 6M LIBOR | 0 |
| 34,301,198.97 | 5.684 | 3.000 | 1.000 | 14.916 | 8.916 | 6 | 24 | 6M LIBOR | 0 |
| 1,249,135.02 | 5.705 | 3.000 | 1.000 | 15.145 | 9.145 | 6 | 35 | 6M LIBOR | 12 |
| 1,474,450.00 | 5.711 | 3.000 | 1.000 | 14.196 | 8.196 | 6 | 23 | 6M LIBOR | 12 |
| 29,025,874.92 | 5.717 | 3.000 | 1.000 | 13.775 | 7.775 | 6 | 36 | 6M LIBOR | 36 |
| 348,221.50 | 5.724 | 3.000 | 1.000 | 14.820 | 8.820 | 6 | 35 | 6M LIBOR | 36 |
| 489,265.27 | 5.725 | 3.000 | 1.000 | 15.625 | 9.625 | 6 | 23 | 6M LIBOR | 12 |
| 5,715,365.99 | 5.728 | 3.000 | 1.000 | 13.355 | 7.355 | 6 | 23 | 6M LIBOR | 24 |
| 539,843.77 | 5.734 | 3.000 | 1.000 | 13.739 | 7.739 | 6 | 36 | 6M LIBOR | 36 |
| 4,113,741.43 | 5.738 | 3.000 | 1.000 | 13.672 | 7.672 | 6 | 23 | 6M LIBOR | 36 |
| 694,913.49 | 5.740 | 3.000 | 1.000 | 14.574 | 8.574 | 6 | 59 | 6M LIBOR | 0 |
| 116,229,141.55 | 5.746 | 3.000 | 1.000 | 14.244 | 8.244 | 6 | 23 | 6M LIBOR | 24 |
| 81,582.31 | 5.750 | 3.000 | 1.000 | 14.950 | 8.950 | 6 | 35 | 6M LIBOR | 24 |
| 4,217,699.73 | 5.763 | 3.000 | 1.000 | 14.533 | 8.533 | 6 | 24 | 6M LIBOR | 12 |
| 314,900.00 | 5.772 | 1.000 | 1.000 | 14.265 | 8.265 | 6 | 5 | 6M LIBOR | 0 |
| 965,439.70 | 5.778 | 3.000 | 1.000 | 15.275 | 9.275 | 6 | 23 | 6M LIBOR | 36 |
| 8,260,090.56 | 5.778 | 3.000 | 1.000 | 14.071 | 8.071 | 6 | 35 | 6M LIBOR | 36 |
| 28,756,951.92 | 5.782 | 3.000 | 1.000 | 14.419 | 8.419 | 6 | 23 | 6M LIBOR | 24 |
| 232,150.00 | 5.797 | 3.000 | 1.000 | 13.726 | 7.726 | 6 | 59 | 6M LIBOR | 0 |
| 48,901,926.05 | 5.799 | 3.000 | 1.000 | 14.453 | 8.453 | 6 | 23 | 6M LIBOR | 24 |
| 532,712.35 | 5.801 | 3.000 | 1.000 | 14.320 | 8.320 | 6 | 36 | 6M LIBOR | 12 |
| 3,388,941.39 | 5.802 | 3.000 | 1.000 | 15.210 | 9.210 | 6 | 24 | 6M LIBOR | 24 |
| 565,660.73 | 5.813 | 3.000 | 1.000 | 14.996 | 8.996 | 6 | 60 | 6M LIBOR | 0 |

</TABLE>

S-94

<PAGE>

GROUP ONE ADJUSTABLE RATE MORTGAGE LOANS (CONT'D)

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 3,250,975.75 | 8.928 | 8.428 | 360 | 359 | 360 | 359 | 0 | 0 |
| 353,618.42 | 8.867 | 8.367 | 360 | 359 | 360 | 359 | 0 | 0 |
| 793,126.97 | 9.483 | 8.983 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,544,379.52 | 8.993 | 8.493 | 360 | 359 | 600 | 599 | 0 | 0 |

| | | | | | | | | |
|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| 6,212,712.30 | 8.049 | 7.549 | 360 | 360 | 480 | 480 | 0 | 0 |
| 2,978,211.65 | 8.296 | 7.796 | 360 | 359 | 600 | 599 | 0 | 0 |
| 980,042.62 | 8.996 | 8.496 | 360 | 360 | 600 | 600 | 0 | 0 |
| 646,932.79 | 9.019 | 8.519 | 360 | 359 | 600 | 599 | 0 | 0 |
| 241,150.00 | 8.075 | 7.575 | 360 | 359 | 300 | 300 | 60 | 59 |
| 2,443,358.53 | 8.607 | 8.107 | 360 | 359 | 600 | 599 | 0 | 0 |
| 662,976.08 | 8.339 | 7.839 | 360 | 359 | 360 | 359 | 0 | 0 |
| 3,059,575.77 | 8.501 | 8.001 | 360 | 360 | 360 | 360 | 0 | 0 |
| 715,000.00 | 8.842 | 8.342 | 360 | 360 | 480 | 480 | 0 | 0 |
| 197,200.00 | 8.650 | 8.150 | 360 | 360 | 600 | 600 | 0 | 0 |
| 182,700.00 | 8.950 | 8.450 | 360 | 360 | 360 | 360 | 0 | 0 |
| 127,465.48 | 9.350 | 8.850 | 360 | 359 | 600 | 599 | 0 | 0 |
| 176,500.00 | 7.300 | 6.800 | 360 | 359 | 300 | 300 | 60 | 59 |
| 324,428.63 | 8.863 | 8.363 | 360 | 360 | 360 | 360 | 0 | 0 |
| 230,500.00 | 8.955 | 8.455 | 360 | 360 | 300 | 300 | 60 | 60 |
| 3,001,753.81 | 9.225 | 8.725 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,540,650.65 | 8.222 | 7.722 | 360 | 359 | 360 | 359 | 0 | 0 |
| 2,200,108.65 | 9.132 | 8.632 | 360 | 359 | 360 | 359 | 0 | 0 |
| 4,375,906.04 | 8.955 | 8.455 | 360 | 359 | 360 | 359 | 0 | 0 |
| 1,196,348.06 | 8.818 | 8.318 | 360 | 360 | 480 | 480 | 0 | 0 |
| 3,367,303.87 | 9.019 | 8.519 | 360 | 359 | 360 | 359 | 0 | 0 |
| 614,833.48 | 8.447 | 7.947 | 360 | 359 | 480 | 479 | 0 | 0 |
| 1,767,107.03 | 8.523 | 8.023 | 360 | 359 | 480 | 479 | 0 | 0 |
| 3,881,030.64 | 8.726 | 8.226 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,838,245.86 | 8.426 | 7.926 | 360 | 359 | 480 | 479 | 0 | 0 |
| 983,363.52 | 8.134 | 7.634 | 360 | 359 | 360 | 359 | 0 | 0 |
| 3,128,857.72 | 8.404 | 7.904 | 360 | 359 | 600 | 599 | 0 | 0 |

<CAPTION>

| CURRENT BALANCE ($) | GROSS MARGIN(%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | ORIGINAL MONTHS TO PREPAYMENT PENALTY EXPIRATION |
|---:|---:|---:|---:|---:|---:|---:|---:|---|---:|
| \<S> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> |
| 3,250,975.75 | 5.814 | 3.000 | 1.000 | 14.928 | 8.928 | 6 | 23 | 6M LIBOR | 12 |
| 353,618.42 | 5.815 | 3.000 | 1.000 | 14.867 | 8.867 | 6 | 35 | 6M LIBOR | 12 |
| 793,126.97 | 5.826 | 2.000 | 1.000 | 15.483 | 9.483 | 6 | 12 | 6M LIBOR | 0 |
| 1,544,379.52 | 5.839 | 3.000 | 1.000 | 14.993 | 8.993 | 6 | 23 | 6M LIBOR | 24 |
| 6,212,712.30 | 5.841 | 3.000 | 1.000 | 14.049 | 8.049 | 6 | 36 | 6M LIBOR | 36 |
| 2,978,211.65 | 5.843 | 3.000 | 1.000 | 14.296 | 8.296 | 6 | 59 | 6M LIBOR | 36 |
| 980,042.62 | 5.852 | 3.000 | 1.000 | 14.996 | 8.996 | 6 | 36 | 6M LIBOR | 36 |
| 646,932.79 | 5.861 | 3.000 | 1.000 | 15.019 | 9.019 | 6 | 35 | 6M LIBOR | 36 |
| 241,150.00 | 5.861 | 3.000 | 1.000 | 14.075 | 8.075 | 6 | 35 | 6M LIBOR | 36 |
| 2,443,358.53 | 5.862 | 3.000 | 1.000 | 14.607 | 8.607 | 6 | 23 | 6M LIBOR | 36 |
| 662,976.08 | 5.869 | 3.000 | 1.000 | 14.339 | 8.339 | 6 | 23 | 6M LIBOR | 36 |
| 3,059,575.77 | 5.891 | 3.000 | 1.000 | 14.501 | 8.501 | 6 | 24 | 6M LIBOR | 24 |
| 715,000.00 | 5.899 | 3.000 | 1.000 | 14.842 | 8.842 | 6 | 36 | 6M LIBOR | 12 |
| 197,200.00 | 5.900 | 3.000 | 1.000 | 14.650 | 8.650 | 6 | 36 | 6M LIBOR | 12 |
| 182,700.00 | 5.900 | 3.000 | 1.000 | 14.950 | 8.950 | 6 | 60 | 6M LIBOR | 36 |
| 127,465.48 | 5.900 | 3.000 | 1.000 | 15.350 | 9.350 | 6 | 23 | 6M LIBOR | 12 |
| 176,500.00 | 5.900 | 3.000 | 1.000 | 13.300 | 7.300 | 6 | 23 | 6M LIBOR | 24 |
| 324,428.63 | 5.900 | 3.000 | 1.000 | 14.863 | 8.863 | 6 | 24 | 6M LIBOR | 36 |
| 230,500.00 | 5.900 | 3.000 | 1.000 | 14.955 | 8.955 | 6 | 24 | 6M LIBOR | 24 |
| 3,001,753.81 | 5.902 | 3.000 | 1.000 | 15.225 | 9.225 | 6 | 24 | 6M LIBOR | 24 |
| 1,540,650.65 | 5.920 | 3.000 | 1.000 | 14.222 | 8.222 | 6 | 35 | 6M LIBOR | 36 |
| 2,200,108.65 | 5.921 | 3.000 | 1.000 | 15.132 | 9.132 | 6 | 23 | 6M LIBOR | 24 |
| 4,375,906.04 | 5.922 | 3.000 | 1.000 | 14.955 | 8.955 | 6 | 23 | 6M LIBOR | 24 |
| 1,196,348.06 | 5.928 | 3.000 | 1.000 | 14.818 | 8.818 | 6 | 24 | 6M LIBOR | 36 |
| 3,367,303.87 | 5.931 | 3.000 | 1.000 | 15.019 | 9.019 | 6 | 23 | 6M LIBOR | 24 |
| 614,833.48 | 5.933 | 3.000 | 1.000 | 14.447 | 8.447 | 6 | 35 | 6M LIBOR | 36 |
| 1,767,107.03 | 5.936 | 3.000 | 1.000 | 14.523 | 8.523 | 6 | 23 | 6M LIBOR | 24 |
| 3,881,030.64 | 5.963 | 3.000 | 1.000 | 14.726 | 8.726 | 6 | 23 | 6M LIBOR | 24 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1,838,245.86 | 5.967 | 3.000 | 1.000 | 14.426 | 8.426 | 6 | 23 | 6M LIBOR | 36 |
| 983,363.52 | 5.988 | 3.000 | 1.000 | 14.134 | 8.134 | 6 | 35 | 6M LIBOR | 36 |
| 3,128,857.72 | 6.005 | 3.000 | 1.000 | 14.404 | 8.404 | 6 | 23 | 6M LIBOR | 36 |

</TABLE>


S-95


<PAGE>

GROUP ONE ADJUSTABLE RATE MORTGAGE LOANS (CONT'D)


<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 894,522.79 | 8.812 | 8.312 | 360 | 359 | 480 | 479 | 0 | 0 |
| 520,500.00 | 8.952 | 8.452 | 360 | 360 | 600 | 600 | 0 | 0 |
| 1,981,825.53 | 8.821 | 8.321 | 360 | 359 | 360 | 359 | 0 | 0 |
| 826,680.68 | 8.380 | 7.880 | 360 | 360 | 480 | 480 | 0 | 0 |
| 1,202,838.99 | 9.318 | 8.818 | 360 | 360 | 480 | 480 | 0 | 0 |
| 1,934,558.16 | 8.554 | 8.054 | 360 | 360 | 360 | 360 | 0 | 0 |
| 925,900.00 | 9.481 | 8.981 | 360 | 360 | 300 | 300 | 60 | 60 |
| 263,150.00 | 9.124 | 8.624 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,348,860.64 | 9.002 | 8.502 | 360 | 359 | 480 | 479 | 0 | 0 |
| 698,955.67 | 8.900 | 8.400 | 360 | 359 | 600 | 599 | 0 | 0 |
| 324,277.06 | 8.828 | 8.328 | 360 | 359 | 480 | 479 | 0 | 0 |
| 227,082.19 | 8.942 | 8.442 | 360 | 359 | 600 | 599 | 0 | 0 |
| 641,476.22 | 8.186 | 7.686 | 360 | 360 | 360 | 360 | 0 | 0 |
| 496,571.29 | 9.862 | 9.362 | 360 | 359 | 360 | 359 | 0 | 0 |
| 546,958.61 | 9.434 | 8.934 | 360 | 359 | 600 | 599 | 0 | 0 |
| 557,358.65 | 9.182 | 8.682 | 360 | 360 | 480 | 480 | 0 | 0 |
| 387,214.06 | 8.682 | 8.182 | 360 | 359 | 360 | 359 | 0 | 0 |
| 261,787.46 | 9.867 | 9.367 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,216,702.35 | 9.135 | 8.635 | 360 | 359 | 600 | 599 | 0 | 0 |
| 279,775.00 | 10.400 | 9.900 | 360 | 360 | 600 | 600 | 0 | 0 |
| 183,350.00 | 8.900 | 8.400 | 360 | 360 | 300 | 300 | 60 | 60 |
| 137,750.00 | 8.450 | 7.950 | 360 | 360 | 600 | 600 | 0 | 0 |
| 80,750.00 | 9.000 | 8.500 | 360 | 360 | 480 | 480 | 0 | 0 |
| 118,750.00 | 8.700 | 8.200 | 360 | 360 | 600 | 600 | 0 | 0 |
| 114,475.00 | 9.850 | 9.350 | 360 | 360 | 360 | 360 | 0 | 0 |
| 145,000.00 | 9.150 | 8.650 | 360 | 360 | 600 | 600 | 0 | 0 |
| 143,925.00 | 9.650 | 9.150 | 360 | 360 | 480 | 480 | 0 | 0 |
| 376,100.00 | 9.900 | 9.400 | 360 | 360 | 300 | 300 | 60 | 60 |
| 427,500.00 | 8.110 | 7.610 | 360 | 360 | 360 | 360 | 0 | 0 |

<CAPTION>

| CURRENT BALANCE ($) | GROSS MARGIN(%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | ORIGINAL MONTHS TO PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 894,522.79 | 6.020 | 3.000 | 1.000 | 14.812 | 8.812 | 6 | 23 | 6M LIBOR | 24 |
| 520,500.00 | 6.024 | 3.000 | 1.000 | 14.952 | 8.952 | 6 | 24 | 6M LIBOR | 24 |
| 1,981,825.53 | 6.029 | 3.000 | 1.000 | 14.821 | 8.821 | 6 | 23 | 6M LIBOR | 36 |
| 826,680.68 | 6.030 | 3.000 | 1.000 | 14.380 | 8.381 | 6 | 60 | 6M LIBOR | 36 |

```
1,202,838.99   6.036   3.000   1.000   15.318    9.318   6   24   6M LIBOR   24
1,934,558.16   6.053   3.000   1.000   14.554    8.554   6   36   6M LIBOR   36
  925,900.00   6.059   3.000   1.000   15.481    9.481   6   24   6M LIBOR   36
  263,150.00   6.062   3.000   1.000   15.124    9.124   6   24   6M LIBOR   36
1,348,860.64   6.062   3.000   1.000   15.002    9.002   6   23   6M LIBOR   24
  698,955.67   6.067   3.000   1.000   14.900    8.900   6   35   6M LIBOR   36
  324,277.06   6.095   3.000   1.000   14.828    8.828   6   35   6M LIBOR   36
  227,082.19   6.111   3.000   1.000   14.942    8.942   6   23   6M LIBOR   36
  641,476.22   6.120   3.000   1.000   14.186    8.186   6   36   6M LIBOR   36
  496,571.29   6.128   2.000   1.000   15.862    9.862   6   11   6M LIBOR   12
  546,958.61   6.145   3.000   1.000   15.434    9.434   6   23   6M LIBOR   24
  557,358.65   6.175   3.000   1.000   15.182    9.182   6   24   6M LIBOR   24
  387,214.06   6.263   3.000   1.000   14.682    8.682   6   23   6M LIBOR   12
  261,787.46   6.305   3.000   1.000   15.867    9.867   6   24   6M LIBOR   36
1,216,702.35   6.327   3.000   1.000   15.135    9.135   6   23   6M LIBOR   24
  279,775.00   6.400   3.000   1.000   16.400   10.400   6   24   6M LIBOR   12
  183,350.00   6.400   3.000   1.000   14.900    8.900   6   24   6M LIBOR   24
  137,750.00   6.400   3.000   1.000   14.450    8.450   6   36   6M LIBOR   24
   80,750.00   6.400   3.000   1.000   15.000    9.000   6   24   6M LIBOR   36
  118,750.00   6.400   3.000   1.000   14.700    8.700   6   36   6M LIBOR   36
  114,475.00   6.400   2.000   1.000   15.850    9.850   6   12   6M LIBOR   12
  145,000.00   6.400   3.000   1.000   15.150    9.150   6   60   6M LIBOR   36
  143,925.00   6.400   3.000   1.000   15.650    9.650   6   24   6M LIBOR   36
  376,100.00   6.400   3.000   1.000   15.900    9.900   6   24   6M LIBOR   36
  427,500.00   6.400   3.000   1.000   14.110    8.110   6   24   6M LIBOR   36
</TABLE>
```

```
                              S-96

<PAGE>


             GROUP TWO ADJUSTABLE RATE MORTGAGE LOANS


<TABLE>
<CAPTION>
```

| | | | | | ORIGINAL AMORTIZATION | REMAINING AMORTIZATION | ORIGINAL | REMAINING |
| | | | | | TERM | TERM | INTEREST | INTEREST |
| | | NET | ORIGINAL | REMAINING | (LESS IO | (LESS IO | ONLY | ONLY |
| CURRENT | MORTGAGE | MORTGAGE | TERM | TERM | TERM) | TERM) | TERM | TERM |
| BALANCE ($) | RATE(%) | RATE(%) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) |
| -------------- | -------- | -------- | -------- | --------- | ------------ | ------------ | -------- | --------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 630,000.00 | 6.200 | 5.700 | 360 | 360 | 480 | 480 | 0 | 0 |
| 7,848,870.00 | 7.471 | 6.971 | 360 | 359 | 300 | 300 | 60 | 59 |
| 2,560,000.00 | 7.696 | 7.196 | 360 | 359 | 240 | 240 | 120 | 119 |
| 77,556.27 | 8.850 | 8.350 | 360 | 359 | 360 | 359 | 0 | 0 |
| 50,000.00 | 9.950 | 9.450 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,068,000.00 | 7.550 | 7.050 | 360 | 359 | 300 | 300 | 60 | 59 |
| 233,600.00 | 8.600 | 8.100 | 360 | 359 | 300 | 300 | 60 | 59 |
| 913,350.00 | 8.377 | 7.877 | 360 | 359 | 300 | 300 | 60 | 59 |
| 834,777.81 | 8.384 | 7.884 | 360 | 359 | 360 | 359 | 0 | 0 |
| 618,372.25 | 7.200 | 6.700 | 360 | 360 | 480 | 480 | 0 | 0 |
| 95,264,588.36 | 8.707 | 8.207 | 360 | 359 | 600 | 599 | 0 | 0 |
| 85,500.00 | 8.350 | 7.850 | 360 | 360 | 300 | 300 | 60 | 60 |
| 35,546,437.80 | 8.579 | 8.079 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,641,917.85 | 8.325 | 7.825 | 360 | 359 | 360 | 359 | 0 | 0 |
| 147,969.31 | 9.100 | 8.600 | 360 | 359 | 480 | 479 | 0 | 0 |
| 1,228,659.15 | 8.257 | 7.757 | 360 | 359 | 600 | 599 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1,164,880.00 | 8.924 | 8.424 | 360 | 360 | 300 | 300 | 60 | 60 |
| 207,920.00 | 8.050 | 7.550 | 360 | 359 | 300 | 300 | 60 | 59 |
| 103,940.16 | 8.750 | 8.250 | 360 | 359 | 360 | 359 | 0 | 0 |
| 53,400.00 | 8.700 | 8.200 | 360 | 360 | 360 | 360 | 0 | 0 |
| 141,000.00 | 10.350 | 9.850 | 360 | 360 | 600 | 600 | 0 | 0 |
| 79,990.66 | 8.200 | 7.700 | 360 | 359 | 600 | 599 | 0 | 0 |
| 87,557.36 | 9.550 | 9.050 | 360 | 359 | 360 | 359 | 0 | 0 |
| 107,200.00 | 7.750 | 7.250 | 360 | 360 | 600 | 600 | 0 | 0 |
| 67,200.00 | 9.250 | 8.750 | 360 | 360 | 300 | 300 | 60 | 60 |
| 80,000.00 | 9.050 | 8.550 | 360 | 360 | 360 | 360 | 0 | 0 |
| 61,000.00 | 9.850 | 9.350 | 360 | 360 | 480 | 480 | 0 | 0 |
| 203,961.71 | 8.309 | 7.809 | 360 | 359 | 480 | 479 | 0 | 0 |
| 112,000.00 | 7.150 | 6.650 | 360 | 360 | 600 | 600 | 0 | 0 |
| 114,800.00 | 8.050 | 7.550 | 360 | 360 | 300 | 300 | 60 | 60 |
| 68,000.00 | 9.500 | 9.000 | 360 | 360 | 240 | 240 | 120 | 120 |

<CAPTION>

| ORIGINAL TO PREPAYMENT PENALTY CURRENT BALANCE ($) EXPIRATION | GROSS MARGIN (%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | MONTHS |
|---|---|---|---|---|---|---|---|---|---|
| --------------- | ------ | ------- | -------- | ------- | ------- | --------- | ---------- | -------- | ------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 630,000.00 | 2.750 | 3.000 | 1.000 | 12.200 | 6.200 | 6 | 60 | 6M LIBOR | 0 |
| 7,848,870.00 | 4.214 | 3.000 | 1.000 | 13.471 | 7.471 | 6 | 35 | 6M LIBOR | 0 |
| 2,560,000.00 | 4.501 | 3.000 | 1.000 | 13.696 | 7.696 | 6 | 59 | 6M LIBOR | 0 |
| 77,556.27 | 4.900 | 1.000 | 1.000 | 14.850 | 8.850 | 6 | 5 | 6M LIBOR | 24 |
| 50,000.00 | 4.900 | 1.000 | 1.000 | 15.950 | 9.950 | 6 | 6 | 6M LIBOR | 12 |
| 1,068,000.00 | 4.900 | 1.000 | 1.000 | 13.550 | 7.550 | 6 | 5 | 6M LIBOR | 12 |
| 233,600.00 | 4.900 | 1.000 | 1.000 | 14.600 | 8.600 | 6 | 5 | 6M LIBOR | 24 |
| 913,350.00 | 4.900 | 1.000 | 1.000 | 14.377 | 8.377 | 6 | 5 | 6M LIBOR | 0 |
| 834,777.81 | 5.092 | 1.000 | 1.000 | 14.384 | 8.384 | 6 | 5 | 6M LIBOR | 24 |
| 618,372.25 | 5.174 | 3.000 | 1.000 | 13.200 | 7.200 | 6 | 24 | 6M LIBOR | 12 |
| 95,264,588.36 | 5.298 | 3.000 | 1.000 | 14.707 | 8.707 | 6 | 23 | 6M LIBOR | 0 |
| 85,500.00 | 5.300 | 3.000 | 1.000 | 14.350 | 8.350 | 6 | 24 | 6M LIBOR | 12 |
| 35,546,437.80 | 5.355 | 3.000 | 1.000 | 14.579 | 8.579 | 6 | 35 | 6M LIBOR | 0 |
| 1,641,917.85 | 5.377 | 1.000 | 1.000 | 14.325 | 8.325 | 6 | 5 | 6M LIBOR | 0 |
| 147,969.31 | 5.400 | 3.000 | 1.000 | 15.100 | 9.100 | 6 | 35 | 6M LIBOR | 12 |
| 1,228,659.15 | 5.400 | 3.000 | 1.000 | 14.257 | 8.257 | 6 | 35 | 6M LIBOR | 36 |
| 1,164,880.00 | 5.400 | 3.000 | 1.000 | 14.924 | 8.924 | 6 | 24 | 6M LIBOR | 24 |
| 207,920.00 | 5.400 | 3.000 | 1.000 | 14.050 | 8.050 | 6 | 23 | 6M LIBOR | 36 |
| 103,940.16 | 5.400 | 2.000 | 1.000 | 14.750 | 8.750 | 6 | 11 | 6M LIBOR | 12 |
| 53,400.00 | 5.400 | 3.000 | 1.000 | 14.700 | 8.700 | 6 | 24 | 6M LIBOR | 12 |
| 141,000.00 | 5.400 | 3.000 | 1.000 | 16.350 | 10.350 | 6 | 24 | 6M LIBOR | 12 |
| 79,990.66 | 5.400 | 3.000 | 1.000 | 14.200 | 8.200 | 6 | 35 | 6M LIBOR | 36 |
| 87,557.36 | 5.400 | 3.000 | 1.000 | 15.550 | 9.550 | 6 | 59 | 6M LIBOR | 36 |
| 107,200.00 | 5.400 | 3.000 | 1.000 | 13.750 | 7.750 | 6 | 60 | 6M LIBOR | 36 |
| 67,200.00 | 5.400 | 3.000 | 1.000 | 15.250 | 9.250 | 6 | 36 | 6M LIBOR | 36 |
| 80,000.00 | 5.400 | 2.000 | 1.000 | 15.050 | 9.050 | 6 | 12 | 6M LIBOR | 24 |
| 61,000.00 | 5.400 | 3.000 | 1.000 | 15.850 | 9.850 | 6 | 24 | 6M LIBOR | 24 |
| 203,961.71 | 5.400 | 3.000 | 1.000 | 14.309 | 8.309 | 6 | 35 | 6M LIBOR | 36 |
| 112,000.00 | 5.400 | 3.000 | 1.000 | 13.150 | 7.150 | 6 | 36 | 6M LIBOR | 36 |
| 114,800.00 | 5.400 | 3.000 | 1.000 | 14.050 | 8.050 | 6 | 36 | 6M LIBOR | 36 |
| 68,000.00 | 5.400 | 3.000 | 1.000 | 15.500 | 9.500 | 6 | 60 | 6M LIBOR | 36 |

</TABLE>

<PAGE>

GROUP TWO ADJUSTABLE RATE MORTGAGE (CONT'D)

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 134,896.77 | 7.350 | 6.850 | 360 | 359 | 360 | 359 | 0 | 0 |
| 180,216.55 | 6.400 | 5.900 | 360 | 359 | 480 | 479 | 0 | 0 |
| 388,991.54 | 7.682 | 7.182 | 360 | 359 | 480 | 479 | 0 | 0 |
| 222,920.00 | 8.589 | 8.089 | 360 | 359 | 300 | 300 | 60 | 59 |
| 75,600.00 | 7.600 | 7.100 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,714,836.06 | 7.842 | 7.342 | 360 | 360 | 480 | 480 | 0 | 0 |
| 262,228.06 | 8.150 | 7.650 | 360 | 359 | 480 | 479 | 0 | 0 |
| 146,615.39 | 7.700 | 7.200 | 360 | 359 | 360 | 359 | 0 | 0 |
| 149,948.23 | 7.350 | 6.850 | 360 | 359 | 480 | 479 | 0 | 0 |
| 1,254,201.32 | 8.235 | 7.735 | 360 | 359 | 600 | 599 | 0 | 0 |
| 281,600.00 | 7.950 | 7.450 | 360 | 360 | 240 | 240 | 120 | 120 |
| 134,400.00 | 8.050 | 7.550 | 360 | 359 | 300 | 300 | 60 | 59 |
| 91,200.00 | 7.450 | 6.950 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,074,718.46 | 8.467 | 7.967 | 360 | 359 | 600 | 599 | 0 | 0 |
| 2,997,549.91 | 7.777 | 7.277 | 360 | 360 | 600 | 600 | 0 | 0 |
| 1,335,775.02 | 9.313 | 8.813 | 360 | 360 | 360 | 360 | 0 | 0 |
| 916,637.10 | 8.766 | 8.266 | 360 | 360 | 360 | 360 | 0 | 0 |
| 3,178,499.60 | 7.558 | 7.058 | 360 | 359 | 240 | 240 | 120 | 119 |
| 627,143.55 | 8.145 | 7.645 | 360 | 360 | 600 | 600 | 0 | 0 |
| 5,780,800.00 | 8.020 | 7.520 | 360 | 359 | 300 | 300 | 60 | 59 |
| 9,066,115.27 | 7.345 | 6.845 | 360 | 359 | 300 | 300 | 60 | 59 |
| 25,788,511.38 | 7.647 | 7.147 | 360 | 359 | 300 | 300 | 60 | 59 |
| 14,090,470.00 | 8.535 | 8.035 | 360 | 360 | 300 | 300 | 60 | 60 |
| 923,138.69 | 8.302 | 7.802 | 360 | 359 | 360 | 359 | 0 | 0 |
| 11,554,994.26 | 8.596 | 8.096 | 360 | 359 | 480 | 479 | 0 | 0 |
| 292,426,807.83 | 8.164 | 7.664 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,461,207.28 | 7.600 | 7.100 | 360 | 359 | 360 | 359 | 0 | 0 |
| 258,612.02 | 8.763 | 8.263 | 360 | 360 | 600 | 600 | 0 | 0 |
| 1,340,335.29 | 9.321 | 8.821 | 360 | 360 | 600 | 600 | 0 | 0 |
| 2,077,871.10 | 8.246 | 7.746 | 360 | 360 | 480 | 480 | 0 | 0 |
| 358,845.34 | 8.218 | 7.718 | 360 | 359 | 480 | 479 | 0 | 0 |

<CAPTION>

| CURRENT BALANCE ($) | GROSS MARGIN (%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | ORIGINAL PREPAYMENT PENALTY | MONTHS TO |
|---|---|---|---|---|---|---|---|---|---|---|

EXPIRATION

-------------- ------ ------- -------- ------- ------- --------- ---------- -------- -------
---
| \<S> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> |
| 134,896.77 | 5.400 | 3.000 | 1.000 | 13.350 | 7.350 | 6 | 23 | 6M LIBOR | 12 |
| 180,216.55 | 5.400 | 3.000 | 1.000 | 12.400 | 6.400 | 6 | 35 | 6M LIBOR | 12 |
| 388,991.54 | 5.400 | 3.000 | 1.000 | 13.682 | 7.682 | 6 | 35 | 6M LIBOR | 36 |
| 222,920.00 | 5.400 | 3.000 | 1.000 | 14.589 | 8.589 | 6 | 23 | 6M LIBOR | 24 |
| 75,600.00 | 5.400 | 2.000 | 1.000 | 13.600 | 7.600 | 6 | 12 | 6M LIBOR | 24 |
| 1,714,836.06 | 5.400 | 3.000 | 1.000 | 13.842 | 7.842 | 6 | 24 | 6M LIBOR | 36 |
| 262,228.06 | 5.400 | 3.000 | 1.000 | 14.150 | 8.150 | 6 | 35 | 6M LIBOR | 24 |
| 146,615.39 | 5.400 | 3.000 | 1.000 | 13.700 | 7.700 | 6 | 59 | 6M LIBOR | 24 |
| 149,948.23 | 5.400 | 3.000 | 1.000 | 13.350 | 7.350 | 6 | 59 | 6M LIBOR | 24 |
| 1,254,201.32 | 5.400 | 3.000 | 1.000 | 14.235 | 8.235 | 6 | 59 | 6M LIBOR | 24 |
| 281,600.00 | 5.400 | 3.000 | 1.000 | 13.950 | 7.950 | 6 | 60 | 6M LIBOR | 24 |
| 134,400.00 | 5.400 | 3.000 | 1.000 | 14.050 | 8.050 | 6 | 35 | 6M LIBOR | 24 |
| 91,200.00 | 5.400 | 3.000 | 1.000 | 13.450 | 7.450 | 6 | 60 | 6M LIBOR | 0 |
| 1,074,718.46 | 5.400 | 3.000 | 1.000 | 14.467 | 8.467 | 6 | 59 | 6M LIBOR | 0 |
| 2,997,549.91 | 5.417 | 3.000 | 1.000 | 13.777 | 7.777 | 6 | 36 | 6M LIBOR | 24 |
| 1,335,775.02 | 5.444 | 3.000 | 1.000 | 15.313 | 9.313 | 6 | 36 | 6M LIBOR | 12 |
| 916,637.10 | 5.488 | 3.000 | 1.000 | 14.766 | 8.766 | 6 | 36 | 6M LIBOR | 24 |
| 3,178,499.60 | 5.488 | 3.000 | 1.000 | 13.558 | 7.558 | 6 | 59 | 6M LIBOR | 36 |
| 627,143.55 | 5.515 | 3.000 | 1.000 | 14.145 | 8.145 | 6 | 36 | 6M LIBOR | 36 |
| 5,780,800.00 | 5.526 | 3.000 | 1.000 | 14.020 | 8.020 | 6 | 23 | 6M LIBOR | 12 |
| 9,066,115.27 | 5.538 | 3.000 | 1.000 | 13.345 | 7.345 | 6 | 35 | 6M LIBOR | 36 |
| 25,788,511.38 | 5.564 | 3.000 | 1.000 | 13.647 | 7.647 | 6 | 23 | 6M LIBOR | 24 |
| 14,090,470.00 | 5.582 | 3.000 | 1.000 | 14.535 | 8.535 | 6 | 24 | 6M LIBOR | 0 |
| 923,138.69 | 5.585 | 2.000 | 1.000 | 14.302 | 8.302 | 6 | 11 | 6M LIBOR | 0 |
| 11,554,994.26 | 5.593 | 3.000 | 1.000 | 14.596 | 8.596 | 6 | 35 | 6M LIBOR | 0 |
| 292,426,807.83 | 5.626 | 3.000 | 1.000 | 14.164 | 8.164 | 6 | 23 | 6M LIBOR | 24 |
| 1,461,207.28 | 5.631 | 3.000 | 1.000 | 13.600 | 7.600 | 6 | 23 | 6M LIBOR | 36 |
| 258,612.02 | 5.637 | 3.000 | 1.000 | 14.763 | 8.763 | 6 | 24 | 6M LIBOR | 36 |
| 1,340,335.29 | 5.637 | 3.000 | 1.000 | 15.321 | 9.321 | 6 | 24 | 6M LIBOR | 12 |
| 2,077,871.10 | 5.638 | 3.000 | 1.000 | 14.246 | 8.246 | 6 | 36 | 6M LIBOR | 12 |
| 358,845.34 | 5.648 | 3.000 | 1.000 | 14.218 | 8.218 | 6 | 59 | 6M LIBOR | 36 |

</TABLE>


S-98


<PAGE>


GROUP TWO ADJUSTABLE RATE MORTGAGE (CONT'D)


<TABLE>
<CAPTION>

| | | | | | ORIGINAL AMORTIZATION | REMAINING AMORTIZATION | ORIGINAL | REMAINING |
| | | | | | TERM | TERM | INTEREST | INTEREST |
| | | NET | ORIGINAL | REMAINING | (LESS IO | (LESS IO | ONLY | ONLY |
| CURRENT | MORTGAGE | MORTGAGE | TERM | TERM | TERM) | TERM) | TERM | TERM |
| BALANCE ($) | RATE(%) | RATE(%) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) | (MONTHS) |
|---|---|---|---|---|---|---|---|---|
| \<S> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> |
| 608,378.50 | 8.496 | 7.996 | 360 | 360 | 360 | 360 | 0 | 0 |
| 7,248,617.21 | 7.922 | 7.422 | 360 | 359 | 600 | 599 | 0 | 0 |
| 14,294,181.15 | 7.700 | 7.200 | 360 | 359 | 600 | 599 | 0 | 0 |
| 15,263,400.71 | 8.133 | 7.633 | 360 | 359 | 360 | 359 | 0 | 0 |
| 1,314,687.93 | 8.289 | 7.789 | 360 | 360 | 360 | 360 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 5,579,266.40 | 8.029 | 7.529 | 360 | 359 | 480 | 479 | 0 | 0 |
| 42,020,846.84 | 7.879 | 7.379 | 360 | 359 | 600 | 599 | 0 | 0 |
| 25,516,162.32 | 8.893 | 8.393 | 360 | 359 | 360 | 359 | 0 | 0 |
| 1,227,104.70 | 8.401 | 7.901 | 360 | 359 | 360 | 359 | 0 | 0 |
| 26,602,661.75 | 8.657 | 8.157 | 360 | 359 | 600 | 599 | 0 | 0 |
| 41,608,398.73 | 8.471 | 7.971 | 360 | 359 | 480 | 479 | 0 | 0 |
| 713,199.99 | 8.210 | 7.710 | 360 | 359 | 300 | 300 | 60 | 59 |
| 1,915,600.00 | 8.587 | 8.087 | 360 | 359 | 300 | 300 | 60 | 59 |
| 6,390,396.85 | 8.347 | 7.847 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,106,381.04 | 8.275 | 7.775 | 360 | 359 | 480 | 479 | 0 | 0 |
| 35,112,826.51 | 9.141 | 8.641 | 360 | 359 | 480 | 479 | 0 | 0 |
| 570,375.60 | 8.663 | 8.163 | 360 | 360 | 600 | 600 | 0 | 0 |
| 100,800.00 | 9.050 | 8.550 | 360 | 359 | 300 | 300 | 60 | 59 |
| 221,206.86 | 9.402 | 8.902 | 360 | 360 | 360 | 360 | 0 | 0 |
| 8,463,725.84 | 9.092 | 8.592 | 360 | 360 | 480 | 480 | 0 | 0 |
| 106,247,753.82 | 8.570 | 8.070 | 360 | 359 | 360 | 359 | 0 | 0 |
| 4,733,145.46 | 8.754 | 8.254 | 360 | 360 | 360 | 360 | 0 | 0 |
| 2,855,116.42 | 9.064 | 8.564 | 360 | 359 | 360 | 359 | 0 | 0 |
| 790,499.99 | 9.186 | 8.686 | 360 | 359 | 300 | 300 | 60 | 59 |
| 63,262,367.88 | 9.009 | 8.509 | 360 | 360 | 360 | 360 | 0 | 0 |
| 535,700.00 | 7.390 | 6.890 | 360 | 360 | 600 | 600 | 0 | 0 |
| 899,475.49 | 7.492 | 6.992 | 360 | 360 | 600 | 600 | 0 | 0 |
| 291,896.29 | 9.278 | 8.778 | 360 | 359 | 480 | 479 | 0 | 0 |
| 2,123,625.29 | 8.804 | 8.304 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,323,213.57 | 8.523 | 8.023 | 360 | 359 | 600 | 599 | 0 | 0 |
| 1,803,140.88 | 9.110 | 8.610 | 360 | 359 | 480 | 479 | 0 | 0 |
| 2,088,521.91 | 9.168 | 8.668 | 360 | 360 | 480 | 480 | 0 | 0 |
| 519,492.61 | 8.748 | 8.248 | 360 | 359 | 600 | 599 | 0 | 0 |

<CAPTION>

| ORIGINAL TO PREPAYMENT PENALTY EXPIRATION CURRENT BALANCE ($) | GROSS MARGIN (%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | MONTHS |
|---|---|---|---|---|---|---|---|---|---|
| -------------- | ------ | ------- | -------- | ------- | ------- | --------- | ---------- | -------- | ------- --- |
| \<S\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> |
| 608,378.50 | 5.654 | 2.000 | 1.000 | 14.496 | 8.496 | 6 | 12 | 6M LIBOR | 12 |
| 7,248,617.21 | 5.655 | 3.000 | 1.000 | 13.922 | 7.922 | 6 | 59 | 6M LIBOR | 36 |
| 14,294,181.15 | 5.676 | 3.000 | 1.000 | 13.700 | 7.700 | 6 | 23 | 6M LIBOR | 36 |
| 15,263,400.71 | 5.696 | 3.000 | 1.000 | 14.133 | 8.133 | 6 | 35 | 6M LIBOR | 36 |
| 1,314,687.93 | 5.697 | 3.000 | 1.000 | 14.289 | 8.289 | 6 | 60 | 6M LIBOR | 36 |
| 5,579,266.40 | 5.698 | 3.000 | 1.000 | 14.029 | 8.029 | 6 | 35 | 6M LIBOR | 36 |
| 42,020,846.84 | 5.705 | 3.000 | 1.000 | 13.879 | 7.879 | 6 | 35 | 6M LIBOR | 36 |
| 25,516,162.32 | 5.709 | 3.000 | 1.000 | 14.893 | 8.893 | 6 | 35 | 6M LIBOR | 0 |
| 1,227,104.70 | 5.717 | 3.000 | 1.000 | 14.401 | 8.401 | 6 | 35 | 6M LIBOR | 36 |
| 26,602,661.75 | 5.718 | 3.000 | 1.000 | 14.657 | 8.657 | 6 | 23 | 6M LIBOR | 12 |
| 41,608,398.73 | 5.719 | 3.000 | 1.000 | 14.471 | 8.471 | 6 | 23 | 6M LIBOR | 24 |
| 713,199.99 | 5.722 | 3.000 | 1.000 | 14.210 | 8.210 | 6 | 23 | 6M LIBOR | 36 |
| 1,915,600.00 | 5.723 | 3.000 | 1.000 | 14.587 | 8.587 | 6 | 35 | 6M LIBOR | 12 |
| 6,390,396.85 | 5.727 | 3.000 | 1.000 | 14.347 | 8.347 | 6 | 35 | 6M LIBOR | 12 |
| 1,106,381.04 | 5.736 | 3.000 | 1.000 | 14.275 | 8.275 | 6 | 23 | 6M LIBOR | 24 |
| 35,112,826.51 | 5.739 | 3.000 | 1.000 | 15.141 | 9.141 | 6 | 23 | 6M LIBOR | 0 |
| 570,375.60 | 5.746 | 3.000 | 1.000 | 14.663 | 8.663 | 6 | 24 | 6M LIBOR | 24 |
| 100,800.00 | 5.750 | 3.000 | 1.000 | 15.050 | 9.050 | 6 | 35 | 6M LIBOR | 24 |
| 221,206.86 | 5.755 | 3.000 | 1.000 | 15.402 | 9.402 | 6 | 36 | 6M LIBOR | 36 |
| 8,463,725.84 | 5.759 | 3.000 | 1.000 | 15.092 | 9.093 | 6 | 24 | 6M LIBOR | 12 |
| 106,247,753.82 | 5.763 | 3.000 | 1.000 | 14.570 | 8.570 | 6 | 23 | 6M LIBOR | 24 |

| 4,733,145.46 | 5.767 | 3.000 | 1.000 | 14.754 | 8.754 | 6 | 24 | 6M LIBOR | 24 |
| 2,855,116.42 | 5.777 | 3.000 | 1.000 | 15.064 | 9.064 | 6 | 23 | 6M LIBOR | 24 |
| 790,499.99 | 5.777 | 3.000 | 1.000 | 15.186 | 9.186 | 6 | 23 | 6M LIBOR | 24 |
| 63,262,367.88 | 5.821 | 3.000 | 1.000 | 15.009 | 9.009 | 6 | 24 | 6M LIBOR | 0 |
| 535,700.00 | 5.822 | 3.000 | 1.000 | 13.390 | 7.390 | 6 | 60 | 6M LIBOR | 36 |
| 899,475.49 | 5.828 | 3.000 | 1.000 | 13.492 | 7.492 | 6 | 36 | 6M LIBOR | 36 |
| 291,896.29 | 5.852 | 3.000 | 1.000 | 15.278 | 9.278 | 6 | 23 | 6M LIBOR | 24 |
| 2,123,625.29 | 5.853 | 3.000 | 1.000 | 14.804 | 8.804 | 6 | 24 | 6M LIBOR | 24 |
| 1,323,213.57 | 5.855 | 3.000 | 1.000 | 14.523 | 8.523 | 6 | 23 | 6M LIBOR | 24 |
| 1,803,140.88 | 5.867 | 3.000 | 1.000 | 15.110 | 9.110 | 6 | 23 | 6M LIBOR | 24 |
| 2,088,521.91 | 5.877 | 3.000 | 1.000 | 15.168 | 9.168 | 6 | 24 | 6M LIBOR | 36 |
| 519,492.61 | 5.881 | 3.000 | 1.000 | 14.748 | 8.748 | 6 | 23 | 6M LIBOR | 24 |

</TABLE>

S-99

<PAGE>

GROUP TWO ADJUSTABLE RATE MORTGAGE (CONT'D)

<TABLE>
<CAPTION>

| CURRENT BALANCE ($) | MORTGAGE RATE(%) | NET MORTGAGE RATE(%) | ORIGINAL TERM (MONTHS) | REMAINING TERM (MONTHS) | ORIGINAL AMORTIZATION TERM (LESS IO TERM) (MONTHS) | REMAINING AMORTIZATION TERM (LESS IO TERM) (MONTHS) | ORIGINAL INTEREST ONLY TERM (MONTHS) | REMAINING INTEREST ONLY TERM (MONTHS) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 89,100.00 | 9.350 | 8.850 | 360 | 360 | 480 | 480 | 0 | 0 |
| 87,982.02 | 9.150 | 8.650 | 360 | 359 | 480 | 479 | 0 | 0 |
| 97,741.12 | 8.850 | 8.350 | 360 | 359 | 600 | 599 | 0 | 0 |
| 176,861.93 | 7.250 | 6.750 | 360 | 359 | 360 | 359 | 0 | 0 |
| 156,995.92 | 8.300 | 7.800 | 360 | 359 | 300 | 300 | 60 | 59 |
| 3,090,382.77 | 8.580 | 8.080 | 360 | 359 | 360 | 359 | 0 | 0 |
| 1,844,840.00 | 8.074 | 7.574 | 360 | 360 | 300 | 300 | 60 | 60 |
| 3,039,771.40 | 9.242 | 8.742 | 360 | 359 | 360 | 359 | 0 | 0 |
| 8,141,030.62 | 8.856 | 8.356 | 360 | 359 | 360 | 359 | 0 | 0 |
| 3,261,495.98 | 8.832 | 8.332 | 360 | 359 | 600 | 599 | 0 | 0 |
| 903,642.53 | 8.928 | 8.428 | 360 | 359 | 600 | 599 | 0 | 0 |
| 4,445,774.97 | 9.377 | 8.877 | 360 | 360 | 600 | 600 | 0 | 0 |
| 256,936.11 | 10.223 | 9.723 | 360 | 360 | 360 | 360 | 0 | 0 |
| 288,250.00 | 8.634 | 8.134 | 360 | 360 | 480 | 480 | 0 | 0 |
| 2,462,482.79 | 9.541 | 9.041 | 360 | 360 | 360 | 360 | 0 | 0 |
| 1,691,900.27 | 8.772 | 8.272 | 360 | 360 | 360 | 360 | 0 | 0 |
| 2,100,075.86 | 9.102 | 8.602 | 360 | 360 | 480 | 480 | 0 | 0 |
| 1,625,323.12 | 9.137 | 8.637 | 360 | 360 | 480 | 480 | 0 | 0 |
| 7,095,997.73 | 9.057 | 8.540 | 360 | 360 | 360 | 360 | 0 | 0 |
| 607,111.08 | 9.348 | 8.848 | 360 | 359 | 480 | 479 | 0 | 0 |
| 800,579.87 | 8.608 | 8.108 | 360 | 359 | 360 | 359 | 0 | 0 |
| 601,360.07 | 8.620 | 8.120 | 360 | 360 | 600 | 600 | 0 | 0 |
| 1,052,813.42 | 8.343 | 7.843 | 360 | 359 | 480 | 479 | 0 | 0 |
| 446,557.00 | 9.150 | 8.650 | 360 | 360 | 300 | 300 | 60 | 60 |
| 1,337,055.15 | 9.057 | 8.557 | 360 | 360 | 360 | 360 | 0 | 0 |
| 82,800.00 | 9.300 | 8.800 | 360 | 360 | 480 | 480 | 0 | 0 |
| 527,869.82 | 9.131 | 8.631 | 360 | 359 | 360 | 359 | 0 | 0 |
| 739,587.90 | 9.972 | 9.472 | 360 | 360 | 600 | 600 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 95,000.00 | 10.650 | 10.150 | 360 | 360 | 360 | 360 | 0 | 0 |
| 451,000.00 | 7.850 | 7.350 | 360 | 360 | 480 | 480 | 0 | 0 |
| 254,000.00 | 8.250 | 7.750 | 360 | 359 | 300 | 300 | 60 | 59 |
| 161,400.13 | 8.400 | 7.900 | 360 | 359 | 360 | 359 | 0 | 0 |
| 473,100.00 | 8.600 | 8.100 | 360 | 360 | 600 | 600 | 0 | 0 |
| 363,850.00 | 9.300 | 8.800 | 360 | 360 | 360 | 360 | 0 | 0 |
| 264,340.08 | 9.159 | 8.659 | 360 | 359 | 360 | 359 | 0 | 0 |
| 246,833.93 | 7.990 | 7.490 | 360 | 359 | 360 | 359 | 0 | 0 |

<CAPTION>

| ORIGINAL TO CURRENT BALANCE ($) | GROSS MARGIN (%) | INITIAL RATE CHANGE CAP(%) | PERIODIC CAP(%) | MAXIMUM RATE(%) | MINIMUM RATE(%) | RATE CHANGE FREQUENCY (MONTHS) | NUMBER OF MONTHS UNTIL NEXT RATE ADJUSTMENT DATE | INDEX | MONTHS PREPAYMENT PENALTY EXPIRATION |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 89,100.00 | 5.900 | 3.000 | 1.000 | 15.350 | 9.350 | 6 | 24 | 6M LIBOR | 36 |
| 87,982.02 | 5.900 | 3.000 | 1.000 | 15.150 | 9.150 | 6 | 35 | 6M LIBOR | 36 |
| 97,741.12 | 5.900 | 3.000 | 1.000 | 14.850 | 8.850 | 6 | 23 | 6M LIBOR | 36 |
| 176,861.93 | 5.900 | 3.000 | 1.000 | 13.250 | 7.250 | 6 | 59 | 6M LIBOR | 36 |
| 156,995.92 | 5.900 | 3.000 | 1.000 | 14.300 | 8.300 | 6 | 35 | 6M LIBOR | 36 |
| 3,090,382.77 | 5.901 | 3.000 | 1.000 | 14.580 | 8.580 | 6 | 23 | 6M LIBOR | 36 |
| 1,844,840.00 | 5.912 | 3.000 | 1.000 | 14.074 | 8.074 | 6 | 24 | 6M LIBOR | 36 |
| 3,039,771.40 | 5.932 | 3.000 | 1.000 | 15.242 | 9.242 | 6 | 23 | 6M LIBOR | 24 |
| 8,141,030.62 | 5.951 | 3.000 | 1.000 | 14.856 | 8.856 | 6 | 23 | 6M LIBOR | 12 |
| 3,261,495.98 | 5.969 | 3.000 | 1.000 | 14.832 | 8.832 | 6 | 23 | 6M LIBOR | 24 |
| 903,642.53 | 5.972 | 3.000 | 1.000 | 14.928 | 8.928 | 6 | 23 | 6M LIBOR | 24 |
| 4,445,774.97 | 5.985 | 3.000 | 1.000 | 15.377 | 9.377 | 6 | 24 | 6M LIBOR | 36 |
| 256,936.11 | 6.009 | 3.000 | 1.000 | 16.223 | 10.223 | 6 | 36 | 6M LIBOR | 24 |
| 288,250.00 | 6.010 | 3.000 | 1.000 | 14.634 | 8.634 | 6 | 24 | 6M LIBOR | 36 |
| 2,462,482.79 | 6.018 | 3.000 | 1.000 | 15.541 | 9.541 | 6 | 24 | 6M LIBOR | 24 |
| 1,691,900.27 | 6.032 | 3.000 | 1.000 | 14.772 | 8.772 | 6 | 36 | 6M LIBOR | 36 |
| 2,100,075.86 | 6.037 | 3.000 | 1.000 | 15.102 | 9.102 | 6 | 24 | 6M LIBOR | 36 |
| 1,625,323.12 | 6.044 | 3.000 | 1.000 | 15.137 | 9.137 | 6 | 24 | 6M LIBOR | 24 |
| 7,095,997.73 | 6.044 | 3.000 | 1.000 | 15.040 | 9.040 | 6 | 24 | 6M LIBOR | 24 |
| 607,111.08 | 6.125 | 3.000 | 1.000 | 15.348 | 9.348 | 6 | 23 | 6M LIBOR | 24 |
| 800,579.87 | 6.141 | 3.000 | 1.000 | 14.608 | 8.608 | 6 | 23 | 6M LIBOR | 36 |
| 601,360.07 | 6.157 | 3.000 | 1.000 | 14.620 | 8.620 | 6 | 24 | 6M LIBOR | 36 |
| 1,052,813.42 | 6.163 | 3.000 | 1.000 | 14.343 | 8.343 | 6 | 35 | 6M LIBOR | 36 |
| 446,557.00 | 6.176 | 3.000 | 1.000 | 15.150 | 9.150 | 6 | 24 | 6M LIBOR | 24 |
| 1,337,055.15 | 6.199 | 3.000 | 1.000 | 15.057 | 9.057 | 6 | 36 | 6M LIBOR | 36 |
| 82,800.00 | 6.250 | 3.000 | 1.000 | 15.300 | 9.300 | 6 | 60 | 6M LIBOR | 24 |
| 527,869.82 | 6.253 | 3.000 | 1.000 | 15.131 | 9.131 | 6 | 23 | 6M LIBOR | 36 |
| 739,587.90 | 6.257 | 3.000 | 1.000 | 15.972 | 9.972 | 6 | 24 | 6M LIBOR | 36 |
| 95,000.00 | 6.400 | 3.000 | 1.000 | 16.650 | 10.650 | 6 | 36 | 6M LIBOR | 36 |
| 451,000.00 | 6.400 | 3.000 | 1.000 | 13.850 | 7.850 | 6 | 36 | 6M LIBOR | 36 |
| 254,000.00 | 6.400 | 3.000 | 1.000 | 14.250 | 8.250 | 6 | 35 | 6M LIBOR | 36 |
| 161,400.13 | 6.400 | 3.000 | 1.000 | 14.400 | 8.400 | 6 | 23 | 6M LIBOR | 36 |
| 473,100.00 | 6.400 | 3.000 | 1.000 | 14.600 | 8.600 | 6 | 24 | 6M LIBOR | 24 |
| 363,850.00 | 6.400 | 2.000 | 1.000 | 15.300 | 9.300 | 6 | 12 | 6M LIBOR | 12 |
| 264,340.08 | 6.400 | 3.000 | 1.000 | 15.159 | 9.159 | 6 | 59 | 6M LIBOR | 36 |
| 246,833.93 | 6.400 | 3.000 | 1.000 | 13.990 | 7.990 | 6 | 35 | 6M LIBOR | 12 |

</TABLE>

S-100

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

```
<TABLE>
<CAPTION>
```

|  |  | CLASS A-1A | | | |  | CLASS A-1B | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| ---------------- | ----- | ---- | ---- | ---- | ---- | ----- | ---- | ---- | ---- | ---- |
| \<S> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> | \<C> |
| Initial ..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 ............... | 99 | 66 | 57 | 36 | 13 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2009 ............... | 98 | 12 | 0 | 0 | 0 | 100 | 100 | 21 | 0 | 0 |
| May 25, 2010 ............... | 97 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2011 ............... | 96 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2012 ............... | 95 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2013 ............... | 94 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2014 ............... | 93 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2015 ............... | 92 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2016 ............... | 90 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2017 ............... | 88 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2018 ............... | 86 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2019 ............... | 84 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2020 ............... | 82 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2021 ............... | 79 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2022 ............... | 77 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2023 ............... | 74 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2024 ............... | 70 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 ............... | 67 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 ............... | 63 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 ............... | 58 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 ............... | 53 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 ............... | 48 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 ............... | 42 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 ............... | 35 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 ............... | 27 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 ............... | 19 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 ............... | 10 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 ............... | 0 | 0 | 0 | 0 | 0 | 94 | 0 | 0 | 0 | 0 |
| May 25, 2036 ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| May 25, 2037 ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years (to maturity) .. | 19.70 | 1.32 | 1.14 | 0.86 | 0.71 | 28.39 | 2.32 | 2.00 | 1.50 | 1.17 |

```
</TABLE>
```

S-101

```
<PAGE>
```

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

```
<TABLE>
<CAPTION>
```

|  |  | CLASS A-1C | | | |  | CLASS A-1D | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| - DISTRIBUTION DATE 200% | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% |
| ---------------- - | ----- | ---- | ---- | ---- | ---- | ----- | ----- | ----- | ---- | --- |

| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial .................. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 ............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2009 ............. | 100 | 100 | 100 | 41 | 0 | 100 | 100 | 100 | 100 | 0 |
| May 25, 2010 ............. | 100 | 71 | 39 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| May 25, 2011 ............. | 100 | 53 | 35 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| May 25, 2012 ............. | 100 | 36 | 19 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| May 25, 2013 ............. | 100 | 23 | 9 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| May 25, 2014 ............. | 100 | 13 | 1 | 0 | 0 | 100 | 100 | 100 | 0 | 0 |
| May 25, 2015 ............. | 100 | 6 | 0 | 0 | 0 | 100 | 100 | 79 | 0 | 0 |
| May 25, 2016 ............. | 100 | 1 | 0 | 0 | 0 | 100 | 100 | 57 | 0 | 0 |
| May 25, 2017 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 82 | 42 | 0 | 0 |
| May 25, 2018 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 64 | 32 | 0 | 0 |
| May 25, 2019 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 50 | 24 | 0 | 0 |
| May 25, 2020 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 39 | 18 | 0 | 0 |
| May 25, 2021 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 31 | 12 | 0 | 0 |
| May 25, 2022 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 24 | 7 | 0 | 0 |
| May 25, 2023 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 19 | * | 0 | 0 |
| May 25, 2024 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 14 | 0 | 0 | 0 |
| May 25, 2025 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 9 | 0 | 0 | 0 |
| May 25, 2026 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| May 25, 2027 ............. | 100 | 0 | 0 | 0 | 0 | 100 | * | 0 | 0 | 0 |
| May 25, 2028 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 ............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2036 ............. | 96 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2037 ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years (to maturity) .. | 29.80 | 4.62 | 3.52 | 1.98 | 1.59 | 29.99 | 12.91 | 10.24 | 2.69 | |

1.98
</TABLE>

----------
*    Less than 0.5% but greater than 0.0%


                              S-102


<PAGE>

          PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
           AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
                     MODEL SET FORTH BELOW

<TABLE>
<CAPTION>

|  | CLASS A-2A | | | | | CLASS A-2B | | | | |
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial .................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 ............... | 99 | 59 | 49 | 22 | 0 | 100 | 100 | 100 | 100 | 90 |
| May 25, 2009 ............... | 98 | 0 | 0 | 0 | 0 | 100 | 89 | 43 | 0 | 0 |
| May 25, 2010 ............... | 97 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2011 ............... | 96 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2012 ............... | 95 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2013 ............... | 94 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2014 ............... | 93 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2015 ............... | 91 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2016 ............... | 90 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2017 ............... | 88 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2018 ............... | 86 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2019 ............... | 83 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2020 ............... | 81 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2021 ............... | 78 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2022 ............... | 75 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2023 ............... | 71 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2024 ............... | 68 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 ............... | 64 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 ............... | 59 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 ............... | 54 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 ............... | 48 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 ............... | 42 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 ............... | 35 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 ............... | 27 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 ............... | 19 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 ............... | 9 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 ............... | 0 | 0 | 0 | 0 | 0 | 97 | 0 | 0 | 0 | 0 |
| May 25, 2035 ............... | 0 | 0 | 0 | 0 | 0 | 73 | 0 | 0 | 0 | 0 |
| May 25, 2036 ............... | 0 | 0 | 0 | 0 | 0 | 47 | 0 | 0 | 0 | 0 |
| May 25, 2037 ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years (to maturity) .. | 18.91 | 1.16 | 1.00 | 0.76 | 0.64 | 28.77 | 2.36 | 2.00 | 1.50 | 1.17 |

</TABLE>


                              S-103


<PAGE>

          PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
           AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
                     MODEL SET FORTH BELOW

```
<TABLE>
<CAPTION>
                                 CLASS A-2C                           CLASS A-2D
                        ----------------------------------    ----------------------------------
DISTRIBUTION DATE        0%    80%   100%  150%  200%       0%    80%   100%  150%  200%
-----------------       -----  ----  ----  ----  ----      -----  -----  ----  ----  ----
<S>                     <C>    <C>   <C>   <C>   <C>        <C>    <C>    <C>   <C>   <C>
Initial ....................  100   100   100   100   100       100   100    100   100   100
May 25, 2008 ...............  100   100   100   100   100       100   100    100   100   100
May 25, 2009 ...............  100   100   100    43     0       100   100    100   100     0
May 25, 2010 ...............  100    90    42     0     0       100   100    100     0     0
May 25, 2011 ...............  100    64    36     0     0       100   100    100     0     0
May 25, 2012 ...............  100    38    13     0     0       100   100    100     0     0
May 25, 2013 ...............  100    19     0     0     0       100   100     92     0     0
May 25, 2014 ...............  100     4     0     0     0       100   100     64     0     0
May 25, 2015 ...............  100     0     0     0     0       100    84     45     0     0
May 25, 2016 ...............  100     0     0     0     0       100    63     32     0     0
May 25, 2017 ...............  100     0     0     0     0       100    48     23     0     0
May 25, 2018 ...............  100     0     0     0     0       100    37     16     0     0
May 25, 2019 ...............  100     0     0     0     0       100    28     12     0     0
May 25, 2020 ...............  100     0     0     0     0       100    21      8     0     0
May 25, 2021 ...............  100     0     0     0     0       100    16      4     0     0
May 25, 2022 ...............  100     0     0     0     0       100    12      1     0     0
May 25, 2023 ...............  100     0     0     0     0       100     9      0     0     0
May 25, 2024 ...............  100     0     0     0     0       100     6      0     0     0
May 25, 2025 ...............  100     0     0     0     0       100     3      0     0     0
May 25, 2026 ...............  100     0     0     0     0       100     1      0     0     0
May 25, 2027 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2028 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2029 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2030 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2031 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2032 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2033 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2034 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2035 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2036 ...............  100     0     0     0     0       100     0      0     0     0
May 25, 2037 ...............    0     0     0     0     0         0     0      0     0     0
Weighted Average Life
  in Years (to maturity) ..  29.90  4.72  3.50  2.01  1.64     29.93  10.83  8.49  2.55  1.94
</TABLE>
```

                            S-104

<PAGE>

                PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
                  AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
                            MODEL SET FORTH BELOW

```
<TABLE>
<CAPTION>
                                 CLASS M-1-1                          CLASS M-1-2
                        ----------------------------------    ----------------------------------
DISTRIBUTION DATE        0%    80%   100%  150%  200%       0%    80%   100%  150%  200%
-----------------       -----  ----  ----  ----  ----      -----  ----  ----  ----  ----
<S>                     <C>    <C>   <C>   <C>   <C>        <C>    <C>   <C>   <C>   <C>
Initial ....................  100   100   100   100   100       100   100   100   100   100
May 25, 2008 ...............  100   100   100   100   100       100   100   100   100   100
May 25, 2009 ...............  100   100   100   100   100       100   100   100   100   100
May 25, 2010 ...............  100   100   100   100    96       100   100   100   100    96
May 25, 2011 ...............  100    68    49   100    45       100    68    50   100    47
May 25, 2012 ...............  100    51    34    78    22       100    51    34    78    26
```

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| May 25, 2013 .............. | 100 | 38 | 24 | 45 | 6 | 100 | 38 | 24 | 47 | 11 |
| May 25, 2014 .............. | 100 | 29 | 16 | 27 | 0 | 100 | 29 | 17 | 29 | 2 |
| May 25, 2015 .............. | 100 | 22 | 11 | 14 | 0 | 100 | 22 | 12 | 17 | 0 |
| May 25, 2016 .............. | 100 | 16 | 8 | 4 | 0 | 100 | 17 | 9 | 8 | 0 |
| May 25, 2017 .............. | 100 | 12 | 6 | 0 | 0 | 100 | 13 | 6 | 2 | 0 |
| May 25, 2018 .............. | 100 | 9 | 4 | 0 | 0 | 100 | 10 | 5 | 0 | 0 |
| May 25, 2019 .............. | 100 | 7 | 3 | 0 | 0 | 100 | 8 | 3 | 0 | 0 |
| May 25, 2020 .............. | 100 | 5 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| May 25, 2021 .............. | 100 | 4 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| May 25, 2022 .............. | 100 | 3 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| May 25, 2023 .............. | 100 | * | 0 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| May 25, 2024 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2036 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2037 .............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years (to maturity) .. | 29.92 | 6.13 | 5.14 | 6.22 | 4.16 | 29.91 | 6.18 | 5.19 | 6.37 | 4.31 |

</TABLE>

----------
*    Less than 0.5% but greater than 0.0%

<PAGE>

        PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
          AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
                    MODEL SET FORTH BELOW


<TABLE>
<CAPTION>

| | CLASS M-2-1 | | | | | CLASS M-2-2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial ................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 .............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2009 .............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2010 .............. | 100 | 100 | 100 | 100 | 12 | 100 | 100 | 100 | 100 | 15 |
| May 25, 2011 .............. | 100 | 68 | 49 | 64 | 5 | 100 | 68 | 50 | 64 | 8 |
| May 25, 2012 .............. | 100 | 51 | 34 | 10 | 0 | 100 | 51 | 34 | 12 | 1 |
| May 25, 2013 .............. | 100 | 38 | 24 | 5 | 0 | 100 | 38 | 24 | 8 | 0 |
| May 25, 2014 .............. | 100 | 29 | 16 | 1 | 0 | 100 | 29 | 17 | 4 | 0 |
| May 25, 2015 .............. | 100 | 22 | 11 | 0 | 0 | 100 | 22 | 12 | 0 | 0 |
| May 25, 2016 .............. | 100 | 16 | 8 | 0 | 0 | 100 | 17 | 9 | 0 | 0 |
| May 25, 2017 .............. | 100 | 12 | 6 | 0 | 0 | 100 | 13 | 6 | 0 | 0 |
| May 25, 2018 .............. | 100 | 9 | 4 | 0 | 0 | 100 | 10 | 4 | 0 | 0 |
| May 25, 2019 .............. | 100 | 7 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| May 25, 2020 .............. | 100 | 5 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| May 25, 2021 .............. | 100 | 4 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| May 25, 2022 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| May 25, 2023 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| May 25, 2024 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2036 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2037 .............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life in Years (to maturity) .. | 29.92 | 6.08 | 5.01 | 4.34 | 2.81 | 29.91 | 6.13 | 5.06 | 4.41 | 2.88 |

</TABLE>

S-106

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

<TABLE>
<CAPTION>

| | CLASS M-3-1 | | | | | CLASS M-3-2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial .................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 .............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2009 .............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2010 .............. | 100 | 100 | 100 | 100 | 12 | 100 | 100 | 100 | 100 | 15 |
| May 25, 2011 .............. | 100 | 68 | 49 | 19 | 5 | 100 | 68 | 50 | 20 | 8 |
| May 25, 2012 .............. | 100 | 51 | 34 | 10 | 0 | 100 | 51 | 34 | 12 | 0 |
| May 25, 2013 .............. | 100 | 38 | 24 | 6 | 0 | 100 | 38 | 24 | 7 | 0 |
| May 25, 2014 .............. | 100 | 29 | 16 | 0 | 0 | 100 | 29 | 17 | 0 | 0 |
| May 25, 2015 .............. | 100 | 22 | 11 | 0 | 0 | 100 | 22 | 12 | 0 | 0 |
| May 25, 2016 .............. | 100 | 16 | 8 | 0 | 0 | 100 | 17 | 9 | 0 | 0 |
| May 25, 2017 .............. | 100 | 12 | 6 | 0 | 0 | 100 | 13 | 6 | 0 | 0 |
| May 25, 2018 .............. | 100 | 9 | 0 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| May 25, 2019 .............. | 100 | 7 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| May 25, 2020 .............. | 100 | 5 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| May 25, 2021 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2022 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2023 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2024 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2036 .............. | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2037 .............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Weighted Average Life
   in Years (to maturity) ..   29.92   6.05   4.95   3.98   2.56   29.91   6.08   4.99   4.03   2.62
</TABLE>

S-107

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

<TABLE>
<CAPTION>

|  |  | CLASS M-4-1 |  |  |  |  | CLASS M-4-2 |  |  |  |
| DISTRIBUTION DATE | 0% | 80% | 100% | 150% | 200% | 0% | 80% | 100% | 150% | 200% |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial ..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2008 ............... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2009 ............... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| May 25, 2010 ............... | 100 | 100 | 100 | 100 | 7 | 100 | 100 | 100 | 100 | 18 |
| May 25, 2011 ............... | 100 | 68 | 49 | 19 | 0 | 100 | 68 | 50 | 20 | 11 |
| May 25, 2012 ............... | 100 | 51 | 34 | 10 | 0 | 100 | 51 | 34 | 12 | 0 |
| May 25, 2013 ............... | 100 | 38 | 24 | 6 | 0 | 100 | 38 | 24 | 7 | 0 |
| May 25, 2014 ............... | 100 | 29 | 16 | 0 | 0 | 100 | 29 | 17 | 0 | 0 |
| May 25, 2015 ............... | 100 | 22 | 12 | 0 | 0 | 100 | 22 | 12 | 0 | 0 |
| May 25, 2016 ............... | 100 | 16 | 8 | 0 | 0 | 100 | 17 | 9 | 0 | 0 |
| May 25, 2017 ............... | 100 | 12 | 6 | 0 | 0 | 100 | 13 | 6 | 0 | 0 |
| May 25, 2018 ............... | 100 | 9 | 0 | 0 | 0 | 100 | 10 | 0 | 0 | 0 |
| May 25, 2019 ............... | 100 | 7 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| May 25, 2020 ............... | 100 | 3 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| May 25, 2021 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2022 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2023 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2024 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2025 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2026 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2027 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2028 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2029 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2030 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2031 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2032 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2033 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2034 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2035 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2036 ............... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| May 25, 2037 ............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life<br>  in Years (to maturity) .. | 29.92 | 6.02 | 4.91 | 3.85 | 2.38 | 29.91 | 6.05 | 4.94 | 3.90 | 2.59 |

</TABLE>

S-108

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

<TABLE>

<CAPTION>

|                                | CLASS M-5 |      |      |      |      | CLASS M-6 |      |      |      |      |
|--------------------------------|-----------|------|------|------|------|-----------|------|------|------|------|
| DISTRIBUTION DATE              | 0%   | 80%  | 100% | 150% | 200% | 0%   | 80%  | 100% | 150% | 200% |
|                                | ----- | ---- | ---- | ---- | ---- | ----- | ---- | ---- | ---- | ---- |
| <S>                            | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| Initial ....................   | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2008 ..............    | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2009 ..............    | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2010 ..............    | 100  | 100  | 100  | 100  | 14   | 100  | 100  | 100  | 100  | 14   |
| May 25, 2011 ..............    | 100  | 68   | 50   | 20   | 5    | 100  | 68   | 50   | 20   | 0    |
| May 25, 2012 ..............    | 100  | 51   | 34   | 11   | 0    | 100  | 51   | 34   | 11   | 0    |
| May 25, 2013 ..............    | 100  | 38   | 24   | 5    | 0    | 100  | 38   | 24   | 0    | 0    |
| May 25, 2014 ..............    | 100  | 29   | 17   | 0    | 0    | 100  | 29   | 17   | 0    | 0    |
| May 25, 2015 ..............    | 100  | 22   | 12   | 0    | 0    | 100  | 22   | 12   | 0    | 0    |
| May 25, 2016 ..............    | 100  | 16   | 9    | 0    | 0    | 100  | 16   | 9    | 0    | 0    |
| May 25, 2017 ..............    | 100  | 13   | 1    | 0    | 0    | 100  | 13   | 0    | 0    | 0    |
| May 25, 2018 ..............    | 100  | 10   | 0    | 0    | 0    | 100  | 10   | 0    | 0    | 0    |
| May 25, 2019 ..............    | 100  | 7    | 0    | 0    | 0    | 100  | 2    | 0    | 0    | 0    |
| May 25, 2020 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2021 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2022 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2023 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2024 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2025 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2026 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2027 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2028 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2029 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2030 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2031 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2032 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2033 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2034 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2035 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2036 ..............    | 100  | 0    | 0    | 0    | 0    | 100  | 0    | 0    | 0    | 0    |
| May 25, 2037 ..............    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    | 0    |
| Weighted Average Life          |      |      |      |      |      |      |      |      |      |      |
| in Years (to maturity) ..      | 29.91 | 6.00 | 4.90 | 3.76 | 2.44 | 29.91 | 5.96 | 4.84 | 3.67 | 2.42 |

</TABLE>

S-109

<PAGE>

PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW

<TABLE>
<CAPTION>

|                                | CLASS B-1 |      |      |      |      | CLASS B-2 |      |      |      |      |
|--------------------------------|-----------|------|------|------|------|-----------|------|------|------|------|
| DISTRIBUTION DATE              | 0%   | 80%  | 100% | 150% | 200% | 0%   | 80%  | 100% | 150% | 200% |
|                                | ----- | ---- | ---- | ---- | ---- | ----- | ---- | ---- | ---- | ---- |
| <S>                            | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  | <C>  |
| Initial ....................   | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2008 ..............    | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2009 ..............    | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  | 100  |
| May 25, 2010 ..............    | 100  | 100  | 100  | 100  | 14   | 100  | 100  | 100  | 100  | 14   |
| May 25, 2011 ..............    | 100  | 68   | 50   | 20   | 0    | 100  | 68   | 50   | 20   | 0    |
| May 25, 2012 ..............    | 100  | 51   | 34   | 11   | 0    | 100  | 51   | 34   | 7    | 0    |
| May 25, 2013 ..............    | 100  | 38   | 24   | 0    | 0    | 100  | 38   | 24   | 0    | 0    |
| May 25, 2014 ..............    | 100  | 29   | 17   | 0    | 0    | 100  | 29   | 17   | 0    | 0    |

```
May 25, 2015 ...............    100    22    12     0     0    100    22    10     0     0
May 25, 2016 ...............    100    16     2     0     0    100    16     0     0     0
May 25, 2017 ...............    100    13     0     0     0    100    13     0     0     0
May 25, 2018 ...............    100     8     0     0     0    100     0     0     0     0
May 25, 2019 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2020 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2021 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2022 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2023 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2024 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2025 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2026 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2027 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2028 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2029 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2030 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2031 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2032 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2033 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2034 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2035 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2036 ...............    100     0     0     0     0    100     0     0     0     0
May 25, 2037 ...............      0     0     0     0     0      0     0     0     0     0
Weighted Average Life
   in Years (to maturity) ..   29.91  5.90  4.79  3.59  2.40  29.91  5.83  4.73  3.50  2.32
</TABLE>
```

S-110


<PAGE>


PERCENTAGE OF INITIAL PRINCIPAL BALANCE OUTSTANDING
AT THE RESPECTIVE PERCENTAGES OF THE PREPAYMENT
MODEL SET FORTH BELOW


```
<TABLE>
<CAPTION>

                                        CLASS B-3
                              ---------------------------------
DISTRIBUTION DATE              0%    80%   100%  150%  200%
-----------------             -----  ----  ----  ----  ----
<S>                           <C>    <C>   <C>   <C>   <C>
Initial ....................   100   100   100   100   100
May 25, 2008 ...............   100   100   100   100   100
May 25, 2009 ...............   100   100   100   100   100
May 25, 2010 ...............   100   100   100    68     5
May 25, 2011 ...............   100    68    50    20     0
May 25, 2012 ...............   100    51    34     0     0
May 25, 2013 ...............   100    38    24     0     0
May 25, 2014 ...............   100    29    14     0     0
May 25, 2015 ...............   100    22     0     0     0
May 25, 2016 ...............   100    13     0     0     0
May 25, 2017 ...............   100     1     0     0     0
May 25, 2018 ...............   100     0     0     0     0
May 25, 2019 ...............   100     0     0     0     0
May 25, 2020 ...............   100     0     0     0     0
May 25, 2021 ...............   100     0     0     0     0
May 25, 2022 ...............   100     0     0     0     0
May 25, 2023 ...............   100     0     0     0     0
May 25, 2024 ...............   100     0     0     0     0
May 25, 2025 ...............   100     0     0     0     0
May 25, 2026 ...............   100     0     0     0     0
May 25, 2027 ...............   100     0     0     0     0
May 25, 2028 ...............   100     0     0     0     0
```

```
    May 25, 2029 ...............    100    0    0    0    0
    May 25, 2030 ...............    100    0    0    0    0
    May 25, 2031 ...............    100    0    0    0    0
    May 25, 2032 ...............    100    0    0    0    0
    May 25, 2033 ...............    100    0    0    0    0
    May 25, 2034 ...............    100    0    0    0    0
    May 25, 2035 ...............    100    0    0    0    0
    May 25, 2036 ...............    100    0    0    0    0
    May 25, 2037 ...............      0    0    0    0    0
    Weighted Average Life
       in Years (to maturity) ..  29.90  5.69  4.61  3.39  2.27
    </TABLE>
```

<div align="center">S-111</div>

&lt;PAGE&gt;

HYPOTHETICAL AVAILABLE FUNDS CAP TABLE

    Based upon the Modeling Assumptions and assuming further that the Fixed Rate Mortgage Loans prepay at a constant rate of 20% HEP and the Adjustable Rate Mortgage Loans prepay at a constant rate of 100% PPC, the following table indicates the related Available Funds Cap under such an assumed hypothetical scenario. It is highly unlikely, however, that prepayments on the Fixed Rate Mortgage Loans will occur at a constant rate of 20% HEP or prepayments on the Adjustable Rate Mortgage Loans will occur at a constant rate of 100% PPC or at any other constant rate. There is no assurance, therefore, of whether or to what extent the actual weighted average Net Mortgage Rate of the Mortgage Loans on any Distribution Date will conform to the corresponding rate set forth for such Distribution Date in the following table.

&lt;TABLE&gt;
&lt;CAPTION&gt;

| DISTRIBUTION DATE | GROUP ONE AVAILABLE FUNDS CAP (%) (1)(3) | GROUP TWO AVAILABLE FUNDS CAP (%) (1)(4) | WEIGHTED AVERAGE AVAILABLE FUNDS CAP (%) (1)(5) | GROUP ONE AVAILABLE FUNDS CAP (%) (2)(3) | GROUP TWO AVAILABLE FUNDS CAP (%) (2)(4) | WEIGHTED AVERAGE AVAILABLE FUNDS CAP (%) (2)(5) |
|---|---|---|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| 6/25/2007 | 9.239 | 9.265 | 9.256 | 9.239 | 9.265 | 9.256 |
| 7/25/2007 | 8.007 | 8.030 | 8.022 | 10.993 | 10.496 | 9.496 |
| 8/25/2007 | 7.749 | 7.771 | 7.763 | 10.993 | 10.496 | 9.495 |
| 9/25/2007 | 7.749 | 7.771 | 7.763 | 10.993 | 10.496 | 9.495 |
| 10/25/2007 | 8.008 | 8.031 | 8.022 | 10.992 | 10.497 | 9.495 |
| 11/25/2007 | 7.751 | 7.776 | 7.767 | 10.992 | 10.497 | 9.496 |
| 12/25/2007 | 8.010 | 8.036 | 8.026 | 22.092 | 22.117 | 22.108 |
| 1/25/2008 | 7.752 | 7.777 | 7.768 | 21.967 | 21.992 | 21.983 |
| 2/25/2008 | 7.752 | 7.777 | 7.768 | 21.969 | 21.995 | 21.985 |

| | | | | |
|---|---|---|---|---|
| 3/25/2008 | | 8.286 | 8.314 | 8.304 | 22.205 |
| 22.233 | 22.223 | | | | |
| 4/25/2008 | | 7.752 | 7.779 | 7.769 | 21.978 |
| 22.005 | 21.995 | | | | |
| 5/25/2008 | | 8.014 | 8.044 | 8.033 | 22.072 |
| 22.102 | 22.091 | | | | |
| 6/25/2008 | | 7.759 | 7.788 | 7.777 | 21.873 |
| 21.902 | 21.891 | | | | |
| 7/25/2008 | | 8.018 | 8.048 | 8.037 | 21.903 |
| 21.933 | 21.922 | | | | |
| 8/25/2008 | | 7.759 | 7.789 | 7.778 | 21.735 |
| 21.765 | 21.754 | | | | |
| 9/25/2008 | | 7.759 | 7.790 | 7.779 | 21.692 |
| 21.723 | 21.712 | | | | |
| 10/25/2008 | | 8.018 | 8.051 | 8.039 | 21.777 |
| 21.809 | 21.798 | | | | |
| 11/25/2008 | | 7.761 | 7.794 | 7.782 | 21.653 |
| 21.688 | 21.675 | | | | |
| 12/25/2008 | | 8.020 | 8.055 | 8.042 | 21.763 |
| 21.799 | 21.786 | | | | |
| 1/25/2009 | | 7.762 | 7.796 | 7.784 | 21.659 |
| 21.694 | 21.681 | | | | |
| 2/25/2009 | | 7.762 | 7.797 | 7.784 | 21.682 |
| 21.717 | 21.704 | | | | |
| 3/25/2009 | | 8.561 | 8.600 | 8.586 | 22.066 |
| 22.107 | 22.092 | | | | |
| 4/25/2009 | | 7.764 | 7.803 | 7.788 | 20.882 |
| 20.922 | 20.907 | | | | |
| 5/25/2009 | | 9.113 | 9.450 | 9.327 | 20.982 |
| 21.405 | 21.251 | | | | |
| 6/25/2009 | | 9.116 | 9.359 | 9.270 | 20.074 |
| 20.352 | 20.250 | | | | |
| 7/25/2009 | | 9.409 | 9.662 | 9.570 | 19.334 |
| 19.625 | 19.519 | | | | |
| 8/25/2009 | | 9.094 | 9.342 | 9.251 | 18.751 |
| 19.035 | 18.931 | | | | |
| 9/25/2009 | | 9.088 | 9.336 | 9.246 | 18.419 |
| 18.704 | 18.600 | | | | |
| 10/25/2009 | | 9.386 | 9.643 | 9.549 | 18.391 |
| 18.686 | 18.579 | | | | |
| 11/25/2009 | | 9.086 | 9.338 | 9.246 | 18.343 |
| 18.751 | 18.602 | | | | |
| 12/25/2009 | | 9.384 | 9.646 | 9.550 | 18.515 |
| 18.893 | 18.755 | | | | |
| 1/25/2010 | | 9.076 | 9.331 | 9.238 | 18.095 |
| 18.463 | 18.329 | | | | |
| 2/25/2010 | | 9.071 | 9.327 | 9.233 | 17.944 |
| 18.312 | 18.178 | | | | |
| 3/25/2010 | | 10.017 | 10.302 | 10.198 | 18.594 |
| 19.002 | 18.853 | | | | |
| 4/25/2010 | | 9.060 | 9.318 | 9.224 | 17.541 |
| 17.911 | 17.776 | | | | |
| 5/25/2010 | | 9.678 | 9.946 | 9.848 | 18.027 |
| 18.509 | 18.333 | | | | |
| 6/25/2010 | | 9.521 | 9.645 | 9.600 | 17.521 |
| 17.811 | 17.705 | | | | |
| 7/25/2010 | | 9.831 | 9.960 | 9.913 | 17.385 |
| 17.688 | 17.578 | | | | |
| 8/25/2010 | | 9.506 | 9.633 | 9.587 | 16.750 |
| 17.045 | 16.937 | | | | |
| 9/25/2010 | | 9.498 | 9.628 | 9.580 | 16.476 |
| 16.773 | 16.665 | | | | |
| 10/25/2010 | | 9.807 | 9.943 | 9.893 | 16.538 |
| 16.847 | 16.734 | | | | |
| 11/25/2010 | | 9.488 | 9.626 | 9.576 | 16.493 |

```
16.900          16.751
</TABLE>
```

S-112

```
<PAGE>

<TABLE>
<CAPTION>
```

| DISTRIBUTION DATE | GROUP ONE AVAILABLE FUNDS CAP (%) (1)(3) | GROUP TWO AVAILABLE FUNDS CAP (%) (1)(4) | WEIGHTED AVERAGE AVAILABLE FUNDS CAP (%) (1)(5) | GROUP ONE AVAILABLE FUNDS CAP (%) (2)(3) | WEIGHTED AVERAGE GROUP TWO AVAILABLE FUNDS CAP (%) (2)(4) | GROUP ONE AVAILABLE FUNDS CAP (%) (2)(5) |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| 12/25/2010 | 9.809 | 9.942 | 9.893 | 16.795 | 17.133 | 17.010 |
| 1/25/2011 | 9.485 | 9.615 | 9.568 | 16.277 | 16.605 | 16.486 |
| 2/25/2011 | 9.477 | 9.609 | 9.561 | 16.104 | 16.435 | 16.314 |
| 3/25/2011 | 10.472 | 10.621 | 10.567 | 17.001 | 17.370 | 17.236 |
| 4/25/2011 | 9.460 | 9.597 | 9.547 | 15.760 | 16.095 | 15.973 |
| 5/25/2011 | 9.767 | 9.910 | 9.858 | 16.337 | 16.678 | 16.554 |
| 6/25/2011 | 9.444 | 9.585 | 9.533 | 16.179 | 16.468 | 16.363 |
| 7/25/2011 | 9.750 | 9.898 | 9.844 | 16.638 | 16.940 | 16.830 |
| 8/25/2011 | 9.427 | 9.572 | 9.519 | 16.439 | 16.733 | 16.626 |
| 9/25/2011 | 9.419 | 9.566 | 9.512 | 16.576 | 16.872 | 16.764 |
| 10/25/2011 | 9.724 | 9.878 | 9.822 | 16.862 | 17.171 | 17.059 |
| 11/25/2011 | 9.401 | 9.553 | 9.498 | 16.573 | 16.868 | 16.761 |
| 12/25/2011 | 9.706 | 9.865 | 9.807 | 16.875 | 17.140 | 17.044 |
| 1/25/2012 | 9.384 | 9.540 | 9.484 | 16.467 | 16.726 | 16.631 |
| 2/25/2012 | 9.376 | 9.534 | 9.476 | 16.396 | 16.658 | 16.563 |
| 3/25/2012 | 10.013 | 10.184 | 10.122 | 17.017 | 17.300 | 17.197 |
| 4/25/2012 | 9.358 | 9.521 | 9.462 | 16.260 | 16.526 | 16.429 |
| 5/25/2012 | 9.689 | 9.862 | 9.799 | 16.552 | 16.836 | 16.733 |
| 6/25/2012 | 9.374 | 9.542 | 9.481 | 11.472 | 11.746 | 11.646 |
| 7/25/2012 | 9.678 | 9.853 | 9.790 | 11.832 | 12.118 | 12.014 |
| 8/25/2012 | 9.356 | 9.529 | 9.466 | 11.429 | | |

| | | | | | |
|---|---|---|---|---|---|
| 11.708 | 11.607 | | | | |
| 9/25/2012 | | 9.347 | 9.522 | 9.458 | 11.407 |
| 11.689 | 11.587 | | | | |
| 10/25/2012 | | 9.649 | 9.832 | 9.766 | 11.765 |
| 12.059 | 11.952 | | | | |
| 11/25/2012 | | 9.331 | 9.509 | 9.444 | 11.373 |
| 11.661 | 11.557 | | | | |
| 12/25/2012 | | 9.632 | 9.819 | 9.751 | 11.732 |
| 12.032 | 11.923 | | | | |
| 1/25/2013 | | 9.312 | 9.495 | 9.429 | 11.332 |
| 11.624 | 11.518 | | | | |
| 2/25/2013 | | 9.303 | 9.488 | 9.421 | 11.310 |
| 11.605 | 11.498 | | | | |
| 3/25/2013 | | 10.289 | 10.497 | 10.422 | 12.497 |
| 12.826 | 12.707 | | | | |
| 4/25/2013 | | 9.284 | 9.474 | 9.405 | 11.265 |
| 11.565 | 11.457 | | | | |
| 5/25/2013 | | 9.584 | 9.782 | 9.710 | 11.627 |
| 11.941 | 11.827 | | | | |
| 6/25/2013 | | 9.265 | 9.459 | 9.389 | 11.232 |
| 11.537 | 11.427 | | | | |
| 7/25/2013 | | 9.564 | 9.767 | 9.694 | 11.583 |
| 11.901 | 11.786 | | | | |
| 8/25/2013 | | 9.246 | 9.445 | 9.373 | 11.187 |
| 11.497 | 11.385 | | | | |
| 9/25/2013 | | 9.237 | 9.437 | 9.365 | 11.164 |
| 11.477 | 11.364 | | | | |
| 10/25/2013 | | 9.535 | 9.744 | 9.669 | 11.513 |
| 11.839 | 11.721 | | | | |
| 11/25/2013 | | 9.218 | 9.423 | 9.349 | 11.127 |
| 11.446 | 11.331 | | | | |
| 12/25/2013 | | | | | 11.477 |
| 11.808 | 11.689 | | | | |

</TABLE>

(1) Assumes no losses, the occurrence of an optional termination on the Initial Optional Termination Date, 20% HEP for the Fixed Rate Mortgage Loans and 100% PPC for the Adjustable Rate Mortgage Loans, and One-Month LIBOR and Six-Month LIBOR each remain constant at 5.3210% and 5.3620%, respectively.

(2) Assumes no losses, the occurrence of an optional termination on the Initial Optional Termination Date, 20% HEP for the Fixed Rate Mortgage Loans and 100% PPC for the Adjustable Rate Mortgage Loans, and One-Month LIBOR and Six-Month LIBOR are 5.3210% and 5.3620%, respectively, for the first Distribution Date and both increase to and remain constant at 20.000% for each Distribution Date thereafter. The values indicated include any Net Swap Payments received from the Swap Counterparty and proceeds from the related Corridor Contract, although such proceeds are excluded from the calculation of the related Available Funds Cap.

(3) The Group One Available Funds Cap for purposes of the table above applies only to the Group One Certificates and means a per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest on the Group One Mortgage Loans at their Net Mortgage Rates in effect on the related Due Date, less the pro rata portion allocable to the Group One Mortgage Loans of any Net Swap Payments or Swap Termination Payments (other than Defaulted Swap Termination Payments) owed to the Swap Counterparty, and (y) the aggregate Stated Principal Balance of the Group One Mortgage Loans as of the first day of the applicable Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period.

(4) The Group Two Available Funds Cap for purposes of the table above applies only to the Group Two Certificates and means a per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest on

the Group Two Mortgage Loans at their Net Mortgage Rates in effect on the related Due Date, less the pro rata portion allocable to the Group Two Mortgage Loans of any Net Swap Payments or Swap Termination Payments (other than Defaulted Swap Termination Payments) owed to the Swap Counterparty, and (y) the aggregate Stated Principal Balance of the Group Two Mortgage Loans as of the first day of the applicable Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period.

<div align="center">S-113</div>

&lt;PAGE&gt;

(5)  The Weighted Average Available Funds Cap for purposes of the table above applies only to the Class M-5, Class M-6 and Class B Certificates and means a per annum rate equal to the weighted average of the Group One Available Funds Cap and the Group Two Available Funds Cap (weighted in proportion to the results of subtracting from the aggregate Stated Principal Balance of each Mortgage Group, the current Certificate Principal Balance of the Group One Certificates, in the case of Group One, or the Group Two Certificates, in the case of Group Two).

ADDITIONAL INFORMATION

    The Depositor has filed additional yield tables and other computational materials (including a free writing prospectus supplement) with respect to the certificates with the Securities and Exchange Commission in a report on Form 8-K. Those tables and materials were prepared by the Underwriter for prospective investors who made requests for that additional information. Those tables and assumptions may be based on assumptions that differ from the Modeling Assumptions. Accordingly, those tables and other materials may not be relevant to or appropriate for investors other than those specifically requesting them.

<div align="center">FEDERAL INCOME TAX CONSEQUENCES</div>

    For federal income tax purposes, the Issuing Entity will include one or more segregated asset pools, with respect to which elections will be made to treat each as a separate REMIC. The Trust Fund will also include (x) a grantor trust that will hold the Class C Certificates, the Corridor Contract Account and the rights to payments under the Corridor Contracts, the Supplemental Interest Trust and the rights and obligations under the Swap Agreement and certain obligations with respect to excess interest payments described below and (y) a grantor trust that will hold the rights to prepayment charges. The assets of the lowest-tier REMIC will consist of the Mortgage Loans and all other property in the Issuing Entity except for (i) interests issued by any of the REMICs, (ii) prepayment charges received with respect to the Mortgage Loans, (iii) the Corridor Contracts, the Swap Agreement, the Corridor Contract Account and the Supplemental Interest Trust and (iv) the interests in the grantor trusts described above. Each class of the Offered Certificates (other than the Class R Certificate) will represent the beneficial ownership of the corresponding regular interest of the highest-tier REMIC. The Class R Certificate will represent the beneficial ownership of the residual interest in each of the REMICs.

    For federal income tax purposes, each of the interests in the highest-tier REMIC that corresponds to an Offered Certificate will be subject to a cap equal to the related Available Funds Cap with the following modifications: (i) the notional balance of the Swap Agreement for each Distribution Date will be treated as limited to, and in certain cases less than, the Stated Principal Balance of the Mortgage Loans as of the preceding Distribution Date; (ii) amounts owed to the Swap Counterparty will be allocated among the Mortgage Groups pro rata based on their relative sizes as of the Cut-off Date (rather than on an ongoing basis); and (iii) any Swap Termination Payment will be treated as being payable solely from Net Excess Cashflow. Such interests in the

highest-tier REMIC shall not be entitled to reimbursement for shortfalls caused
by such interest rate cap. In addition to representing the beneficial ownership
of the corresponding interest of the highest-tier REMIC, each of the Offered
Certificates will also represent the beneficial ownership of any excess of the
interest distributable on such class over the interest that would have accrued
on the corresponding class of interest had each of the Offered Certificates been
subject to the interest rate cap described in the preceding sentence (such
excess, "excess interest payments"). Further, in addition to ownership of the
corresponding interest in the highest-tier REMIC and the right to receive excess
interest payments, each of the Offered Certificates will also represent the
obligation under a notional principal contract to pay any excess of the interest
distributable on such interest in the highest-tier REMIC over the interest
distributable on such Offered Certificate (such excess also, "excess interest
payments"). The rights and obligations with respect to excess interest payments
associated with the Offered Certificates will not, for federal income tax
purposes, be treated as interests in a REMIC.

<center>S-114</center>

<PAGE>

Upon the issuance of the Offered Certificates, Dechert LLP will deliver its
opinion to the effect that, assuming compliance with the Pooling and Servicing
Agreement, and the accuracy of certain representations made in the Pooling and
Servicing Agreement or the transfer agreements with respect to the Mortgage
Loans and certain representations made by the Sponsor, for federal income tax
purposes, each of the REMICs will qualify as a REMIC within the meaning of
Section 860D of the Code and the grantor trusts will qualify as such under
subpart E, Part I of Subchapter J of the Code.

Holders of Subordinate Certificates may be required to accrue income
currently even though their distributions may be reduced due to defaults and
delinquencies on the related Mortgage Loans. See "Material Federal Income Tax
Consequences" in the prospectus.

The current backup withholding rate is 28%. The rate is subject to
adjustment after 2010.

TAXATION OF THE BASIS RISK ARRANGEMENTS

General. Each holder of an Offered Certificate will be treated for federal
income tax purposes as having entered into, on the date it purchases its Offered
Certificate, one or more notional principal contracts whereby it has the right
to receive and the obligation to make payments with respect to excess interest
payments (a "basis risk arrangement").

In general, the holders of the Offered Certificates must allocate the price
they pay for their certificates between their interest in the highest-tier REMIC
and their basis risk arrangement based on their relative fair market values. To
the extent a basis risk arrangement is determined to have a value on the Closing
Date that is greater than zero, a portion of such purchase price will be
allocable to such basis risk arrangement, and such portion will be treated as a
non-periodic payment on a notional principal contract paid by the holders of the
Offered Certificates. A holder of an Offered Certificate will be required to
amortize the non-periodic payment under one of the methods set forth in the Swap
Regulations. Prospective purchasers of the Offered Certificates should consult
their own tax advisors regarding the appropriate method of amortizing any
non-periodic payment.

Under the Swap Regulations (i) all taxpayers must recognize periodic
payments with respect to a notional principal contract under the accrual method
of accounting, and (ii) any periodic payments received in connection with the
right to receive excess interest payments must be netted against periodic
payments made in connection with the obligation to make excess interest payments
and payments, if any, deemed made as a result of the non-periodic payments

described above over the recipient's taxable year, rather than accounted for on
a gross basis. Net income or deduction with respect to net payments under a
notional principal contract for a taxable year should, and under recently
proposed regulations would, constitute ordinary income or ordinary deduction.
The proposed regulations referred to in the preceding sentence are proposed to
be effective thirty days after they are published as final regulations. It is
not known whether the proposed regulations will be adopted as final regulations
or, if so, whether they will be adopted in their current form. The IRS could
contend the amount of net income or deduction is capital gain or loss, but such
treatment is unlikely, at least in the absence of further regulations.
Individuals may be limited in their ability to deduct any such net deduction and
should consult their tax advisors prior to investing in the Offered
Certificates.

　　Termination Payments. Any amount of proceeds from the sale, redemption or
retirement of an Offered Certificate that is considered to be allocated to the
selling beneficial owner's rights to receive excess interest payments in
connection with the sale or exchange of an Offered Certificate would be
considered under the Swap Regulations a "termination payment" received by such
owner. Any reduction in the amount of proceeds from the sale, redemption or
retirement of an Offered Certificate that is considered to be attributable to
the selling beneficial owner's obligation to make excess interest payments

<div align="center">S-115</div>

<PAGE>

would be considered under the Swap Regulations a "termination payment" paid by
such owner. A holder of an Offered Certificate will have gain or loss from such
a termination of the basis risk arrangement equal to (i) any termination payment
it received or is deemed to have received minus (ii) any termination payment it
has paid or is deemed to have paid and the unamortized portion of any
non-periodic payment paid (or deemed paid) by the beneficial owner upon entering
into or acquiring its basis risk arrangement.

　　Gain or loss realized upon the termination of a right to receive excess
interest payments generally will be treated as capital gain or loss. Moreover,
in the case of a bank or thrift institution, Section 582(c) of the Code would
likely not apply to treat such gain or loss, or a portion thereof, as ordinary.

　　Application of the Straddle Rules. The Offered Certificates, representing
beneficial ownership of the corresponding regular interest and the right to
receive excess interest payments, may constitute positions in a straddle, in
which case, the straddle rules of Section 1092 of the Code would apply. If the
straddle rules apply, a selling beneficial owner's capital gain or loss with
respect to such corresponding regular interest would be short-term because the
holding period would be tolled under the straddle rules. Similarly, capital gain
or loss realized in connection with the termination of the right to receive
excess interest payments would be short-term. If the holder of an Offered
Certificate incurred or continued indebtedness to acquire or hold such Offered
Certificate, the holder would generally be required to capitalize a portion of
the interest paid on such indebtedness until termination of the right to receive
excess interest payments.

　　Investors are urged to consult their own tax advisors regarding the
appropriate tax treatment of the right to receive, and the obligations with
respect to, excess interest payments.

ORIGINAL ISSUE DISCOUNT AND AMORTIZABLE BOND PREMIUM

　　The REMIC regular interests represented by the Offered Certificates (other
than the Class R Certificate) may be treated as being issued with original issue
discount. For purposes of determining the amount and rate of accrual of original
issue discount and market discount, the Depositor intends to assume that there

will be Principal Prepayments on the Mortgage Loans at a rate equal to 100% of
the applicable prepayment model, as described above. No representation is made
as to whether the Mortgage Loans will prepay at that rate or any other rate. See
"Yield, Prepayment and Maturity Considerations" in this prospectus supplement
and "Material Federal Income Tax Consequences" in the prospectus.

     The REMIC regular interests represented by the Offered Certificates (other
than the Class R Certificate) may be treated as being issued at a premium. If
this occurs, the holders of such Offered Certificates may elect under Section
171 of the Code to amortize that premium under the constant yield method and to
treat that amortizable premium as an offset to interest income on such regular
interests. This election, however, applies to all the certificateholder's debt
instruments held during or after the first taxable year in which the election is
first made, may be revoked only with the consent of the IRS, and should only be
made after consulting with a tax advisor.

     If the method for computing original issue discount described in the
prospectus results in a negative amount for any period with respect to a
certificateholder, such certificateholder will be permitted to offset such
excess amounts only against the respective future income, if any, from the REMIC
regular interest represented by such certificate. Although the tax treatment is
uncertain, a certificateholder may be permitted to deduct a loss to the extent
that such holder's respective remaining basis in the REMIC regular interest
represented by such certificate exceeds the maximum amount of future payments to
which such holder is entitled with respect to its REMIC regular interest,
assuming no further Principal Prepayments on the Mortgage Loans are received.
Although the matter is not free from doubt, any such loss might be treated as a
capital loss.


                                     S-116


<PAGE>

SPECIAL TAX ATTRIBUTES OF THE OFFERED CERTIFICATES

     For purposes of this discussion, the "REMIC assets" of the Issuing Entity
includes all assets of the Issuing Entity other than (i) rights under the
Corridor Contracts and the Corridor Contract Account, (ii) rights under the Swap
Agreement and the Supplemental Interest Trust and (iii) rights to receive
prepayment charges with respect to the Mortgage Loans.

     As is described more fully under "Material Federal Income Tax Consequences"
in the prospectus, the REMIC interests represented by the Offered Certificates
will be treated as assets described in Section 7701(a)(19)(C) of the Code in the
same proportion that the REMIC assets of the Issuing Entity would be so treated;
provided, however, that if at least 95% of the REMIC assets of the Issuing
Entity are assets described in Section 7701(a)(19)(C)(i)-(x) of the Code, the
REMIC interests represented by the Offered Certificates will be treated in their
entirety as assets described in Section 7701(a)(19)(C) of the Code.

     The REMIC interests represented by the Offered Certificates will be treated
as "real estate assets" under Section 856(c)(5)(B) of the Code in the same
proportion that the REMIC assets of the Issuing Entity would be so treated;
provided, however, that if at least 95% of the REMIC assets of the Issuing
Entity are "real estate assets" within the meaning of Section 856(c)(5)(B) of
the Code, then the REMIC interests represented by the Offered Certificates will
be treated in their entirety as "real estate assets" under Section 856(c)(5)(B)
of the Code. Interest on the REMIC interests represented by the Offered
Certificates will be treated as "interest on obligations secured by mortgages on
real property" within the meaning of Section 856(c)(3)(B) of the Code in the
same proportion that income from the REMIC assets of the Issuing Entity is
income described in Section 856(c)(3)(B) of the Code; provided, however, that if
at least 95% of the REMIC assets of the Issuing Entity are "real estate assets"
within the meaning of Section 856(c)(5)(B) of the Code, then all interest on the

REMIC interests represented by the Offered Certificates, will be treated as "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code.

The portion of any Offered Certificate representing a basis risk arrangement will not be treated as a "real estate asset" under Section 856(c)(5)(B) of the Code or as a qualifying asset under Section 860G(a)(3) or Section 7701(a)(19)(C) of the Code and income with respect to such portion will not be treated as "interest on obligations secured by mortgages on real property" within the meaning of Section 856(c)(3)(B) of the Code.

PROHIBITED TRANSACTIONS TAX AND OTHER TAXES

The Code imposes a tax on REMICs equal to 100% of the net income derived from "prohibited transactions." In general, subject to specified exceptions, a prohibited transaction means the disposition of a Mortgage Loan, the receipt of income from a source other than a Mortgage Loan or other permitted investments, the receipt of compensation for services, or gain from the disposition of an asset purchased with the payments on the Mortgage Loans for temporary investment pending distribution on the certificates. It is not anticipated that the Issuing Entity will engage in any prohibited transactions in which it would recognize a material amount of net income.

In addition, contributions to a trust fund that elects to be treated as a REMIC made after the day on which such trust fund issues all of its interests could result in the imposition of a tax on the trust fund equal to 100% of the value of the contributed property. The Issuing Entity will not accept contributions that would subject it to such tax.

S-117

<PAGE>

In addition, a trust fund that elects to be treated as a REMIC may be subject to federal income tax at the highest corporate rate on "net income from foreclosure property," determined by reference to the rules applicable to real estate investment trusts. "Net income from foreclosure property" generally means income derived from foreclosure property, including gain from the sale of a foreclosure property, other than qualifying rents and other income or gain that would be qualifying income for a real estate investment trust. It is not anticipated that the Issuing Entity will recognize net income from foreclosure property subject to federal income tax.

Where the above-referenced prohibited transactions tax, tax on contributions to an issuing entity, tax on net income from foreclosure property or state or local income or franchise tax that may be imposed on a REMIC arises out of a breach of the Servicer's or the Trustee's obligations, as the case may be, under the Pooling and Servicing Agreement and in respect of compliance with then applicable law, such tax will be borne by the Servicer or the Trustee in either case out of its own funds. In the event that either the Servicer or the Trustee, as the case may be, fails to pay or is not required to pay any such tax as provided above, such tax will be paid by the Issuing Entity first with amounts that might otherwise be distributable to the holders of certificates in the manner provided in the Pooling and Servicing Agreement. It is not anticipated that any material state or local income or franchise tax will be imposed on the Issuing Entity.

For further information regarding the federal income tax consequences of investing in the Offered Certificates, see "Material Federal Income Tax Consequences--REMICs" in the prospectus.

CLASS R CERTIFICATE

The holder of the Class R Certificate must include the taxable income or

loss of the REMICs in determining its federal taxable income. The Class R Certificate will remain outstanding for federal income tax purposes until there are no certificates of any other class outstanding. Prospective investors are cautioned that the Class R certificateholder's REMIC taxable income and the tax liability thereon may exceed, and may substantially exceed, cash distributions to such holder during certain periods, in which event, the holder thereof must have sufficient alternative sources of funds to pay such tax liability. Furthermore, it is anticipated that all or a substantial portion of the taxable income of the REMICs includable by the holder of the Class R Certificate will be treated as "excess inclusion" income, resulting in (i) the inability of such holder to use net operating losses to offset such income from the REMICs, (ii) the treatment of such income as "unrelated business taxable income" to certain holders who are otherwise tax-exempt and (iii) the treatment of such income as subject to 30% withholding tax to certain non-U.S. investors, with no exemption or treaty reduction.

The Class R Certificate will be considered to represent "noneconomic residual interests," with the result that transfers thereof would be disregarded for federal income tax purposes if any significant purpose of the transfer was to impede the assessment or collection of tax. All transfers of the Class R Certificate will be subject to certain restrictions intended to reduce the possibility of any such transfer being disregarded. Such restrictions include requirements that (i) the transferor represent that it has conducted an investigation of the transferee and made certain findings regarding whether the transferee has historically paid its debts when they become due, (ii) the proposed transferee make certain representations regarding its understanding that as the holder of a Class R Certificate the transferee may incur tax liabilities in excess of the cashflow from the Class R Certificate and its intention to pay the taxes associated with holding the Class R Certificate as they become due and (iii) the proposed transferee agree that it will not transfer the Class R Certificate to any person unless that person agrees to comply with the same restrictions on future transfers. See "Description of the Certificates--Restrictions on Transfer of the Class R Certificate" in this prospectus supplement and "Material Federal Income Tax Consequences--Tax-Related Restrictions on Transfers of REMIC Residual Certificates" in the prospectus.

S-118

<PAGE>

An individual, trust or estate that holds the Class R Certificate (whether such Class R Certificate is held directly or indirectly through certain pass-through entities) also may have additional gross income with respect to, but may be subject to limitations on the deductibility of, Servicing Fees on the Mortgage Loans and other administrative expenses of the Issuing Entity in computing such holder's regular tax liability, and may not be able to deduct such fees or expenses to any extent in computing such holder's alternative minimum tax liability. In addition, some portion of a purchaser's basis, if any, in the Class R Certificate may not be recovered until termination of the Issuing Entity. Furthermore, the federal income tax consequences of any consideration paid to a transferee on a transfer of the Class R Certificate are unclear. Recently issued regulations require an acquiror or transferee of a noneconomic residual interest to recognize as income any fee received to induce such person to become a holder of such interest over a period reasonably related to the period during which the applicable REMIC is expected to generate taxable income or net loss in a manner that reasonably reflects the after-tax costs and benefits (without regard to such fee) of holding such interest. The regulations provide two safe harbor methods that satisfy this requirement. Under one method, the fee is recognized in accordance with the method of accounting, and over the same period, that the taxpayer uses for financial reporting purposes, provided that the fee is included in income for financial reporting purposes over a period that is not shorter than the period during which the applicable REMIC is expected to generate taxable income. Under a second method, the fee is recognized ratably over the anticipated weighted average life of the applicable

REMIC (as determined under applicable Treasury regulations) remaining as of the date of acquisition of the noneconomic residual interest. The IRS may provide additional safe harbor methods in future guidance. Once a taxpayer adopts a particular method of accounting for such fees, the taxpayer generally may not change to a different method without consent of the IRS. Under the regulations, if any portion of such a fee has not been recognized in full by the time the holder of a noneconomic residual interest disposes of such interest, then the holder must include the unrecognized portion in income at that time. The regulations also provide that such a fee shall be treated as income from sources within the United States. Any transferee receiving consideration with respect to the Class R Certificate should consult its tax advisors.

Due to the special tax treatment of residual interests, the effective after-tax return of the Class R Certificate may be significantly lower than would be the case if the Class R Certificate were taxed as a debt instrument, or may be negative.

For further information regarding the federal income tax consequences of investing in the Offered Certificates, see "Material Federal Income Tax Consequences" in the prospectus.

### TAX RETURN DISCLOSURE REQUIREMENTS

Taxpayers are required to report certain information on IRS Form 8886 if they participate in a "reportable transaction." Holders should consult with their tax advisors as to the need to file IRS Form 8886 (disclosing certain potential tax shelters) with their federal income tax returns.

### STATE TAXES

The Depositor makes no representations regarding the tax consequences of purchase, ownership or disposition of the Offered Certificates under the tax laws of any state. Investors considering an investment in the Offered Certificates should consult their own tax advisors regarding such tax consequences.

All investors should consult their own tax advisors regarding the federal, state, local or foreign income tax consequences of the purchase, ownership and disposition of the Offered Certificates.

S-119

<PAGE>

### ERISA CONSIDERATIONS

Section 406 of ERISA prohibits "parties in interest" with respect to a Plan subject to ERISA and Section 4975 of the Code prohibits "disqualified persons" with respect to a Plan subject thereto from engaging in certain transactions involving such Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes certain excise taxes and other penalties on prohibited transactions involving Plans subject to that Section. ERISA authorizes the imposition of civil penalties for prohibited transactions involving Plans subject to Title I of ERISA in certain circumstances. Any Plan fiduciary proposing to cause a Plan to acquire the Offered Certificates should consult with its counsel with respect to the potential consequences under ERISA and the Code of the Plan's acquisition and holding of the Offered Certificates. The Class R Certificate may not be purchased by a Plan; therefore, references in the following discussion to the Offered Certificates do not apply, in general, to the Class R Certificate. See "ERISA Considerations" in the prospectus.

Certain employee benefit plans, including governmental plans and certain church plans, are not subject to ERISA. Accordingly, assets of such plans may be

invested in the Offered Certificates without regard to the ERISA Considerations described herein and in the prospectus, subject to any provisions under any federal, state, local, non-U.S. or other laws or regulations that are substantively similar to Title I of ERISA or Section 4975 of the Code.

Except as noted above, investments by Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan. A fiduciary deciding whether to invest the assets of a Plan in the Offered Certificates should consider, among other factors, the extreme sensitivity of the investments to the rate of principal payments (including Principal Prepayments) on the Mortgage Loans.

The U.S. Department of Labor has granted the Exemption from certain of the prohibited transaction rules of ERISA and the related excise tax provisions of Section 4975 of the Code with respect to the initial purchase, the holding, the servicing and the subsequent resale by Plans of certificates in pass-through trusts that consist of receivables, loans and other obligations that meet the conditions and requirements of the Exemption.

Among the general conditions that must be satisfied for the Exemption to apply are the following:

(1) the acquisition of the certificates by a Plan is on terms (including the price for the certificates) that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party;

(2) the rights and interests evidenced by the certificates acquired by the Plan are not subordinated to the rights and interests evidenced by other certificates of the Issuing Entity, other than in the case of Designated Transactions;

(3) the certificates acquired by the Plan have received a rating at the time of such acquisition that is one of the three (or in the case of Designated Transactions, four) highest generic rating categories of Fitch, Moody's or S&P;

(4) the Trustee must not be an affiliate of any other member of the Restricted Group other than an underwriter;

S-120

<PAGE>

(5) the sum of all payments made to and retained by the underwriter in connection with the distribution of the certificates represents not more than reasonable compensation for underwriting the certificates; the sum of all payments made to and retained by the Sponsor for the assignment of the Mortgage Loans to the Issuing Entity represents not more than the fair market value of such Mortgage Loans; the sum of all payments made to and retained by the Servicer and any other servicer represents not more than reasonable compensation for such person's services under the agreement in which the loans are pooled and reimbursements of such person's reasonable expenses in connection therewith; and

(6) the Plan investing in the certificates is an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933, as amended.

The Issuing Entity must also meet the following requirements:

(1) the corpus of the Trust Fund must consist solely of assets of the type

that have been included in other investment pools;

  (2)  certificates in such other investment pools must have been rated in one of the three (or in the case of Designated Transactions, four) highest rating categories of Fitch, Moody's or S&P for at least one year prior to the Plan's acquisition of certificates; and

  (3)  certificates evidencing interests in such other investment pools must have been purchased by investors other than Plans for at least one year prior to any Plan's acquisition of certificates.

    Moreover, the Exemption provides relief from certain self-dealing/conflict of interest prohibited transactions that may occur when a Plan fiduciary causes a Plan (other than a Plan sponsored by a member of the Restricted Group) to acquire certificates in a trust and the fiduciary (or its affiliate) is an obligor on the receivables held in the trust, provided that, among other requirements:

  (1)  in the case of an acquisition in connection with the initial issuance of certificates, at least fifty percent (50%) of each class of certificates in which Plans have invested is acquired by persons independent of the Restricted Group and at least fifty percent (50%) of the aggregate interest in the trust is acquired by persons independent of the Restricted Group;

  (2)  such fiduciary (or its affiliate) is an obligor with respect to five percent (5%) or less of the fair market value of the obligations contained in the trust;

  (3)  the Plan's investment in certificates of any class does not exceed twenty-five percent (25%) of all of the certificates of that class outstanding at the time of the acquisition; and

  (4)  immediately after the acquisition, no more than twenty-five percent (25%) of the assets of any Plan with respect to which such person is a fiduciary are invested in certificates representing an interest in one or more trusts containing assets sold or serviced by the same entity.

<center>S-121</center>

&lt;PAGE&gt;

    Further, additional conditions under the Exemption are applicable to eligible swaps or cap contracts. These conditions are discussed in "ERISA Considerations" in the prospectus.

    Except as described below, it is expected that the Exemption will apply to the acquisition and holding of the Offered Certificates by Plans and that all conditions of the Exemption other than those within the control of the investors will be met. In addition, as of the date hereof, there is no single mortgagor that is the obligor on five percent (5%) or more of the Mortgage Loans included in the Issuing Entity by aggregate unamortized principal balance of the assets of the Issuing Entity.

    The Swap Agreement does not satisfy all of the requirements to qualify as an "eligible swap" under the Exemption. Until termination of the Swap Agreement, for ERISA purposes, an interest in a class of Offered Certificates will be deemed to represent a beneficial interest in each of two assets: (i) the right to receive payments with respect to the applicable class of Offered Certificates without taking into account payments made or received with respect to the Swap Agreement and (ii) the right in the Supplemental Interest Trust to receive payments under the Swap Agreement. Under this approach, the Exemption does not cover the acquisition or holding of the interest described in (ii). Consequently, a Plan's acquisition and holding of an Offered Certificate could

constitute or result in a prohibited transaction under ERISA or Section 4975 of
the Code unless an exemption is available with respect to the acquisition and
holding of the interest described in (ii).

     Accordingly, until the termination of the Swap Agreement, neither a Plan
nor any person acting for, on behalf of or with any assets of a Plan may acquire
or hold any interest in an Offered Certificate unless such acquisition and
holding is eligible for relief under and is covered by an Investor-Based
Exemption. Even if the conditions specified in one or more of the Investor-Based
Exemptions are met, however, the scope of relief provided by the Investor-Based
Exemptions may not necessarily cover all acts that might constitute prohibited
transactions. Plan fiduciaries should consult their legal counsel concerning
these issues. Until the termination of the Swap Agreement, each beneficial owner
of an Offered Certificate (other than the Class R Certificate) or any interest
therein shall be deemed to have represented that either (i) it is not a Plan or
a person acting for, on behalf of or with any assets of a Plan or (ii) the
acquisition and holding of the Offered Certificate will not constitute or result
in a non-exempt prohibited transaction under Title I of ERISA or Section 4975 of
the Code. Subsequent to the termination of the Swap Agreement, it is expected
that the Exemption will apply to the acquisition and holding of the Offered
Certificates (other than the Class R Certificate).

     Because the characteristics of the Class R Certificate may not meet the
requirements of the Exemption or any other issued exemption under ERISA, a Plan
may have engaged in a prohibited transaction or incur excise taxes or civil
penalties if it purchases and holds the Class R Certificate. Consequently,
transfers of the Class R Certificate will not be registered by the Trustee
unless the Trustee receives a representation from the transferee of the Class R
Certificate, acceptable to and in form and substance satisfactory to the
Trustee, to the effect that the transferee is not a Plan and is not directly or
indirectly acquiring the Class R Certificate for, on behalf of or with any
assets of any such Plan. Any purported transfer of the Class R Certificate or
any interest therein in violation of such representation shall be void and of no
effect, and the next preceding permitted beneficial owner will be treated as the
beneficial owner of the Class R Certificate. The Trustee shall be entitled, but
not obligated, to recover from any holder of the Class R Certificate that was in
fact a Plan and that held such Certificate in violation of such representation
all payments made on such Class R Certificate at and after the time it commenced
such holding. Any such payments so recovered shall be paid and delivered to such
last preceding beneficial owner.

     Prospective Plan investors should consult with their legal advisors
concerning the impact of ERISA and the Code, the applicability of the Exemption
and PTCE 83-1 (described in the prospectus),

                                    S-122

<PAGE>

and the potential consequences in their specific circumstances, prior to making
an investment in the Offered Certificates. Moreover, each Plan fiduciary should
determine whether under the general fiduciary standards of ERISA, an investment
in the Offered Certificates is appropriate for the Plan, taking into account the
overall investment policy of the Plan and the composition of the Plan's
investment portfolio.

                              LEGAL INVESTMENT

     Generally, the Offered Certificates that are rated in one of the two
highest rating categories by at least one nationally recognized statistical
rating organization will constitute "mortgage related securities" under SMMEA.
The other Offered Certificates will not constitute "mortgage related securities"
under SMMEA. The appropriate characterization of the Offered Certificates under
various legal investment restrictions, and thus the ability of investors subject

to those restrictions to purchase Offered Certificates, may be subject to significant interpretive uncertainties. All investors whose investment authority is subject to legal restrictions should consult their own legal advisors to determine whether, and to what extent, the Offered Certificates will constitute legal investments for them.

No representations are made as to the proper characterization of the Offered Certificates for legal investment or financial institution regulatory purposes, or other purposes, or as to the ability of particular investors to purchase the Offered Certificates under applicable legal investment restrictions. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Offered Certificates) may adversely affect the liquidity of the Offered Certificates. See "Legal Investment" in the prospectus.

## USE OF PROCEEDS

Substantially all of the net proceeds to be received from the sale of the LIBOR Certificates will be applied by the Depositor to the purchase price of the Mortgage Loans.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions of the underwriting agreement dated February 28, 2003, and the terms agreement dated May 25, 2007, each between the Depositor and the Underwriter, the Offered Certificates are being purchased from the Depositor by the Underwriter. Distributions on the Offered Certificates will be made by the Underwriter from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. In connection with the sale of the Offered Certificates, the Underwriter may be deemed to have received compensation from the Depositor in the form of underwriting discounts.

The Depositor has been advised by the Underwriter that it intends to make a market in the Offered Certificates, but that the Underwriter has no obligation to do so. There can be no assurance that a secondary market for the Offered Certificates, or any particular class of Offered Certificates, will develop or, if it does develop, that it will continue or that such market will provide sufficient liquidity of investment. The Offered Certificates will not be listed on any national exchange.

The Depositor has agreed to indemnify the Underwriter against, or make contributions to the Underwriter with respect to, certain liabilities, including liabilities under the Securities Act of 1933, as amended.

S-123

<PAGE>

The Underwriter has agreed to reimburse the Depositor for certain expenses incurred in connection with the issuance of the certificates. Expenses incurred by the Depositor in connection with this offering are expected to be approximately $600,000.

Merrill Lynch is an affiliate of the Depositor, the Servicer and First Franklin Financial.

## LEGAL MATTERS

Certain legal matters will be passed upon for the Depositor and for the Underwriter by Dechert LLP, New York, New York.

## RATINGS

It is a condition of the issuance of the Offered Certificates that they be

assigned the ratings designated below by each of Moody's and S&P.

```
<TABLE>
<CAPTION>
CLASS OF CERTIFICATES    MOODY'S    S&P
---------------------    -------    ----
<S>                      <C>        <C>
A-1A.................    Aaa        AAA
A-1B.................    Aaa        AAA
A-1C.................    Aaa        AAA
A-1D.................    Aaa        AAA
A-2A.................    Aaa        AAA
A-2B.................    Aaa        AAA
A-2C.................    Aaa        AAA
A-2D.................    Aaa        AAA
M-1-1...............     Aa1        AA+
M-1-2...............     Aa1        AA+
M-2-1...............     Aa2        AA
M-2-2...............     Aa2        AA
M-3-1...............     Aa3        AA-
M-3-2...............     Aa3        AA-
M-4-1...............     A1         A+
M-4-2...............     A1         A+
M-5.................     A2         A
M-6.................     A3         A-
B-1.................     Baa1       BBB+
B-2.................     Baa2       BBB
B-3.................     Baa3       BBB-
R...................     NR         AAA
</TABLE>
```

        The security ratings assigned to the Offered Certificates should be
evaluated independently from similar ratings on other types of securities. A
security rating is not a recommendation to buy, sell or hold securities and may
be subject to revision or withdrawal at any time by the Rating Agencies. The
ratings on the Offered Certificates do not, however, constitute statements
regarding the likelihood or frequency of Principal Prepayments on the Mortgage
Loans, the payment of the Floating Rate Certificate Carryover or the anticipated
yields in light of Principal Prepayments.

        Moody's ratings on mortgage pass-through certificates address the
likelihood of the receipt by certificateholders of all distributions to which
such certificateholders are entitled. Moody's ratings

                                    S-124

<PAGE>

opinions address the structural and legal issues associated with the Offered
Certificates, including the nature of the underlying Mortgage Loans. Moody's
ratings on pass-through certificates do not represent any assessment of the
likelihood that Principal Prepayments may differ from those originally
anticipated nor do they address the possibility that, as a result of Principal
Prepayments, certificateholders may receive a lower than anticipated yield.

        S&P's ratings on mortgage pass-through certificates address the likelihood
of receipt by certificateholders of payments required under the operative
agreements. S&P's ratings take into consideration the credit quality of the
mortgage pool including any credit support providers, structural and legal
aspects associated with the certificates, and the extent to which the payment
stream of the mortgage pool is adequate to make payments required under the
certificates. S&P's ratings on mortgage pass-through certificates do not,
however, constitute a statement regarding the frequency of prepayments on the
mortgage loans or address the likelihood of receipt of Floating Rate Certificate

Carryover. S&P's ratings do not address the possibility that investors may suffer a lower than anticipated yield.

The Depositor has not requested a rating of the Offered Certificates by any rating agency other than Moody's and S&P. However, there can be no assurance as to whether any other rating agency will rate the Offered Certificates or, if it does, what ratings would be assigned by such other rating agency. The ratings assigned by any such other rating agency to the Offered Certificates could be lower than the respective ratings assigned by the Rating Agencies.

<div align="center">S-125</div>

&lt;PAGE&gt;

<div align="center">GLOSSARY OF DEFINED TERMS</div>

&lt;TABLE&gt;
&lt;S&gt;                              &lt;C&gt;

| | |
|---|---|
| 1/29 LIBOR LOANS | means Mortgage Loans that bear interest at a fixed rate for a period of approximately one year after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as Six-Month LIBOR Loans. |
| 2/28 LIBOR LOANS | means Mortgage Loans that bear interest at a fixed rate for a period of approximately two years after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as Six-Month LIBOR Loans. |
| 3/27 LIBOR LOANS | means Mortgage Loans that bear interest at a fixed rate for a period of approximately three years after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as Six-Month LIBOR Loans. |
| 5/25 LIBOR LOANS | means Mortgage Loans that bear interest at a fixed rate for a period of approximately five years after origination and thereafter have semi-annual interest rate and payment adjustments in substantially the same manner as Six-Month LIBOR Loans. |
| ACCOUNTS | means one or more accounts maintained by the Trustee or the Servicer pursuant to the Pooling and Servicing Agreement. |
| ACCRUAL PERIOD | means, with respect to the LIBOR Certificates and a Distribution Date, the period from and including the preceding Distribution Date (or from the Closing Date in the case of the first Distribution Date) to and including the day prior to such Distribution Date. |
| ADJUSTABLE RATE MORTGAGE LOAN | means a Mortgage Loan in the Trust Fund with an adjustable interest rate. |
| ADJUSTMENT DATE | means, with respect to an Adjustable Rate Mortgage Loan, generally the first day of the month or months specified in the related mortgage note. |

| | |
|---|---|
| ADVANCE | means, with respect to a Servicer Remittance Date, an advance of the Servicer's own funds, or funds in the related Collection Account that are not required to be distributed on the related Distribution Date that are required to be deposited pursuant to the Pooling and Servicing Agreement, in an amount generally equal to the aggregate amount of all payments of principal and interest (or, with respect to the Interest-Only Mortgage Loans and REO Property, payments of scheduled |

</TABLE>

S-126

<PAGE>

<TABLE>
<S>                    <C>

| | |
|---|---|
| | interest) on the Mortgage Loans (adjusted to the applicable Net Mortgage Rate) that were due on the related Due Date and delinquent on the related Servicer Remittance Date (other than the principal portion of any Balloon Amount, advances deemed non-recoverable by the Servicer, advances on each Mortgage Loan that is 150 days delinquent or more, and shortfalls in principal and interest due to bankruptcy proceedings or the application of the Servicemembers Civil Relief Act or similar state legislation or regulations) together with an amount equivalent to interest (adjusted to the Net Mortgage Rate) deemed due on each Mortgage Loan which is an REO Property (subject to the exceptions described above for advances on Mortgage Loans) such latter amount to be calculated after taking into account rental income. |
| APPLIED REALIZED LOSS AMOUNT | means, with respect to any class of Subordinate Certificates and as to any Distribution Date, the sum of the Realized Losses with respect to Mortgage Loans which have been applied in reduction of the Certificate Principal Balance of such class. |
| AVAILABLE FUNDS CAP | means any of the Group One Available Funds Cap, the Group Two Available Funds Cap or the Weighted Average Available Funds Cap. |
| BALLOON AMOUNT | means the balloon payment of the remaining outstanding principal balance of a mortgage loan. |
| BALLOON LOAN | means a mortgage loan having an original term to stated maturity of approximately 15 or 30 years and providing for level monthly payments generally based on a 30, 40 or 50 year amortization schedule with a payment of a Balloon Amount due on such mortgage loan at its stated maturity. |
| BOOK-ENTRY CERTIFICATES | means the LIBOR Certificates, other than any Definitive Certificates. |

| | |
|---|---|
| BUSINESS DAY | means any day other than (i) a Saturday or Sunday, (ii) a day on which the New York Stock Exchange or banking institutions in the State of Illinois, State of Pennsylvania or the City of New York, New York are authorized or obligated by law or executive order to be closed, or (iii) with respect to HLS only, any day on which the New York Stock Exchange is closed. |
| CAP CONTRACT COUNTERPARTY | means The Bank of New York, or a successor thereto. |
| CERTIFICATE ACCOUNT | means the one or more accounts established by the Trustee, for the benefit of the certificateholders, into |

</TABLE>

S-127

<PAGE>

<TABLE>
<S>                              <C>
which the Trustee is required to deposit or cause to be deposited certain payments received from the Servicer as described herein.

| | |
|---|---|
| CERTIFICATE OWNERS | means persons acquiring beneficial ownership interests in the LIBOR Certificates. |
| CERTIFICATE PRINCIPAL BALANCE | means, with respect to (A) any class of LIBOR Certificates and as of any Distribution Date, the outstanding principal balance of such class on the date of the initial issuance of the certificates as reduced, but not below zero, by (i) all amounts distributed on previous Distribution Dates on such class on account of principal; and (ii) such class's share of any Applied Realized Loss Amounts for previous Distribution Dates; notwithstanding the foregoing, on any Distribution Date relating to the preceding calendar month in which a Subsequent Recovery has been received by the Servicer, the Certificate Principal Balance of any class of Subordinate Certificates then outstanding for which any Applied Realized Loss Amount has been allocated will be increased, in order of seniority, by an amount equal to the lesser of (I) the Unpaid Realized Loss Amount for such class of certificates and (II) the total of any Subsequent Recovery distributed on such date to the certificateholders (reduced by the amount of the increase in the Certificate Principal Balance of any more senior class of certificates pursuant to this sentence on such Distribution Date); and (B) the Class C Certificates and as of any Distribution Date, the overcollateralization amount as of such Distribution Date. |
| CLASS A CERTIFICATES | means the Class A-1, Class A-2 and Class R Certificates. |

| | |
|---|---|
| CLASS A PRINCIPAL DISTRIBUTION AMOUNT | means (1) with respect to any Distribution Date prior to the related Stepdown Date or as to which a Stepdown Trigger Event exists, 100% of the Principal Distribution Amount for such Distribution Date and (2) with respect to any Distribution Date on or after the Stepdown Date and as to which a Stepdown Trigger Event does not exist, the excess of (A) the Certificate Principal Balance of the Class A Certificates immediately prior to such Distribution Date over (B) the lesser of (1) approximately 59.80% of the aggregate Stated Principal Balance of the Mortgage Loans as of such Distribution Date and (2) the excess of the aggregate Stated Principal Balance of the Mortgage Loans as of such Distribution Date over approximately $9,442,479; provided, however, that in no event will the Class A Principal Distribution Amount with respect to any Distribution Date exceed the aggregate Certificate Principal Balance of the Class A Certificates. |

</TABLE>

S-128

<PAGE>

<TABLE>
<S>                          <C>

| | |
|---|---|
| CLASS A-1 CERTIFICATES | means the Class A-1A, Class A-1B, Class A-1C and Class A-1D Certificates. |
| CLASS A-1 PRINCIPAL DISTRIBUTION AMOUNT | means, as of any Distribution Date, the amount equal to the lesser of (i) the aggregate Certificate Principal Balance of the Class A-1 and Class R Certificates and (ii) the product of (x) the Group One Principal Distribution Percentage and (y) the Class A Principal Distribution Amount; provided, however, that (A) with respect to any Distribution Date on which the Class A-1 and Class R Certificates are outstanding and the Certificate Principal Balances of the Class A-2 Certificates is reduced to zero, the Class A-2 Principal Distribution Amount in excess of the amount necessary to reduce the Certificate Principal Balance of the Class A-2 Certificates to zero will be applied to increase the Class A-1 Principal Distribution Amount and (B) with respect to any Distribution Date thereafter, the Class A-1 Principal Distribution Amount will equal the Class A Principal Distribution Amount. |
| CLASS A-1A CERTIFICATE | means any certificate designated as a "Class A-1A Certificate" on the face thereof and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS A-1B CERTIFICATE | means any certificate designated as a "Class A-1B Certificate" on the face thereof, substantially in the form exhibited in the |

|                              |                                                                                                                                                                                                                                                              |
| ---------------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|                              | Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.                                                                                                                  |
| CLASS A-1C CERTIFICATE       | means any certificate designated as a "Class A-1C Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS A-1D CERTIFICATE       | means any certificate designated as a "Class A-1D Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS A-2 CERTIFICATES       | means the Class A-2A, Class A-2B, Class A-2C and Class A-2D Certificates.                                                                                                                                                                                     |
| CLASS A-2 PRINCIPAL DISTRIBUTION AMOUNT | means, as of any Distribution Date, the amount equal to the lesser of (i) the aggregate Certificate Principal Balance of the Class A-2 Certificates and (ii) the product                                                                            |

</TABLE>


S-129

<PAGE>

<TABLE>
<S>                            <C>

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| ------------------------ | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                          | of (x) the Group Two Principal Distribution Percentage and (y) the Class A Principal Distribution Amount; provided, however, that (A) with respect to any Distribution Date on which the Class A-2 Certificates are outstanding and the Certificate Principal Balances of the Class A-1 and Class R Certificates is reduced to zero, the Class A-1 Principal Distribution Amount in excess of the amount necessary to reduce the Certificate Principal Balance of the Class A-1 Certificates and Class R Certificates to zero will be applied to increase the Class A-2 Principal Distribution Amount and (B) with respect to any Distribution Date thereafter, the Class A-2 Principal Distribution Amount will equal the Class A Principal Distribution Amount. |
| CLASS A-2A CERTIFICATE   | means any certificate designated as a "Class A-2A Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS A-2B CERTIFICATE   | means any certificate designated as a "Class A-2B Certificate" on the face thereof,                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                   |

<table>
<tr><td></td><td>substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.</td></tr>
<tr><td>CLASS A-2C CERTIFICATE</td><td>means any certificate designated as a "Class A-2C Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.</td></tr>
<tr><td>CLASS A-2D CERTIFICATE</td><td>means any certificate designated as a "Class A-2D Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.</td></tr>
<tr><td>CLASS B CERTIFICATES</td><td>means the Class B-1, Class B-2 and Class B-3 Certificates.</td></tr>
<tr><td>CLASS B-1 CERTIFICATE</td><td>means any certificate designated as a "Class B-1 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.</td></tr>
<tr><td>CLASS B-1 PRINCIPAL DISTRIBUTION AMOUNT</td><td>means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the aggregate Certificate Principal Balance of the Class A and Class M Certificates has been reduced to</td></tr>
</table>

&lt;/TABLE&gt;


                              S-130


&lt;PAGE&gt;


&lt;TABLE&gt;
&lt;S&gt;                           &lt;C&gt;
                              zero and a Stepdown Trigger Event exists, or,
                              as long as a Stepdown Trigger Event does not
                              exist, the excess of (1) the sum of (A) the
                              Certificate Principal Balance of the Class A
                              Certificates (after taking into account
                              distributions of the Class A Principal
                              Distribution Amount to the Class A Certificates
                              for such Distribution Date), (B) the
                              Certificate Principal Balance of the Class M-1
                              Certificates (after taking into account
                              distributions of the Class M-1 Principal
                              Distribution Amount to the Class M-1
                              Certificates for such Distribution Date), (C)
                              the Certificate Principal Balance of the Class
                              M-2 Certificates (after taking into account
                              distributions of the Class M-2 Principal
                              Distribution Amount to the Class M-2
                              Certificates for such Distribution Date), (D)

the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date), (G) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account distributions of the Class M-6 Principal Distribution Amount to the Class M-6 Certificates for such Distribution Date) and (H) the Certificate Principal Balance of the Class B-1 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 89.90% of the aggregate Stated Principal Balance of the Mortgage Loans and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans over approximately $9,442,479. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A and Class M Certificates has been reduced to zero, the Class B-1 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class B-1 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A and Class M Certificates and (2) in no event will the Class B-1 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class B-1 Certificates.

CLASS B-2 CERTIFICATE          means any certificate designated as a "Class B-2 Certificate" on the face thereof, substantially in the form

&lt;/TABLE&gt;

S-131

&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;S&gt;                            &lt;C&gt;
                               exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.

CLASS B-2 PRINCIPAL            means, with respect to any Distribution Date on
DISTRIBUTION AMOUNT            or after the Stepdown Date, 100% of the Principal Distribution Amount if the aggregate Certificate Principal Balance of the Class A,

Class M and Class B-1 Certificates has been
reduced to zero and a Stepdown Trigger Event
exists, or, as long as a Stepdown Trigger Event
does not exist, the excess of (1) the sum of
(A) the Certificate Principal Balance of the
Class A Certificates (after taking into account
distributions of the Class A Principal
Distribution Amount to the Class A Certificates
for such Distribution Date), (B) the
Certificate Principal Balance of the Class M-1
Certificates (after taking into account
distributions of the Class M-1 Principal
Distribution Amount to the Class M-1
Certificates for such Distribution Date), (C)
the Certificate Principal Balance of the Class
M-2 Certificates (after taking into account
distributions of the Class M-2 Principal
Distribution Amount to the Class M-2
Certificates for such Distribution Date), (D)
the Certificate Principal Balance of the Class
M-3 Certificates (after taking into account
distributions of the Class M-3 Principal
Distribution Amount to the Class M-3
Certificates for such Distribution Date), (E)
the Certificate Principal Balance of the Class
M-4 Certificates (after taking into account
distributions of the Class M-4 Principal
Distribution Amount to the Class M-4
Certificates for such Distribution Date), (F)
the Certificate Principal Balance of the Class
M-5 Certificates (after taking into account
distributions of the Class M-5 Principal
Distribution Amount to the Class M-5
Certificates for such Distribution Date), (G)
the Certificate Principal Balance of the Class
M-6 Certificates (after taking into account
distributions of the Class M-6 Principal
Distribution Amount to the Class M-6
Certificates for such Distribution Date), (H)
the Certificate Principal Balance of the Class
B-1 Certificates (after taking into account
distributions of the Class B-1 Principal
Distribution Amount to the Class B-1
Certificates for such Distribution Date) and
(I) the Certificate Principal Balance of the
Class B-2 Certificates immediately prior to
such Distribution Date over (2) the lesser of
(A) approximately 91.90% of the aggregate
Stated Principal Balance of the Mortgage Loans
and (B) the excess of the aggregate Stated
Principal Balance of the Mortgage Loans over
approximately $9,442,479. Notwithstanding the
above, (1) on any Distribution Date prior to
the Stepdown Date on which the aggregate
Certificate Principal Balance of the Class A,
Class M and Class B-1

&lt;/TABLE&gt;

S-132

&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;S&gt; &lt;C&gt;

Certificates has been reduced to zero, the Class B-2 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class B-2 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M and Class B-1 Certificates and (2) in no event will the Class B-2 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class B-2 Certificates.

| | |
|---|---|
| CLASS B-3 CERTIFICATE | means any certificate designated as a "Class B-3 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS B-3 PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the aggregate Certificate Principal Balance of the Class A, Class M, Class B-1 and Class B-2 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date), (G) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account distributions of the Class M-6 Principal Distribution Amount to the Class M-6 Certificates for such Distribution Date), (H) the |

S-133

<PAGE>

<TABLE>
<S>                                  <C>
                                     Certificate Principal Balance of the Class B-1
                                     Certificates (after taking into account
                                     distributions of the Class B-1 Principal
                                     Distribution Amount to the Class B-1
                                     Certificates for such Distribution Date), (I)
                                     the Certificate Principal Balance of the Class
                                     B-2 Certificates (after taking into account
                                     distributions of the Class B-2 Principal
                                     Distribution Amount to the Class B-2
                                     Certificates for such Distribution Date) and
                                     (J) the Certificate Principal Balance of the
                                     Class B-3 Certificates immediately prior to
                                     such Distribution Date over (2) the lesser of
                                     (A) approximately 94.40% of the aggregate
                                     Stated Principal Balance of the Mortgage Loans
                                     and (B) the excess of the aggregate Stated
                                     Principal Balance of the Mortgage Loans over
                                     approximately $9,442,479. Notwithstanding the
                                     above, (1) on any Distribution Date prior to
                                     the Stepdown Date on which the aggregate
                                     Certificate Principal Balance of the Class A,
                                     Class M, Class B-1 and Class B-2 Certificates
                                     has been reduced to zero, the Class B-3
                                     Principal Distribution Amount will equal the
                                     lesser of (A) the outstanding Certificate
                                     Principal Balance of the Class B-3 Certificates
                                     and (B) 100% of the Principal Distribution
                                     Amount remaining after any distributions on the
                                     Class A, Class M, Class B-1 and Class B-2
                                     Certificates and (2) in no event will the Class
                                     B-3 Principal Distribution Amount with respect
                                     to any Distribution Date exceed the Certificate
                                     Principal Balance of the Class B-3
                                     Certificates.

CLASS C CERTIFICATE                  means any certificate, which is not being
                                     offered in this prospectus supplement,
                                     designated as a "Class C Certificate" on the
                                     face thereof, substantially in the form
                                     exhibited in the Pooling and Servicing
                                     Agreement, and representing the right to
                                     distributions as set forth herein and in the
                                     Pooling and Servicing Agreement.

CLASS M CERTIFICATES                 means the Class M-1, Class M-2, Class M-3,
                                     Class M-4, Class M-5 and Class M-6
                                     Certificates.

CLASS M-1 CERTIFICATES               means the Class M-1-1 and Class M-1-2
                                     Certificates.

CLASS M-1-1 CERTIFICATE              means any certificate designated as a "Class
                                     M-1-1 Certificate" on the face thereof,
                                     substantially in the form exhibited in the
                                     Pooling and Servicing Agreement, and
                                     representing the right to distributions as set
</TABLE>

                                     forth herein and in the Pooling and Servicing
                                     Agreement.

CLASS M-1-2 CERTIFICATE              means any certificate designated as a "Class
                                     M-1-2 Certificate" on the face thereof,
                                     substantially in the form exhibited in the
                                     Pooling and Servicing Agreement, and
                                     representing the right to distributions as set
                                     forth herein and in the Pooling and Servicing
                                     Agreement.

</TABLE>


                                     S-134


<PAGE>

<TABLE>
<S>                                  <C>
CLASS M-1 PRINCIPAL                  means, with respect to any Distribution Date on
DISTRIBUTION AMOUNT                  or after the Stepdown Date, 100% of the
                                     Principal Distribution Amount if the aggregate
                                     Certificate Principal Balance of the Class A
                                     Certificates has been reduced to zero and a
                                     Stepdown Trigger Event exists, or, as long as a
                                     Stepdown Trigger Event does not exist, the
                                     excess of (1) the sum of (A) the aggregate
                                     Certificate Principal Balance of the Class A
                                     Certificates (after taking into account
                                     distributions of the Class A Principal
                                     Distribution Amount to the Class A Certificates
                                     for such Distribution Date) and (B) the
                                     Certificate Principal Balance of the Class M-1
                                     Certificates immediately prior to such
                                     Distribution Date over (2) the lesser of (A)
                                     approximately 70.00% of the aggregate Stated
                                     Principal Balance of the Mortgage Loans and (B)
                                     the excess of the aggregate Stated Principal
                                     Balance of the Mortgage Loans over
                                     approximately $9,442,479. Notwithstanding the
                                     above, (1) on any Distribution Date prior to
                                     the Stepdown Date on which the aggregate
                                     Certificate Principal Balance of the Class A
                                     Certificates has been reduced to zero, the
                                     Class M-1 Principal Distribution Amount will
                                     equal the lesser of (A) the outstanding
                                     Certificate Principal Balance of the Class M-1
                                     Certificates and (B) 100% of the Principal
                                     Distribution Amount remaining after any
                                     distributions on the Class A Certificates and
                                     (2) in no event will the Class M-1 Principal
                                     Distribution Amount with respect to any
                                     Distribution Date exceed the Certificate
                                     Principal Balance of the Class M-1
                                     Certificates.

CLASS M-2 CERTIFICATES               means the Class M-2-1 and Class M-2-2
                                     Certificates.

CLASS M-2-1 CERTIFICATE              means any certificate designated as a "Class
                                     M-2-1 Certificate" on the face thereof,
                                     substantially in the form exhibited in the
                                     Pooling and Servicing Agreement, and
                                     representing the right to distributions as set
                                     forth herein and in the Pooling and Servicing

Agreement.

| | |
|---|---|
| CLASS M-2-2 CERTIFICATE | means any certificate designated as a "Class M-2-2 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS M-2 PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the Certificate Principal Balance of each class of Class A and Class M-1 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the aggregate Certificate Principal |

</TABLE>

S-135

<PAGE>

<TABLE>
<S>                          <C>

Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date) and (C) the Certificate Principal Balance of the Class M-2 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 78.30% of the aggregate Stated Principal Balance of the Mortgage Loans and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans over approximately $9,442,479. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A and Class M-1 Certificates has been reduced to zero, the Class M-2 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class M-2 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A and Class M-1 Certificates and (2) in no event will the Class M-2 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-2 Certificates.

| | |
|---|---|
| CLASS M-3 CERTIFICATES | means the Class M-3-1 and Class M-3-2 Certificates. |
| CLASS M-3-1 CERTIFICATE | means any certificate designated as a "Class |

                                     M-3-1 Certificate" on the face thereof,
                                     substantially in the form exhibited in the
                                     Pooling and Servicing Agreement, and
                                     representing the right to distributions as set
                                     forth herein and in the Pooling and Servicing
                                     Agreement.

CLASS M-3-2 CERTIFICATE              means any certificate designated as a "Class
                                     M-3-2 Certificate" on the face thereof,
                                     substantially in the form exhibited in the
                                     Pooling and Servicing Agreement, and
                                     representing the right to distributions as set
                                     forth herein and in the Pooling and Servicing
                                     Agreement.

CLASS M-3 PRINCIPAL                  means, with respect to any Distribution Date on
DISTRIBUTION AMOUNT                  or after the Stepdown Date, 100% of the
                                     Principal Distribution Amount if the
                                     Certificate Principal Balance of each class of
                                     Class A, Class M-1 and Class M-2 Certificates
                                     has been reduced to zero and a Stepdown Trigger
                                     Event exists, or, as long as a Stepdown Trigger
                                     Event does not exist, the excess of (1) the sum
                                     of (A) the aggregate Certificate Principal
                                     Balance of the Class A Certificates (after
                                     taking into account distributions of the Class
                                     A Principal Distribution Amount to the Class A

</TABLE>


                                      S-136


<PAGE>

<TABLE>
<S>                                  <C>
                                     Certificates for such Distribution Date), (B)
                                     the Certificate Principal Balance of the Class
                                     M-1 Certificates (after taking into account
                                     distributions of the Class M-1 Principal
                                     Distribution Amount to the Class M-1
                                     Certificates for such Distribution Date), (C)
                                     the Certificate Principal Balance of the Class
                                     M-2 Certificates (after taking into account
                                     distributions of the Class M-2 Principal
                                     Distribution Amount to the Class M-2
                                     Certificates for such Distribution Date), and
                                     (D) the Certificate Principal Balance of the
                                     Class M-3 Certificates immediately prior to
                                     such Distribution Date over (2) the lesser of
                                     (A) approximately 80.60% of the aggregate
                                     Stated Principal Balance of the Mortgage Loans
                                     and (B) the excess of the aggregate Stated
                                     Principal Balance of the Mortgage Loans over
                                     approximately $9,442,479. Notwithstanding the
                                     above, (1) on any Distribution Date prior to
                                     the Stepdown Date on which the aggregate
                                     Certificate Principal Balance of the Class A,
                                     Class M-1 and Class M-2 Certificates has been
                                     reduced to zero, the Class M-3 Principal
                                     Distribution Amount will equal the lesser of
                                     (A) the outstanding Certificate Principal
                                     Balance of the Class M-3 Certificates and (B)
                                     100% of the Principal Distribution Amount
                                     remaining after any distributions on the Class

|  | A, Class M-1 and Class M-2 Certificates and (2) in no event will the Class M-3 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-3 Certificates. |
|---|---|
| CLASS M-4 CERTIFICATES | means the Class M-4-1 and Class M-4-2 Certificates. |
| CLASS M-4-1 CERTIFICATE | means any certificate designated as a "Class M-4-1 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS M-4-2 CERTIFICATE | means any certificate designated as a "Class M-4-2 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS M-4 PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the Certificate Principal Balance of each class of Class A, Class M-1, Class M-2 and Class M-3 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the aggregate Certificate Principal Balance of the Class A |

</TABLE>

S-137

<PAGE>

<TABLE>
<S>                              <C>
                                 Certificates (after taking into account
                                 distributions of the Class A Principal
                                 Distribution Amount to the Class A Certificates
                                 for such Distribution Date), (B) the
                                 Certificate Principal Balance of the Class M-1
                                 Certificates (after taking into account
                                 distributions of the Class M-1 Principal
                                 Distribution Amount to the Class M-1
                                 Certificates for such Distribution Date), (C)
                                 the Certificate Principal Balance of the Class
                                 M-2 Certificates (after taking into account
                                 distributions of the Class M-2 Principal
                                 Distribution Amount to the Class M-2
                                 Certificates for such Distribution Date), (D)
                                 the Certificate Principal Balance of the Class
                                 M-3 Certificates (after taking into account
                                 distributions of the Class M-3 Principal
                                 Distribution Amount to the Class M-3
                                 Certificates for such Distribution Date), and
                                 (E) the Certificate Principal Balance of the

Class M-4 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 83.50% of the aggregate Stated Principal Balance of the Mortgage Loans and (B) the excess of the aggregate Stated Principal Balance of the Mortgage Loans over approximately $9,442,479. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2 and Class M-3 Certificates has been reduced to zero, the Class M-4 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class M-4 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M-1, Class M-2 and Class M-3 Certificates and (2) in no event will the Class M-4 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-4 Certificates.

| | |
|---|---|
| CLASS M-5 CERTIFICATE | means any certificate designated as a "Class M-5 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS M-5, CLASS M-6 AND CLASS B CERTIFICATE CORRIDOR CONTRACT | means a confirmation and agreement between the Trustee, on behalf of the Issuing Entity, and the Cap Contract Counterparty for the benefit of the Class M-5, Class M-6 and Class B Certificates. |
| CLASS M-5, CLASS M-6 AND CLASS B CERTIFICATE CORRIDOR CONTRACT NOTIONAL BALANCE | means, as of any Distribution Date, the notional balance of the Class M-5, Class M-6 and Class B Certificate Corridor Contract set forth on the table on page S-71. |

</TABLE>


S-138


<PAGE>


<TABLE>
<S>                           <C>

| | |
|---|---|
| CLASS M-5, CLASS M-6 AND CLASS B CERTIFICATE LOWER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1ML Strike Lower Collar" in the Class M-5, Class M-6 and Class B Certificate Derivative LIBOR Corridor Table on page S-71. |
| CLASS M-5, CLASS M-6 AND CLASS B CERTIFICATE UPPER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1ML Strike Upper Collar" in the Class M-5, Class M-6 and Class B Certificate Derivative LIBOR Corridor Table on page S-71. |
| CLASS M-5 PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the |

Principal Distribution Amount if the
Certificate Principal Balance of each class of
Class A, Class M-1, Class M-2, Class M-3 and
Class M-4 Certificates has been reduced to zero
and a Stepdown Trigger Event exists, or, as
long as a Stepdown Trigger Event does not
exist, the excess of (1) the sum of (A) the
aggregate Certificate Principal Balance of the
Class A Certificates (after taking into account
distributions of the Class A Principal
Distribution Amount to the Class A Certificates
for such Distribution Date), (B) the
Certificate Principal Balance of the Class M-1
Certificates (after taking into account
distributions of the Class M-1 Principal
Distribution Amount to the Class M-1
Certificates for such Distribution Date), (C)
the Certificate Principal Balance of the Class
M-2 Certificates (after taking into account
distributions of the Class M-2 Principal
Distribution Amount to the Class M-2
Certificates for such Distribution Date), (D)
the Certificate Principal Balance of the Class
M-3 Certificates (after taking into account
distributions of the Class M-3 Principal
Distribution Amount to the Class M-3
Certificates for such Distribution Date), (E)
the Certificate Principal Balance of the Class
M-4 Certificates (after taking into account
distributions of the Class M-4 Principal
Distribution Amount to the Class M-4
Certificates for such Distribution Date) and
(F) the Certificate Principal Balance of the
Class M-5 Certificates immediately prior to
such Distribution Date over (2) the lesser of
(A) approximately 86.00% of the aggregate
Stated Principal Balance of the Mortgage Loans
and (B) the excess of the aggregate Stated
Principal Balance of the Mortgage Loans over
approximately $9,442,479. Notwithstanding the
above, (1) on any Distribution Date prior to
the Stepdown Date on which the aggregate
Certificate Principal Balance of the Class A,
Class M-1, Class M-2, Class M-3 and Class M-4
Certificates has been reduced

&lt;/TABLE&gt;


                    S-139


&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;S&gt;                        &lt;C&gt;
                           to zero, the Class M-5 Principal Distribution
                           Amount will equal the lesser of (A) the
                           outstanding Certificate Principal Balance of
                           the Class M-5 Certificates and (B) 100% of the
                           Principal Distribution Amount remaining after
                           any distributions on the Class A, Class M-1,
                           Class M-2, Class M-3 and Class M-4 Certificates
                           and (2) in no event will the Class M-5
                           Principal Distribution Amount with respect to
                           any Distribution Date exceed the Certificate
                           Principal Balance of the Class M-5

Certificates.

| | |
|---|---|
| CLASS M-6 CERTIFICATE | means any certificate designated as a "Class M-6 Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement. |
| CLASS M-6 PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to any Distribution Date on or after the Stepdown Date, 100% of the Principal Distribution Amount if the Certificate Principal Balance of each class of Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates has been reduced to zero and a Stepdown Trigger Event exists, or, as long as a Stepdown Trigger Event does not exist, the excess of (1) the sum of (A) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account distributions of the Class A Principal Distribution Amount to the Class A Certificates for such Distribution Date), (B) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account distributions of the Class M-1 Principal Distribution Amount to the Class M-1 Certificates for such Distribution Date), (C) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account distributions of the Class M-2 Principal Distribution Amount to the Class M-2 Certificates for such Distribution Date), (D) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account distributions of the Class M-3 Principal Distribution Amount to the Class M-3 Certificates for such Distribution Date), (E) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account distributions of the Class M-4 Principal Distribution Amount to the Class M-4 Certificates for such Distribution Date), (F) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account distributions of the Class M-5 Principal Distribution Amount to the Class M-5 Certificates for such Distribution Date) and (G) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date over (2) the lesser of (A) approximately 87.80% of the aggregate Stated Principal |

</TABLE>


S-140


<PAGE>


<TABLE>
<S>                              <C>
                                 Balance of the Mortgage Loans and (B) the
                                 excess of the aggregate Stated Principal

Balance of the Mortgage Loans over approximately $9,442,479. Notwithstanding the above, (1) on any Distribution Date prior to the Stepdown Date on which the aggregate Certificate Principal Balance of the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates has been reduced to zero, the Class M-6 Principal Distribution Amount will equal the lesser of (A) the outstanding Certificate Principal Balance of the Class M-6 Certificates and (B) 100% of the Principal Distribution Amount remaining after any distributions on the Class A, Class M-1, Class M-2, Class M-3, Class M-4 and Class M-5 Certificates and (2) in no event will the Class M-6 Principal Distribution Amount with respect to any Distribution Date exceed the Certificate Principal Balance of the Class M-6 Certificates.

CLASS P CERTIFICATE     means any certificate, which is not being offered in this prospectus supplement, designated as a "Class P Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.

CLASS R CERTIFICATE     means any certificate designated as a "Class R Certificate" on the face thereof, substantially in the form exhibited in the Pooling and Servicing Agreement, and representing the right to distributions as set forth herein and in the Pooling and Servicing Agreement.

CLEARSTREAM LUXEMBOURG     means Clearstream Banking, societe anonyme.

CLOSING DATE     means on or about May 30, 2007.

CODE     means the Internal Revenue Code of 1986, as amended.

COLLATERAL VALUE     means, with respect to a Mortgage Loan the proceeds of which were used to purchase the related mortgaged property, the lesser of (x) the appraised value of such mortgaged property based on an appraisal made for the originator by an independent fee appraiser at the time of the origination of the related Mortgage Loan and (y) the sales price of such mortgaged property at such time of origination and means, with respect to a Mortgage Loan the proceeds of which were used to refinance an existing Mortgage Loan, the appraised value of the mortgaged property based upon the appraisal obtained at the time of refinancing.

COLLECTION ACCOUNT     means the one or more accounts established by the Servicer, for the benefit of the certificateholders, into

&lt;/TABLE&gt;

<PAGE>

<TABLE>
<S>                                  <C>
                                     which the Servicer is required to deposit or
                                     cause to be deposited certain payments
                                     described in the Pooling and Servicing
                                     Agreement.

COMPENSATING INTEREST                means, for any Distribution Date, the amount of
                                     the Servicing Fee otherwise payable to the
                                     Servicer for the related month, which the
                                     Servicer is obligated to deposit into the
                                     Collection Account for distribution to
                                     certificateholders on that Distribution Date,
                                     in an amount up to the amount of any shortfall
                                     in interest payments resulting from Principal
                                     Prepayments in full received during the period
                                     from and including the 15th day of the month
                                     preceding the Distribution Date through and
                                     including the last day of the month preceding
                                     the Distribution Date with respect to Mortgage
                                     Loans serviced by the Servicer; provided that
                                     any such deposit in reduction of the Servicing
                                     Fee otherwise payable to the Servicer with
                                     respect to that Distribution Date will be
                                     limited to the product of (1) one-twelfth of
                                     0.25% per annum and (2) the aggregate Stated
                                     Principal Balance of the Mortgage Loans on the
                                     related Distribution Date.

CPR OR CONSTANT PREPAYMENT           means a prepayment assumption which represents
RATE                                 a constant assumed rate of prepayment each
                                     month relative to the then outstanding
                                     principal balance of a pool of mortgage loans
                                     for the life of such mortgage loans. For
                                     example, 28% CPR assumes a constant prepayment
                                     rate of 28% per annum.

CO-OP LOAN                           means a Mortgage Loan secured by the stock
                                     allocated to a cooperative unit in a
                                     residential cooperative housing corporation.

CORRIDOR CONTRACT                    means any of the Group One Corridor Contract,
                                     the Group Two Corridor Contract or the Class
                                     M-5, Class M-6 and Class B Certificate Corridor
                                     Contract.

CORRIDOR CONTRACT ACCOUNT            means the separate account into which payments
                                     received on the Corridor Contracts will be
                                     deposited.

CORRIDOR CONTRACT NOTIONAL           means any of the Group One Corridor Contract
BALANCE                              Notional Balance, the Group Two Corridor
                                     Contract Notional Balance or the Class M-5,
                                     Class M-6 and Class B Certificate Corridor
                                     Contract Notional Balance.

CORRIDOR CONTRACT TERMINATION        means the Distribution Date in November 2007.
DATE

CREDIT SCORES                        means statistical credit scores obtained by
                                     many mortgage lenders in connection with a loan
                                     application. The credit score used for purposes
</TABLE>

of this prospectus supplement is the FICO
Score.

S-142

<PAGE>

<TABLE>
<S>                                 <C>
CURRENT INTEREST                    means, with respect to each class of the LIBOR
                                    Certificates and each Distribution Date, the
                                    interest accrued at the applicable Pass-Through
                                    Rate for the applicable Accrual Period on the
                                    Certificate Principal Balance of such class as
                                    of such Distribution Date plus any amount
                                    previously distributed with respect to Current
                                    Interest or Interest Carry Forward Amounts for
                                    such class that is recovered as a voidable
                                    preference by a trustee in bankruptcy less any
                                    Prepayment Interest Shortfalls allocated to
                                    such class on such Distribution Date.

CUT-OFF DATE                        means May 1, 2007.

DEFAULTED SWAP TERMINATION          means any payment required to be made by the
PAYMENT                             Supplemental Interest Trust to the Swap
                                    Counterparty pursuant to the Swap Agreement as
                                    a result of an event of default under the Swap
                                    Agreement with respect to which the Swap
                                    Counterparty is the defaulting party or a
                                    termination event (including a Downgrade
                                    Termination Event) under that agreement (other
                                    than illegality or a tax event) with respect to
                                    which the Swap Counterparty is the sole
                                    Affected Party (as determined under the Swap
                                    Agreement).

DEFINITIVE CERTIFICATE              means a physical certificate representing a
                                    LIBOR Certificate. On the Closing Date, the
                                    Class R Certificate will be a Definitive
                                    Certificate.

DEPOSITOR                           means Merrill Lynch Mortgage Investors, Inc.

DERIVATIVE LIBOR                    means the London interbank offered rate for
                                    one-month United States dollar deposits as
                                    determined in accordance with the Corridor
                                    Contracts and Swap Agreement, as applicable.

DESIGNATED TRANSACTION              means a transaction in which the assets
                                    underlying the certificates consist of
                                    single-family residential, multi-family
                                    residential, home equity, manufactured housing
                                    and/or commercial mortgage obligations that are
                                    secured by single-family residential,
                                    multi-family residential, commercial real
                                    property or leasehold interests therein.

DETERMINATION DATE                  means, with respect to a Distribution Date, the
                                    15th day of the month of such Distribution Date
                                    (or, if not a Business Day, the immediately
                                    preceding Business Day).

DISTRIBUTION DATE                  means the 25th day of each month beginning in
                                   June 2007, or if such day is not a Business
                                   Day, the first Business Day thereafter.


</TABLE>


                               S-143


<PAGE>

<TABLE>
<S>                                <C>
DOWNGRADE TERMINATION EVENT        means an event whereby (x) the Swap
                                   Counterparty (or its guarantor) ceases to have
                                   short term unsecured and/or long term debt
                                   ratings at least equal to the levels specified
                                   in the Swap Agreement, and (y) the Swap
                                   Counterparty has failed to complete at least
                                   one of the following events (except to the
                                   extent otherwise approved by the Ratings
                                   Agencies): (i) post collateral securing its
                                   obligations under the Swap Agreement and (ii)
                                   obtain a guarantor or a substitute swap
                                   counterparty acceptable to the Supplemental
                                   Interest Trust Trustee and the Rating Agencies
                                   (if required under the Swap Agreement) that
                                   will assume the obligations of the Swap
                                   Counterparty under the Swap Agreement.

DTC                                means The Depository Trust Company.

DUE DATE                           means a scheduled monthly payment date for any
                                   Mortgage Loan.

DUE PERIOD                         means, with respect to any Distribution Date,
                                   the period beginning on the second day of the
                                   calendar month preceding the calendar month in
                                   which such Distribution Date occurs and ending
                                   on the first day in the month in which such
                                   Distribution Date occurs.

ERISA                              means the Employee Retirement Income Security
                                   Act of 1974, as amended.

EUROCLEAR                          means the Euroclear System.

EUROCLEAR OPERATOR                 means Euroclear Bank S.A./N.V., a bank
                                   incorporated under the laws of the Kingdom of
                                   Belgium.

EUROPEAN DEPOSITARIES              means Citibank, N.A., as depositary for
                                   Clearstream Luxembourg, and JPMorgan Chase
                                   Bank, as depositary for Euroclear,
                                   collectively.

EXEMPTION                          means PTE 90-29 (Exemption Application No.
                                   D-8012, 55 Fed. Reg. 21459 (1990)), as amended,
                                   granted by the U.S. Department of Labor to
                                   Merrill Lynch and its affiliates, or any
                                   substantially similar administrative exemption
                                   granted by the U.S. Department of Labor to an
                                   underwriter as amended.

EXTRA PRINCIPAL DISTRIBUTION       means, with respect to any Distribution Date,

AMOUNT                          (1) prior to the Stepdown Date, the excess of
                                (A) the sum of (x) the aggregate Certificate
                                Principal Balance of the LIBOR Certificates
                                reduced by the Principal Funds with respect to
                                such Distribution Date and (y) approximately
                                $52,877,883 over (B) the aggregate Stated
                                Principal Balance of the Mortgage Loans and (2)
                                on and after the Stepdown Date, (A) the sum of
                                (x) the aggregate

</TABLE>


                                    S-144


<PAGE>

<TABLE>
<S>                             <C>
                                Certificate Principal Balance of the LIBOR
                                Certificates reduced by the Principal Funds
                                with respect to such Distribution Date and (y)
                                the greater of (a) 5.60% of the aggregate
                                Stated Principal Balance of the Mortgage Loans
                                as of such Distribution Date and (b)
                                approximately $9,442,479 less (B) the aggregate
                                Stated Principal Balance of the Mortgage Loans;
                                provided, however, that if on any Distribution
                                Date a Stepdown Trigger Event is in effect, the
                                Extra Principal Distribution Amount will not be
                                reduced to the applicable percentage of then
                                current Stated Principal Balance of the
                                Mortgage Loans (and will remain fixed at the
                                applicable percentage of the Stated Principal
                                Balance of the Mortgage Loans as of the Due
                                Date immediately prior to the Stepdown Trigger
                                Event) until the next Distribution Date on
                                which the Stepdown Trigger Event is not in
                                effect.

FANNIE MAE                      means Fannie Mae or any successor.

FICO SCORE                      means a statistical ranking of likely future
                                credit performance developed by Fair, Isaac &
                                Company and the three national credit
                                repositories: Equifax, TransUnion and First
                                American (f/k/a Experian, which was f/k/a TRW).

FIRST FRANKLIN FINANCIAL        means First Franklin Financial Corporation, a
                                Delaware corporation.

FIRST FRANKLIN UNDERWRITING     means the underwriting standards and guidelines
GUIDELINES                      established by First Franklin Financial and
                                further described under the heading
                                "Underwriting Guidelines."

FINANCIAL INTERMEDIARY          means a bank, brokerage firm, thrift
                                institution or other financial intermediary.

FITCH                           means Fitch, Inc. or any successor.

FIXED RATE MORTGAGE LOAN        means a Mortgage Loan in the Trust Fund with a
                                fixed interest rate.

FIXED SWAP PAYMENT              means, for each Distribution Date, the product
                                of (i) a per annum rate for such Distribution

Date as set forth under the heading "Fixed
Strike Rate" in the Swap Agreement Notional
Balance Table on page S-73, determined on the
basis of a 360-day year consisting of twelve
30-day months and (ii) the notional balance as
set forth under the heading "Notional Balance"
for the related Distribution Date in the Swap
Agreement Notional Balance Table set forth in
the table on page S-73.

&lt;/TABLE&gt;

<div align="center">S-145</div>

&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;S&gt;                                      &lt;C&gt;
FLOATING RATE CERTIFICATE               means, with respect to a Distribution Date, in
CARRYOVER                               the event that the Pass-Through Rate for a
                                        class of LIBOR Certificates is based upon the
                                        related Available Funds Cap or the related
                                        Maximum Rate Cap, the sum of (A) the excess of
                                        (1) the amount of interest that such class
                                        would have been entitled to receive on such
                                        Distribution Date had the Pass-Through Rate for
                                        that class not been calculated based on the
                                        related Available Funds Cap or the related
                                        Maximum Rate Cap, up to but not exceeding the
                                        greater of (a) the related Maximum Rate Cap or
                                        (b) the sum of (i) the related Available Funds
                                        Cap and (ii) the product of (AA) a fraction,
                                        the numerator of which is 360 and the
                                        denominator of which is the actual number of
                                        days in the related Accrual Period and (BB) the
                                        sum of (x) the quotient of (I) an amount equal
                                        to the proceeds, if any, payable under the
                                        related Corridor Contract with respect to such
                                        Distribution Date and (II) the aggregate
                                        Certificate Principal Balance of each of the
                                        Classes of Certificates to which such Corridor
                                        Contract relates for such Distribution Date and
                                        (y) the quotient obtained by dividing (I) any
                                        Net Swap Payments owed by the Swap Counterparty
                                        for such Distribution Date and (II) the
                                        aggregate Stated Principal Balance of the
                                        Mortgage Loans as of the immediately preceding
                                        Distribution Date over (2) the amount of
                                        interest such class was entitled to receive on
                                        such Distribution Date based on the related
                                        Available Funds Cap; together with (B) the
                                        unpaid portion of any such excess from prior
                                        Distribution Dates (and interest accrued
                                        thereon at the then applicable Pass-Through
                                        Rate for such class, without giving effect to
                                        the related Available Funds Cap
                                        or the related Maximum Rate Cap) and (C) any
                                        amount previously distributed with respect to
                                        Floating Rate Certificate Carryover for such
                                        class that is recovered as a voidable
                                        preference by a trustee in bankruptcy.

FLOATING SWAP PAYMENT                   means, for each Distribution Date, the product
                                        of (i) Derivative LIBOR for such Distribution
                                        Date determined based on a 360-day year and the

https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

|  |  |
|---|---|
|  | actual number of days in the Accrual Period and (ii) the notional balance as set forth under the heading "Notional Balance" for the related Distribution Date in the Swap Agreement Notional Balance Table on page S-73. |
| FREDDIE MAC | means the Federal Home Loan Mortgage Corporation or any successor. |
| GROSS MARGIN | means a fixed percentage amount specified in the related mortgage note. |
| GROUP ONE | means the portion of the mortgage pool identified as "Group One" in this prospectus supplement. |

</TABLE>

S-146

<PAGE>

<TABLE>
<S>                             <C>

|  |  |
|---|---|
| GROUP ONE AVAILABLE FUNDS CAP | means, with respect to a Distribution Date, the per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest on the Group One Mortgage Loans based on the Net Mortgage Rates in effect on the related Due Date, less the pro rata portion (calculated based on the ratio of the Group One Mortgage Loans to the total pool of Mortgage Loans) allocable to the Group One Mortgage Loans of any Net Swap Payments or Swap Termination Payments (other than Defaulted Swap Termination Payments) owed to the Swap Counterparty for such Distribution Date, and (y) the aggregate Stated Principal Balance of the Group One Mortgage Loans as of the first day of the related Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period. The Group One Available Funds Cap shall be related to the Group One Certificates. |
| GROUP ONE CERTIFICATES | means the Class A-1, Class R, Class M-1-1, Class M-2-1, Class M-3-1 and Class M-4-1 Certificates. |
| GROUP ONE CORRIDOR CONTRACT | means a confirmation and agreement, including the schedule thereto and the related credit support annex, between the Trustee, on behalf of the Issuing Entity, and the Cap Contract Counterparty for the benefit of the Group One Certificates. |
| GROUP ONE CORRIDOR CONTRACT NOTIONAL BALANCE | means, as of any Distribution Date, the notional balance of the Group One Corridor Contract set forth in the table on page S-70. |
| GROUP ONE LOWER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1 ML Strike Lower Collar" in the Group One Derivative LIBOR Corridor Table on |

page S-70.

| | |
|---|---|
| GROUP ONE MAXIMUM RATE CAP | means, with respect to a Distribution Date, the per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest that would have been due on the Group One Mortgage Loans had the Adjustable Rate Mortgage Loans provided for interest at their maximum lifetime Net Mortgage Rates and the Fixed Rate Mortgage Loans provided for interest at their Net Mortgage Rates less the pro rata portion (calculated based on the ratio of the Group One Mortgage Loans to the total pool of Mortgage Loans) allocable to the Group One Mortgage Loans of any Net Swap Payments or Swap Termination Payments owed to the Swap Counterparty for such Distribution Date (other than Defaulted Swap Termination Payments), and |

</TABLE>

S-147

<PAGE>

<TABLE>
<S>                                    <C>

| | |
|---|---|
| | (y) the aggregate Stated Principal Balance of the Group One Mortgage Loans as of the first day of the related Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period. The Group One Maximum Rate Cap shall be related to the Group One Certificates. |
| GROUP ONE PRINCIPAL DISTRIBUTION PERCENTAGE | means, with respect to any Distribution Date, a fraction expressed as a percentage, the numerator of which is the amount of Principal Funds received with respect to Mortgage Loans in Group One and the denominator of which is the amount of Principal Funds received from all of the Mortgage Loans in the mortgage pool. |
| GROUP ONE UPPER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1ML Strike Upper Collar" in the Group One Derivative LIBOR Corridor Table on page S-70. |
| GROUP TWO | means the portion of the mortgage pool identified as "Group Two" in this prospectus supplement. |
| GROUP TWO AVAILABLE FUNDS CAP | means, with respect to a Distribution Date, the per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest on the Group Two Mortgage Loans based on the Net Mortgage Rates in effect on the related Due Date, less the pro rata portion (calculated based on the ratio of the Group Two Mortgage Loans to the total pool of Mortgage Loans) allocable to the Group Two Mortgage Loans of any Net Swap Payments or Swap Termination Payments (other than Defaulted Swap |

| | |
|---|---|
| | Termination Payments) owed to the Swap Counterparty for such Distribution Date, and (y) the aggregate Stated Principal Balance of the Group Two Mortgage Loans as of the first day of the related Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period. The Group Two Available Funds Cap shall be related to the Group Two Certificates. |
| GROUP TWO CERTIFICATES | means the Class A-2, Class M-1-2, Class M-2-2, Class M-3-2 and Class M-4-2 Certificates. |
| GROUP TWO CORRIDOR CONTRACT | means a confirmation and agreement, including the schedule thereto and the related credit support annex, between the Trustee, on behalf of the Issuing Entity, and the Cap Contract Counterparty for the benefit of the Group Two Certificates. |

</TABLE>

S-148

<PAGE>

<TABLE>
<S>                                <C>

| | |
|---|---|
| GROUP TWO CORRIDOR CONTRACT NOTIONAL BALANCE | means, as of any Distribution Date, the notional balance of the Group Two Corridor Contract set forth in the table on page S-71. |
| GROUP TWO LOWER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1ML Strike Lower Collar" in the Group Two Derivative LIBOR Corridor Table on page S-71. |
| GROUP TWO MAXIMUM RATE CAP | means, with respect to a Distribution Date, the per annum rate equal to the product of (i) 12, (ii) the quotient of (x) the total scheduled interest that would have been due on the Group Two Mortgage Loans had the Adjustable Rate Mortgage Loans provided for interest at their maximum lifetime Net Mortgage Rates and the Fixed Rate Mortgage Loans provided for interest at their Net Mortgage Rates less the pro rata portion (calculated based on the ratio of the Group Two Mortgage Loans to the total pool of Mortgage Loans) allocable to the Group Two Mortgage Loans of any Net Swap Payments or Swap Termination Payments owed to the Swap Counterparty for such Distribution Date (other than Defaulted Swap Termination Payments), and (y) the aggregate Stated Principal Balance of the Group Two Mortgage Loans as of the first day of the related Accrual Period and (iii) a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Accrual Period. The Group Two Maximum Rate Cap shall be related to the Group Two Certificates. |
| GROUP TWO PRINCIPAL | means, with respect to any Distribution Date, a |

| | |
|---|---|
| DISTRIBUTION PERCENTAGE | fraction expressed as a percentage, the numerator of which is the amount of Principal Funds received with respect to Mortgage Loans in Group Two and the denominator of which is the amount of Principal Funds received from all of the Mortgage Loans in the mortgage pool. |
| GROUP TWO UPPER COLLAR | means, with respect to each Distribution Date, the applicable per annum rate set forth under the heading "1ML Strike Upper Collar" in the Group Two Derivative LIBOR Corridor Table on page S-71. |
| HEP OR HOME EQUITY PREPAYMENT | means a prepayment model which uses a prepayment assumption which represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. 20% HEP, which represents 100% of the prepayment model for the Fixed Rate Mortgage Loans, assumes prepayment rates of 2.0% per |

</TABLE>

S-149

<PAGE>

<TABLE>
<S>                             <C>

| | |
|---|---|
| | annum of the then outstanding principal balance of the related Mortgage Loans in the first month of the life of such Mortgage Loans and an additional 2.0% per annum in each month thereafter up to and including the tenth month. Beginning in the eleventh month and in each month thereafter during the life of such Mortgage Loans, 20% HEP assumes a Constant Prepayment Rate of 20% per annum. |
| HLS | means Home Loan Services, Inc. |
| INDIRECT PARTICIPANTS | means Participants and organizations which have indirect access to the DTC system, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly. |
| INITIAL OPTIONAL TERMINATION DATE | means the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans (or if such Mortgage Loan is an REO Property, the fair market value of such REO Property) is less than or equal to 10% of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date. |
| INTEREST CARRY FORWARD AMOUNT | means, with respect to each class of the LIBOR Certificates and each Distribution Date, the sum of (1) the excess of (A) Current Interest for such class with respect to prior Distribution Dates (excluding any Floating Rate Certificate Carryover for such class, if applicable) over (B) the amount actually |

distributed to such class with respect to Current Interest and Interest Carry Forward Amount on such prior Distribution Dates and (2) interest on such excess (to the extent permitted by applicable law) at the applicable Pass-Through Rate for the related Accrual Period.

INTEREST DETERMINATION DATE       means each date that is the second LIBOR Business Day preceding the commencement of each Accrual Period for the LIBOR Certificates.

INTEREST FUNDS                    means, with respect to any Distribution Date, the sum, without duplication, of (1) all scheduled interest due during the related Due Period that is received before the related Servicer Remittance Date less the Servicing Fee, (2) all Advances relating to interest, (3) all Compensating Interest, (4) liquidation proceeds collected during the related Prepayment Period if made in connection with Principal Prepayments in full and during the preceding calendar month if made in connection with partial Principal Prepayments (to the extent such liquidation proceeds relate to interest), (5) proceeds of any Mortgage Loan purchased by the

&lt;/TABLE&gt;


S-150


&lt;PAGE&gt;

&lt;TABLE&gt;
&lt;S&gt;                               &lt;C&gt;
                                  Depositor or any transferor under the Pooling and Servicing Agreement during the related Prepayment Period for document defects, breach of a representation or warranty, realization upon default or optional termination (to the extent such proceeds relate to interest) and (6) prepayment charges received with respect to the related Mortgage Loans during the related Prepayment Period if made in connection with Principal Prepayments in full and during the preceding calendar month if made in connection with partial Principal Prepayments, less all non-recoverable Advances relating to interest and certain fees, indemnity amounts and expenses reimbursed to the Trustee and the Servicer.

INTEREST-ONLY MORTGAGE LOAN       means a Mortgage Loan that provides for monthly payments of interest at the Mortgage Rate, but no payments of principal for the first five to ten years after its origination.

INVESTOR-BASED EXEMPTION          means any of (but not limited to) Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code, (for transactions with persons who provide services to Plans), PTE 84-14 (for transactions by independent "qualified professional asset managers"), PTE 90-1 (for transactions by insurance company pooled

|  | separate accounts), PTE 91-38 (for transactions by bank collective investment funds), PTE 95-60 (for transactions by insurance company general accounts) or PTE 96-23 (for transactions effected by "in-house asset managers"), each as it may be amended from time to time. |
| IRS | means the Internal Revenue Service. |
| ISSUING ENTITY | Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3. |
| LASALLE | means LaSalle Bank National Association. |
| LAST SCHEDULED DISTRIBUTION DATE | means, for each class of LIBOR Certificates, the latest maturity date for any Mortgage Loan plus one month. |
| LIBOR BUSINESS DAY | means a day on which banks are open for dealing in foreign currency and exchange in London and New York City. |
| LIBOR CERTIFICATES | means the Class A, Class M and Class B Certificates. |
| LOAN-TO-VALUE RATIO OR LTV | means, for any Mortgage Loan, (1) the original principal balance of such Mortgage Loan divided by (2) the Collateral Value of the related mortgaged property. |

</TABLE>

S-151

<PAGE>

<TABLE>
<S>                                <C>

| LOWER COLLAR | means, with respect to each Distribution Date and each of the Corridor Contracts, the applicable per annum rate set forth under the heading "1ML Strike Lower Collar" in the Group One Derivative LIBOR Corridor Table, the Group Two Derivative LIBOR Corridor Table or the Class M-5, Class M-6 and Class B Derivative LIBOR Corridor Table. |
| MAXIMUM MORTGAGE RATE | means, with respect to each Adjustable Rate Mortgage Loan, the rate which the Mortgage Rate will never exceed as set forth in the related mortgage note. |
| MAXIMUM RATE CAP | means any of the Group One Maximum Rate Cap, the Group Two Maximum Rate Cap or the Weighted Average Maximum Rate Cap. |
| MERRILL LYNCH | means Merrill Lynch, Pierce, Fenner & Smith Incorporated. |
| MINIMUM MORTGAGE RATE | means, with respect to each Adjustable Rate Mortgage Loan, the rate which the Mortgage Rate will never fall below as set forth in the related mortgage note. |
| MODELING ASSUMPTIONS | means the following assumptions: |

- the assumed Adjustable Rate Mortgage Loans and the assumed Fixed Rate Mortgage Loans prepay at the indicated percentage of the related prepayment model;

- distributions on the Certificates are received, in cash, on the 25th day of each month, commencing in June 2007, in accordance with the payment priorities defined in this prospectus supplement;

- no defaults or delinquencies in, or modifications, waivers or amendments respecting, the payment by the mortgagors of principal and interest on the assumed Mortgage Loans occur;

- Scheduled Payments are assumed to be received on the first day of each month commencing in June 2007, and Principal Prepayments represent payment in full of individual assumed Mortgage Loans and are assumed to be received on the last day of each month, commencing in May 2007, and include 30 days' interest thereon;

</TABLE>

S-152

<PAGE>

<TABLE>
<S>                              <C>

- the level of Six-Month LIBOR remains constant at 5.3620%, and the level of One-Month LIBOR remains constant at 5.3210%;

- the sum of the Servicing Fee Rate and other fees payable by the Trust Fund is 0.500% per annum;

- the Certificate Principal Balance of the Class R Certificate is zero;

- the maximum prepayment speed is capped at 95% CPR;

- the Closing Date for the certificates is May 30, 2007;

- the Mortgage Rate for each assumed Adjustable Rate Mortgage Loan is adjusted on its next Mortgage Rate Adjustment Date (and on any subsequent Mortgage Rate Adjustment Dates, if necessary) to equal the sum of (a) the assumed level of the Mortgage Index and (b) the respective Gross Margin (such sum being subject

                       to the applicable periodic adjustment caps and floors, as well as the lifetime Maximum Mortgage Rate and Minimum Mortgage Rate);

- the Swap Termination Payment is assumed to be zero as of the Initial Optional Termination Date;

- the auction does not result in a termination of the Trust Fund and neither the NIMS Insurer, if any, nor the Servicer purchases the Mortgage Loans and terminates the Trust Fund as described in this prospectus supplement under "The Pooling and Servicing Agreement--Optional Termination"; and

- the initial overcollateralization amount is approximately $52,878,811, the targeted overcollateralization amount is approximately $52,877,883 and the minimum required overcollateralization amount is approximately $9,442,479.

| | |
|---|---|
| MOODY'S | means Moody's Investors Service, Inc. or any successor. |
| MORTGAGE GROUP | means either of Group One or Group Two. |

</TABLE>

S-153

<PAGE>

<TABLE>
<S>                         <C>

| | |
|---|---|
| MORTGAGE INDEX | means, with respect to any Adjustment Date, the average of the London interbank offered rates for six-month U.S. dollar deposits in the London market, as set forth in The Wall Street Journal, or, if such rate ceases to be published in The Wall Street Journal or becomes unavailable for any reason, then based upon a new index selected by the Servicer, as holder of the related mortgage note, based on comparable information, in each case as most recently announced as of a date 45 days prior to such Adjustment Date. |
| MORTGAGE LOANS | means mortgage loans that are included in the Issuing Entity as of the Closing Date. |
| MORTGAGE LOAN SCHEDULE | means the schedule of Mortgage Loans appearing as an exhibit to the Pooling and Servicing Agreement from time to time. |
| MORTGAGE RATE | means the per annum interest rate borne by a Mortgage Loan. |
| NET EXCESS CASHFLOW | means Interest Funds and Principal Funds not otherwise required to be distributed with |

respect to principal of and interest on the
LIBOR Certificates and not otherwise required
to be distributed to the Class P Certificates.

NET MORTGAGE RATE      means, with respect to any Mortgage Loan, the
Mortgage Rate with respect to such Mortgage
Loan less the Servicing Fee Rate.

NET SWAP PAYMENT      means, in respect of each Distribution Date,
the net amount of the Fixed Swap Payment that
the Supplemental Interest Trust is obligated to
pay to the Swap Counterparty and the Floating
Swap Payment that the Swap Counterparty is
obligated to pay to the Supplemental Interest
Trust.

NIMS INSURER      means any one or more insurance companies that
may issue a financial guaranty insurance policy
covering net interest margin securities issued
by a separate trust and secured by all or a
portion of the Class C and Class P Certificates
issued by the Issuing Entity.

OFFERED CERTIFICATES      means the Class A, Class M, Class B
Certificates.

ONE-MONTH LIBOR      means the London interbank offered rate for
one-month United States dollar deposits.

OPTIONAL TERMINATION PRICE      means, on any day after the Initial Optional
Termination Date, the sum of (i) the then
aggregate outstanding Stated Principal Balance
of the Mortgage Loans (or if such Mortgage Loan
is an REO Property, the fair market

</TABLE>

S-154

<PAGE>

<TABLE>
<S>      <C>
value of such REO Property), plus accrued
interest thereon at the applicable Mortgage
Rate through the Due Date in the month in which
the proceeds of the auction will be distributed
on the Certificates, (ii) any unreimbursed
fees, indemnity amounts and out-of-pocket costs
and expenses owed to the Trustee (including any
amounts incurred by the Trustee in connection
with conducting such auction) or the Servicer
and all unreimbursed Advances and servicing
advances, in each case incurred by such party
in the performance of its obligations, (iii)
any unreimbursed costs, penalties and/or
damages incurred by the Issuing Entity in
connection with any violation relating to any
of the Mortgage Loans of any predatory or
abusive lending law and (iv) any unpaid Net
Swap Payments and any Swap Termination Payment
owed to the Swap Counterparty; such Swap
Termination Payment shall include any payment
to the Swap Counterparty resulting from the
optional termination of the Trust.

| ORIGINAL LOAN-TO-VALUE RATIO | means, in the case of any Mortgage Loan, the Loan-to-Value Ratio or LTV. |

| ORIGINATOR | means First Franklin Financial. |

| PARTICIPANTS | means participating organizations that utilize the services of DTC, including securities brokers and dealers, banks and trust companies and clearing corporations and certain other organizations. |

| PASS-THROUGH MARGIN | means for each class of the LIBOR Certificates for any Distribution Date: |

| CLASS | ON OR BEFORE THE INITIAL OPTIONAL TERMINATION DATE | AFTER THE INITIAL OPTIONAL TERMINATION DATE |
| --- | --- | --- |
| Class A-1A | 0.0400% | 0.0800% |
| Class A-1B | 0.1300% | 0.2600% |
| Class A-1C | 0.1700% | 0.3400% |
| Class A-1D | 0.2100% | 0.4200% |
| Class A-2A | 0.0500% | 0.1000% |
| Class A-2B | 0.1300% | 0.2600% |
| Class A-2C | 0.1800% | 0.3600% |
| Class A-2D | 0.2500% | 0.5000% |
| Class M-1-1 | 0.3000% | 0.4500% |
| Class M-1-2 | 0.2500% | 0.3750% |
| Class M-2-1 | 0.3200% | 0.4800% |
| Class M-2-2 | 0.2700% | 0.4050% |
| Class M-3-1 | 0.3700% | 0.5550% |
| Class M-3-2 | 0.2900% | 0.4350% |
| Class M-4-1 | 0.5000% | 0.7500% |
| Class M-4-2 | 0.4000% | 0.6000% |

</TABLE>

S-155

<PAGE>

<TABLE>
<S>                    <C>

| CLASS | ON OR BEFORE THE INITIAL OPTIONAL TERMINATION DATE | AFTER THE INITIAL OPTIONAL TERMINATION DATE |
| --- | --- | --- |
| Class M-5 | 0.4500% | 0.6750% |
| Class M-6 | 0.7500% | 1.1250% |
| Class B-1 | 1.3500% | 2.0250% |
| Class B-2 | 2.0000% | 3.0000% |
| Class B-3 | 2.4000% | 3.6000% |
| Class R | 0.0400% | 0.0800% |

| PASS-THROUGH RATE | means, with respect to any class of the LIBOR Certificates on any Distribution Date, the least of (1) One-Month LIBOR plus the Pass-Through Margin for such class of LIBOR Certificates, (2) the related Available Funds Cap and (3) the related Maximum Rate Cap. |

| PERCENTAGE INTEREST | means, with respect to any certificate, the percentage derived by dividing the denomination of such certificate by the aggregate |

|                              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
|------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                              | denominations of all certificates of the applicable class.                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| PERIODIC RATE CAP            | means the maximum amount by which the Mortgage Rate on any Adjustable Rate Mortgage Loan may increase or decrease on an Adjustment Date.                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| PLAN                         | means an employee benefit plan or arrangement subject to Title I of ERISA, a plan subject to Section 4975 of the Code or a plan subject to any provisions under any federal, state, local, non-U.S. or other laws or regulations that are substantively similar to the foregoing provisions of ERISA or the Code.                                                                                                                                                                                                                                                                                  |
| POOLING AND SERVICING AGREEMENT | means the Pooling and Servicing Agreement, dated as of May 1, 2007, among the Depositor, the Servicer and the Trustee.                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| PPC OR PREPAYMENT CONSTANT   | means a prepayment model which uses a prepayment assumption which represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. 100% PPC, which represents 100% of the prepayment model for the Adjustable Rate Mortgage Loans, assumes prepayment rates at a Constant Prepayment Rate of 2% per annum in month 1, increasing linearly (rounded to the nearest hundredth) to a Constant Prepayment Rate of 30% per annum in month 12 and remaining constant at a Constant Prepayment Rate of 30% per annum from month 13 up to and including month 22, then remaining constant at a Constant Prepayment Rate of 50% per annum from |

</TABLE>

S-156

<PAGE>

<TABLE>
<S>                                <C>

|                              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|------------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                              | month 23 up to and including month 27 and then remaining constant at a Constant Prepayment Rate of 35% per annum from month 28 and thereafter.                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
| PREPAYMENT INTEREST EXCESSES | means, with respect to any Servicer Remittance Date, for each Mortgage Loan that was the subject of a Principal Prepayment in full during the portion of the related Prepayment Period occurring between the first day of the calendar month in which such Servicer Remittance Date occurs and the last day of the related Prepayment Period, an amount equal to interest (to the extent received) at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the first day of the calendar month in which such Servicer Remittance Date occurs and ending on the date on which such Principal Prepayment is so applied. |

| PREPAYMENT INTEREST SHORTFALL | means a shortfall in interest distributions as a result of Principal Prepayments to certificateholders in excess of Compensating Interest. |
|---|---|
| PREPAYMENT PERIOD | means, with respect to any Distribution Date, (i) for Principal Prepayments or liquidations in full and any prepayment charges associated with such Principal Prepayments in full, the period from and including the 15th day of the calendar month preceding the month in which such Distribution Date occurs (or, in the case of the first Distribution Date, beginning on the Cut-off Date) and including the 14th day of the calendar month in which such Distribution Date occurs and (ii) for partial Principal Prepayments or liquidations and any prepayment charges associated with such partial Principal Prepayments, the calendar month preceding the calendar month in which such Distribution Date occurs. |
| PRINCIPAL DISTRIBUTION AMOUNT | means, with respect to each Distribution Date, the sum of (1) the Principal Funds for such Distribution Date and (2) any Extra Principal Distribution Amount for such Distribution Date. |
| PRINCIPAL FUNDS | means, with respect to any Distribution Date, the sum, without duplication, of (1) the scheduled principal due during the related Due Period and received before the related Servicer Remittance Date or required to be advanced by the Servicer on or before the related Servicer Remittance Date, (2) Principal Prepayments in full collected in the related Prepayment Period, (3) the Stated Principal Balance of each Mortgage Loan that was purchased by the Depositor or the Servicer during the related Prepayment Period or, in the case of a purchase in connection with an optional termination, on |

</TABLE>


S-157


<PAGE>


<TABLE>
<S>                             <C>
                                the Business Day prior to such Distribution
                                Date, (4) the amount, if any, by which the
                                aggregate unpaid principal balance of any
                                replacement Mortgage Loans is less than the
                                aggregate unpaid principal balance of any
                                Mortgage Loans delivered by the Sponsor in
                                connection with a substitution of a Mortgage
                                Loan, (5) all liquidation proceeds collected
                                during the related Prepayment Period (to the
                                extent such liquidation proceeds relate to
                                principal and represent payment in full), (6)
                                all Subsequent Recoveries received during the
                                preceding calendar month and (7) all other
                                collections and recoveries in respect of
                                principal, including partial Principal

Prepayments, during the preceding calendar month, less all non-recoverable Advances relating to principal and all non-recoverable servicing advances reimbursed during the applicable period and certain fees, indemnity amounts and expenses reimbursable to the Trustee and the Servicer.

| | |
|---|---|
| PRINCIPAL PREPAYMENT | means any mortgagor payment of principal or other recovery of principal on a Mortgage Loan that is recognized as having been received or recovered in advance of its Due Date and applied to reduce the Stated Principal Balance of the Mortgage Loan in accordance with the terms of the mortgage note. |
| PTE | means a Prohibited Transaction Exemption granted by the U.S. Department of Labor. |
| RATING AGENCY | means either of Moody's or S&P. |
| RATING AGENCY CONDITION | has the meaning specified in the Swap Agreement. |
| REALIZED LOSS | means the excess of the Stated Principal Balance of a defaulted Mortgage Loan plus accrued interest over the net liquidation proceeds of a defaulted Mortgage Loan that are allocated to principal. |
| RECORD DATE | means, for a Distribution Date, the last Business Day of the month preceding the month of such Distribution Date (or in the case of the first Distribution Date, the Closing Date). |
| REFERENCE BANKS | means leading banks selected by the Trustee and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (1) with an established place of business in London, (2) whose quotations appear on the Reuters Screen LIBO Page on the Interest Determination Date in question, (3) which have been designated as such by the Servicer and (4) not controlling, controlled by, or under common control |

</TABLE>

S-158

<PAGE>

<TABLE>
<S>                              <C>

with, the Depositor, the Trustee, the Servicer, the Sponsor or any successor servicer.

| | |
|---|---|
| REGULATION AB | means Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R. Sections 229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Securities and Exchange Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed Reg. |

1,506, 1.531 (Jan. 7, 2005) or by the staff of
the Securities and Exchange Commission, or as
may be provided by the Securities and Exchange
Commission or its staff from time to time.

RELEVANT DEPOSITARY          means Citibank, N.A., as depository for
                             Clearstream Luxembourg, and JPMorgan Chase
                             Bank, as depository for Euroclear,
                             individually.

REO PROPERTY                 means mortgaged property which has been
                             acquired by the Servicer through foreclosure or
                             deed-in-lieu of foreclosure in connection with
                             a defaulted mortgage loan.

REQUIRED PERCENTAGE          means, with respect to a Distribution Date
                             after the Stepdown Date, the quotient of (x)
                             the excess of (1) the aggregate Stated
                             Principal Balance of the Mortgage Loans, as of
                             the prior Distribution Date over (2) the
                             Certificate Principal Balance of the most
                             senior class of Certificates outstanding as of
                             such Distribution Date (for purposes of this
                             calculation, the Class A Certificates are
                             considered to be a single class), prior to
                             giving effect to distributions to be made on
                             such Distribution Date, and (y) the aggregate
                             Stated Principal Balance of the Mortgage Loans,
                             as of the prior Distribution Date.

RESERVE INTEREST RATE        means the rate per annum that the Trustee
                             determines to be either (1) the arithmetic mean
                             (rounded upwards if necessary to the nearest
                             whole multiple of 0.03125%) of the one-month
                             United States dollar lending rates which New
                             York City banks selected by the Trustee are
                             quoting on the relevant Interest Determination
                             Date to the principal London offices of leading
                             banks in the London interbank market or (2) in
                             the event that the Trustee can determine no
                             such arithmetic mean, the lowest one-month
                             United States dollar lending rate which New
                             York City banks selected by the Trustee are
                             quoting on such Interest Determination Date to
                             leading European banks.

RESTRICTED GROUP             means the Underwriter, the Trustee, the
                             Servicer, any obligor with respect to Mortgage
                             Loans included in the Trust Fund constituting
                             more than five percent (5%) of

</TABLE>

                              S-159

<PAGE>

<TABLE>
<S>                          <C>
                             the aggregate unamortized principal balance of
                             the assets in the Trust Fund or any affiliate
                             of such parties.

REUTERS                      means Reuters Monitor Money Rates Service.

| | |
|---|---|
| REUTERS SCREEN LIBO PAGE | means the display designated as page "LIBO" on Reuters (or such other page as may replace the LIBO page on that service for the purpose of displaying London interbank offered rates of major banks). |
| RULES | means the rules, regulations and procedures creating and affecting DTC and its operations. |
| S&P | means Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor. |
| SCHEDULED PAYMENTS | means scheduled monthly payments made by mortgagors on the Mortgage Loans. |
| SERVICER | means HLS. |
| SERVICER REMITTANCE DATE | means the later of (x) the day that is two Business Days after the 15th day of the month in which the related Distribution Date occurs and (y) the 18th day (or if such day is not a Business Day, the immediately succeeding Business Day) of the month in which the related Distribution Date occurs. |
| SERVICING FEE | means a monthly fee paid to the Servicer from interest collected with respect to each Mortgage Loan serviced by it (as well as from any liquidation proceeds from a liquidated Mortgage Loan that are applied to accrued and unpaid interest) generally equal to the product of (a) one-twelfth of the Servicing Fee Rate and (b) the Stated Principal Balance of such Mortgage Loan. The Servicer also is entitled to receive, as additional servicing compensation, Prepayment Interest Excesses, insufficient funds charges, late charges, excess proceeds from REO property sales, all assumption fees and other similar charges (other than prepayment charges) and all investment income earned on, or benefits received from, amounts on deposit in the Collection Account and amounts on deposit in the related escrow accounts. |
| SERVICING FEE RATE | means 0.500% for each Mortgage Loan. |
| SIX-MONTH LIBOR | means the London interbank offered rate for six-month United States dollar deposits. |
| SIX-MONTH LIBOR LOANS | means Adjustable Rate Mortgage Loans having a Mortgage Rate which is generally subject to semi-annual adjustment on the first day of the months specified in the |

</TABLE>

S-160

<PAGE>

<TABLE>
<S>                                <C>
related mortgage note to equal the sum, rounded to the nearest 0.125%, of (1) the Mortgage

Index and (2) the Gross Margin.

| | |
|---|---|
| SMMEA | means the Secondary Mortgage Market Enhancement Act of 1984, as amended. |
| SPONSOR | means First Franklin Financial. |
| STATED PRINCIPAL BALANCE | means, with respect to a Mortgage Loan and any Distribution Date, the amount equal to the outstanding principal balance as of the Cut-off Date, after giving effect to Scheduled Payments due on or before that date, reduced by (1) the principal portion of all Scheduled Payments due on or before the Due Date in the Due Period immediately preceding such Distribution Date, whether or not received, and (2) all amounts allocable to unscheduled principal payments received on or before the last day of the applicable Prepayment Period. The Stated Principal Balance of a liquidated Mortgage Loan shall be deemed to be zero. |
| STATISTICAL MORTGAGE LOANS | means those mortgage loans included in the statistical mortgage pool for purposes of this prospectus supplement. |
| STEPDOWN DATE | means, the earlier of: (A) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero; and (B) the later to occur of (1) the Distribution Date in June 2010 or (2) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates (after giving effect to distributions of the Principal Funds amount for such Distribution Date) is less than or equal to 59.80% of the aggregate Stated Principal Balances of the Mortgage Loans. |

</TABLE>

S-161

<PAGE>

<TABLE>
<S>                          <C>

| STEPDOWN REQUIRED LOSS PERCENTAGE | means, for any Distribution Date, the applicable percentage for such Distribution Date set forth in the following table: |
|---|---|

| DISTRIBUTION DATE OCCURRING IN | STEPDOWN REQUIRED LOSS PERCENTAGE |
|---|---|
| June 2009 - May 2010 | 1.25% with respect to June 2009, plus an additional 1/12th of 1.55% for each month thereafter |
| June 2010 - May 2011 | 2.80% with respect to June 2010, plus an additional 1/12th of 1.55% for each month |

|  |  |  |
|--|--|--|
|  |  | thereafter |
|  | June 2011 - May 2012 | 4.35% with respect to June 2011, plus an additional 1/12th of 1.30% for each month thereafter |
|  | June 2012 - May 2013 | 5.65% with respect to June 2012, plus an additional 1/12th of 0.65% for each month thereafter |
|  | June 2013 - May 2014 | 6.30% with respect to June 2012, plus an additional 1/12th of 0.05% for each month thereafter |
|  | June 2014 and thereafter | 6.35% |

STEPDOWN TRIGGER EVENT      means the situation that exists with respect to
                           any Distribution Date on or after the Stepdown
                           Date, if (a) the quotient, measured on a
                           rolling three-month basis, of (1) the aggregate
                           Stated Principal Balance of all Mortgage Loans
                           60 or more days delinquent (including Mortgage
                           Loans in foreclosure, REO Properties and
                           Mortgage Loans with respect to which the
                           applicable mortgagor is in bankruptcy) and (2)
                           the aggregate Stated Principal Balance of the
                           Mortgage Loans as of the preceding Servicer
                           Remittance Date, equals or exceeds the product
                           of (i) 39.75% and (ii) the Required Percentage
                           or (b) the quotient (expressed as a percentage)
                           of (1) the aggregate Realized Losses incurred
                           from the Cut-off Date through the last day of
                           the calendar month preceding such Distribution
                           Date and (2) the aggregate Stated Principal
                           Balance of the Mortgage Loans as of the Cut-off
                           Date exceeds the Stepdown Required Loss
                           Percentage. For purposes

</TABLE>

                              S-162

<PAGE>

<TABLE>
<S>                        <C>
                           hereof, for any Distribution Date, the
                           calculation of "rolling three-month basis"
                           requires first, the calculation of the quotient
                           described in (a) of this definition for each of
                           the three (3) Due Periods immediately prior to
                           such Distribution Date, second, the addition of
                           such 3 quotients and third, dividing the sum of
                           such 3 quotients by 3.

SUBORDINATE CERTIFICATES   means the Class M and Class B Certificates.

SUBSEQUENT RECOVERY        means any amount (net of amounts to be

reimbursed to the Servicer related to such
Mortgage Loan) received on a Mortgage Loan
subsequent to such Mortgage Loan being
determined to be a liquidated Mortgage Loan.

SUPPLEMENTAL INTEREST TRUST          means the separate trust established pursuant
                                     to the Pooling and Servicing Agreement by the
                                     Supplemental Interest Trust Trustee, as
                                     directed, for the benefit of the
                                     certificateholders which shall be party to the
                                     Swap Agreement and (i) out of which any Swap
                                     Termination Payments or Net Swap Payments owed
                                     to the Swap Counterparty will be paid and
                                     certain distributions to certificateholders
                                     will be made and (ii) into which any Swap
                                     Termination Payments or Net Swap Payments
                                     received from the Swap Counterparty will be
                                     deposited.

SUPPLEMENTAL INTEREST TRUST          means LaSalle, in its capacity as supplemental
TRUSTEE                              interest trust trustee under the Pooling and
                                     Servicing Agreement.

SWAP AGREEMENT                       means the confirmation and the master agreement
                                     incorporated therein, as well as the schedule
                                     thereto and the related credit support annex,
                                     between the Swap Counterparty and the
                                     Supplemental Interest Trust Trustee, on behalf
                                     of the Supplemental Interest Trust.

SWAP AGREEMENT NOTIONAL              means the notional balance of the Swap
BALANCES                             Agreement as set forth in the Swap Agreement
                                     Notional Balance Table on page S-73.

SWAP COUNTERPARTY                    means The Bank of New York, or any successor
                                     counterparty who meets the requirements set
                                     forth in the Swap Agreement.

SWAP REGULATIONS                     means the final regulations issued by the IRS
                                     relating to notional principal contracts under
                                     Section 446 of the Code.

SWAP TERMINATION PAYMENT             means a payment required to be made by either
                                     the Supplemental Interest Trust or the Swap
                                     Counterparty pursuant to the Swap Agreement as
                                     a result of termination of the Swap Agreement.
</TABLE>


                                   S-163


<PAGE>

<TABLE>
<S>                                  <C>
TERMS AND CONDITIONS                 means the Terms and Conditions Governing Use of
                                     Euroclear, the related Operating Procedures of
                                     the Euroclear System and applicable Belgian
                                     law.

TRUST FUND                           means the trust fund created by the Pooling and
                                     Servicing Agreement.

TRUSTEE                              means LaSalle, in its capacity as trustee under
                                     the Pooling and Servicing Agreement.

| | |
|---|---|
| UNDERWRITER | means Merrill Lynch, Pierce Fenner & Smith Incorporated. |
| UNPAID REALIZED LOSS AMOUNT | means, with respect to any class of the Subordinate Certificates and as to any Distribution Date, the excess of (1) Applied Realized Loss Amounts with respect to such class over (2) the sum of (x) all distributions in reduction of the Unpaid Applied Realized Loss Amounts on all previous Distribution Dates and (y) all increases in the Certificate Principal Balance of such class pursuant to the last sentence of the definition of "Certificate Principal Balance." Any amounts distributed to a class of Subordinate Certificates in respect of any Unpaid Realized Loss Amount will not be applied to reduce the Certificate Principal Balance of such class. |
| UPPER COLLAR | means any of the Group One Upper Collar, the Group Two Upper Collar or the Class M-5, Class M-6 and Class B Upper Collar. |
| WEIGHTED AVERAGE AVAILABLE FUNDS CAP | means, with respect to a Distribution Date, the per annum rate equal to the weighted average of the Group One Available Funds Cap and the Group Two Available Funds Cap (weighted in proportion to the results of subtracting from the aggregate Stated Principal Balance of each Mortgage Group, the current Certificate Principal Balance of the Group One Certificates, in the case of Group One, or the Group Two Certificates, in the case of Group Two). |
| WEIGHTED AVERAGE MAXIMUM RATE CAP | means, with respect to a Distribution Date, the per annum rate equal to the weighted average (weighted in proportion to the results of subtracting from the aggregate Stated Principal Balance of each Mortgage Group, the current Certificate Principal Balance of the Group One Certificates, in the case of Group One, or the Group Two Certificates, in the case of Group Two) of the Group One Maximum Rate Cap and the Group Two Maximum Rate Cap. |

</TABLE>

S-164

<PAGE>

ANNEX I

GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES

Except in limited circumstances, the globally offered Merrill Lynch First Franklin Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2007-3 known as "Global Securities," will be available only in book-entry form. Investors in the Global Securities may hold such Global Securities through any of DTC, Clearstream Luxembourg or Euroclear. The Global Securities will be tradeable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors holding Global Securities through Clearstream Luxembourg and Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional Eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding Global Securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations and prior mortgage pass-through certificate issues.

Secondary cross-market trading between Clearstream Luxembourg or Euroclear and DTC Participants holding certificates will be effected on a delivery-against-payment basis through the respective European Depositaries of Clearstream Luxembourg and Euroclear (in such capacity) and as DTC Participants.

Beneficial owners of Global Securities that are non-U.S. Persons (as described below) will be subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

INITIAL SETTLEMENT

All Global Securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Global Securities will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC. As a result, Clearstream Luxembourg and Euroclear will hold positions on behalf of their Participants through their respective European Depositaries, which in turn will hold such positions in accounts as DTC Participants.

Investors electing to hold their Global Securities through DTC will follow the settlement practices applicable to prior mortgage pass-through certificate issues. Investors' securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Global Securities through Clearstream Luxembourg or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global Securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

SECONDARY MARKET TRADING

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

A-I-1

<PAGE>

Trading Between DTC Participants. Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage pass-through certificate issues in same-day funds.

Trading Between Clearstream Luxembourg and/or Euroclear Participants. Secondary market trading between Clearstream Luxembourg Participants or Euroclear Participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

Trading Between DTC Seller and Clearstream Luxembourg or Euroclear

Purchaser. When Global Securities are to be transferred from the account of a
DTC Participant to the account of a Clearstream Luxembourg Participant or a
Euroclear Participant, the purchaser will send instructions to Clearstream
Luxembourg or Euroclear through a Clearstream Luxembourg Participant or
Euroclear Participant at least one business day prior to settlement. Clearstream
Luxembourg or Euroclear will instruct the Relevant Depositary to receive the
Global Securities against payment. Payment will include interest accrued on the
Global Securities from and including the last coupon payment date to and
excluding the settlement date, on the basis of either the actual number of days
in such accrual period and a year assumed to consist of 360 days or a 360-day
year of twelve 30-day months, as applicable to the related class of Global
Securities. For transactions settling on the 31st of the month, payment will
include interest accrued to and excluding the first day of the following month.
Payment will then be made by the Relevant Depositary of the DTC Participant's
account against delivery of the Global Securities. After settlement has been
completed, the Global Securities will be credited to the respective clearing
system and by the clearing system, in accordance with its usual procedures, to
the Clearstream Luxembourg Participant's or Euroclear Participant's account. The
securities credit will appear the next day (European time) and the cash debt
will be back-valued to, and the interest on the Global Securities will accrue
from, the value date (which would be the preceding day when settlement occurred
in New York). If settlement is not completed on the intended value date (i.e.,
the trade fails), the Clearstream Luxembourg or Euroclear cash debt will be
valued instead as of the actual settlement date.

        Clearstream Luxembourg Participants and Euroclear Participants will need to
make available to the respective clearing systems the funds necessary to process
same-day funds settlement. The most direct means of doing so is to pre-position
funds for settlement, either from cash on hand or existing lines of credit, as
they would for any settlement occurring within Clearstream Luxembourg or
Euroclear. Under this approach, they may take on credit exposure to Clearstream
Luxembourg or Euroclear until the Global Securities are credited to their
accounts one day later.

        As an alternative, if Clearstream Luxembourg or Euroclear has extended a
line of credit to them, Clearstream Luxembourg Participants or Euroclear
Participants can elect not to pre-position funds and allow that credit line to
be drawn upon the finance settlement. Under this procedure, Clearstream
Luxembourg Participants or Euroclear Participants purchasing Global Securities
would incur overdraft charges for one day, assuming they cleared the overdraft
when the Global Securities were credited to their accounts. However, interest on
the Global Securities would accrue from the value date. Therefore, in many cases
the investment income on the Global Securities earned during that one-day period
may substantially reduce or offset the amount of such overdraft charges,
although this result will depend on each Clearstream Luxembourg Participant's or
Euroclear Participant's particular cost of funds.

        Since the settlement is taking place during New York business hours, DTC
Participants can employ their usual procedures for sending Global Securities to
the respective European Depositary for the benefit of Clearstream Luxembourg
Participants or Euroclear Participants. The sale proceeds will be available to
the DTC seller on the settlement date. Thus, to the DTC Participants a
cross-market transaction will settle no differently than a trade between two DTC
Participants.


                                    A-I-2


<PAGE>


        Trading Between Clearstream Luxembourg or Euroclear Seller and DTC
Purchaser. Due to time zone differences in their favor, Clearstream Luxembourg
Participants and Euroclear Participants may employ their customary procedures
for transactions in which Global Securities are to be transferred by the
respective clearing system, through the Relevant Depositary, to a DTC

Participant. The seller will send instructions to Clearstream Luxembourg or Euroclear through a Clearstream Luxembourg Participant or Euroclear Participant at least one business day prior to settlement. In these cases, Clearstream Luxembourg or Euroclear will instruct the Relevant Depositary, as appropriate, to deliver the Global Securities to the DTC Participant's account against payment. Payment will include interest accrued on the Global Securities from and including the last coupon payment date to and excluding the settlement date on the basis of either the actual number of days in such accrual period and a year assumed to consist of 360 days or a 360-day year of twelve 30-day months, as applicable to the related class of Global Securities. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Clearstream Luxembourg Participant or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream Luxembourg Participant's or Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream Luxembourg Participant or Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream Luxembourg Participant's or Euroclear Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream Luxembourg or Euroclear and that purchase Global Securities from DTC Participants for delivery to Clearstream Luxembourg Participants or Euroclear Participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

(1) borrowing through Clearstream Luxembourg or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream Luxembourg or Euroclear accounts) in accordance with the clearing system's customary procedures;

(2) borrowing the Global Securities in the U.S. from a DTC Participant no later than one day prior to settlement, which would give the Global Securities sufficient time to be reflected in their Clearstream Luxembourg or Euroclear account in order to settle the sale side of the trade; or

(3) staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Clearstream Luxembourg Participant or Euroclear Participant.

CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS

A beneficial owner of Global Securities that is a non-U.S. Person will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless (1) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (2) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

A-I-3

<PAGE>

Exemption for non-U.S. Persons (Form W-8BEN). Beneficial owners of Global Securities that are non-U.S. Persons and are neither "10-percent shareholders" of the issuer within the meaning of Code Section 871(h)(3)(B) nor controlled foreign corporations related to the issuer within the meaning of Code Section 881(c)(3)(C) can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Further, non-U.S. Persons that are beneficial owners residing in a country that has a tax treaty with the United States and are eligible for benefits under that treaty can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing a properly completed Form W-8BEN claiming eligibility for treaty benefits. If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change. If the owner of Global Securities is a partnership or other type of pass-through entity that is not treated for U.S. withholding tax purposes as the beneficial owner of the income with respect to such Global Securities, the owner generally must receive the statement described in the previous sentence from the owner's partners or other beneficial owners of the income with respect to the Global Securities and may be required to provide such statements, and certain additional information, to the person through whom the owner holds the Global Securities.

Exemption for non-U.S. Persons with Effectively Connected Income (Form W-8ECI). A non-U.S. Person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

The term "U.S. Person" means

(1)  a citizen or resident of the United States,

(2)  a corporation or partnership organized in or under the laws of the United States, any state thereof or the District of Columbia (unless, in the case of a partnership, Treasury regulations provide otherwise), including an entity treated as a corporation or partnership for federal income tax purposes,

(3)  an estate the income of which is includable in gross income for United States tax purposes, regardless of its source, or

(4)  a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States persons prior to such date, that elect to continue to be treated as United States persons will also be U.S. Persons.

This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the Global Securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Global Securities.

A-I-4

<PAGE>

ANNEX II

THE MORTGAGE POOL(1)

MORTGAGE RATES

```
<TABLE>
<CAPTION>
```

| RANGE OF MORTGAGE RATES | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| 5.501% to 6.000% | 66.12% | 42.86% | 78.13% | 26.88% | 36 | $ 10,469,404 | 0.55% | 5.900% | 723 | $290,817 |
| 6.001% to 6.500% | 75.44 | 43.06 | 88.10 | 17.55 | 186 | 48,396,333 | 2.54 | 6.321 | 707 | 260,195 |
| 6.501% to 7.000% | 77.17 | 43.93 | 77.11 | 12.01 | 402 | 106,833,947 | 5.60 | 6.824 | 682 | 265,756 |
| 7.001% to 7.500% | 80.05 | 44.12 | 77.50 | 13.56 | 733 | 181,002,738 | 9.50 | 7.294 | 672 | 246,934 |
| 7.501% to 8.000% | 81.79 | 43.95 | 71.31 | 5.70 | 1,312 | 305,370,551 | 16.02 | 7.803 | 656 | 232,752 |
| 8.001% to 8.500% | 83.42 | 43.78 | 68.71 | 6.59 | 1,430 | 312,523,329 | 16.40 | 8.291 | 648 | 218,548 |
| 8.501% to 9.000% | 85.60 | 43.50 | 68.14 | 3.46 | 1,808 | 367,879,540 | 19.30 | 8.771 | 636 | 203,473 |
| 9.001% to 9.500% | 87.10 | 43.70 | 71.79 | 4.20 | 1,285 | 230,791,390 | 12.11 | 9.275 | 623 | 179,604 |
| 9.501% to 10.000% | 89.33 | 43.15 | 68.43 | 3.56 | 1,128 | 193,570,860 | 10.15 | 9.758 | 621 | 171,605 |
| 10.001% to 10.500% | 92.11 | 42.74 | 66.97 | 3.19 | 450 | 71,762,503 | 3.76 | 10.267 | 618 | 159,472 |
| 10.501% to 11.000% | 94.61 | 43.70 | 73.66 | 4.29 | 282 | 42,001,461 | 2.20 | 10.758 | 622 | 148,941 |
| 11.001% to 11.500% | 96.28 | 42.92 | 70.50 | 2.29 | 116 | 16,773,124 | 0.88 | 11.259 | 629 | 144,596 |
| 11.501% to 12.000% | 99.68 | 44.66 | 68.07 | 6.59 | 73 | 9,835,839 | 0.52 | 11.772 | 626 | 134,738 |
| 12.001% to 12.500% | 99.86 | 44.81 | 71.46 | 5.74 | 40 | 5,003,559 | 0.26 | 12.254 | 617 | 125,089 |
| 12.501% to 13.000% | 99.90 | 47.75 | 78.30 | 0.00 | 23 | 2,921,320 | 0.15 | 12.700 | 614 | 127,014 |
| 13.001% to 13.500% | 100.00 | 45.18 | 100.00 | 65.39 | 5 | 801,010 | 0.04 | 13.347 | 596 | 160,202 |
| 13.501% to 14.000% | 100.00 | 38.93 | 100.00 | 0.00 | 2 | 258,900 | 0.01 | 13.677 | 581 | 129,450 |
| Total | 84.51% | 43.66% | 71.31% | 6.40% | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 |

```
</TABLE>
```

As of the Cut-off Date, Mortgage Rates borne by the Mortgage Loans ranged from 5.600% per annum to 13.750% per annum and the weighted average Mortgage Rate of the Mortgage Loans was approximately 8.526% per annum.

REMAINING MONTHS TO STATED MATURITY

```
<TABLE>
<CAPTION>
                        NUMBER    AGGREGATE    PERCENT            WEIGHTED   AVERAGE
WEIGHTED  WEIGHTED
                          OF      PRINCIPAL      OF     WEIGHTED  AVERAGE   PRINCIPAL
AVERAGE   AVERAGE  PERCENT
RANGE OF  REMAINING      MORTGAGE   BALANCE    MORTGAGE  AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO-   FULL   PERCENT
TERMS (MONTHS)           LOANS   OUTSTANDING    POOL     COUPON    SCORE   OUTSTANDING
LTV     INCOME     DOC      IO
----------------------  --------  -------------- --------- -------- -------- ----------- -----
---  --------  ------- -------
<S>                       <C>     <C>            <C>       <C>      <C>      <C>         <C>
<C>      <C>        <C>
169 to 180..............    64  $    8,613,069    0.45%   7.861%    658     $134,579
74.74%   40.51%   79.24%   11.16%
229 to 240..............     2       183,800     0.01     8.330     617      91,900
80.31    37.51   100.00    0.00
349 to 360..............  9,245  1,897,398,940   99.54     8.529     645     205,235
84.55    43.68    71.27    6.38
                          -----  --------------  ------   -----     ---    --------   ----
-    -----   ------   -----
  Total................  9,311  $1,906,195,808  100.00%   8.526%    645    $204,725
84.51%   43.66%   71.31%    6.40%
                          =====  ==============  ======   =====     ===    ========
=====   =====   ======    =====
</TABLE>
```

    As of the Cut-off Date, the remaining term to stated maturity of the
Mortgage Loans ranged from 177 months to 360 months and the weighted average
term to stated maturity of the Mortgage Loans was approximately 359 months.

----------
(1)  All references to Mortgage Loans in this Annex II mean the Statistical
     Mortgage Loans having an aggregate principal balance of $1,906,195,808 as
     of the Cut-Off Date. The actual final mortgage pool to be delivered to the
     Issuing Entity on the Closing Date will have a total Stated Principal
     Balance of $1,888,495,811 as of the Cut-off Date.

                                    A-II-1
<PAGE>

                   ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES

```
<TABLE>
<CAPTION>
                             NUMBER    AGGREGATE    PERCENT            WEIGHTED   AVERAGE
WEIGHTED  WEIGHTED
                               OF      PRINCIPAL      OF     WEIGHTED  AVERAGE   PRINCIPAL
AVERAGE   AVERAGE  PERCENT
ORIGINAL MORTGAGE LOAN      MORTGAGE   BALANCE    MORTGAGE  AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO   FULL   PERCENT
PRINCIPAL BALANCES          LOANS   OUTSTANDING    POOL     COUPON    SCORE   OUTSTANDING
LTV     -INCOME    DOC      IO
----------------------  --------  -------------- --------- -------- -------- ----------- -----
---  --------  ------- -------
<S>                       <C>     <C>            <C>       <C>      <C>      <C>         <C>
<C>      <C>        <C>
$50,000 or less ........     62  $    3,019,557    0.16%   9.590%    614     $ 48,703
75.81%   35.78%   85.10%    1.66%
$50,001 to $100,000 .....  1,920     148,116,964    7.77   9.217     627      77,144
84.78    40.21    88.32     1.81
$100,001 to $150,000 ....  2,161     270,489,658   14.19   8.779     633     125,169
```

```
84.17    42.37    84.99      3.31
$150,001 to $200,000 ....   1,675     291,865,874    15.31    8.583    639      174,248
84.39    43.64    76.65      4.58
$200,001 to $250,000 ....   1,072     239,574,078    12.57    8.440    644      223,483
84.51    43.77    70.99      5.91
$250,001 to $300,000 ....     779     213,326,217    11.19    8.363    643      273,846
84.27    44.86    70.99      6.73
$300,001 to $350,000 ....     426     138,028,967     7.24    8.444    650      324,012
85.24    45.08    61.76      6.79
$350,001 to $400,000 ....     364     136,314,268     7.15    8.330    655      374,490
84.33    45.01    56.62      7.62
$400,001 to $450,000 ....     222      94,752,980     4.97    8.309    654      426,815
84.42    45.31    51.88      8.12
$450,001 to $500,000 ....     171      81,631,353     4.28    8.395    654      477,376
84.94    44.77    61.37      7.60
$500,001 to $550,000 ....     148      77,891,223     4.09    8.232    657      526,292
84.37    45.49    62.84      6.12
$550,001 to $600,000 ....     113      64,838,081     3.40    8.665    647      573,788
86.53    43.47    58.36      8.75
$600,001 to $650,000 ....      66      41,179,224     2.16    8.405    668      623,928
86.41    41.71    58.82     13.64
$650,001 to $700,000 ....      36      24,313,610     1.28    8.666    679      675,378
85.95    43.03    61.14     13.96
$700,001 to $750,000 ....      29      20,936,871     1.10    8.398    670      721,961
85.89    40.34    79.43     17.28
$750,001 to $800,000 ....      28      21,773,172     1.14    7.982    688      777,613
84.13    45.97    60.81     21.41
$800,001 to $850,000 ....       9       7,467,900     0.39    7.514    661      829,767
83.84    43.38    77.80     33.60
$850,001 to $900,000 ....       6       5,299,501     0.28    7.661    654      883,250
76.44    48.83    83.64      0.00
$900,001 to $950,000 ....       4       3,680,160     0.19    8.112    693      920,040
80.00    36.02   100.00     24.96
$950,001 to $1,000,000 ..       6       5,875,900     0.31    7.929    654      979,317
78.16    34.23    83.75      0.00
$1,000,001 or greater ...      14      15,820,250     0.83    7.384    699    1,130,018
78.06    45.21    91.59     22.59
                                    --------------   ------   -----    ---   ----------   ----
-    -----    ------     -----
  Total ................   9,311  $1,906,195,808  100.00%   8.526%    645   $  204,725
84.51%   43.66%   71.31%     6.40%
                            =====  ==============   ======   =====    ===   ==========
=====    =====    ======     =====
</TABLE>
```

As of the Cut-off Date, the outstanding principal balances of the Mortgage Loans ranged from approximately $31,130 to approximately $1,350,000 and the average outstanding principal balance of the Mortgage Loans was approximately $204,725.


A-II-2

```
<PAGE>
```

PRODUCT TYPES

```
<TABLE>
<CAPTION>
                             NUMBER        AGGREGATE      PERCENT                WEIGHTED    AVERAGE
WEIGHTED   WEIGHTED
                               OF          PRINCIPAL        OF      WEIGHTED    AVERAGE    PRINCIPAL
AVERAGE    AVERAGE   PERCENT
                            MORTGAGE        BALANCE       MORTGAGE   AVERAGE    CREDIT      BALANCE
ORIGINAL   DEBT-TO    FULL    PERCENT
```

```
PRODUCT TYPES                       LOANS  OUTSTANDING       POOL    COUPON   SCORE   OUTSTANDING
LTV      -INCOME   DOC                IO
-------------                      --------  --------------  --------  --------  --------  -----------  -----
---   --------   ------   -------
<S>                                  <C>    <C>               <C>      <C>       <C>      <C>           <C>
<C>      <C>       <C>
Balloon - 30/50 ........      358   $  64,662,838   3.39%    9.074%    629      $180,622
85.12%   44.49%    78.18%    0.00%
ARM - 1 Year/6 Month ....      23        3,928,045   0.21     8.876    639       170,785
86.51    44.74     60.15     0.00
ARM - 2 Year/6 Month
   (50 due in 30) .......   2,331      638,233,765  33.48     8.367    651       273,803
84.05    45.47     70.67     0.00
ARM - 3 Year/6 Month
   (50 due in 30) .......     599      156,971,893   8.23     8.185    653       262,057
84.23    44.92     64.36     0.00
ARM - 5 Year/6 Month
   (50 due in 30) .......      58       14,905,422   0.78     8.050    662       256,990
82.44    41.97     74.88     0.00
15 Year Fixed Loans .....      61        8,226,069   0.43     7.780    659       134,854
73.82    40.53     78.26    11.68
15/30 Balloon Loans .....       3          387,000   0.02     9.584    639       129,000
94.19    39.94    100.00     0.00
20 Year Fixed Loans .....       2          183,800   0.01     8.330    617        91,900
80.31    37.51    100.00     0.00
2/28 LIBOR Loans ........   2,260      397,922,900  20.88     8.642    642       176,072
85.60    42.02     73.19    16.08
2/28 LIBOR Loans
   (40 due in 30) .......     807      177,445,002   9.31     8.766    629       219,882
85.89    44.34     67.35     0.00
30 Year Fixed Loans .....   1,630      213,496,354  11.20     8.850    642       130,979
83.84    40.96     79.69     6.86
30/40 Balloon Loans .....     208       34,732,566   1.82     8.979    636       166,983
85.07    44.25     72.81     0.00
3/27 LIBOR Loans ........     651      123,555,855   6.48     8.344    650       189,794
83.75    41.89     63.94    25.45
3/27 LIBOR Loans
   (40 due in 30) .......     225       49,223,438   2.58     8.411    639       218,771
85.33    43.09     71.24     0.00
5/25 LIBOR Loans ........      56       13,476,993   0.71     7.794    674       240,661
78.45    41.95     68.33    61.99
5/25 LIBOR Loans
   (40 due in 30) .......      13        2,614,173   0.14     7.936    700       201,090
80.44    42.18     85.69     0.00
Six Month LIBOR Loans ...      26        6,229,696   0.33     8.169    651       239,604
82.59    44.52     70.46    40.61
                             -----  --------------  ------   -----    ---      --------   ----
-    -----    ------    -----
   Total ...............   9,311   $1,906,195,808  100.00%   8.526%    645      $204,725
84.51%   43.66%    71.31%    6.40%
                             =====  ==============  ======   =====    ===      ========
=====    =====    ======    =====
</TABLE>
```

                        AMORTIZATION TYPE

```
<TABLE>
<CAPTION>
                           NUMBER    AGGREGATE    PERCENT              WEIGHTED    AVERAGE
WEIGHTED   WEIGHTED
                             OF      PRINCIPAL      OF      WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE    AVERAGE   PERCENT
                          MORTGAGE    BALANCE     MORTGAGE   AVERAGE    CREDIT     BALANCE
ORIGINAL   DEBT-TO    FULL   PERCENT
AMORTIZATION TYPE           LOANS   OUTSTANDING    POOL     COUPON     SCORE    OUTSTANDING
```

```
LTV      -INCOME  DOC      IO
---------------- -------- -------------- -------- -------- -------- ----------- -----
---  -------- ------- -------
<S>                        <C>        <C>              <C>      <C>      <C>      <C>         <C>
<C>     <C>      <C>      <C>
Fully Amortizing.........   4,274   $  645,080,793   33.84%   8.741%     638    $150,931
84.84%   41.28%   74.53%    0.00%
Balloon..................   4,602    1,139,176,097   59.76    8.460      646     247,539
84.48    44.97    69.90     0.00
60 Month Interest-Only...     409      113,584,296    5.96    8.038      674     277,712
83.37    44.09    67.51   100.00
120 Month Interest-Only..      26        8,354,623    0.44    7.640      691     321,332
77.42    43.36    66.05   100.00
                            -----   --------------   ------   -----      ---    -------- ----
-    -----    -----   ------
   Total..................  9,311   $1,906,195,808  100.00%   8.526%     645    $204,725
84.51%   43.66%   71.31%    6.40%
                            =====   ==============   ======   =====      ===    ========
=====    =====    =====    ======
</TABLE>
```

ADJUSTMENT TYPE

```
<TABLE>
<CAPTION>
                           NUMBER      AGGREGATE      PERCENT             WEIGHTED    AVERAGE
WEIGHTED  WEIGHTED
                             OF        PRINCIPAL        OF      WEIGHTED  AVERAGE   PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                          MORTGAGE     BALANCE       MORTGAGE   AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO   FULL   PERCENT
ADJUSTMENT TYPE            LOANS     OUTSTANDING       POOL     COUPON    SCORE   OUTSTANDING
LTV      -INCOME  DOC      IO
-------------- -------- -------------- -------- -------- -------- ----------- -----
---  -------- ------- -------
<S>                        <C>        <C>              <C>      <C>      <C>      <C>         <C>
<C>     <C>      <C>
ARM .....................  7,049   $1,584,507,182   83.12%   8.454%     647    $224,785
84.61%   44.00%   69.82%    6.71%
Fixed Rate ..............  2,262      321,688,627   16.88    8.882      639     142,214
83.98    42.01    78.64     4.85
                           -----   --------------   ------   -----      ---    -------- ----
-    -----    -----   ----
   Total ................  9,311   $1,906,195,808  100.00%   8.526%     645    $204,725
84.51%   43.66%   71.31%    6.40%
                           =====   ==============   ======   =====      ===    ========
=====    =====    =====    ====
</TABLE>
```

A-II-3

<PAGE>

GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES

```
<TABLE>
<CAPTION>
                           NUMBER      AGGREGATE      PERCENT             WEIGHTED    AVERAGE
WEIGHTED  WEIGHTED
                             OF        PRINCIPAL        OF      WEIGHTED  AVERAGE   PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                          MORTGAGE     BALANCE       MORTGAGE   AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO   FULL   PERCENT
GEOGRAPHIC DISTRIBUTIONS   LOANS     OUTSTANDING       POOL     COUPON    SCORE   OUTSTANDING
```

```
LTV    -INCOME   DOC      IO
------------------------  --------  ---------------  --------  --------  --------  -----------  -----
---  --------  -------  -------
<S>                       <C>       <C>       <C>       <C>       <C>       <C>       <C>          <C>
<C>       <C>      <C>
Alabama ...............    95    $   12,380,188     0.65%     9.011%    627    $130,318
88.56%  41.11%  87.17%   3.02%
Arizona ...............   250        53,060,310     2.78      8.276     649      212,241
82.36   43.94   72.70   11.05
Arkansas ..............    28         3,121,813     0.16      9.364     626      111,493
91.28   39.53   84.37    5.03
California ............   896       333,006,231    17.47      7.865     662      371,659
81.42   45.18   67.02   10.45
Colorado ..............   164        37,083,997     1.95      8.596     643      226,122
85.27   42.40   86.59   10.56
Connecticut ...........    70        16,003,705     0.84      8.721     635      228,624
85.26   44.13   72.90    7.46
Delaware ..............    12         2,530,910     0.13      8.648     628      210,909
87.37   43.35  100.00   17.70
District of Columbia ..     2           648,000     0.03      8.122     642      324,000
83.96   49.89  100.00    0.00
Florida ...............   914       196,777,480    10.32      8.352     647      215,293
83.33   44.00   64.43    4.92
Georgia ...............   322        57,568,801     3.02      9.098     636      178,785
86.58   43.49   81.44    8.05
Idaho .................    57         8,346,544     0.44      8.507     632      146,431
83.77   43.35   91.28    5.14
Illinois ..............   589       128,110,636     6.72      8.948     639      217,505
86.31   44.12   53.79    2.95
Indiana ...............   309        33,912,562     1.78      9.075     622      109,749
89.45   39.74   84.34    3.97
Iowa ..................    35         3,457,685     0.18      9.531     619       98,791
90.56   39.26   95.05    4.48
Kansas ................    27         2,917,022     0.15      9.350     637      108,038
88.05   46.68   94.54   14.22
Kentucky ..............    93        10,840,325     0.57      9.189     623      116,563
88.42   39.64   85.43    3.95
Louisiana .............    51         7,137,229     0.37      8.659     641      139,946
87.23   42.78   85.29    8.04
Maine .................    27         4,418,750     0.23      8.518     633      163,657
85.06   47.04   81.72    3.71
Maryland ..............   165        49,501,835     2.60      8.638     642      300,011
84.50   44.07   80.46    4.74
Massachusetts .........   142        37,996,030     1.99      8.825     641      267,578
83.59   44.13   71.93    2.81
Michigan ..............   367        49,402,645     2.59      8.935     635      134,612
88.15   42.82   77.74    4.66
Minnesota .............   176        35,732,646     1.87      8.870     637      203,026
86.32   45.52   68.42   10.39
Mississippi ...........    29         3,822,235     0.20      8.738     634      131,801
85.14   39.34   86.57    9.78
Missouri ..............   151        18,175,812     0.95      9.116     622      120,370
87.55   43.20   82.31    1.96
Montana ...............     8         1,168,730     0.06      8.066     667      146,091
82.16   46.10   60.33    0.00
Nebraska ..............    16         1,811,621     0.10      9.517     612      113,226
90.28   42.82   82.52    5.56
Nevada ................   141        36,649,239     1.92      8.128     648      259,924
82.91   44.84   87.17    5.36
New Hampshire .........    22         4,367,605     0.23      8.727     638      198,528
82.55   43.86   82.22    5.71
New Jersey ............   193        55,009,285     2.89      8.885     647      285,022
86.32   45.18   44.33    7.20
New Mexico ............    59        10,593,662     0.56      8.912     621      179,554
86.52   45.00   85.13   11.98
```

| | NUMBER OF LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|
| New York | 495 | 137,152,552 | 7.20 | 8.492 | 659 | 277,076 |
| 85.00    44.77    45.44 | 8.99 | | | | | |
| North Carolina .......... | 261 | 37,006,097 | 1.94 | 9.085 | 631 | 141,786 |
| 87.02    41.07    86.94 | 4.63 | | | | | |
| North Dakota ........... | 6 | 621,102 | 0.03 | 8.917 | 639 | 103,517 |
| 80.71    48.81    90.79 | 0.00 | | | | | |
| Ohio ................... | 432 | 48,815,929 | 2.56 | 9.192 | 628 | 113,000 |
| 88.86    41.05    89.64 | 2.34 | | | | | |
| Oklahoma ............... | 52 | 5,435,290 | 0.29 | 9.229 | 626 | 104,525 |
| 89.54    36.26    89.05 | 0.00 | | | | | |
| Oregon ................. | 213 | 48,459,721 | 2.54 | 8.316 | 645 | 227,510 |
| 83.75    41.18    79.92 | 11.56 | | | | | |
| Pennsylvania ........... | 219 | 28,528,074 | 1.50 | 8.757 | 628 | 130,265 |
| 85.75    40.01    74.91 | 2.71 | | | | | |
| Rhode Island ........... | 47 | 10,005,584 | 0.52 | 8.550 | 648 | 212,885 |
| 81.97    46.78    56.03 | 4.96 | | | | | |
| South Carolina ......... | 108 | 15,393,246 | 0.81 | 9.050 | 637 | 142,530 |
| 86.27    42.46    87.41 | 9.28 | | | | | |
| South Dakota ........... | 8 | 1,036,334 | 0.05 | 8.504 | 638 | 129,542 |
| 86.24    45.99    81.57 | 0.00 | | | | | |
| Tennessee .............. | 307 | 37,423,081 | 1.96 | 8.791 | 637 | 121,899 |
| 84.14    43.03    91.69 | 5.33 | | | | | |
| Texas .................. | 721 | 98,399,239 | 5.16 | 8.903 | 637 | 136,476 |
| 85.64    42.07    85.15 | 2.95 | | | | | |
| Utah ................... | 336 | 66,301,351 | 3.48 | 8.388 | 640 | 197,325 |
| 84.24    42.92    79.59 | 2.32 | | | | | |
| Vermont ................ | 14 | 2,028,800 | 0.11 | 9.141 | 624 | 144,914 |
| 88.55    41.97    87.40 | 0.00 | | | | | |
| Virginia ............... | 94 | 24,242,497 | 1.27 | 8.201 | 653 | 257,899 |
| 83.22    44.69    65.51 | 3.79 | | | | | |
| Washington ............. | 380 | 101,826,079 | 5.34 | 8.152 | 653 | 267,963 |
| 82.90    43.46    77.30 | 4.55 | | | | | |
| West Virginia .......... | 10 | 1,368,076 | 0.07 | 9.131 | 628 | 136,808 |
| 83.65    42.38    71.71 | 0.00 | | | | | |
| Wisconsin .............. | 187 | 24,614,092 | 1.29 | 8.975 | 631 | 131,626 |
| 85.49    43.16    82.23 | 1.59 | | | | | |
| Wyoming ................ | 11 | 1,985,130 | 0.10 | 8.624 | 628 | 180,466 |
| 84.28    43.22    89.60 | 0.00 | | | | | |
| -   -----   ------   ----- | ----- | -------------- | ------ | ----- | --- | -------- | ---- |
| Total ................ | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 |
| 84.51%    43.66%    71.31% | 6.40% | | | | | |
| =====   =====   ======   ===== | ===== | ============== | ====== | ===== | === | ======== |

</TABLE>

     No more than approximately 0.27% of the Mortgage Loans will be secured by mortgaged properties located in any one zip code.

A-II-4

<PAGE>

ORIGINAL LOAN-TO-VALUE RATIOS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL DEBT-TO FULL | WEIGHTED AVERAGE PERCENT |
|---|---|---|---|---|---|---|---|---|

| LTV | -INCOME | DOC | IO | | | | | |
|-----|---------|-----|-----|---|---|---|---|---|
| --- | -------- | ------- | ------- | -------- | -------------- | -------- | -------- | -------- | ----------- | ----- |
| <S> | | | <C> | <C> | | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | | |
| 50.00% or less ......... | | | 136 | $ 17,902,374 | 0.94% | 7.774% | 638 | $131,635 |
| 41.17% | 37.55% | 59.91% | 6.02% | | | | | |
| 50.01% to 55.00% ........ | | | 52 | 8,969,546 | 0.47 | 7.745 | 638 | 172,491 |
| 52.42 | 40.32 | 57.27 | 4.27 | | | | | |
| 55.01% to 60.00% ........ | | | 85 | 13,461,900 | 0.71 | 7.715 | 629 | 158,375 |
| 57.81 | 41.01 | 64.68 | 2.60 | | | | | |
| 60.01% to 65.00% ........ | | | 132 | 23,626,854 | 1.24 | 7.814 | 629 | 178,991 |
| 63.37 | 39.89 | 67.48 | 3.03 | | | | | |
| 65.01% to 70.00% ........ | | | 199 | 42,200,141 | 2.21 | 7.753 | 638 | 212,061 |
| 68.72 | 41.94 | 58.39 | 9.53 | | | | | |
| 70.01% to 75.00% ........ | | | 313 | 60,623,328 | 3.18 | 8.043 | 625 | 193,685 |
| 73.81 | 41.46 | 60.34 | 4.55 | | | | | |
| 75.01% to 80.00% ........ | | | 3,808 | 833,563,389 | 43.73 | 8.094 | 658 | 218,898 |
| 79.84 | 44.39 | 78.08 | 8.59 | | | | | |
| 80.01% to 85.00% ........ | | | 669 | 131,054,912 | 6.88 | 8.596 | 610 | 195,897 |
| 84.47 | 42.34 | 69.21 | 4.11 | | | | | |
| 85.01% to 90.00% ........ | | | 1,468 | 297,390,119 | 15.60 | 8.671 | 628 | 202,582 |
| 89.64 | 42.99 | 63.57 | 4.99 | | | | | |
| 90.01% to 95.00% ........ | | | 1,683 | 348,256,600 | 18.27 | 9.075 | 644 | 206,926 |
| 94.86 | 43.81 | 67.80 | 4.15 | | | | | |
| 95.01% to 100.00% ....... | | | 766 | 129,146,644 | 6.78 | 10.289 | 658 | 168,599 |
| 99.98 | 45.08 | 70.32 | 4.94 | | | | | |
| - | ----- | ----- | ---- | | | | | |
| Total ............... | | | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 |
| 84.51% | 43.66% | 71.31% | 6.40% | | | | | |
| ===== | ===== | ===== | ==== | ===== | ============== | ====== | ====== | === | ======== | ==== |

</TABLE>

As of the Cut-off Date, the Original Loan-to-Value Ratios of the Mortgage Loans ranged from 15.20% to 100.00%.

COMBINED LOAN-TO-VALUE RATIOS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL COMBINED LOAN-TO-VALUE RATIOS | WEIGHTED AVERAGE DEBT-TO -INCOME | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|
| LTV | -INCOME | DOC | IO | | | | | |
| --- | -------- | ------- | ------- | -------- | -------------- | -------- | -------- | -------- | ----------- | ----- |
| <S> | | | <C> | <C> | | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | | |
| 50.00% or less ......... | | | 136 | $ 17,902,374 | 0.94% | 7.774% | 638 | $131,635 |
| 41.17% | 37.55% | 59.91% | 6.02% | | | | | |
| 50.01% to 55.00% ........ | | | 49 | 8,109,546 | 0.43 | 7.798 | 636 | 165,501 |
| 52.56 | 41.12 | 54.37 | 2.28 | | | | | |
| 55.01% to 60.00% ........ | | | 84 | 13,040,650 | 0.68 | 7.759 | 629 | 155,246 |
| 57.62 | 40.76 | 63.54 | 2.68 | | | | | |
| 60.01% to 65.00% ........ | | | 130 | 22,202,054 | 1.16 | 7.865 | 622 | 170,785 |
| 63.32 | 39.82 | 65.40 | 3.22 | | | | | |
| 65.01% to 70.00% ........ | | | 198 | 42,096,641 | 2.21 | 7.747 | 638 | 212,609 |
| 68.64 | 41.78 | 58.29 | 10.02 | | | | | |
| 70.01% to 75.00% ........ | | | 305 | 57,536,878 | 3.02 | 8.044 | 622 | 188,646 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 73.52 | 40.96 | 58.90 | 4.80 | | | | | |
| 75.01% to 80.00% ........ | 924 | 185,373,784 | 9.72 | 7.922 | 631 | 200,621 | | |
| 79.36 | 40.61 | 65.85 | 6.56 | | | | | |
| 80.01% to 85.00% ........ | 674 | 133,364,812 | 7.00 | 8.578 | 611 | 197,871 | | |
| 84.35 | 42.44 | 69.38 | 4.04 | | | | | |
| 85.01% to 90.00% ........ | 1,505 | 308,552,815 | 16.19 | 8.619 | 629 | 205,018 | | |
| 89.13 | 42.98 | 64.33 | 5.47 | | | | | |
| 90.01% to 95.00% ........ | 1,765 | 373,554,093 | 19.60 | 9.008 | 646 | 211,645 | | |
| 93.82 | 43.86 | 68.98 | 4.67 | | | | | |
| 95.01% to 100.00% ....... | 3,541 | 744,462,161 | 39.05 | 8.528 | 665 | 210,241 | | |
| 83.46 | 45.47 | 79.54 | 8.16 | | | | | |
| Total ............... | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | | |
| 84.51% | 43.66% | 71.31% | 6.40% | | | | | |

</TABLE>

As of the Cut-off Date, the Combined Loan-to-Value Ratios of the Mortgage Loans ranged from 15.20% to 100.00% and the weighted average Combined Loan-to-Value Ratio for Mortgage Loans was approximately 91.24%. This table was calculated using the Combined Loan-to-Value Ratio for Mortgage Loans that are in a second lien position and for Mortgage Loans that are in a first lien position with subordinate financing. Approximately 34.49% of the Mortgage Loans are in a first lien position with subordinate financing and the weighted average Combined Loan-to-Value Ratio for such Mortgage Loans was approximately 99.37%.

A-II-5

<PAGE>

DEBT-TO-INCOME RATIOS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL DEBT-TO-INCOME RATIOS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 20.00% or less ......... | 268 | $ 54,071,348 | 2.84% | 8.294% | 649 | $201,759 | 82.71% | 13.92% | 92.54% | 9.73% |
| 20.01% to 25.00% ........ | 319 | 50,017,498 | 2.62 | 8.545 | 639 | 156,795 | 82.02 | 23.08 | 81.47 | 6.09 |
| 25.01% to 30.00% ........ | 543 | 90,291,517 | 4.74 | 8.591 | 634 | 166,283 | 83.34 | 28.21 | 78.84 | 6.01 |
| 30.01% to 35.00% ........ | 801 | 134,482,753 | 7.06 | 8.572 | 642 | 167,894 | 83.58 | 33.21 | 76.26 | 3.79 |
| 35.01% to 40.00% ........ | 1,228 | 231,642,801 | 12.15 | 8.596 | 641 | 188,634 | 84.12 | 38.21 | 72.62 | 4.32 |
| 40.01% to 45.00% ........ | 1,754 | 360,847,275 | 18.93 | 8.565 | 646 | 205,728 | 84.87 | 43.22 | 60.85 | 6.53 |
| 45.01% to 50.00% ........ | 2,301 | 527,581,060 | 27.68 | 8.594 | 648 | 229,283 | 85.32 | 48.21 | 60.63 | 7.19 |
| 50.01% to 55.00% ........ | 2,094 | 456,535,171 | 23.95 | 8.382 | 647 | 218,021 | 84.46 | 53.40 | 84.69 | 6.85 |

```
55.01% to 60.00% ........        3         726,385    0.04    8.454    651      242,128
89.25   56.48   51.66   48.34
                             -----  --------------  ------  -----   ---  --------  ----

-       -----   -----   -----
   Total ...............    9,311  $1,906,195,808  100.00%  8.526%  645  $204,725
84.51%  43.66%  71.31%   6.40%
                             =====  ==============  ======  =====   ===  ========

=====   =====   =====   =====
</TABLE>
```

As of the Cut-off Date, the Debt-to-Income Ratios of the Mortgage Loans ranged from 0.28% to 57.00% and the weighted average Debt-to-Income Ratio for Mortgage Loans with Debt-to-Income Ratios was approximately 43.66%.

LOAN PURPOSE

<TABLE>
<CAPTION>

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| LOAN PURPOSE | | | | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Purchase ................ | 5,452 | $1,107,703,474 | 58.11% | 8.617% | 656 | $203,174 | 85.49% | 44.25% | 79.51% | 7.46% |
| Refinance - Cashout ..... | 3,232 | 677,977,229 | 35.57 | 8.428 | 630 | 209,770 | 83.14 | 42.95 | 57.90 | 4.88 |
| Refinance - Rate/Term ... | 627 | 120,515,105 | 6.32 | 8.249 | 639 | 192,209 | 83.17 | 42.29 | 71.30 | 5.17 |
| Total ............... | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | 84.51% | 43.66% | 71.31% | 6.40% |

</TABLE>

TYPES OF MORTGAGED PROPERTIES

<TABLE>
<CAPTION>

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| PROPERTY TYPE | | | | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Single Family .......... | 6,887 | $1,325,339,458 | 69.53% | 8.557% | 642 | $192,441 | 84.60% | 43.30% | 70.70% | 5.65% |
| Planned Unit Development ......... | 1,475 | 357,499,377 | 18.75 | 8.432 | 649 | 242,372 | 84.55 | 44.33 | 79.28 | 7.74 |

| ORIGINAL LTV | DEBT-TO-INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|
| Two- to Four-Family ..... | | | | 418 | 116,199,301 | 6.10 | 8.497 | 659 | 277,989 |
| 84.12 | 46.15 | 51.13 | 6.30 | | | | | | |
| Condominium ............ | | | | 531 | 107,157,672 | 5.62 | 8.490 | 656 | 201,804 |
| 83.55 | 43.18 | 74.09 | 11.30 | | | | | | |
| Total ................ | | | | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 |
| 84.51% | 43.66% | 71.31% | 6.40% | | | | | | |

</TABLE>

A-II-6

<PAGE>

DOCUMENTATION SUMMARY

<TABLE>
<CAPTION>

| ORIGINAL LTV | DEBT-TO-INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|
| DOCUMENTATION | | | | | | | | | |
| <S> | | | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | | | |
| Full Documentation ...... | | | | 7,182 | $1,359,246,925 | 71.31% | 8.487% | 641 | $189,257 |
| 84.37% | 43.45% | 100.00% | 6.05% | | | | | | |
| Rapid ................... | | | | 1,099 | 282,571,485 | 14.82 | 8.466 | 638 | 257,117 |
| 85.79 | 44.43 | 0.00 | 4.92 | | | | | | |
| Stated Income .......... | | | | 892 | 229,278,154 | 12.03 | 8.780 | 677 | 257,038 |
| 82.82 | 43.84 | 0.00 | 10.40 | | | | | | |
| Limited Income Verification ......... | | | | 78 | 17,150,965 | 0.90 | 8.572 | 650 | 219,884 |
| 85.24 | 43.06 | 0.00 | 3.71 | | | | | | |
| Stated Plus ............. | | | | 39 | 13,603,619 | 0.71 | 9.202 | 674 | 348,811 |
| 94.93 | 45.33 | 0.00 | 9.83 | | | | | | |
| Blended ................. | | | | 21 | 4,344,661 | 0.23 | 9.087 | 676 | 206,889 |
| 95.83 | 47.31 | 0.00 | 0.00 | | | | | | |
| Total ................ | | | | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 |
| 84.51% | 43.66% | 71.31% | 6.40% | | | | | | |

</TABLE>

OCCUPANCY TYPES

<TABLE>
<CAPTION>

| ORIGINAL OCCUPANCY | DEBT-TO-INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Primary ................. | 8,821 | $1,828,473,605 | 95.92% | 8.537% | 644 | $207,286 | 84.55% | 43.77% | 70.74% | 6.25% |
| Investment ............. | 458 | 71,371,173 | 3.74 | 8.231 | 683 | 155,832 | 83.08 | 41.13 | 84.90 | 10.10 |
| Second Home ............ | 32 | 6,351,030 | 0.33 | 8.781 | 683 | 198,470 | 88.47 | 41.98 | 82.09 | 6.33 |
| Total ................ | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | 84.51% | 43.66% | 71.31% | 6.40% |

</TABLE>

    The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

                    MORTGAGE LOAN AGE SUMMARY

<TABLE>
<CAPTION>

| MORTGAGE LOAN AGE (MONTHS) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <= 0 .................... | 4,242 | $ 864,136,697 | 45.33% | 8.637% | 645 | $203,710 | 84.76% | 43.70% | 71.81% | 5.03% |
| 1 ....................... | 5,022 | 1,035,065,884 | 54.30 | 8.431 | 646 | 206,106 | 84.28 | 43.63 | 70.81 | 7.45 |
| 2 ....................... | 35 | 4,579,401 | 0.24 | 9.285 | 626 | 130,840 | 89.81 | 44.06 | 90.05 | 22.04 |
| 3 ....................... | 11 | 1,979,114 | 0.10 | 8.107 | 647 | 179,919 | 81.73 | 44.44 | 85.92 | 17.07 |
| 4 ....................... | 1 | 434,712 | 0.02 | 8.300 | 633 | 434,712 | 72.67 | 39.00 | 0.00 | 0.00 |
| Total ................ | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | 84.51% | 43.66% | 71.31% | 6.40% |

</TABLE>

    As of the Cut-off Date, the weighted average age of the Mortgage Loans was approximately 1 month.

                          A-II-7

<PAGE>

                ORIGINAL PREPAYMENT CHARGE TERM

```
<TABLE>
<CAPTION>
```

| ORIGINAL PREPAYMENT CHARGE TERM | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE ORIGINAL INCOME | WEIGHTED AVERAGE DEBT-TO- DOC | PERCENT FULL IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| None.................. | 2,782 | $ 608,539,715 | 31.92% | 8.815% | 647 | $218,742 | 85.23% | 43.20% | 65.88% | 6.57% |
| 12 Months.............. | 501 | 126,888,933 | 6.66 | 8.748 | 650 | 253,271 | 84.80 | 43.63 | 62.51 | 10.82 |
| 24 Months.............. | 3,667 | 767,568,667 | 40.27 | 8.356 | 643 | 209,318 | 84.23 | 44.16 | 75.96 | 4.78 |
| 36 Months.............. | 2,361 | 403,198,493 | 21.15 | 8.344 | 645 | 170,774 | 83.85 | 43.40 | 73.41 | 7.82 |
| Total.............. | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | 84.51% | 43.66% | 71.31% | 6.40% |

```
</TABLE>
```

The weighted average prepayment penalty term at origination with respect to the Mortgage Loans having prepayment penalties is approximately 27 months.

CREDIT SCORES

```
<TABLE>
<CAPTION>
```

| RANGE OF CREDIT SCORES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE ORIGINAL INCOME | WEIGHTED AVERAGE DEBT-TO- DOC | PERCENT FULL IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 526 to 550.............. | 190 | $ 29,508,121 | 1.55% | 9.354% | 545 | $155,306 | 77.33% | 41.22% | 90.70% | 3.04% |
| 551 to 575.............. | 652 | 103,983,580 | 5.46 | 9.234 | 565 | 159,484 | 80.35 | 42.37 | 78.41 | 1.31 |
| 576 to 600.............. | 1,031 | 169,008,246 | 8.87 | 9.227 | 588 | 163,927 | 85.48 | 42.25 | 78.72 | 2.81 |
| 601 to 625.............. | 1,872 | 346,495,127 | 18.18 | 8.900 | 614 | 185,094 | 86.46 | 43.45 | 77.23 | 2.81 |
| 626 to 650.............. | 2,187 | 441,501,972 | 23.16 | 8.684 | 639 | 201,876 | 85.35 | 44.38 | 74.47 | 3.06 |
| 651 to 675.............. | 1,663 | 383,271,835 | 20.11 | 8.229 | 662 | 230,470 | 84.56 | 43.82 | 66.38 | 8.18 |
| 676 to 700.............. | 831 | 201,447,075 | 10.57 | 7.976 | 687 | 242,415 | 83.44 | 44.02 | 61.53 | 13.10 |
| 701 to 725.............. | 452 | 117,659,907 | 6.17 | 7.638 | 711 | 260,310 | 82.93 | 43.96 | 61.17 | 17.63 |

| RANGE | NUMBER OF LOANS | AGGREGATE PRINCIPAL BALANCE | PERCENT OF POOL | WEIGHTED AVERAGE COUPON | CREDIT SCORE | AVERAGE PRINCIPAL BALANCE | LTV |
|---|---|---|---|---|---|---|---|
| 726 to 750.............. | 225 | 60,182,464 | 3.16 | 7.762 | 737 | 267,478 | 82.09 |
| 43.62   58.24   10.92 | | | | | | | |
| 751 to 775.............. | 121 | 31,955,067 | 1.68 | 7.858 | 762 | 264,091 | 85.03 |
| 44.48   65.12   11.23 | | | | | | | |
| 776 to 800.............. | 67 | 17,131,365 | 0.90 | 7.544 | 786 | 255,692 | 80.37 |
| 44.42   72.74   14.52 | | | | | | | |
| 801 to 809.............. | 14 | 2,744,100 | 0.14 | 7.940 | 804 | 196,007 | 88.32 |
| 43.20   72.38   14.21 | | | | | | | |
| 810 to 820.............. | 6 | 1,306,950 | 0.07 | 8.303 | 813 | 217,825 | 82.54 |
| 38.41   67.86   11.85 | | | | | | | |
|   | ----- | -------------- | ------ | ----- | --- | -------- | ----- |
| -----    -----    ----- | | | | | | | |
| Total............... | 9,311 | $1,906,195,808 | 100.00% | 8.526% | 645 | $204,725 | |
| 84.51%   43.66%   71.31% | 6.40% | | | | | | |
| =====    =====    ===== | ===== | ============== | ====== | ===== | === | ======== | ===== |

</TABLE>

The Credit Scores of the Mortgage Loans that were scored as of the Cut-off
Date ranged from 540 to 815 and the weighted average Credit Score of the
Mortgage Loans that were scored as of the Cut-off Date was approximately 645.


A-II-8


<PAGE>


GROSS MARGINS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<TABLE>
<CAPTION>

| RANGE OF GROSS MARGINS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV |
|---|---|---|---|---|---|---|---|
| ORIGINAL LTV   DEBT-TO-INCOME   FULL DOC   PERCENT IO | | | | | | | |
| --------------------   --------   -------   ------- | -------- | -------------- | -------- | -------- | -------- | ----------- | ------ |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C>   <C>   <C> | | | | | | | |
| 2.501% to 3.000%........ | 91 | $ 35,583,668 | 2.25% | 7.352% | 694 | $391,029 | |
| 80.49%   39.47%   77.71%   24.07% | | | | | | | |
| 4.001% to 4.500%........ | 9 | 1,753,550 | 0.11 | 9.294 | 607 | 194,839 | 73.64 |
| 41.51   31.13   5.09 | | | | | | | |
| 4.501% to 5.000%........ | 65 | 13,433,907 | 0.85 | 8.905 | 621 | 206,675 | 83.14 |
| 45.55   44.84   19.22 | | | | | | | |
| 5.001% to 5.500%........ | 3,807 | 860,583,140 | 54.31 | 8.128 | 652 | 226,053 | 78.75 |
| 44.40   73.08   7.51 | | | | | | | |
| 5.501% to 6.000%........ | 1,426 | 317,229,033 | 20.02 | 8.537 | 625 | 222,461 | 88.18 |
| 43.10   63.85   5.11 | | | | | | | |
| 6.001% to 6.500%........ | 1,645 | 355,255,184 | 22.42 | 9.257 | 649 | 215,961 | 96.11 |
| 44.21   67.54   4.02 | | | | | | | |
| 6.501% to 7.000%........ | 6 | 668,700 | 0.04 | 9.692 | 625 | 111,450 | 96.87 |
| 43.54   100.00   0.00 | | | | | | | |
|   | ----- | -------------- | ------ | ----- | --- | -------- | ----- |
| -----   ------   ----- | | | | | | | |
| Total:............... | 7,049 | $1,584,507,182 | 100.00% | 8.454% | 647 | $224,785 | |
| 84.61%   44.00%   69.82% | 6.71% | | | | | | |
| =====   ======   ===== | ===== | ============== | ====== | ===== | === | ======== | ===== |

</TABLE>

As of the Cut-off Date, the Gross Margin for the Adjustable Rate Mortgage Loans ranged from 2.750% per annum to 6.750% per annum and the weighted average Gross Margin of the Adjustable Rate Mortgage Loans was approximately 5.659% per annum.

<div align="center">

MAXIMUM MORTGAGE RATES
(EXCLUDES FIXED RATE MORTGAGE LOANS)

</div>

| RANGE OF ORIGINAL MORTGAGE RATES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE MAXIMUM DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 11.501% to 12.000% | 22 | $ 7,245,809 | 0.46% | 5.878% | 717 | $329,355 | 70.14% | 43.84% | 75.18% | 38.83% |
| 12.001% to 12.500% | 110 | 32,088,477 | 2.03 | 6.341 | 700 | 291,713 | 78.13 | 45.79 | 87.42 | 24.47 |
| 12.501% to 13.000% | 323 | 91,636,947 | 5.78 | 6.822 | 680 | 283,706 | 77.86 | 44.50 | 76.64 | 13.80 |
| 13.001% to 13.500% | 615 | 160,060,167 | 10.10 | 7.296 | 671 | 260,260 | 80.49 | 44.53 | 77.92 | 14.05 |
| 13.501% to 14.000% | 1,112 | 270,652,615 | 17.08 | 7.800 | 655 | 243,393 | 82.22 | 44.09 | 71.69 | 5.97 |
| 14.001% to 14.500% | 1,214 | 278,134,292 | 17.55 | 8.290 | 648 | 229,106 | 83.56 | 43.86 | 68.88 | 6.75 |
| 14.501% to 15.000% | 1,462 | 318,957,676 | 20.13 | 8.770 | 637 | 218,165 | 85.70 | 43.64 | 66.82 | 3.32 |
| 15.001% to 15.500% | 942 | 185,322,163 | 11.70 | 9.272 | 625 | 196,733 | 87.37 | 44.04 | 69.93 | 3.96 |
| 15.501% to 16.000% | 780 | 150,452,595 | 9.50 | 9.755 | 625 | 192,888 | 89.93 | 43.56 | 63.84 | 3.54 |
| 16.001% to 16.500% | 251 | 48,530,578 | 3.06 | 10.267 | 622 | 193,349 | 92.84 | 43.57 | 59.77 | 3.36 |
| 16.501% to 17.000% | 136 | 25,309,891 | 1.60 | 10.748 | 628 | 186,102 | 95.05 | 44.59 | 64.25 | 1.96 |
| 17.001% to 17.500% | 47 | 9,759,031 | 0.62 | 11.244 | 640 | 207,639 | 95.84 | 42.56 | 55.76 | 2.36 |
| 17.501% to 18.000% | 22 | 3,828,844 | 0.24 | 11.782 | 642 | 174,038 | 99.97 | 45.63 | 46.17 | 0.00 |
| 18.001% to 18.500% | 10 | 1,536,900 | 0.10 | 12.236 | 638 | 153,690 | 99.81 | 44.29 | 34.67 | 0.00 |
| 18.501% to 19.000% | 3 | 991,197 | 0.06 | 12.630 | 639 | 330,399 | 100.00 | 51.38 | 41.08 | 0.00 |
| Total | 7,049 | $1,584,507,182 | 100.00% | 8.454% | 647 | $224,785 | 84.61% | 44.00% | 69.82% | 6.71% |

As of the Cut-off Date, the Maximum Mortgage Rates for the Adjustable Rate Mortgage Loans ranged from 11.600% per annum to 18.800% per annum and the weighted average Maximum Mortgage Rate of the Adjustable Rate Mortgage Loans was approximately 14.454% per annum.

5/20/2019    https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

A-II-9

<PAGE>

NEXT RATE ADJUSTMENT DATE
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<TABLE>
<CAPTION>

| NEXT RATE ADJUSTMENT DATE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF MORTGAGE POOL | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| October 2007........... | 16 | $ 4,717,846 | 0.30% | 8.179% | 651 | $294,865 | | 81.34% | 44.68% | 64.64% | 51.72% |
| November 2007.......... | 11 | 1,567,530 | 0.10 | 8.171 | 650 | 142,503 | 86.25 | | 43.58 | 89.03 | 5.74 |
| April 2008............. | 13 | 2,119,450 | 0.13 | 8.792 | 632 | 163,035 | 86.81 | | 43.76 | 47.73 | 0.00 |
| May 2008.............. | 11 | 1,878,395 | 0.12 | 9.030 | 646 | 170,763 | 86.49 | | 45.26 | 75.63 | 0.00 |
| February 2009.......... | 6 | 1,040,712 | 0.07 | 8.998 | 613 | 173,452 | 81.84 | | 42.32 | 79.63 | 32.47 |
| March 2009............ | 14 | 1,917,806 | 0.12 | 9.117 | 631 | 136,986 | 92.57 | | 43.98 | 79.41 | 14.02 |
| April 2009............. | 2,860 | 649,212,443 | 40.97 | 8.388 | 647 | 226,997 | 84.48 | | 44.16 | 70.42 | 5.66 |
| May 2009.............. | 2,514 | 560,717,795 | 35.39 | 8.658 | 644 | 223,038 | 85.19 | | 44.21 | 71.74 | 4.75 |
| June 2009............. | 2 | 489,250 | 0.03 | 10.092 | 641 | 244,625 | 95.00 | | 41.11 | 0.00 | 0.00 |
| February 2010.......... | 3 | 403,893 | 0.03 | 8.218 | 605 | 134,631 | 83.30 | | 42.01 | 83.51 | 0.00 |
| March 2010............ | 7 | 1,268,238 | 0.08 | 8.017 | 650 | 181,177 | 82.41 | | 43.56 | 100.00 | 47.75 |
| April 2010............. | 830 | 187,475,131 | 11.83 | 8.183 | 650 | 225,874 | 83.84 | | 43.39 | 64.59 | 11.95 |
| May 2010.............. | 634 | 140,033,305 | 8.84 | 8.406 | 650 | 220,873 | 84.70 | | 43.69 | 65.91 | 6.03 |
| June 2010............. | 1 | 668,800 | 0.04 | 8.800 | 691 | 668,800 | 95.00 | | 41.00 | 0.00 | 0.00 |
| April 2012............. | 74 | 17,863,080 | 1.13 | 7.968 | 667 | 241,393 | 79.68 | | 42.12 | 74.26 | 30.77 |
| May 2012.............. | 53 | 13,133,508 | 0.83 | 7.877 | 676 | 247,802 | 81.70 | | 41.79 | 71.16 | 21.76 |
| | ----- | -------------- | ------ | ------ | --- | -------- | ----- | | | | |
| Total:................. | 7,049 | $1,584,507,182 | 100.00% | 8.454% | 647 | $224,785 | | 84.61% | 44.00% | 69.82% | 6.71% |
| | ===== | ============== | ====== | ====== | === | ======== | ===== | | ====== | ====== | ===== |

</TABLE>

<PAGE>

THE GROUP ONE MORTGAGE LOANS

MORTGAGE RATES FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5.501% to 6.000%........ 42.45% | 77.34% | 17.24% | 19 | $ 4,499,745 | 0.65% | 5.911% | 726 | $236,829 | 62.97% |
| 6.001% to 6.500%....... 42.59 | 82.30 | 15.06 | 90 | 19,560,680 | 2.80 | 6.334 | 706 | 217,341 | 73.60 |
| 6.501% to 7.000%....... 44.73 | 68.87 | 10.79 | 161 | 36,434,093 | 5.22 | 6.824 | 679 | 226,299 | 76.13 |
| 7.001% to 7.500%....... 44.47 | 74.47 | 12.36 | 289 | 61,503,466 | 8.82 | 7.291 | 664 | 212,815 | 79.64 |
| 7.501% to 8.000%....... 45.16 | 65.23 | 3.56 | 500 | 107,426,358 | 15.40 | 7.799 | 650 | 214,853 | 81.76 |
| 8.001% to 8.500%....... 44.87 | 63.17 | 3.63 | 566 | 119,518,489 | 17.14 | 8.294 | 640 | 211,163 | 84.59 |
| 8.501% to 9.000%....... 44.74 | 64.44 | 3.60 | 696 | 136,889,706 | 19.63 | 8.775 | 629 | 196,681 | 86.59 |
| 9.001% to 9.500%....... 44.63 | 67.21 | 2.16 | 505 | 93,109,055 | 13.35 | 9.282 | 619 | 184,374 | 88.27 |
| 9.501% to 10.000%....... 44.87 | 66.18 | 2.78 | 406 | 72,252,289 | 10.36 | 9.751 | 615 | 177,961 | 88.89 |
| 10.001% to 10.500%...... 43.91 | 60.66 | 2.47 | 153 | 24,716,363 | 3.54 | 10.267 | 610 | 161,545 | 90.88 |
| 10.501% to 11.000%...... 44.99 | 67.85 | 5.13 | 83 | 13,232,791 | 1.90 | 10.749 | 609 | 159,431 | 92.36 |
| 11.001% to 11.500%...... 44.84 | 40.38 | 3.35 | 28 | 4,573,085 | 0.66 | 11.278 | 631 | 163,324 | 97.16 |
| 11.501% to 12.000%...... 48.19 | 40.20 | 8.00 | 19 | 3,585,490 | 0.51 | 11.767 | 637 | 188,710 | 99.82 |
| 12.001% to 12.500%...... 54.00 | 100.00 | 0.00 | 1 | 82,297 | 0.01 | 12.800 | 629 | 82,297 | 100.00 |
| | | | ----- | ------------ | ------ | ------ | --- | -------- | ------ |
| Total.................... 44.72% | 66.24% | 4.89% | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| | | | ===== | ============ | ====== | ====== | === | ======== | ====== |

</TABLE>

As of the Cut-off Date, Mortgage Rates borne by the Group One Mortgage Loans ranged from 5.600% per annum to 12.800% per annum and the weighted average Mortgage Rate of the Group One Mortgage Loans was approximately 8.514% per annum.

REMAINING MONTHS TO STATED MATURITY FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

<TABLE>
<CAPTION>

| RANGE OF REMAINING TERMS (MONTHS) INCOME DOC IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| <S> <C> <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 169 to 180.............. 40.57%  81.21% 10.68% | 27 | $ 4,461,892 | 0.64% | 7.434% | 668 | $165,255 | 72.46% |
| 229 to 240.............. 30.00  100.00  0.00 | 1 | 107,100 | 0.02 | 7.850 | 669 | 107,100 | 85.00 |
| 349 to 360.............. 44.75  66.14  4.85 | 3,488 | 692,814,915 | 99.34 | 8.521 | 638 | 198,628 | 84.77 |
|  |  |  |  |  |  |  |  |
| Total................ 44.72%  66.24%  4.89% | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |

</TABLE>

     As of the Cut-off Date, the remaining term to stated maturity of the Group
One Mortgage Loans ranged from 179 months to 360 months and the weighted average
term to stated maturity of the Group One Mortgage Loans was approximately 358
months.


                              A-II-11


<PAGE>


                  ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES
                     FOR THE GROUP ONE MORTGAGE LOANS


<TABLE>
<CAPTION>

| RANGE OF ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES INCOME DOC IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| <S> <C> <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| $50,000 or less......... 34.76%  74.98%  0.00% | 4 | $ 199,846 | 0.03% | 7.850% | 672 | $ 49,961 | 62.84% |
| $50,001 to $100,000.... 42.34  84.30  3.74 | 331 | 27,625,774 | 3.96 | 9.102 | 633 | 83,462 | 84.19 |
| $100,001 to $150,000.... 43.91  85.04  4.04 | 944 | 119,489,203 | 17.13 | 8.782 | 633 | 126,578 | 84.58 |
| $150,001 to $200,000.... 44.60  71.82  4.13 | 851 | 148,109,689 | 21.24 | 8.566 | 636 | 174,042 | 84.38 |
| $200,001 to $250,000.... 45.20  64.80  4.74 | 510 | 113,852,083 | 16.33 | 8.391 | 638 | 223,239 | 84.42 |
| $250,001 to $300,000.... 45.21  63.31  4.17 | 363 | 99,342,588 | 14.25 | 8.315 | 636 | 273,671 | 84.18 |

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| $300,001 to $350,000.... 44.04 54.48 7.41 | 185 | 59,820,824 | 8.58 | 8.472 | 637 | 323,356 | 86.78 |
| $350,001 to $400,000.... 45.49 49.65 6.60 | 243 | 92,295,130 | 13.23 | 8.338 | 652 | 379,815 | 84.77 |
| $400,001 to $450,000.... 46.04 43.13 7.66 | 65 | 26,735,519 | 3.83 | 8.508 | 648 | 411,316 | 84.79 |
| $450,001 to $500,000.... 44.39 38.05 0.00 | 13 | 6,267,250 | 0.90 | 8.414 | 656 | 482,096 | 86.20 |
| $500,001 to $550,000.... 49.73 42.66 0.00 | 7 | 3,646,000 | 0.52 | 7.767 | 644 | 520,857 | 88.79 |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- |
| Total................ 44.72% 66.24% 4.89% | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| | ===== | ============ | ====== | ===== | === | ======== | ===== |

===== ===== ====

</TABLE>

As of the Cut-off Date, the outstanding principal balances of the Group One Mortgage Loans ranged from approximately $49,846 to approximately $532,000 and the average outstanding principal balance of the Group One Mortgage Loans was approximately $198,346.

PRODUCT TYPES FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| PRODUCT TYPES DEBT-TO-INCOME FULL DOC PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| ------------- -------- ------- ------- | -------- | ------------ | ------- | -------- | -------- | ----------- | -------- |
| <S> <C> <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Balloon - 30/50......... 44.95% 70.65% 0.00% | 140 | $ 25,834,795 | 3.70% | 8.860% | 624 | $184,534 | 83.80% |
| ARM - 1 Year/6 Month.... 43.18 54.59 0.00 | 10 | 1,772,575 | 0.25 | 9.272 | 629 | 177,258 | 88.89 |
| ARM - 2 Year/6 Month (50 due in 30)....... 46.31 67.41 0.00 | 847 | 193,824,547 | 27.79 | 8.453 | 640 | 228,837 | 85.39 |
| ARM - 3 Year/6 Month (50 due in 30)....... 45.67 66.12 0.00 | 283 | 65,670,220 | 9.42 | 8.177 | 649 | 232,050 | 84.54 |
| ARM - 5 Year/6 Month (50 due in 30)....... 43.77 55.05 0.00 | 23 | 4,683,662 | 0.67 | 8.186 | 652 | 203,637 | 84.49 |
| 15 Year Fixed Loans..... 40.42 80.21 11.25 | 25 | 4,236,892 | 0.61 | 7.356 | 670 | 169,476 | 71.53 |
| 15/30 Balloon Loans..... 43.50 100.00 0.00 | 2 | 225,000 | 0.03 | 8.889 | 635 | 112,500 | 90.00 |
| 20 Year Fixed Loans..... 30.00 100.00 0.00 | 1 | 107,100 | 0.02 | 7.850 | 669 | 107,100 | 85.00 |
| 2/28 LIBOR Loans........ 43.81 68.11 9.59 | 771 | 136,550,704 | 19.58 | 8.686 | 634 | 177,109 | 85.82 |
| 2/28 LIBOR Loans (40 due in 30)....... 45.35 64.65 0.00 | 372 | 78,995,708 | 11.33 | 8.707 | 624 | 212,354 | 85.89 |
| 30 Year Fixed Loans..... 42.37 69.45 8.11 | 504 | 79,887,144 | 11.46 | 8.546 | 646 | 158,506 | 81.95 |

5/20/2019    https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

| | NUMBER | AGGREGATE PRINCIPAL | PERCENT | WEIGHTED AVERAGE | CREDIT | AVERAGE PRINCIPAL | WEIGHTED AVERAGE |
|---|---|---|---|---|---|---|---|
| 30/40 Balloon Loans..... | 82 | 15,843,278 | 2.27 | 8.809 | 640 | 193,211 | 83.98 |
| 45.11   65.71   0.00 | | | | | | | |
| 3/27 LIBOR Loans........ | 290 | 54,701,515 | 7.84 | 8.336 | 646 | 188,626 | 83.56 |
| 43.52   56.50   20.94 | | | | | | | |
| 3/27 LIBOR Loans | | | | | | | |
| (40 due in 30)....... | 126 | 26,886,283 | 3.86 | 8.454 | 634 | 213,383 | 85.65 |
| 43.96   62.30   0.00 | | | | | | | |
| 5/25 LIBOR Loans........ | 26 | 5,306,951 | 0.76 | 7.760 | 669 | 204,113 | 77.45 |
| 42.82   50.65   42.71 | | | | | | | |
| 5/25 LIBOR Loans | | | | | | | |
| (40 due in 30)....... | 7 | 1,392,450 | 0.20 | 8.631 | 678 | 198,921 | 87.73 |
| 48.09   73.14   0.00 | | | | | | | |
| Six Month LIBOR Loans... | 7 | 1,465,084 | 0.21 | 8.061 | 639 | 209,298 | 82.40 |
| 44.97   70.69   21.49 | | | | | | | |
| Total................ | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| 44.72%   66.24%   4.89% | | | | | | | |

</TABLE>

A-II-12

<PAGE>

AMORTIZATION TYPE FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| DEBT-TO-   FULL   PERCENT AMORTIZATION TYPE   INCOME   DOC   IO | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C>   <C>   <C> | | | | | | | |
| Fully Amortizing........ | 1,475 | $249,937,508 | 35.84% | 8.623% | 636 | $169,449 | 84.03% |
| 43.06%   65.87%   0.00% | | | | | | | |
| Balloon................. | 1,882 | 413,355,942 | 59.27 | 8.495 | 637 | 219,637 | 85.21 |
| 45.72   66.38   0.00 | | | | | | | |
| 60 Month | | | | | | | |
| Interest-Only........ | 148 | 31,823,956 | 4.56 | 7.973 | 672 | 215,027 | 83.60 |
| 44.86   69.66   100.00 | | | | | | | |
| 120 Month | | | | | | | |
| Interest-Only........ | 11 | 2,266,501 | 0.33 | 7.596 | 696 | 206,046 | 78.05 |
| 44.66   34.74   100.00 | | | | | | | |
| Total................ | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| 44.72%   66.24%   4.89% | | | | | | | |

</TABLE>

ADJUSTMENT TYPE FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| | NUMBER | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED | WEIGHTED | | |
| | OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE | AVERAGE | PERCENT | |
| | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL | DEBT-TO- | FULL | PERCENT |
| ADJUSTMENT TYPE | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV | INCOME | DOC | IO |
| --------------- | -------- | ------------ | ------- | -------- | -------- | ----------- | -------- | -------- | ------- | ------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| ARM.................... | 2,762 | $571,249,698 | 81.91% | 8.494% | 638 | $206,825 | 85.23% | 45.07% | 65.49% | 4.75% |
| Fixed Rate............. | 754 | 126,134,209 | 18.09 | 8.603 | 642 | 167,287 | 82.25 | 43.17 | 69.67 | 5.51 |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- | ----- | ----- | ---- |
| Total............... | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% | 44.72% | 66.24% | 4.89% |
| | ===== | ============ | ====== | ===== | === | ======== | ===== | ===== | ===== | ==== |

</TABLE>


A-II-13

<PAGE>


GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES
FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| | NUMBER | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED | WEIGHTED | | |
| | OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE | AVERAGE | | |
| | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL | DEBT-TO- | PERCENT | PERCENT |
| GEOGRAPHIC DISTRIBUTIONS | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV | INCOME | FULL DOC | IO |
| ----------------------- | -------- | ------------ | ------- | -------- | -------- | ----------- | -------- | -------- | -------- | ------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Alabama................ | 27 | $ 3,784,085 | 0.54% | 8.961% | 631 | $140,151 | 89.37% | 43.81% | 71.29% | 0.00% |
| Arizona................ | 96 | 18,460,705 | 2.65 | 8.321 | 650 | 192,299 | 83.69 | 46.18 | 67.21 | 6.15 |
| Arkansas............... | 6 | 738,850 | 0.11 | 8.195 | 633 | 123,142 | 84.81 | 47.43 | 43.18 | 0.00 |
| California............. | 278 | 82,848,051 | 11.88 | 7.716 | 656 | 298,015 | 80.01 | 45.22 | 58.33 | 10.87 |
| Colorado............... | 66 | 12,870,159 | 1.85 | 8.389 | 644 | 195,002 | 86.61 | 45.77 | 89.62 | 4.47 |
| Connecticut............ | 33 | 6,327,400 | 0.91 | 8.668 | 624 | 191,739 | 85.61 | 45.50 | 77.12 | 0.00 |
| Delaware............... | 5 | 842,100 | 0.12 | 8.382 | 644 | 168,420 | 82.64 | 42.18 | 100.00 | 22.33 |
| Florida................ | 331 | 70,239,030 | 10.07 | 8.385 | 637 | 212,203 | 84.07 | 44.94 | 54.66 | 2.55 |
| Georgia................ | 161 | 27,064,209 | 3.88 | 9.040 | 632 | 168,101 | 87.44 | 44.09 | 78.18 | 5.48 |
| Idaho.................. | 19 | 3,366,659 | 0.48 | 8.551 | 635 | 177,193 | 85.65 | 45.66 | 91.98 | 8.88 |

| State | | | | | | | |
|---|---|---|---|---|---|---|---|
| Illinois.............. | 349 | 73,766,504 | 10.58 | 8.862 | 633 | 211,365 | 86.33 |
| 44.90   47.60   2.46 | | | | | | | |
| Indiana............... | 96 | 12,699,282 | 1.82 | 8.916 | 618 | 132,284 | 89.16 |
| 42.62   79.14   2.23 | | | | | | | |
| Iowa.................. | 10 | 1,557,400 | 0.22 | 8.716 | 630 | 155,740 | 89.57 |
| 36.70   93.41   9.95 | | | | | | | |
| Kansas................ | 5 | 860,702 | 0.12 | 8.771 | 654 | 172,140 | 91.34 |
| 51.59   100.00   26.03 | | | | | | | |
| Kentucky.............. | 27 | 3,887,171 | 0.56 | 8.888 | 619 | 143,969 | 89.71 |
| 42.43   92.64   5.93 | | | | | | | |
| Louisiana............. | 20 | 3,214,744 | 0.46 | 8.349 | 648 | 160,737 | 88.84 |
| 45.97   85.97   11.11 | | | | | | | |
| Maine................. | 10 | 1,512,400 | 0.22 | 8.652 | 635 | 151,240 | 85.85 |
| 46.71   70.42   10.83 | | | | | | | |
| Maryland.............. | 62 | 15,910,650 | 2.28 | 8.684 | 635 | 256,623 | 85.47 |
| 46.20   71.07   5.35 | | | | | | | |
| Massachusetts......... | 73 | 17,104,475 | 2.45 | 9.011 | 625 | 234,308 | 83.41 |
| 47.06   68.81   5.08 | | | | | | | |
| Michigan.............. | 137 | 20,924,462 | 3.00 | 8.864 | 633 | 152,733 | 88.56 |
| 44.44   71.45   2.24 | | | | | | | |
| Minnesota............. | 121 | 23,536,616 | 3.37 | 8.790 | 637 | 194,517 | 86.78 |
| 46.26   65.03   8.87 | | | | | | | |
| Mississippi........... | 3 | 441,550 | 0.06 | 8.575 | 619 | 147,183 | 86.33 |
| 35.26   58.33   0.00 | | | | | | | |
| Missouri.............. | 59 | 8,871,392 | 1.27 | 9.107 | 626 | 150,363 | 89.09 |
| 44.90   75.42   2.23 | | | | | | | |
| Montana............... | 2 | 357,900 | 0.05 | 7.487 | 689 | 178,950 | 79.55 |
| 46.21   59.79   0.00 | | | | | | | |
| Nebraska.............. | 3 | 399,140 | 0.06 | 9.219 | 619 | 133,047 | 94.43 |
| 47.57   75.69   0.00 | | | | | | | |
| Nevada................ | 55 | 12,504,411 | 1.79 | 8.103 | 647 | 227,353 | 83.85 |
| 42.27   81.61   7.80 | | | | | | | |
| New Hampshire......... | 9 | 1,767,155 | 0.25 | 8.255 | 642 | 196,351 | 80.20 |
| 44.17   69.07   0.00 | | | | | | | |
| New Jersey............ | 108 | 28,972,159 | 4.15 | 8.868 | 645 | 268,261 | 85.72 |
| 45.87   43.94   5.25 | | | | | | | |
| New Mexico............ | 27 | 5,455,715 | 0.78 | 8.780 | 614 | 202,064 | 86.98 |
| 45.66   78.59   9.60 | | | | | | | |
| New York.............. | 155 | 38,519,661 | 5.52 | 8.363 | 644 | 248,514 | 81.79 |
| 44.75   44.10   4.82 | | | | | | | |
| North Carolina........ | 159 | 21,636,473 | 3.10 | 9.070 | 631 | 136,078 | 88.04 |
| 43.15   86.04   5.45 | | | | | | | |
| North Dakota.......... | 3 | 364,720 | 0.05 | 8.074 | 661 | 121,573 | 80.00 |
| 55.00   100.00   0.00 | | | | | | | |
| Ohio.................. | 108 | 15,175,405 | 2.18 | 9.014 | 628 | 140,513 | 87.70 |
| 44.04   82.89   2.48 | | | | | | | |
| Oklahoma.............. | 9 | 971,050 | 0.14 | 8.816 | 610 | 107,894 | 85.17 |
| 36.63   94.23   0.00 | | | | | | | |
| Oregon................ | 82 | 17,945,490 | 2.57 | 8.311 | 641 | 218,847 | 84.47 |
| 42.91   84.25   4.42 | | | | | | | |
| Pennsylvania.......... | 52 | 7,890,632 | 1.13 | 8.551 | 632 | 151,743 | 85.83 |
| 42.68   59.91   5.70 | | | | | | | |
| Rhode Island.......... | 30 | 6,340,445 | 0.91 | 8.513 | 636 | 211,348 | 82.53 |
| 47.01   68.92   0.00 | | | | | | | |
| South Carolina........ | 44 | 6,314,586 | 0.91 | 8.849 | 638 | 143,513 | 85.78 |
| 43.80   78.43   14.62 | | | | | | | |
| South Dakota.......... | 6 | 829,279 | 0.12 | 8.661 | 619 | 138,213 | 86.33 |
| 46.68   76.97   0.00 | | | | | | | |
| Tennessee............. | 63 | 8,679,642 | 1.24 | 8.830 | 630 | 137,772 | 85.06 |
| 43.46   85.02   2.90 | | | | | | | |
| Texas................. | 118 | 16,848,217 | 2.42 | 8.708 | 640 | 142,782 | 85.98 |
| 43.43   82.41   3.86 | | | | | | | |
| Utah.................. | 192 | 35,572,156 | 5.10 | 8.219 | 635 | 185,272 | 82.99 |
| 43.30   80.46   0.76 | | | | | | | |
| Vermont............... | 4 | 599,025 | 0.09 | 9.160 | 619 | 149,756 | 87.41 |

5/20/2019   https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt
Case 1:19-cv-04890-VSB Document 1-3 Filed 05/24/19 Page 210 of 377

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT GROUP ONE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|
| Virginia................ | 38 | 8,836,530 | 1.27 | 7.995 | 654 | 232,540 | 81.53 |
| 45.66    65.21    8.31 | | | | | | | |
| Washington............. | 162 | 36,907,822 | 5.29 | 8.095 | 646 | 227,826 | 83.36 |
| 44.44    76.20    3.06 | | | | | | | |
| West Virginia.......... | 3 | 531,400 | 0.08 | 8.669 | 637 | 177,133 | 84.10 |
| 52.77    42.60    0.00 | | | | | | | |
| Wisconsin.............. | 85 | 12,274,196 | 1.76 | 9.008 | 625 | 144,402 | 86.21 |
| 45.31    76.92    2.25 | | | | | | | |
| Wyoming................ | 5 | 862,100 | 0.12 | 8.403 | 611 | 172,420 | 86.61 |
| 46.61    100.00    0.00 | | | | | | | |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- |
| ----- | ------ | ---- | | | | | |
| Total.............. | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| 44.72%    66.24%    4.89% | | | | | | | |
| | ===== | ============ | ====== | ===== | === | ======== | ===== |
| ===== | ====== | ==== | | | | | |

</TABLE>

    No more than approximately 0.59% of the Group One Mortgage Loans will be
secured by mortgaged properties located in any one zip code.


                            A-II-14


<PAGE>

        ORIGINAL LOAN-TO-VALUE RATIOS FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| | | NUMBER | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED |
| WEIGHTED | | | OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE |
| AVERAGE | | | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL |
| RANGE OF ORIGINAL | | | | | | | | | |
| DEBT-TO-  PERCENT  PERCENT | | | | | | | | | |
| LOAN-TO-VALUE RATIOS | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV |
| INCOME    FULL DOC    IO | | | | | | | | |
|---|---|---|---|---|---|---|---|
| --------------------     --------     ------------     -------     --------     --------     -----------     -------- | | | | | | | | |
| --------    --------    ------- | | | | | | | | |
| <S>                      <C>          <C>              <C>         <C>          <C>          <C>             <C> | | | | | | | | |
| <C>      <C>        <C> | | | | | | | | |
| 50.00% or less.......... | 55 | $ 9,185,095 | 1.32% | 7.497% | 655 | $167,002 | 42.91% |
| 38.81%    55.84%    4.53% | | | | | | | |
| 50.01% to 55.00%........ | 26 | 5,184,396 | 0.74 | 7.622 | 635 | 199,400 | 52.60 |
| 43.23    46.45    7.39 | | | | | | | |
| 55.01% to 60.00%........ | 30 | 5,736,450 | 0.82 | 7.657 | 637 | 191,215 | 57.98 |
| 43.65    51.85    6.10 | | | | | | | |
| 60.01% to 65.00%........ | 65 | 12,751,447 | 1.83 | 7.825 | 621 | 196,176 | 63.33 |
| 43.55    64.43    4.50 | | | | | | | |
| 65.01% to 70.00%........ | 95 | 19,690,909 | 2.82 | 7.750 | 635 | 207,273 | 68.53 |
| 43.85    66.37    7.48 | | | | | | | |
| 70.01% to 75.00%........ | 153 | 30,115,270 | 4.32 | 8.165 | 622 | 196,832 | 73.74 |
| 41.66    55.42    3.83 | | | | | | | |
| 75.01% to 80.00%........ | 1,108 | 215,177,446 | 30.85 | 8.060 | 649 | 194,203 | 79.69 |
| 45.37    75.60    6.82 | | | | | | | |
| 80.01% to 85.00%........ | 324 | 66,763,650 | 9.57 | 8.557 | 611 | 206,061 | 84.45 |
| 43.86    63.11    2.75 | | | | | | | |
| 85.01% to 90.00%........ | 760 | 159,976,622 | 22.94 | 8.636 | 629 | 210,496 | 89.56 |
| 44.75    60.51    4.11 | | | | | | | |
| 90.01% to 95.00%........ | 702 | 137,493,816 | 19.72 | 9.038 | 645 | 195,860 | 94.86 |
| 44.92    64.26    2.99 | | | | | | | |
| 95.01% to 100.00%....... | 198 | 35,308,806 | 5.06 | 10.109 | 664 | 178,327 | 99.96 |
| 46.98    66.62    7.22 | | | | | | | |

5/20/2019    https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

Case 1:19-cv-04890-LGS-SDA Document 13 Filed 05/24/19 Page 211 of 377

https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt    210/376

```
                                -----   ------------  ------   ------   ---   --------   -----
     Total................   3,516   $697,383,907  100.00%   8.514%   639   $198,346   84.69%
 44.72%   66.24%   4.89%
                                =====   ============  ======   ======   ===   ========   =====
</TABLE>
```

As of the Cut-off Date, the Original Loan-to-Value Ratios of the Group One Mortgage Loans ranged from 16.26% to 100.00%.

COMBINED LOAN-TO-VALUE RATIOS OF THE GROUP ONE MORTGAGE LOANS

| RANGE OF COMBINED LOAN-TO-VALUE RATIOS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less.......... | 55 | $ 9,185,095 | 1.32% | 7.497% | 655 | $167,002 | 42.91% | 38.81% | 55.84% | 4.53% |
| 50.01% to 55.00%........ | 24 | 4,854,396 | 0.70 | 7.653 | 632 | 202,266 | 52.64 | 44.19 | 45.52 | 3.81 |
| 55.01% to 60.00%........ | 30 | 5,736,450 | 0.82 | 7.657 | 637 | 191,215 | 57.98 | 43.65 | 51.85 | 6.10 |
| 60.01% to 65.00%........ | 65 | 12,751,447 | 1.83 | 7.825 | 621 | 196,176 | 63.33 | 43.55 | 64.43 | 4.50 |
| 65.01% to 70.00%........ | 95 | 19,696,909 | 2.82 | 7.745 | 635 | 207,336 | 68.35 | 43.53 | 66.38 | 8.48 |
| 70.01% to 75.00%........ | 150 | 29,404,320 | 4.22 | 8.146 | 622 | 196,029 | 73.72 | 41.40 | 55.68 | 3.93 |
| 75.01% to 80.00%........ | 449 | 93,999,958 | 13.48 | 7.906 | 631 | 209,354 | 79.30 | 42.50 | 62.51 | 6.22 |
| 80.01% to 85.00%........ | 327 | 67,574,050 | 9.69 | 8.544 | 611 | 206,648 | 84.40 | 43.91 | 62.83 | 2.72 |
| 85.01% to 90.00%........ | 781 | 164,371,612 | 23.57 | 8.595 | 630 | 210,463 | 89.24 | 44.74 | 60.99 | 4.80 |
| 90.01% to 95.00%........ | 735 | 144,807,566 | 20.76 | 8.982 | 646 | 197,017 | 94.11 | 45.09 | 65.96 | 3.61 |
| 95.01% to 100.00%....... | 805 | 145,002,105 | 20.79 | 8.701 | 663 | 180,127 | 84.86 | 47.53 | 80.69 | 6.17 |
| Total................ | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% | 44.72% | 66.24% | 4.89% |

As of the Cut-off Date, the Combined Loan-to-Value Ratios of the Group One Mortgage Loans ranged from 16.26% to 100.00% and the weighted average Combined Loan-to-Value Ratio for Group One Mortgage Loans was approximately 88.07%. This table was calculated using the Combined Loan-to-Value Ratio for Group One Mortgage Loans that are in a second lien position and for Group One Mortgage Loans that are in a first lien position with subordinate financing. Approximately 17.66% of the Group One Mortgage Loans are in a first lien position with subordinate financing and the weighted average Combined

Loan-to-Value Ratio for such Group One Mortgage Loans was approximately 98.99%.


                                A-II-15


<PAGE>

        DEBT-TO-INCOME RATIOS OF THE GROUP ONE MORTGAGE LOANS


<TABLE>
<CAPTION>

| | NUMBER | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED |
| WEIGHTED | | | | | | | |
| AVERAGE | OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE |
| RANGE OF | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL |
| DEBT-TO-  PERCENT  PERCENT | | | | | | | |
| DEBT-TO-INCOME RATIOS | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV |
| INCOME  FULL DOC    IO | | | | | | | |
| --------------------  --------  -------- | -------- | ------------ | ------- | -------- | -------- | ----------- | -------- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C>     <C>      <C> | | | | | | | |
| 20.01% to 25.00%........ | 91 | $ 16,059,077 | 2.30% | 8.289% | 645 | $176,473 | 78.50% |
| 23.02%   73.68%   8.74% | | | | | | | |
| 25.01% to 30.00%........ | 177 | 32,035,500 | 4.59 | 8.426 | 637 | 180,992 | 83.43 |
| 28.07   75.27   4.98 | | | | | | | |
| 30.01% to 35.00%........ | 285 | 50,819,057 | 7.29 | 8.454 | 641 | 178,312 | 83.27 |
| 33.16   70.49   4.74 | | | | | | | |
| 35.01% to 40.00%........ | 429 | 83,153,375 | 11.92 | 8.564 | 633 | 193,831 | 84.07 |
| 38.26   67.52   3.00 | | | | | | | |
| 40.01% to 45.00%........ | 723 | 143,083,371 | 20.52 | 8.559 | 639 | 197,902 | 85.07 |
| 43.19   55.98   4.61 | | | | | | | |
| 45.01% to 50.00%........ | 923 | 192,470,476 | 27.60 | 8.557 | 638 | 208,527 | 85.13 |
| 48.22   59.52   5.28 | | | | | | | |
| 50.01% to 55.00%........ | 886 | 179,387,827 | 25.72 | 8.457 | 641 | 202,469 | 85.35 |
| 53.36   77.50   5.26 | | | | | | | |
| 55.01% to 60.00%........ | 2 | 375,225 | 0.05 | 9.908 | 635 | 187,613 | 97.90 |
| 56.00   100.00   0.00 | | | | | | | |
| | ----- | ------------ | ------ | ----- | --- | -------- | ----- |
| ----- ------ ---- | | | | | | | |
| Total................ | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% |
| 44.72%   66.24%   4.89% | | | | | | | |
| | ===== | ============ | ====== | ===== | === | ======== | ===== |
| ===== ====== ==== | | | | | | | |
</TABLE>

    As of the Cut-off Date, the Debt-to-Income Ratios of the Group One Mortgage
Loans ranged from 21.00% to 56.00% and the weighted average Debt-to-Income Ratio
for Group One Mortgage Loans with Debt-to-Income Ratios was approximately
44.72%.

        LOAN PURPOSE FOR THE GROUP ONE MORTGAGE LOANS


<TABLE>
<CAPTION>

| | NUMBER | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED |
| WEIGHTED | | | | | | | |
| AVERAGE | OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE |
| | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL |
| DEBT-TO-  PERCENT  PERCENT | | | | | | | |
| LOAN PURPOSE | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV |
| INCOME  FULL DOC    IO | | | | | | | |
| ------------ | -------- | ------------ | ------- | -------- | -------- | ----------- | -------- |

```
-------- -------- -------
<S>                       <C>          <C>            <C>      <C>       <C>      <C>          <C>
<C>        <C>     <C>
Refinance - Cashout.....  1,871    $401,877,563    57.63%   8.469%     629    $214,793     83.75%
43.90%     56.25%   4.35%
Purchase................  1,252     220,885,135    31.67    8.668      656     176,426     86.74
46.51      83.40    5.45
Refinance - Rate/Term...    393      74,621,209    10.70    8.298      639     189,876     83.67
43.88      69.28    6.14
                          -----    ------------   ------    -----      ---    --------     -----
----- ----- ----
   Total................  3,516    $697,383,907   100.00%   8.514%     639    $198,346     84.69%
44.72%     66.24%   4.89%
                          =====    ============   ======    =====      ===    ========     =====
===== ===== ====
</TABLE>
```

TYPES OF MORTGAGED PROPERTIES FOR THE GROUP ONE MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                          NUMBER     AGGREGATE     PERCENT             WEIGHTED    AVERAGE     WEIGHTED
WEIGHTED
                            OF       PRINCIPAL       OF     WEIGHTED   AVERAGE    PRINCIPAL    AVERAGE
AVERAGE
                         MORTGAGE     BALANCE      GROUP     AVERAGE    CREDIT     BALANCE     ORIGINAL
DEBT-TO-  PERCENT PERCENT
PROPERTY TYPE             LOANS     OUTSTANDING     ONE      COUPON     SCORE    OUTSTANDING     LTV
INCOME    FULL DOC   IO
--------------           --------  ------------   -------   --------   --------  -----------  --------
-------- -------- -------
<S>                       <C>          <C>            <C>      <C>       <C>      <C>          <C>
<C>        <C>     <C>
Single Family...........  2,659    $510,031,807    73.14%   8.540%     635    $191,813     84.65%
44.37%     65.90%   4.69%
Planned Unit
   Development...........    454      97,650,264    14.00    8.457      646     215,089     85.93
45.95      72.28    5.11
Two- to Four-Family.....     186      50,679,192     7.27    8.401      652     272,469     83.17
46.05      55.60    5.98
Condominium.............     217      39,022,644     5.60    8.463      652     179,828     84.09
44.61      69.47    5.49
                          -----    ------------   ------    -----      ---    --------     -----
----- ----- ----
   Total................  3,516    $697,383,907   100.00%   8.514%     639    $198,346     84.69%
44.72%     66.24%   4.89%
                          =====    ============   ======    =====      ===    ========     =====
===== ===== ====
</TABLE>
```

                                   A-II-16

```
<PAGE>
```

               DOCUMENTATION SUMMARY FOR THE GROUP ONE MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                          NUMBER     AGGREGATE                        WEIGHTED    AVERAGE
WEIGHTED WEIGHTED
                            OF       PRINCIPAL     PERCENT  WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE   AVERAGE PERCENT
                         MORTGAGE     BALANCE        OF     AVERAGE    CREDIT     BALANCE
ORIGINAL  DEBT-TO-  FULL   PERCENT
DOCUMENTATION            LOANS     OUTSTANDING   GROUP ONE  COUPON     SCORE    OUTSTANDING
```

| ORIGINAL LTV | DEBT-TO- INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|
| Full Documentation...... 84.64% | 44.84% | 100.00% | 4.97% | 2,518 | $461,974,647 | 66.24% | 8.468% | 636 | $183,469 |
| Rapid................... 85.99 | 44.64 | 0.00 | 3.70 | 715 | 171,039,760 | 24.53 | 8.533 | 636 | 239,216 |
| Stated Income.......... 80.47 | 43.90 | 0.00 | 8.20 | 230 | 53,675,066 | 7.70 | 8.795 | 668 | 233,370 |
| Limited Income Verification........ 84.18 | 46.47 | 0.00 | 5.98 | 33 | 6,860,524 | 0.98 | 8.523 | 637 | 207,895 |
| Stated Plus............ 91.56 | 40.59 | 0.00 | 0.00 | 11 | 2,517,129 | 0.36 | 9.025 | 672 | 228,830 |
| Blended................ 94.62 | 46.48 | 0.00 | 0.00 | 9 | 1,316,780 | 0.19 | 9.753 | 652 | 146,309 |
| Total............... 84.69% | 44.72% | 66.24% | 4.89% | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 |

### OCCUPANCY TYPES FOR THE GROUP ONE MORTGAGE LOANS

| OCCUPANCY / ORIGINAL LTV | DEBT-TO- INCOME | FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|
| Primary................. 84.76% | 44.88% | 64.86% | 4.42% | 3,250 | $647,163,845 | 92.80% | 8.536% | 635 | $199,127 |
| Investment.............. 83.03 | 42.70 | 84.17 | 11.32 | 240 | 44,843,022 | 6.43 | 8.153 | 688 | 186,846 |
| Second Home............ 90.28 | 42.25 | 83.11 | 7.48 | 26 | 5,377,040 | 0.77 | 8.876 | 688 | 206,809 |
| Total............... 84.69% | 44.72% | 66.24% | 4.89% | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 |

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

### MORTGAGE LOAN AGE SUMMARY FOR THE GROUP ONE MORTGAGE LOANS

| AVERAGE MORTGAGE LOAN AGE ORIGINAL (MONTHS) LTV INCOME DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | MORTGAGE PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 0...................... | 1,552 | $316,861,835 | 45.44% | 8.582% | 638 | $204,164 | 84.74% | 44.97% | 66.12% | 3.83% |
| 1...................... | 1,955 | 379,279,676 | 54.39 | 8.455 | 639 | 194,005 | 84.63 | 44.51 | 66.26 | 5.64 |
| 2...................... | 7 | 1,022,250 | 0.15 | 9.058 | 630 | 146,036 | 89.27 | 46.72 | 100.00 | 56.09 |
| 3...................... | 2 | 220,146 | 0.03 | 8.484 | 634 | 110,073 | 83.02 | 41.19 | 69.75 | 0.00 |
| Total............... | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% | 44.72% | 66.24% | 4.89% |

</TABLE>

As of the Cut-off Date, the weighted average age of the Group One Mortgage Loans was approximately 1 month.

A-II-17

<PAGE>

ORIGINAL PREPAYMENT CHARGE TERM FOR THE GROUP ONE MORTGAGE LOANS

<TABLE>
<CAPTION>

| ORIGINAL PREPAYMENT CHARGE TERM ORIGINAL LTV INCOME DOC | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | MORTGAGE PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| None.................... | 1,267 | $256,971,184 | 36.85% | 8.778% | 641 | $202,819 | 85.60% | 44.45% | 61.51% | 4.75% |
| 12 Months.............. | 184 | 41,228,446 | 5.91 | 8.662 | 635 | 224,068 | 82.63 | 43.85 | 61.23 | 7.32 |
| 24 Months.............. | 1,231 | 243,812,051 | 34.96 | 8.408 | 634 | 198,060 | 84.93 | 45.24 | 71.76 | 2.91 |
| 36 Months.............. | 834 | 155,372,225 | 22.28 | 8.204 | 643 | 186,298 | 83.35 | 44.59 | 66.75 | 7.57 |
| Total............... | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% | 44.72% | 66.24% | 4.89% |

</TABLE>

The weighted average prepayment penalty term at origination with respect to the Group One Mortgage Loans having prepayment penalties is approximately 27 months.

## CREDIT SCORES FOR THE GROUP ONE MORTGAGE LOANS

| RANGE OF CREDIT SCORES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 526 to 550 | 75 | $ 13,835,600 | 1.98% | 9.357% | 545 | $184,475 | 76.75% | 43.79% | 90.08% | 6.49% |
| 551 to 575 | 280 | 53,034,150 | 7.60 | 9.254 | 565 | 189,408 | 80.51 | 43.37 | 77.95 | 1.95 |
| 576 to 600 | 379 | 68,685,655 | 9.85 | 9.044 | 588 | 181,229 | 84.09 | 44.57 | 71.35 | 1.19 |
| 601 to 625 | 757 | 147,140,912 | 21.10 | 8.751 | 613 | 194,374 | 86.22 | 44.62 | 67.23 | 1.91 |
| 626 to 650 | 812 | 160,768,270 | 23.05 | 8.647 | 638 | 197,990 | 86.33 | 45.41 | 62.61 | 1.79 |
| 651 to 675 | 590 | 120,716,805 | 17.31 | 8.126 | 662 | 204,605 | 85.17 | 45.28 | 62.61 | 7.56 |
| 676 to 700 | 282 | 60,385,305 | 8.66 | 7.943 | 687 | 214,132 | 83.64 | 45.16 | 60.09 | 11.53 |
| 701 to 725 | 167 | 37,015,666 | 5.31 | 7.691 | 712 | 221,651 | 83.71 | 43.67 | 60.84 | 12.89 |
| 726 to 750 | 85 | 19,246,626 | 2.76 | 7.592 | 737 | 226,431 | 83.04 | 43.81 | 62.17 | 14.34 |
| 751 to 775 | 49 | 9,454,353 | 1.36 | 7.885 | 762 | 192,946 | 85.31 | 43.20 | 77.99 | 10.04 |
| 776 to 800 | 30 | 5,331,315 | 0.76 | 7.137 | 784 | 177,711 | 73.64 | 41.07 | 87.36 | 10.13 |
| 801 to 809 | 7 | 1,364,300 | 0.20 | 8.068 | 804 | 194,900 | 90.35 | 42.27 | 71.41 | 28.59 |
| 810 to 820 | 3 | 404,950 | 0.06 | 8.031 | 814 | 134,983 | 89.30 | 42.24 | 58.51 | 38.25 |
| Total | 3,516 | $697,383,907 | 100.00% | 8.514% | 639 | $198,346 | 84.69% | 44.72% | 66.24% | 4.89% |

The Credit Scores of the Group One Mortgage Loans that were scored as of the Cut-off Date ranged from 540 to 815 and the weighted average Credit Score of the Group One Mortgage Loans that were scored as of the Cut-off Date was approximately 639.

A-II-18

GROSS MARGINS FOR THE GROUP ONE MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

```
<TABLE>
<CAPTION>
```

| RANGE OF ORIGINAL LTV | GROSS MARGINS WEIGHTED AVERAGE DEBT-TO- INCOME | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | |
|---|---|---|---|---|---|---|---|---|---|
| `<S>` | | | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| `<C>` | `<C>` | `<C>` | | | | | | | |
| 2.501% to 3.000%........ 84.39% | 39.09% | 77.07% | 40 28.54% | $ 10,582,981 | 1.85% | 7.492% | 702 | $264,575 | |
| 4.001% to 4.500%........ 73.53 | 40.65 | 17.69 | 6 0.00 | 1,467,350 | 0.26 | 9.282 | 606 | 244,558 | |
| 4.501% to 5.000%........ 83.44 | 44.26 | 37.39 | 42 4.39 | 8,356,335 | 1.46 | 9.137 | 605 | 198,960 | |
| 5.001% to 5.500%........ 78.16 | 45.32 | 67.27 | 1,275 5.20 | 255,632,469 | 44.75 | 8.171 | 640 | 200,496 | |
| 5.501% to 6.000%........ 88.17 | 44.81 | 62.15 | 759 3.77 | 168,264,546 | 29.46 | 8.496 | 624 | 221,692 | |
| 6.001% to 6.500%........ 95.89 | 45.51 | 67.70 | 638 3.25 | 126,745,067 | 22.19 | 9.176 | 649 | 198,660 | |
| 6.501% to 7.000%........ 93.49 | 39.94 | 100.00 | 2 0.00 | 200,950 | 0.04 | 8.620 | 609 | 100,475 | |
| | | | ----- | ------------ | ------ | ----- | --- | -------- | --- |
| Total................ 85.23% | 45.07% | 65.49% | 2,762 4.75% | $571,249,698 | 100.00% | 8.494% | 638 | $206,825 | |
| | | | ===== | ============ | ====== | ===== | === | ======== | |

```
</TABLE>
```

As of the Cut-off Date, the Gross Margin for the Adjustable Rate Group One Mortgage Loans ranged from 2.750% per annum to 6.750% per annum and the weighted average Gross Margin of the Adjustable Rate Group One Mortgage Loans was approximately 5.708% per annum.

MAXIMUM MORTGAGE RATES FOR THE GROUP ONE MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

```
<TABLE>
<CAPTION>
```

| RANGE OF ORIGINAL LTV | MAXIMUM MORTGAGE RATES WEIGHTED AVERAGE DEBT-TO- INCOME | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP ONE | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | |
|---|---|---|---|---|---|---|---|---|---|
| `<S>` | | | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| `<C>` | `<C>` | `<C>` | | | | | | | |
| 11.501% to 12.000%...... 69.66% | 44.79% | 73.42% | 8 39.00% | $ 1,989,150 | 0.35% | 5.863% | 718 | $248,644 | |
| 12.001% to 12.500%...... 76.58 | 45.28 | 76.42 | 43 26.03 | 10,672,885 | 1.87 | 6.383 | 691 | 248,207 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12.501% to 13.000%...... | 119 | 27,745,593 | 4.86 | 6.820 | 675 | 233,156 | |
| 77.46    44.88    67.74 | 13.51 | | | | | | |
| 13.001% to 13.500%...... | 247 | 53,547,518 | 9.37 | 7.294 | 662 | 216,792 | |
| 80.24    45.28    74.69 | 12.07 | | | | | | |
| 13.501% to 14.000%...... | 422 | 92,829,396 | 16.25 | 7.797 | 650 | 219,975 | |
| 82.52    45.37    66.08 | 3.88 | | | | | | |
| 14.001% to 14.500%...... | 496 | 106,138,721 | 18.58 | 8.291 | 639 | 213,989 | |
| 84.86    44.87    64.01 | 2.70 | | | | | | |
| 14.501% to 15.000%...... | 577 | 115,870,305 | 20.28 | 8.777 | 629 | 200,815 | |
| 86.79    44.83    64.92 | 3.26 | | | | | | |
| 15.001% to 15.500%...... | 393 | 76,035,770 | 13.31 | 9.275 | 620 | 193,475 | |
| 88.56    45.13    65.28 | 1.32 | | | | | | |
| 15.501% to 16.000%...... | 300 | 56,822,826 | 9.95 | 9.744 | 618 | 189,409 | |
| 89.57    45.03    62.94 | 2.86 | | | | | | |
| 16.001% to 16.500%...... | 94 | 17,001,948 | 2.98 | 10.272 | 612 | 180,872 | |
| 91.47    44.99    57.29 | 1.74 | | | | | | |
| 16.501% to 17.000%...... | 44 | 8,393,210 | 1.47 | 10.739 | 609 | 190,755 | |
| 92.04    46.17    65.13 | 2.42 | | | | | | |
| 17.001% to 17.500%...... | 14 | 2,966,080 | 0.52 | 11.294 | 643 | 211,863 | |
| 96.70    43.65    16.51 | 0.00 | | | | | | |
| 17.501% to 18.000%...... | 4 | 1,154,000 | 0.20 | 11.756 | 661 | 288,500 | |
| 99.91    48.72    0.00 | 0.00 | | | | | | |
| 18.501% to 19.000%...... | 1 | 82,297 | 0.01 | 12.800 | 629 | 82,297 | |
| 100.00    54.00    100.00 | 0.00 | | | | | | |
| | ----- | ------------ | ------ | ------ | --- | -------- | ---- |
| --    -----    ------    ----- | | | | | | | |
| Total................ | 2,762 | $571,249,698 | 100.00% | 8.494% | 638 | $206,825 | |
| 85.23%    45.07%    65.49% | 4.75% | | | | | | |
| | ===== | ============ | ====== | ====== | === | ======== | |
| ======    =====    ======    ===== | | | | | | | |

</TABLE>

    As of the Cut-off Date, the Maximum Mortgage Rates for the Adjustable Rate
Group One Mortgage Loans ranged from 11.600% per annum to 18.800% per annum and
the weighted average Maximum Mortgage Rate of the Adjustable Rate Group One
Mortgage Loans was approximately 14.494% per annum.


                              A-II-19

    <PAGE>


         NEXT RATE ADJUSTMENT DATE FOR THE GROUP ONE MORTGAGE LOANS
                (EXCLUDES FIXED RATE MORTGAGE LOANS)


    <TABLE>
    <CAPTION>

| | | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | WEIGHTED |
|---|---|---|---|---|---|---|---|
| WEIGHTED | | | | | | | |
| | NUMBER OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | AVERAGE |
| AVERAGE   PERCENT | | | | | | | |
| NEXT | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | ORIGINAL |
| DEBT-TO-    FULL    PERCENT | | | | | | | |
| RATE ADJUSTMENT DATE | LOANS | OUTSTANDING | ONE | COUPON | SCORE | OUTSTANDING | LTV |
| INCOME    DOC    IO | | | | | | | |
| -------------------- | --------- | ------------ | ------- | -------- | -------- | ----------- | -------- |
| --------    -------    ------- | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C>    <C>    <C> | | | | | | | |
| October 2007 .......... | 4 | $    805,784 | 0.14% | 8.330% | 620 | $201,446 | 75.20% |
| 40.94%    46.70%    27.92% | | | | | | | |
| November 2007 ......... | 3 | 659,300 | 0.12 | 7.732 | 662 | 219,767 | 91.20 |
| 49.88    100.00    13.64 | | | | | | | |
| April 2008 ............ | 6 | 1,211,800 | 0.21 | 9.169 | 623 | 201,967 | 89.12 |
| 44.40    48.84    0.00 | | | | | | | |
| May 2008 .............. | 4 | 560,775 | 0.10 | 9.494 | 640 | 140,194 | 88.39 |

| | Number of Loans | Aggregate Principal Balance Outstanding | Percent | Weighted Average Coupon | Credit Score | Weighted Average Principal Balance Outstanding | LTV | Original Income | Debt-to DOC | Percent IO |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 40.53 | 67.01 | 0.00 |
| March 2009 ............. | 3 | 429,517 | 0.08 | 9.012 | 609 | 143,172 | 94.59 | 48.18 | 100.00 | 26.29 |
| April 2009 ............. | 1,075 | 215,325,532 | 37.69 | 8.483 | 636 | 200,303 | 85.53 | 45.17 | 67.41 | 3.36 |
| May 2009 ............... | 911 | 193,227,835 | 33.83 | 8.684 | 634 | 212,105 | 85.71 | 45.44 | 66.80 | 2.97 |
| June 2009 .............. | 1 | 308,750 | 0.05 | 10.000 | 626 | 308,750 | 95.00 | 40.00 | 0.00 | 0.00 |
| February 2010 ......... | 2 | 220,146 | 0.04 | 8.484 | 634 | 110,073 | 83.02 | 41.19 | 69.75 | 0.00 |
| March 2010 ............ | 4 | 606,337 | 0.11 | 8.513 | 641 | 151,584 | 83.30 | 46.69 | 100.00 | 53.70 |
| April 2010 ............ | 407 | 85,394,680 | 14.95 | 8.260 | 645 | 209,815 | 83.94 | 44.30 | 61.90 | 9.31 |
| May 2010 .............. | 286 | 61,116,180 | 10.70 | 8.317 | 644 | 213,693 | 84.98 | 44.88 | 61.42 | 5.20 |
| April 2012 ............ | 35 | 6,999,743 | 1.23 | 7.957 | 666 | 199,993 | 81.84 | 43.49 | 57.89 | 19.04 |
| May 2012 .............. | 21 | 4,383,320 | 0.77 | 8.177 | 658 | 208,730 | 81.23 | 44.43 | 50.93 | 21.30 |
| Total .............. | 2,762 | $571,249,698 | 100.00% | 8.494% | 638 | $206,825% | 85.23% | 45.07 | 65.49 | 4.75 |

</TABLE>


A-II-20


<PAGE>


THE GROUP TWO MORTGAGE LOANS

MORTGAGE RATES FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF MORTGAGE RATES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | WEIGHTED AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE ORIGINAL INCOME | WEIGHTED AVERAGE DEBT-TO- DOC | PERCENT FULL IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5.501% to 6.000% ....... | 17 | $ 5,969,659 | 0.49% | 5.891% | 721 | $351,156 | 68.48% | 43.16% | 78.73% | 34.14% |
| 6.001% to 6.500% ....... | 96 | 28,835,653 | 2.39 | 6.313 | 708 | 300,371 | 76.70 | 43.37 | 92.03 | 19.23 |
| 6.501% to 7.000% ....... | 241 | 70,399,854 | 5.82 | 6.824 | 684 | 292,116 | 77.72 | 43.52 | 81.37 | 12.64 |
| 7.001% to 7.500% ....... | 444 | 119,499,272 | 9.89 | 7.296 | 677 | 269,143 | 80.26 | 43.95 | 79.05 | 14.18 |
| 7.501% to 8.000% ....... | 812 | 197,944,194 | 16.38 | 7.805 | 659 | 243,774 | 81.81 | 43.29 | 74.62 | 6.86 |
| 8.001% to 8.500% ....... | 864 | 193,004,840 | 15.97 | 8.289 | 653 | 223,385 | 82.70 | 43.10 | 72.15 | 8.43 |
| 8.501% to 9.000% ....... | 1,112 | 230,989,833 | 19.11 | 8.769 | 641 | 207,725 | | | | |

| | 85.00 | 42.76 | 70.34 | 3.38 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9.001% to 9.500% ....... | 780 | 137,682,335 | 11.39 | 9.270 | 627 | 176,516 |
| 86.31 | 43.07 | 74.88 | 5.57 |
| 9.501% to 10.000% ...... | 722 | 121,318,571 | 10.04 | 9.763 | 625 | 168,031 |
| 89.58 | 42.13 | 69.77 | 4.03 |
| 10.001% to 10.500% ..... | 297 | 47,046,140 | 3.89 | 10.268 | 622 | 158,405 |
| 92.75 | 42.12 | 70.29 | 3.56 |
| 10.501% to 11.000% ..... | 199 | 28,768,670 | 2.38 | 10.762 | 628 | 144,566 |
| 95.65 | 43.10 | 76.33 | 3.90 |
| 11.001% to 11.500% ..... | 88 | 12,200,039 | 1.01 | 11.252 | 628 | 138,637 |
| 95.95 | 42.20 | 81.78 | 1.89 |
| 11.501% to 12.000% ..... | 54 | 6,250,349 | 0.52 | 11.775 | 620 | 115,747 |
| 99.59 | 42.64 | 84.05 | 5.78 |
| 12.001% to 12.500% ..... | 40 | 5,003,559 | 0.41 | 12.254 | 617 | 125,089 |
| 99.86 | 44.81 | 71.46 | 5.74 |
| 12.501% to 13.000% ..... | 22 | 2,839,023 | 0.23 | 12.697 | 613 | 129,047 |
| 99.90 | 47.57 | 77.67 | 0.00 |
| 13.001% to 13.500% ..... | 5 | 801,010 | 0.07 | 13.347 | 596 | 160,202 |
| 100.00 | 45.18 | 100.00 | 65.39 |
| 13.501% to 14.000% ..... | 2 | 258,900 | 0.02 | 13.677 | 581 | 129,450 |
| 100.00 | 38.93 | 100.00 | 0.00 |
| | ----- | -------------- | ------ | ------ | --- | -------- | ----- |
| -   -----   ------   ----- |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |
| 84.40% | 43.05% | 74.23% | 7.27% |
| | ===== | ============== | ====== | ====== | === | ======== | ===== |
| ====== | ===== | ====== | ===== |

</TABLE>

As of the Cut-off Date, Mortgage Rates borne by the Group Two Mortgage
Loans ranged from 5.650% per annum to 13.750% per annum and the weighted average
Mortgage Rate of the Group Two Mortgage Loans was approximately 8.534% per
annum.

REMAINING MONTHS TO STATED MATURITY FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| | | | AGGREGATE | PERCENT | | WEIGHTED | AVERAGE | | |
|---|---|---|---|---|---|---|---|---|---|
| WEIGHTED | WEIGHTED | | NUMBER OF | PRINCIPAL | OF | WEIGHTED | AVERAGE | PRINCIPAL | |
| AVERAGE | AVERAGE | PERCENT | MORTGAGE | BALANCE | GROUP | AVERAGE | CREDIT | BALANCE | |
| RANGE OF REMAINING | ORIGINAL | DEBT-TO- | FULL | PERCENT | LOANS | OUTSTANDING | TWO | COUPON | SCORE | OUTSTANDING | LTV |
| TERMS (MONTHS) | INCOME | DOC | IO | | | | | | | |
| ------------------ | --------- | -------------- | ------- | -------- | -------- | ----------- | ------ |
| -- | -------- | ------- | ------- |
| <S> | | | <C> | <C> | | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> |
| 169 to 180 ............. | 37 | $ 4,151,177 | 0.34% | 8.320% | 647 | $112,194 |
| 77.18% | 40.44% | 77.12% | 11.67% |
| 229 to 240 ............. | 1 | 76,700 | 0.01 | 9.000 | 544 | 76,700 | 73.75 |
| 48.00 | 100.00 | 0.00 |
| 349 to 360 ............. | 5,757 | 1,204,584,025 | 99.65 | 8.534 | 649 | 209,238 | 84.42 |
| 43.06 | 74.22 | 7.25 |
| | ----- | -------------- | ------ | ----- | --- | -------- | ----- |
| ----- | ------ | ----- |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |
| 84.40% | 43.05% | 74.23% | 7.27% |
| | ===== | ============== | ====== | ===== | === | ======== | ===== |
| ===== | ====== | ===== |

</TABLE>

As of the Cut-off Date, the remaining term to stated maturity of the Group

Two Mortgage Loans ranged from 177 months to 360 months and the weighted average term to stated maturity of the Group Two Mortgage Loans was approximately 359 months.

A-II-21

<PAGE>

ORIGINAL MORTGAGE LOAN PRINCIPAL BALANCES FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL MORTGAGE LOAN ORIGINAL PRINCIPAL BALANCES | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV | WEIGHTED AVERAGE ORIGINAL DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| $50,000 or less......... | 58 | $ 2,819,711 | 0.23% | 9.713% | 610 | $ 48,616 | 76.73% | 35.85% | 85.81% | 1.77% |
| $50,001 to $100,000..... | 1,589 | 120,491,190 | 9.97 | 9.243 | 625 | 75,828 | 84.91 | 39.72 | 89.24 | 1.37 |
| $100,001 to $150,000.... | 1,217 | 151,000,455 | 12.49 | 8.776 | 632 | 124,076 | 83.85 | 41.15 | 84.95 | 2.73 |
| $150,001 to $200,000.... | 824 | 143,756,184 | 11.89 | 8.601 | 641 | 174,461 | 84.40 | 42.66 | 81.63 | 5.04 |
| $200,001 to $250,000.... | 562 | 125,721,994 | 10.40 | 8.484 | 651 | 223,705 | 84.60 | 42.48 | 76.60 | 6.96 |
| $250,001 to $300,000.... | 416 | 113,983,629 | 9.43 | 8.405 | 650 | 273,999 | 84.36 | 44.57 | 77.67 | 8.96 |
| $300,001 to $350,000.... | 241 | 78,208,143 | 6.47 | 8.422 | 659 | 324,515 | 84.06 | 45.87 | 67.33 | 6.31 |
| $350,001 to $400,000.... | 121 | 44,019,138 | 3.64 | 8.314 | 661 | 363,795 | 83.42 | 44.01 | 71.24 | 9.75 |
| $400,001 to $450,000.... | 157 | 68,017,461 | 5.63 | 8.230 | 656 | 433,232 | 84.27 | 45.03 | 55.32 | 8.29 |
| $450,001 to $500,000.... | 158 | 75,364,103 | 6.23 | 8.393 | 653 | 476,988 | 84.83 | 44.80 | 63.31 | 8.23 |
| $500,001 to $550,000.... | 141 | 74,245,223 | 6.14 | 8.254 | 658 | 526,562 | 84.15 | 45.28 | 63.83 | 6.42 |
| $550,001 to $600,000.... | 113 | 64,838,081 | 5.36 | 8.665 | 647 | 573,788 | 86.53 | 43.47 | 58.36 | 8.75 |
| $600,001 to $650,000.... | 66 | 41,179,224 | 3.41 | 8.405 | 668 | 623,928 | 86.41 | 41.71 | 58.82 | 13.64 |
| $650,001 to $700,000.... | 36 | 24,313,610 | 2.01 | 8.666 | 679 | 675,378 | 85.95 | 43.03 | 61.14 | 13.96 |
| $700,001 to $750,000.... | 29 | 20,936,871 | 1.73 | 8.398 | 670 | 721,961 | 85.89 | 40.34 | 79.43 | 17.28 |
| $750,001 to $800,000.... | 28 | 21,773,172 | 1.80 | 7.982 | 688 | 777,613 | 84.13 | 45.97 | 60.81 | 21.41 |
| $800,001 to $850,000.... | 9 | 7,467,900 | 0.62 | 7.514 | 661 | 829,767 | 83.84 | 43.38 | 77.80 | 33.60 |
| $850,001 to $900,000.... | 6 | 5,299,501 | 0.44 | 7.661 | 654 | 883,250 | 76.44 | 48.83 | 83.64 | 0.00 |
| $900,001 to $950,000.... | 4 | 3,680,160 | 0.30 | 8.112 | 693 | 920,040 | 80.00 | 36.02 | 100.00 | 24.96 |
| $950,001 to $1,000,000.. | 6 | 5,875,900 | 0.49 | 7.929 | 654 | 979,317 | 78.16 | 34.23 | 83.75 | 0.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1,000,001 or greater... 45.21  91.59  22.59 | 14 | 15,820,250 | 1.31 | 7.384 | 699 | 1,130,018 | 78.06 |
| | | ----- | --------------- | ------ | ----- | --- | ---------- | ----- |
| Total................ 84.40%  43.05%  74.23% | 5,795 7.27% | $1,208,811,901 | 100.00% | 8.534% | 649 | $ 208,596 | |
| | | ===== | ============== | ====== | ===== | === | ========== | ===== |

===== ====== =====

</TABLE>

As of the Cut-off Date, the outstanding principal balances of the Group Two Mortgage Loans ranged from approximately $31,130 to approximately $1,350,000 and the average outstanding principal balance of the Group Two Mortgage Loans was approximately $208,596.

A-II-22

<PAGE>

PRODUCT TYPES FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| ORIGINAL PRODUCT TYPES LTV | WEIGHTED AVERAGE DEBT-TO- INCOME | WEIGHTED AVERAGE PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|
| --------- | -------- | ------- | ------- | --------------- | --------- | -------- | -------- | ------------ ----- |
| <S> <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Balloon - 30/50 ....... 85.99%  44.19%  83.19% | 218 0.00% | $ 38,828,043 | 3.21% | 9.216% | 632 | $178,110 | |
| ARM - 1 Year/6 Month ... 84.55  46.02  64.72 | 13 0.00 | 2,155,470 | 0.18 | 8.550 | 648 | 165,805 | |
| ARM - 2 Year/6 Month (50 due in 30) ...... 83.46  45.10  72.09 | 1,484 0.00 | 444,409,219 | 36.76 | 8.330 | 656 | 299,467 | |
| ARM - 3 Year/6 Month (50 due in 30) ...... 84.01  44.39  63.09 | 316 0.00 | 91,301,673 | 7.55 | 8.191 | 655 | 288,929 | |
| ARM - 5 Year/6 Month (50 due in 30) ...... 81.50  41.15  83.97 | 35 0.00 | 10,221,760 | 0.85 | 7.988 | 667 | 292,050 | |
| 15 Year Fixed Loans .... 76.26  40.66  76.19 | 36 12.15 | 3,989,177 | 0.33 | 8.230 | 647 | 110,810 | |
| 15/30 Balloon Loans .... 100.00  35.00  100.00 | 1 0.00 | 162,000 | 0.01 | 10.550 | 644 | 162,000 | |
| 20 Year Fixed Loans .... 73.75  48.00  100.00 | 1 0.00 | 76,700 | 0.01 | 9.000 | 544 | 76,700 | |
| 2/28 LIBOR Loans ....... 85.49  41.08  75.85 | 1,489 19.48 | 261,372,195 | 21.62 | 8.619 | 647 | 175,535 | |
| 2/28 LIBOR Loans (40 due in 30) ...... 85.89  43.53  69.52 | 435 0.00 | 98,449,294 | 8.14 | 8.812 | 633 | 226,320 | |
| 30 Year Fixed Loans .... 84.97  40.11  85.81 | 1,126 6.11 | 133,609,210 | 11.05 | 9.032 | 639 | 118,658 | |
| 30/40 Balloon Loans .... 85.99  43.54  78.77 | 126 0.00 | 18,889,288 | 1.56 | 9.122 | 632 | 149,915 | |
| 3/27 LIBOR Loans ....... 83.90  40.59  69.85 | 361 29.03 | 68,854,340 | 5.70 | 8.351 | 653 | 190,732 | |

```
3/27 LIBOR Loans
  (40 due in 30) ......      99     22,337,155    1.85    8.360    646     225,628
84.95   42.05   82.00     0.00
5/25 LIBOR Loans .......      30      8,170,042    0.68    7.817    677     272,335
79.10   41.39   79.82    74.52
5/25 LIBOR Loans
  (40 due in 30) ......       6      1,221,723    0.10    7.144    725     203,621
72.13   35.45  100.00     0.00
Six Month LIBOR Loans ..      19      4,764,612    0.39    8.202    654     250,769
82.65   44.39   70.39    46.49
                           -----  --------------  ------  ------   ---    --------  ----
--      -----   ------    -----
  Total ...............   5,795  $1,208,811,901  100.00%  8.534%   649    $208,596
84.40%  43.05%  74.23%    7.27%
                           =====  ==============  ======  ======   ===    ========
======  =====   ======    =====
</TABLE>
```

         AMORTIZATION TYPE FOR THE GROUP TWO MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                           NUMBER     AGGREGATE                      WEIGHTED   AVERAGE
WEIGHTED  WEIGHTED
                             OF       PRINCIPAL    PERCENT  WEIGHTED  AVERAGE  PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                          MORTGAGE     BALANCE       OF     AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO-   FULL   PERCENT
AMORTIZATION TYPE          LOANS    OUTSTANDING   GROUP TWO  COUPON    SCORE   OUTSTANDING
LTV     INCOME    DOC      IO
----------------          -------   --------------  ---------  --------  --------  -----------  -----
---   --------  -------  -------
<S>                        <C>      <C>           <C>        <C>      <C>      <C>          <C>
<C>     <C>      <C>
Fully Amortizing .......  2,799  $  395,143,285   32.69%    8.816%    640    $141,173
85.35%  40.15%   80.00%   0.00%
Balloon ...............   2,720     725,820,155    60.04    8.440     651     266,846
84.06   44.54    71.90    0.00
60 Month
  Interest-Only .......     261      81,760,340     6.76    8.063     675     313,258
83.29   43.80    66.68   100.00
120 Month
  Interest-Only .......      15       6,088,122     0.50    7.656     689     405,875
77.19   42.87    77.71   100.00
                           -----  --------------  ------  -----    ---    --------  ----
-       -----    -----    ------
  Total ...............   5,795  $1,208,811,901  100.00%  8.534%   649    $208,596
84.40%  43.05%   74.23%   7.27%
                           =====  ==============  ======  =====    ===    ========
=====   =====    =====    ======
</TABLE>
```

         ADJUSTMENT TYPE FOR THE GROUP TWO MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                           NUMBER     AGGREGATE                      WEIGHTED   AVERAGE
WEIGHTED  WEIGHTED
                             OF       PRINCIPAL    PERCENT  WEIGHTED  AVERAGE  PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                          MORTGAGE     BALANCE       OF     AVERAGE   CREDIT    BALANCE
ORIGINAL  DEBT-TO-   FULL   PERCENT
ADJUSTMENT TYPE            LOANS    OUTSTANDING   GROUP TWO  COUPON    SCORE   OUTSTANDING
LTV     INCOME    DOC      IO
---------------           -------   --------------  ---------  --------  --------  -----------  -----
```

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE | ORIGINAL LTV | DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| ARM .................... | 4,287 | $1,013,257,483 | 83.82% | 8.432% | 651 | $236,356 | 84.26% | 43.39% | 72.26% | 7.82% |
| Fixed Rate ............. | 1,508 | 195,554,418 | 16.18 | 9.062 | 637 | 129,678 | 85.10 | 41.26 | 84.43 | 4.42 |
| Total .............. | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 | 84.40% | 43.05% | 74.23% | 7.27% |

</TABLE>

A-II-23

<PAGE>

## GEOGRAPHIC DISTRIBUTIONS OF MORTGAGED PROPERTIES
## FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| GEOGRAPHIC DISTRIBUTIONS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | ORIGINAL LTV | DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama ................. | 68 | $ 8,596,103 | 0.71% | 9.033% | 626 | $126,413 | 88.21% | 39.92% | 94.16% | 4.35% |
| Arizona ................. | 154 | 34,599,605 | 2.86 | 8.252 | 649 | 224,673 | 81.65 | 42.75 | 75.63 | 13.67 |
| Arkansas ............... | 22 | 2,382,963 | 0.20 | 9.726 | 623 | 108,316 | 93.29 | 37.08 | 97.15 | 6.59 |
| California ............. | 618 | 250,158,181 | 20.69 | 7.914 | 664 | 404,787 | 81.89 | 45.17 | 69.89 | 10.32 |
| Colorado ............... | 98 | 24,213,838 | 2.00 | 8.707 | 643 | 247,080 | 84.56 | 40.60 | 84.98 | 13.81 |
| Connecticut ............ | 37 | 9,676,305 | 0.80 | 8.755 | 642 | 261,522 | 85.04 | 43.23 | 70.14 | 12.34 |
| Delaware ............... | 7 | 1,688,810 | 0.14 | 8.780 | 620 | 241,259 | 89.73 | 43.93 | 100.00 | 15.40 |
| District of Columbia ... | 2 | 648,000 | 0.05 | 8.122 | 642 | 324,000 | 83.96 | 49.89 | 100.00 | 0.00 |
| Florida ................. | 583 | 126,538,450 | 10.47 | 8.333 | 653 | 217,047 | 82.91 | 43.47 | 69.85 | 6.23 |
| Georgia ................ | 161 | 30,504,592 | 2.52 | 9.149 | 640 | 189,470 | 85.82 | 42.97 | 84.33 | 10.32 |
| Idaho .................. | 38 | 4,979,885 | 0.41 | 8.477 | 630 | 131,050 | 82.49 | 41.79 | 90.80 | 2.61 |
| Illinois ............... | 240 | 54,344,133 | 4.50 | 9.064 | 647 | 226,434 | 86.28 | 43.06 | 62.20 | 3.61 |
| Indiana ................ | 213 | 21,213,280 | 1.75 | 9.170 | 624 | 99,593 | 89.62 | 38.01 | 87.45 | 5.01 |
| Iowa ................... | 25 | 1,900,285 | 0.16 | 10.198 | 610 | 76,011 | 91.37 | 41.35 | 96.40 | 0.00 |

https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt

| State | | | | | | |
|---|---|---|---|---|---|---|
| Kansas ................. | 22 | 2,056,320 | 0.17 | 9.592 | 630 | 93,469 |
| 86.67 | 44.62 | 92.25 | 9.28 | | | |
| Kentucky ............... | 66 | 6,953,154 | 0.58 | 9.357 | 626 | 105,351 |
| 87.70 | 38.08 | 81.40 | 2.84 | | | |
| Louisiana ............. | 31 | 3,922,485 | 0.32 | 8.913 | 635 | 126,532 |
| 85.91 | 40.17 | 84.73 | 5.53 | | | |
| Maine ................. | 17 | 2,906,350 | 0.24 | 8.449 | 632 | 170,962 |
| 84.65 | 47.21 | 87.60 | 0.00 | | | |
| Maryland .............. | 103 | 33,591,185 | 2.78 | 8.616 | 645 | 326,128 |
| 84.04 | 43.06 | 84.90 | 4.45 | | | |
| Massachusetts ......... | 69 | 20,891,555 | 1.73 | 8.673 | 654 | 302,776 |
| 83.73 | 41.73 | 74.49 | 0.95 | | | |
| Michigan .............. | 230 | 28,478,182 | 2.36 | 8.987 | 636 | 123,818 |
| 87.86 | 41.62 | 82.35 | 6.44 | | | |
| Minnesota ............. | 55 | 12,196,030 | 1.01 | 9.025 | 636 | 221,746 |
| 85.43 | 44.10 | 74.96 | 13.34 | | | |
| Mississippi ........... | 26 | 3,380,685 | 0.28 | 8.759 | 636 | 130,026 |
| 84.99 | 39.87 | 90.26 | 11.06 | | | |
| Missouri .............. | 92 | 9,304,420 | 0.77 | 9.125 | 619 | 101,135 |
| 86.08 | 41.58 | 88.88 | 1.70 | | | |
| Montana ............... | 6 | 810,830 | 0.07 | 8.322 | 658 | 135,138 |
| 83.31 | 46.05 | 60.57 | 0.00 | | | |
| Nebraska .............. | 13 | 1,412,481 | 0.12 | 9.602 | 610 | 108,652 |
| 89.10 | 41.48 | 84.45 | 7.13 | | | |
| Nevada ................ | 86 | 24,144,828 | 2.00 | 8.140 | 648 | 280,754 |
| 82.43 | 46.18 | 90.05 | 4.09 | | | |
| New Hampshire ......... | 13 | 2,600,450 | 0.22 | 9.047 | 635 | 200,035 |
| 84.15 | 43.64 | 91.16 | 9.60 | | | |
| New Jersey ............ | 85 | 26,037,126 | 2.15 | 8.903 | 650 | 306,319 |
| 86.97 | 44.41 | 44.76 | 9.37 | | | |
| New Mexico ............ | 32 | 5,137,947 | 0.43 | 9.053 | 629 | 160,561 |
| 86.03 | 44.30 | 92.08 | 14.51 | | | |
| New York .............. | 340 | 98,632,891 | 8.16 | 8.542 | 664 | 290,097 |
| 86.25 | 44.78 | 45.96 | 10.63 | | | |
| North Carolina ........ | 102 | 15,369,623 | 1.27 | 9.106 | 631 | 150,683 |
| 85.57 | 38.15 | 88.22 | 3.46 | | | |
| North Dakota .......... | 3 | 256,382 | 0.02 | 10.117 | 607 | 85,461 |
| 81.73 | 39.99 | 77.69 | 0.00 | | | |
| Ohio .................. | 324 | 33,640,524 | 2.78 | 9.272 | 627 | 103,829 |
| 89.39 | 39.71 | 92.68 | 2.28 | | | |
| Oklahoma .............. | 43 | 4,464,240 | 0.37 | 9.319 | 630 | 103,820 |
| 90.49 | 36.18 | 87.92 | 0.00 | | | |
| Oregon ................ | 131 | 30,514,231 | 2.52 | 8.318 | 648 | 232,933 |
| 83.33 | 40.16 | 77.38 | 15.76 | | | |
| Pennsylvania .......... | 167 | 20,637,442 | 1.71 | 8.835 | 626 | 123,577 |
| 85.72 | 38.99 | 80.65 | 1.56 | | | |
| Rhode Island .......... | 17 | 3,665,139 | 0.30 | 8.613 | 670 | 215,596 |
| 80.99 | 46.39 | 33.72 | 13.53 | | | |
| South Carolina ........ | 64 | 9,078,660 | 0.75 | 9.189 | 635 | 141,854 |
| 86.62 | 41.52 | 93.65 | 5.56 | | | |
| South Dakota .......... | 2 | 207,055 | 0.02 | 7.872 | 714 | 103,528 |
| 85.84 | 43.22 | 100.00 | 0.00 | | | |
| Tennessee ............. | 244 | 28,743,439 | 2.38 | 8.779 | 639 | 117,801 |
| 83.86 | 42.90 | 93.70 | 6.06 | | | |
| Texas ................. | 603 | 81,551,022 | 6.75 | 8.943 | 636 | 135,242 |
| 85.57 | 41.79 | 85.71 | 2.77 | | | |
| Utah .................. | 144 | 30,729,195 | 2.54 | 8.584 | 645 | 213,397 |
| 85.69 | 42.49 | 78.58 | 4.13 | | | |
| Vermont ............... | 10 | 1,429,775 | 0.12 | 9.132 | 626 | 142,978 |
| 89.02 | 43.04 | 82.12 | 0.00 | | | |
| Virginia .............. | 56 | 15,405,967 | 1.27 | 8.320 | 653 | 275,107 |
| 84.20 | 44.13 | 65.69 | 1.20 | | | |
| Washington ............ | 218 | 64,918,257 | 5.37 | 8.185 | 657 | 297,790 |
| 82.64 | 42.90 | 77.93 | 5.40 | | | |
| West Virginia ......... | 7 | 836,676 | 0.07 | 9.424 | 622 | 119,525 |

| | Number | Aggregate Principal Balance | Percent | Weighted Average Coupon | Average Credit Score | Average Principal Balance | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 83.36 | 35.78 | 90.20 | 0.00 |
| Wisconsin .............. | 102 | 12,339,896 | 1.02 | 8.942 | 638 | 120,979 | 84.78 | 41.02 | 87.51 | 0.93 |
| Wyoming ................ | 6 | 1,123,030 | 0.09 | 8.794 | 642 | 187,172 | 82.49 | 40.61 | 81.62 | 0.00 |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 | 84.40% | 43.05% | 74.23% | 7.27% |

</TABLE>

No more than approximately 0.27% of the Group Two Mortgage Loans will be secured by mortgaged properties located in any one zip code.

A-II-24

<PAGE>

ORIGINAL LOAN-TO-VALUE RATIOS FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | PERCENT IO |
|---|---|---|---|---|---|---|---|---|---|---|
| 50.00% or less ......... | 81 | $ 8,717,279 | 0.72% | 8.065% | 620 | $107,621 | 39.33% | 36.22% | 64.21% | 7.60% |
| 50.01% to 55.00% ....... | 26 | 3,785,150 | 0.31 | 7.914 | 641 | 145,583 | 52.17 | 36.33 | 72.10 | 0.00 |
| 55.01% to 60.00% ....... | 55 | 7,725,450 | 0.64 | 7.759 | 622 | 140,463 | 57.68 | 39.05 | 74.21 | 0.00 |
| 60.01% to 65.00% ....... | 67 | 10,875,407 | 0.90 | 7.800 | 638 | 162,320 | 63.43 | 35.58 | 71.06 | 1.31 |
| 65.01% to 70.00% ....... | 104 | 22,509,232 | 1.86 | 7.755 | 641 | 216,435 | 68.88 | 40.27 | 51.41 | 11.32 |
| 70.01% to 75.00% ....... | 160 | 30,508,058 | 2.52 | 7.923 | 628 | 190,675 | 73.89 | 41.27 | 65.21 | 5.26 |
| 75.01% to 80.00% ....... | 2,700 | 618,385,943 | 51.16 | 8.105 | 662 | 229,032 | 79.89 | 44.05 | 78.94 | 9.20 |
| 80.01% to 85.00% ....... | 345 | 64,291,263 | 5.32 | 8.637 | 609 | 186,351 | 84.49 | 40.77 | 75.55 | 5.53 |
| 85.01% to 90.00% ....... | 708 | 137,413,497 | 11.37 | 8.711 | 626 | 194,087 | 89.73 | 40.95 | 67.12 | 6.02 |
| 90.01% to 95.00% ....... | 981 | 210,762,784 | 17.44 | 9.099 | 643 | 214,845 | 94.86 | 43.09 | 70.11 | 4.91 |
| 95.01% to 100.00% ...... | 568 | 93,837,838 | 7.76 | 10.357 | 656 | 165,207 | 99.98 | 44.36 | 71.71 | 4.08 |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 | 84.40% | 43.05% | 74.23% | 7.27% |

</TABLE>

    As of the Cut-off Date, the Original Loan-to-Value Ratios of the Group Two
Mortgage Loans ranged from 15.20% to 100.00%.

                                    A-II-25
<PAGE>

        COMBINED LOAN-TO-VALUE RATIOS FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS (LTV) | WEIGHTED AVERAGE COMBINED | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 50.00% or less ......... | 39.33% | 36.22% | 64.21% | 81 | 7.60% | $ 8,717,279 | 0.72% | 8.065% | 620 | $107,621 |
| 50.01% to 55.00% ....... | 52.45 | 36.55 | 67.56 | 25 | 0.00 | 3,255,150 | 0.27 | 8.014 | 641 | 130,206 |
| 55.01% to 60.00% ....... | 57.33 | 38.49 | 72.72 | 54 | 0.00 | 7,304,200 | 0.60 | 7.840 | 623 | 135,263 |
| 60.01% to 65.00% ....... | 63.32 | 34.78 | 66.69 | 65 | 1.51 | 9,450,607 | 0.78 | 7.918 | 623 | 145,394 |
| 65.01% to 70.00% ....... | 68.89 | 40.24 | 51.18 | 103 | 11.38 | 22,399,732 | 1.85 | 7.750 | 642 | 217,473 |
| 70.01% to 75.00% ....... | 73.32 | 40.51 | 62.27 | 155 | 5.71 | 28,132,558 | 2.33 | 7.937 | 622 | 181,500 |
| 75.01% to 80.00% ....... | 79.43 | 38.68 | 69.29 | 475 | 6.91 | 91,373,826 | 7.56 | 7.939 | 630 | 192,366 |
| 80.01% to 85.00% ....... | 84.30 | 40.93 | 76.10 | 347 | 5.40 | 65,790,763 | 5.44 | 8.612 | 611 | 189,599 |
| 85.01% to 90.00% ....... | 89.00 | 40.98 | 68.12 | 724 | 6.24 | 144,181,203 | 11.93 | 8.645 | 629 | 199,145 |
| 90.01% to 95.00% ....... | 93.64 | 43.09 | 70.89 | 1,030 | 5.34 | 228,746,527 | 18.92 | 9.025 | 645 | 222,084 |
| 95.01% to 100.00% ...... | 83.12 | 44.98 | 79.26 | 2,736 | 8.64 | 599,460,056 | 49.59 | 8.486 | 665 | 219,101 |
| Total .............. | 84.40% | 43.05% | 74.23% | 5,795 | 7.27% | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |

</TABLE>

    As of the Cut-off Date, the Combined Loan-to-Value Ratios of the Group Two
Mortgage Loans ranged from 15.20% to 100.00% and the weighted average Combined
Loan-to-Value Ratio for Group Two Mortgage Loans was approximately 93.07%. This
table was calculated using the Combined Loan-to-Value Ratio for Group Two
Mortgage Loans that are in a second lien position and for Group Two Mortgage
Loans that are in a first lien position with subordinate financing.
Approximately 44.20% of the Group Two Mortgage Loans are in a first lien
position with subordinate financing and the weighted average Combined
Loan-to-Value Ratio for such Group Two Mortgage Loans was approximately 99.45%.

DEBT-TO-INCOME RATIOS FOR THE GROUP TWO MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                               NUMBER     AGGREGATE                            WEIGHTED   AVERAGE
WEIGHTED   WEIGHTED
                                 OF        PRINCIPAL    PERCENT   WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE    AVERAGE  PERCENT
RANGE OF                       MORTGAGE     BALANCE       OF      AVERAGE    CREDIT     BALANCE
ORIGINAL   DEBT-TO-   FULL   PERCENT
DEBT-TO-INCOME RATIOS          LOANS     OUTSTANDING   GROUP TWO   COUPON     SCORE    OUTSTANDING
LTV      INCOME    DOC      IO
---------------------         --------  -------------- ---------  --------  --------  ----------- -----
---  --------  ------- -------
<S>          <C>      <C>    <C>         <C>           <C>        <C>       <C>       <C>          <C>
<C>      <C>      <C>
20.00% or less .........      268   $   54,071,348     4.47%     8.294%     649      $201,759
82.71%    13.92%   92.54%    9.73%
20.01% to 25.00% .......      228       33,958,422     2.81      8.666      637       148,940
83.69     23.11    85.16     4.85
25.01% to 30.00% .......      366       58,256,017     4.82      8.683      633       159,169
83.29     28.29    80.80     6.57
30.01% to 35.00% .......      516       83,663,696     6.92      8.644      642       162,139
83.77     33.24    79.77     3.21
35.01% to 40.00% .......      799      148,489,426    12.28      8.613      645       185,844
84.14     38.19    75.48     5.06
40.01% to 45.00% .......    1,031      217,763,904    18.01      8.568      651       211,216
84.74     43.24    64.05     7.79
45.01% to 50.00% .......    1,378      335,110,584    27.72      8.615      654       243,186
85.42     48.21    61.27     8.29
50.01% to 55.00% .......    1,208      277,147,344    22.93      8.333      651       229,427
83.88     53.43    89.35     7.88
55.01% to 60.00% .......        1          351,160     0.03      6.900      667       351,160
80.00     57.00     0.00   100.00
                            -----   --------------    ------     -----      ---       --------   ----
-     -----    -----   ------
   Total ...............    5,795   $1,208,811,901   100.00%     8.534%     649      $208,596
84.40%    43.05%   74.23%    7.27%
                            =====   ==============    ======     =====      ===       ========
=====     =====    =====   ======
</TABLE>
```

    As of the Cut-off Date, the Debt-to-Income Ratios of the Group Two Mortgage
Loans ranged from 0.28% to 57.00% and the weighted average Debt-to-Income Ratio
for Group Two Mortgage Loans with Debt-to-Income Ratios was approximately
43.05%.


                                    A-II-26

<PAGE>


                 LOAN PURPOSE FOR THE GROUP TWO MORTGAGE LOANS


```
<TABLE>
<CAPTION>
                               NUMBER     AGGREGATE                            WEIGHTED   AVERAGE
WEIGHTED   WEIGHTED
                                 OF        PRINCIPAL    PERCENT   WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE    AVERAGE  PERCENT
                               MORTGAGE     BALANCE       OF      AVERAGE    CREDIT     BALANCE
ORIGINAL   DEBT-TO-   FULL   PERCENT
LOAN PURPOSE                   LOANS     OUTSTANDING   GROUP TWO   COUPON     SCORE    OUTSTANDING
LTV      INCOME    DOC      IO
------------                  --------  -------------- ---------  --------  --------  ----------- -----
```

```
---  --------  -------  -------
<S>                         <C>        <C>             <C>        <C>       <C>       <C>           <C>
<C>        <C>      <C>
Purchase ...............    4,200   $   886,818,339    73.36%     8.604%    656       $211,147
85.17%    43.68%   78.55%   7.96%
Refinance - Cashout ....    1,361       276,099,666    22.84      8.368     630        202,865
82.24     41.57    60.30    5.66
Refinance - Rate Term ..      234        45,893,897     3.80      8.171     640        196,128
82.36     39.71    74.58    3.60
                            -----   --------------    ------     -----     ---       --------      ----
-    -----    -----    ----
    Total ..............    5,795   $1,208,811,901   100.00%     8.534%    649       $208,596
84.40%    43.05%   74.23%   7.27%
                            =====   ==============    ======     =====     ===       ========
=====    =====    =====    ====
</TABLE>
```

TYPES OF MORTGAGED PROPERTIES FOR THE GROUP TWO MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                            NUMBER      AGGREGATE                           WEIGHTED    AVERAGE
WEIGHTED  WEIGHTED
                              OF        PRINCIPAL     PERCENT    WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                           MORTGAGE      BALANCE        OF       AVERAGE    CREDIT     BALANCE
ORIGINAL  DEBT-TO-   FULL   PERCENT
PROPERTY TYPE               LOANS     OUTSTANDING   GROUP TWO    COUPON     SCORE     OUTSTANDING
LTV      INCOME    DOC     IO
-------------               -------   --------------   ---------  --------  --------  -----------  -----
---  --------  -------  -------
<S>                         <C>        <C>             <C>        <C>       <C>       <C>           <C>
<C>        <C>      <C>
Single Family .........    4,228   $   815,307,651    67.45%     8.568%    647       $192,835
84.58%    42.63%   73.70%   6.24%
Planned Unit
    Development .........    1,021       259,849,113    21.50      8.423     649        254,505
84.03     43.73    81.92    8.73
Condominium ...........      314        68,135,028     5.64      8.506     658        216,991
83.24     42.36    76.74   14.62
Two- to Four-Family ....      232        65,520,110     5.42      8.571     665        282,414
84.85     46.23    47.68    6.55
                            -----   --------------    ------     -----     ---       --------      ----
-    -----    -----    -----
    Total ..............    5,795   $1,208,811,901   100.00%     8.534%    649       $208,596
84.40%    43.05%   74.23%   7.27%
                            =====   ==============    ======     =====     ===       ========
=====    =====    =====    =====
</TABLE>
```

DOCUMENTATION SUMMARY FOR THE GROUP TWO MORTGAGE LOANS

```
<TABLE>
<CAPTION>
                            NUMBER      AGGREGATE                           WEIGHTED    AVERAGE
WEIGHTED  WEIGHTED
                              OF        PRINCIPAL     PERCENT    WEIGHTED   AVERAGE    PRINCIPAL
AVERAGE   AVERAGE  PERCENT
                           MORTGAGE      BALANCE        OF       AVERAGE    CREDIT     BALANCE
ORIGINAL  DEBT-TO-   FULL   PERCENT
DOCUMENTATION               LOANS     OUTSTANDING   GROUP TWO    COUPON     SCORE     OUTSTANDING
LTV      INCOME    DOC     IO
-------------               -------   --------------   ---------  --------  --------  -----------  -----
---  --------  -------  -------
<S>                         <C>        <C>             <C>        <C>       <C>       <C>           <C>
```

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
| | ORIGINAL LTV | DEBT-TO-INCOME | FULL DOC | PERCENT IO | | |
|---|---|---|---|---|---|---|
| Full Documentation ..... | 4,664 | $ 897,272,277 | 74.23% | 8.497% | 644 | $192,383 |
| 84.23% | 42.73% | 100.00% | 6.60% | | | |
| Stated Income ......... | 662 | 175,603,087 | 14.53 | 8.776 | 679 | 265,261 |
| 83.54 | 43.82 | 0.00 | 11.08 | | | |
| Rapid ................. | 384 | 111,531,725 | 9.23 | 8.364 | 640 | 290,447 |
| 85.49 | 44.11 | 0.00 | 6.80 | | | |
| Stated Plus ........... | 28 | 11,086,490 | 0.92 | 9.242 | 674 | 395,946 |
| 95.70 | 46.40 | 0.00 | 12.06 | | | |
| Limited Income Verification ........ | 45 | 10,290,441 | 0.85 | 8.605 | 659 | 228,676 |
| 85.95 | 40.79 | 0.00 | 2.20 | | | |
| Blended ............... | 12 | 3,027,881 | 0.25 | 8.797 | 686 | 252,323 |
| 96.35 | 47.67 | 0.00 | 0.00 | | | |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |
| 84.40% | 43.05% | 74.23% | 7.27% | | | |

</TABLE>

A-II-27

<PAGE>

OCCUPANCY TYPES FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
| ORIGINAL OCCUPANCY LTV | DEBT-TO-INCOME | FULL DOC | PERCENT IO | | | |
|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| `<C>` | `<C>` | `<C>` | | | | |
| Primary ............... | 5,571 | $1,181,309,761 | 97.72% | 8.538% | 649 | $212,046 |
| 84.43% | 43.15% | 73.96% | 7.26% | | | |
| Investment ............. | 218 | 26,528,150 | 2.19 | 8.362 | 675 | 121,689 |
| 83.17 | 38.48 | 86.12 | 8.03 | | | |
| Second Home ........... | 6 | 973,990 | 0.08 | 8.256 | 659 | 162,332 |
| 78.47 | 40.47 | 76.46 | 0.00 | | | |
| Total ............... | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |
| 84.40% | 43.05% | 74.23% | 7.27% | | | |

</TABLE>

The information set forth above with respect to occupancy is based upon representations of the related mortgagors at the time of origination.

MORTGAGE LOAN AGE SUMMARY FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| | NUMBER | AGGREGATE | | WEIGHTED | AVERAGE |
|---|---|---|---|---|---|

| WEIGHTED AVERAGE ORIGINAL LTV | WEIGHTED AVERAGE DEBT-TO-INCOME | PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| MORTGAGE AGE (MONTHS) | | | | | | | | | |
| 0 ..................... | | | 2,690 | | $ 547,274,863 | 45.27% | 8.669% | 649 | $203,448 |
| 84.76% | 42.96% | 75.10% | | 5.73% | | | | | |
| 1 ..................... | | | 3,067 | | 655,786,208 | 54.25 | 8.417 | 650 | 213,820 |
| 84.08 | 43.12 | 73.44 | | 8.50 | | | | | |
| 2 ..................... | | | 28 | | 3,557,151 | 0.29 | 9.351 | 626 | 127,041 |
| 89.96 | 43.29 | 87.19 | | 12.25 | | | | | |
| 3 ..................... | | | 9 | | 1,758,968 | 0.15 | 8.060 | 648 | 195,441 |
| 81.56 | 44.85 | 87.95 | | 19.21 | | | | | |
| 4 ..................... | | | 1 | | 434,712 | 0.04 | 8.300 | 633 | 434,712 |
| 72.67 | 39.00 | 0.00 | | 0.00 | | | | | |
| Total ............... | | | 5,795 | | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 |
| 84.40% | 43.05% | 74.23% | | 7.27% | | | | | |

</TABLE>

As of the Cut-off Date, the weighted average age of the Group Two Mortgage
Loans was approximately 1 month.

A-II-28

<PAGE>

ORIGINAL PREPAYMENT CHARGE TERM FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| ORIGINAL PREPAYMENT CHARGE TERM | WEIGHTED AVERAGE ORIGINAL DEBT-TO-INCOME | PERCENT FULL DOC | NUMBER OF MORTGAGE LOANS | PERCENT IO | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED AVERAGE ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| None................... | | | 1,515 | | $ 351,568,531 | 29.08% | 8.842% | 652 | $232,058 | 84.96% |
| 42.29% | 69.07% | 7.90% | | | | | | | | |
| 12 Months.............. | | | 317 | | 85,660,487 | 7.09 | 8.789 | 658 | 270,222 | 85.85 |
| 43.52 | 63.13 | 12.51 | | | | | | | | |
| 24 Months.............. | | | 2,436 | | 523,756,615 | 43.33 | 8.333 | 647 | 215,007 | 83.90 |
| 43.66 | 77.92 | 5.64 | | | | | | | | |
| 36 Months.............. | | | 1,527 | | 247,826,268 | 20.50 | 8.433 | 646 | 162,296 | 84.16 |
| 42.66 | 77.58 | 7.98 | | | | | | | | |
| Total................ | | | 5,795 | | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 | 84.40% |
| 43.05% | 74.23% | 7.27% | | | | | | | | |

===== ===== =====
</TABLE>

The weighted average prepayment penalty term at origination with respect to the Group Two Mortgage Loans having prepayment penalties is approximately 26 months.

CREDIT SCORES FOR THE GROUP TWO MORTGAGE LOANS

<TABLE>
<CAPTION>

| RANGE OF CREDIT SCORES | WEIGHTED AVERAGE ORIGINAL DEBT-TO-INCOME | WEIGHTED AVERAGE PERCENT FULL DOC | PERCENT IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 526 to 550.............. | 38.94% | 91.25% | 0.00% | 115 | $ 15,672,521 | 1.30% | 9.351% | 545 | $136,283 | 77.84% |
| 551 to 575.............. | 41.32 | 78.88 | 0.65 | 372 | 50,949,430 | 4.21 | 9.214 | 565 | 136,961 | 80.18 |
| 576 to 600.............. | 40.67 | 83.77 | 3.93 | 652 | 100,322,591 | 8.30 | 9.353 | 589 | 153,869 | 86.42 |
| 601 to 625.............. | 42.59 | 84.62 | 3.48 | 1,115 | 199,354,215 | 16.49 | 9.010 | 614 | 178,793 | 86.63 |
| 626 to 650.............. | 43.80 | 81.26 | 3.78 | 1,375 | 280,733,702 | 23.22 | 8.705 | 639 | 204,170 | 84.79 |
| 651 to 675.............. | 43.15 | 68.11 | 8.46 | 1,073 | 262,555,030 | 21.72 | 8.277 | 662 | 244,692 | 84.28 |
| 676 to 700.............. | 43.53 | 62.15 | 13.77 | 549 | 141,061,770 | 11.67 | 7.990 | 687 | 256,943 | 83.36 |
| 701 to 725.............. | 44.09 | 61.32 | 19.80 | 285 | 80,644,241 | 6.67 | 7.614 | 710 | 282,962 | 82.57 |
| 726 to 750.............. | 43.53 | 56.40 | 9.31 | 140 | 40,935,838 | 3.39 | 7.841 | 737 | 292,399 | 81.64 |
| 751 to 775.............. | 45.02 | 59.71 | 11.74 | 72 | 22,500,714 | 1.86 | 7.847 | 762 | 312,510 | 84.92 |
| 776 to 800.............. | 45.94 | 66.13 | 16.50 | 37 | 11,800,050 | 0.98 | 7.728 | 787 | 318,920 | 83.41 |
| 801 to 809.............. | 44.11 | 73.33 | 0.00 | 7 | 1,379,800 | 0.11 | 7.813 | 804 | 197,114 | 86.30 |
| 810 to 820.............. | 36.69 | 72.06 | 0.00 | 3 | 902,000 | 0.07 | 8.425 | 813 | 300,667 | 79.50 |
| Total................ | 43.05% | 74.23% | 7.27% | 5,795 | $1,208,811,901 | 100.00% | 8.534% | 649 | $208,596 | 84.40% |

===== ===== =====
</TABLE>

The Credit Scores of the Group Two Mortgage Loans that were scored as of the Cut-off Date ranged from 540 to 814 and the weighted average Credit Score of the Group Two Mortgage Loans that were scored as of the Cut-off Date was approximately 649.

A-II-29

<PAGE>

GROSS MARGINS FOR THE GROUP TWO MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<TABLE>
<CAPTION>

| RANGE OF GROSS MARGINS | ORIGINAL INCOME | DEBT-TO- DOC | FULL IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED PERCENT LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 2.501% to 3.000%........ | 39.64% | 77.98% | 22.17% | 51 | $ 25,000,687 | 2.47% | 7.293% | 691 | $490,210 | 78.84% |
| 4.001% to 4.500%........ | 45.93 | 100.00 | 31.17 | 3 | 286,200 | 0.03 | 9.360 | 610 | 95,400 | 74.20 |
| 4.501% to 5.000%........ | 47.69 | 57.10 | 43.62 | 23 | 5,077,572 | 0.50 | 8.523 | 647 | 220,764 | 82.65 |
| 5.001% to 5.500%........ | 44.02 | 75.53 | 8.49 | 2,532 | 604,950,671 | 59.70 | 8.110 | 657 | 238,922 | 79.00 |
| 5.501% to 6.000%........ | 41.18 | 65.78 | 6.62 | 667 | 148,964,487 | 14.70 | 8.583 | 625 | 223,335 | 88.20 |
| 6.001% to 6.500%........ | 43.49 | 67.45 | 4.44 | 1,007 | 228,510,117 | 22.55 | 9.302 | 649 | 226,922 | 96.23 |
| 6.501% to 7.000%........ | 45.08 | 100.00 | 0.00 | 4 | 467,750 | 0.05 | 10.152 | 632 | 116,938 | 98.32 |
| | | | | ----- | -------------- | ------ | ------ | --- | -------- | ----- |
| Total................ | 43.39% | 72.26% | 7.82% | 4,287 | $1,013,257,483 | 100.00% | 8.432% | 651 | $236,356 | 84.26% |
| | | | | ===== | ============== | ====== | ====== | === | ======== | ===== |

===== ====== =====
</TABLE>

    As of the Cut-off Date, the Gross Margin for the Group Two Adjustable Rate
Mortgage Loans ranged from 2.750% per annum to 6.750% per annum and the weighted
average Gross Margin of the Group Two Adjustable Rate Mortgage Loans was
approximately 5.631% per annum.

MAXIMUM MORTGAGE RATES FOR THE GROUP TWO MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<TABLE>
<CAPTION>

| RANGE OF MAXIMUM MORTGAGE RATES | ORIGINAL INCOME | DEBT-TO- DOC | FULL IO | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | WEIGHTED PERCENT LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 11.501% to 12.000%...... | 70.33% | 43.48% | 75.85% | 38.77% 14 | $ 5,256,659 | 0.52% | 5.883% | 716 | $375,476 |  |

5/20/2019 https://www.sec.gov/Archives/edgar/data/1398697/000095012307008073/y35327b5e424b5.txt 233/376

| Range | Number of Loans | Aggregate Principal Balance | Percent | Weighted Average Coupon | Credit Score | Average Principal Balance | LTV |
|---|---|---|---|---|---|---|---|
| 12.001% to 12.500%...... | 67 | 21,415,592 | 2.11 | 6.320 | 705 | 319,636 | 78.90 |
| 46.04  92.90  23.68 | | | | | | | |
| 12.501% to 13.000%...... | 204 | 63,891,354 | 6.31 | 6.823 | 682 | 313,193 | 78.04 |
| 44.33  80.50  13.93 | | | | | | | |
| 13.001% to 13.500%...... | 368 | 106,512,649 | 10.51 | 7.297 | 675 | 289,437 | 80.61 |
| 44.15  79.55  15.04 | | | | | | | |
| 13.501% to 14.000%...... | 690 | 177,823,218 | 17.55 | 7.802 | 658 | 257,715 | 82.07 |
| 43.42  74.61  7.06 | | | | | | | |
| 14.001% to 14.500%...... | 718 | 171,995,571 | 16.97 | 8.289 | 654 | 239,548 | 82.76 |
| 43.24  71.89  9.24 | | | | | | | |
| 14.501% to 15.000%...... | 885 | 203,087,372 | 20.04 | 8.767 | 642 | 229,477 | 85.08 |
| 42.97  67.91  3.35 | | | | | | | |
| 15.001% to 15.500%...... | 549 | 109,286,392 | 10.79 | 9.270 | 629 | 199,064 | 86.54 |
| 43.28  73.17  5.80 | | | | | | | |
| 15.501% to 16.000%...... | 480 | 93,629,769 | 9.24 | 9.762 | 629 | 195,062 | 90.15 |
| 42.66  64.39  3.96 | | | | | | | |
| 16.001% to 16.500%...... | 157 | 31,528,630 | 3.11 | 10.264 | 628 | 200,819 | 93.58 |
| 42.81  61.11  4.23 | | | | | | | |
| 16.501% to 17.000%...... | 92 | 16,916,681 | 1.67 | 10.753 | 637 | 183,877 | 96.54 |
| 43.81  63.81  1.73 | | | | | | | |
| 17.001% to 17.500%...... | 33 | 6,792,951 | 0.67 | 11.222 | 639 | 205,847 | 95.47 |
| 42.08  72.90  3.39 | | | | | | | |
| 17.501% to 18.000%...... | 18 | 2,674,844 | 0.26 | 11.794 | 634 | 148,602 | 100.00 |
| 44.29  66.09  0.00 | | | | | | | |
| 18.001% to 18.500%...... | 10 | 1,536,900 | 0.15 | 12.236 | 638 | 153,690 | 99.81 |
| 44.29  34.67  0.00 | | | | | | | |
| 18.501% to 19.000%...... | 2 | 908,900 | 0.09 | 12.614 | 640 | 454,450 | 100.00 |
| 51.14  35.75  0.00 | | | | | | | |
| | | ----- | -------------- | ------ | ------ | --- | -------- | ------ |
| Total................ | 4,287 | $1,013,257,483 | 100.00% | 8.432% | 651 | $236,356 | |
| 84.26%  43.39%  72.26%  7.82% | | | | | | | |

=====  =====  =====          =====  ==============  ======  ======  ===  ========  ======

</TABLE>

As of the Cut-off Date, the Maximum Mortgage Rates for the Group Two Adjustable Rate Mortgage Loans ranged from 11.650% per annum to 18.650% per annum and the weighted average Maximum Mortgage Rate of the Group Two Adjustable Rate Mortgage Loans was approximately 14.432% per annum.

A-II-30

<PAGE>

NEXT RATE ADJUSTMENT DATE FOR THE GROUP TWO MORTGAGE LOANS
(EXCLUDES FIXED RATE MORTGAGE LOANS)

<TABLE>
<CAPTION>

| | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING | PERCENT OF GROUP TWO | WEIGHTED AVERAGE COUPON | WEIGHTED AVERAGE CREDIT SCORE | AVERAGE PRINCIPAL BALANCE OUTSTANDING | LTV |
|---|---|---|---|---|---|---|---|
| NEXT RATE ADJUSTMENT DATE / WEIGHTED AVERAGE ORIGINAL INCOME / WEIGHTED AVERAGE DEBT-TO- DOC / PERCENT FULL IO | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C>  <C>  <C> | | | | | | | |
| October 2007............ | 12 | $ 3,912,062 | 0.39% | 8.147% | 657 | $326,005 | 82.61% |
| 45.45%  68.33%  56.62% | | | | | | | |

| November 2007........... | 8 | 908,230 | 0.09 | 8.490 | 640 | 113,529 | 82.65 |
| 39.00      81.06      0.00 | | | | | | | |
| April 2008.............. | 7 | 907,650 | 0.09 | 8.288 | 644 | 129,664 | 83.72 |
| 42.90      46.26      0.00 | | | | | | | |
| May 2008................ | 7 | 1,317,620 | 0.13 | 8.833 | 649 | 188,231 | 85.67 |
| 47.27      79.30      0.00 | | | | | | | |
| February 2009.......... | 6 | 1,040,712 | 0.10 | 8.998 | 613 | 173,452 | 81.84 |
| 42.32      79.63     32.47 | | | | | | | |
| March 2009............. | 11 | 1,488,289 | 0.15 | 9.148 | 638 | 135,299 | 91.98 |
| 42.77      73.47     10.48 | | | | | | | |
| April 2009............. | 1,785 | 433,886,911 | 42.82 | 8.341 | 652 | 243,074 | 83.96 |
| 43.65      71.91      6.81 | | | | | | | |
| May 2009................ | 1,603 | 367,489,960 | 36.27 | 8.644 | 649 | 229,251 | 84.92 |
| 43.56      74.34      5.68 | | | | | | | |
| June 2009............... | 1 | 180,500 | 0.02 | 10.250 | 666 | 180,500 | 95.00 |
| 43.00       0.00      0.00 | | | | | | | |
| February 2010.......... | 1 | 183,747 | 0.02 | 7.900 | 571 | 183,747 | 83.64 |
| 43.00     100.00      0.00 | | | | | | | |
| March 2010............. | 3 | 661,901 | 0.07 | 7.563 | 658 | 220,634 | 81.59 |
| 40.68     100.00     42.30 | | | | | | | |
| April 2010............. | 423 | 102,080,451 | 10.07 | 8.118 | 653 | 241,325 | 83.76 |
| 42.62      66.83     14.15 | | | | | | | |
| May 2010................ | 348 | 78,917,125 | 7.79 | 8.474 | 654 | 226,773 | 84.48 |
| 42.77      69.40      6.67 | | | | | | | |
| June 2010............... | 1 | 668,800 | 0.07 | 8.800 | 691 | 668,800 | 95.00 |
| 41.00       0.00      0.00 | | | | | | | |
| April 2012............. | 39 | 10,863,337 | 1.07 | 7.975 | 667 | 278,547 | 78.29 |
| 41.24      84.81     38.33 | | | | | | | |
| May 2012................ | 32 | 8,750,188 | 0.86 | 7.727 | 684 | 273,443 | 81.94 |
| 40.47      81.30     21.99 | | | | | | | |
| | ----- | -------------- | ------ | ------ | --- | -------- | ----- |
| -----      ------      ----- | | | | | | | |
|     Total............... | 4,287 | $1,013,257,483 | 100.00% | 8.432% | 651 | $236,356 | 84.26% |
| 43.39%     72.26%     7.82% | | | | | | | |
| | ===== | ============== | ====== | ====== | === | ======== | ===== |

===== ====== =====

</TABLE>


A-II-31


<PAGE>


PROSPECTUS


ASSET BACKED CERTIFICATES

ASSET BACKED NOTES
(ISSUABLE IN SERIES)


MERRILL LYNCH MORTGAGE INVESTORS, INC.
DEPOSITOR
----------------------
CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE 1 OF THIS PROSPECTUS.


The securities of each series will not represent an obligation of or interest in
the depositor, Merrill Lynch, Pierce, Fenner & Smith Incorporated, any master
servicer or any of their respective affiliates, except to the limited extent
described herein and in the related prospectus supplement.


This prospectus may be used to offer and sell the securities only if accompanied
by a prospectus supplement.


THE SECURITIES

Merrill Lynch Mortgage Investors, Inc., as depositor, will sell the securities, which may be in the form of asset backed certificates or asset backed notes. Each issue of securities will have its own series designation and will evidence either:

- ownership interests in certain assets in a trust fund or

- debt obligations secured by certain assets in a trust fund.

- Each series of securities will consist of one or more classes. Each class of securities will represent the entitlement to a specified portion of future interest payments and a specified portion of future principal payments on the assets in the related trust fund. In each case, the specified portion may equal from 0% to 100%. A series may include one or more classes of securities that are senior in right of payment to one or more other classes. One or more classes of securities may be entitled to receive distributions of principal, interest or both prior to one or more other classes, or before or after certain specified events have occurred. The related prospectus supplement will specify each of these features.

THE TRUST FUND AND ITS ASSETS

As specified in the related prospectus supplement, each trust fund will consist primarily of assets from one of the following categories:

- one or more segregated pools of various types of mortgage loans or closed-end and/or revolving home equity loans (or certain balances of these loans), in each case secured by first and/or junior liens on one- to five-family residential properties, or security interests in shares issued by cooperative housing corporations, including mixed residential and commercial structures;

- manufactured housing installment contracts and installment loan agreements secured by senior or junior liens on manufactured homes and/or by mortgages on real estate on which the manufactured homes are located;

- home improvement installment sales contracts or installment loan agreements originated by a home improvement contractor and secured by a mortgage on the related mortgaged property that is junior to other liens on the mortgaged property; and

- certain direct obligations of the United States, agencies thereof or agencies created thereby. Each trust fund may be subject to early termination in certain circumstances.

MARKET FOR THE SECURITIES

No market will exist for the securities of any series before they are issued. In addition, even after the securities of a series have been issued and sold, there can be no assurance that a resale market will develop.

OFFERS OF THE SECURITIES

Offers of the securities are made through Merrill Lynch, Pierce, Fenner & Smith Incorporated and the other underwriters listed in the related prospectus supplement.

Neither the Securities and Exchange Commission nor any state securities commission has approved these securities or determined that this prospectus is accurate or complete. Any representation to the contrary is a criminal offense.
                    ----------------------
                    MERRILL LYNCH & CO.

----------------------

The date of this Prospectus is May 15, 2007.

<PAGE>

IMPORTANT NOTICE ABOUT INFORMATION IN THIS PROSPECTUS
AND EACH ACCOMPANYING PROSPECTUS SUPPLEMENT

Information about each series of securities is contained in the following documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

    You should rely only on the information contained in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement. The information in this prospectus is accurate only as of the date of this prospectus.

    Each prospectus supplement generally will include the following information with respect to the related series of securities:

    - the principal amount, interest rate and authorized denominations of each class of securities;

    - information concerning the mortgage loans, home improvement contracts and/or securities in the related trust fund;

    - information concerning the seller or sellers of the mortgage loans, home improvement contracts and/or securities and information concerning any servicer;

    - the terms of any credit enhancement with respect to particular classes of the securities;

    - information concerning other trust fund assets, including any reserve fund;

    - the final scheduled distribution date for each class of securities;

    - the method for calculating the amount of principal to be paid to each class of securities, and the timing and order of priority of principal payments;

    - information about any REMIC tax elections for some or all of the trust fund assets; and

    - particulars of the plan of distribution for the securities.

    If you require additional information, the mailing address of our principal executive offices is Merrill Lynch Mortgage Investors, Inc., 250 Vesey Street, World Financial Center-North Tower, 10th Floor, New York, New York 10281-1310, Attention: Secretary, and our telephone number is (212) 449-0357. For other means of acquiring additional information about us or a series of securities, see "Incorporation of Certain Information by Reference" on page 124 of this prospectus.

                                    ii

<PAGE>

                            TABLE OF CONTENTS

```
<Table>
<S>                                            <C>
Risk Factors.........................           1
Description of the Trust Funds......            7
      Assets.........................           7
      Mortgage Loans.................           7
      Loan-to-Value Ratio............           9
      Mortgage Loan Information in
         Prospectus Supplements.......          9
      Government Securities..........          11
      Pre-Funding Account............          11
      Accounts.......................          11
      Credit Support.................          12
      Cash Flow Agreements...........          12
Use of Proceeds.....................           12
Yield Considerations................          12
      General.......................           12
      Pass-Through Rate and
         Interest Rate...............          12
      Timing of Payment of
         Interest....................          13
      Payments of Principal;
         Prepayments.................          13
      Prepayments--Maturity and
         Weighted Average Life........         14
      Other Factors Affecting
         Weighted Average Life........         15
The Depositor.......................           17
Description of the Securities.......           17
      General.......................           17
      Categories of Classes of
         Securities..................          18
      Distributions.................           21
      Available Distribution
         Amount......................          22
      Distributions of Interest on
         the Securities..............          23
      Distributions of Principal of
         the Securities..............          24
      Components.....................          24
      Allocation of Losses and
         Shortfalls..................          24
      Advances in Respect of
         Delinquencies...............          24
      Reports to Securityholders.....          25
      Termination....................          27
      Book-Entry Registration and
         Definitive Securities........         27
Exchangeable Certificates...........           30
      General.......................           30
      Exchanges.....................           31
      Procedures....................           32
Description of the Agreements.......           33
      Agreements Applicable to a
         Series......................          33
      Assignment of Assets;
         Repurchases.................          34
      Representations and Warranties;
         Repurchases.................          35
      Collection Account and Related
         Accounts....................          36
      Collection and Other Servicing
         Procedures..................          40
      Sub-Servicers.................           40
```

Realization upon Defaulted
    Mortgage Loans............... 41
Primary Mortgage Insurance
    Policies.................... 42
Hazard Insurance Policies...... 43
Fidelity Bonds and Errors and
    Omissions Insurance........ 44
Due-on-Sale Provisions......... 44
Retained Interest; Servicing
    Compensation and Payment of
    Expenses.................... 45
Evidence as to Compliance...... 45
Certain Matters Regarding a
    Master Servicer and the
    Depositor................... 46
Events of Default under the
    Agreement................... 47
Rights upon Event of Default
    under the Agreement......... 48
Amendment...................... 49
The Trustee.................... 49
Duties of the Trustee.......... 49
Certain Matters Regarding the
    Trustee..................... 50
Resignation and Removal of the
    Trustee..................... 50
Certain Terms of the
    Indenture................... 51
Description of Credit Support....... 53
    General........................ 53
    Subordinate Securities......... 54
    Cross-Support Provisions....... 54
    Insurance or Guarantees........ 54
    Letter of Credit............... 54
    Insurance Policies and Surety
        Bonds...................... 54
    Reserve Funds.................. 54
</Table>

                                iii

<PAGE>
<Table>
<S>                                 <C>
Certain Legal Aspects of Mortgage
    Loans............................ 55
    General........................ 55
    Types of Mortgage
        Instruments................ 55
    Interest in Real Property...... 56
    Cooperative Loans.............. 56
    Foreclosure.................... 57
    Junior Mortgages............... 61
    Anti-Deficiency Legislation and
        Other Limitations on
        Lenders.................... 61
    Environmental Legislation...... 62
    Due-on-Sale Clauses............ 62
    Subordinate Financing.......... 63
    Applicability of Usury Laws.... 63
    Alternative Mortgage
        Instruments................ 64
    Servicemembers Civil Relief
        Act........................ 64
    Forfeitures in Drug and RICO
        Proceedings................ 65

      The Contracts...................         65
Material Federal Income Tax
   Consequences......................         68
      General.........................         68
      Grantor Trust Funds.............         68
      New Withholding Regulations.....         77
      REMICs..........................         77
      Tax-Related Restrictions on
         Transfers of REMIC Residual
         Certificates.................         92
      Tax Characterization of a Trust
         Fund as a Partnership........         95
      Tax Treatment of Certificates
         as Debt for Tax Purposes.....        101
Taxation of Classes of Exchangeable
   Securities........................        104
      General.........................        104
      Tax Status......................        104
      Tax Accounting for Exchangeable
         Securities...................        104
      Exchanges of Exchangeable
         Securities...................        106
      Tax Treatment of Foreign
         Investors....................        106
      Backup Withholding.............        106
      Reporting and Administrative
         Matters......................        106
State Tax Considerations............        106
ERISA Considerations................        107
      General.........................        107
      Prohibited Transactions........        107
      Availability of Underwriter's
         Exemption for Certificates...        108
      Review by Plan Fiduciaries.....        113
Legal Investment....................        113
Plan of Distribution................        115
Legal Matters.......................        116
Financial Information...............        116
Incorporation of Certain Information
   by Reference......................        116
Ratings.............................        117
Index of Defined Terms..............        118
</Table>

                                          iv

<PAGE>

                             RISK FACTORS


You should consider the following information carefully, since it identifies
certain significant sources of risk associated with an investment in the
securities.

THERE IS A RISK THAT THE SECURITIES WILL HAVE LIMITED LIQUIDITY.

At the time a series of securities is issued, there will not be a secondary
market for them. Merrill Lynch, Pierce, Fenner & Smith Incorporated currently
expects to make a secondary market in the offered securities, but it is not
required to. We cannot assure you that a secondary market for the securities of
any series will develop or, if it does develop, that it will provide holders of
those securities with liquidity of investment or will continue while those
securities remain outstanding.

THERE IS A RISK ASSOCIATED WITH LIMITED ASSETS THAT THOSE ASSETS WILL NOT BE
SUFFICIENT TO PAY THE SECURITIES IN FULL.

- The securities will not represent an interest in or obligation of the
  depositor, the master servicer or any of their affiliates.

- The only obligations with respect to the securities or the assets securing
  them will be the obligations (if any) of any "warranting party" (as further
  described in this prospectus) pursuant to certain limited representations and
  warranties made with respect to the mortgage loans, the master servicer's and
  any sub-servicer's servicing obligations under the related agreements
  (including the limited obligation to make certain advances in the event of
  delinquencies on the mortgage loans, but only to the extent they deem such
  advances recoverable) and, if described in the related prospectus supplement,
  certain limited obligations of the master servicer in connection with an
  agreement to purchase or act as remarketing agent with respect to a
  convertible adjustable-rate mortgage loan (as more fully described in this
  prospectus) upon conversion to a fixed rate or a different index.

- Since certain representations and warranties with respect to the mortgage
  assets may have been made and/or assigned in connection with transfers of the
  mortgage assets prior to the closing date, the rights of the trustee and the
  securityholders with respect to such representations or warranties will be
  limited to their rights as an assignee thereof.

- None of the depositor, the master servicer or any affiliate thereof will have
  any obligation with respect to representations or warranties made by any
  other entity.

- Neither the securities nor the underlying assets will be guaranteed or
  insured by any governmental agency or instrumentality, or by the depositor,
  the master servicer, any sub-servicer.

- Proceeds of the assets included in the related trust fund for each series of
  securities (including the assets and any form of credit enhancement) will be
  the sole source of payments on the securities, and there will be no recourse
  to the depositor or any other entity in the event that these proceeds are
  insufficient or otherwise unavailable to make all payments provided for under
  the securities.

- A series of securities will not have any claim against or security interest
  in the trust funds for any other series. If the related trust fund is
  insufficient to make payments on these securities, no other assets will be
  available for payment of the deficiency. Additionally, certain amounts
  remaining in certain funds or accounts, including the collection account and
  any accounts maintained as credit support, may be withdrawn under certain
  conditions, as described in the related prospectus supplement. In the event
  of such withdrawal, such amounts will not be available for future payment of
  principal of or interest on the securities.

- If provided in the prospectus supplement for a series of securities
  consisting of one or more classes of subordinate securities, on any
  distribution date in respect of which losses or shortfalls in collections on
  the assets have been incurred, the amount of such losses or shortfalls will
  be borne first by one or more classes of the subordinate securities, and,
  thereafter, by the remaining classes of securities in the priority and manner
  and subject to the limitations specified in that prospectus supplement.

We refer you to "Description of the Trust Funds" for further information.

<div align="center">1</div>

&lt;PAGE&gt;

THERE IS A RISK THAT PREPAYMENTS ON THE ASSETS IN A TRUST FUND WILL ADVERSELY
AFFECT THE AVERAGE LIFE AND YIELDS OF THE RELATED SECURITIES.

- Prepayments (including those caused by defaults) on the assets in any trust

fund generally will result in a faster rate of principal payments on one or
more classes of the related securities than if payments on these assets were
made as scheduled. Thus, the prepayment experience on the assets may affect
the average life of each class of related securities. The rate of principal
payments on pools of mortgage loans varies between pools and from time to
time is influenced by a variety of economic, demographic, geographic, social,
tax, legal and other factors. We can't assure you as to the rate of
prepayment on the assets in any trust fund or that the rate of payments will
conform to any model we describe here or in any prospectus supplement. If
prevailing interest rates fall significantly below the applicable mortgage
interest rates, principal prepayments are likely to be higher than if
prevailing rates remain at or above the rates borne by the mortgage loans
underlying or comprising the mortgage assets in any trust fund. As a result,
the actual maturity of any class of securities evidencing an interest in a
trust fund containing mortgage assets could occur significantly earlier than
expected.

- A series of securities may include one or more classes of securities with
  priorities of payment and, as a result, yields on other classes of
  securities, including classes of offered securities, of such series may be
  more sensitive to prepayments on assets. A series of securities may include
  one or more classes offered at a significant premium or discount. Yields on
  these classes of securities will be sensitive, and in some cases extremely
  sensitive, to prepayments on mortgage assets and, where the amount of
  interest payable with respect to a class is disproportionately high, as
  compared to the amount of principal, as with certain classes of stripped
  interest securities, a holder might, in some prepayment scenarios, fail to
  recoup its original investment. A series of securities may include one or
  more classes of securities, including classes of offered securities, that
  provide for distribution of principal thereof from amounts attributable to
  interest accrued but not currently distributable on one or more classes of
  accrual securities and, as a result, yields on such securities will be
  sensitive to (a) the provisions of such accrual securities relating to the
  timing of distributions of interest thereon and (b) if such accrual
  securities accrue interest at a variable or adjustable pass-through rate or
  interest rate, changes in such rate.

We refer you to "Yield Considerations" in the prospectus and, if applicable, in
the related prospectus supplement for further information.

THERE IS A RISK THAT DEFAULTS BY OBLIGORS OR DECLINES IN THE VALUES OF MORTGAGED
PROPERTIES WILL RESULT IN LOSSES TO INVESTORS.

- An investment in securities such as the securities which generally represent
  interests in mortgage loans may be affected by, among other things, a decline
  in real estate values and changes in the mortgagors' financial condition. No
  assurance can be given that values of the mortgaged properties have remained
  or will remain at their levels on the dates of origination of the related
  mortgage loans. If the relevant residential real estate market should
  experience an overall decline in property values such that the outstanding
  balances of the related mortgage loans, and any secondary financing on the
  mortgaged properties, become equal to or greater than the value of the
  mortgaged properties, the actual rates of delinquencies, foreclosures and
  losses could be higher than those now generally experienced in the mortgage
  lending industry in that market. In addition, in the case of mortgage loans
  that are subject to negative amortization, due to the addition to principal
  balance of deferred interest, the principal balances of such mortgage loans
  could be increased to an amount equal to or in excess of the value of the
  underlying mortgaged properties, thereby increasing the likelihood of
  default.

- To the extent that these losses are not covered by the applicable credit
  support, if any, holders of securities of the series evidencing interests in
  the related mortgage loans will bear all risk of loss resulting from default
  by mortgagors and will have to look primarily to the value of the mortgaged

properties for recovery of the outstanding principal and unpaid interest on
the defaulted mortgage loans. Certain of the

                                      2

<PAGE>

types of mortgage loans may involve additional uncertainties not present in
traditional types of loans.

- For example, certain of the mortgage loans provide for escalating or variable
  payments by the mortgagor under the mortgage loan, as to which the mortgagor
  is generally qualified on the basis of the initial payment amount. In some
  cases the mortgagor's income may not be sufficient to enable it to continue
  to make its loan payments as such payments increase and thus the likelihood
  of default will increase.

- In addition to the foregoing, certain geographic regions of the United States
  from time to time will experience weaker regional economic conditions and
  housing markets, and will thus experience higher rates of loss and
  delinquency than the mortgage loans generally will experience. The mortgage
  loans underlying certain series of securities may be concentrated in these
  regions, and this concentration may present risk considerations in addition
  to those generally present for similar mortgage-backed securities without
  this concentration.

- Further, the rate of default on mortgage loans that are refinance or limited
  documentation mortgage loans, and on mortgage loans with high loan-to-value
  ratios, may be higher than for other types of mortgage loans. Additionally, a
  decline in the value of the mortgaged properties will increase the risk of
  loss particularly with respect to any related junior mortgage loans.

We refer you to "--There is a risk that there will be reduced or no proceeds
available when junior lien mortgage loans are liquidated" in this prospectus for
further information.

- In addition, a prospectus supplement may specify that the loan-to-value
  ratios for the mortgage loans in the related trust will exceed 100%. The
  related mortgaged properties will thus be highly unlikely to provide adequate
  security for these mortgage loans. To the extent specified in that prospectus
  supplement, the assessment of the credit history of a borrower and that
  borrower's capacity to make payments on the related mortgage loan will have
  been the primary considerations in underwriting the mortgage loans included
  in that trust. The evaluation of the adequacy of the loan-to-value ratio, if
  so specified in the related prospectus supplement, will have been given less
  consideration, and in certain cases no consideration, in underwriting those
  mortgage loans.

THERE IS A RISK THAT STATUTORY AND JUDICIAL LIMITATIONS ON FORECLOSURE
PROCEDURES MAY DELAY RECOVERY IN RESPECT OF THE MORTGAGED PROPERTY AND, IN SOME
INSTANCES, LIMIT THE AMOUNT THAT MAY BE RECOVERED BY THE FORECLOSING LENDER,
RESULTING IN LOSSES ON THE MORTGAGE LOANS THAT MIGHT BE ALLOCATED TO THE
CERTIFICATES.

Foreclosure procedures may vary from state to state. Two primary methods of
foreclosing a mortgage instrument are judicial foreclosure, involving court
proceedings, and non-judicial foreclosure pursuant to a power of sale granted in
the mortgage instrument. A foreclosure action is subject to most of the delays
and expenses of other lawsuits if defenses are raised or counterclaims are
asserted. Delays may also result from difficulties in locating necessary
defendants. Non-judicial foreclosures may be subject to delays resulting from
state laws mandating the recording of notice of default and notice of sale and,
in some states, notice to any party having an interest of record in the real
property, including junior lienholders. Some states have adopted "anti-
deficiency" statutes that limit the ability of a lender to collect the full
amount owed on a mortgage loan if the property sells at foreclosure for less

than the full amount owed. In addition, United States courts have traditionally imposed general equitable principles to limit the remedies available to lenders in foreclosure actions that are perceived by the court as harsh or unfair. The effect of these statutes and judicial principles may be to delay and/or reduce distributions in respect of the offered certificates.

See "Certain Legal Aspects of Mortgage Loans -- Foreclosure."

THERE IS A RISK THAT THERE WILL BE REDUCED OR NO PROCEEDS AVAILABLE WHEN JUNIOR LIEN MORTGAGE LOANS ARE LIQUIDATED.

- Certain mortgage loans may be secured by junior liens and the related first and other senior liens, if any, may not be included in the mortgage pool.

3

<PAGE>

- The primary risk to holders of mortgage loans secured by junior liens is the possibility that adequate funds will not be received in connection with a foreclosure of the related senior lien to satisfy fully both the senior lien and the mortgage loan. If a holder of the senior lien forecloses on a mortgaged property, the proceeds of the foreclosure or similar sale will be applied first to the payment of court costs and fees in connection with the foreclosure, second to real estate taxes, third in satisfaction of all principal, interest, prepayment or acceleration penalties, if any, and any other sums due and owing to the holder of the senior lien. The claims of the holder of the senior lien will be satisfied in full out of proceeds of the liquidation of the mortgage loan, if these proceeds are sufficient, before the trust fund as holder of the junior lien receives any payments in respect of the mortgage loan.

- If the master servicer were to foreclose on any mortgage loan, it would do so subject to any related senior lien. In order for the debt related to the mortgage loan to be paid in full at such sale, a bidder at the foreclosure sale of that mortgage loan would have to bid an amount sufficient to pay off all sums due under the mortgage loan and the senior lien or purchase the mortgaged property subject to the senior lien. In the event that such proceeds from a foreclosure or similar sale of the related mortgaged property were insufficient to satisfy both loans in the aggregate, the trust fund, as the holder of the junior lien, and, accordingly, holders of the certificates, would bear the risk of delay in distributions while a deficiency judgment against the borrower was being obtained and the risk of loss if the deficiency judgment were not realized upon. Moreover, deficiency judgments may not be available in certain jurisdictions. In addition, a junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgage.

We refer you to "Certain Legal Aspects of the Mortgage Loans--Junior Mortgages" in this prospectus for further information.

THERE IS A RISK THAT ANY APPLICABLE CREDIT SUPPORT WILL NOT COVER ALL LOSSES.

- The prospectus supplement for a series of certificates will describe any credit support in the related trust fund, which may include letters of credit, insurance policies, guarantees, reserve funds or other types of credit support, or combinations of these. Any credit support will be subject to the conditions and limitations described here and in the related prospectus supplement. Moreover, this credit support may not cover all potential losses or risks; for example, credit support may or may not cover fraud or negligence by a borrower or other parties.

- A series of securities may include one or more classes of subordinate securities (which may include offered securities), if we provide for that in the related prospectus supplement. Although subordination is designed to reduce the risk to holders of senior securities of delinquent distributions

or ultimate losses, the amount of subordination will be limited and may
decline under certain circumstances. In addition, if principal payments on
one or more classes of securities of a series are made in a specified order
of priority, any limits with respect to the aggregate amount of claims under
any related credit support may be exhausted before the principal of the lower
priority classes of securities of this series has been repaid. As a result,
the impact of significant losses and shortfalls on the assets may fall
primarily upon those classes of securities having a lower priority of
payment. Moreover, if a form of credit support covers more than one series of
securities (we refer to this as a "covered trust"), holders of securities
evidencing an interest in a covered trust will be subject to the risk that
this credit support will be exhausted by the claims of other covered trusts.

-  The amount of any applicable credit support supporting one or more classes of
   offered securities, including the subordination of one or more classes of
   securities, will be determined on the basis of criteria established by each
   rating agency rating such classes of securities based on an assumed level of
   defaults, delinquencies, other losses or other factors. We can't assure you,
   however, that the

                                   4

<PAGE>

   loss experience on the related assets will not exceed these assumed levels.

-  Regardless of the form of credit enhancement, the amount of coverage will be
   limited in amount and in most cases will be subject to periodic reduction in
   accordance with a schedule or formula. The master servicer will generally be
   permitted to reduce, terminate or substitute all or a portion of the credit
   enhancement for any series of securities, if the applicable rating agency
   indicates that the then-current rating of those securities will not be
   adversely affected.

-  The rating agency rating a series of securities may lower its rating
   following the initial issuance of the securities if the obligations of any
   applicable credit support provider have been downgraded, or as a result of
   losses on the related assets substantially in excess of the levels
   contemplated by that rating agency when it performed its initial rating
   analysis. None of the depositor, the master servicer or any of their
   affiliates will have any obligation to replace or supplement any credit
   support or to take any other action to maintain any rating of any series of
   securities.

We refer you to "--There are risks in relying on the limited nature of ratings",
"Description of the Securities" and "Description of Credit Support" for further
information.

THERE IS A RISK TO HOLDERS OF SUBORDINATE SECURITIES THAT LOSSES WILL HAVE A
GREATER IMPACT ON THEM.

-  The rights of subordinate securityholders to receive distributions to which
   they would otherwise be entitled with respect to the assets will be
   subordinate to the rights of the master servicer (to the extent that the
   master servicer is paid its servicing fee, including any unpaid servicing
   fees with respect to one or more prior due periods, and is reimbursed for
   certain unreimbursed advances and unreimbursed liquidation expenses) and the
   senior securityholders to the extent described in the related prospectus
   supplement. As a result of the foregoing, investors must be prepared to bear
   the risk that they may be subject to delays in payment and may not recover
   their initial investments in the subordinate securities.

We refer you to "Description of the Securities--General" and "--Allocation of
Losses and Shortfalls" in this prospectus for further information.

-  The yields on the subordinate securities may be extremely sensitive to the

loss experience of the assets and the timing of any such losses. If the
actual rate and amount of losses experienced by the assets exceed the rate
and amount of such losses assumed by an investor, the yields to maturity on
the subordinate securities may be lower than you anticipated.

THERE IS A RISK THAT OBLIGORS ON BALLOON LOANS WILL NOT BE ABLE TO MAKE BALLOON
PAYMENTS.

Some of the mortgage loans as of the cut-off date may not be fully amortizing
over their terms to maturity (we call these "balloon loans") and, thus, will
require substantial principal payments (i.e., balloon payments) at their stated
maturity. Mortgage loans with balloon payments involve a greater degree of risk
because the ability of a mortgagor to make a balloon payment typically will
depend upon its ability either to timely refinance the loan or to timely sell
the related mortgaged property. The ability of a mortgagor to accomplish either
of these goals will be affected by a number of factors, including the level of
available mortgage interest rates at the time of sale or refinancing, the
mortgagor's equity in the related mortgaged property, the financial condition of
the mortgagor, the value of the mortgaged property, tax laws, prevailing general
economic conditions and the availability of credit for single family or
multifamily real properties generally.

THERE IS A POSSIBILITY, IF THE RELATED PROSPECTUS SUPPLEMENT PROVIDES FOR IT,
THAT UPON AN OPTIONAL TERMINATION OF A TRUST FUND, THE PROCEEDS MAY BE LESS THAN
THE OUTSTANDING PRINCIPAL AMOUNT OF THE SECURITIES PLUS ACCRUED INTEREST.

-  If specified in the related prospectus supplement, a series of securities may
   be subject to optional early termination through the repurchase of the assets
   in the related trust fund by the party specified therein, under the
   circumstances and in the manner set forth therein. If provided in the related
   prospectus supplement, upon the reduction of the security balance of a
   specified class or classes of securities to a specified percentage or amount,
   the party

                                       5
<PAGE>

   specified therein will solicit bids for the purchase of all assets of the
   trust fund, or of a sufficient portion of such assets to retire such class or
   classes or purchase such class or classes at a price set forth in the related
   prospectus supplement, in each case, under the circumstances and in the
   manner set forth therein.

-  In either such case, if the related prospectus supplement provides for it,
   the proceeds available for distribution to securityholders may be less than
   the outstanding principal balance of their securities plus accrued interest.
   If this happens, these securityholders could incur a loss on their
   investment.

THERE ARE RISKS RELATING TO CERTAIN FEDERAL INCOME TAX CONSIDERATIONS REGARDING
REMIC RESIDUAL CERTIFICATES.

-  Holders of REMIC residual certificates must report on their federal income
   tax returns as ordinary income their pro rata share of the taxable income of
   the REMIC, regardless of the amount or timing of their receipt of cash
   payments, as described in "Material Federal Income Tax Consequences--REMICs."
   Under certain circumstances, holders of offered securities that are REMIC
   residual certificates may have taxable income and tax liabilities arising
   from such investment during a taxable year in excess of the cash received
   during such period. Individual holders of REMIC residual certificates may be
   limited in their ability to deduct servicing fees and other expenses of the
   REMIC.

-  In addition, REMIC residual certificates are subject to certain restrictions
   on transfer. Because of the special tax treatment of REMIC residual

certificates, the taxable income arising in a given year on a REMIC residual
certificate will not be equal to the taxable income associated with
investment in a corporate bond or stripped instrument having similar cash
flow characteristics and pre-tax yield. Therefore, the after-tax yield on the
REMIC residual certificate may be significantly less than that of a corporate
bond or stripped instrument having similar cash flow characteristics.
Additionally, prospective purchasers of a REMIC residual certificate should
be aware that treasury regulations provide that REMIC residual interests may
not be marked to market.

We refer you to "Material Federal Income Tax Consequences--REMICs" in this
prospectus for further information.

THERE ARE RISKS IN RELYING ON THE LIMITED NATURE OF RATINGS.

        Any rating assigned by a rating agency to a class of securities will
reflect that rating agency's assessment solely of the likelihood that holders of
securities of that class will receive payments to which those securityholders
are entitled under the related agreement. This rating will not be an assessment
of the likelihood that principal prepayments (including those caused by
defaults) on the related mortgage assets will be made, the degree to which the
rate of such prepayments might differ from what you originally anticipated or
the likelihood of early optional termination of the series of securities. This
rating will not address the possibility that prepayment at higher or lower rates
than you anticipated may cause you to experience a yield lower than you
anticipated or that an investor purchasing a security at a significant premium
might fail to recoup its initial investment under certain prepayment scenarios.
Each prospectus supplement will identify any payment to which holders of offered
securities of the related series are entitled that is not covered by the
applicable rating.

We refer you to "Ratings" in this prospectus for further information.

                                    6
<PAGE>

                    DESCRIPTION OF THE TRUST FUNDS

ASSETS

The primary assets of each Trust Fund (the "Assets") will include:

        (i)    one- to five-family mortgage loans (collectively, the "Mortgage
               Loans"), including without limitation, Home Equity Loans, Home
               Improvement Contracts and Manufactured Housing Contracts or

        (ii)   direct obligations of the United States, agencies thereof or
               agencies created thereby which are:

               (a)    interest-bearing securities,

               (b)    non-interest-bearing securities,

               (c)    originally interest-bearing securities from which coupons
                      representing the right to payment of interest have been
                      removed, or

               (d)    interest-bearing securities from which the right to payment
                      of principal has been removed (the "Government Securities").

        As used herein, "Mortgage Loans" refers to whole Mortgage Loans. The
Mortgage Loans will not be guaranteed or insured by Merrill Lynch Mortgage
Investors, Inc. (the "Depositor"). Each Asset will be selected by a sponsor of
the transaction for inclusion in a Trust Fund from among those purchased, either
directly or indirectly, from a prior holder thereof (an "Asset Seller"), which

may be an affiliate of the Depositor and, with respect to Assets, which prior holder may or may not be the originator of such Mortgage Loan.

The Securities will be entitled to payment only from the assets of the related Trust Fund and will not be entitled to payments in respect of the assets of any other trust fund established by the Depositor. If specified in the related Prospectus Supplement, the assets of a Trust Fund will consist of certificates representing beneficial ownership interests in, or indebtedness of, another trust fund that contains the Assets.

Static pool information regarding the sponsor of the transaction will be available on a website, as set forth in the related prospectus supplement. Such website may include information regarding transactions which closed prior to January 1, 2006. Any information related to such pre-January 1, 2006 information will not be deemed to be part of the related prospectus supplement, this prospectus or the registration statement.

MORTGAGE LOANS

General

Each Mortgage Loan will be secured by:

(i)     a lien on a Mortgaged Property consisting of a one- to five-family residential property (a "Single Family Property" and the related Mortgage Loan a "Single Family Mortgage Loan") or

(ii)    a security interest in shares issued by private cooperative housing corporations ("Cooperatives"). If so specified in the related Prospectus Supplement, a Mortgaged Property may include some commercial use.

Mortgaged Properties will be located in any one of the fifty states, the District of Columbia, the Commonwealth of Puerto Rico or any U.S. possession. To the extent specified in the related Prospectus Supplement, the Mortgage Loans will be secured by first and/or junior mortgages or deeds of trust or other similar security instruments creating a first or junior lien on Mortgaged Property. The Mortgaged

7

<PAGE>

Properties may include apartments owned by Cooperatives and leasehold interests in properties, the title to which is held by third party lessors. Each Mortgage Loan will have been originated by a person (the "Originator") other than the Depositor. The related Prospectus Supplement will indicate if any Originator is an affiliate of the Depositor. The Mortgage Loans will be evidenced by promissory notes (the "Mortgage Notes") secured by mortgages, deeds of trust or other security instruments (the "Mortgages") creating a lien on the Mortgaged Properties. If specified in the related Prospectus Supplement, certain of the Mortgage Loans (by principal balance) in a Trust Fund will be, as of the related Cut-off Date, 30 days or more past their most recent contractually scheduled payment date.

The adjustable or variable index (the "Index") applicable to Mortgage Loans with adjustable Mortgage Rates ("ARM Loans") may be one of the following indices:

-       U.S. Dollar LIBOR ("LIBOR"), which is the average of the London Interbank Offer Rate, a rate at which banks in London, England lend U.S. dollars to other banks in the U.S. dollar wholesale or interbank money markets for a specified duration.

-       EURIBOR ("EURIBOR"), which is the average of the Euro Interbank Offer Rate, a rate at which banks offer to lend Euros to other banks in the

Euro wholesale or interbank money markets for a specified duration.

- GBP LIBOR ("GBP LIBOR"), which is the average of the British Pounds Sterling London Interbank Offer Rate, a rate at which banks in London, England lend British Pounds Sterling to other banks in the British Pounds Sterling wholesale or interbank money markets for a specified duration.

- London Interbank Offer Swap Rate ("LIBORSWAP"), a rate which is the difference between the negotiated and of a swap, with the spread determined by characteristics of market supply and creditor worthiness.

- SIBOR ("SIBOR"), which is the average of the Singapore Interbank Offer Rate, a rate at which banks in Asia lend U.S. dollars to other banks in the Singapore wholesale or interbank money markets for a specified duration.

- Constant Maturity Treasury ("CMT") Indices, which is an average yield on United States Treasury securities adjusted to a specified constant maturity, as by the Federal Reserve Board.

- Treasury Bill ("T-Bill") Indices, which is a rate based on the results of auctions that the U.S. Department of Treasury holds for its Treasury bills, notes or bonds or is derived from its daily yield curve.

- Federal Funds Rate ("Fed Funds Rate"), which is the rate that banks charge each other on overnight loans made between them, as determined by the Federal Reserve Bank.

- Prime Rate ("Prime Rate") Index, which is an index based on the interest rate that banks charge to their most credit-worthy customers for short-term loans. The Prime Rate may differ among financial institutions.

- Monthly Treasury Average ("MTA"), which is a per annum rate equal to the 12-month average yields on United States Treasury securities adjusted to a constant maturity of one year, as published by the Federal Reserve Board.

- Cost of Funds Index ("COFI"), which is a weighted average cost of funds for savings institutions that are member institutions of various federal banking districts, most commonly by 11th District members of the Federal Home Loan Bank of San Francisco.

- National Monthly Median Cost of Funds Index ("National Monthly Median COFI"), which is the median COFI of all federal banking districts, or the midpoint value, of institutions' COFI ratios.

8

<PAGE>

- Cost of Savings Index ("COSI"), which is a weighted average of the rates of interest on the deposit accounts of the federally insured depository institution subsidiaries of Golden West Financial Corporation, which operates under the name World Savings.

- Consumer Price Index ("CPI"), which is an published monthly by the U.S. Bureau of Labor Statistics that measures the change in the cost of a basket of products and services, including housing, electricity, food and transportation.

- Certificate of Deposit Indices ("CODI"), which are indices based on the averages of the nationally published secondary market interest

rates on nationally traded certificates of deposit, as published by the Federal Reserve Board. The certificates of deposit are issued by banks and other financial institutions and pay a fixed rate of interest for specified maturities.

- National Average Contract Mortgage Rate ("National Average Contract Mortgage Rate"), which is an index based on a weighted average rate of initial mortgage interest rates paid by home buyers for conventional fixed and adjustable rate single-family homes reported by a sample of mortgage lenders for loans closed for the last five working days of the month. The weightings are determined by the type, size and location of the lender and is reported monthly by the Federal Housing Finance Board.

- Federal Home Loan Bank Index ("FHLB Index"), which is which is the average interest rate that member banks pay when they borrow money from a Federal Home Loan Bank.

The Indices described above which are applicable to the Mortgage Loans for a trust fund will be disclosed in the related prospectus supplement.

LOAN-TO-VALUE RATIO

The "Loan-to-Value Ratio" of a Mortgage Loan at any given time is the ratio (expressed as a percentage) of the then outstanding principal balance of the Mortgage Loan plus the principal balance of any senior mortgage loan to the Value of the related Mortgaged Property. If specified in the related Prospectus Supplement, the Loan-to-Value Ratio of certain Mortgage Loans may exceed 100%. The "Value" of a Mortgaged Property, other than with respect to Refinance Loans, is generally the lesser of:

(a)  the appraised value determined in an appraisal obtained by the originator at origination of such loan and

(b)  the sales price for such property.

"Refinance Loans" are loans made to refinance existing loans. The Value of a Mortgaged Property as of the date of initial issuance of the related series of Certificates may be less than the value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.

MORTGAGE LOAN INFORMATION IN PROSPECTUS SUPPLEMENTS

Each Prospectus Supplement will contain information, as of the dates specified in such Prospectus Supplement with respect to the Mortgage Loans, including:

(i)    the aggregate outstanding principal balance and the largest, smallest and average outstanding principal balance of the Mortgage Loans as of the applicable Cut-off Date,

(ii)   the type of property securing the Mortgage Loans,

(iii)  the weighted average (by principal balance) of the original and remaining terms to maturity of the Mortgage Loans,

(iv)   the earliest and latest origination date and maturity date of the Mortgage Loans,

(v)    the range of the Loan-to-Value Ratios at origination of the Mortgage Loans,

9

(vi)    the Mortgage Rates or range of Mortgage Rates and the weighted
        average Mortgage Rate borne by the Mortgage Loans,

(vii)   the state or states in which most of the Mortgaged Properties are
        located,

(viii)  information with respect to the prepayment provisions, if any, of
        the Mortgage Loans,

(ix)    with respect to ARM Loans, the index, the frequency of the
        adjustment dates, the range of margins added to the index, and
        the maximum Mortgage Rate or monthly payment variation at the
        time of any adjustment thereof and over the life of the ARM Loan,
        and

(x)     information regarding the payment characteristics of the Mortgage
        Loans, including without limitation balloon payment and other
        amortization provisions

     The related Prospectus Supplement may specify whether the Mortgage Loans
include closed-end and/or revolving home equity loans or certain balances
thereof ("Home Equity Loans"), which may be secured by Mortgages that are junior
to other liens on the related Mortgaged Property and/or home improvement
installment sales contracts or installment loan agreements (the "Home
Improvement Contracts") originated by a home improvement contractor and secured
by a Mortgage on the related Mortgaged Property that is junior to other liens on
the Mortgaged Property. Generally, the home improvements purchased with the Home
Improvement Contracts will generally be replacement windows, house siding,
roofs, swimming pools, satellite dishes, kitchen and bathroom remodeling goods
and solar heating panels. The related Prospectus Supplement will specify whether
the Home Improvement Contracts are partially insured under Title I of the
National Housing Act and, if so, the limitations on such insurance.

     If specified in the related Prospectus Supplement, new draws by borrowers
under the revolving Home Equity Loans will, during a specified period of time,
automatically become part of the Trust Fund for a series. As a result, the
aggregate balance of the revolving Home Equity Loans will fluctuate from day to
day as new draws by borrowers are added to the Trust Fund and principal
collections are applied to purchase such balances. Such amounts will usually
differ each day, as more specifically described in the related Prospectus
Supplement.

     The related Prospectus Supplement may specify whether the Mortgage Loans
consist, in whole or in part, of conventional manufactured housing installment
sales contracts and installment loan agreements, originated by a manufactured
housing dealer in the ordinary course of business (collectively, "Manufactured
Housing Contracts"). Such Manufactured Housing Contracts will be secured by
manufactured homes, located in any of the fifty states or the District of
Columbia, or by mortgages on the real estate on which the manufactured homes are
located.

     The manufactured homes securing the Manufactured Housing Contracts will
consist of manufactured homes within the meaning of 42 United States Code,
Section 5402(6), or manufactured homes meeting those other standards as shall be
described in the related prospectus supplement. Section 5402(6) defines a
"manufactured home" as "a structure, transportable in one or more sections,
which, in the traveling mode, is eight body feet or more in width or forty body
feet or more in length, or, when erected on site, is three hundred twenty or
more square feet, and which is built on a permanent chassis and designed to be
used as a dwelling with or without a permanent foundation when connected to the
required utilities, and includes the plumbing, heating, air conditioning and
electrical systems contained therein; except that the term shall include any
structure which meets all the requirements of [this] paragraph except the size
requirements and with respect to which the manufacturer voluntarily files a

certification required by the Secretary of Housing and Urban Development and complies with the standards established under [this] chapter."

Manufactured homes, and home improvements, unlike mortgaged properties, generally depreciate in value. Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios at origination, that the market value of a manufactured home or home improvement may be lower than the principal amount outstanding under the related contract.

<div align="center">10</div>

<PAGE>

Payment provisions of the mortgage loans

All of the Mortgage Loans will:

(i)     have original terms to maturity of not more than 40 years, and

(ii)    provide for payments of principal, interest or both, on due dates that occur monthly, quarterly or semi-annually or at such other regular interval.

Each Mortgage Loan may provide for no accrual of interest or for accrual of interest thereon at an interest rate (a "Mortgage Rate") that is fixed over its term or that adjusts from time to time, or that may be converted from an adjustable to a fixed Mortgage Rate or a different adjustable Mortgage Rate, or from a fixed to an adjustable Mortgage Rate, from time to time pursuant to an election or as otherwise specified on the related Mortgage Note, in each case as described in the related Prospectus Supplement. Each Mortgage Loan may provide for scheduled payments to maturity or payments that adjust from time to time to accommodate changes in the Mortgage Rate or to reflect the occurrence of certain events or that adjust on the basis of other methodologies, and may provide for negative amortization or accelerated amortization, in each case as described in the related Prospectus Supplement. Each Mortgage Loan may be fully amortizing or require a balloon payment due on its stated maturity date, in each case as described in the related Prospectus Supplement.

GOVERNMENT SECURITIES

The Prospectus Supplement for a series of Securities evidencing interests in Assets of a Trust Fund that include Government Securities will specify, to the extent available,

(i)     the aggregate approximate initial and outstanding principal amounts or notional amounts, as applicable, and types of the Government Securities to be included in the Trust Fund,

(ii)    the original and remaining terms to stated maturity of the Government Securities,

(iii)   whether such Government Securities are entitled only to interest payments, only to principal payments or to both,

(iv)    the interest rates of the Government Securities or the formula to determine such rates, if any,

(v)     the applicable payment provisions for the Government Securities and

(vi)    to what extent, if any, the obligation evidenced thereby is backed by the full faith and credit of the United States.

PRE-FUNDING ACCOUNT

To the extent provided in a Prospectus Supplement, the Depositor will be

obligated (subject only to the availability thereof) to sell at a predetermined
price, and the Trust Fund for the related series of Securities will be obligated
to purchase (subject to the satisfaction of certain conditions described in the
applicable Agreement and in the related Prospectus Supplement), additional
Assets (the "Subsequent Assets") from time to time (as frequently as daily)
within the number of months specified in the related Prospectus Supplement after
the issuance of such series of Securities (not to exceed one year) having an
aggregate principal balance approximately equal to the amount on deposit in the
Pre-Funding Account (the "Pre-Funded Amount") for such series on date of such
issuance. The Pre-Funded Amount will not exceed 50% of the proceeds of the
offering of the related series of Securities.

ACCOUNTS

     Each Trust Fund will include one or more accounts established and
maintained on behalf of the Securityholders into which the person or persons
designated in the related Prospectus Supplement will, to the extent described
herein and in such Prospectus Supplement deposit all payments and collections

                                    11
<PAGE>

received or advanced with respect to the Assets and other assets in the Trust
Fund. Such an account may be maintained as an interest bearing or a non-interest
bearing account, and funds held therein may be held as cash or invested in
certain short-term, investment grade obligations, in each case as described in
the related Prospectus Supplement. See "Description of the Agreement--Collection
Account and Related Accounts."

CREDIT SUPPORT

     If so provided in the related Prospectus Supplement, partial or full
protection against certain defaults and losses on the Assets in the related
Trust Fund may be provided to one or more classes of Securities in the related
series in the form of subordination of one or more other classes of Securities
in such series and/or by one or more other types of credit support, such as a
letter of credit, insurance policy, surety bonds, guarantee, reserve fund or a
combination thereof (any such coverage with respect to the Securities of any
series, "Credit Support"). The amount and types of coverage, the identification
of the entity providing the coverage (if applicable) and related information
with respect to each type of Credit Support, if any, will be described in the
Prospectus Supplement for a series of Securities. See "Risk Factors--Credit
Support Limitations" and "Description of Credit Support."

CASH FLOW AGREEMENTS

     If so provided in the related Prospectus Supplement, the Trust Fund may
include guaranteed investment contracts pursuant to which moneys held in the
funds and accounts established for the related series will be invested at a
specified rate. The Trust Fund may also include one or more of the following
agreements: interest rate exchange agreements, interest rate cap or floor
agreements, currency exchange agreements or interest rate swap agreements
consistent with the foregoing. The principal terms of any such agreement (any
such agreement, a "Cash Flow Agreement"), including, without limitation,
provisions relating to the timing, manner and amount of payments thereunder and
provisions relating to the termination thereof, will be described in the
Prospectus Supplement for the related series. In addition, the related
Prospectus Supplement will provide certain information with respect to the
obligor under any such Cash Flow Agreement.

                            USE OF PROCEEDS

     The net proceeds to be received from the sale of the Securities will be
applied by the Depositor to the purchase of Assets, or the payment of the
financing incurred in such purchase, and to pay for certain expenses incurred in

connection with such purchase of Assets and sale of Securities. The Depositor
expects to sell the Securities from time to time, but the timing and amount of
offerings of Securities will depend on a number of factors, including the volume
of Assets acquired by the Depositor, prevailing interest rates, availability of
funds and general market conditions.

## YIELD CONSIDERATIONS

GENERAL

The yield on any Offered Security will depend on the price paid by the
Securityholder, the Pass-Through Rate or interest rate of the Security, the
receipt and timing of receipt of distributions on the Security and the weighted
average life of the Assets in the related Trust Fund (which may be affected by
prepayments, defaults, liquidations or repurchases). See "Risk Factors."

PASS-THROUGH RATE AND INTEREST RATE

Securities of any class within a series may have fixed, variable or
adjustable Pass-Through Rates or interest rates, which may or may not be based
upon the interest rates borne by the Assets in the related Trust Fund. The
Prospectus Supplement with respect to any series of Securities will specify the
Pass-

12

<PAGE>

Through Rate or interest rate for each class of such Securities or, in the case
of a variable or adjustable Pass-Through Rate or interest rate, the method of
determining the Pass-Through Rate or interest rate; the effect, if any, of the
prepayment of any Asset on the Pass-Through Rate or interest rate of one or more
classes of Securities; and whether the distributions of interest on the
Securities of any class will be dependent, in whole or in part, on the
performance of any obligor under a Cash Flow Agreement.

If so specified in the related Prospectus Supplement, the effective yield
to maturity to each holder of Securities entitled to payments of interest will
be below that otherwise produced by the applicable Pass-Through Rate or interest
rate and purchase price of such Security because, while interest may accrue on
each Asset during a certain period, the distribution of such interest will be
made on a day which may be several days, weeks or months following the period of
accrual.

TIMING OF PAYMENT OF INTEREST

Each payment of interest on the Securities (or addition to the Security
Balance of a class of Accrual Securities) on a Distribution Date will include
interest accrued during the Interest Accrual Period for such Distribution Date.
As indicated above under "--Pass-Through Rate and Interest Rate," if the
Interest Accrual Period ends on a date other than the day before a Distribution
Date for the related series, the yield realized by the holders of such
Securities may be lower than the yield that would result if the Interest Accrual
Period ended on such day before the Distribution Date.

PAYMENTS OF PRINCIPAL; PREPAYMENTS

The yield to maturity on the Securities will be affected by the rate of
principal payments on the Assets (including principal prepayments on Mortgage
Loans resulting from both voluntary prepayments by the borrowers and involuntary
liquidations). The rate at which principal prepayments occur on the Mortgage
Loans will be affected by a variety of factors, including, without limitation,
the terms of the Mortgage Loans, the level of prevailing interest rates, the
availability of mortgage credit and economic, demographic, geographic, tax,
legal and other factors. In general, however, if prevailing interest rates fall
significantly below the Mortgage Rates on the Mortgage Loans comprising or

underlying the Assets in a particular Trust Fund, such Mortgage Loans are likely to be the subject of higher principal prepayments than if prevailing rates remain at or above the rates borne by such Mortgage Loans. In this regard, it should be noted that certain Assets may consist of Mortgage Loans with different Mortgage Rates. The rate of principal payments on some or all of the classes of Securities of a series will correspond to the rate of principal payments on the Assets in the related Trust Fund. Mortgage Loans with a prepayment premium provision, to the extent enforceable, generally would be expected to experience a lower rate of principal prepayments than otherwise identical Mortgage Loans without such provisions or with lower Prepayment Premiums.

If the purchaser of a Security offered at a discount calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is faster than that actually experienced on the Assets, the actual yield to maturity will be lower than that so calculated. Conversely, if the purchaser of a Security offered at a premium calculates its anticipated yield to maturity based on an assumed rate of distributions of principal that is slower than that actually experienced on the Assets, the actual yield to maturity will be lower than that so calculated. In either case, if so provided in the Prospectus Supplement for a series of Securities, the effect on yield on one or more classes of the Securities of such series of prepayments of the Assets in the related Trust Fund may be mitigated or exacerbated by any provisions for sequential or selective distribution of principal to such classes.

Generally, when a full prepayment is made on a Mortgage Loan, the obligor is charged interest on the principal amount of the Mortgage Loan so prepaid for the number of days in the month actually elapsed up to the date of the prepayment. Prepayments in full will likely reduce the amount of interest paid in the following month to holders of Securities entitled to payments of interest because interest on the principal amount of any Mortgage Loan so prepaid will be paid only to the date of prepayment rather than for a full month. Generally, a partial prepayment of principal is applied so as to reduce the outstanding

<div align="center">13</div>

&lt;PAGE&gt;

principal balance of the related Mortgage Loan as of the Due Date in the month in which such partial prepayment is received.

The timing of changes in the rate of principal payments on the Assets may significantly affect an investor's actual yield to maturity, even if the average rate of distributions of principal is consistent with an investor's expectation. In general, the earlier a principal payment is received on the Mortgage Loans and distributed on a Security, the greater the effect on such investor's yield to maturity. The effect on an investor's yield of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during a given period may not be offset by a subsequent like decrease (or increase) in the rate of principal payments.

The Securityholder will bear the risk of being able to reinvest principal received in respect of a Security at a yield at least equal to the yield on such Security.

PREPAYMENTS--MATURITY AND WEIGHTED AVERAGE LIFE

The rates at which principal payments are received on the Assets included in or comprising a Trust Fund and the rate at which payments are made from any Credit Support or Cash Flow Agreement for the related series of Securities may affect the ultimate maturity and the weighted average life of each class of such series. Prepayments on the Mortgage Loans comprising or underlying the Assets in a particular Trust Fund will generally accelerate the rate at which principal is paid on some or all of the classes of the Securities of the related series.

If so provided in the Prospectus Supplement for a series of Securities,

one or more classes of Securities may have a final scheduled Distribution Date, which is the date on or prior to which the Security Balance thereof is scheduled to be reduced to zero, calculated on the basis of the assumptions applicable to such series set forth therein.

Weighted average life refers to the average amount of time that will elapse from the date of issue of a security until each dollar of principal of such security will be repaid to the investor. The weighted average life of a class of Securities of a series will be influenced by the rate at which principal on the Mortgage Loans comprising or underlying the Assets is paid to such class, which may be in the form of scheduled amortization or prepayments (for this purpose, the term "prepayment" includes prepayments, in whole or in part, and liquidations due to default).

In addition, the weighted average life of the Securities may be affected by the varying maturities of the Mortgage Loans comprising or underlying the Assets in a Trust Fund. If any Mortgage Loans comprising or underlying the Assets in a particular Trust Fund have actual terms to maturity less than those assumed in calculating final scheduled Distribution Dates for the classes of Securities of the related series, one or more classes of such Securities may be fully paid prior to their respective final scheduled Distribution Dates, even in the absence of prepayments. Accordingly, the prepayment experience of the Assets will, to some extent, be a function of the mix of Mortgage Rates and maturities of the Mortgage Loans comprising or underlying such Assets. See "Description of the Trust Funds."

Prepayments on loans are also commonly measured relative to a prepayment standard or model, such as the Constant Prepayment Rate ("CPR") prepayment model or the Standard Prepayment Assumption ("SPA") prepayment model, each as described below. CPR represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans for the life of such loans. SPA represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of loans. A prepayment assumption of 100% of SPA assumes prepayment rates of 0.2% per annum of the then outstanding principal balance of such loans in the first month of the life of the loans and an additional 0.2% per annum in each month thereafter until the thirtieth month. Beginning in the thirtieth month and in each month thereafter during the life of the loans, 100% of SPA assumes a constant prepayment rate of 6% per annum each month.

14

<PAGE>

Neither CPR nor SPA nor any other prepayment model or assumption purports to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of loans, including the Mortgage Loans underlying or comprising the Assets.

The Prospectus Supplement with respect to each series of Securities may contain tables, if applicable, setting forth the projected weighted average life of each class of Offered Securities of such series and the percentage of the initial Security Balance of each such class that would be outstanding on specified Distribution Dates based on the assumptions stated in such Prospectus Supplement, including assumptions that prepayments on the Mortgage Loans comprising or underlying the related Assets are made at rates corresponding to various percentages of CPR, SPA or such other standard specified in such Prospectus Supplement. Such tables and assumptions are intended to illustrate the sensitivity of the weighted average life of the Securities to various prepayment rates and will not be intended to predict or to provide information that will enable investors to predict the actual weighted average life of the Securities. It is unlikely that prepayment of any Mortgage Loans comprising or underlying the Assets for any series will conform to any particular level of CPR, SPA or any other rate specified in the related Prospectus Supplement.

OTHER FACTORS AFFECTING WEIGHTED AVERAGE LIFE

Type of Mortgage Loan

If so specified in the related Prospectus Supplement, a number of Mortgage Loans may have balloon payments due at maturity, and because the ability of a mortgagor to make a balloon payment typically will depend upon its ability either to refinance the loan or to sell the related Mortgaged Property, there is a risk that a number of Mortgage Loans having balloon payments may default at maturity. In the case of defaults, recovery of proceeds may be delayed by, among other things, bankruptcy of the mortgagor or adverse conditions in the market where the property is located. In order to minimize losses on defaulted Mortgage Loans, the servicer may, to the extent and under the circumstances set forth in the related Prospectus Supplement, be permitted to modify Mortgage Loans that are in default or as to which a payment default is imminent. Any defaulted balloon payment or modification that extends the maturity of a Mortgage Loan will tend to extend the weighted average life of the Securities, thereby lengthening the period of time elapsed from the date of issuance of a Security until it is retired.

With respect to certain Mortgage Loans, including ARM Loans, the Mortgage Rate at origination may be below the rate that would result if the index and margin relating thereto were applied at origination. Under the applicable underwriting standards, the mortgagor under each Mortgage Loan generally will be qualified on the basis of the Mortgage Rate in effect at origination. The repayment of any such Mortgage Loan may thus be dependent on the ability of the mortgagor or obligor to make larger level monthly payments following the adjustment of the Mortgage Rate. In addition, certain Mortgage Loans may be subject to temporary buydown plans ("Buydown Mortgage Loans") pursuant to which the monthly payments made by the mortgagor during the early years of the Mortgage Loan will be less than the scheduled monthly payments thereon (the "Buydown Period"). The periodic increase in the amount paid by the mortgagor of a Buydown Mortgage Loan during or at the end of the applicable Buydown Period may create a greater financial burden for the mortgagor, who might not have otherwise qualified for a mortgage, and may accordingly increase the risk of default with respect to the related Mortgage Loan.

The Mortgage Rates on certain ARM Loans subject to negative amortization generally adjust monthly and their amortization schedules adjust less frequently. During a period of rising interest rates as well as immediately after origination (initial Mortgage Rates are generally lower than the sum of the applicable index at origination and the related margin over such index at which interest accrues), the amount of interest accruing on the principal balance of such Mortgage Loans may exceed the amount of the minimum scheduled monthly payment thereon. As a result, a portion of the accrued interest on negatively amortizing Mortgage Loans may be added to the principal balance thereof and will bear interest at the applicable Mortgage Rate. The addition of any such deferred interest to the principal balance of any related class or classes of Securities will lengthen the weighted average life thereof and may adversely

15

<PAGE>

affect yield to holders thereof, depending upon the price at which such Securities were purchased. In addition, with respect to certain ARM Loans subject to negative amortization, during a period of declining interest rates, it might be expected that each minimum scheduled monthly payment on such a Mortgage Loan would exceed the amount of scheduled principal and accrued interest on the principal balance thereof, and since such excess will be applied to reduce the principal balance of the related class or classes of Securities, the weighted average life of such Securities will be reduced and may adversely affect yield to holders thereof, depending upon the price at which such Securities were purchased.

Defaults

The rate of defaults on the Mortgage Loans will also affect the rate, timing and amount of principal payments on the Assets and thus the yield on the Securities. In general, defaults on mortgage loans are expected to occur with greater frequency in their early years. The rate of default on Mortgage Loans which are refinance or limited documentation mortgage loans, and on Mortgage Loans with high Loan-to-Value Ratios, may be higher than for other types of Mortgage Loans. Furthermore, the rate and timing of prepayments, defaults and liquidations on the Mortgage Loans will be affected by the general economic condition of the region of the country in which the related Mortgage Properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values.

Foreclosures

The number of foreclosures or repossessions and the principal amount of the Mortgage Loans comprising or underlying the Assets that are foreclosed or repossessed in relation to the number and principal amount of Mortgage Loans that are repaid in accordance with their terms will affect the weighted average life of the Mortgage Loans comprising or underlying the Assets and that of the related series of Securities.

Refinancing

At the request of a mortgagor, the Master Servicer or a Sub-Servicer may allow the refinancing of a Mortgage Loan in any Trust Fund by accepting prepayments thereon and permitting a new loan secured by a mortgage on the same property. In the event of such a refinancing, the new loan would not be included in the related Trust Fund and, therefore, such refinancing would have the same effect as a prepayment in full of the related Mortgage Loan. A Sub-Servicer or the Master Servicer may, from time to time, implement programs designed to encourage refinancing. Such programs may include, without limitation, modifications of existing loans, general or targeted solicitations, the offering of pre-approved applications, reduced origination fees or closing costs, or other financial incentives. In addition, Sub-Servicers may encourage the refinancing of Mortgage Loans, including defaulted Mortgage Loans, that would permit creditworthy borrowers to assume the outstanding indebtedness of such Mortgage Loans.

Due-on-Sale Clauses

Acceleration of mortgage payments as a result of certain transfers of underlying Mortgaged Property is another factor affecting prepayment rates that may not be reflected in the prepayment standards or models used in the relevant Prospectus Supplement. A number of the Mortgage Loans comprising or underlying the Assets may include "due-on-sale" clauses that allow the holder of the Mortgage Loans to demand payment in full of the remaining principal balance of the Mortgage Loans upon sale, transfer or conveyance of the related Mortgaged Property. With respect to any Mortgage Loans, the Master Servicer will generally enforce any due-on-sale clause to the extent it has knowledge of the conveyance or proposed conveyance of the underlying Mortgaged Property and it is entitled to do so under applicable law; provided, however, that the Master Servicer will not take any action in relation to the enforcement of any due-on-sale provision which would adversely affect or jeopardize coverage under any

16

<PAGE>

applicable insurance policy. See "Certain Legal Aspects of Mortgage Loans--Due-on-Sale Clauses" and "Description of the Agreements--Due-on-Sale Provisions."

THE DEPOSITOR

Merrill Lynch Mortgage Investors, Inc., the Depositor, is a direct wholly-owned subsidiary of Merrill Lynch Mortgage Capital Inc. and was incorporated in the State of Delaware on June 13, 1986. The principal executive offices of the Depositor are located at 250 Vesey Street, World Financial Center, North Tower, 10th Floor, New York, New York 10218-1310. Its telephone number is (212) 449-0357.

The Depositor's principal business is to acquire, hold and/or sell or otherwise dispose of cash flow assets, usually in connection with the securitization of that asset. The Depositor does not have, nor is it expected in the future to have, any significant assets.

DESCRIPTION OF THE SECURITIES

GENERAL

The certificates of each series (including any class of certificates not offered hereby) (collectively, the "Certificates") will represent the entire beneficial ownership interest in the Trust Fund created pursuant to the related Agreement. If a series of Securities includes Notes, such Notes will represent indebtedness of the related Trust Fund and will be issued and secured pursuant to an indenture (an "Indenture"). Each series of Securities will consist of one or more classes of Securities that may:

(i)     provide for the accrual of interest thereon based on fixed, variable or adjustable rates;

(ii)    be senior (collectively, "Senior Securities") or subordinate (collectively, "Subordinate Securities") to one or more other classes of Securities in respect of certain distributions on the Securities;

(iii)   be entitled to principal distributions, with disproportionately low, nominal or no interest distributions (collectively, "Stripped Principal Securities");

(iv)    be entitled to interest distributions, with disproportionately low, nominal or no principal distributions (collectively, "Stripped Interest Securities");

(v)     provide for distributions of accrued interest thereon commencing only following the occurrence of certain events, such as the retirement of one or more other classes of Securities of such series (collectively, "Accrual Securities");

(vi)    provide for payments of principal as described in the related Prospectus Supplement, from all or only a portion of the Assets in such Trust Fund, to the extent of available funds, in each case as described in the related Prospectus Supplement; and/or

(vii)   provide for distributions based on a combination of two or more components thereof with one or more of the characteristics described in this paragraph including a Stripped Principal Security component and a Stripped Interest Security component.

If so specified in the related Prospectus Supplement, distributions on one or more classes of a series of Securities may be limited to collections from a designated portion of the Mortgage Loans in the related Mortgage Pool (each such portion of Mortgage Loans, a "Mortgage Loan Group"). Any such classes may include classes of Offered Securities.

Each class of Offered Securities of a series will be issued in minimum denominations corresponding to the Security Balances or, in case of Stripped Interest Securities, notional amounts or percentage interests specified in the

related Prospectus Supplement. The transfer of any Offered Securities may be
registered and such Securities may be exchanged without the payment of any
service charge payable in connection with such registration of transfer or
exchange, but the Depositor or the Trustee or any agent

<center>17</center>

&lt;PAGE&gt;

thereof may require payment of a sum sufficient to cover any tax or other
governmental charge. One or more classes of Securities of a series may be issued
in definitive form ("Definitive Securities") or in book-entry form ("Book-Entry
Securities"), as provided in the related Prospectus Supplement. See "Risk
Factors--Book-Entry Registration" and "Description of the Securities--Book-Entry
Registration and Definitive Securities." Definitive Securities will be
exchangeable for other Securities of the same class and series of a like
aggregate Security Balance, notional amount or percentage interest but of
different authorized denominations. See "Risk Factors--Limited Liquidity" and
"--Limited Assets."

CATEGORIES OF CLASSES OF SECURITIES

        The Securities of any series may be comprised of one or more classes. Such
classes, in general, fall into different categories. The following chart
identifies and generally defines certain of the more typical categories. The
Prospectus Supplement for a series of Securities may identify the classes which
comprise such series by reference to the following categories or another
category specified in the related Prospectus Supplement.

&lt;Table&gt;
&lt;Caption&gt;

| CATEGORIES OF CLASSES | DEFINITION |
| --------------------- | ---------- |
| &lt;S&gt; | &lt;C&gt; |
| | PRINCIPAL TYPES |
| "Accretion Directed".......................... | A class that receives principal payments from the accreted interest from specified Accrual Classes. An Accretion Directed Class also may receive principal payments from principal paid on the Mortgage Loans for the related series. |
| "Component Securities"....................... | A class consisting of "Components." The Components of a class of Component Securities may have different principal and/or interest payment characteristics but together constitute a single class and do not represent severable interests. Each Component of a class of Component Securities may be identified as falling into one or more of the categories in this chart. |
| "Lockout Class" (sometimes also referred to as a "NAS Class").......................... | A class that is designed to receive no principal payments or a disproportionately small portion of principal payments from the first Distribution Date until a Distribution Date specified in the related Prospectus Supplement. |
| "Notional Amount Class"...................... | A class having no principal balance and bearing interest on the related notional amount. The notional amount is used for purposes of the determination of interest distributions. |
| "Planned Amortization Class" (also sometimes referred to as a "PAC")................... | A class that is designed to receive principal payments using a pre-determined principal balance schedule |

derived by assuming two constant prepayment rates for the underlying Mortgage Loans. These two rates are the endpoints for the "structuring range" for the Planned Amortization Class. The Planned Amortization Classes in any series of Securities may be subdivided into different categories (e.g., Planned Amortization Class I ("PAC I") Planned Amortization Class II ("PAC II") and so forth) derived using different structuring ranges.

</Table>

18

<PAGE>

<Table>
<Caption>

| CATEGORIES OF CLASSES | DEFINITION |
| --------------------- | ---------- |
| <S> | <C> |
| "Scheduled Amortization Class"............... | A class that is designed to receive principal payments using a pre-determined principal balance schedule but is not designated as a Planned Amortization Class or Targeted Amortization Class. The schedule is derived by assuming either two constant prepayment rates or a single constant prepayment rate for the underlying Mortgage Loans. In the former case, the two rates are the endpoints for the "structuring rate" for the Scheduled Amortization Class and such range generally is narrower than that for a Planned Amortization Class. Typically, the Support Class for the applicable series of Securities generally will represent a smaller percentage of the Scheduled Amortization Class than a Support Class generally would represent in relation to a Planned Amortization Class or a Targeted Amortization Class. |
| "Senior Securities"......................... | A class that is entitled to receive payments of principal and interest on each Distribution Date prior to the classes of Subordinate Securities. |
| "Senior Support Securities"................. | A class of Senior Securities that bears certain losses allocated to one or more classes of Senior Securities after the classes of Subordinate Securities are no longer outstanding. |
| "Sequential Pay Class"...................... | Classes that are entitled to receive principal payments in a prescribed sequence, that do not have predetermined principal balance schedules and that, in most cases, are entitled to receive payments of principal continuously from the first Distribution Date on which they receive principal until they are retired. A single class that is entitled to receive principal payments before or after other classes in the same series of Securities may be identified as a Sequential Pay class. |
| "Strip Class"............................... | A class that is entitled to receive a constant proportion, or "strip," of the principal payments on the underlying Mortgage Loans. |
| "Mezzanine Securities"...................... | A class that is entitled to receive payments of principal and interest on each Distribution Date after the Senior Securities have received their full principal and interest entitlements and prior to any distributions of principal and interest on the classes |

of Subordinate Securities.

"Subordinate Securities"..................... A class that is entitled to receive payments of principal and interest on each Distribution Date only after the Senior Securities and classes of Subordinate Securities with higher priority of distributions, if any have received their full principal and interest entitlements.

"Super Senior Securities"................... A class of Senior Securities that will not bear its share of certain losses after the class of Subordinate Securities are no longer outstanding for so long as one or more other specified classes of Senior Securities are outstanding.

&lt;/Table&gt;

19

&lt;PAGE&gt;

&lt;Table&gt;
&lt;Caption&gt;
CATEGORIES OF CLASSES       DEFINITION
---------------------       ----------
&lt;S&gt;       &lt;C&gt;
"Support Class" (also sometimes referred to
  as a "Companion Class")................... A class that is entitled to receive principal payments on any Distribution Date only if scheduled payments have been made on specified Planned Amortization Classes, Targeted Amortization Classes and/or Scheduled Amortization Classes.

Targeted Amortization Class" (also sometimes
  referred to as a "TAC")................... A class that is designed to receive principal payments using a pre-determined principal balance schedule derived by assuming a single constant prepayment rate for the underlying Mortgage Loans.

           INTEREST TYPES

"Component Securities"..................... A class consisting of "Components." The components of a class of Component Securities may have different principal and/or interest payment characteristics but together constitute a single class and do not represent severable interests. Each Component of a class of Component Securities may be identified as falling into one or more of the categories in this chart.

"Fixed Rate Class"........................... A class with an interest rate that is fixed throughout the life of the class.

"Floating Rate Class"...................... A class with an interest rate that resets periodically based upon a designated index and that varies directly with changes in such index.

"Inverse Floating Rate Class"................ A class with an interest rate that resets periodically based upon a designated index and that varies inversely with changes in such index and with changes in the interest rate payable on the related Floating Rate Class.

"Variable Rate Class"....................... A class with an interest rate that resets periodically and is calculated by reference to the rate or rates of interest applicable to the Mortgage Loans.

| | |
|---|---|
| "Interest-Only Class"........................ | A class that is entitled to receive some or all of the interest payments made on the Mortgage Loans and little or no principal. Interest-Only Classes have either a nominal principal balance or a notional amount. A nominal principal balance represents actual principal that will be paid on the class. It is referred to as nominal since it is extremely small compared to other classes. A notional amount is the amount used as a reference to calculate the amount of interest due on an Interest-Only Class that is not entitled to any distributions in respect of principal. |

</Table>

20

<PAGE>

<Table>
<Caption>

| CATEGORIES OF CLASSES | DEFINITION |
|---|---|
| --------------------- | ---------- |
| <S> | <C> |
| "Principal-Only Class"...................... | A class that does not bear interest and is entitled to receive only distributions in respect of principal. |
| "Accrual Class"............................. | A class that accretes the amount of accrued interest otherwise distributable on such class, which amount will be added as principal to the principal balance of such class on each applicable Distribution Date. Such accretion may continue until some specified event has occurred or until such Accrual Class is retired. |
| "Step-up Class"............................. | A class that bears interest at one or more higher, or "stepped-up" Pass-Through Rates or interest rates for a period of time specified in the related Prospectus Supplement before resetting to a lower Pass-Through Rate or interest rate that will remain fixed thereafter. |
| "Exchangeable Class"........................ | A class that may be exchanged for another class under terms specified in the related Prospectus Supplement. |

</Table>

    If the Interest Rate of a Floating Rate Class is determined based upon an
Index, the Index will be one of the following:

    -    CMT;

    -    CODI;

    -    COFI;

    -    COSI;

    -    CPI;

    -    Fed Funds Rate;

    -    FHLB Index;

    -    GBP LIBOR;

    -    LIBOR;

    -    LIBORSWAP;

-   MTA;

-   National Average Contract Mortgage Rate;

-   National Monthly Median COFI;

-   Prime Rate;

-   SIBOR;

-   SWAPLIBOR; and

-   T-Bill.

    Each of these indices is described in more detail under "Description of
the Trust Funds--The Mortgage Loans--General" above.

DISTRIBUTIONS

    Distributions on the Securities of each series will be made by or on
behalf of the Trustee on each Distribution Date as specified in the related
Prospectus Supplement from the Available Distribution

                                    21
<PAGE>

Amount for such series and such Distribution Date. Except as otherwise specified
in the related Prospectus Supplement, distributions (other than the final
distribution) will be made to the persons in whose names the Securities are
registered at the close of business on the last business day of the month
preceding the month in which the Distribution Date occurs (the "Record Date"),
and the amount of each distribution will be determined as of the close of
business on the date specified in the related Prospectus Supplement (the
"Determination Date"). All distributions with respect to each class of
Securities on each Distribution Date will be allocated pro rata among the
outstanding Securities in such class or by random selection, as described in the
related Prospectus Supplement or otherwise established by the related Trustee.
Payments will be made either by wire transfer in immediately available funds to
the account of a Securityholder at a bank or other entity having appropriate
facilities therefor, if such Securityholder has so notified the Trustee or other
person required to make such payments no later than the date specified in the
related Prospectus Supplement (and, if so provided in the related Prospectus
Supplement, holds Securities in the requisite amount specified therein), or by
check mailed to the address of the person entitled thereto as it appears on the
Security Register; provided, however, that the final distribution in retirement
of the Securities (whether Definitive Securities or Book-Entry Securities) will
be made only upon presentation and surrender of the Securities at the location
specified in the notice to Securityholders of such final distribution.

AVAILABLE DISTRIBUTION AMOUNT

    All distributions on the Securities of each series on each Distribution
Date will be made from the Available Distribution Amount described below, in
accordance with the terms described in the related Prospectus Supplement. Unless
provided otherwise in the related Prospectus Supplement, the "Available
Distribution Amount" for each Distribution Date equals the sum of the following
amounts:

    (i)     the total amount of all cash on deposit in the related Collection
            Account as of the corresponding Determination Date, exclusive of:

            (a)   all scheduled payments of principal and interest collected
                  but due on a date subsequent to the related Due Period
                  (unless the related Prospectus Supplement provides
                  otherwise, a "Due Period" with respect to any Distribution

Date will commence on the second day of the month in which
the immediately preceding Distribution Date occurs, or the
day after the Cut-off Date in the case of the first Due
Period, and will end on the first day of the month of the
related Distribution Date),

      (b)   unless the related Prospectus Supplement provides otherwise,
all prepayments, together with related payments of the
interest thereon and related Prepayment Premiums,
Liquidation Proceeds, Insurance Proceeds and other
unscheduled recoveries received subsequent to the related
Due Period, and

      (c)   all amounts in the Collection Account that are due or
reimbursable to the Depositor, the Trustee, an Asset Seller,
a Sub-Servicer, the Master Servicer or any other entity as
specified in the related Prospectus Supplement or that are
payable in respect of certain expenses of the related Trust
Fund;

   (ii)   if the related Prospectus Supplement so provides, interest or
investment income on amounts on deposit in the Collection Account,
including any net amounts paid under any Cash Flow Agreements;

   (iii)   all advances made by a Master Servicer or any other entity as
specified in the related Prospectus Supplement with respect to
such Distribution Date;

   (iv)   if and to the extent the related Prospectus Supplement so
provides, amounts paid by a Master Servicer or any other entity as
specified in the related Prospectus Supplement with respect to
interest shortfalls resulting from prepayments during the related
Prepayment Period; and

<div align="center">22</div>

&lt;PAGE&gt;

   (v)   unless the related Prospectus Supplement provides otherwise, to
the extent not on deposit in the related Collection Account as of
the corresponding Determination Date, any amounts collected under,
from or in respect of any Credit Support with respect to such
Distribution Date.

     As described below, the entire Available Distribution Amount will be
distributed among the related Securities (including any Securities not offered
hereby) on each Distribution Date, and accordingly will be released from the
Trust Fund and will not be available for any future distributions.

DISTRIBUTIONS OF INTEREST ON THE SECURITIES

     Each class of Securities (other than classes of Stripped Principal
Securities that have no Pass-Through Rate or interest rate) may have a different
Pass-Through Rate or interest rate, which will be a fixed, variable or
adjustable rate at which interest will accrue on such class or a component
thereof (the "Pass-Through Rate" in the case of Certificates). The related
Prospectus Supplement will specify the Pass-Through Rate or interest rate for
each class or component or, in the case of a variable or adjustable Pass-Through
Rate or interest rate, the method for determining the Pass-Through Rate or
interest rate. As set forth in the related Prospectus Supplement, interest on
the Securities will be calculated on the basis of either a 360-day year
consisting of twelve 30-day months or a 360-day year and the actual number of
days elapsed in the accrual period for such Securities.

     Distributions of interest in respect of the Securities of any class will
be made on each Distribution Date (other than any class of Accrual Securities,
which will be entitled to distributions of accrued interest commencing only on

the Distribution Date, or under the circumstances, specified in the related Prospectus Supplement, and any class of Stripped Principal Securities that are not entitled to any distributions of interest) based on the Accrued Security Interest for such class and such Distribution Date, subject to the sufficiency of the portion of the Available Distribution Amount allocable to such class on such Distribution Date. Prior to the time interest is distributable on any class of Accrual Securities, the amount of Accrued Security Interest otherwise distributable on such class will be added to the Security Balance thereof on each Distribution Date. With respect to each class of Securities and each Distribution Date (other than certain classes of Stripped Interest Securities), "Accrued Security Interest" will be equal to interest accrued for a specified period on the outstanding Security Balance thereof immediately prior to the Distribution Date, at the applicable Pass-Through Rate or interest rate, reduced as described below. Accrued Security Interest on Stripped Interest Securities will be equal to interest accrued for a specified period on the outstanding notional amount thereof immediately prior to each Distribution Date, at the applicable Pass-Through Rate or interest rate, reduced as described below. The method of determining the notional amount for any class of Stripped Interest Securities will be described in the related Prospectus Supplement. Reference to notional amount is solely for convenience in certain calculations and does not represent the right to receive any distributions of principal.

The Accrued Security Interest on a series of Securities will be reduced in the event of prepayment interest shortfalls, which are shortfalls in collections of interest for a full accrual period resulting from prepayments prior to the due date in such accrual period on the Mortgage Loans comprising or underlying the Assets in the Trust Fund for such series. The particular manner in which such shortfalls are to be allocated among some or all of the classes of Securities of that series will be specified in the related Prospectus Supplement. The related Prospectus Supplement will also describe the extent to which the amount of Accrued Certificate Interest that is otherwise distributable on (or, in the case of Accrual Securities, that may otherwise be added to the Security Balance of) a class of Offered Securities may be reduced as a result of any other contingencies, including delinquencies, losses and deferred interest on or in respect of the Mortgage Loans comprising or underlying the Assets in the related Trust Fund. Any reduction in the amount of Accrued Security Interest otherwise distributable on a class of Securities by reason of the allocation to such class of a portion of any deferred interest on the Mortgage Loans comprising or underlying the Assets in the related Trust Fund will result in a corresponding increase in the Security Balance of such class. See "Risk Factors--Average Life of Securities; Prepayments; Yields" and "Yield Considerations."

<div align="center">23</div>

<PAGE>

DISTRIBUTIONS OF PRINCIPAL OF THE SECURITIES

The Securities of each series, other than certain classes of Stripped Interest Securities, will have a "Security Balance" which, at any time, will equal the then maximum amount that the holder will be entitled to receive in respect of principal out of the future cash flow on the Assets and other assets included in the related Trust Fund. The outstanding Security Balance of a Security will be reduced to the extent of distributions of principal thereon from time to time and, if and to the extent so provided in the related Prospectus Supplement, by the amount of losses incurred in respect of the related Assets, may be increased in respect of deferred interest on the related Mortgage Loans to the extent provided in the related Prospectus Supplement and, in the case of Accrual Securities prior to the Distribution Date on which distributions of interest are required to commence, will be increased by any related Accrued Security Interest. The initial aggregate Security Balance of all classes of Securities of a series will not be greater than the outstanding aggregate principal balance of the related Assets as of the applicable Cut-off Date. The initial aggregate Security Balance of a series and each class thereof will be specified in the related Prospectus Supplement. Distributions of

principal will be made on each Distribution Date to the class or classes of Securities entitled thereto in accordance with the provisions described in such Prospectus Supplement until the Security Balance of such class has been reduced to zero. Stripped Interest Securities with no Security Balance are not entitled to any distributions of principal.

COMPONENTS

     To the extent specified in the related Prospectus Supplement, distribution on a class of Securities may be based on a combination of two or more different components as described under "--General" above. To such extent, the descriptions set forth under "--Distributions of Interests on the Securities" and "--Distributions of Principal of the Securities" above also relate to components of such a class of Securities. In such case, reference in such sections to Security Balance and Pass-Through Rate or interest rate refer to the principal balance, if any, of any such component and the Pass-Through Rate or interest rate, if any, on any such component, respectively.

ALLOCATION OF LOSSES AND SHORTFALLS

     If so provided in the Prospectus Supplement for a series of Securities consisting of one or more classes of Subordinate Securities, on any Distribution Date in respect of which losses or shortfalls in collections on the Assets have been incurred, the amount of such losses or shortfalls will be borne first by a class of Subordinate Securities in the priority and manner and subject to the limitations specified in such Prospectus Supplement. See "Description of Credit Support" for a description of the types of protection that may be included in a Trust Fund against losses and shortfalls on Assets comprising such Trust Fund.

ADVANCES IN RESPECT OF DELINQUENCIES

     With respect to any series of Securities evidencing an interest in a Trust Fund, the Master Servicer or another entity described therein will be required as part of its servicing responsibilities to advance on or before each Distribution Date its own funds or funds held in the Collection Account that are not included in the Available Distribution Amount for such Distribution Date, in an amount equal to the aggregate of payments of principal (other than any balloon payments) and interest (net of related servicing fees and Retained Interest) that were due on the Mortgage Loans in such Trust Fund during the related Due Period and were delinquent on the related Determination Date, subject to the Master Servicer's (or another entity's) good faith determination that such advances will be reimbursable from Related Proceeds (as defined below). In the case of a series of Securities that includes one or more classes of Subordinate Securities and if so provided in the related Prospectus Supplement, the Master Servicer's (or another entity's) advance obligation may be limited only to the portion of such delinquencies necessary to make the required distributions on one or more classes of Senior Securities and/or may be subject to the Master Servicer's (or another entity's) good faith determination that such advances will be reimbursable not only from Related Proceeds but also from collections on other Assets otherwise distributable on one or more classes of such Subordinate Securities. See "Description of Credit Support."

24

<PAGE>

     Advances are intended to maintain a regular flow of scheduled interest and principal payments to holders of the class or classes of Certificates entitled thereto, rather than to guarantee or insure against losses. Advances of the Master Servicer's (or another entity's) funds will be reimbursable only out of related recoveries on the Mortgage Loans (including amounts received under any form of Credit Support) respecting which such advances were made (as to any Mortgage Loan, "Related Proceeds") and, if so provided in the Prospectus Supplement, out of any amounts otherwise distributable on one or more classes of Subordinate Securities of such series; provided, however, that any such advance will be reimbursable from any amounts in the Collection Account prior to any

distributions being made on the Securities to the extent that the Master
Servicer (or such other entity) shall determine in good faith that such advance
(a "Nonrecoverable Advance") is not ultimately recoverable from Related Proceeds
or, if applicable, from collections on other Assets otherwise distributable on
such Subordinate Securities. If advances have been made by the Master Servicer
from excess funds in the Collection Account, the Master Servicer is required to
replace such funds in the Collection Account on any future Distribution Date to
the extent that funds in the Collection Account on such Distribution Date are
less than payments required to be made to Securityholders on such date. If so
specified in the related Prospectus Supplement, the obligations of the Master
Servicer (or another entity) to make advances may be secured by a cash advance
reserve fund, a surety bond, a letter of credit or another form of limited
guaranty. If applicable, information regarding the characteristics of, and the
identity of any obligor on, any such surety bond, will be set forth in the
related Prospectus Supplement.

　　　　If and to the extent so provided in the related Prospectus Supplement, the
Master Servicer (or another entity) will be entitled to receive interest at the
rate specified therein on its outstanding advances and will be entitled to pay
itself such interest periodically from general collections on the Assets prior
to any payment to Securityholders or as otherwise provided in the related
Agreement and described in such Prospectus Supplement.

REPORTS TO SECURITYHOLDERS

　　　　With each distribution to holders of any class of Securities of a series,
the Master Servicer or the Trustee, as provided in the related Prospectus
Supplement, will forward or cause to be forwarded to each such holder, to the
Depositor a statement setting forth, in each case the following information (but
not limited to the following information) to the extent applicable and
available:

　　(i)　　　the amount of such distribution to holders of Securities of such
　　　　　　class applied to reduce the Security Balance thereof;

　　(ii)　　the amount of such distribution to holders of Securities of such
　　　　　　class allocable to Accrued Security Interest;

　　(iii)　　the amount of such distribution allocable to Prepayment
　　　　　　Premiums;

　　(iv)　　the amount of related servicing compensation received by a
　　　　　　Master Servicer (and, if payable directly out of the related
　　　　　　Trust Fund, by any Sub-Servicer) and such other customary
　　　　　　information as any such Master Servicer or the Trustee deems
　　　　　　necessary or desirable, or that a Securityholder reasonably
　　　　　　requests, to enable Securityholders to prepare their tax
　　　　　　returns;

　　(v)　　　the aggregate amount of advances included in such distribution,
　　　　　　and the aggregate amount of unreimbursed advances at the close of
　　　　　　business on such Distribution Date;

　　(vi)　　the aggregate principal balance of the Assets at the close of
　　　　　　business on such Distribution Date;

　　(vii)　　the number and aggregate principal balance of Mortgage Loans in
　　　　　　respect of which:

　　　　　　(a)　　one scheduled payment is delinquent,

　　　　　　(b)　　two scheduled payments are delinquent,

25

      (c)    three or more scheduled payments are delinquent, and

      (d)    foreclosure proceedings have been commenced;

(viii)     with respect to any Mortgage Loan liquidated during the related Due Period, the portion of such liquidation proceeds payable or reimbursable to the Master Servicer (or any other entity) in respect of such Mortgage Loan, and the amount of any loss to Securityholders;

(ix)     with respect to each REO Property relating to a Mortgage Loan and included in the Trust Fund as of the end of the related Due Period, the loan number of the related Mortgage Loan and the date of acquisition;

(x)     with respect to each REO Property relating to a Whole Loan and included in the Trust Fund as of the end of the related Due Period:

      (a)    the book value,

      (b)    the principal balance of the related Mortgage Loan immediately following such Distribution Date (calculated as if such Mortgage Loan were still outstanding taking into account certain limited modifications to the terms thereof specified in the Agreement),

      (c)    the aggregate amount of unreimbursed servicing expenses and unreimbursed advances in respect thereof, and

      (d)    if applicable, the aggregate amount of interest accrued and payable on related servicing expenses and related advances;

(xi)     with respect to any such REO Property sold during the related Due Period:

      (a)    the aggregate amount of sale proceeds,

      (b)    the portion of such sales proceeds payable or reimbursable to the Master Servicer in respect of such REO Property or the related Mortgage Loan; and

      (c)    the amount of any loss to Securityholders in respect of the related Mortgage Loan;

(xii)     the aggregate Security Balance or notional amount, as the case may be, of each class of Securities (including any class of Securities not offered hereby) at the close of business on such Distribution Date, separately identifying any reduction in such Security Balance due to the allocation of any loss and increase in the Security Balance of a class of Accrual Securities in the event that Accrued Security Interest has been added to such balance;

(xiii)     the aggregate amount of principal prepayments made during the related Due Period;

(xiv)     the amount deposited in the reserve fund, if any, on such Distribution Date;

(xv)     the amount remaining in the reserve fund, if any, as of the close of business on such Distribution Date;

(xvi)      the aggregate unpaid Accrued Security Interest, if any, on each
           class of Securities at the close of business on such
           Distribution Date;

(xvii)     in the case of Securities with a variable Pass-Through Rate or
           interest rate, the Pass-Through Rate or interest rate applicable
           to such Distribution Date, and, if available, the immediately
           succeeding Distribution Date, as calculated in accordance with
           the method specified in the related Prospectus Supplement;

(xviii)    in the case of Securities with an adjustable Pass-Through Rate
           or interest rate, for statements to be distributed in any month
           in which an adjustment date occurs, the adjustable Pass-Through
           Rate or interest rate applicable to such Distribution Date, if

                                    26

<PAGE>

           available, and the immediately succeeding Distribution Date as
           calculated in accordance with the method specified in the
           related Prospectus Supplement;

(xix)      as to any series which includes Credit Support, the amount of
           coverage of each instrument of Credit Support included therein
           as of the close of business on such Distribution Date; and

(xx)       the aggregate amount of payments by the obligors of default
           interest, late charges and assumption and modification fees
           collected during the related Due Period.

     In the case of information furnished pursuant to subclauses (i)-(iv)
above, the amounts shall be expressed as a dollar amount per minimum
denomination of Securities or for such other specified portion thereof. In
addition, in the case of information furnished pursuant to subclauses (i), (ii),
(xii), (xvi) and (xvii) above, such amounts shall also be provided with respect
to each component, if any, of a class of Securities. The Prospectus Supplement
for each series of Offered Securities will describe any additional information
to be included in reports to the holders of such Securities.

     Within a reasonable period of time after the end of each calendar year,
the Master Servicer or the Trustee, as provided in the related Prospectus
Supplement, shall furnish to each person who at any time during the calendar
year was a holder of a Security a statement containing the information set forth
in subclauses (i)-(iv) above, aggregated for such calendar year or the
applicable portion thereof during which such person was a Securityholder. Such
obligation of the Master Servicer or the Trustee shall be deemed to have been
satisfied to the extent that substantially comparable information shall be
provided by the Master Servicer or the Trustee pursuant to any requirements of
the Code as are from time to time in force. See "Description of the
Securities--Registration and Definitive Securities."

TERMINATION

     The obligations created by the related Agreement for each series of
Certificates will terminate upon the payment to Certificateholders of that
series of all amounts held in the Collection Account or by the Master Servicer,
if any, or the Trustee and required to be paid to them pursuant to such
Agreement following the earlier of (i) the final payment or other liquidation of
the last Asset subject thereto or the disposition of all property acquired upon
foreclosure of any Mortgage Loan subject thereto and (ii) the purchase of all of
the assets of the Trust Fund by the party entitled to effect such termination,
under the circumstances and in the manner set forth in the related Prospectus
Supplement. In no event, however, will the trust created by the Agreement
continue beyond the date specified in the related Prospectus Supplement. Written
notice of termination of the Agreement will be given to each Securityholder, and

the final distribution will be made only upon presentation and surrender of the
Securities at the location to be specified in the notice of termination.

If so specified in the related Prospectus Supplement, a series of
Securities may be subject to optional early termination through the repurchase
of the assets in the related Trust Fund by a servicer of the transaction, under
the circumstances and in the manner set forth therein. If so provided in the
related Prospectus Supplement, upon the reduction of the Security Balance of a
specified class or classes of Securities by a specified percentage or amount,
the party specified therein will solicit bids for the purchase of all assets of
the Trust Fund, or of a sufficient portion of such assets to retire such class
or classes or purchase such class or classes at a price set forth in the related
Prospectus Supplement, in each case, under the circumstances and in the manner
set forth therein.

BOOK-ENTRY REGISTRATION AND DEFINITIVE SECURITIES

If so provided in the related Prospectus Supplement, one or more classes
of the Offered Securities of any series will be issued as Book-Entry Securities,
and each such class will be represented by one or more single Securities
registered in the name of a nominee for the depository, The Depository Trust
Company ("DTC").

27

<PAGE>

DTC is a limited-purpose trust company organized under the laws of the
State of New York, a member of the Federal Reserve System, a "clearing
corporation" within the meaning of the Uniform Commercial Code ("UCC") and a
"clearing agency" registered pursuant to the provisions of Section 17A of the
Securities Exchange Act of 1934, as amended. DTC was created to hold securities
for its participating organizations ("Participants") and facilitate the
clearance and settlement of securities transactions between Participants through
electronic book-entry changes in their accounts, thereby eliminating the need
for physical movement of certificates. Participants include Merrill Lynch,
Pierce, Fenner & Smith Incorporated, securities brokers and dealers, banks,
trust companies and clearing corporations and may include certain other
organizations. Indirect access to the DTC system also is available to others
such as banks, brokers, dealers and trust companies that clear through or
maintain a custodial relationship with a Participant, either directly or
indirectly ("Indirect Participants").

Investors that are not Participants or Indirect Participants but desire to
purchase, sell or otherwise transfer ownership of, or other interests in,
Book-Entry Securities may do so only through Participants and Indirect
Participants. In addition, such investors ("Security Owners") will receive all
distributions on the Book-Entry Securities through DTC and its Participants.
Under a book-entry format, Security Owners will receive payments after the
related Distribution Date because, while payments are required to be forwarded
to Cede & Co., as nominee for DTC ("Cede"), on each such date, DTC will forward
such payments to its Participants which thereafter will be required to forward
them to Indirect Participants or Security Owners. The only "Securityholder" (as
such term is used in the Agreement) will be Cede, as nominee of DTC, and the
Security Owners will not be recognized by the Trustee as Securityholders under
the Agreement. Security Owners will be permitted to exercise the rights of
Securityholders under the related Agreement, Trust Agreement or Indenture, as
applicable, only indirectly through the Participants who in turn will exercise
their rights through DTC.

Under the rules, regulations and procedures creating and affecting DTC and
its operations, DTC is required to make book-entry transfers among Participants
on whose behalf it acts with respect to the Book-Entry Securities and is
required to receive and transmit distributions of principal of and interest on
the Book-Entry Securities. Participants and Indirect Participants with which
Security Owners have accounts with respect to the Book-Entry Securities

similarly are required to make book-entry transfers and receive and transmit
such payments on behalf of their respective Security Owners.

Because DTC can act only on behalf of Participants, who in turn act on
behalf of Indirect Participants and certain banks, the ability of a Security
Owner to pledge its interest in the Book-Entry Securities to persons or entities
that do not participate in the DTC system, or otherwise take actions in respect
of its interest in the Book-Entry Securities, may be limited due to the lack of
a physical certificate evidencing such interest.

DTC has advised the Depositor that it will take any action permitted to be
taken by a Securityholder under an Agreement only at the direction of one or
more Participants to whose account with DTC interests in the Book-Entry
Securities are credited.

Cedelbank ("CEDEL") is incorporated under the laws of Luxembourg as a
professional depository. CEDEL holds securities for its participating
organizations ("CEDEL Participants") and facilitates the clearance and
settlement of securities transactions between CEDEL Participants through
electronic book-entry changes in accounts of CEDEL Participants, thereby
eliminating the need for physical movement of certificates. Transactions may be
settled in CEDEL in any of 28 currencies, including United States dollars. CEDEL
provides to its CEDEL Participants, among other things, services for
safekeeping, administration, clearance and settlement of internationally traded
securities and securities lending and borrowing. CEDEL interfaces with domestic
markets in several countries. As a professional depository, CEDEL is subject to
regulation by the Luxembourg Monetary Institute. CEDEL Participants are
recognized financial institutions around the world, including underwriters,
securities brokers and dealers, banks, trust companies, clearing corporations
and certain other organizations and may include the Underwriters. Indirect
access to CEDEL is also available to others, such as banks, brokers, dealers and

28

<PAGE>

trust companies that clear through or maintain a custodial relationship with a
CEDEL Participant, either directly or indirectly.

The Euroclear System was created in 1968 to hold securities for
participants of the Euroclear System ("Euroclear Participants") and to clear and
settle transactions between Euroclear Participants through simultaneous
electronic book-entry delivery against payment, thereby eliminating the need for
physical movement of certificates and any risk from lack of simultaneous
transfers of securities and cash. Transactions may now be settled in Euroclear
in any of 32 currencies, including United States dollars. The Euroclear System
includes various other services, including securities lending and borrowing, and
interfaces with domestic markets in several countries generally similar to the
arrangements for cross-market transfers with DTC. The Euroclear System is
operated by JPMorgan Chase Bank, Brussels, Belgium office (the "Euroclear
Operator" or "Euroclear"), under contract with Euroclear Clearance System, S.C.,
a Belgian cooperative corporation (the "Euroclear Cooperative"). All operations
are conducted by the Euroclear Operator, and all Euroclear securities clearance
accounts and Euroclear cash accounts are accounts with the Euroclear Operator,
not the Euroclear Cooperative. The Euroclear Cooperative establishes policy for
the Euroclear System on behalf of Euroclear Participants. Euroclear Participants
include banks (including central banks), securities brokers and dealers and
other professional financial intermediaries and may include the Underwriters.
Indirect access to the Euroclear System is also available to other firms that
clear through or maintain a custodial relationship with a Euroclear Participant,
either directly or indirectly.

The Euroclear Operator is the Belgian branch of a New York banking
corporation which is a member bank of the Federal Reserve System. As such, it is
regulated and examined by the Board of Governors of the Federal Reserve System
and the New York State Banking Department, as well as the Belgian Banking

Commission.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law (collectively, the "Terms and Conditions"). The Terms and Conditions govern transfers of securities and cash within the Euroclear System, withdrawal of securities and cash from the Euroclear System, and receipts of payments with respect to securities in the Euroclear System. All securities in the Euroclear System are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants and has no record of or relationship with persons holding through Euroclear Participants.

Distributions with respect to Securities held through CEDEL or Euroclear will be credited to the cash accounts of CEDEL Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by its Depositary. Such distributions will be subject to tax reporting and may be subject to withholding in accordance with relevant United States tax laws and regulations. See "Material Federal Income Tax Consequences" in this Prospectus and "Global Clearance, Settlement and Tax Documentation Procedures" in Annex I to the related Prospectus Supplement. CEDEL or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a Security under the Indenture, Trust Agreement or Pooling and Servicing Agreement, as applicable, on behalf of a CEDEL Participant or Euroclear Participant only in accordance with its relevant rules and procedures and subject to its Depositary's ability to effect such actions on its behalf through DTC.

Cede, as nominee for DTC, will hold the Securities. CEDEL and Euroclear will hold omnibus positions in the Securities on behalf of the CEDEL Participants and the Euroclear Participants, respectively, through customers' securities accounts in CEDEL's and Euroclear's names on the books of their respective depositaries (collectively, the "Depositaries"), which in turn will hold such positions in customers' securities accounts in the Depositaries' names on the books of DTC.

Transfers between DTC's participating organizations (the "Participants") will occur in accordance with DTC rules. Transfers between CEDEL Participants and Euroclear Participants will occur in the ordinary way in accordance with their applicable rules and operating procedures.

29

<PAGE>

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through CEDEL Participants or Euroclear Participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by its Depositary; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its Depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. CEDEL Participants and Euroclear Participants may not deliver instructions directly to the Depositaries.

Because of time zone differences, credits of securities in CEDEL or Euroclear as a result of a transaction with a Participant will be made during the subsequent securities settlement processing, dated the business day following the DTC settlement date, and such credits or any transactions in such securities settled during such processing will be reported to the relevant CEDEL

Participant or Euroclear Participant on such business day. Cash received in
CEDEL or Euroclear as a result of sales of securities by or through a CEDEL
Participant or a Euroclear Participant to a Participant will be received with
value on the DTC settlement date but will be available in the relevant CEDEL or
Euroclear cash account only as of the business day following settlement in DTC.

    Although DTC, CEDEL and Euroclear have agreed to the foregoing procedures
in order to facilitate transfers of Securities among participants of DTC, CEDEL
and Euroclear, they are under no obligation to perform or continue to perform
such procedures and such procedures may be discontinued at any time.

    In the event that any of DTC, CEDEL or Euroclear should discontinue its
services, the Administrator would seek an alternative depository (if available)
or cause the issuance of Definitive Securities to the owners thereof or their
nominees in the manner described in the Prospectus under "Description of the
Securities--Book Entry Registration and Definitive Securities".

    Securities initially issued in book-entry form will be issued in fully
registered certificated form to Security Owners or their nominees (the
"Definitive Securities"), rather than to DTC or its nominee only if (i) the
Depositor advises the Trustee in writing that DTC is no longer willing or able
to properly discharge its responsibilities as depository with respect to the
Securities and the Depositor is unable to locate a qualified successor or (ii)
the Depositor, at its option, elects to terminate the book-entry system through
DTC.

    Upon the occurrence of either of the events described in the immediately
preceding paragraph, DTC is required to notify all Participants of the
availability through DTC of Definitive Securities for the Security Owners. Upon
surrender by DTC of the certificate or certificates representing the Book-Entry
Securities, together with instructions for reregistration, the Trustee will
issue (or cause to be issued) to the Security Owners identified in such
instructions the Definitive Securities to which they are entitled, and
thereafter the Trustee will recognize the holders of such Definitive Securities
as Securityholders under the Agreement.

EXCHANGEABLE CERTIFICATES

GENERAL

    If specified in the related prospectus supplement, a Series of
Certificates may include one or more classes that are exchangeable certificates
("Exchangeable Certificates"). In any of theses series, the holders of one or
more of the classes of Exchangeable Certificates will be entitled, after notice
and payment to the trustee of an administrative fee, to exchange all or a
portion of those classes for proportionate interests in one or more of the other
classes of Exchangeable Certificates.

                                     30
<PAGE>

    If a series includes Exchangeable Certificates as described in the related
prospectus supplement, all of these classes of Exchangeable Certificates will be
listed in the prospectus supplement. The Classes of Certificates that are
exchangeable for one another will be referred to in the related prospectus
supplement as "related" to each other, and each related grouping of Exchangeable
Certificates will be referred to as a "combination." Each combination of
Exchangeable Certificates will be issued by the related issuing entity and, in
the aggregate, will represent a distinct combination of uncertificated interests
in the issuing entity. At any time after their initial issuance, any class of
Exchangeable Certificates may be exchanged for the related class or classes of
Exchangeable Certificates. In some cases, multiple classes of Exchangeable
Certificates may be exchanged for one or more classes of related Exchangeable
Certificates.

The descriptions in the related prospectus supplement of the Certificates of a Series that includes Exchangeable Certificates, including descriptions of principal and interest distributions, registration and denomination of Certificates, credit enhancement, yield and prepayment considerations and tax, ERISA and legal investment considerations, also will apply to each class of Exchangeable Certificates. The related prospectus supplement will separately describe the yield and prepayment considerations applicable to, and the risks of investment in, each class of Exchangeable Certificates in a combination. For example, separate decrement tables and yield tables, if applicable, will be included for each class of a combination of Exchangeable Certificates.

EXCHANGES

If a holder elects to exchange its Exchangeable Certificates for related Exchangeable Certificates, the following three conditions must be satisfied:

- the aggregate principal balance of the Exchangeable Certificates received in the exchange, immediately after the exchange, must equal the aggregate principal balance, immediately prior to the exchange, of the exchanged certificates (for purposes of this condition, an interest-only class will have a principal balance of zero);

- the aggregate amount of interest payable on each Distribution Date with respect to the Exchangeable Certificates received in the exchange must equal the aggregate amount of interest payable on that Distribution Date with respect to the exchanged securities; and

- the class or classes of Exchangeable Certificates must be exchanged in the applicable proportions, if any, described in the related prospectus supplement. There are different types of combinations that can exist. Any individual series of securities may have multiple types of combinations. Some examples of combinations of Exchangeable Certificates that differ in their interest characteristics include:

- A class of Exchangeable Certificates with an interest rate that varies directly with changes in an index and a class of Exchangeable Certificates with an interest rate that varies indirectly with changes in an index may be exchangeable for a class of Exchangeable Certificates with a fixed interest rate. In this case, the classes with interest rates that vary with an index would produce, in the aggregate, an annual interest amount equal to that generated by the class with a fixed interest rate. In addition, the aggregate principal balance of the two classes with interest rates that vary with an index would equal the principal balance of the class with the fixed interest rate.

- An interest-only class and a principal only class of Exchangeable Certificates may be exchangeable, together, for a class that is entitled to both principal and interest payments. The principal balance of the principal and interest class would be equal to the principal balance of the exchangeable principal only class, and the interest rate on the principal and interest class would be a fixed rate that, when applied to the principal balance of this class, would generate an annual interest amount equal to the annual interest amount of the exchangeable interest-only class.

31

<PAGE>

- Two classes of principal and interest classes with different fixed interest rates may be exchangeable, together, for a class that is entitled to both principal and interest payments, with a principal balance equal to the aggregate principal balance of the tow exchanged classes, and a fixed interest rate that, when applied to the principal balance of the exchanged for classes, would generate an annual

interest amount equal to the aggregate amount of annual interest of the two exchanged classes.

In some series, a Certificateholder may be able to exchange its Exchangeable Certificates for other Exchangeable Certificates that have different principal payment characteristics. Examples of these types of combinations include:

-   A class of Exchangeable Certificates that accretes all of its interest for a specified period, with the accreted amount added to the principal balance of the accreting class, and a class of Exchangeable Certificates that receives principal payments from these accretions may be exchangeable, together, for a single class of Exchangeable Certificates that receives payments of interest continuously from the first distribution date on which it receives interest until it is retired.

-   A class of Exchangeable Certificates that is a Scheduled Amortization Class, Planned Amortization Class or Targeted Amortization Class, and a class of Exchangeable Certificates that only receives principal payments on a distribution date if scheduled payments have been made on the Scheduled Amortization Class, Planned Amortization Class or Targeted Amortization Class, as applicable, may be exchangeable, together for a class of Exchangeable Certificates that receives principal payments without regard to the schedule from the first distribution date on which it receives principal until it is retired.

A number of factors may limit the ability of an Exchangeable Certificateholder to effect an exchange. For example, the Certificateholder must own, at the time of the proposed exchange, the class or classes necessary to make the exchange in the necessary proportions. If a Certificateholder does not own the necessary classes or does not own the necessary classes in the proper proportions, the Certificateholder may not be able to obtain the desired class of Exchangeable Certificates. The Certificateholder desiring to make the exchange may not be able to purchase the necessary class from the then-current owner at a reasonable price, or the necessary proportion of the needed class may no longer be available due to principal payments or prepayments that have been applied to that class.

PROCEDURES

The related prospectus supplement will describe the procedures that must be followed to make an exchange. A Certificateholder will be required to provide notice to the trustee five business days prior to the proposed exchange date or as otherwise specified in the related prospectus supplement. The notice must include the outstanding principal or notional amount of the securities to be exchanged and to be received, and the proposed exchange date. When the trustee receives this notice, it will provide instructions to the Certificateholder regarding delivery of the securities and payment of the administrative fee. A Certificateholder's notice to the trustee will become irrevocable on the second business day prior to the proposed exchange date. Any Exchangeable Certificates in book-entry form will be subject to the rules, regulations and procedures applicable to DTC's book-entry securities.

If the related prospectus supplement describes exchange proportions for a combination of classes of Exchangeable Certificates, these proportions will be based on the original, rather than the outstanding, principal or notional amounts of these classes.

The first payment on an exchangeable security received in an exchange will be made on the Distribution Date in the month following the month of the exchange or as otherwise described in the related prospectus supplement. This payment will be made to the Certificateholder of record as of the applicable record date.

&lt;PAGE&gt;

## DESCRIPTION OF THE AGREEMENTS

AGREEMENTS APPLICABLE TO A SERIES

REMIC Certificates, Grantor Trust Certificates. Certificates that are REMIC Certificates, Grantor Trust Certificates or indebtedness for tax purposes will be issued, and the related Trust Fund will be created, pursuant to a pooling and servicing agreement (a "Pooling and Servicing Agreement") among the Depositor, the Master Servicer and the Trustee. The Assets of such Trust Fund will be transferred to the Trust Fund and thereafter serviced in accordance with the terms of the Pooling and Servicing Agreement. In the context of the conveyance and servicing of the related Assets, the Pooling and Servicing Agreement or the Trust Agreement, as applicable, may be referred to herein as the "Agreement". If specified in the related Prospectus Supplement, certificates that are REMIC Certificates, Grantor Trust Certificates or indebtedness for tax purposes will be issued, and the related Trust Fund will be created, pursuant to a Trust Agreement (a "Trust Agreement") between the Depositor and the Trustee. The Assets of such Trust Fund will be serviced by one or more Master Servicers or servicers pursuant to one or more servicing agreements between the Trustee and the Master Servicer or servicer, as applicable (each, a "Servicing Agreement"), each of which may also be referred to herein as the "Agreement". If the Assets of the Trust Fund for such a series consists only of Government Securities, such Assets will be conveyed to the Trust Fund and administered pursuant to a Trust Agreement between the Depositor and the Trustee, which may also be referred to herein as the "Agreement".

Certificates That Are Partnership Interests for Tax Purposes and Notes. Certificates that are partnership interests for tax purposes will be issued, and the related Trust Fund will be created, pursuant to a Trust Agreement between the Depositor and the Trustee. The Assets of the related Trust Fund will be transferred to the Trust Fund and thereafter serviced in accordance with a servicing agreement (a "Servicing Agreement") among the Depositor, the Servicer and the Trustee. In the context of the conveyance and servicing of the related Assets, a Servicing Agreement may be referred to herein as the "Agreement".

A series of Notes issued by a Trust Fund will be issued pursuant to the indenture (the "Indenture") between the related Trust Fund and an indenture trustee (the "Indenture Trustee") named in the related Prospectus Supplement.

Notwithstanding the foregoing, if the Assets of a Trust Fund consist only of Government Securities, such Assets will be conveyed to the Trust Fund and administered in accordance with the terms of the Trust Agreement, which in such context may be referred to herein as the Agreement.

General. Any Master Servicer and the Trustee with respect to any series of Securities will be named in the related Prospectus Supplement. In any series of Securities for which there are multiple Master Servicers, there may also be multiple Mortgage Loan Groups, each corresponding to a particular Master Servicer; and, if the related Prospectus Supplement so specifies, the servicing obligations of each such Master Servicer will be limited to the Whole Loans in such corresponding Mortgage Loan Group. In lieu of appointing a Master Servicer, a servicer may be appointed pursuant to the Agreement for any Trust Fund. Such servicer will service all or a significant number of Mortgage Loans directly without a Sub-Servicer. The obligations of any such servicer shall be commensurate with those of the Master Servicer described herein. References in this Prospectus to Master Servicer and its rights and obligations shall be deemed to also be references to any servicer servicing Mortgage Loans directly without a Master Servicer. A manager or administrator may be appointed pursuant to the Trust Agreement for any Trust Fund to administer such Trust Fund. The provisions of each Agreement will vary depending upon the nature of the Securities to be issued thereunder and the nature of the related Trust Fund.

Forms of a Pooling and Servicing Agreement, a Sale and Servicing Agreement and a
Trust Agreement have been filed as exhibits to the Registration Statement of
which this Prospectus is a part.

The following summaries describe certain provisions that may appear in
each Agreement. The Prospectus Supplement for a series of Securities will
describe any provision of the Agreement relating to such series that materially
differs from the description thereof contained in this Prospectus. The summaries

33

<PAGE>

do not purport to be complete and are subject to, and are qualified in their
entirety by reference to, all of the provisions of the Agreement for each Trust
Fund and the description of such provisions in the related Prospectus
Supplement. As used herein with respect to any series, the term "Security"
refers to all of the Securities of that series, whether or not offered hereby
and by the related Prospectus Supplement, unless the context otherwise requires.
The Depositor will provide a copy of the Agreement (without exhibits) relating
to any series of Securities without charge upon written request of a holder of a
Security of such series addressed to Merrill Lynch Mortgage Investors, Inc., 250
Vesey Street, World Financial Center, North Tower, 10th Floor, New York, New
York 10281-1310. Attention: Jack Ross.

ASSIGNMENT OF ASSETS; REPURCHASES

At the time of issuance of any series of Securities, the Depositor will
assign (or cause to be assigned) to the designated Trustee the Assets to be
included in the related Trust Fund, together with all principal and interest to
be received on or with respect to such Assets after the Cut-off Date, other than
principal and interest due on or before the Cut-off Date and other than any
Retained Interest. The Trustee will, concurrently with such assignment, deliver
the Securities to the Depositor in exchange for the Assets and the other assets
comprising the Trust Fund for such series. Each Asset will be identified in a
schedule appearing as an exhibit to the related Agreement. Such schedule will
include detailed information in respect of each Loan included in the related
Trust Fund.

With respect to each Mortgage Loan, except as otherwise specified in the
related Prospectus Supplement, the Depositor will deliver or cause to be
delivered to the Trustee (or to the custodian hereinafter referred to) certain
loan documents, which will include the original Mortgage Note endorsed, without
recourse, in blank or to the order of the Trustee, the original Mortgage (or a
certified copy thereof) with evidence of recording indicated thereon and an
assignment of the Mortgage to the Trustee in recordable form. Notwithstanding
the foregoing, a Trust Fund may include Mortgage Loans where the original
Mortgage Note is not delivered to the Trustee if the Depositor delivers to the
Trustee or the custodian a copy or a duplicate original of the Mortgage Note,
together with an affidavit certifying that the original thereof has been lost or
destroyed. With respect to such Mortgage Loans, the Trustee (or its nominee) may
not be able to enforce the Mortgage Note against the related borrower. The Asset
Seller will be required to agree to repurchase, or substitute for (or cause
another party to repurchase or substitute for), each such Mortgage Loan that is
subsequently in default if the enforcement thereof or of the related Mortgage is
materially adversely affected by the absence of the original Mortgage Note. The
related Prospectus Supplement will specify whether the related Agreement will
require the Depositor or another party specified therein to promptly cause each
such assignment of Mortgage to be recorded in the appropriate public office for
real property records, except in the State of California or in other states
where, in the opinion of counsel acceptable to the Trustee, such recording is
not required to protect the Trustee's interest in the related Mortgage Loan
against the claim of any subsequent transferee or any successor to or creditor
of the Depositor, the Master Servicer, the relevant Asset Seller or any other
prior holder of the Mortgage Loan.

The Trustee (or a custodian) will review such Mortgage Loan documents

within a specified period of days after receipt thereof, and the Trustee (or a custodian) will hold such documents in trust for the benefit of the Certificateholders. If any such document is found to be missing or defective in any material respect, the Trustee (or such custodian) shall notify the Master Servicer and the Depositor, and the Master Servicer shall notify the relevant Asset Seller. If the Asset Seller cannot cure the omission or defect within a specified number of days after receipt of such notice, then the Asset Seller will be obligated, within a specified number of days of receipt of such notice, to repurchase the related Mortgage Loan from the Trustee at the Purchase Price or substitute for such Mortgage Loan. There can be no assurance that an Asset Seller will fulfill this repurchase or substitution obligation, and neither the Master Servicer nor the Depositor will be obligated to repurchase or substitute for such Mortgage Loan if the Asset Seller defaults on its obligation. This repurchase or substitution obligation constitutes the sole remedy available to the Certificateholders or the Trustee for omission of, or a material defect in, a constituent document. To the extent specified in the related Prospectus Supplement, in lieu of curing any

                                        34

<PAGE>

omission or defect in the Asset or repurchasing or substituting for such Asset, the Asset Seller may agree to cover any losses suffered by the Trust Fund as a result of such breach or defect.

      Notwithstanding the preceding two paragraphs, the related Prospectus Supplement will specify whether the documents with respect to Home Equity Loans, Home Improvement Contracts and Manufactured Housing Contracts will be delivered to the Trustee (or a custodian), or whether they will be retained by the Master Servicer, which may also be the Asset Seller. The related Prospectus Supplement will specify whether assignments of the related Mortgages to the Trustee will be recorded.

      With respect to each Government Security in certificated form, the Depositor will deliver or cause to be delivered to the Trustee (or the custodian) the original certificate or other definitive evidence of such Government Security, together with bond power or other instruments, certifications or documents required to transfer fully such Government Security, to the Trustee for the benefit of the Certificateholders. With respect to each Government Security in uncertificated or book-entry form or held through a "clearing corporation" within the meaning of the UCC, the Depositor and the Trustee will cause such Government Security to be registered directly or on the books of such clearing corporation or of one or more securities intermediaries in the name of the Trustee for the benefit of the Securityholders. The related Prospectus Supplement will specify whether the related Agreement will require that either the Depositor or the Trustee promptly cause any Government Securities in certificated form not registered in the name of the Trustee to be re-registered, with the applicable persons, in the name of the Trustee.

REPRESENTATIONS AND WARRANTIES; REPURCHASES

      The Depositor will, with respect to each Mortgage Loan, assign certain representations and warranties, as of a specified date (the person making such representations and warranties, the "Warranting Party") covering, by way of example, the following types of matters:

      (i)     the accuracy of the information set forth for such Mortgage Loan on
              the schedule of Assets appearing as an exhibit to the related
              Agreement;

      (ii)    the existence of title insurance insuring the lien priority of the
              Mortgage Loan;

      (iii)   the authority of the Warranting Party to sell the Mortgage Loan;

(iv)   the payment status of the Mortgage Loan;

(v)   in the case of a Mortgage Loan, the existence of customary provisions in the related Mortgage Note and Mortgage to permit realization against the Mortgaged Property of the benefit of the security of the Mortgage; and

(vi)   the existence of hazard and extended perils insurance coverage on the Mortgaged Property.

Any Warranting Party shall be an Asset Seller or an affiliate thereof or such other person acceptable to the Depositor and shall be identified in the related Prospectus Supplement.

Representations and warranties made in respect of a Mortgage Loan may have been made as of a date prior to the applicable Cut-off Date. A substantial period of time may have elapsed between such date and the date of initial issuance of the related series of Certificates evidencing an interest in such Mortgage Loan. In the event of a breach of any such representation or warranty, the Warranting Party will be obligated to reimburse the Trust Fund for losses caused by any such breach or either cure such breach or repurchase or replace the affected Mortgage Loan as described below. Since the representations and warranties may not address events that may occur following the date as of which they were made, the Warranting Party will have a reimbursement, cure, repurchase or substitution obligation in connection with a breach of such a representation and warranty only if the relevant event that causes such breach occurs prior to such date. Such party would have no such obligations if the relevant event that causes such breach occurs after such date.

Each Agreement will provide that the Master Servicer and/or Trustee will be required to notify promptly the relevant Warranting Party of any breach of any representation or warranty made by it in

35

<PAGE>

respect of a Mortgage Loan that materially and adversely affects the value of such Mortgage Loan or the interests therein of the Securityholders. If such Warranting Party cannot cure such breach within a specified period following the date on which such party was notified of such breach, then such Warranting Party will be obligated to repurchase such Mortgage Loan from the Trustee within a specified period from the date on which the Warranting Party was notified of such breach, at the Purchase Price therefor. As to any Mortgage Loan, the "Purchase Price" is at least equal to the sum of the unpaid principal balance thereof, plus unpaid accrued interest thereon at the Mortgage Rate from the date as to which interest was last paid to the due date in the Due Period in which the relevant purchase is to occur, plus certain servicing expenses that are reimbursable to the Master Servicer. If so provided in the Prospectus Supplement for a series, a Warranting Party, rather than repurchase a Mortgage Loan as to which a breach has occurred, will have the option, within a specified period after initial issuance of such series of Certificates, to cause the removal of such Mortgage Loan from the Trust Fund and substitute in its place one or more other Mortgage Loans in accordance with the standards described in the related Prospectus Supplement. If so provided in the Prospectus Supplement for a series, a Warranting Party, rather than repurchase or substitute a Mortgage Loan as to which a breach has occurred, will have the option to reimburse the Trust Fund or the Securityholders for any losses caused by such breach. This reimbursement, repurchase or substitution obligation will constitute the sole remedy available to holders of Securities or the Trustee for a breach of representation by a Warranting Party.

Neither the Depositor (except to the extent that it is the Warranting Party) nor the Master Servicer will be obligated to purchase or substitute for a Mortgage Loan if a Warranting Party defaults on its obligation to do so, and no assurance can be given that Warranting Parties will carry out such obligations with respect to Mortgage Loans.

The Warranting Party will, with respect to a Trust Fund that includes Government Securities, make or assign certain representations or warranties, as of a specified date, with respect to such Government Securities, covering the accuracy of the information set forth therefor on the schedule of Assets appearing as an exhibit to the related Agreement and covering the authority of the Warranting Party to sell such Assets. The related Prospectus Supplement will describe the remedies for a breach thereof.

A Master Servicer will make certain representations and warranties regarding its authority to enter into, and its ability to perform its obligations under, the related Agreement. A breach of any such representation of the Master Servicer which materially and adversely affects the interests of the Certificateholders and which continues unremedied for the number of days specified in the Agreement after the giving of written notice of such breach to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer, the Depositor and the Trustee by the holders of Certificates evidencing not less than 25% of the Voting Rights (or a higher percentage set forth in the related Prospectus Supplement), will constitute an Event of Default under such Pooling and Servicing Agreement. See "Events of Default" and "Rights Upon Event of Default".

COLLECTION ACCOUNT AND RELATED ACCOUNTS

General

The Master Servicer and/or the Trustee will, as to each Trust Fund, establish and maintain or cause to be established and maintained one or more separate accounts for the collection of payments on the related Assets (collectively, the "Collection Account"), which must be either

    (i)   an account or accounts the deposits in which are insured by the Federal Deposit Insurance Corporation ("FDIC") (to the limits established by the FDIC) and, if so specified in the related Prospectus Supplement, the uninsured deposits in which are otherwise secured such that the Trustee have a claim with respect to the funds in the Collection Account or a perfected first priority security interest against any collateral securing such funds that is superior to the claims of any other depositors or general creditors of the institution with which the Collection Account is maintained or

<div align="center">36</div>

&lt;PAGE&gt;

    (ii)   otherwise maintained with a bank or trust company, and in a manner, satisfactory to the Rating Agency or Agencies rating any class of Securities of such series.

The collateral eligible to secure amounts in the Collection Account is limited to United States government securities and other investment grade obligations specified in the Agreement ("Permitted Investments"). A Collection Account may be maintained as an interest bearing or a non-interest bearing account and the funds held therein may be invested pending each succeeding Distribution Date in certain short-term Permitted Investments. Any interest or other income earned on funds in the Collection Account will be paid to a Master Servicer or its designee as additional servicing compensation. The Collection Account may be maintained with an institution that is an affiliate of the Master Servicer, if applicable, provided that such institution meets the standards imposed by the Rating Agency or Agencies. If permitted by the Rating Agency or Agencies and so specified in the related Prospectus Supplement, a Collection Account may contain funds relating to more than one series of mortgage pass-through certificates and may contain other funds respecting payments on mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others.

Deposits

A Master Servicer or the Trustee will deposit or cause to be deposited in the Collection Account for one or more Trust Funds as frequently as required in the related Agreement, the following payments and collections received, or advances made, by the Master Servicer or the Trustee or on its behalf subsequent to the Cut-off Date (other than payments due on or before the Cut-off Date, and exclusive of any amounts representing a Retained Interest):

    (i)     all payments on account of principal, including principal prepayments, on the Assets;

    (ii)    all payments on account of interest on the Assets, including any default interest collected, in each case net of any portion thereof retained by a Master Servicer or a Sub-Servicer as its servicing compensation and net of any Retained Interest;

    (iii)   all proceeds of the hazard insurance policies to be maintained in respect of each Mortgaged Property securing a Mortgage Loan in the Trust Fund (to the extent such proceeds are not applied to the restoration of the property or released to the mortgagor in accordance with the normal servicing procedures of a Master Servicer or the related Sub-Servicer, subject to the terms and conditions of the related Mortgage and Mortgage Note) (collectively, "Insurance Proceeds") and all other amounts received and retained in connection with the liquidation of defaulted Mortgage Loans in the Trust Fund, by foreclosure or otherwise ("Liquidation Proceeds"), together with the net proceeds on a monthly basis with respect to any Mortgaged Properties acquired for the benefit of Securityholders by foreclosure or by deed in lieu of foreclosure or otherwise;

    (iv)   any amounts paid under any instrument or drawn from any fund that constitutes Credit Support for the related series of Securities as described under "Description of Credit Support";

    (v)    any advances made as described under "Description of the Securities--Advances in Respect of Delinquencies";

    (vi)   any amounts paid under any Cash Flow Agreement, as described under "Description of the Trust Funds--Cash Flow Agreements";

    (vii)   all proceeds of any Asset or, with respect to a Mortgage Loan, property acquired in respect thereof purchased by the Depositor, any Asset Seller or any other specified person as described under "Assignment of Assets; Repurchases" and "Representations and Warranties; Repurchases," all proceeds of any defaulted Mortgage Loan purchased as described under "Realization Upon Defaulted Mortgage Loans," and all proceeds of any Asset

37

<PAGE>

        purchased as described under "Description of the Securities--Termination" (also, "Liquidation Proceeds");

    (viii)  any amounts paid by a Master Servicer to cover certain interest shortfalls arising out of the prepayment of Mortgage Loans in the Trust Fund as described under "Description of the Agreements--Retained Interest; Servicing Compensation and Payment of Expenses";

    (ix)   to the extent that any such item does not constitute additional servicing compensation to a Master Servicer, any payments on account of modification or assumption fees, late payment charges

or prepayment premiums on the Mortgage Loans;

(x)     all payments required to be deposited in the Collection Account
        with respect to any deductible clause in any blanket insurance
        policy described under "Hazard Insurance Policies";

(xi)    any amount required to be deposited by a Master Servicer or the
        Trustee in connection with losses realized on investments for the
        benefit of the Master Servicer or the Trustee, as the case may be,
        of funds held in the Collection Account; and

(xii)   any other amounts required to be deposited in the Collection
        Account as provided in the related Agreement and described in the
        related Prospectus Supplement.

Withdrawals

        A Master Servicer or the Trustee may, from time to time, make withdrawals
from the Collection Account for each Trust Fund for any of the following
purposes:

(i)     to make distributions to the Securityholders on each Distribution
        Date;

(ii)    to reimburse a Master Servicer for unreimbursed amounts advanced
        as described under "Description of the Securities--Advances in
        Respect of Delinquencies," such reimbursement to be made out of
        amounts received which were identified and applied by the Master
        Servicer as late collections of interest (net of related
        servicing fees and Retained Interest) on and principal of the
        particular Mortgage Loans with respect to which the advances
        were made or out of amounts drawn under any form of Credit
        Support with respect to such Mortgage Loans;

(iii)   to reimburse a Master Servicer for unpaid servicing fees earned
        and certain unreimbursed servicing expenses incurred with
        respect to Mortgage Loans and properties acquired in respect
        thereof, such reimbursement to be made out of amounts that
        represent Liquidation Proceeds and Insurance Proceeds collected
        on the particular Mortgage Loans and properties, and net income
        collected on the particular properties, with respect to which
        such fees were earned or such expenses were incurred or out of
        amounts drawn under any form of Credit Support with respect to
        such Mortgage Loans and properties;

(iv)    to reimburse a Master Servicer for any advances described in
        clause (ii) above and any servicing expenses described in clause
        (iii) above which, in the Master Servicer's good faith judgment,
        will not be recoverable from the amounts described in clauses
        (ii) and (iii), respectively, such reimbursement to be made from
        amounts collected on other Assets or, if and to the extent so
        provided by the related Agreement and described in the related
        Prospectus Supplement, just from that portion of amounts
        collected on other Assets that is otherwise distributable on one
        or more classes of Subordinate Securities, if any remain
        outstanding, and otherwise any outstanding class of Securities,
        of the related series;

(v)     if and to the extent described in the related Prospectus
        Supplement, to pay a Master Servicer interest accrued on the
        advances described in clause (ii) above and the servicing
        expenses described in clause (iii) above while such remain
        outstanding and unreimbursed;

38

(vi)       to reimburse a Master Servicer, the Depositor, or any of their respective directors, officers, employees and agents, as the case may be, for certain expenses, costs and liabilities incurred thereby, as and to the extent described under "Certain Matters Regarding a Master Servicer and the Depositor";

(vii)     if and to the extent described in the related Prospectus Supplement, to pay (or to transfer to a separate account for purposes of escrowing for the payment of) the Trustee's fees;

(viii)    to reimburse the Trustee or any of its directors, officers, employees and agents, as the case may be, for certain expenses, costs and liabilities incurred thereby, as and to the extent described under "Certain Matters Regarding the Trustee";

(ix)      to pay a Master Servicer, as additional servicing compensation, interest and investment income earned in respect of amounts held in the Collection Account;

(x)       to pay the person entitled thereto any amounts deposited in the Collection Account that were identified and applied by the Master Servicer as recoveries of Retained Interest;

(xi)      to pay for costs reasonably incurred in connection with the proper management and maintenance of any Mortgaged Property acquired for the benefit of Securityholders by foreclosure or by deed in lieu of foreclosure or otherwise, such payments to be made out of income received on such property;

(xii)     if one or more elections have been made to treat the Trust Fund or designated portions thereof as a REMIC, to pay any federal, state or local taxes imposed on the Trust Fund or its assets or transactions, as and to the extent described under "Material Federal Income Tax Consequences--REMICs--Prohibited Transactions Tax and Other Taxes";

(xiii)    to pay for the cost of an independent appraiser or other expert in real estate matters retained to determine a fair sale price for a defaulted Mortgage Loan or a property acquired in respect thereof in connection with the liquidation of such Mortgage Loan or property;

(xiv)     to pay for the cost of various opinions of counsel obtained pursuant to the related Agreement for the benefit of Securityholders;

(xv)      to pay for the costs of recording the related Agreement if such recordation materially and beneficially affects the interests of Securityholders, provided that such payment shall not constitute a waiver with respect to the obligation of the Warranting Party to remedy any breach of representation or warranty under the Agreement;

(xvi)     to pay the person entitled thereto any amounts deposited in the Collection Account in error, including amounts received on any Asset after its removal from the Trust Fund whether by reason of purchase or substitution as contemplated by "Assignment of Assets; Repurchase" and "Representations and Warranties; Repurchases" or otherwise;

(xvii)    to make any other withdrawals permitted by the related Agreement; and

(xviii)    to clear and terminate the Collection Account at the termination of the Trust Fund.

Other Collection Accounts

     Notwithstanding the foregoing, if so specified in the related Prospectus Supplement, the Agreement for any series of Securities may provide for the establishment and maintenance of a separate collection account into which the Master Servicer or any related Sub-Servicer will deposit on a daily basis the amounts described under "--Deposits" above for one or more series of Securities. Any amounts on deposit in any such collection account will be withdrawn therefrom and deposited into the appropriate Collection Account by a time specified in the related Prospectus Supplement. To the extent specified in the related Prospectus Supplement, any amounts which could be withdrawn from the Collection Account as described

<div align="center">39</div>

&lt;PAGE&gt;

under "--Withdrawals" above, may also be withdrawn from any such collection account. The Prospectus Supplement will set forth any restrictions with respect to any such collection account, including investment restrictions and any restrictions with respect to financial institutions with which any such collection account may be maintained.

COLLECTION AND OTHER SERVICING PROCEDURES

     The Master Servicer, directly or through Sub-Servicers, is required to make reasonable efforts to collect all scheduled payments under the Mortgage Loans and will follow or cause to be followed such collection procedures as it would follow with respect to mortgage loans that are comparable to the Mortgage Loans and held for its own account, provided such procedures are consistent with:

(i)     the terms of the related Agreement and any related hazard insurance policy or instrument of Credit Support, if any, included in the related Trust Fund described herein or under "Description of Credit Support,"

(ii)    applicable law and

(iii)   the general servicing standard specified in the related Prospectus Supplement or, if no such standard is so specified, its normal servicing practices (in either case, the "Servicing Standard").

In connection therewith, the Master Servicer will be permitted in its discretion to waive any late payment charge or penalty interest in respect of a late payment on a Mortgage Loan.

     Each Master Servicer will also be required to perform other customary functions of a servicer of comparable loans, including maintaining hazard insurance policies as described herein and in any related Prospectus Supplement, and filing and settling claims thereunder; maintaining escrow or impoundment accounts of mortgagors for payment of taxes, insurance and other items required to be paid by any mortgagor pursuant to a Mortgage Loan; processing assumptions or substitutions in those cases where the Master Servicer has determined not to enforce any applicable due-on-sale clause; attempting to cure delinquencies; supervising foreclosures or repossessions; inspecting and managing Mortgaged Properties under certain circumstances; and maintaining accounting records relating to the Mortgage Loans. The Master Servicer (or another party specified in the related Prospectus Supplement), will be responsible for filing and settling claims in respect of particular Mortgage Loans under any applicable instrument of Credit Support. See "Description of Credit Support."

     The Master Servicer may agree to modify, waive or amend any term of any

Mortgage Loan in a manner consistent with the Servicing Standard so long as the modification, waiver or amendment will not affect the amount or timing of any scheduled payments of principal or interest on the Mortgage Loan or, in its judgment, materially impair the security for the Mortgage Loan or reduce the likelihood of timely payment of amounts due thereon. The Master Servicer also may agree to any modification, waiver or amendment that would so affect or impair the payments on, or the security for, a Mortgage Loan if, in its judgment, a material default on the Mortgage Loan has occurred or a payment default is imminent, and in its judgment, such modification, waiver or amendment is reasonably likely to produce a greater recovery with respect to the Mortgage Loan on a present value basis than would liquidation. The Master Servicer is required to notify the Trustee in the event of any modification, waiver or amendment of any Mortgage Loan.

SUB-SERVICERS

    A Master Servicer may delegate its servicing obligations in respect of the Mortgage Loans to third-party servicers (each, a "Sub-Servicer"), but such Master Servicer will remain obligated under the related Agreement. Each sub-servicing agreement between a Master Servicer and a Sub-Servicer (a "Sub-Servicing Agreement") must be consistent with the terms of the related Agreement and must provide that, if for any reason the Master Servicer for the related series of Securities is no longer acting in such

                                        40

<PAGE>

capacity, the Trustee or any successor Master Servicer may assume the Master Servicer's rights and obligations under such Sub-Servicing Agreement.

    The Master Servicer will be solely liable for all fees owed by it to any Sub-Servicer, irrespective of whether the Master Servicer's compensation pursuant to the related Agreement is sufficient to pay such fees. Each Sub-Servicer will be reimbursed by the Master Servicer for certain expenditures which it makes, generally to the same extent the Master Servicer would be reimbursed under an Agreement. See "Retained Interest; Servicing Compensation and Payment of Expenses."

REALIZATION UPON DEFAULTED MORTGAGE LOANS

    The Master Servicer is required to monitor any Mortgage Loan which is in default, initiate corrective action in cooperation with the mortgagor or obligor if cure is likely, inspect the Mortgaged Property and take such other actions as are consistent with the Servicing Standard. A significant period of time may elapse before the Master Servicer is able to assess the success of such corrective action or the need for additional initiatives.

    Any Agreement relating to a Trust Fund that includes Mortgage Loans may grant to the Master Servicer and/or the holder or holders of certain classes of Securities a right of first refusal to purchase from the Trust Fund at a predetermined purchase price any such Mortgage Loan as to which a specified number of scheduled payments thereunder are delinquent. Any such right granted to the holder of an Offered Security will be described in the related Prospectus Supplement. The related Prospectus Supplement will also describe any such right granted to any person if the predetermined purchase price is less than the Purchase Price described under "Representations and Warranties; Repurchases."

    If so specified in the related Prospectus Supplement, the Master Servicer may offer to sell any defaulted Mortgage Loan described in the preceding paragraph and not otherwise purchased by any person having a right of first refusal with respect thereto, if and when the Master Servicer determines, consistent with the Servicing Standard, that such a sale would produce a greater recovery on a present value basis than would liquidation through foreclosure, repossession or similar proceedings. The related Agreement will provide that any such offering be made in a commercially reasonable manner for a specified period

and that the Master Servicer accept the highest cash bid received from any
person (including itself, an affiliate of the Master Servicer or any
Securityholder) that constitutes a fair price for such defaulted Mortgage Loan.
In the absence of any bid determined in accordance with the related Agreement to
be fair, the Master Servicer shall proceed with respect to such defaulted
Mortgage Loan as described below. Any bid in an amount at least equal to the
Purchase Price described under "Representations and Warranties; Repurchases"
will in all cases be deemed fair.

     The Master Servicer, on behalf of the Trustee, may at any time institute
foreclosure proceedings, exercise any power of sale contained in any mortgage,
obtain a deed in lieu of foreclosure, or otherwise acquire title to a Mortgaged
Property securing a Mortgage Loan by operation of law or otherwise, if such
action is consistent with the Servicing Standard and a default on such Mortgage
Loan has occurred or, in the Master Servicer's judgment, is imminent.

     If title to any Mortgaged Property is acquired by a Trust Fund as to which
a REMIC election has been made, the Master Servicer, on behalf of the Trust
Fund, will be required to sell the Mortgaged Property within three years of
acquisition, unless the Internal Revenue Service grants an extension of time to
sell such property, or unless the Trustee receives an opinion of independent
counsel to the effect that the holding of the property by the Trust Fund
subsequent to three years after its acquisition will not result in the
imposition of a tax on the Trust Fund or cause the Trust Fund to fail to qualify
as a REMIC under the Code at any time that any Security is outstanding. Subject
to the foregoing, the Master Servicer will be required to solicit bids for any
Mortgaged Property so acquired in such a manner as will be reasonably likely to
realize a fair price for such property and accept the first (and, if multiple
bids are contemporaneously received, the highest) cash bid received from any
person that constitutes a fair price.

                                      41
<PAGE>

     The limitations imposed by the related Agreement and the REMIC provisions
of the Code (if a REMIC election has been made with respect to the related Trust
Fund) on the ownership and management of any Mortgaged Property acquired on
behalf of the Trust Fund may result in the recovery of an amount less than the
amount that would otherwise be recovered. See "Certain Legal Aspects of Mortgage
Loans--Foreclosure."

     If recovery on a defaulted Mortgage Loan under any related instrument of
Credit Support is not available, the Master Servicer nevertheless will be
obligated to follow or cause to be followed such normal practices and procedures
as it deems necessary or advisable to realize upon the defaulted Mortgage Loan.
If the proceeds of any liquidation of the property securing the defaulted
Mortgage Loan are less than the outstanding principal balance of the defaulted
Mortgage Loan plus interest accrued thereon at the Mortgage Rate, as applicable,
plus the aggregate amount of expenses incurred by the Master Servicer in
connection with such proceedings and which are reimbursable under the Agreement,
the Trust Fund will realize a loss in the amount of such difference. The Master
Servicer will be entitled to withdraw or cause to be withdrawn from the
Collection Account out of the Liquidation Proceeds recovered on any defaulted
Mortgage Loan, prior to the distribution of such Liquidation Proceeds to
Securityholders, amounts representing its normal servicing compensation on the
Mortgage Loan, unreimbursed servicing expenses incurred with respect to the
Mortgage Loan and any unreimbursed advances of delinquent payments made with
respect to the Mortgage Loan.

     If any property securing a defaulted Mortgage Loan is damaged, the Master
Servicer is not required to expend its own funds to restore the damaged property
unless it determines (i) that such restoration will increase the proceeds to
Securityholders on liquidation of the Mortgage Loan after reimbursement of the
Master Servicer for its expenses and (ii) that such expenses will be recoverable
by it from related Insurance Proceeds or Liquidation Proceeds.

As servicer of the Mortgage Loans, a Master Servicer, on behalf of itself, the Trustee and the Securityholders, will present claims to the obligor under each instrument of Credit Support, and will take such reasonable steps as are necessary to receive payment or to permit recovery thereunder with respect to defaulted Mortgage Loans.

If a Master Servicer or its designee recovers payments under any instrument of Credit Support with respect to any defaulted Mortgage Loan, the Master Servicer will be entitled to withdraw or cause to be withdrawn from the Collection Account out of such proceeds, prior to distribution thereof to Certificateholders, amounts representing its normal servicing compensation on such Mortgage Loan, unreimbursed servicing expenses incurred with respect to the Mortgage Loan and any unreimbursed advances of delinquent payments made with respect to the Mortgage Loan. See "Hazard Insurance Policies" and "Description of Credit Support."

PRIMARY MORTGAGE INSURANCE POLICIES

The Master Servicer will maintain or cause to be maintained, as the case may be and as permitted by law, in full force and effect, to the extent specified in the prospectus supplement, a primary mortgage insurance policy (each, a "Primary Mortgage Insurance Policy") with regard to each Mortgage Loan for which that coverage is required. Unless required by law, the Master Servicer will not cancel or refuse to renew any Primary Mortgage Insurance Policy in effect at the time of the initial issuance of a series of securities that is required to be kept in force under the applicable Agreement unless the replacement Primary Mortgage Insurance Policy for the cancelled or nonrenewed policy is maintained with an insurer whose claims-paying ability is sufficient to maintain the current rating of the classes of securities of that series that have been rated.

Although the terms and conditions of primary mortgage insurance vary, the amount of a claim for benefits under a Primary Mortgage Insurance Policy covering a mortgage loan will consist of the insured percentage of the unpaid principal amount of the covered loan and accrued and unpaid interest on the Mortgage Loan and reimbursement of certain expenses, less:

<div align="center">42</div>

&lt;PAGE&gt;

- all rents or other payments collected or received by the insured (other than the proceeds of hazard insurance) that are derived from or in any way related to the property;

- hazard insurance proceeds in excess of the amount required to restore the property and which have not been applied to the payment of the Mortgage Loan;

- amounts expended but not approved by the insurer of the related primary mortgage insurance policy;

- claim payments previously made by the insurer; and

- unpaid premiums.

Primary Mortgage Insurance Policies reimburse certain losses sustained by reason of default in payments by borrowers. Primary Mortgage Insurance Policies will not insure against, and exclude from coverage, losses sustained by reason of a default arising from or involving certain matters, including:

- fraud or negligence in origination or servicing of the Mortgage Loans, including misrepresentation by the originator, mortgagor (or obligor) or other persons involved in the origination of the Mortgage Loan;

- failure to construct the property subject to the Mortgage Loan in
  accordance with specified plans;

- physical damage to the property; and

- the related Master Servicer not being approved as a Master Servicer by
  the insurer.

Evidence of each Primary Mortgage Insurance Policy will be provided to the
Trustee simultaneously with the transfer to the Trustee of the Mortgage Loan.
The Master Servicer, on behalf of itself, the Trustee and the securityholders,
is required to present claims to the insurer under any Primary Mortgage
Insurance Policy and to take reasonable steps that are necessary to permit
recovery thereunder with respect to defaulted Mortgage Loans. Amounts collected
by the Master Servicer on behalf of itself, the Trustee and the securityholders
shall be deposited in the related Collection Account for distribution as set
forth above.

HAZARD INSURANCE POLICIES

Generally, each Agreement for a Trust Fund comprised of Mortgage Loans
will require the Master Servicer to cause the mortgagor on each Mortgage Loan to
maintain a hazard insurance policy providing for such coverage as is required
under the related mortgage or, if any mortgage permits the holder thereof to
dictate to the mortgagor the insurance coverage to be maintained on the related
Mortgaged Property, then such coverage as is consistent with the Servicing
Standard. Such coverage will be in general in an amount equal to the lesser of
the principal balance owing on such Mortgage Loan and the amount necessary to
fully compensate for any damage or loss to the improvements on the Mortgaged
Property on a replacement cost basis, but in either case not less than the
amount necessary to avoid the application of any co-insurance clause contained
in the hazard insurance policy. The ability of the Master Servicer to assure
that hazard insurance proceeds are appropriately applied may be dependent upon
its being named as an additional insured under any hazard insurance policy and
under any other insurance policy referred to below, or upon the extent to which
information in this regard is furnished by mortgagors. All amounts collected by
the Master Servicer under any such policy (except for amounts to be applied to
the restoration or repair of the Mortgaged Property or released to the mortgagor
in accordance with the Master Servicer's normal servicing procedures, subject to
the terms and conditions of the related mortgage and Mortgage Note) will be
deposited in the Collection Account. The Agreement will provide that the Master
Servicer may satisfy its obligation to cause each mortgagor to maintain such a
hazard insurance policy by the Master Servicer's maintaining a blanket policy
insuring against hazard losses on the Mortgage Loans. If such blanket policy
contains a deductible clause, the Master Servicer will be required to deposit in
the Collection Account all sums that would have been deposited therein but for
such clause.

43

<PAGE>

In general, the standard form of fire and extended coverage policy covers
physical damage to or destruction of the improvements on the property by fire,
lightning, explosion, smoke, windstorm and hail, and riot, strike and civil
commotion, subject to the conditions and exclusions specified in each policy.
Although the policies relating to the Mortgage Loans will be underwritten by
different insurers under different state laws in accordance with different
applicable state forms, and therefore will not contain identical terms and
conditions, the basic terms thereof are dictated by respective state laws, and
most such policies typically do not cover any physical damage resulting from
war, revolution, governmental actions, floods and other water-related causes,
earth movement (including earthquakes, landslides and mudflows), wet or dry rot,
vermin, domestic animals and certain other kinds of uninsured risks.

The hazard insurance policies covering the Mortgaged Properties securing

the Mortgage Loans will typically contain a co-insurance clause that in effect requires the insured at all times to carry insurance of a specified percentage (generally 80% to 90%) of the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, such clause generally provides that the insurer's liability in the event of partial loss does not exceed the lesser of (i) the replacement cost of the improvements less physical depreciation and (ii) such proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of such improvements.

Each Agreement for a Trust Fund comprised of Mortgage Loans will require the Master Servicer to cause the mortgagor on each Mortgage Loan to maintain all such other insurance coverage with respect to the related Mortgaged Property as is consistent with the terms of the related mortgage and the Servicing Standard, which insurance may typically include flood insurance (if the related Mortgaged Property was located at the time of origination in a federally designated flood area).

Any cost incurred by the Master Servicer in maintaining any such insurance policy will be added to the amount owing under the Mortgage Loan where the terms of the Mortgage Loan so permit; provided, however, that the addition of such cost will not be taken into account for purposes of calculating the distribution to be made to Certificateholders. Such costs may be recovered by the Master Servicer or Sub-Servicer, as the case may be, from the Collection Account, with interest thereon, as provided by the Agreement.

Under the terms of the Mortgage Loans, mortgagors will generally be required to present claims to insurers under hazard insurance policies maintained on the related Mortgaged Properties. The Master Servicer, on behalf of the Trustee and Certificateholders, is obligated to present or cause to be presented claims under any blanket insurance policy insuring against hazard losses on Mortgaged Properties securing the Mortgage Loans. However, the ability of the Master Servicer to present or cause to be presented such claims is dependent upon the extent to which information in this regard is furnished to the Master Servicer by mortgagors.

FIDELITY BONDS AND ERRORS AND OMISSIONS INSURANCE

Each Agreement will require that the Master Servicer obtain and maintain in effect a fidelity bond or similar form of insurance coverage (which may provide blanket coverage) or any combination thereof insuring against loss occasioned by fraud, theft or other intentional misconduct of the officers, employees and agents of the Master Servicer. The related Agreement will allow the Master Servicer to self-insure against loss occasioned by the errors and omissions of the officers, employees and agents of the Master Servicer so long as certain criteria set forth in the Agreement are met.

DUE-ON-SALE PROVISIONS

The Mortgage Loans may contain clauses requiring the consent of the mortgagee to any sale or other transfer of the related Mortgaged Property, or due-on-sale clauses entitling the mortgagee to accelerate payment of the Mortgage Loan upon any sale, transfer or conveyance of the related Mortgaged Property. The Master Servicer will generally enforce any due-on-sale clause to the extent it has knowledge of the conveyance or proposed conveyance of the underlying Mortgaged Property and it is entitled to do so

44

<PAGE>

under applicable law; provided, however, that the Master Servicer will not take any action in relation to the enforcement of any due-on-sale provision which would adversely affect or jeopardize coverage under any applicable insurance policy. The related Prospectus Supplement will specify whether any fee collected by or on behalf of the Master Servicer for entering into an assumption agreement

will be retained by or on behalf of the Master Servicer as additional servicing compensation.

RETAINED INTEREST; SERVICING COMPENSATION AND PAYMENT OF EXPENSES

     The Prospectus Supplement for a series of Certificates will specify whether there will be any Retained Interest in the Assets, and, if so, the initial owner thereof. If so, the Retained Interest will be established on a loan-by-loan basis and will be specified on an exhibit to the related Agreement. A "Retained Interest" in an Asset represents a specified portion of the interest payable thereon. The Retained Interest will be deducted from mortgagor payments as received and will not be part of the related Trust Fund.

     The Master Servicer's primary servicing compensation with respect to a series of Securities will be set forth in the related Prospectus Supplement. Since any Retained Interest and a Master Servicer's primary compensation are percentages of the principal balance of each Asset, such amounts will decrease in accordance with the amortization of the Assets. The Prospectus Supplement with respect to a series of Securities evidencing interests in a Trust Fund that includes Mortgage Loans may provide that, as additional compensation, the Master Servicer or the Sub-Servicers may retain all or a portion of assumption fees, modification fees, late payment charges or Prepayment Premiums collected from mortgagors and any interest or other income which may be earned on funds held in the Collection Account or any account established by a Sub-Servicer pursuant to the Agreement.

     The Master Servicer may, to the extent provided in the related Prospectus Supplement, pay from its servicing compensation certain expenses incurred in connection with its servicing and managing of the Assets, including, without limitation, payment of the fees and disbursements of the Trustee and independent accountants, payment of expenses incurred in connection with distributions and reports to Securityholders, and payment of any other expenses described in the related Prospectus Supplement. Certain other expenses, including certain expenses relating to defaults and liquidations on the Mortgage Loans and, to the extent so provided in the related Prospectus Supplement, interest thereon at the rate specified therein may be borne by the Trust Fund.

     If and to the extent provided in the related Prospectus Supplement, the Master Servicer may be required to apply a portion of the servicing compensation otherwise payable to it in respect of any Due Period to certain interest shortfalls resulting from the voluntary prepayment of any Mortgage Loans in the related Trust Fund during such period prior to their respective due dates therein.

EVIDENCE AS TO COMPLIANCE

     The related Prospectus Supplement will identify each party that will be required to deliver annually to the Trustee, Master Servicer or us, as applicable, on or before the date specified in the applicable agreement, an officer's certificate stating that (i) a review of that party's servicing activities during the preceding calendar year and of performance under the agreement has been made under the officer's supervision, and (ii) to the best of the officer's knowledge, based on the review, such party has fulfilled all its obligations under the agreement throughout the year, or, if there has been a failure to fulfill any obligation in any material respect, specifying the failure known to the officer and the nature and status of the failure.

     In addition, for each year in which a Report on Form 10-K is required to be filed, each party that participates in the servicing and administration of more than 5% of the mortgage loans and other assets comprising a trust for any series will be required to deliver annually to us and/or the Trustee, a report (an

45

<PAGE>

"Assessment of Compliance") that assesses compliance by that party with the servicing criteria set forth in Item 1122(d) of Regulation AB (17 CFR 229.1122) that contains the following:

-  a statement of the party's responsibility for assessing compliance with the servicing criteria applicable to it;

-  a statement that the party used the criteria in Item 1122(d) of Regulation AB to assess compliance with the applicable servicing criteria;

-  the party's assessment of compliance with the applicable servicing criteria during and as of the end of the prior calendar year, setting forth any material instance of noncompliance identified by the party; and

-  a statement that a registered public accounting firm has issued an attestation report on the party's assessment of compliance with the applicable servicing criteria.

Each party that is required to deliver an Assessment of Compliance will also be required to deliver a report (an "Attestation Report") of a registered public accounting firm, prepared in accordance with the standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board, that expresses an opinion, or states that an opinion cannot be expressed, concerning the party's assessment of compliance with the applicable servicing criteria.

For each year in which a Report on Form 10-K is required to be filed, the Depositor will cause all such items to be filed on a Form 10-K.

CERTAIN MATTERS REGARDING A MASTER SERVICER AND THE DEPOSITOR

The Master Servicer, if any, or a servicer for substantially all the Mortgage Loans under each Agreement will be named in the related Prospectus Supplement. The entity serving as Master Servicer (or as such servicer) may be an affiliate of the Depositor and may have other normal business relationships with the Depositor or the Depositor's affiliates. Reference herein to the Master Servicer shall be deemed to be to the servicer of substantially all of the Mortgage Loans.

The related Agreement will provide that the Master Servicer may resign from its obligations and duties thereunder only upon a determination that its duties under the Agreement are no longer permissible under applicable law or are in material conflict by reason of applicable law with any other activities carried on by it, the other activities of the Master Servicer so causing such a conflict being of a type and nature carried on by the Master Servicer at the date of the Agreement. No such resignation will become effective until the Trustee or a successor servicer has assumed the Master Servicer's obligations and duties under the Agreement.

Each Agreement will further provide that neither any Master Servicer, the Depositor nor any director, officer, employee, or agent of a Master Servicer or the Depositor will be under any liability to the related Trust Fund or Securityholders for any action taken, or for refraining from the taking of any action, in good faith pursuant to the Agreement; provided, however, that neither a Master Servicer, the Depositor nor any such person will be protected against any breach of a representation, warranty or covenant made in such Agreement, or against any liability specifically imposed thereby, or against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of obligations or duties thereunder or by reason of reckless disregard of obligations and duties thereunder.

Each Agreement will further provide that any Master Servicer, the

Depositor and any director, officer, employee or agent of a Master Servicer or the Depositor will be entitled to indemnification by the related Trust Fund and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Agreement or the Securities; provided, however, that such indemnification will not extend to any loss, liability or expense:

     (i)     specifically imposed by such Agreement or otherwise incidental to the performance of obligations and duties thereunder, including, in the case of a Master Servicer, the

46

<PAGE>

          prosecution of an enforcement action in respect of any specific Mortgage Loan or Mortgage Loans (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to such Agreement);

     (ii)    incurred in connection with any breach of a representation, warranty or covenant made in such Agreement;

     (iii)   incurred by reason of misfeasance, bad faith or gross negligence in the performance of obligations or duties thereunder, or by reason of reckless disregard of such obligations or duties;

     (iv)   incurred in connection with any violation of any state or federal securities law; or

     (v)    imposed by any taxing authority if such loss, liability or expense is not specifically reimbursable pursuant to the terms of the related Agreement.

In addition, each Agreement will provide that neither any Master Servicer nor the Depositor will be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its respective responsibilities under the Agreement and which in its opinion may involve it in any expense or liability. Any such Master Servicer or the Depositor may, however, in its discretion undertake any such action which it may deem necessary or desirable with respect to the Agreement and the rights and duties of the parties thereto and the interests of the Securityholders thereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of the Securityholders, and the Master Servicer or the Depositor, as the case may be, will be entitled to be reimbursed therefor and to charge the Collection Account.

Any person into which the Master Servicer or the Depositor may be merged or consolidated, or any person resulting from any merger or consolidation to which the Master Servicer or the Depositor is a party, or any person succeeding to the business of the Master Servicer or the Depositor, will be the successor of the Master Servicer or the Depositor, as the case may be, under the related Agreement.

EVENTS OF DEFAULT UNDER THE AGREEMENT

Generally, Events of Default under the related Agreement will include:

     (i)     any failure by the Master Servicer to distribute or cause to be distributed to Securityholders, or to remit to the Trustee or Indenture Trustee, as applicable, for distribution to Securityholders, any required payment that continues after a grace period, if any;

     (ii)    any failure by the Master Servicer duly to observe or perform in any material respect any of its other covenants or obligations

under the Agreement which continues unremedied for thirty days (or such other period specified in the related Prospectus Supplement) after written notice of such failure has been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer, the Depositor and the Trustee by the holders of Securities evidencing not less than 25% of the Voting Rights;

(iii)   any breach of a representation or warranty made by the Master Servicer under the Agreement which materially and adversely affects the interests of Securityholders and which continues unremedied for thirty days (or such longer period specified in the related Prospectus Supplement) after written notice of such breach has been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer, the Depositor and the Trustee by the holders of Securities evidencing not less than 25% of the Voting Rights; and

(iv)   certain events of insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings and certain actions by or on behalf of the Master Servicer indicating its insolvency or inability to pay its obligations.

47

<PAGE>

Material variations to the foregoing Events of Default (other than to shorten cure periods or eliminate notice requirements) and additions to the foregoing Events of Default will be specified in the related Prospectus Supplement. Unless otherwise specified in the related Prospectus Supplement, the Trustee shall, not later than the later of 60 days after the occurrence of any event which constitutes or, with notice or lapse of time or both, would constitute an Event of Default and five days after certain officers of the Trustee become aware of the occurrence of such an event, transmit by mail to the Depositor and all Securityholders of the applicable series notice of such occurrence, unless such default shall have been cured or waived.

The manner of determining the "Voting Rights" of a Security or class or classes of Securities will be specified in the related Prospectus Supplement.

RIGHTS UPON EVENT OF DEFAULT UNDER THE AGREEMENT

So long as an Event of Default under an Agreement remains unremedied, the Trustee may, and if specified in the related Prospectus Supplement, at the direction of holders of Securities evidencing a percentage set forth in the related Prospectus Supplement of the Voting Rights, the Trustee shall, terminate all of the rights and obligations of the Master Servicer under the Agreement and in and to the Mortgage Loans (other than as a Securityholder or as the owner of any Retained Interest), whereupon the Trustee will succeed to all of the responsibilities, duties and liabilities of the Master Servicer under the Agreement (except that if the Trustee is prohibited by law from obligating itself to make advances regarding delinquent Mortgage Loans, or if the related Prospectus Supplement so specifies, then the Trustee will not be obligated to make such advances) and will be entitled to similar compensation arrangements. Unless otherwise specified in the related Prospectus Supplement, in the event that the Trustee is unwilling or unable so to act, it may or, if specified in the related Prospectus Supplement, at the written request of the holders of Securities entitled to a percentage set forth in the related Prospectus Supplement of the Voting Rights, it shall appoint, or petition a court of competent jurisdiction for the appointment of, a loan servicing institution acceptable to the Rating Agency with a net worth at the time of such appointment of at least $15,000,000 (or such other amount specified in the related Prospectus Supplement) to act as successor to the Master Servicer under the Agreement. Pending such appointment, the Trustee is obligated to act in such capacity. The Trustee and any such successor may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation

payable to the Master Servicer under the Agreement.

     If specified in the related Prospectus Supplement, holders of Securities
representing a percentage set forth in the related Prospectus Supplement of the
Voting Rights allocated to the respective classes of Securities affected by any
Event of Default will be entitled to waive such Event of Default; provided,
however, that an Event of Default involving a failure to distribute a required
payment to Securityholders described in clause (i) under "Events of Default" may
be waived only by all of the Securityholders. Upon any such waiver of an Event
of Default, such Event of Default shall cease to exist and shall be deemed to
have been remedied for every purpose under the Agreement.

     No Securityholder will have the right under any Agreement to institute any
proceeding with respect thereto unless such holder previously has given to the
Trustee written notice of default and unless the holders of Securities
evidencing a percentage set forth in the related Prospectus Supplement of the
Voting Rights have made written request upon the Trustee to institute such
proceeding in its own name as Trustee thereunder and have offered to the Trustee
reasonable indemnity, and the Trustee for the number of days set forth in the
related Prospectus Supplement has neglected or refused to institute any such
proceeding. The Trustee, however, is under no obligation to exercise any of the
trusts or powers vested in it by any Agreement or to make any investigation of
matters arising thereunder or to institute, conduct or defend any litigation
thereunder or in relation thereto at the request, order or direction of any of
the holders of Securities covered by such Agreement, unless such Securityholders
have offered to the Trustee reasonable security or indemnity against the costs,
expenses and liabilities which may be incurred therein or thereby.

                                       48

<PAGE>

AMENDMENT

     Each Agreement may be amended by the parties thereto, without the consent
of any of the holders of Securities covered by the Agreement:

     (i)    to cure any ambiguity or correct any mistake,

     (ii)   to correct, modify or supplement any provision therein which may
            be inconsistent with any other provision therein or with the
            related Prospectus Supplement,

     (iii)  to make any other provisions with respect to matters or questions
            arising under the Agreement which are not materially inconsistent
            with the provisions thereof,

     (iv)   to modify, alter, amend, add to or rescind any of the terms or
            provisions contained in the Agreement, or

     (v)    to comply with any requirements imposed by the Code; provided,
            however, that, in the case of clauses (iii) and (iv), such
            amendment will not, as evidenced by an opinion of counsel to such
            affect, adversely affect in any material respect the interests of
            any Securityholder; provided, further, however, that such amendment
            will be deemed to not adversely affect in any material respect the
            interest of any Securityholder and the foregoing opinion of counsel
            shall not be required if the Person requesting such amendment
            obtains a letter from each applicable Rating Agency stating that
            such amendment will not result in a reduction or withdrawal of its
            rating of any class of the related Security.

     Unless otherwise specified in the related Prospectus Supplement, each
Agreement may also be amended by the Depositor, the Master Servicer, if any, and
the Trustee, with the consent of the percentage of holders of Securities
specified in the related Prospectus Supplement affected thereby of the Voting

Rights, for any purpose; provided, however, no such amendment may:

> (i)    reduce in any manner the amount of, or delay the timing of, payments received or advanced on Mortgage Loans which are required to be distributed on any Security without the consent of the holder of such Security or

> (ii)   reduce the consent percentages described in this paragraph without the consent of the holders of all Securities covered by such Agreement then outstanding.

However, with respect to any series of Securities as to which a REMIC election is to be made, the Trustee will not consent to any amendment of the Agreement unless it shall first have received an opinion of counsel to the effect that such amendment will not result in the imposition of a tax on the related Trust Fund or cause the related Trust Fund to fail to qualify as a REMIC at any time that the related Securities are outstanding.

THE TRUSTEE

The Trustee under each Agreement or Trust Agreement will be named in the related Prospectus Supplement. The commercial bank, national banking association, banking corporation or trust company serving as Trustee may have a banking relationship with the Depositor and its affiliates and with any Master Servicer and its affiliates.

DUTIES OF THE TRUSTEE

The Trustee will make no representations as to the validity or sufficiency of any Agreement or Trust Agreement, the Securities or any Asset or related document and is not accountable for the use or application by or on behalf of any Master Servicer of any funds paid to the Master Servicer or its designee in respect of the Securities or the Assets, or deposited into or withdrawn from the Collection Account or any other account by or on behalf of the Master Servicer. If no Event of Default has occurred and is continuing, the Trustee is required to perform only those duties specifically required under the related Agreement or Trust Agreement, as applicable. However, upon receipt of the various certificates, reports or

49

<PAGE>

other instruments required to be furnished to it, the Trustee is required to examine such documents and to determine whether they conform to the requirements of the Agreement or Trust Agreement, as applicable.

CERTAIN MATTERS REGARDING THE TRUSTEE

The Trustee and any director, officer, employee or agent of the Trustee shall be entitled to indemnification out of the Collection Account for any loss, liability or expense (including costs and expenses of litigation, and of investigation, counsel fees, damages, judgments and amounts paid in settlement) incurred in connection with the Trustee's:

> (i)    enforcing its rights and remedies and protecting the interests of the Securityholders during the continuance of an Event of Default,

> (ii)   defending or prosecuting any legal action in respect of the related Agreement or series of Securities,

> (iii)  being the mortgagee of record with respect to the Mortgage Loans in a Trust Fund and the owner of record with respect to any Mortgaged Property acquired in respect thereof for the benefit of Securityholders, or

(iv)    acting or refraining from acting in good faith at the direction of
        the holders of the related series of Securities entitled to the
        percentage as is specified in the related Agreement with respect to
        any particular matter) of the Voting Rights for such series;
        provided, however, that such indemnification will not extend to any
        loss, liability or expense that constitutes a specific liability of
        the Trustee pursuant to the related Agreement, or to any loss,
        liability or expense incurred by reason of willful misfeasance, bad
        faith or negligence on the part of the Trustee in the performance
        of its obligations and duties thereunder, or by reason of its
        reckless disregard of such obligations or duties, or as may arise
        from a breach of any representation, warranty or covenant of the
        Trustee made therein.

RESIGNATION AND REMOVAL OF THE TRUSTEE

        The Trustee may at any time resign from its obligations and duties under
an Agreement by giving written notice thereof to the Depositor, the Master
Servicer, if any, and all Securityholders. Upon receiving such notice of
resignation, the Depositor is required promptly to appoint a successor trustee
acceptable to the Master Servicer, if any. If no successor trustee shall have
been so appointed and have accepted appointment within 30 days after the giving
of such notice of resignation, the resigning Trustee may petition any court of
competent jurisdiction for the appointment of a successor trustee.

        If at any time the Trustee shall cease to be eligible to continue as such
under the related Agreement, or if at any time the Trustee shall become
incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver
of the Trustee or of its property shall be appointed, or any public officer
shall take charge or control of the Trustee or of its property or affairs for
the purpose of rehabilitation, conservation or liquidation, or if a change in
the financial condition of the Trustee has adversely affected or will adversely
affect the rating on any class of the Securities, then the Depositor may remove
the Trustee and appoint a successor trustee acceptable to the Master Servicer,
if any. Holders of the Securities of any series entitled to at least 51% (or
such other percentage specified in the related Prospectus Supplement) of the
Voting Rights for such series may at any time remove the Trustee without cause
and appoint a successor trustee.

        Any resignation or removal of the Trustee and appointment of a successor
trustee shall not become effective until acceptance of appointment by the
successor trustee.

                                       50
<PAGE>

CERTAIN TERMS OF THE INDENTURE

        Events of Default.  Events of Default under the Indenture for each series
of Notes include:

(i)     default for thirty (30) days (or such other number of days
        specified in such Prospectus Supplement) or more in the payment of
        any principal of or interest on any Note of such series;

(ii)    failure to perform any other covenant of the Depositor or the
        Trust Fund in the Indenture which continues for a period of sixty
        (60) days (or such other number of days specified in such
        Prospectus Supplement) after notice thereof is given in accordance
        with the procedures described in the related Prospectus
        Supplement;

(iii)   any representation or warranty made by the Depositor or the Trust
        Fund in the Indenture or in any certificate or other writing
        delivered pursuant thereto or in connection therewith with respect

to or affecting such series having been incorrect in a material
respect as of the time made, and such breach is not cured within
sixty (60) days (or such other number of days specified in such
Prospectus Supplement) after notice thereof is given in accordance
with the procedures described in the related Prospectus
Supplement;

(iv)    certain events of bankruptcy, insolvency, receivership or
        liquidation of the Depositor or the Trust Fund; or

(v)     any other Event of Default provided with respect to Notes of that
        series.

    Material variations to the foregoing Events of Default (other than to
shorten cure periods or eliminate notice requirements) and additions to the
foregoing Events of Default will be specified in the related Prospectus
Supplement. If an Event of Default with respect to the Notes of any series at
the time outstanding occurs and is continuing, either the Indenture Trustee or
the holders of a majority of the then aggregate outstanding amount of the Notes
of such series may declare the principal amount (or, if the Notes of that series
are Accrual Securities, such portion of the principal amount as may be specified
in the terms of that series, as provided in the related Prospectus Supplement)
of all the Notes of such series to be due and payable immediately. Such
declaration may, under certain circumstances, be rescinded and annulled by the
holders of a majority in aggregate outstanding amount of the Notes of such
series.

    If, following an Event of Default with respect to any series of Notes, the
Notes of such series have been declared to be due and payable, the Indenture
Trustee may, in its discretion, notwithstanding such acceleration, elect to
maintain possession of the collateral securing the Notes of such series and to
continue to apply distributions on such collateral as if there had been no
declaration of acceleration if such collateral continues to provide sufficient
funds for the payment of principal of and interest on the Notes of such series
as they would have become due if there had not been such a declaration. In
addition, the Indenture Trustee may not sell or otherwise liquidate the
collateral securing the Notes of a series following an Event of Default, other
than a default in the payment of any principal or interest on any Note of such
series for thirty (30) days or more, unless:

(a)     the holders of 100% (or such other percentage specified in the
        related Prospectus Supplement) of the then aggregate outstanding
        amount of the Notes of such series consent to such sale,

(b)     the proceeds of such sale or liquidation are sufficient to pay in
        full the principal of and accrued interest, due and unpaid, on the
        outstanding Notes of such series at the date of such sale or

(c)     the Indenture Trustee determines that such collateral would not be
        sufficient on an ongoing basis to make all payments on such Notes as
        such payments would have become due if such Notes had not been
        declared due and payable, and the Indenture Trustee obtains the
        consent of the holders of 66% (or such other percentage specified in
        the related Prospectus Supplement) of the then aggregate outstanding
        amount of the Notes of such series.

    In the event that the Indenture Trustee liquidates the collateral in
connection with an Event of Default involving a default for thirty (30) days (or
such other number of days specified in the related

                                    51

<PAGE>

Prospectus Supplement) or more in the payment of principal of or interest on the
Notes of a series, the Indenture provides that the Indenture Trustee will have a

prior lien on the proceeds of any such liquidation for unpaid fees and expenses. As a result, upon the occurrence of such an Event of Default, the amount available for distribution to the Noteholders would be less than would otherwise be the case. However, the Indenture Trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the Indenture for the benefit of the Noteholders after the occurrence of such an Event of Default.

In the event the principal of the Notes of a series is declared due and payable, as described above, the holders of any such Notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount thereof less the amount of such discount which is unamortized.

Subject to the provisions of the Indenture relating to the duties of the Indenture Trustee, in case an Event of Default shall occur and be continuing with respect to a series of Notes, the Indenture Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of Notes of such series, unless such holders offered to the Indenture Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred by it in complying with such request or direction. Subject to such provisions for indemnification and certain limitations contained in the Indenture, the holders of a majority of the then aggregate outstanding amount of the Notes of such series shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Indenture Trustee or exercising any trust or power conferred on the Indenture Trustee with respect to the Notes of such series, and the holders of a majority of the then aggregate outstanding amount of the Notes of such series may, in certain cases, waive any default with respect thereto, except a default in the payment of principal or interest or a default in respect of a covenant or provision of the Indenture that cannot be modified without the waiver or consent of all the holders of the outstanding Notes of such series affected thereby.

Discharge of the Indenture. The Indenture will be discharged with respect to a series of Notes (except with respect to certain continuing rights specified in the Indenture) upon the delivery to the Indenture Trustee for cancellation of all the Notes of such series or, with certain limitations, upon deposit with the Indenture Trustee of funds sufficient for the payment in full of all of the Notes of such series.

In addition to such discharge with certain limitations, the Indenture will provide that, if so specified with respect to the Notes of any series, the related Trust Fund will be discharged from any and all obligations in respect of the Notes of such series (except for certain obligations relating to temporary Notes and exchange of Notes, to register the transfer of or exchange Notes of such series, to replace stolen, lost or mutilated Notes of such series, to maintain paying agencies and to hold monies for payment in trust) upon the deposit with the Indenture Trustee, in trust, of money and/or direct obligations of or obligations guaranteed by the United States of America which through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of and each installment of interest on the Notes of such series on the maturity date for such Notes and any installment of interest on such Notes in accordance with the terms of the Indenture and the Notes of such series. In the event of any such defeasance and discharge of Notes of such series, holders of Notes of such series would be able to look only to such money and/or direct obligations for payment of principal and interest, if any, on their Notes until maturity.

Indenture Trustee's Annual Report. The Indenture Trustee for each series of Notes will be required to mail each year to all related Noteholders a brief report relating to its eligibility and qualification to continue as Indenture Trustee under the related Indenture, any amounts advanced by it under the Indenture, the amount, interest rate and maturity date of certain indebtedness owing by such Trust to the applicable Indenture Trustee in its individual capacity, the property and funds physically held by such Indenture Trustee as

such and any action taken by it that materially affects such Notes and that has not been previously reported.

                                        52

<PAGE>

       The Indenture Trustee. The Indenture Trustee for a series of Notes will be specified in the related Prospectus Supplement. The Indenture Trustee for any series may resign at any time, in which event the Depositor will be obligated to appoint a successor trustee for such series. The Depositor may also remove any such Indenture Trustee if such Indenture Trustee ceases to be eligible to continue as such under the related Indenture or if such Indenture Trustee becomes insolvent. In such circumstances the Depositor will be obligated to appoint a successor trustee for the applicable series of Notes. Any resignation or removal of the Indenture Trustee and appointment of a successor trustee for any series of Notes does not become effective until acceptance of the appointment by the successor trustee for such series.

       The bank or trust company serving as Indenture Trustee may have a banking relationship with the Depositor or any of its affiliates or the Master Servicer or any of its affiliates.

                          DESCRIPTION OF CREDIT SUPPORT

GENERAL

       For any series of Securities Credit Support may be provided with respect to one or more classes thereof or the related Assets. Credit Support may be in the form of the subordination of one or more classes of Securities, letters of credit, insurance policies, surety bonds, guarantees, the establishment of one or more reserve funds or any combination of the foregoing. If so provided in the related Prospectus Supplement, any form of Credit Support may be structured so as to be drawn upon by more than one series to the extent described therein.

       The Credit Support will not provide protection against all risks of loss and will not guarantee repayment of the entire Security Balance of the Securities and interest thereon. If losses or shortfalls occur that exceed the amount covered by Credit Support or that are not covered by Credit Support, Securityholders will bear their allocable share of deficiencies. Moreover, if a form of Credit Support covers more than one series of Securities (each, a "Covered Trust"), holders of Securities evidencing interests in any of such Covered Trusts will be subject to the risk that such Credit Support will be exhausted by the claims of other Covered Trusts prior to such Covered Trust receiving any of its intended share of such coverage.

       If Credit Support is provided with respect to one or more classes of Securities of a series, or the related Assets, the related Prospectus Supplement will include a description of:

       (a)   the nature and amount of coverage under such Credit Support,

       (b)   any conditions to payment thereunder not otherwise described herein,

       (c)   the conditions (if any) under which the amount of coverage under
             such Credit Support may be reduced and under which such Credit
             Support may be terminated or replaced, and

       (d)   the material provisions relating to such Credit Support.
             Additionally, the related Prospectus Supplement will set forth
             certain information with respect to the obligor under any instrument
             of Credit Support, including

             (i)   a brief description of its principal business activities,

             (ii)    its principal place of business, place of incorporation and

          the jurisdiction under which it is chartered or licensed to
          do business,

   (iii)    if applicable, the identity of regulatory agencies that
          exercise primary jurisdiction over the conduct of its
          business and

   (iv)     its total assets, and its stockholders' or policyholders'
          surplus, if applicable, as of the date specified in the
          Prospectus Supplement.

See "Risk Factors--Credit Support Limitations--Risk That Credit Support Will Not
Cover All Losses."

                                       53
<PAGE>

SUBORDINATE SECURITIES

        If so specified in the related Prospectus Supplement, one or more classes
of Securities of a series may be Subordinate Securities. To the extent specified
in the related Prospectus Supplement, the rights of the holders of Subordinate
Securities to receive distributions of principal and interest from the
Collection Account on any Distribution Date will be subordinated to such rights
of the holders of Senior Securities. If so provided in the related Prospectus
Supplement, the subordination of a class may apply only in the event of (or may
be limited to) certain types of losses or shortfalls. The related Prospectus
Supplement will set forth information concerning the amount of subordination of
a class or classes of Subordinate Securities in a series, the circumstances in
which such subordination will be applicable and the manner, if any, in which the
amount of subordination will be effected.

CROSS-SUPPORT PROVISIONS

        If the Assets for a series are divided into separate groups, each
supporting a separate class or classes of Securities of a series, credit support
may be provided by cross-support provisions requiring that distributions be made
on Senior Securities evidencing interests in one group of Assets prior to
distributions on Subordinate Securities evidencing interests in a different
group of Assets within the Trust Fund. The Prospectus Supplement for a series
that includes a cross-support provision will describe the manner and conditions
for applying such provisions.

INSURANCE OR GUARANTEES

        If so provided in the Prospectus Supplement for a series of Securities,
the Mortgage Loans in the related Trust Fund will be covered for various default
risks by insurance policies or guarantees.

LETTER OF CREDIT

        If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain classes
thereof will be covered by one or more letters of credit, issued by a bank or
financial institution specified in such Prospectus Supplement (the "L/C Bank").
Under a letter of credit, the L/C Bank will be obligated to honor draws
thereunder in an aggregate fixed dollar amount, net of unreimbursed payments
thereunder, generally equal to a percentage specified in the related Prospectus
Supplement of the aggregate principal balance of the Assets on the related
Cut-off Date or of the initial aggregate Security Balance of one or more classes
of Securities. If so specified in the related Prospectus Supplement, the letter
of credit may permit draws in the event of only certain types of losses and
shortfalls. The amount available under the letter of credit will, in all cases,
be reduced to the extent of the unreimbursed payments thereunder and may
otherwise be reduced as described in the related Prospectus Supplement. The

obligations of the L/C Bank under the letter of credit for each series of
Securities will expire at the earlier of the date specified in the related
Prospectus Supplement or the termination of the Trust Fund.

INSURANCE POLICIES AND SURETY BONDS

     If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain classes
thereof will be covered by insurance policies and/or surety bonds provided by
one or more insurance companies or sureties. Such instruments may cover, with
respect to one or more classes of Securities of the related series, timely
distributions of interest and/or full distributions of principal on the basis of
a schedule of principal distributions set forth in or determined in the manner
specified in the related Prospectus Supplement.

RESERVE FUNDS

     If so provided in the Prospectus Supplement for a series of Securities,
deficiencies in amounts otherwise payable on such Securities or certain classes
thereof will be covered by one or more reserve funds in which cash, a letter of
credit, Permitted Investments, a demand note or a combination thereof

                                       54
<PAGE>

will be deposited, in the amounts so specified in such Prospectus Supplement.
The reserve funds for a series may also be funded over time by depositing
therein a specified amount of the distributions received on the related Assets
as specified in the related Prospectus Supplement.

     Amounts on deposit in any reserve fund for a series, together with the
reinvestment income thereon, if any, will be applied for the purposes, in the
manner, and to the extent specified in the related Prospectus Supplement. A
reserve fund may be provided to increase the likelihood of timely distributions
of principal of and interest on the Certificates. If so specified in the related
Prospectus Supplement, reserve funds may be established to provide limited
protection against only certain types of losses and shortfalls. Following each
Distribution Date, amounts in a reserve fund in excess of any amount required to
be maintained therein may be released from the reserve fund under the conditions
and to the extent specified in the related Prospectus Supplement and will not be
available for further application to the Securities.

     Generally, moneys deposited in any Reserve Funds will be invested in
Permitted Investments. If specified in the related Prospectus Supplement, any
reinvestment income or other gain from such investments will be credited to the
related Reserve Fund for such series, and any loss resulting from such
investments will be charged to such Reserve Fund. However, such income may be
payable to any related Master Servicer or another service provider as additional
compensation. The related Prospectus Supplement will specify whether the Reserve
Fund, if any, for a series will not be a part of the Trust Fund.

     Additional information concerning any Reserve Fund will be set forth in
the related Prospectus Supplement, including the initial balance of such Reserve
Fund, the balance required to be maintained in the Reserve Fund, the manner in
which such required balance will decrease over time, the manner of funding such
Reserve Fund, the purposes for which funds in the Reserve Fund may be applied to
make distributions to Securityholders and use of investment earnings from the
Reserve Fund, if any.

                      CERTAIN LEGAL ASPECTS OF MORTGAGE LOANS

     The following discussion contains summaries, which are general in nature,
of certain state law legal aspects of loans secured by single-family or
multi-family residential properties. Because such legal aspects are governed
primarily by the applicable laws of the state in which the related Mortgaged
Property is located (which laws may differ substantially), the summaries do not

purport to be complete nor to reflect the laws of any particular state, nor to
encompass the laws of all states in which the security for the Mortgage Loans is
situated. The summaries are qualified in their entirety by reference to the
applicable federal and state laws governing the Mortgage Loans. See "Description
of the Trust Funds--Assets."

GENERAL

     All of the Mortgage Loans are loans evidenced by a note or bond and
secured by instruments granting a security interest in real property which may
be mortgages, deeds of trust, security deeds or deeds to secure debt, depending
upon the prevailing practice and law in the state in which the Mortgaged
Property is located. Mortgages, deeds of trust and deeds to secure debt are
herein collectively referred to as "mortgages." Any of the foregoing types of
mortgages will create a lien upon, or grant a title interest in, the subject
property, the priority of which will depend on the terms of the particular
security instrument, as well as separate, recorded, contractual arrangements
with others holding interests in the mortgaged property, the knowledge of the
parties to such instrument as well as the order of recordation of the instrument
in the appropriate public recording office. However, recording does not
generally establish priority over governmental claims for real estate taxes and
assessments and other charges imposed under governmental police powers.

TYPES OF MORTGAGE INSTRUMENTS

     A mortgage either creates a lien against or constitutes a conveyance of
real property between two parties--a mortgagor (the borrower and usually the
owner of the subject property) and a mortgagee (the

                                       55
<PAGE>

lender). In contrast, a deed of trust is a three-party instrument, among a
trustor (the equivalent of a mortgagor), a trustee to whom the mortgaged
property is conveyed, and a beneficiary (the lender) for whose benefit the
conveyance is made. As used in this Prospectus, unless the context otherwise
requires, "mortgagor" includes the trustor under a deed of trust and a grantor
under a security deed or a deed to secure debt. Under a deed of trust, the
mortgagor grants the property, irrevocably until the debt is paid, in trust,
generally with a power of sale as security for the indebtedness evidenced by the
related note. A deed to secure debt typically has two parties. By executing a
deed to secure debt, the grantor conveys title to, as opposed to merely creating
a lien upon, the subject property to the grantee until such time as the
underlying debt is repaid, generally with a power of sale as security for the
indebtedness evidenced by the related mortgage note. In case the mortgagor under
a mortgage is a land trust, there would be an additional party because legal
title to the property is held by a land trustee under a land trust agreement for
the benefit of the mortgagor. At origination of a mortgage loan involving a land
trust, the mortgagor executes a separate undertaking to make payments on the
mortgage note. The mortgagee's authority under a mortgage, the trustee's
authority under a deed of trust and the grantee's authority under a deed to
secure debt are governed by the express provisions of the mortgage, the law of
the state in which the real property is located, certain federal laws
(including, without limitation, the Service Members Civil Relief Act) and, in
some cases, in deed of trust transactions, the directions of the beneficiary.

INTEREST IN REAL PROPERTY

     The real property covered by a mortgage, deed of trust, security deed or
deed to secure debt is most often the fee estate in land and improvements.
However, such an instrument may encumber other interests in real property such
as a tenant's interest in a lease of land or improvements, or both, and the
leasehold estate created by such lease. An instrument covering an interest in
real property other than the fee estate requires special provisions in the
instrument creating such interest or in the mortgage, deed of trust, security

deed or deed to secure debt, to protect the mortgagee against termination of
such interest before the mortgage, deed of trust, security deed or deed to
secure debt is paid. Unless otherwise specified in the Prospectus Supplement,
the Depositor or the Asset Seller will make certain representations and
warranties in the Agreement with respect to any Mortgage Loans that are secured
by an interest in a leasehold estate. Such representations and warranties, if
applicable, will be set forth in the Prospectus Supplement.

COOPERATIVE LOANS

     If specified in the Prospectus Supplement relating to a series of Offered
Securities, the Mortgage Loans may also consist of cooperative apartment loans
("Cooperative Loans") secured by security interests in shares issued by a
cooperative housing corporation (a "Cooperative") and in the related proprietary
leases or occupancy agreements granting exclusive rights to occupy specific
dwelling units in the Cooperatives' buildings. The security agreement will
create a lien upon, or grant a title interest in, the property which it covers,
the priority of which will depend on the terms of the particular security
agreement as well as the order of recordation of the agreement in the
appropriate recording office. Such a lien or title interest is not prior to the
lien for real estate taxes and assessments and other charges imposed under
governmental police powers.

     Each Cooperative owns in fee or has a leasehold interest in all the real
property and owns in fee or leases the building and all separate dwelling units
therein. The Cooperative is directly responsible for property management and, in
most cases, payment of real estate taxes, other governmental impositions and
hazard and liability insurance. If there is a blanket mortgage or mortgages on
the Cooperative apartment building or underlying land, as is generally the case,
or an underlying lease of the land, as is the case in some instances, the
Cooperative, as property mortgagor, or lessee, as the case may be, is also
responsible for meeting these mortgage or rental obligations. A blanket mortgage
is ordinarily incurred by the Cooperative in connection with either the
construction or purchase of the Cooperative's apartment building or obtaining of
capital by the Cooperative. The interest of the occupant under proprietary
leases or occupancy agreements as to which that Cooperative is the landlord are
generally subordinate to the

                                   56

<PAGE>

interest of the holder of a blanket mortgage and to the interest of the holder
of a land lease. If the Cooperative is unable to meet the payment obligations
(i) arising under a blanket mortgage, the mortgagee holding a blanket mortgage
could foreclose on that mortgage and terminate all subordinate proprietary
leases and occupancy agreements or (ii) arising under its land lease, the holder
of the landlord's interest under the land lease could terminate it and all
subordinate proprietary leases and occupancy agreements. Also, a blanket
mortgage on a Cooperative may provide financing in the form of a mortgage that
does not fully amortize, with a significant portion of principal being due in
one final payment at maturity. The inability of the Cooperative to refinance a
mortgage and its consequent inability to make such final payment could lead to
foreclosure by the mortgagee. Similarly, a land lease has an expiration date and
the inability of the Cooperative to extend its term or, in the alternative, to
purchase the land could lead to termination of the Cooperative's interest in the
property and termination of all proprietary leases and occupancy agreement. In
either event, a foreclosure by the holder of a blanket mortgage or the
termination of the underlying lease could eliminate or significantly diminish
the value of any collateral held by the lender that financed the purchase by an
individual tenant stockholder of Cooperative shares or, in the case of the
Mortgage Loans, the collateral securing the Cooperative Loans.

     The Cooperative is owned by tenant-stockholders who, through ownership of
stock or shares in the corporation, receive proprietary lease or occupancy
agreements which confer exclusive rights to occupy specific units. Generally, a

tenant-stockholder of a Cooperative must make a monthly payment to the
Cooperative representing such tenant-stockholder's pro rata share of the
Cooperative's payments for its blanket mortgage, real property taxes,
maintenance expenses and other capital or ordinary expenses. An ownership
interest in a Cooperative and accompanying occupancy rights are financed through
a cooperative share loan evidenced by a promissory note and secured by an
assignment of and a security interest in the occupancy agreement or proprietary
lease and a security interest in the related cooperative shares. The lender
generally takes possession of the share certificate and a counterpart of the
proprietary lease or occupancy agreement and a financing statement covering the
proprietary lease or occupancy agreement and the cooperative shares is filed in
the appropriate state and local offices to perfect the lender's interest in its
collateral. Subject to the limitations discussed below, upon default of the
tenant-stockholder, the lender may sue for judgment on the promissory note,
dispose of the collateral at a public or private sale or otherwise proceed
against the collateral or tenant-stockholder as an individual as provided in the
security agreement covering the assignment of the proprietary lease or occupancy
agreement and the pledge of cooperative shares. See "Foreclosure--Cooperatives"
below.

FORECLOSURE

General

     Foreclosure is a legal procedure that allows the mortgagee to recover its
mortgage debt by enforcing its rights and available legal remedies under the
mortgage. If the mortgagor defaults in payment or performance of its obligations
under the note or mortgage, the mortgagee has the right to institute foreclosure
proceedings to sell the mortgaged property at public auction to satisfy the
indebtedness.

     Foreclosure procedures with respect to the enforcement of a mortgage vary
from state to state. Two primary methods of foreclosing a mortgage are judicial
foreclosure and non-judicial foreclosure pursuant to a power of sale granted in
the mortgage instrument. There are several other foreclosure procedures
available in some states that are either infrequently used or available only in
certain limited circumstances, such as strict foreclosure.

Judicial Foreclosure

     A judicial foreclosure proceeding is conducted in a court having
jurisdiction over the mortgaged property. Generally, the action is initiated by
the service of legal pleadings upon all parties having an interest of record in
the real property. Delays in completion of the foreclosure may occasionally
result from difficulties in locating defendants. When the lender's right to
foreclose is contested, the legal proceedings can be time-consuming. Upon
successful completion of a judicial foreclosure proceeding, the court

                                      57
<PAGE>

generally issues a judgment of foreclosure and appoints a referee or other
officer to conduct a public sale of the mortgaged property, the proceeds of
which are used to satisfy the judgment. Such sales are made in accordance with
procedures that vary from state to state.

Equitable Limitations on Enforceability of Certain Provisions

     United States courts have traditionally imposed general equitable
principles to limit the remedies available to a mortgagee in connection with
foreclosure. These equitable principles are generally designed to relieve the
mortgagor from the legal effect of mortgage defaults, to the extent that such
effect is perceived as harsh or unfair. Relying on such principles, a court may
alter the specific terms of a loan to the extent it considers necessary to
prevent or remedy an injustice, undue oppression or overreaching, or may require

the lender to undertake affirmative and expensive actions to determine the cause
of the mortgagor's default and the likelihood that the mortgagor will be able to
reinstate the loan. In some cases, courts have substituted their judgment for
the lender's have and required that lenders reinstate loans or recast payment
schedules in order to accommodate mortgagors who are suffering from a temporary
financial disability. In other cases, courts have limited the right of the
lender to foreclose if the default under the mortgage is not monetary, e.g., the
mortgagor failed to maintain the mortgaged property adequately or the mortgagor
executed a junior mortgage on the mortgaged property. The exercise by the court
of its equity powers will depend on the individual circumstances of each case
presented to it. Finally, some courts have been faced with the issue of whether
federal or state constitutional provisions reflecting due process concerns for
adequate notice require that a mortgagor receive notice in addition to
statutorily-prescribed minimum notice. For the most part, these cases have
upheld the reasonableness of the notice provisions or have found that a public
sale under a mortgage providing for a power of sale does not involve sufficient
state action to afford constitutional protections to the mortgagor.

Non-Judicial Foreclosure/Power of Sale

     Foreclosure of a deed of trust is generally accomplished by a non-judicial
trustee's sale pursuant to the power of sale granted in the deed of trust. A
power of sale is typically granted in a deed of trust. It may also be contained
in any other type of mortgage instrument. A power of sale allows a non-judicial
public sale to be conducted generally following a request from the
beneficiary/lender to the trustee to sell the property upon any default by the
mortgagor under the terms of the mortgage note or the mortgage instrument and
after notice of sale is given in accordance with the terms of the mortgage
instrument, as well as applicable state law. In some states, prior to such sale,
the trustee under a deed of trust must record a notice of default and notice of
sale and send a copy to the mortgagor and to any other party who has recorded a
request for a copy of a notice of default and notice of sale. In addition, in
some states the trustee must provide notice to any other party having an
interest of record in the real property, including junior lienholders. A notice
of sale must be posted in a public place and, in most states, published for a
specified period of time in one or more newspapers. The mortgagor or junior
lienholder may then have the right, during a reinstatement period required in
some states, to cure the default by paying the entire actual amount in arrears
(without acceleration) plus the expenses incurred in enforcing the obligation.
In other states, the mortgagor or the junior lienholder is not provided a period
to reinstate the loan, but has only the right to pay off the entire debt to
prevent the foreclosure sale. Generally, the procedure for public sale, the
parties entitled to notice, the method of giving notice and the applicable time
periods are governed by state law and vary among the states. Foreclosure of a
deed to secure debt is also generally accomplished by a non-judicial sale
similar to that required by a deed of trust, except that the lender or its
agent, rather than a trustee, is typically empowered to perform the sale in
accordance with the terms of the deed to secure debt and applicable law.

Public Sale

     A third party may be unwilling to purchase a mortgaged property at a
public sale because of the difficulty in determining the value of such property
at the time of sale, due to, among other things, redemption rights which may
exist and the possibility of physical deterioration of the property during the

                                      58
<PAGE>

foreclosure proceedings. For these reasons, it is common for the lender to
purchase the mortgaged property for an amount equal to or less than the
underlying debt and accrued and unpaid interest plus the expenses of
foreclosure. Generally, state law controls the amount of foreclosure costs and
expenses which may be recovered by a lender. Thereafter, subject to the
mortgagor's right in some states to remain in possession during a redemption

period, if applicable, the lender will become the owner of the property and have both the benefits and burdens of ownership of the mortgaged property. For example, the lender will become obligated to pay taxes, obtain casualty insurance and to make such repairs at its own expense as are necessary to render the property suitable for sale. The lender will commonly obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Moreover, a lender commonly incurs substantial legal fees and court costs in acquiring a mortgaged property through contested foreclosure and/or bankruptcy proceedings. Generally, state law controls the amount of foreclosure expenses and costs, including attorneys' fees, that may be recovered by a lender.

A junior mortgagee may not foreclose on the property securing the junior mortgage unless it forecloses subject to senior mortgages and any other prior liens, in which case it may be obliged to make payments on the senior mortgages to avoid their foreclosure. In addition, in the event that the foreclosure of a junior mortgage triggers the enforcement of a "due-on-sale" clause contained in a senior mortgage, the junior mortgagee may be required to pay the full amount of the senior mortgage to avoid its foreclosure. Accordingly, with respect to those Mortgage Loans, if any, that are junior mortgage loans, if the lender purchases the property the lender's title will be subject to all senior mortgages, prior liens and certain governmental liens.

The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale and then in satisfaction of the indebtedness secured by the mortgage under which the sale was conducted. Any proceeds remaining after satisfaction of senior mortgage debt are generally payable to the holders of junior mortgages and other liens and claims in order of their priority, whether or not the mortgagor is in default. Any additional proceeds are generally payable to the mortgagor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgage or a subsequent ancillary proceeding or may require the institution of separate legal proceedings by such holders.

Rights of Redemption

The purposes of a foreclosure action are to enable the mortgagee to realize upon its security and to bar the mortgagor, and all persons who have an interest in the property which is subordinate to the mortgage being foreclosed, from exercise of their "equity of redemption." The doctrine of equity of redemption provides that, until the property covered by a mortgage has been sold in accordance with a properly conducted foreclosure and foreclosure sale, those having an interest which is subordinate to that of the foreclosing mortgagee have an equity of redemption and may redeem the property by paying the entire debt with interest. In addition, in some states, when a foreclosure action has been commenced, the redeeming party must pay certain costs of such action. Those having an equity of redemption must generally be made parties and joined in the foreclosure proceeding in order for their equity of redemption to be cut off and terminated.

The equity of redemption is a common-law (non-statutory) right which exists prior to completion of the foreclosure, is not waivable by the mortgagor, must be exercised prior to foreclosure sale and should be distinguished from the post-sale statutory rights of redemption. In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. In some states, statutory redemption may occur only upon payment of the foreclosure sale price. In other states, redemption may be authorized if the former mortgagor pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser from a foreclosure sale or sale under a deed of trust. Consequently,

59

the practical effect of the redemption right is to force the lender to maintain the property and pay the expenses of ownership until the redemption period has expired. In some states, a post-sale statutory right of redemption may exist following a judicial foreclosure, but not following a trustee's sale under a deed of trust.

Under the REMIC Provisions currently in effect, property acquired by foreclosure generally must not be held for more than three years. With respect to a series of Securities for which an election is made to qualify the Trust Fund or a part thereof as a REMIC, the Agreement will permit foreclosed property to be held for more than three years if the Internal Revenue Service grants an extension of time within which to sell such property or independent counsel renders an opinion to the effect that holding such property for such additional period is permissible under the REMIC Provisions.

Cooperative Loans

The cooperative shares owned by the tenant-stockholder and pledged to the lender are, in almost all cases, subject to restrictions on transfer as set forth in the Cooperative's Certificate of Incorporation and By-laws, as well as the proprietary lease or occupancy agreement, and may be cancelled by the Cooperative for failure by the tenant-stockholder to pay rent or other obligations or charges owed by such tenant-stockholder, including mechanics' liens against the Cooperative apartment building incurred by such tenant-stockholder. The proprietary lease or occupancy agreement generally permits the Cooperative to terminate such lease or agreement in the event an obligor fails to make payments or defaults in the performance of covenants required thereunder. Typically, the lender and the Cooperative enter into a recognition agreement which establishes the rights and obligations of both parties in the event of a default by the tenant-stockholder. Under the proprietary lease or occupancy agreement such a default will usually constitute a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, in the event that the tenant-stockholder has defaulted under the proprietary lease or occupancy agreement, the Cooperative will take no action to terminate such lease or agreement until the lender has been provided with an opportunity to cure the default. The recognition agreement typically provides that if the proprietary lease or occupancy agreement is terminated, the Cooperative will recognize the lender's lien against proceeds from the sale of the Cooperative apartment, subject, however, to the Cooperative's right to sums due under such proprietary lease or occupancy agreement. The total amount owed to the Cooperative by the tenant-stockholder, which the lender generally cannot restrict and does not monitor, could reduce the value of the collateral below the outstanding principal balance of the Cooperative Loan and accrued and unpaid interest thereon. Recognition agreements also provide that in the event of a foreclosure on a Cooperative Loan, the lender must obtain the approval or consent of the Cooperative as required by the proprietary lease before transferring the cooperative shares or assigning the proprietary lease. Generally, the lender is not limited in any rights it may have to dispossess the tenant-stockholders.

In some states, foreclosure on the cooperative shares is accomplished by a sale in accordance with the provisions of Article 9 of the UCC and the security agreement relating to those shares. Article 9 of the UCC requires that a sale be conducted in a "commercially reasonable" manner. Whether a foreclosure sale has been conducted in a "commercially reasonable" manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the foreclosure. Generally, a sale conducted according to the usual practice of banks selling similar collateral will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be

applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to the right of the Cooperatives to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency.

60

<PAGE>

In the case of foreclosure on a building which was converted from a rental building to a building owned by a Cooperative under a non-eviction plan, some states require that a purchaser at a foreclosure sale take the property subject to rent control and rent stabilization laws which apply to certain tenants who elected to remain in the building when it was so converted.

JUNIOR MORTGAGES

Some of the Mortgage Loans may be secured by junior mortgages or deeds of trust, which are subordinate to first or other senior mortgages or deeds of trust held by other lenders. The rights of the Trust Fund as the holder of a junior deed of trust or a junior mortgage are subordinate in lien and in payment to those of the holder of the senior mortgage or deed of trust, including the prior rights of the senior mortgagee or beneficiary to receive and apply hazard insurance and condemnation proceeds and, upon default of the mortgagor, to cause a foreclosure on the property. Upon completion of the foreclosure proceedings by the holder of the senior mortgage or the sale pursuant to the deed of trust, the junior mortgagee's or junior beneficiary's lien will be extinguished unless the junior lienholder satisfies the defaulted senior loan or asserts its subordinate interest in a property in foreclosure proceedings. See "--Foreclosure" herein.

Furthermore, because the terms of the junior mortgage or deed of trust are subordinate to the terms of the first mortgage or deed of trust, in the event of a conflict between the terms of the first mortgage or deed of trust and the junior mortgage or deed of trust, the terms of the first mortgage or deed of trust will generally govern. Upon a failure of the mortgagor or trustor to perform any of its obligations, the senior mortgagee or beneficiary, subject to the terms of the senior mortgage or deed of trust, may have the right to perform the obligation itself. Generally, all sums so expended by the mortgagee or beneficiary become part of the indebtedness secured by the mortgage or deed of trust. To the extent a first mortgagee expends such sums, such sums will generally have priority over all sums due under the junior mortgage.

ANTI-DEFICIENCY LEGISLATION AND OTHER LIMITATIONS ON LENDERS

Statutes in some states limit the right of a beneficiary under a deed of trust or a mortgagee under a mortgage to obtain a deficiency judgment against the mortgagor following foreclosure or sale under a deed of trust. A deficiency judgment would be a personal judgment against the former mortgagor equal to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Some states require the lender to exhaust the security afforded under a mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the mortgagor. In certain other states, the lender has the option of bringing a personal action against the mortgagor on the debt without first exhausting such security; however, in some of these states, the lender, following judgment on such personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. In some cases, a lender will be precluded from exercising any additional rights under the note or mortgage if it has taken any prior enforcement action. Consequently, the practical effect of the election requirement, in those states permitting such election, is that lenders will usually proceed against the security first rather than bringing a personal action against the mortgagor. Finally, other statutory

provisions limit any deficiency judgment against the former mortgagor following
a judicial sale to the excess of the outstanding debt over the fair market value
of the property at the time of the public sale. The purpose of these statutes is
generally to prevent a lender from obtaining a large deficiency judgment against
the former mortgagor as a result of low or no bids at the judicial sale.

In addition to laws limiting or prohibiting deficiency judgments, numerous
other federal and state statutory provisions, including the federal bankruptcy
laws and state laws affording relief to debtors, may interfere with or affect
the ability of the secured mortgage lender to realize upon collateral or enforce
a deficiency judgment. For example, with respect to federal bankruptcy law, a
court with federal bankruptcy jurisdiction may permit a debtor through his or
her Chapter 11 or Chapter 13 rehabilitative plan to cure a monetary default in
respect of a mortgage loan on a debtor's residence by paying arrearages within a
reasonable time period and reinstating the original mortgage loan payment
schedule even though the lender accelerated the mortgage loan and final judgment
of foreclosure had been entered in state court

                                61
<PAGE>

(provided no sale of the residence had yet occurred) prior to the filing of the
debtor's petition. Some courts with federal bankruptcy jurisdiction have
approved plans, based on the particular facts of the reorganization case, that
effected the curing of a mortgage loan default by paying arrearages over a
number of years.

Courts with federal bankruptcy jurisdiction have also indicated that the
terms of a mortgage loan secured by property of the debtor may be modified.
These courts have allowed modifications that include reducing the amount of each
monthly payment, changing the rate of interest, altering the repayment schedule,
forgiving all or a portion of the debt and reducing the lender's security
interest to the value of the residence, thus leaving the lender a general
unsecured creditor for the difference between the value of the residence and the
outstanding balance of the loan. Generally, however, the terms of a mortgage
loan secured only by a mortgage on real property that is the debtor's principal
residence may not be modified pursuant to a plan confirmed pursuant to Chapter
11 or Chapter 13 except with respect to mortgage payment arrearages, which may
be cured within a reasonable time period.

Certain tax liens arising under the Internal Revenue Code of 1986, as
amended, may in certain circumstances provide priority over the lien of a
mortgage or deed of trust. In addition, substantive requirements are imposed
upon mortgage lenders in connection with the origination and the servicing of
mortgage loans by numerous federal and some state consumer protection laws.
These laws include the federal Truth-in-Lending Act, Real Estate Settlement
Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair
Credit Reporting Act and related statutes. These federal laws impose specific
statutory liabilities upon lenders who originate mortgage loans and who fail to
comply with the provisions of the law. In some cases this liability may affect
assignees of the mortgage loans.

Generally, Article 9 of the UCC governs foreclosure on cooperative shares
and the related proprietary lease or occupancy agreement. Some courts have
interpreted section 9-504 of the UCC to prohibit a deficiency award unless the
creditor establishes that the sale of the collateral (which, in the case of a
Cooperative Loan, would be the shares of the Cooperative and the related
proprietary lease or occupancy agreement) was conducted in a commercially
reasonable manner.

ENVIRONMENTAL LEGISLATION

Certain states impose a statutory lien for associated costs on property
that is the subject of a cleanup action by the state on account of hazardous
wastes or hazardous substances released or disposed of on the property. Such a
lien will generally have priority over all subsequent liens on the property and,

in certain of these states, will have priority over prior recorded liens including the lien of a mortgage. In addition, under federal environmental legislation and under state law in a number of states, a secured party that takes a deed in lieu of foreclosure or acquires a mortgaged property at a foreclosure sale or becomes involved in the operation or management of a property so as to be deemed an "owner" or "operator" of the property may be liable for the costs of cleaning up a contaminated site. Although such costs could be substantial, it is unclear whether they would be imposed on a lender (such as a Trust Fund) secured by residential real property. In the event that title to a Mortgaged Property securing a Mortgage Loan in a Trust Fund was acquired by the Trust Fund and cleanup costs were incurred in respect of the Mortgaged Property, the holders of the related series of Securities might realize a loss if such costs were required to be paid by the Trust Fund.

DUE-ON-SALE CLAUSES

        Unless the related Prospectus Supplement indicates otherwise, the Mortgage Loans will contain due-on-sale clauses. These clauses generally provide that the lender may accelerate the maturity of the loan if the mortgagor sells, transfers or conveys the related Mortgaged Property. The enforceability of due-on-sale clauses has been the subject of legislation or litigation in many states and, in some cases, the enforceability of these clauses was limited or denied. However, with respect to certain loans the Garn-St Germain Depository Institutions Act of 1982 preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses and permits lenders to enforce these clauses in

                                       62
<PAGE>

accordance with their terms, subject to certain limited exceptions. Due-on-sale clauses contained in mortgage loans originated by federal savings and loan associations or federal savings banks are fully enforceable pursuant to regulations of the United States Federal Home Loan Bank Board, as succeeded by the Office of Thrift Supervision, which preempt state law restrictions on the enforcement of such clauses. Similarly, "due-on-sale" clauses in mortgage loans made by national banks and federal credit unions are now fully enforceable pursuant to preemptive regulations of the Comptroller of the Currency and the National Credit Union Administration, respectively.

        The Garn-St Germain Act also sets forth nine specific instances in which a mortgage lender covered by the act (including federal savings and loan associations and federal savings banks) may not exercise a "due-on-sale" clause, notwithstanding the fact that a transfer of the property may have occurred. These include intra-family transfers, certain transfers by operation of law, leases of fewer than three years and the creation of a junior encumbrance. Regulations promulgated under the Garn-St Germain Act also prohibit the imposition of a prepayment penalty upon the acceleration of a loan pursuant to a due-on-sale clause. The inability to enforce a "due-on-sale" clause may result in a mortgage that bears an interest rate below the current market rate being assumed by a new home buyer rather than being paid off, which may affect the average life of the Mortgage Loans and the number of Mortgage Loans which may extend to maturity.

SUBORDINATE FINANCING

        Where a mortgagor encumbers mortgaged property with one or more junior liens, the senior lender is subjected to additional risk. First, the mortgagor may have difficulty servicing and repaying multiple loans. In addition, if the junior loan permits recourse to the mortgagor (as junior loans often do) and the senior loan does not, a mortgagor may be more likely to repay sums due on the junior loan than those on the senior loan. Second, acts of the senior lender that prejudice the junior lender or impair the junior lender's security may create a superior equity in favor of the junior lender. For example, if the mortgagor and the senior lender agree to an increase in the principal amount of

or the interest rate payable on the senior loan, the senior lender may lose its
priority to the extent any existing junior lender is harmed or the mortgagor is
additionally burdened. Third, if the mortgagor defaults on the senior loan
and/or any junior loan or loans, the existence of junior loans and actions taken
by junior lenders can impair the security available to the senior lender and can
interfere with or delay the taking of action by the senior lender. Moreover, the
bankruptcy of a junior lender may operate to stay foreclosure or similar
proceedings by the senior lender.

APPLICABILITY OF USURY LAWS

    Title V of the Depository Institutions Deregulation and Monetary Control
Act of 1980, enacted in March 1980 ("Title V"), provides that state usury
limitations shall not apply to certain types of residential first mortgage loans
originated by certain lenders after March 31, 1980. A similar federal statute
was in effect with respect to mortgage loans made during the first three months
of 1980. The Office of Thrift Supervision is authorized to issue rules and
regulations and to publish interpretations governing implementation of Title V.
The statute authorized any state to reimpose interest rate limits by adopting,
before April 1, 1983, a law or constitutional provision that expressly rejects
application of the federal law. In addition, even where Title V is not so
rejected, any state is authorized by the law to adopt a provision limiting
discount points or other charges on mortgage loans covered by Title V. Certain
states have taken action to reimpose interest rate limits and/or to limit
discount points or other charges.

    The Depositor believes that a court interpreting Title V would hold that
residential first mortgage loans that are originated on or after January 1, 1980
are subject to federal preemption. Therefore, in a state that has not taken the
requisite action to reject application of Title V or to adopt a provision
limiting discount points or other charges prior to origination of such mortgage
loans, any such limitation under such state's usury law would not apply to such
mortgage loans.

                                   63
<PAGE>

    In any state in which application of Title V has been expressly rejected
or a provision limiting discount points or other charges is adopted, no mortgage
loan originated after the date of such state action will be eligible for
inclusion in a Trust Fund unless (i) such mortgage loan provides for such
interest rate, discount points and charges as are permitted in such state or
(ii) such mortgage loan provides that the terms thereof shall be construed in
accordance with the laws of another state under which such interest rate,
discount points and charges would not be usurious and the mortgagor's counsel
has rendered an opinion that such choice of law provision would be given effect.

    Statutes differ in their provisions as to the consequences of a usurious
loan. One group of statutes requires the lender to forfeit the interest due
above the applicable limit or impose a specified penalty. Under this statutory
scheme, the mortgagor may cancel the recorded mortgage or deed of trust upon
paying its debt with lawful interest, and the lender may foreclose, but only for
the debt plus lawful interest. A second group of statutes is more severe. A
violation of this type of usury law results in the invalidation of the
transaction, thereby permitting the mortgagor to cancel the recorded mortgage or
deed of trust without any payment or prohibiting the lender from foreclosing.

ALTERNATIVE MORTGAGE INSTRUMENTS

    Alternative mortgage instruments, including adjustable rate mortgage loans
and early ownership mortgage loans, originated by non-federally chartered
lenders have historically been subject to a variety of restrictions. Such
restrictions differed from state to state, resulting in difficulties in
determining whether a particular alternative mortgage instrument originated by a
state-chartered lender was in compliance with applicable law. These difficulties

were alleviated substantially as a result of the enactment of Title VIII of the
Garn-St Germain Act ("Title VIII"). Title VIII provides that, notwithstanding
any state law to the contrary, state-chartered banks may originate alternative
mortgage instruments in accordance with regulations promulgated by the
Comptroller of the Currency with respect to origination of alternative mortgage
instruments by national banks; state-chartered credit unions may originate
alternative mortgage instruments in accordance with regulations promulgated by
the National Credit Union Administration with respect to origination of
alternative mortgage instruments by federal credit unions; and all other non-
federally chartered housing creditors, including state-chartered savings and
loan associations, state-chartered savings banks and mutual savings banks and
mortgage banking companies, may originate alternative mortgage instruments in
accordance with the regulations promulgated by the Federal Home Loan Bank Board,
predecessor to the Office of Thrift Supervision, with respect to origination of
alternative mortgage instruments by federal savings and loan associations. Title
VIII provides that any state may reject applicability of the provisions of Title
VIII by adopting, prior to October 15, 1985, a law or constitutional provision
expressly rejecting the applicability of such provisions. Certain states have
taken such action.

SERVICEMEMBERS CIVIL RELIEF ACT

     The Servicemembers Civil Relief Act was recently signed into law, revising
the Soldiers' and Sailors' Civil Relief Act of 1940 (the "Relief Act"). Under
the terms of the Relief Act, a mortgagor who enters military service after the
origination of such mortgagor's Mortgage Loan (including a mortgagor who was in
reserve status and is called to active duty after origination of the Mortgage
Loan), may not be charged interest (including fees and charges) above an annual
rate of 6% (and all interest in excess of 6% shall be forgiven) during the
period of such mortgagor's active duty status, unless a court orders otherwise
upon application of the lender. The Relief Act applies to mortgagors who are
members of all branches of the military (including draftees and reservists in
military service called to active duty). Because the Relief Act applies to
mortgagors who enter military service (including reservists who are called to
active duty) after origination of the related Mortgage Loan, no information can
be provided as to the number of loans that may be affected by the Relief Act.
Application of the Relief Act would adversely affect, for an indeterminate
period of time, the ability of any servicer to collect full amounts of interest
on certain of the Mortgage Loans. Any shortfalls in interest collections
resulting from the application of the Relief Act would result in a reduction of
the amounts distributable to the holders of the related series of Certificates,

                                     64

<PAGE>

and would not be covered by advances and may not be covered by any form of
Credit Support provided in connection with such Certificates. In addition, the
Relief Act imposes limitations that would impair the ability of the servicer to
foreclose on an affected Mortgage Loan during the mortgagor's period of active
duty status, and, under certain circumstances, during an additional three month
period thereafter. Thus, in the event that such a Mortgage Loan goes into
default, there may be delays and losses occasioned thereby.

FORFEITURES IN DRUG AND RICO PROCEEDINGS

     Federal law provides that property purchased or improved with assets
derived from criminal activity or otherwise tainted, or used in the commission
of certain offenses, can be seized and ordered forfeited to the United States of
America. The offenses which can trigger such a seizure and forfeiture include,
among others, violations of the Racketeer Influenced and Corrupt Organizations
Act, the Bank Secrecy Act, the anti-money laundering laws and regulations,
including the USA Patriot Act of 2001 and the regulations issued pursuant to
that Act, as well as the narcotic drug laws. In many instances, the United
States may seize the property even before a conviction occurs.

In the event of a forfeiture proceeding, a lender may be able to avoid forfeiture of its interest in the property by proving that (1) its mortgage was executed and recorded before the commission of the illegal conduct from which the assets used to purchase or improve the property were derived or before the commission of any other crime upon which the forfeiture is based, or (2) the lender, at the time of the execution of the mortgage, "did not know or was reasonably without cause to believe that the property was subject to forfeiture." However, there is no assurance that such a defense will be successful.

THE CONTRACTS

General.  The manufactured housing contracts and home improvement contracts, other than those that are unsecured or are secured by mortgages on real estate generally, are "chattel paper" or constitute "purchase money security interests" each as defined in the UCC. Pursuant to the UCC, the sale of chattel paper is treated in a manner similar to perfection of a security interest in chattel paper. Under the related agreement, the Depositor or the seller will transfer physical possession of the contracts to the trustee or a designated custodian or may retain possession of the contracts as custodian for the trustee. In addition, the Depositor will make an appropriate filing of a UCC-1 financing statement in the appropriate states to, among other things, give notice of the trust fund's ownership of the contracts. The contracts will not be stamped or otherwise marked to reflect their assignment from the Depositor or the trustee unless the related prospectus supplement states that they will be so stamped. With respect to each transaction, a decision will be made as to whether or not the contracts will be stamped or otherwise marked to reflect their assignment from the Depositor to the trustee, based upon, among other things, the practices and procedures of the related originator and servicer and after consultation with the applicable rating agency or rating agencies. Therefore, if the contracts are not stamped or otherwise marked to reflect their assignment from the Depositor to the trustee and through negligence, fraud or otherwise, a subsequent purchaser were able to take physical possession of the contracts without notice of the assignment, the trust fund's interest in the contracts could be defeated.

Security Interests in Home Improvements.  The contracts that are secured by home improvements grant to the originator of those contracts a purchase money security interest in the home improvements to secure all or part of the purchase price of the home improvements and related services. A financing statement generally is not required to be filed to perfect a purchase money security interest in consumer goods. The purchase money security interests are assignable. In general, a purchase money security interest grants to the holder a security interest that has priority over a conflicting security interest in the same collateral and the proceeds of that collateral. However, to the extent that the collateral subject to a purchase money security interest becomes a fixture, in order for the related purchase money security interest to take priority over a conflicting interest in the fixture, the holder's interest in that home improvement must generally be perfected by a timely fixture filing. In general, a security interest does not exist under the UCC in ordinary building material incorporated into an improvement on land. Home improvement contracts that finance lumber, bricks, other types of ordinary building materials or other

65

<PAGE>

goods that are deemed to lose that characterization upon incorporation of those materials into the related property, will not be secured by a purchase money security interest in the home improvement being financed.

Enforcement of Security Interest in Home Improvements.  So long as the home improvement is not governed by real estate law, a creditor can repossess a home improvement securing a contract by voluntary surrender, by "self-help" repossession that is "peaceful"--i.e., without breach of the peace--or, in the absence of voluntary surrender and the ability to repossess without breach of the peace, by judicial process. The holder of a contract must give the debtor a

number of days' notice, which varies from 10 to 30 days depending on the state, prior to commencement of any repossession. The UCC and consumer protection laws in most states place restrictions on repossession sales, including requiring prior notice to the debtor and commercial reasonableness in effecting a repossession sale. The law in most states also requires that the debtor be given notice of any sale prior to resale of the unit that the debtor may redeem at or before the resale.

    Under the laws of most states, a creditor is entitled to obtain a deficiency judgment from a debtor for any deficiency on repossession and resale of the property securing the debtor's mortgage loan. However, some states impose prohibitions or limitations on deficiency judgments, and in many cases the defaulting borrower would have no assets with which to pay a judgment. Other statutory provisions, including federal and state bankruptcy and insolvency laws and general equitable principles, may limit or delay the ability of a lender to repossess and resell collateral or enforce a deficiency judgment.

    Security Interests in the Manufactured Homes.  The manufactured homes securing the manufactured housing contracts may be located in all 50 states and the District of Columbia. Security interests in manufactured homes may be perfected either by notation of the secured party's lien on the certificate of title or by delivery of the required documents and payment of a fee to the state motor vehicle authority, depending on state law. The security interests of the related trustee in the manufactured homes will not be noted on the certificates of title or by delivery of the required documents and payment of fees to the applicable state motor vehicle authorities unless the related prospectus supplement so states. With respect to each transaction, a decision will be made as to whether or not the security interests of the related trustee in the manufactured homes will be noted on the certificates of title and the required documents and fees will be delivered to the applicable state motor vehicle authorities based upon, among other things, the practices and procedures of the related originator and servicer and after consultation with the applicable rating agency or rating agencies. In some nontitle states, perfection pursuant to the provisions of the UCC is required. As manufactured homes have become large and often have been attached to their sites without any apparent intention to move them, courts in many states have held that manufactured homes, under particular circumstances, may become governed by real estate title and recording laws. As a result, a security interest in a manufactured home could be rendered subordinate to the interests of other parties claiming an interest in the manufactured home under applicable state real estate law. In order to perfect a security interest in a manufactured home under real estate laws, the secured party must file either a "fixture filing" under the provisions of the UCC or a real estate mortgage under the real estate laws of the state where the home is located. These filings must be made in the real estate records office of the county where the manufactured home is located. If so specified in the related prospectus supplement, the manufactured housing contracts may contain provisions prohibiting the borrower from permanently attaching the manufactured home to its site. So long as the borrower does not violate this agreement, a security interest in the manufactured home will be governed by the certificate of title laws or the UCC, and the notation of the security interest on the certificate of title or the filing of a UCC financing statement will be effective to maintain the priority of the security interest in the manufactured home. If, however, a manufactured home is permanently attached to its site, the related lender may be required to perfect a security interest in the manufactured home under applicable real estate laws.

    In the event that the owner of a manufactured home moves it to a state other than the state in which the manufactured home initially is registered, under the laws of most states the perfected security interest in the manufactured home would continue for four months after that relocation and, after expiration of the four months, only if and after the owner re-registers the manufactured home in that state.

                                           66

<PAGE>

If the owner were to relocate a manufactured home to another state and not re-register a security interest in that state, the security interest in the manufactured home would cease to be perfected. A majority of states generally require surrender of a certificate of title to re-register a manufactured home; accordingly, the secured party must surrender possession if it holds the certificate of title to that manufactured home or, in the case of manufactured homes registered in states which provide for notation of lien on the certificate of title, notice of surrender would be given to the secured party noted on the certificate of title. In states that do not require a certificate of title for registration of a manufactured home, re-registration could defeat perfection of the security interest.

Under the laws of most states, liens for repairs performed on a manufactured home and liens for personal property taxes take priority over a perfected security interest in the manufactured home.

Consumer Protection Laws. The so-called "Holder-in-Due Course" rule of the FTC is intended to defeat the ability of the transferor of a consumer credit contract who is the seller of goods which gave rise to the transaction, and particular, related lenders and assignees, to transfer that contract free of notice of claims by the contract debtor. The effect of this rule is to subject the assignee of a contract of this type to all claims and defenses that the debtor under the contract could assert against the seller of goods. Liability under this rule is limited to amounts paid under a contract; however, the obligor also may be able to assert the rule to set off remaining amounts due as a defense against a claim brought by the trustee against that obligor. Numerous other federal and state consumer protection laws impose requirements applicable to the origination and lending pursuant to the contracts, including the Truth in Lending Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Uniform Consumer Credit Code. In the case of some of these laws, the failure to comply with their provisions may affect the enforceability of the related contract.

Applicability of Usury Laws. Title V provides that state usury limitations shall not apply to any contract that is secured by a first lien on particular kinds of consumer goods, unless it is covered by any of the following conditions. The contracts would be covered if they satisfy conditions governing, among other things, the terms of any prepayments, late charges and deferral fees and requiring a 30-day notice period prior to instituting any action leading to repossession of the related unit.

Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting before April 1, 1983 a law or constitutional provision which expressly rejects application of the federal law. Fifteen states adopted a similar law prior to the April 1, 1983 deadline. In addition, even where Title V was not rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on Mortgage Loans covered by Title V.

Installment Contracts. The Mortgage Loans may also consist of installment contracts. Under an installment contract the property seller, as lender under the contract, retains legal title to the property and enters into an agreement with the purchaser, as borrower under the contract, for the payment of the purchase price, plus interest, over the term of that contract. Only after full performance by the borrower of the contract is the lender obligated to convey title to the property to the purchaser. As with mortgage or deed of trust financing, during the effective period of the installment contract, the borrower is generally responsible for maintaining the property in good condition and for paying real estate taxes, assessments and hazard insurance premiums associated with the property.

The method of enforcing the rights of the lender under an installment contract varies on a state-by-state basis depending upon the extent to which state courts are willing, or able pursuant to state statute, to enforce the

contract strictly according to its terms. The terms of installment contracts
generally provide that upon a default by the borrower, the borrower loses his or
her right to occupy the property, the entire indebtedness is accelerated, and
the buyer's equitable interest in the property is forfeited. The lender in that
type of situation does not have to foreclose in order to obtain title to the
property, although in some cases a quiet title action is in order if the
borrower has filed the installment contract in local land records and an
ejectment action may be necessary to recover possession. In a few states,
particularly in cases of borrower default during the early years of an
installment contract, the courts will permit ejectment of the buyer and a
forfeiture of his or her interest in the property. However, most state
legislatures have enacted

                                      67

<PAGE>

provisions by analogy to mortgage law protecting borrowers under installment
contracts from the harsh consequences of forfeiture. Under those statutes, a
judicial or nonjudicial foreclosure may be required, the lender may be required
to give notice of default and the borrower may be granted some grace period
during which the installment contract may be reinstated upon full payment of the
default amount and the borrower may have a post-foreclosure statutory redemption
right. In other states, courts in equity may permit a borrower with significant
investment in the property under an installment contract for the sale of real
estate to share in the proceeds of sale of the property after the indebtedness
is repaid or may otherwise refuse to enforce the forfeiture clause. Nevertheless
generally speaking, the lender's procedures for obtaining possession and clear
title under an installment contract in a given state are simpler and less
time-consuming and costly than are the procedures for foreclosing and obtaining
clear title to a property that is encumbered by one or more liens.

                      MATERIAL FEDERAL INCOME TAX CONSEQUENCES

        The following summary of the anticipated material federal income tax
consequences of the purchase, ownership and disposition of Offered Certificates
represents the opinion of Dechert LLP, counsel to the Depositor, as of the date
of this Prospectus. This summary is based on the Internal Revenue Code of 1986,
as amended (the "Code"), laws, regulations, including the REMIC regulations
promulgated by the Treasury Department (the "REMIC Regulations"), rulings and
decisions now in effect or (with respect to regulations) proposed, all of which
are subject to change either prospectively or retroactively. This summary does
not address the federal income tax consequences of an investment in Securities
applicable to all categories of investors, some of which (for example, banks and
insurance companies) may be subject to special rules. Prospective investors
should consult their tax advisors regarding the federal, state, local and any
other tax consequences to them of the purchase, ownership and disposition of
Securities.

        The term "U.S. Person" means a citizen or resident of the United States, a
corporation, partnership or other entity created or organized in or under the
laws of the United States or any state thereof or the District of Columbia
(other than a partnership that is not treated as a United States person under
any applicable Treasury regulations), an estate whose income is subject to U.S.
federal income tax regardless of its source, or a trust if a court within the
United States is able to exercise primary supervision of the administration of
the trust and one or more United States persons have the authority to control
all substantial decisions of the trust. Notwithstanding the preceding sentence,
to the extent provided in regulations, certain trusts in existence on August 20,
1996 and treated as United States persons prior to such date that elect to
continue to be treated as United States persons shall be considered U.S. Persons
as well.

GENERAL

        The federal income tax consequences to Securityholders will vary depending
on whether an election is made to treat the Trust Fund relating to a particular

series of Securities as a REMIC under the Code. The Prospectus Supplement for each series of Securities will specify whether a REMIC election will be made.

GRANTOR TRUST FUNDS

     If the related Prospectus Supplement indicates that the Trust Fund will be treated as a grantor trust, then Dechert LLP will deliver its opinion that the Trust Fund will not be classified as an association taxable as a corporation and that each such Trust Fund will be classified as a grantor trust under subpart E, Part I of subchapter J of the Code. In this case, owners of Certificates will be treated for federal income tax purposes as owners of a portion of the Trust Fund's assets as described below.

     1.     Single Class of Grantor Trust Certificates

     Characterization.  The Trust Fund may be created with one class of Grantor Trust Certificates. In this case, each Grantor Trust Certificateholder will be treated as the owner of a pro rata undivided interest

                                   68
<PAGE>

in the interest and principal portions of the Trust Fund represented by the Grantor Trust Certificates and will be considered the equitable owner of a pro rata undivided interest in each of the Mortgage Loans in the Pool. Any amounts received by a Grantor Trust Certificateholder in lieu of amounts due with respect to any Mortgage Loan because of a default or delinquency in payment will be treated for federal income tax purposes as having the same character as the payments they replace.

     Each Grantor Trust Certificateholder will be required to report on its federal income tax return in accordance with such Grantor Trust Certificateholder's method of accounting its pro rata share of the entire income from the Mortgage Loans in the Trust Fund represented by Grantor Trust Certificates, including interest, original issue discount ("OID"), if any, prepayment fees, assumption fees, any gain recognized upon an assumption and late payment charges received by the Master Servicer. Under Code Sections 162 or 212 each Grantor Trust Certificateholder will be entitled to deduct its pro rata share of servicing fees, prepayment fees, assumption fees, any loss recognized upon an assumption and late payment charges retained by the Master Servicer, provided that such amounts are reasonable compensation for services rendered to the Trust Fund. Grantor Trust Certificateholders that are individuals, estates or trusts will be entitled to deduct their share of expenses as itemized deductions only to the extent such expenses plus all other Code Section 212 expenses exceed two percent of its adjusted gross income. In addition, the amount of itemized deductions otherwise allowable for the taxable year for an individual whose adjusted gross income exceeds the applicable amount (which amount will be adjusted for inflation) will be reduced by the lesser of (i) 3% of the excess of adjusted gross income over the applicable amount and (ii) 80% of the amount of itemized deductions otherwise allowable for such taxable year. This reduction is currently scheduled to be phased-out over a five-year period beginning in 2006. A Grantor Trust Certificateholder using the cash method of accounting must take into account its pro rata share of income and deductions as and when collected by or paid to the Master Servicer. A Grantor Trust Certificateholder using an accrual method of accounting must take into account its pro rata share of income and deductions as they become due or are paid to the Master Servicer, whichever is earlier. If the servicing fees paid to the Master Servicer are deemed to exceed reasonable servicing compensation, the amount of such excess could be considered as an ownership interest retained by the Master Servicer (or any person to whom the Master Servicer assigned for value all or a portion of the servicing fees) in a portion of the interest payments on the Mortgage Loans. The Mortgage Loans would then be subject to the "coupon stripping" rules of the Code discussed below.

     Generally, as to each series of Certificates evidencing an interest in a

Trust Fund comprised of Mortgage Loans, Dechert LLP will have advised the Depositor that:

(i)  a Grantor Trust Certificate owned by a "domestic building and loan association" within the meaning of Code Section 7701(a)(19) representing principal and interest payments on Mortgage Loans will be considered to represent "loans . . . secured by an interest in real property which is . . . residential property" within the meaning of Code Section 7701(a)(19)(C)(v), to the extent that the Mortgage Loans represented by that Grantor Trust Certificate are of a type described in such Code section;

(ii)  a Grantor Trust Certificate owned by a real estate investment trust representing an interest in Mortgage Loans will be considered to represent "real estate assets" within the meaning of Code Section 856(c)(4)(A), and interest income on the Mortgage Loans will be considered "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B), to the extent that the Mortgage Loans represented by that Grantor Trust Certificate are of a type described in such Code section;

(iii)  a Grantor Trust Certificate owned by a REMIC will represent "obligation[s] . . . which [are] principally secured by an interest in real property" within the meaning of Code Section 860G(a)(3); and

(iv)  a Grantor Trust Certificate representing interests in obligations secured by manufactured housing treated as a single-family residence under Section 25(e)(10) of the Code will be

69

<PAGE>

considered interests in "qualified mortgages" as defined in Section 860G(a)(3) of the Code.

The Small Business Job Protection Act of 1996, as part of the repeal of the bad debt reserve method for thrift institutions, repealed the application of Code Section 593(d) to any taxable year beginning after December 31, 1995.

Stripped Bonds and Coupons.  Certain Trust Funds may consist of Government Securities which constitute "stripped bonds" or "stripped coupons" as those terms are defined in Code Section 1286, and, as a result, such assets would be subject to the stripped bond provisions of the Code. Under these rules, such Government Securities are treated as having OID based on the purchase price and the stated redemption price at maturity of each Security. As such, Grantor Trust Certificateholders would be required to include in income their pro rata share of the OID on each Government Security recognized in any given year on an economic accrual basis even if the Grantor Trust Certificateholder is a cash method taxpayer. Accordingly, the sum of the income includible to the Grantor Trust Certificateholder in any taxable year may exceed amounts actually received during such year.

Buydown Loans.  The assets constituting certain Trust Funds may include Buydown Loans. The characterization of any investment in Buydown Loans will depend upon the precise terms of the related buydown agreement, but to the extent that such Buydown Loans are secured in part by a bank account or other personal property, they may not be treated in their entirety as assets described in the foregoing sections of the Code. There are no directly applicable precedents with respect to the federal income tax treatment or the characterization of investments in Buydown Loans. Accordingly, Grantor Trust Certificateholders should consult their own tax advisors with respect to the characterization of investments in Grantor Trust Certificates representing an interest in a Trust Fund that includes Buydown Loans.

Premium.  The price paid for a Grantor Trust Certificate by a holder will
be allocated to such holder's undivided interest in each Mortgage Loan based on
each Mortgage Loan's relative fair market value, so that such holder's undivided
interest in each Mortgage Loan will have its own tax basis. A Grantor Trust
Certificateholder that acquires an interest in Mortgage Loans at a premium may
elect to amortize such premium under a constant interest method, provided that
the underlying mortgage loans with respect to such Mortgage Loans were
originated after September 27, 1985. Premium allocable to mortgage loans
originated on or before September 27, 1985 should be allocated among the
principal payments on such mortgage loans and allowed as an ordinary deduction
as principal payments are made. Amortizable bond premium will be treated as an
offset to interest income on such Grantor Trust Certificate. The basis for such
Grantor Trust Certificate will be reduced to the extent that amortizable premium
is applied to offset interest payments. It is not clear whether a reasonable
prepayment assumption should be used in computing amortization of premium
allowable under Code Section 171. A Certificateholder that makes this election
for a Certificate that is acquired at a premium will be deemed to have made an
election to amortize bond premium with respect to all debt instruments having
amortizable bond premium that such Certificateholder acquires during the year of
the election or thereafter.

If a premium is not subject to amortization using a reasonable prepayment
assumption, the holder of a Grantor Trust Certificate acquired at a premium
should recognize a loss if a Mortgage Loan (or an underlying mortgage loan with
respect to a Mortgage Loan) prepays in full, equal to the difference between the
portion of the prepaid principal amount of such Mortgage Loan (or underlying
mortgage loan) that is allocable to the Certificate and the portion of the
adjusted basis of the Certificate that is allocable to such Mortgage Loan (or
underlying mortgage loan). If a reasonable prepayment assumption is used to
amortize such premium, it appears that such a loss would be available, if at
all, only if prepayments have occurred at a rate faster than the reasonable
assumed prepayment rate. It is not clear whether any other adjustments would be
required to reflect differences between an assumed prepayment rate and the
actual rate of prepayments.

On December 30, 1997 the IRS issued final regulations (the "Amortizable
Bond Premium Regulations") dealing with amortizable bond premium. These
regulations specifically do not apply to prepayable debt instruments subject to
Code Section 1272(a)(6) such as the Certificates. Absent further
                                        70
<PAGE>

guidance from the IRS, the Trustee intends to account for amortizable bond
premium in the manner described above. Prospective Certificateholders should
consult their tax advisors regarding the possible application of the amortizable
Bond Premium Regulations.

Original Issue Discount.  The IRS has stated in published rulings that, in
circumstances similar to those described herein, the special rules of the Code
relating to original issue discount ("OID")(currently Code Sections 1271 through
1273 and 1275) and Treasury regulations issued on January 27, 1994, as amended
on June 11, 1996, under such Sections (the "OID Regulations"), will be
applicable to a Grantor Trust Certificateholder's interest in those Mortgage
Loans meeting the conditions necessary for these Sections to apply. Rules
regarding periodic inclusion of OID income are applicable to mortgages of
corporations originated after May 27, 1969, mortgages of noncorporate mortgagors
(other than individuals) originated after July 1, 1982, and mortgages of
individuals originated after March 2, 1984. Such OID could arise by the
financing of points or other charges by the originator of the mortgages in an
amount greater than a statutory de minimis exception to the extent that the
points are not currently deductible under applicable Code provisions or are not
for services provided by the lender. OID generally must be reported as ordinary
gross income as it accrues under a constant interest method. See "--Multiple
Classes of Grantor Trust Certificates--Accrual of Original Issue Discount"

below.

　　　Market Discount.  A Grantor Trust Certificateholder that acquires an undivided interest in Mortgage Loans may be subject to the market discount rules of Code Sections 1276 through 1278 to the extent an undivided interest in a Mortgage Loan is considered to have been purchased at a "market discount." Generally, the amount of market discount is equal to the excess of the portion of the principal amount of such Mortgage Loan allocable to such holder's undivided interest over such holder's tax basis in such interest. Market discount with respect to a Grantor Trust Certificate will be considered to be zero if the amount allocable to the Grantor Trust Certificate is less than 0.25% of the Grantor Trust Certificate's stated redemption price at maturity multiplied by the weighted average maturity remaining after the date of purchase. Treasury regulations implementing the market discount rules have not yet been issued; therefore, investors should consult their own tax advisors regarding the application of these rules and the advisability of making any of the elections allowed under Code Sections 1276 through 1278.

　　　The Code provides that any principal payment (whether a scheduled payment or a prepayment) or any gain on disposition of a market discount bond acquired by the taxpayer after October 22, 1986 shall be treated as ordinary income to the extent that it does not exceed the accrued market discount at the time of such payment. The amount of accrued market discount for purposes of determining the tax treatment of subsequent principal payments or dispositions of the market discount bond is to be reduced by the amount so treated as ordinary income.

　　　The Code also grants the Treasury Department authority to issue regulations providing for the computation of accrued market discount on debt instruments, the principal of which is payable in more than one installment. While the Treasury Department has not yet issued regulations, rules described in the relevant legislative history will apply. Under those rules, the holder of a market discount bond may elect to accrue market discount either on the basis of a constant interest rate or according to one of the following methods. If a Grantor Trust Certificate is issued with OID, the amount of market discount that accrues during any accrual period would be equal to the product of:

　　(i)　the total remaining market discount and

　　(ii)　a fraction, the numerator of which is the OID accruing during the period and the denominator of which is the total remaining OID at the beginning of the accrual period.

<center>71</center>

&lt;PAGE&gt;

　　　For Grantor Trust Certificates issued without OID, the amount of market discount that accrues during a period is equal to the product of:

　　(i)　the total remaining market discount and

　　(ii)　a fraction, the numerator of which is the amount of stated interest paid during the accrual period and the denominator of which is the total amount of stated interest remaining to be paid at the beginning of the accrual period.

　　　For purposes of calculating market discount under any of the above methods in the case of instruments (such as the Grantor Trust Certificates) that provide for payments that may be accelerated by reason of prepayments of other obligations securing such instruments, the same prepayment assumption applicable to calculating the accrual of OID will apply. Because the regulations described above have not been issued, it is impossible to predict what effect those regulations might have on the tax treatment of a Grantor Trust Certificate purchased at a discount or premium in the secondary market.

　　　A holder who acquired a Grantor Trust Certificate at a market discount

also may be required to defer a portion of its interest deductions for the taxable year attributable to any indebtedness incurred or continued to purchase or carry such Grantor Trust Certificate purchased with market discount. For these purposes, the de minimis rule referred to above applies. Any such deferred interest expense would not exceed the market discount that accrues during such taxable year and is, in general, allowed as a deduction not later than the year in which such market discount is includible in income. If such holder elects to include market discount in income currently as it accrues on all market discount instruments acquired by such holder in that taxable year or thereafter, the interest deferral rule described above will not apply.

Election to Treat All Interest as OID.  The OID Regulations permit a Certificateholder to elect to accrue all interest, discount (including de minimis market or original issue discount) and premium in income as interest, based on a constant yield method for Certificates acquired on or after April 4, 1994. If such an election were to be made with respect to a Grantor Trust Certificate with market discount, the Certificateholder would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such Certificateholder acquires during the year of the election or thereafter. Similarly, a Certificateholder that makes this election for a Certificate that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Certificateholder owns or acquires. See "--Premium" herein. The election to accrue interest, discount and premium on a constant yield method with respect to a Certificate is irrevocable.

2.     Multiple Classes of Grantor Trust Certificates

a.     Stripped Bonds and Stripped Coupons

Pursuant to Code Section 1286, the separation of ownership of the right to receive some or all of the interest payments on an obligation from ownership of the right to receive some or all of the principal payments results in the creation of "stripped bonds" with respect to principal payments and "stripped coupons" with respect to interest payments. For purposes of Code Sections 1271 through 1288, Code Section 1286 treats a stripped bond or a stripped coupon as an obligation issued on the date that such stripped interest is created. If a Trust Fund is created with two classes of Grantor Trust Certificates, one class of Grantor Trust Certificates may represent the right to principal and interest, or principal only, on all or a portion of the Mortgage Loans (the "Stripped Bond Certificates"), while the second class of Grantor Trust Certificates may represent the right to some or all of the interest on such portion (the "Stripped Coupon Certificates").

Servicing fees in excess of reasonable servicing fees ("excess servicing") will be treated under the stripped bond rules. If the excess servicing fee is less than 100 basis points (i.e., 1% interest on the Mortgage Loan principal balance) or the Certificates are initially sold with a de minimis discount (assuming no prepayment assumption is required), any non-de minimis discount arising from a subsequent

72

<PAGE>

transfer of the Certificates should be treated as market discount. The IRS appears to require that reasonable servicing fees be calculated on a Mortgage Loan by Mortgage Loan basis, which could result in some Mortgage Loans being treated as having more than 100 basis points of interest stripped off.

Although not entirely clear, a Stripped Bond Certificate generally should be treated as an in interest in Mortgage Loans issued on the day such Certificate is purchased for purposes of calculating any OID. Generally, if the discount on a Mortgage Loan is larger than a de minimis amount (as calculated for purposes of the OID rules) a purchaser of such a Certificate will be

required to accrue the discount under the OID rules of the Code. See "--Single Class of Grantor Trust Certificates--Original Issue Discount" herein. However, a purchaser of a Stripped Bond Certificate will be required to account for any discount on the Mortgage Loans as market discount rather than OID if either:

    (i)   the amount of OID with respect to the Mortgage Loans is treated as zero under the OID de minimis rule when the Certificate was stripped or

    (ii)  no more than 100 basis points (including any amount of servicing fees in excess of reasonable servicing fees) is stripped off of the Trust Fund's Mortgage Loans.

Pursuant to Revenue Procedure 91-49, issued on August 8, 1991, purchasers of Stripped Bond Certificates using an inconsistent method of accounting must change their method of accounting and request the consent of the IRS to the change in their accounting method on a statement attached to their first timely tax return filed after August 8, 1991.

The precise tax treatment of Stripped Coupon Certificates is substantially uncertain. The Code could be read literally to require that OID computations be made for each payment from each Mortgage Loan. However, based on the recent IRS guidance, it appears that all payments from a Mortgage Loan underlying a Stripped Coupon Certificate should be treated as a single installment obligation subject to the OID rules of the Code, in which case, all payments from such Mortgage Loan would be included in the Mortgage Loan's stated redemption price at maturity for purposes of calculating income on such certificate under the OID rules of the Code.

It is unclear under what circumstances, if any, the prepayment of Mortgage Loans will give rise to a loss to the holder of a Stripped Bond Certificate purchased at a premium or a Stripped Coupon Certificate. If such Certificate is treated as a single instrument (rather than an interest in discrete mortgage loans) and the effect of prepayments is taken into account in computing yield with respect to such Grantor Trust Certificate, it appears that no loss will be available as a result of any particular prepayment unless prepayments occur at a rate faster than the assumed prepayment rate. However, if such Certificate is treated as an interest in discrete Mortgage Loans, or if no prepayment assumption is used, then when a Mortgage Loan is prepaid, the holder of such Certificate should be able to recognize a loss equal to the portion of the adjusted issue price of such Certificate that is allocable to such Mortgage Loan.

Holders of Stripped Bond Certificates and Stripped Coupon Certificates are urged to consult with their own tax advisors regarding the proper treatment of these Certificates for federal income tax purposes.

Treatment of Certain Owners.  Several Code sections provide beneficial treatment to certain taxpayers that invest in Mortgage Loans of the type that make up the Trust Fund. With respect to these Code sections, no specific legal authority exists regarding whether the character of the Grantor Trust Certificates, for federal income tax purposes, will be the same as that of the underlying Mortgage Loans. While Code Section 1286 treats a stripped obligation as a separate obligation for purposes of the Code provisions addressing OID, it is not clear whether such characterization would apply with regard to these other Code sections. Although the issue is not free from doubt, based on policy considerations, each class of Grantor Trust Certificates should be considered to represent "real estate assets" within the meaning of Code Section 856(c)(4)(A) and "loans . . . secured by, an interest in real property which is . . . residential real property" within the meaning of Code Section 7701(a)(19)(C)(v), and interest income attributable to Grantor Trust Certificates should be considered to represent "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B), provided that in each case the underlying Mortgage Loans and interest on such Mortgage Loans qualify for such treatment.

&lt;PAGE&gt;

Prospective purchasers to which such characterization of an investment in Certificates is material should consult their own tax advisors regarding the characterization of the Grantor Trust Certificates and the income therefrom. Grantor Trust Certificates will be "obligation[s] . . . which [are] principally secured, directly or indirectly, by an interest in real property" within the meaning of Code Section 860G(a)(3).

     b.    Grantor Trust Certificates Representing Interests in Loans other than ARM Loans

     The OID rules of Code Sections 1271 through 1275 will be applicable to a Certificateholder's interest in those Mortgage Loans as to which the conditions for the application of those sections are met. Rules regarding periodic inclusion of OID in income are applicable to mortgages of corporations originated after May 27, 1969, mortgages of noncorporate mortgagors (other than individuals) originated after July 1, 1982, and mortgages of individuals originated after March 2, 1984. Under the OID Regulations, such OID could arise by the charging of points by the originator of the mortgage in an amount greater than the statutory de minimis exception, including a payment of points that is currently deductible by the borrower under applicable Code provisions, or under certain circumstances, by the presence of "teaser" rates on the Mortgage Loans. OID on each Grantor Trust Certificate must be included in the owner's ordinary income for federal income tax purposes as it accrues, in accordance with a constant interest method that takes into account the compounding of interest, in advance of receipt of the cash attributable to such income. The amount of OID required to be included in an owner's income in any taxable year with respect to a Grantor Trust Certificate representing an interest in Mortgage Loans other than Mortgage Loans with interest rates that adjust periodically (ARM Loans) likely will be computed as described below under "--Accrual of Original Issue Discount." The following discussion is based in part on the OID Regulations and in part on the provisions of the Tax Reform Act of 1986 (the "1986 Act"). The OID Regulations generally are effective for debt instruments issued on or after April 4, 1994, but may be relied upon as authority with respect to debt instruments, such as the Grantor Trust Certificates, issued after December 21, 1992. Alternatively, proposed Treasury regulations issued December 21, 1992 may be treated as authority for debt instruments issued after December 21, 1992 and prior to April 4, 1994, and proposed Treasury regulations issued in 1986 and 1991 may be treated as authority for instruments issued before December 21, 1992. In applying these dates, the issue date of the Mortgage Loans should be used, or, in the case of Stripped Bond Certificates or Stripped Coupon Certificates, the date such Certificates are acquired. The holder of a Certificate should be aware, however, that neither the proposed OID Regulations nor the OID Regulations adequately address certain issues relevant to prepayable securities.

     Under the Code, the Mortgage Loans underlying the Grantor Trust Certificate will be treated as having been issued on the date they were originated with an amount of OID equal to the excess of such Mortgage Loan's stated redemption price at maturity over its issue price. The issue price of a Mortgage Loan is generally the amount lent to the mortgagee, which may be adjusted to take into account certain loan origination fees. The stated redemption price at maturity of a Mortgage Loan is the sum of all payments to be made on such Mortgage Loan other than payments that are treated as qualified stated interest payments. The accrual of this OID, as described below under "--Accrual of Original Issue Discount," will generally utilize the original yield to maturity of the Grantor Trust Certificate calculated based on a reasonable assumed prepayment rate for the mortgage loans underlying the Grantor Trust Certificates (the "Prepayment Assumption"), and will take into account events that occur during the calculation period. The Prepayment Assumption will be determined in the manner prescribed by regulations that have not yet been issued. The legislative history of the 1986 Act (the "Legislative History") provides, however, that the regulations will require that the Prepayment

Assumption be the prepayment assumption that is used in determining the offering
price of such Certificate. No representation is made that any Certificate will
prepay at the Prepayment Assumption or at any other rate. The prepayment
assumption contained in the Code literally only applies to debt instruments
collateralized by other debt instruments that are subject to prepayment rather
than direct ownership interests in such debt instruments, such as the
Certificates represent. However, no other legal authority provides guidance with
regard to the proper method for accruing OID on obligations that are subject to
prepayment, and, until further guidance is issued, the Master Servicer intends
to calculate and report OID under the method described below.

                                        74
<PAGE>

     Accrual of Original Issue Discount.  Generally, the owner of a Grantor
Trust Certificate must include in gross income the sum of the "daily portions,"
as defined below, of the OID on such Grantor Trust Certificate for each day on
which it owns such Certificate, including the date of purchase but excluding the
date of disposition. In the case of an original owner, the daily portions of OID
with respect to each component generally will be determined as set forth under
the OID Regulations. A calculation will be made by the Master Servicer or such
other entity specified in the related Prospectus Supplement of the portion of
OID that accrues during each successive monthly accrual period (or shorter
period from the date of original issue) that ends on the day in the calendar
year corresponding to each of the Distribution Dates on the Grantor Trust
Certificates (or the day prior to each such date). This will be done, in the
case of each full month accrual period, by:

     (i)    adding

            (a)    the present value at the end of the accrual period (determined
                   by using as a discount factor the original yield to maturity of
                   the respective component under the Prepayment Assumption) of
                   all remaining payments to be received under the Prepayment
                   Assumption on the respective component and

            (b)    any payments included in the state redemption price at maturity
                   received during such accrual period, and

     (ii)   subtracting from that total the "adjusted issue price" of the
            respective component at the beginning of such accrual period.

     The adjusted issue price of a Grantor Trust Certificate at the beginning
of the first accrual period is its issue price; the adjusted issue price of a
Grantor Trust Certificate at the beginning of a subsequent accrual period is the
adjusted issue price at the beginning of the immediately preceding accrual
period plus the amount of OID allocable to that accrual period reduced by the
amount of any payment other than a payment of qualified stated interest made at
the end of or during that accrual period. The OID accruing during such accrual
period will then be divided by the number of days in the period to determine the
daily portion of OID for each day in the period. With respect to an initial
accrual period shorter than a full monthly accrual period, the daily portions of
OID must be determined according to an appropriate allocation under any
reasonable method.

     OID generally must be reported as ordinary gross income as it accrues
under a constant interest method that takes into account the compounding of
interest as it accrues rather than when received. However, the amount of OID
includible in the income of a holder of an obligation is reduced when the
obligation is acquired after its initial issuance at a price greater than the
sum of the original issue price and the previously accrued OID, less prior
payments of principal. Accordingly, if such Mortgage Loans acquired by a
Certificateholder are purchased at a price equal to the then unpaid principal
amount of such Mortgage Loan, no OID attributable to the difference between the
issue price and the original principal amount of such Mortgage Loan (i.e.

points) will be includible by such holder. Other OID on the Mortgage Loans
(e.g., that arising from a "teaser" rate) would still need to be accrued.

      c.    Grantor Trust Certificates Representing Interests in ARM Loans

      The OID Regulations do not address the treatment of instruments, such as
the Grantor Trust Certificates, which represent interests in ARM Loans.
Additionally, the IRS has not issued guidance under the Code's coupon stripping
rules with respect to such instruments. In the absence of any authority, the
Master Servicer will report OID on Grantor Trust Certificates attributable to
ARM Loans ("Stripped ARM Obligations") to holders in a manner it believes is
consistent with the rules described above under the heading "--Grantor Trust
Certificates Representing Interests in Loans Other Than ARM Loans" and with the
OID Regulations. In general, application of these rules may require inclusion of
income on a Stripped ARM Obligation in advance of the receipt of cash
attributable to such income. Further, the addition of interest deferred by
reason of negative amortization ("Deferred Interest") to the principal balance
of an ARM Loan may require the inclusion of such amount in the income of the
Grantor Trust Certificateholder when such amount accrues. Furthermore, the
addition of Deferred Interest to the

           75

<PAGE>

Grantor Trust Certificate's principal balance will result in additional income
(including possibly OID income) to the Grantor Trust Certificateholder over the
remaining life of such Grantor Trust Certificates.

      Because the treatment of Stripped ARM Obligations is uncertain, investors
are urged to consult their tax advisors regarding how income will be includible
with respect to such Certificates.

      3.    Sale or Exchange of a Grantor Trust Certificate

      Sale or exchange of a Grantor Trust Certificate prior to its maturity will
result in gain or loss equal to the difference, if any, between the amount
received and the owner's adjusted basis in the Grantor Trust Certificate. Such
adjusted basis generally will equal the seller's purchase price for the Grantor
Trust Certificate, increased by the OID included in the seller's gross income
with respect to the Grantor Trust Certificate, and reduced by principal payments
on the Grantor Trust Certificate previously received by the seller. Such gain or
loss will be capital gain or loss to an owner for which a Grantor Trust
Certificate is a "capital asset" within the meaning of Code Section 1221, and
will be long-term or short-term depending on whether the Grantor Trust
Certificate has been owned for the long-term capital gain holding period
(generally more than one year). Long-term capital gains of non-corporate
taxpayers are subject to reduced maximum rates while short-term capital gains
are taxable at ordinary rates. The use of capital losses is subject to
limitations.

      Prospective investors should consult their own tax advisors concerning the
treatment of capital gains.

      Grantor Trust Certificates will be "evidences of indebtedness" within the
meaning of Code Section 582(c)(1), so that gain or loss recognized from the sale
of a Grantor Trust Certificate by a bank or a thrift institution to which such
section applies will be treated as ordinary income or loss.

      4.    Non-U.S. Persons

      Generally, to the extent that a Grantor Trust Certificate evidences
ownership in underlying Mortgage Loans that were issued on or before July 18,
1984, interest or OID paid by the person required to withhold tax under Code
Section 1441 or 1442 to (i) an owner that is not a U.S. Person or (ii) a Grantor
Trust Certificateholder holding on behalf of an owner that is not a U.S. Person
will be subject to federal income tax, collected by withholding, at a rate of

30% or such lower rate as may be provided for interest by an applicable tax treaty. Accrued OID recognized by the owner on the sale or exchange of such a Grantor Trust Certificate also will be subject to federal income tax at the same rate. Generally, such payments would not be subject to withholding to the extent that a Grantor Trust Certificate evidences ownership in Mortgage Loans issued after July 18, 1984, by natural persons if such Grantor Trust Certificateholder complies with certain identification requirements (including delivery of a statement, signed by the Grantor Trust Certificateholder under penalties of perjury, certifying that such Grantor Trust Certificateholder is not a U.S. Person and providing the name and address of such Grantor Trust Certificateholder). Additional restrictions apply to Mortgage Loans where the mortgagor is not a natural person in order to qualify for the exemption from withholding.

     5.    Information Reporting and Backup Withholding

     The Master Servicer will furnish or make available, within a reasonable time after the end of each calendar year, to each person who was a Certificateholder at any time during such year, such information as may be deemed necessary or desirable to assist Certificateholders in preparing their federal income tax returns, or to enable holders to make such information available to beneficial owners or financial intermediaries that hold such Certificates as nominees on behalf of beneficial owners. If a holder, beneficial owner, financial intermediary or other recipient of a payment on behalf of a beneficial owner fails to supply a certified taxpayer identification number or if the Secretary of the Treasury determines that such person has not reported all interest and dividend income required to be shown on its federal income tax return, backup withholding may be required with respect to any payments. Any amounts deducted and withheld on account of backup withholding from a distribution to a recipient would be

<div align="center">76</div>

&lt;PAGE&gt;

allowed as a credit against such recipient's federal income tax liability. The backup withholding rate is currently 28%. This rate is scheduled to adjust for tax years after 2010.

NEW WITHHOLDING REGULATIONS

     On January 1, 2001 new regulations (the "New Regulations") became effective (subject to certain transition rules) which make certain modifications to the withholding, backup withholding and information reporting rules described above. The New Regulations attempt to unify certification requirements and modify reliance standards. Prospective investors are urged to consult their own tax advisors regarding the New Regulations.

REMICS

     The Trust Fund relating to a series of Certificates may elect to be treated as a REMIC. Qualification as a REMIC requires ongoing compliance with certain conditions. Although a REMIC is not generally subject to federal income tax (see, however "--Taxation of Owners of REMIC Residual Certificates" and "--Prohibited Transactions Tax and Other Taxes" below), if a Trust Fund with respect to which a REMIC election is made fails to comply with one or more of the ongoing requirements of the Code for REMIC status during any taxable year, including the implementation of restrictions on the purchase and transfer of the residual interests in a REMIC as described below under "Taxation of Owners of REMIC Residual Certificates," the Code provides that a Trust Fund will not be treated as a REMIC for such year and thereafter. In that event, such entity may be taxable as a separate corporation, and the related Certificates (the "REMIC Certificates") may not be accorded the status or given the tax treatment described below. While the Code authorizes the Treasury Department to issue regulations providing relief in the event of an inadvertent termination of the status of a trust fund as a REMIC, no such regulations have been issued. Any

such relief, moreover, may be accompanied by sanctions, such as the imposition of a corporate tax on all or a portion of the REMIC's income for the period in which the requirements for such status are not satisfied. With respect to each Trust Fund that elects REMIC status, Dechert LLP will deliver its opinion generally to the effect that, under then existing law and assuming compliance with all provisions of the related Pooling and Servicing Agreement, such Trust Fund will qualify as a REMIC, and the related Certificates will be considered to be regular interests ("REMIC Regular Certificates") or a sole class of residual interests ("REMIC Residual Certificates") in the REMIC. The related Prospectus Supplement for each series of Certificates will indicate whether the Trust Fund will make a REMIC election and whether a class of Certificates will be treated as a regular or residual interest in the REMIC.

In general, with respect to each series of Certificates for which a REMIC election is made, (i) such Certificates held by a thrift institution taxed as a "domestic building and loan association" will constitute assets described in Code Section 7701(a)(19)(C); (ii) such Certificates held by a real estate investment trust will constitute "real estate assets" within the meaning of Code Section 856(c)(4)(A); and (iii) interest on such Certificates held by a real estate investment trust will be considered "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B). If less than 95% of the REMIC's assets are assets qualifying under any of the foregoing Code sections, the Certificates will be qualifying assets only to the extent that the REMIC's assets are qualifying assets. In addition, payments on Mortgage Loans held pending distribution on the REMIC Certificates will be considered to be real estate assets for purposes of Code Section 856(c). The Small Business Job Protection Act of 1996, as part of the repeal of the bad debt reserve method for thrift institutions, repealed the application of Code Section 593(d) to any taxable year beginning after December 31, 1995.

In some instances the Mortgage Loans may not be treated entirely as assets described in the foregoing sections. See, in this regard, the discussion of Buydown Loans contained in "--Single Class of Grantor Trust Certificates" above. REMIC Certificates held by a real estate investment trust will not constitute "Government Securities" within the meaning of Code Section 856(c)(4)(A), and REMIC Certificates held by a regulated investment company will not constitute "Government Securities" within

77

<PAGE>

the meaning of Code Section 851(b)(3)(A)(ii). REMIC Certificates held by certain financial institutions will constitute "evidences of indebtedness" within the meaning of Code Section 582(c)(1).

A "qualified mortgage" for REMIC purposes is any obligation (including certificates of participation in such an obligation) that is principally secured by an interest in real property and that is transferred to the REMIC within a prescribed time period in exchange for regular or residual interests in the REMIC. The REMIC Regulations provide that obligations secured by manufactured housing that qualify as "single-family residences" within the meaning of Code Section 25(e)(10) may be treated as "qualified mortgages" of a REMIC. Under Code Section 25(e)(10), the term "single-family residence" includes any manufactured home which has a minimum of 400 square feet of living space, a minimum width in excess of 102 inches and which is of a kind customarily used at a fixed location.

Tiered REMIC Structures.  For certain series of Certificates, two separate elections may be made to treat designated portions of the related Trust Fund as REMICs (respectively, the "Subsidiary REMIC" and the "Master REMIC") for federal income tax purposes. Upon the issuance of any such series of Certificates, Dechert LLP, counsel to the Depositor, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the related Agreement, the Master REMIC as well as any Subsidiary REMIC will each qualify as a REMIC, and the REMIC Certificates issued by the Master REMIC and the Subsidiary REMIC,

respectively, will be considered to evidence ownership of REMIC Regular Certificates or REMIC Residual Certificates in the related REMIC within the meaning of the REMIC provisions.

Only REMIC Certificates, other than the residual interest in the Subsidiary REMIC, issued by the Master REMIC will be offered hereunder. The Subsidiary REMIC and the Master REMIC will be treated as one REMIC solely for purposes of determining whether the REMIC Certificates will be (i) "real estate assets" within the meaning of Code Section 856(c)(4)(A); (ii) "loans secured by an interest in real property" under Code Section 7701(a)(19)(C); and (iii) whether the income on such Certificates is interest described in Code Section 856(c)(3)(B).

    1.   Taxation of Owners of REMIC Regular Certificates

General. Except as otherwise stated in this discussion, REMIC Regular Certificates will be treated for federal income tax purposes as debt instruments issued by the REMIC and not as ownership interests in the REMIC or its assets. Moreover, holders of REMIC Regular Certificates that otherwise report income under a cash method of accounting will be required to report income with respect to REMIC Regular Certificates under an accrual method.

Original Issue Discount and Premium. The REMIC Regular Certificates may be issued with OID. Generally, such OID, if any, will equal the difference between the "stated redemption price at maturity" of a REMIC Regular Certificate and its "issue price." Holders of any class of Certificates issued with OID will be required to include such OID in gross income for federal income tax purposes as it accrues, in accordance with a constant interest method based on the compounding of interest as it accrues rather than in accordance with receipt of the interest payments. The following discussion is based in part on the OID Regulations and in part on the provisions of the 1986 Act. Holders of REMIC Regular Certificates (the "REMIC Regular Certificateholders") should be aware, however, that the OID Regulations do not adequately address certain issues relevant to prepayable securities, such as the REMIC Regular Certificates.

Rules governing OID are set forth in Code Sections 1271 through 1273 and 1275. These rules require that the amount and rate of accrual of OID be calculated based on the Prepayment Assumption and the anticipated reinvestment rate, if any, relating to the REMIC Regular Certificates and prescribe a method for adjusting the amount and rate of accrual of such discount where the actual prepayment rate differs from the Prepayment Assumption. Under the Code, the Prepayment Assumption must be determined in the manner prescribed by regulations, which regulations have not yet been issued. The Legislative History provides, however, that Congress intended the regulations to require that the Prepayment Assumption be the prepayment assumption that is used in determining the initial offering

<div align="center">78</div>

&lt;PAGE&gt;

price of such REMIC Regular Certificates. The Prospectus Supplement for each series of REMIC Regular Certificates will specify the Prepayment Assumption to be used for the purpose of determining the amount and rate of accrual of OID. No representation is made that the REMIC Regular Certificates will prepay at the Prepayment Assumption or at any other rate.

In general, each REMIC Regular Certificate will be treated as a single installment obligation issued with an amount of OID equal to the excess of its "stated redemption price at maturity" over its "issue price." The issue price of a REMIC Regular Certificate is the first price at which a substantial amount of REMIC Regular Certificates of that class are first sold to the public (excluding bond houses, brokers, underwriters or wholesalers). If less than a substantial amount of a particular class of REMIC Regular Certificates is sold for cash on or prior to the date of their initial issuance (the "Closing Date"), the issue price for such class will be treated as the fair market value of such class on

the Closing Date. The issue price of a REMIC Regular Certificate also includes
the amount paid by an initial Certificateholder for accrued interest that
relates to a period prior to the issue date of the REMIC Regular Certificate.
The stated redemption price at maturity of a REMIC Regular Certificate includes
the original principal amount of the REMIC Regular Certificate, but generally
will not include distributions of interest if such distributions constitute
"qualified stated interest." Qualified stated interest generally means interest
payable at a single fixed rate or qualified variable rate (as described below)
provided that such interest payments are unconditionally payable at intervals of
one year or less during the entire term of the REMIC Regular Certificate.
Interest is payable at a single fixed rate only if the rate appropriately takes
into account the length of the interval between payments. Distributions of
interest on REMIC Regular Certificates with respect to which Deferred Interest
will accrue will not constitute qualified stated interest payments, and the
stated redemption price at maturity of such REMIC Regular Certificates includes
all distributions of interest as well as principal thereon.

Where the interval between the issue date and the first Distribution Date on
a REMIC Regular Certificate is longer than the interval between subsequent
Distribution Dates, the greater of any original issue discount (disregarding the
rate in the first period) and any interest foregone during the first period is
treated as the amount by which the stated redemption price at maturity of the
Certificate exceeds its issue price for purposes of the de minimis rule
described below. The OID Regulations suggest that all interest on a long first
period REMIC Regular Certificate that is issued with non-de minimis OID, as
determined under the foregoing rule, will be treated as OID. Where the interval
between the issue date and the first Distribution Date on a REMIC Regular
Certificate is shorter than the interval between subsequent Distribution Dates,
interest due on the first Distribution Date in excess of the amount that accrued
during the first period would be added to the Certificate's stated redemption
price at maturity. REMIC Regular Certificateholders should consult their own tax
advisors to determine the issue price and stated redemption price at maturity of
a REMIC Regular Certificate.

Under the de minimis rule, OID on a REMIC Regular Certificate will be
considered to be zero if such OID is less than 0.25% of the stated redemption
price at maturity of the REMIC Regular Certificate multiplied by the weighted
average maturity of the REMIC Regular Certificate. For this purpose, the
weighted average maturity of the REMIC Regular Certificate is computed as the
sum of the amounts determined by multiplying the number of full years (i.e.,
rounding down partial years) from the issue date until each distribution in
reduction of stated redemption price at maturity is scheduled to be made by a
fraction, the numerator of which is the amount of each distribution included in
the stated redemption price at maturity of the REMIC Regular Certificate and the
denominator of which is the stated redemption price at maturity of the REMIC
Regular Certificate. Although currently unclear, it appears that the schedule of
such distributions should be determined in accordance with the Prepayment
Assumption. The Prepayment Assumption with respect to a series of REMIC Regular
Certificates will be set forth in the related Prospectus Supplement. Holders
generally must report de minimis OID pro rata as principal payments are
received, and such income will be capital gain if the REMIC Regular Certificate
is held as a capital asset. However, accrual method holders may elect to accrue
all de minimis OID as well as market discount under a constant interest method.

79

<PAGE>

The Prospectus Supplement with respect to a Trust Fund may provide for
certain REMIC Regular Certificates to be issued at prices significantly
exceeding their principal amounts or based on notional principal balances (the
"Super-Premium Certificates"). The income tax treatment of such REMIC Regular
Certificates is not entirely certain. For information reporting purposes, the
Trust Fund intends to take the position that the stated redemption price at
maturity of such REMIC Regular Certificates is the sum of all payments to be
made on such REMIC Regular Certificates determined under the Prepayment

Assumption, with the result that such REMIC Regular Certificates would be issued with OID. The calculation of income in this manner could result in negative original issue discount (which delays future accruals of OID rather than being immediately deductible) when prepayments on the Mortgage Loans exceed those estimated under the Prepayment Assumption. The IRS might contend, however, that certain contingent payment rules contained in regulations, with respect to OID, should apply to such Certificates. Although such rules are not applicable to instruments governed by Code Section 1272(a)(6), they represent the only guidance regarding the current views of the IRS with respect to contingent payment instruments. In the alternative, the IRS could assert that the stated redemption price at maturity of such REMIC Regular Certificates should be limited to their principal amount (subject to the discussion below under "--Accrued Interest Certificates"), so that such REMIC Regular Certificates would be considered for federal income tax purposes to be issued at a premium. If such a position were to prevail, the rules described below under "--Taxation of Owners of REMIC Regular Certificates--Premium" would apply. It is unclear when a loss may be claimed for any unrecovered basis for a Super-Premium Certificate. It is possible that a holder of a Super-Premium Certificate may only claim a loss when its remaining basis exceeds the maximum amount of future payments, assuming no further prepayments or when the final payment is received with respect to such Super-Premium Certificate.

Under the REMIC Regulations, if the issue price of a REMIC Regular Certificate (other than a REMIC Regular Certificate based on a notional amount) does not exceed 125% of its actual principal amount, the interest rate is not considered disproportionately high. Accordingly, such REMIC Regular Certificate generally should not be treated as a Super-Premium Certificate and the rules described below under "--Taxation of Owners of REMIC Regular Certificates--Premium" should apply. However, it is possible that holders of REMIC Regular Certificates issued at a premium, even if the premium is less than 25% of such Certificate's actual principal balance, will be required to amortize the premium under an original issue discount method or contingent interest method even though no election under Code Section 171 is made to amortize such premium.

Generally, a REMIC Regular Certificateholder must include in gross income the "daily portions," as determined below, of the OID that accrues on a REMIC Regular Certificate for each day a Certificateholder holds the REMIC Regular Certificate, including the purchase date but excluding the disposition date. In the case of an original holder of a REMIC Regular Certificate, a calculation will be made of the portion of the OID that accrues during each successive period ("an accrual period") that ends on the day in the calendar year corresponding to a Distribution Date (or if Distribution Dates are on the first day or first business day of the immediately preceding month, interest may be treated as payable on the last day of the immediately preceding month) and begins on the day after the end of the immediately preceding accrual period (or on the issue date in the case of the first accrual period). This will be done, in the case of each full accrual period, by:

    (i)   adding

          (a)   the present value at the end of the accrual period (determined
                by using as a discount factor the original yield to maturity of
                the REMIC Regular Certificates as calculated under the
                Prepayment Assumption) of all remaining payments to be received
                on the REMIC Regular Certificates under the Prepayment
                Assumption, and

          (b)   any payments included in the stated redemption price at
                maturity received during such accrual period, and

    (ii)  subtracting from that total the adjusted issue price of the REMIC
          Regular Certificates at the beginning of such accrual period.

                                    80

<PAGE>

The adjusted issue price of a REMIC Regular Certificate at the beginning of the first accrual period is its issue price; the adjusted issue price of a REMIC Regular Certificate at the beginning of a subsequent accrual period is the adjusted issue price at the beginning of the immediately preceding accrual period plus the amount of OID allocable to that accrual period and reduced by the amount of any payment other than a payment of qualified stated interest made at the end of or during that accrual period. The OID accrued during an accrual period will then be divided by the number of days in the period to determine the daily portion of OID for each day in the accrual period. The calculation of OID under the method described above will cause the accrual of OID to either increase or decrease (but never below zero) in a given accrual period to reflect the fact that prepayments are occurring faster or slower than under the Prepayment Assumption. With respect to an initial accrual period shorter than a full accrual period, the daily portions of OID may be determined according to an appropriate allocation under any reasonable method.

A subsequent purchaser of a REMIC Regular Certificate issued with OID who purchases the REMIC Regular Certificate at a cost less than the remaining stated redemption price at maturity will also be required to include in gross income the sum of the daily portions of OID on that REMIC Regular Certificate. In computing the daily portions of OID for such a purchaser (as well as an initial purchaser that purchases at a price higher than the adjusted issue price but less than the stated redemption price at maturity), however, the daily portion is reduced by the amount that would be the daily portion for such day (computed in accordance with the rules set forth above) multiplied by a fraction, the numerator of which is the amount, if any, by which the price paid by such holder for that REMIC Regular Certificate exceeds the following amount:

(a)    the sum of the issue price plus the aggregate amount of OID that would have been includible in the gross income of an original REMIC Regular Certificateholder (who purchased the REMIC Regular Certificate at its issue price), less

(b)    any prior payments included in the stated redemption price at maturity, and the denominator of which is the sum of the daily portions for that REMIC Regular Certificate for all days beginning on the date after the purchase date and ending on the maturity date computed under the Prepayment Assumption. A holder who pays an acquisition premium instead may elect to accrue OID by treating the purchase as a purchase at original issue.

Variable Rate REMIC Regular Certificates.  REMIC Regular Certificates may provide for interest based on a variable rate. Interest based on a variable rate will constitute qualified stated interest and not contingent interest if, generally,

(i)     such interest is unconditionally payable at least annually,

(ii)    the issue price of the debt instrument does not exceed the total noncontingent principal payments, and

(iii)   interest is based on a "qualified floating rate," an "objective rate," a combination of a single fixed rate and one or more "qualified floating rates," one "qualified inverse floating rate," or a combination of "qualified floating rates" that do not operate in a manner that significantly accelerates or defers interest payments on such REMIC Regular Certificate.

The amount of OID with respect to a REMIC Regular Certificate bearing a variable rate of interest will accrue in the manner described above under "--Original Issue Discount and Premium" by assuming generally that the index used for the variable rate will remain fixed throughout the term of the Certificate. Appropriate adjustments are made for the actual variable rate.

Although unclear at present, the Depositor intends to treat interest on a REMIC Regular Certificate that is a weighted average of the net interest rates on Mortgage Loans as qualified stated interest. In such case, the weighted average rate used to compute the initial pass-through rate on the REMIC Regular Certificates will be deemed to be the index in effect through the life of the REMIC Regular Certificates. It is possible, however, that the IRS may treat some or all of the interest on REMIC

<div align="center">81</div>

<PAGE>

Regular Certificates with a weighted average rate as taxable under the rules relating to obligations providing for contingent payments. Such treatment may effect the timing of income accruals on such REMIC Regular Certificates.

Election to Treat All Interest as OID. The OID Regulations permit a Certificateholder to elect to accrue all interest, discount (including de minimis market or original issue discount) and premium in income as interest, based on a constant yield method. If such an election were to be made with respect to a REMIC Regular Certificate with market discount, the Certificateholder would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such Certificateholder acquires during the year of the election and thereafter. Similarly, a Certificateholder that makes this election for a Certificate that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such Certificateholder owns or acquires. See "--Taxation of Owners of REMIC Regular Certificates--Premium" herein. The election to accrue interest, discount and premium on a constant yield method with respect to a Certificate is irrevocable.

Market Discount. A purchaser of a REMIC Regular Certificate may also be subject to the market discount provisions of Code Sections 1276 through 1278. Under these provisions and the OID Regulations, "market discount" equals the excess, if any, of

(i)　the REMIC Regular Certificate's stated principal amount or, in the case of a REMIC Regular Certificate with OID, the adjusted issue price (determined for this purpose as if the purchaser had purchased such REMIC Regular Certificate from an original holder) over

(ii)　the price for such REMIC Regular Certificate paid by the purchaser.

A Certificateholder that purchases a REMIC Regular Certificate at a market discount will recognize income upon receipt of each distribution representing amounts included in such certificate's stated redemption price at maturity. In particular, under Code Section 1276 such a holder generally will be required to allocate each such distribution first to accrued market discount not previously included in income, and to recognize ordinary income to that extent. A Certificateholder may elect to include market discount in income currently as it accrues rather than including it on a deferred basis in accordance with the foregoing. If made, such election will apply to all market discount bonds acquired by such Certificateholder on or after the first day of the first taxable year to which such election applies.

Market discount with respect to a REMIC Regular Certificate will be considered to be zero if the amount allocable to the REMIC Regular Certificate is less than 0.25% of such REMIC Regular Certificate's stated redemption price at maturity multiplied by such REMIC Regular Certificate's weighted average maturity remaining after the date of purchase. If market discount on a REMIC Regular Certificate is considered to be zero under this rule, the actual amount of market discount must be allocated to the remaining principal payments on the REMIC Regular Certificate, and gain equal to such allocated amount will be recognized when the corresponding principal payment is made. Treasury

regulations implementing the market discount rules have not yet been issued;
therefore, investors should consult their own tax advisors regarding the
application of these rules and the advisability of making any of the elections
allowed under Code Sections 1276 through 1278.

     The Code provides that any principal payment (whether a scheduled payment
or a prepayment) or any gain on disposition of a market discount bond acquired
by the taxpayer after October 22, 1986, shall be treated as ordinary income to
the extent that it does not exceed the accrued market discount at the time of
such payment. The amount of accrued market discount for purposes of determining
the tax treatment of subsequent principal payments or dispositions of the market
discount bond is to be reduced by the amount so treated as ordinary income.

     The Code also grants authority to the Treasury Department to issue
regulations providing for the computation of accrued market discount on debt
instruments, the principal of which is payable in more than one installment.
Until such time as regulations are issued by the Treasury, rules described in
the Legislative History will apply. Under those rules, the holder of a market
discount bond may elect to accrue
                                        82
<PAGE>
market discount either on the basis of a constant interest method rate or
according to one of the following methods. For REMIC Regular Certificates issued
with OID, the amount of market discount that accrues during a period is equal to
the product of:

          (i)   the total remaining market discount and

          (ii)  a fraction, the numerator of which is the OID accruing during the
                period and the denominator of which is the total remaining OID at
                the beginning of the period.

For REMIC Regular Certificates issued without OID, the amount of market discount
that accrues during a period is equal to the product of:

          (a)   the total remaining market discount and

          (b)   a fraction, the numerator of which is the amount of stated interest
                paid during the accrual period and the denominator of which is the
                total amount of stated interest remaining to be paid at the
                beginning of the period.

For purposes of calculating market discount under any of the above methods in
the case of instruments (such as the REMIC Regular Certificates) that provide
for payments that may be accelerated by reason of prepayments of other
obligations securing such instruments, the same Prepayment Assumption applicable
to calculating the accrual of OID will apply.

     A holder who acquired a REMIC Regular Certificate at a market discount
also may be required to defer a portion of its interest deductions for the
taxable year attributable to any indebtedness incurred or continued to purchase
or carry such Certificate purchased with market discount. For these purposes,
the de minimis rule referred to above applies. Any such deferred interest
expense would not exceed the market discount that accrues during such taxable
year and is, in general, allowed as a deduction not later than the year in which
such market discount is includible in income. If such holder elects to include
market discount in income currently as it accrues on all market discount
instruments acquired by such holder in that taxable year or thereafter, the
interest deferral rule described above will not apply.

     Premium.  A purchaser of a REMIC Regular Certificate that purchases the
REMIC Regular Certificate at a cost (not including accrued qualified stated
interest) greater than its remaining stated redemption price at maturity will be
considered to have purchased the REMIC Regular Certificate at a premium and may

elect to amortize such premium under a constant yield method. A
Certificateholder that makes this election for a Certificate that is acquired at
a premium will be deemed to have made an election to amortize bond premium with
respect to all debt instruments having amortizable bond premium that such
Certificateholder acquires during the year of the election or thereafter. It is
not clear whether the Prepayment Assumption would be taken into account in
determining the life of the REMIC Regular Certificate for this purpose. However,
the Legislative History states that the same rules that apply to accrual of
market discount (which rules require use of a Prepayment Assumption in accruing
market discount with respect to REMIC Regular Certificates without regard to
whether such Certificates have OID) will also apply in amortizing bond premium
under Code Section 171. The Code provides that amortizable bond premium will be
allocated among the interest payments on such REMIC Regular Certificates and
will be applied as an offset against such interest payment. On December 30,
1997, the IRS issued final regulations (the "Amortizable Bond Premium
Regulations") dealing with amortizable bond premium. These regulations
specifically do not apply to prepayable debt instruments subject to Code Section
1272(a)(6). Absent further guidance from the IRS the Trust intends to account
for amortizable bond premium in the manner described above. Certificateholders
should consult their tax advisors regarding the possibility of making an
election to amortize any such bond premium.

     Deferred Interest.  Certain classes of REMIC Regular Certificates may
provide for the accrual of Deferred Interest with respect to one or more ARM
Loans. Any Deferred Interest that accrues with respect to a class of REMIC
Regular Certificates will constitute income to the holders of such Certificates
prior to the time distributions of cash with respect to such Deferred Interest
are made. It is unclear, under the OID Regulations, whether any of the interest
on such Certificates will constitute qualified stated

                                   83

<PAGE>

interest or whether all or a portion of the interest payable on such
Certificates must be included in the stated redemption price at maturity of the
Certificates and accounted for as OID (which could accelerate such inclusion).
Interest on REMIC Regular Certificates must in any event be accounted for under
an accrual method by the holders of such Certificates and, therefore, applying
the latter analysis may result only in a slight difference in the timing of the
inclusion in income of interest on such REMIC Regular Certificates.

     Effects of Defaults and Delinquencies.  Certain series of Certificates may
contain one or more classes of Subordinated Certificates, and in the event there
are defaults or delinquencies on the Mortgage Loans, amounts that would
otherwise be distributed on the Subordinated Certificates may instead be
distributed on the Senior Certificates. Subordinated Certificateholders
nevertheless will be required to report income with respect to such Certificates
under an accrual method without giving effect to delays and reductions in
distributions on such Subordinated Certificates attributable to defaults and
delinquencies on the Mortgage Loans, except to the extent that it can be
established that such amounts are uncollectible. As a result, the amount of
income reported by a Subordinated Certificateholder in any period could
significantly exceed the amount of cash distributed to such holder in that
period. The holder will eventually be allowed a loss (or will be allowed to
report a lesser amount of income) to the extent that the aggregate amount of
distributions on the Subordinated Certificate is reduced as a result of defaults
and delinquencies on the Mortgage Loans. Timing and characterization of such
losses is discussed in "--Taxation of Owners of REMIC Regular
Certificates--Treatment of Realized Losses" below.

     Sale, Exchange or Redemption.  If a REMIC Regular Certificate is sold,
exchanged, redeemed or retired, the seller will recognize gain or loss equal to
the difference between the amount realized on the sale, exchange, redemption, or
retirement and the seller's adjusted basis in the REMIC Regular Certificate.
Such adjusted basis generally will equal the cost of the REMIC Regular

Certificate to the seller, increased by any OID and market discount included in the seller's gross income with respect to the REMIC Regular Certificate, and reduced (but not below zero) by payments included in the stated redemption price at maturity previously received by the seller and by any amortized premium. Similarly, a holder who receives a payment that is part of the stated redemption price at maturity of a REMIC Regular Certificate will recognize gain equal to the excess, if any, of the amount of the payment over the holder's adjusted basis in the REMIC Regular Certificate. A REMIC Regular Certificateholder who receives a final payment that is less than the holder's adjusted basis in the REMIC Regular Certificate will generally recognize a loss. Except as provided in the following paragraph and as provided under "--Market Discount" above, any such gain or loss will be capital gain or loss, provided that the REMIC Regular Certificate is held as a "capital asset" (generally, property held for investment) within the meaning of Code Section 1221. Such gain or loss generally will be long-term capital gain or loss if the Note were held for more than one year. Long-term capital gains of non-corporate taxpayers are subject to reduced maximum rates while short-term capital gains are taxable at ordinary rates. The use of capital losses is subject to limitations. Prospective investors should consult their own tax advisors concerning the treatment of capital gains.

Gain from the sale or other disposition of a REMIC Regular Certificate that might otherwise be capital gain will be treated as ordinary income to the extent that such gain does not exceed the excess, if any, of (i) the amount that would have been includible in such holder's income with respect to the REMIC Regular Certificate had income accrued thereon at a rate equal to 110% of the AFR as defined in Code Section 1274(d) determined as of the date of purchase of such REMIC Regular Certificate, over (ii) the amount actually includible in such holder's income.

The Certificates will be "evidences of indebtedness" within the meaning of Code Section 582(c)(1), so that gain or loss recognized from the sale of a REMIC Regular Certificate by a bank or a thrift institution to which such section applies will be ordinary income or loss.

The REMIC Regular Certificate information reports will include a statement of the adjusted issue price of the REMIC Regular Certificate at the beginning of each accrual period. In addition, the reports will include information necessary to compute the accrual of any market discount that may arise upon

84

<PAGE>

secondary trading of REMIC Regular Certificates. Because exact computation of the accrual of market discount on a constant yield method would require information relating to the holder's purchase price which the REMIC may not have, it appears that the information reports will only require information pertaining to the appropriate proportionate method of accruing market discount.

Accrued Interest Certificates.  Certain of the REMIC Regular Certificates ("Payment Lag Certificates") may provide for payments of interest based on a period that corresponds to the interval between Distribution Dates but that ends prior to each such Distribution Date. The period between the Closing Date for Payment Lag Certificates and their first Distribution Date may or may not exceed such interval. Purchasers of Payment Lag Certificates for which the period between the Closing Date and the first Distribution Date does not exceed such interval could pay upon purchase of the REMIC Regular Certificates accrued interest in excess of the accrued interest that would be paid if the interest paid on the Distribution Date were interest accrued from Distribution Date to Distribution Date. If a portion of the initial purchase price of a REMIC Regular Certificate is allocable to interest that has accrued prior to the issue date ("pre-issuance accrued interest") and the REMIC Regular Certificate provides for a payment of stated interest on the first payment date (and the first payment date is within one year of the issue date) that equals or exceeds the amount of the pre-issuance accrued interest, then the REMIC Regular Certificates' issue price may be computed by subtracting from the issue price the amount of

pre-issuance accrued interest, rather than as an amount payable on the REMIC Regular Certificate. However, it is unclear under this method how the OID Regulations treat interest on Payment Lag Certificates. Therefore, in the case of a Payment Lag Certificate, the Trust Fund intends to include accrued interest in the issue price and report interest payments made on the first Distribution Date as interest to the extent such payments represent interest for the number of days that the Certificateholder has held such Payment Lag Certificate during the first accrual period.

Investors should consult their own tax advisors concerning the treatment for federal income tax purposes of Payment Lag Certificates.

Non-Interest Expenses of the REMIC. Under temporary Treasury regulations, if the REMIC is considered to be a "single-class REMIC," a portion of the REMIC's servicing, administrative and other non-interest expenses will be allocated as a separate item to those REMIC Regular Certificateholders that are "pass-through interest holders." Certificateholders that are pass-through interest holders should consult their own tax advisors about the impact of these rules on an investment in the REMIC Regular Certificates. See "Taxation of Owners of REMIC Residual Certificates--Pass-Through Non-Interest Expenses of the REMIC" below.

Treatment of Realized Losses. Although not entirely clear, it appears that holders of REMIC Regular Certificates that are corporations should in general be allowed to deduct as an ordinary loss any loss sustained during the taxable year on account of any such Certificates becoming wholly or partially worthless, and that, in general, holders of Certificates that are not corporations should be allowed to deduct as a short-term capital loss any loss sustained during the taxable year on account of any such Certificates becoming wholly worthless. Although the matter is not entirely clear, non-corporate holders of Certificates may be allowed a bad debt deduction at such time that the principal balance of any such Certificate is reduced to reflect realized losses resulting from any liquidated Mortgage Loans. The Internal Revenue Service, however, could take the position that non-corporate holders will be allowed a bad debt deduction to reflect realized losses only after all Mortgage Loans remaining in the related Trust Fund have been liquidated or the Certificates of the related series have been otherwise retired. Potential investors and holders of the Certificates are urged to consult their own tax advisors regarding the appropriate timing, amount and character of any loss sustained with respect to such Certificates, including any loss resulting from the failure to recover previously accrued interest or discount income. Special loss rules are applicable to banks and thrift institutions, including rules regarding reserves for bad debts. Such taxpayers are advised to consult their tax advisors regarding the treatment of losses on Certificates.

Non-U.S. Persons. Generally, payments of interest (including any payment with respect to accrued OID) on the REMIC Regular Certificates to a REMIC Regular Certificateholder who is not a

<PAGE>

U.S. Person and is not engaged in a trade or business within the United States will not be subject to federal withholding tax if (i) such REMIC Regular Certificateholder does not actually or constructively own 10 percent or more of the combined voting power of all classes of equity in the Issuer; (ii) such REMIC Regular Certificateholder is not a controlled foreign corporation (within the meaning of Code Section 957) related to the Issuer; and (iii) such REMIC Regular Certificateholder complies with certain identification requirements (including delivery of a statement, signed by the REMIC Regular Certificateholder under penalties of perjury, certifying that such REMIC Regular Certificateholder is a foreign person and providing the name and address of such REMIC Regular Certificateholder). If a REMIC Regular Certificateholder is not exempt from withholding, distributions of interest to such holder, including distributions in respect of accrued OID, may be subject to a 30% withholding

tax, subject to reduction under any applicable tax treaty.

        Further, a REMIC Regular Certificate will not be included in the estate of
a non-resident alien individual and will not be subject to United States estate
taxes; provided that the REMIC Regular Certificate is not held in connection
with the conduct of a United States trade or business. However,
Certificateholders who are non-resident alien individuals should consult their
tax advisors concerning this question.

        REMIC Regular Certificateholders who are not U.S. Persons and persons
related to such holders should not acquire any REMIC Residual Certificates, and
holders of REMIC Residual Certificates (the "REMIC Residual Certificateholder")
and persons related to REMIC Residual Certificateholders should not acquire any
REMIC Regular Certificates without consulting their tax advisors as to the
possible adverse tax consequences of doing so.

        Information Reporting and Backup Withholding.  The Master Servicer will
furnish or make available, within a reasonable time after the end of each
calendar year, to each person who was a REMIC Regular Certificateholder at any
time during such year, such information as may be deemed necessary or desirable
to assist REMIC Regular Certificateholders in preparing their federal income tax
returns, or to enable holders to make such information available to beneficial
owners or financial intermediaries that hold such REMIC Regular Certificates on
behalf of beneficial owners. If a holder, beneficial owner, financial
intermediary or other recipient of a payment on behalf of a beneficial owner
fails to supply a certified taxpayer identification number or if the Secretary
of the Treasury determines that such person has not reported all interest and
dividend income required to be shown on its federal income tax return, backup
withholding may be required with respect to any payments. Any amounts deducted
and withheld from a distribution to a recipient on account of backup withholding
would be allowed as a credit against such recipient's federal income tax
liability.

        New Withholding Regulations.  On January 1, 2001 the New Regulations
became effective (subject to certain transition rules) which make certain
modifications to the withholding, backup withholding and information reporting
rules described above. The New Regulations attempt to unify certification
requirements and modify reliance standards. Prospective investors are urged to
consult their own tax advisors regarding the New Regulations.

        2.      Taxation of Owners of REMIC Residual Certificates

        Allocation of the Income of the REMIC to the REMIC Residual
Certificates.  The REMIC will not be subject to federal income tax except with
respect to income from prohibited transactions and certain other transactions.
See "--Prohibited Transactions Tax and Other Taxes" below. Instead, each
original holder of a REMIC Residual Certificate will report on its federal
income tax return, as ordinary income, its share of the taxable income of the
REMIC for each day during the taxable year on which such holder owns any REMIC
Residual Certificates. The taxable income of the REMIC for each day will be
determined by allocating the taxable income of the REMIC for each calendar
quarter ratably to each day in the quarter. Such a holder's share of the taxable
income of the REMIC for each day will be based on the portion of the outstanding
REMIC Residual Certificates that such holder owns on that day. The taxable
income of the REMIC will be determined under an accrual method and will be
taxable to the holders of REMIC Residual Certificates without regard to the
timing or amounts of cash distributions by
                                    86

<PAGE>

the REMIC. Ordinary income derived from REMIC Residual Certificates will be
"portfolio income" for purposes of the taxation of taxpayers subject to the
limitations on the deductibility of "passive losses." As residual interests, the
REMIC Residual Certificates will be subject to tax rules, described below, that
differ from those that would apply if the REMIC Residual Certificates were

treated for federal income tax purposes as direct ownership interests in the Certificates or as debt instruments issued by the REMIC.

A REMIC Residual Certificateholder may be required to include taxable income from the REMIC Residual Certificate in excess of the cash distributed. For example, a structure where principal distributions are made serially on regular interests (that is, a fast-pay, slow-pay structure) may generate such a mismatching of income and cash distributions (that is, "phantom income"). This mismatching may be caused by the use of certain required tax accounting methods by the REMIC, variations in the prepayment rate of the underlying Mortgage Loans and certain other factors. Depending upon the structure of a particular transaction, the aforementioned factors may significantly reduce the after-tax yield of a REMIC Residual Certificate to a REMIC Residual Certificateholder. Investors should consult their own tax advisors concerning the federal income tax treatment of a REMIC Residual Certificate and the impact of such tax treatment on the after-tax yield of a REMIC Residual Certificate.

A subsequent REMIC Residual Certificateholder also will report on its federal income tax return amounts representing a daily share of the taxable income of the REMIC for each day that such REMIC Residual Certificateholder owns such REMIC Residual Certificate. Those daily amounts generally would equal the amounts that would have been reported for the same days by an original REMIC Residual Certificateholder, as described above. The Legislative History indicates that certain adjustments may be appropriate to reduce (or increase) the income of a subsequent holder of a REMIC Residual Certificate that purchased such REMIC Residual Certificate at a price greater than (or less than) the adjusted basis such REMIC Residual Certificate would have in the hands of an original REMIC Residual Certificateholder. See "--Sale or Exchange of REMIC Residual Certificates" below. It is not clear, however, whether such adjustments will in fact be permitted or required and, if so, how they would be made. The REMIC Regulations do not provide for any such adjustments.

Taxable Income of the REMIC Attributable to Residual Interests. The taxable income of the REMIC will reflect a netting of (i) the income from the Mortgage Loans and the REMIC's other assets and (ii) the deductions allowed to the REMIC for interest and OID on the REMIC Regular Certificates and, except as described above under "--Taxation of Owners of REMIC Regular Certificates--Non-Interest Expenses of the REMIC," other expenses. REMIC taxable income is generally determined in the same manner as the taxable income of an individual using the accrual method of accounting, except that:

   (i)    the limitations on deductibility of investment interest expense and expenses for the production of income do not apply,

   (ii)   all bad loans will be deductible as business bad debts, and

   (iii)  organizational expenses are not deductible.

The REMIC's gross income includes interest, original issue discount income, and market discount income, if any, on the Mortgage Loans, reduced by amortization of any premium on the Mortgage Loans, plus income on reinvestment of cash flows and reserve assets, plus any cancellation of indebtedness income upon allocation of realized losses to the REMIC Regular Certificates. Note that the timing of cancellation of indebtedness income recognized by REMIC Residual Certificateholders resulting from defaults and delinquencies on Mortgage Loans may differ from the time of the actual loss on the Mortgage Loan. The REMIC's deductions include interest and original issue discount expense on the REMIC Regular Certificates, servicing fees on the Mortgage Loans, other administrative expenses of the REMIC and realized losses on the Mortgage Loans. The requirement that REMIC Residual Certificateholders report their pro rata share of taxable income or net loss of the REMIC will continue until there are no Certificates of any class of the related series outstanding.

For purposes of determining its taxable income, the REMIC will have an initial aggregate tax basis in its assets equal to the sum of the issue prices

of the REMIC Regular Certificates and the REMIC
87

&lt;PAGE&gt;

Residual Certificates (or, if a class of Certificates is not sold initially, its
fair market value). Such aggregate basis will be allocated among the Mortgage
Loans and other assets of the REMIC in proportion to their respective fair
market value. A Mortgage Loan will be deemed to have been acquired with discount
or premium to the extent that the REMIC's basis therein is less than or greater
than its principal balance, respectively. Any such discount (whether market
discount or OID) will be includible in the income of the REMIC as it accrues, in
advance of receipt of the cash attributable to such income, under a method
similar to the method described above for accruing OID on the REMIC Regular
Certificates. The REMIC expects to elect under Code Section 171 to amortize any
premium on the Mortgage Loans. Premium on any Mortgage Loan to which such
election applies would be amortized under a constant yield method. It is not
clear whether the yield of a Mortgage Loan would be calculated for this purpose
based on scheduled payments or taking account of the Prepayment Assumption.
Additionally, such an election would not apply to the yield with respect to any
underlying mortgage loan originated on or before September 27, 1985. Instead,
premium with respect to such a mortgage loan would be allocated among the
principal payments thereon and would be deductible by the REMIC as those
payments become due.

   The REMIC will be allowed a deduction for interest and OID on the REMIC
Regular Certificates. The amount and method of accrual of OID will be calculated
for this purpose in the same manner as described above with respect to REMIC
Regular Certificates except that the 0.25% per annum de minimis rule and
adjustments for subsequent holders described therein will not apply.

   A REMIC Residual Certificateholder will not be permitted to amortize the
cost of the REMIC Residual Certificate as an offset to its share of the REMIC's
taxable income. However, REMIC taxable income will not include cash received by
the REMIC that represents a recovery of the REMIC's basis in its assets, and, as
described above, the issue price of the REMIC Residual Certificates will be
added to the issue price of the REMIC Regular Certificates in determining the
REMIC's initial basis in its assets. See "--Sale or Exchange of REMIC Residual
Certificates" below. For a discussion of possible adjustments to income of a
subsequent holder of a REMIC Residual Certificate to reflect any difference
between the actual cost of such REMIC Residual Certificate to such holder and
the adjusted basis such REMIC Residual Certificate would have in the hands of an
original REMIC Residual Certificateholder, see "--Allocation of the Income of
the REMIC to the REMIC Residual Certificates" above.

   Net Losses of the REMIC.  The REMIC will have a net loss for any calendar
quarter in which its deductions exceed its gross income. Such net loss would be
allocated among the REMIC Residual Certificateholders in the same manner as the
REMIC's taxable income. The net loss allocable to any REMIC Residual Certificate
will not be deductible by the holder to the extent that such net loss exceeds
such holder's adjusted basis in such REMIC Residual Certificate. Any net loss
that is not currently deductible by reason of this limitation may only be used
by such REMIC Residual Certificateholder to offset its share of the REMIC's
taxable income in future periods (but not otherwise). The ability of REMIC
Residual Certificateholders that are individuals or closely held corporations to
deduct net losses may be subject to additional limitations under the Code.

   Mark to Market Rules. A Residual Certificate acquired after January 3,
1995 cannot be marked to market.

   Pass-Through of Non-Interest Expenses of the REMIC.  As a general rule,
all of the fees and expenses of a REMIC will be taken into account by holders of
the REMIC Residual Certificates. In the case of a "single class REMIC," however,
the expenses and a matching amount of additional income will be allocated, under
temporary Treasury regulations, among the REMIC Regular Certificateholders and
the REMIC Residual Certificateholders on a daily basis in proportion to the

relative amounts of income accruing to each Certificateholder on that day. In general terms, a single class REMIC is one that either (i) would qualify, under existing Treasury regulations, as a grantor trust if it were not a REMIC (treating all interests as ownership interests, even if they would be classified as debt for federal income tax purposes) or (ii) is similar to such a trust and is structured with the principal purpose of avoiding the single class REMIC rules. The expenses of the REMIC will be allocated to holders of the related REMIC Residual Certificates in their entirety and not to holders of the related REMIC Regular Certificates.

88

<PAGE>

     In the case of individuals (or trusts, estates or other persons that compute their income in the same manner as individuals) who own an interest in a REMIC Regular Certificate or a REMIC Residual Certificate directly or through a pass-through interest holder that is required to pass miscellaneous itemized deductions through to its owners or beneficiaries (e.g. a partnership, an S corporation or a grantor trust), such expenses will be deductible under Code Section 67 only to the extent that such expenses, plus other "miscellaneous itemized deductions" of the individual, exceed 2% of such individual's adjusted gross income. In addition, Code Section 68 provides that the amount of itemized deductions otherwise allowable for an individual whose adjusted gross income exceeds a certain amount (the "Applicable Amount") will be reduced by the lesser of (i) 3% of the excess of the individual's adjusted gross income over the Applicable Amount or (ii) 80% of the amount of itemized deductions otherwise allowable for the taxable year. This reduction is currently scheduled to be phased-out over a five-year period beginning in 2006. The amount of additional taxable income recognized by REMIC Residual Certificateholders who are subject to the limitations of either Code Section 67 or Code Section 68 may be substantial. Further, holders (other than corporations) subject to the alternative minimum tax may not deduct miscellaneous itemized deductions in determining such holders' alternative minimum taxable income. The REMIC is required to report to each pass-through interest holder and to the

     IRS such holder's allocable share, if any, of the REMIC's non-interest expenses. The term "pass-through interest holder" generally refers to individuals, entities taxed as individuals and certain pass-through entities, but does not include real estate investment trusts. REMIC Residual Certificateholders that are pass-through interest holders should consult their own tax advisors about the impact of these rules on an investment in the REMIC Residual Certificates.

     Excess Inclusions.  A portion of the income on a REMIC Residual Certificate (referred to in the Code as an "excess inclusion") for any calendar quarter will be subject to federal income tax in all events. Thus, for example, an excess inclusion (i) may not, except as described below, be offset by any unrelated losses, deductions or loss carryovers of a REMIC Residual Certificateholder; (ii) will be treated as "unrelated business taxable income" within the meaning of Code Section 512 if the REMIC Residual Certificateholder is subject to tax only on its unrelated business taxable income (see "--Tax-Exempt Investors" below); and (iii) is not eligible for any reduction in the rate of withholding tax in the case of a REMIC Residual Certificateholder that is a foreign investor. See "--Non-U.S. Persons" below. An exception to the excess inclusion rules that applied to thrifts holding certain residuals was repealed by the Small Business Tax Act of 1996.

     Except as discussed in the following paragraph, with respect to any REMIC Residual Certificateholder, the excess inclusions for any calendar quarter is the excess, if any, of (i) the income of such REMIC Residual Certificateholder for that calendar quarter from its REMIC Residual Certificate over (ii) the sum of the "daily accruals" (as defined below) for all days during the calendar quarter on which the REMIC Residual Certificateholder holds such REMIC Residual Certificate. For this purpose, the daily accruals with respect to a REMIC Residual Certificate are determined by allocating to each day in the calendar

quarter its ratable portion of the product of the "adjusted issue price" (as
defined below) of the REMIC Residual Certificate at the beginning of the
calendar quarter and 120 percent of the "Federal long-term rate" in effect at
the time the REMIC Residual Certificate is issued. For this purpose, the
"adjusted issue price" of a REMIC Residual Certificate at the beginning of any
calendar quarter equals the issue price of the REMIC Residual Certificate,
increased by the amount of daily accruals for all prior quarters, and decreased
(but not below zero) by the aggregate amount of payments made on the REMIC
Residual Certificate before the beginning of such quarter. The "federal
long-term rate" is an average of current yields on Treasury securities with a
remaining term of greater than nine years, computed and published monthly by the
IRS.

       In the case of any REMIC Residual Certificates held by a real estate
investment trust, the aggregate excess inclusions with respect to such REMIC
Residual Certificates, reduced (but not below zero) by the real estate
investment trust taxable income (within the meaning of Code Section 857(b)(2),
excluding any net capital gain), will be allocated among the shareholders of
such trust in proportion to the dividends received by such shareholders from
such trust, and any amount so allocated will be treated as an
                                    89
<PAGE>

excess inclusion with respect to a REMIC Residual Certificate as if held
directly by such shareholder. Regulated investment companies, common trust funds
and certain Cooperatives are subject to similar rules.

       Fees Paid to Transferee of a REMIC Residual Certificate.  The federal
income tax consequences of any consideration paid to a transferee on a transfer
of a REMIC Residual Certificate are unclear. Recently issued regulations require
a transferee of a noneconomic residual interest to recognize any fee received to
induce such transferee to become a holder of such interest over a period
reasonably related to the period during which the applicable REMIC is expected
to generate taxable income or net loss in a manner that reasonably reflects the
after-tax costs and benefits (without regard to such fee) of holding such
interest. The regulations provide two safe harbor methods that would satisfy
this requirement. Under one method, the fee is recognized in accordance with the
method of accounting, and over the same period, that the taxpayer uses for
financial reporting purposes, provided that the fee is included in income for
financial reporting purposes over a period that is not shorter than the period
during which the applicable REMIC is expected to generate taxable income. Under
a second method, the fee is recognized ratably over the anticipated weighted
average life of the applicable REMIC (as determined under applicable Treasury
regulations) remaining as of the date of acquisition of the noneconomic residual
interest. The IRS may provide additional safe harbor methods in future guidance.
Once a taxpayer adopts a particular method of accounting for such fees, the
taxpayer generally may not change to a different method without consent of the
IRS. Under the regulations, if any portion of such a fee has not been recognized
in full by the time the holder of a noneconomic residual interest disposes of
such interest, then the holder must include the unrecognized portion in income
at that time. The regulations also provide that such a fee shall be treated as
income from sources within the United States. Any transferee receiving
consideration with respect to a REMIC Residual Certificate should consult its
tax advisors.

       Payments.  Any distribution made on a REMIC Residual Certificate to a
REMIC Residual Certificateholder will be treated as a non-taxable return of
capital to the extent it does not exceed the REMIC Residual Certificateholder's
adjusted basis in such REMIC Residual Certificate. To the extent a distribution
exceeds such adjusted basis, it will be treated as gain from the sale of the
REMIC Residual Certificate.

       Sale or Exchange of REMIC Residual Certificates.  If a REMIC Residual
Certificate is sold or exchanged, the seller will generally recognize gain or
loss equal to the difference between the amount realized on the sale or exchange

and its adjusted basis in the REMIC Residual Certificate (except that the recognition of loss may be limited under the "wash sale" rules described below). A holder's adjusted basis in a REMIC Residual Certificate generally equals the cost of such REMIC Residual Certificate to such REMIC Residual Certificateholder, increased by the taxable income of the REMIC that was included in the income of such REMIC Residual Certificateholder with respect to such REMIC Residual Certificate, and decreased (but not below zero) by the net losses that have been allowed as deductions to such REMIC Residual Certificateholder with respect to such REMIC Residual Certificate and by the distributions received thereon by such REMIC Residual Certificateholder. In general, any such gain or loss will be capital gain or loss provided the REMIC Residual Certificate is held as a capital asset. However, REMIC Residual Certificates will be "evidences of indebtedness" within the meaning of Code Section 582(c)(1), so that gain or loss recognized from sale of a REMIC Residual Certificate by a bank or thrift institution to which such section applies would be ordinary income or loss.

Except as provided in Treasury regulations yet to be issued, if the seller of a REMIC Residual Certificate reacquires such REMIC Residual Certificate, or acquires any other REMIC Residual Certificate, any residual interest in another REMIC or similar interest in a "taxable mortgage pool" (as defined in Code Section 7701(i)) during the period beginning six months before, and ending six months after, the date of such sale, such sale will be subject to the "wash sale" rules of Code Section 1091. In that event, any loss realized by the REMIC Residual Certificateholder on the sale will not be deductible, but, instead, will increase such REMIC Residual Certificateholder's adjusted basis in the newly acquired asset.

90
<PAGE>

3.      Prohibited Transactions Tax and Other Taxes

The Code imposes a tax on REMICs equal to 100% of the net income derived from "prohibited transactions" (the "Prohibited Transactions Tax"). In general, subject to certain specified exceptions, a prohibited transaction means the disposition of a Mortgage Loan, the receipt of income from a source other than a Mortgage Loan or certain other permitted investments, the receipt of compensation for services, or gain from the disposition of an asset purchased with the payments on the Mortgage Loans for temporary investment pending distribution on the Certificates. It is not anticipated that the Trust Fund for any series of Certificates will engage in any prohibited transactions in which it would recognize a material amount of net income.

In addition, certain contributions to a Trust Fund as to which an election has been made to treat such Trust Fund as a REMIC made after the day on which such Trust Fund issues all of its interests could result in the imposition of a tax on the Trust Fund equal to 100% of the value of the contributed property (the "Contributions Tax"). No Trust Fund for any series of Certificates will accept contributions that would subject it to such tax.

In addition, a Trust Fund as to which an election has been made to treat such Trust Fund as a REMIC may also be subject to federal income tax at the highest corporate rate on "net income from foreclosure property," determined by reference to the rules applicable to real estate investment trusts. "Net income from foreclosure property" generally means income from foreclosure property other than qualifying income for a real estate investment trust.

Where any Prohibited Transactions Tax, Contributions Tax, tax on net income from foreclosure property or state or local income or franchise tax that may be imposed on a REMIC relating to any series of Certificates arises out of or results from (i) a breach of the related Master Servicer's, Trustee's or Asset Seller's obligations, as the case may be, under the related Agreement for such series, such tax will be borne by such Master Servicer, Trustee or Asset Seller, as the case may be, out of its own funds or (ii) the Asset Seller's

obligation to repurchase a Mortgage Loan, such tax will be borne by the Asset
Seller. In the event that such Master Servicer, Trustee or Asset Seller, as the
case may be, fails to pay or is not required to pay any such tax as provided
above, such tax will be payable out of the Trust Fund for such series and will
result in a reduction in amounts available to be distributed to the
Certificateholders of such series.

      4.    Liquidation and Termination

      If the REMIC adopts a plan of complete liquidation, within the meaning of
Code Section 860F(a)(4)(A)(i), which may be accomplished by designating in the
REMIC's final tax return a date on which such adoption is deemed to occur, and
sells all of its assets (other than cash) within a 90-day period beginning on
such date, the REMIC will not be subject to any Prohibited Transaction Tax,
provided that the REMIC credits or distributes in liquidation all of the sale
proceeds plus its cash (other than the amounts retained to meet claims) to
holders of Regular and REMIC Residual Certificates within the 90-day period.

      The REMIC will terminate shortly following the retirement of the REMIC
Regular Certificates. If a REMIC Residual Certificateholder's adjusted basis in
the REMIC Residual Certificate exceeds the amount of cash distributed to such
REMIC Residual Certificateholder in final liquidation of its interest, then it
would appear that the REMIC Residual Certificateholder would be entitled to a
loss equal to the amount of such excess. It is unclear whether such a loss, if
allowed, will be a capital loss or an ordinary loss.

      5.    Administrative Matters

      Solely for the purpose of the administrative provisions of the Code, the
REMIC generally will be treated as a partnership and the REMIC Residual
Certificateholders will be treated as the partners. Certain information will be
furnished quarterly to each REMIC Residual Certificateholder who held a REMIC
Residual Certificate on any day in the previous calendar quarter.

                                       91
<PAGE>

      Each REMIC Residual Certificateholder is required to treat items on its
return consistently with their treatment on the REMIC's return, unless the REMIC
Residual Certificateholder either files a statement identifying the
inconsistency or establishes that the inconsistency resulted from incorrect
information received from the REMIC. The IRS may assert a deficiency resulting
from a failure to comply with the consistency requirement without instituting an
administrative proceeding at the REMIC level. The REMIC does not intend to
register as a tax shelter pursuant to Code Section 6111 because it is not
anticipated that the REMIC will have a net loss for any of the first five
taxable years of its existence. Any person that holds a REMIC Residual
Certificate as a nominee for another person may be required to furnish the
REMIC, in a manner to be provided in Treasury regulations, with the name and
address of such person and other information.

      6.    Tax-Exempt Investors

      Any REMIC Residual Certificateholder that is a pension fund or other
entity that is subject to federal income taxation only on its "unrelated
business taxable income" within the meaning of Code Section 512 will be subject
to such tax on that portion of the distributions received on a REMIC Residual
Certificate that is considered an excess inclusion. See "--Taxation of Owners of
REMIC Residual Certificates--Excess Inclusions" above.

      7.    Residual Certificate Payments--Non-U.S. Persons

      Amounts paid to REMIC Residual Certificateholders who are not U.S. Persons
are treated as interest for purposes of the 30% (or lower treaty rate) United
States withholding tax. Amounts distributed to holders of REMIC Residual

Certificates should qualify as "portfolio interest," subject to the conditions described in "--Taxation of Owners of REMIC Regular Certificates--Non U.S. Persons" above, but only to the extent that the underlying mortgage loans were originated after July 18, 1984. Furthermore, the rate of withholding on any income on a REMIC Residual Certificate that is excess inclusion income will not be subject to reduction under any applicable tax treaties or the "portfolio interest" exemption. See "--Taxation of Owners of REMIC Residual Certificates--Excess Inclusions" above. If the portfolio interest exemption is unavailable, such amount will be subject to United States withholding tax when paid or otherwise distributed (or when the REMIC Residual Certificate is disposed of) under rules similar to those for withholding upon disposition of debt instruments that have OID. The Code, however, grants the Treasury Department authority to issue regulations requiring that those amounts be taken into account earlier than otherwise provided where necessary to prevent avoidance of tax (for example, where the REMIC Residual Certificates do not have significant value). See "--Taxation of Owners of REMIC Residual Certificates--Excess Inclusions" above. If the amounts paid to REMIC Residual Certificateholders that are not U.S. Persons are effectively connected with their conduct of a trade or business within the United States, the 30% (or lower treaty rate) withholding will not apply. Instead, the amounts paid to such non-U.S. Person will be subject to U.S. federal income taxation at regular graduated rates. For special restrictions on the transfer of REMIC Residual Certificates, see "--Tax-Related Restrictions on Transfers of REMIC Residual Certificates" below.

REMIC Regular Certificateholders and persons related to such holders should not acquire any REMIC Residual Certificates, and REMIC Residual Certificateholders and persons related to REMIC Residual Certificateholders should not acquire any REMIC Regular Certificates, without consulting their tax advisors as to the possible adverse tax consequences of such acquisition.

TAX-RELATED RESTRICTIONS ON TRANSFERS OF REMIC RESIDUAL CERTIFICATES

Disqualified Organizations. An entity may not qualify as a REMIC unless there are reasonable arrangements designed to ensure that residual interests in such entity are not held by "disqualified organizations" (as defined below). Further, a tax is imposed on the transfer of a residual interest in a REMIC to a "disqualified organization." The amount of the tax equals the product of (i) an amount (as determined under the REMIC Regulations) equal to the present value of the total anticipated "excess inclusions" with respect to such interest for periods after the transfer and (ii) the highest marginal federal income tax rate applicable to corporations. The tax is imposed on the transferor unless the transfer is

                                    92

<PAGE>

through an agent (including a broker or other middleman) for a disqualified organization, in which event the tax is imposed on the agent. The person otherwise liable for the tax shall be relieved of liability for the tax if the transferee furnished to such person an affidavit that the transferee is not a disqualified organization and, at the time of the transfer, such person does not have actual knowledge that the affidavit is false. A "disqualified organization" means (A) the United States, any State, possession or political subdivision thereof, any foreign government, any international organization or any agency or instrumentality of any of the foregoing (provided that such term does not include an instrumentality if all its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by any such governmental agency), (B) any organization (other than certain farmers' Cooperatives) generally exempt from federal income taxes unless such organization is subject to the tax on "unrelated business taxable income" and (C) a rural electric or telephone Cooperative.

A tax is imposed on a "pass-through entity" (as defined below) holding a residual interest in a REMIC if at any time during the taxable year of the pass-through entity a disqualified organization is the record holder of an

interest in such entity. The amount of the tax is equal to the product of (A) the amount of excess inclusions for the taxable year allocable to the interest held by the disqualified organization and (B) the highest marginal federal income tax rate applicable to corporations. The pass-through entity otherwise liable for the tax, for any period during which the disqualified organization is the record holder of an interest in such entity, will be relieved of liability for the tax if such record holder furnishes to such entity an affidavit that such record holder is not a disqualified organization and, for such period, the pass-through entity does not have actual knowledge that the affidavit is false. For this purpose, a "pass-through entity" means (i) a regulated investment company, real estate investment trust or common trust fund, (ii) a partnership, trust or estate and (iii) certain Cooperatives. Except as may be provided in Treasury regulations not yet issued, any person holding an interest in a pass-through entity as a nominee for another will, with respect to such interest, be treated as a pass-through entity. The tax on pass-through entities is generally effective for periods after March 31, 1988, except that in the case of regulated investment companies, real estate investment trusts, common trust funds and publicly-traded partnerships the tax shall apply only to taxable years of such entities beginning after December 31, 1988. Under the Taxpayer Relief Act of 1997, large partnerships (generally with 250 or more partners) will be taxable on excess inclusion income as if all partners were disqualified organizations.

In order to comply with these rules, the Agreement will provide that no record or beneficial ownership interest in a REMIC Residual Certificate may be purchased, transferred or sold, directly or indirectly, unless the Master Servicer receives the following: (i) an affidavit from the proposed transferee to the effect that it is not a disqualified organization and is not acquiring the REMIC Residual Certificate as a nominee or agent for a disqualified organization and (ii) a covenant by the proposed transferee to the effect that the proposed transferee agrees to be bound by and to abide by the transfer restrictions applicable to the REMIC Residual Certificate.

Noneconomic REMIC Residual Certificates. The REMIC Regulations disregard, for federal income tax purposes, any transfer of a Noneconomic REMIC Residual Certificate unless no significant purpose of the transfer is to impede the assessment or collection of tax. If a transfer of a Noneconomic REMIC Residual Certificate is disregarded, the transferor would continue to be treated as the owner of the REMIC Residual Certificate and would continue to be subject to tax on its allocable portion of the net income of the REMIC. A Noneconomic REMIC Residual Certificate is any REMIC Residual Certificate (including a REMIC Residual Certificate with a positive value at issuance) unless, at the time of transfer, taking into account the Prepayment Assumption and any required or permitted clean up calls or required liquidation provided for in the REMIC's organizational documents, (i) the present value of the expected future distributions on the REMIC Residual Certificate at least equals the product of the present value of the anticipated excess inclusions and the highest corporate income tax rate in effect for the year in which the transfer occurs and (ii) the transferor reasonably expects that the transferee will receive distributions from the REMIC at or after the time at which taxes accrue on the anticipated excess inclusions in an amount sufficient to satisfy the accrued taxes. A significant purpose to impede the assessment or collection of tax exists if the transferor, at the time of the transfer, either knew or should

93

<PAGE>

have known that the transferee would be unwilling or unable to pay taxes due on its share of the taxable income of the REMIC.

The Treasury Department recently adopted final regulations setting forth the requirements of a safe harbor under which a transfer of a noneconomic REMIC Residual Certificate is presumed to be a valid transfer that will be respected for federal income tax purposes. To be respected under the safe harbor:

- the transferor must perform a reasonable investigation of the financial status of the transferee and determine that the transferee has historically paid its debts when they become due and find no significant evidence to indicate that the transferee will not continue to pay its debts as they come due (the "reasonable investigation requirement");

- the transferor must obtain a representation from the transferee to the effect that the transferee understands that as the holder of the REMIC Residual Certificate the transferee may incur tax liabilities in excess of the cash flow from the REMIC Residual Certificate and that the transferee intends to pay taxes associated with holding the Residual Certificate as they become due;

- the transferee must represent that it will not cause income from the REMIC Residual Certificate to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer (together with the representation described in the preceding bullet point, the "transferee representation requirement"); and

the transfer must satisfy either the "asset test" or the "formula test".

A transfer satisfies the "asset test" if the following three conditions are satisfied:

for financial reporting purposes, the transferee's gross assets exceed $100 million and its net assets exceed $10 million at the time of the transfer and at the close of both of the transferee's two preceding fiscal years, excluding certain related party obligations and certain assets held with a principal purpose of satisfying this requirement;

the transferee is a domestic C corporation (other than a tax-exempt corporation, regulated investment company, real estate investment trust, REMIC or Cooperative) that will not hold the REMIC Residual Certificate through a foreign permanent establishment (an "Eligible C Corporation") and agrees in writing that any subsequent transfer of the REMIC Residual Certificate will be to an Eligible C Corporation and will satisfy the asset test and the other requirements for the subsequent transfer to satisfy the safe harbor; and

a reasonable person would not conclude, based on the facts and circumstances known to the transferor (including any payment made to the transferee), that the taxes associated with the REMIC Residual Certificate will not be paid.

A transfer satisfies the "formula test" if the transfer is not a direct or indirect transfer of the REMIC Residual Certificate to a foreign permanent establishment or fixed based (within the meaning of an applicable income tax treaty) of a domestic transferee, and if the present value of the anticipated tax liabilities associated with holding the noneconomic REMIC Residual Certificate does not exceed the sum of:

the present value of any consideration given to the transferee to acquire the interest;

the present value of the expected future distributions on the interest; and

the present value of the anticipated tax savings associated with holding the interest as the REMIC generates losses.

For purposes of the computations under the formula test, the transferee generally is assumed to pay tax at the highest rate of tax specified in Code Section 11(b)(1). However, if the transferee has been subject to the alternative minimum tax under Code Section 55 in the preceding two years and will compute its taxable income in the current year using the alternative minimum tax rate, then the tax rate specified in Code Section 55(b)(1)(B) may be used in lieu of

the highest rate specified in Code

<PAGE>

Section 11(b)(1). Further, present values generally are computed using a discount rate equal to the federal short-term rate prescribed by Code Section 1274(d) for the month of the transfer and the compounding period used by the transferee. In some situations, satisfaction of the formula test would require the transferor of a noneconomic REMIC Residual Certificate to pay more consideration to the transferee than would otherwise be the case.

All transfers of REMIC Residual Certificates will be subject to certain restrictions that are intended to reduce the possibility of any such transfer being disregarded. Such restrictions will include requirements that (i) the transferor represent to the Master Servicer or the Trustee that it has conducted an investigation of the transferee and made the findings needed to satisfy the reasonable investigation requirement, (ii) the proposed transferee provides to the Master Servicer or the Trustee the representations needed to satisfy the transferee representation requirement and (iii) the proposed transferee agrees that it will not transfer the REMIC Residual Certificate to any person unless that person agrees to comply with the same restrictions on future transfers. Prior to purchasing a REMIC Residual Certificate, prospective purchasers should consider the possibility that a purported transfer of such REMIC Residual Certificate by such a purchaser to another purchaser at some future date may be disregarded in accordance with the foregoing rules, which would result in the retention of tax liability by such purchaser.

Foreign Investors.  The REMIC Regulations provide that the transfer of a REMIC Residual Certificate that has a "tax avoidance potential" to a "foreign person" will be disregarded for federal income tax purposes. This rule appears to apply to a transferee who is not a U.S. Person unless such transferee's income in respect of the REMIC Residual Certificate is effectively connected with the conduct of a United Sates trade or business. A REMIC Residual Certificate is deemed to have a tax avoidance potential unless, at the time of transfer, the transferor reasonably expect that the REMIC will distribute to the transferee amounts that will equal at least 30 percent of each excess inclusion, and that such amounts will be distributed at or after the time the excess inclusion accrues and not later than the end of the calendar year following the year of accrual. If the non-U.S. Person transfers the REMIC Residual Certificate to a U.S. Person, the transfer will be disregarded, and the foreign transferor will continue to be treated as the owner, if the transfer has the effect of allowing the transferor to avoid tax on accrued excess inclusions. The provisions in the REMIC Regulations regarding transfers of REMIC Residual Certificates that have tax avoidance potential to foreign persons are effective for all transfers after June 30, 1992. The Agreement will provide that no record or beneficial ownership interest in a REMIC Residual Certificate may be transferred, directly or indirectly, to a non-U.S. Person unless such person provides the Trustee with a duly completed IRS Form W-8ECI.

Any attempted transfer or pledge in violation of the transfer restrictions shall be absolutely null and void and shall vest no rights in any purported transferee. Investors in REMIC Residual Certificates are advised to consult their own tax advisors with respect to transfers of the REMIC Residual Certificates and, in addition, pass-through entities are advised to consult their own tax advisors with respect to any tax which may be imposed on a pass-through entity.

TAX CHARACTERIZATION OF A TRUST FUND AS A PARTNERSHIP

Dechert LLP, special counsel to the Depositor, will deliver its opinion that a Trust Fund for which a partnership election is made will not be an association (or publicly traded partnership) taxable as a corporation for federal income tax purposes. This opinion will be based on the assumption that the terms of the Trust Agreement and related documents will be complied with, and on counsel's conclusions that (1) the nature of the income of the Trust Fund

will exempt it from the rule that certain publicly traded partnerships are
taxable as corporations or (2) the issuance of the Certificates has been
structured as a private placement under an IRS safe harbor, so that the Trust
Fund will not be characterized as a publicly traded partnership taxable as a
corporation.

    If the Trust Fund were taxable as a corporation for federal income tax
purposes, the Trust Fund would be subject to corporate income tax on its taxable
income. The Trust Fund's taxable income would include all its income, possibly
reduced by its interest expense on the Notes. Any such corporate income

                                    95
<PAGE>

tax could materially reduce cash available to make payments on the Notes and
distributions on the Certificates, and Certificateholders could be liable for
any such tax that is unpaid by the Trust Fund.

    1.    Tax Consequences to Holders of the Notes

    Treatment of the Notes as Indebtedness.  The Trust Fund will agree, and
the Noteholders will agree by their purchase of Notes, to treat the Notes as
debt for federal income tax purposes. Special counsel to the Depositor will,
except as otherwise provided in the related Prospectus Supplement, advise the
Depositor that the Notes will be classified as debt for federal income tax
purposes. The discussion below assumes this characterization of the Notes is
correct.

    OID, etc.  The discussion below assumes that all payments on the Notes are
denominated in U.S. dollars. Moreover, the discussion assumes that the interest
formula for the Notes meets the requirements for "qualified stated interest"
under the OID regulations, and that any OID on the Notes (i.e., any excess of
the principal amount of the Notes over their issue price) does not exceed a de
minimis amount (i.e., 1/4% of their principal amount multiplied by the number of
full years included in their term), all within the meaning of the OID
regulations. If these conditions are not satisfied with respect to any given
series of Notes, additional tax considerations with respect to such Notes will
be disclosed in the related Prospectus Supplement.

    Interest Income on the Notes.  Based on the above assumptions, except as
discussed in the following paragraph, the Notes will not be considered issued
with OID. The stated interest thereon will be taxable to a Noteholder as
ordinary interest income when received or accrued in accordance with such
Noteholder's method of tax accounting. Under the OID regulations, a holder of a
Note issued with a de minimis amount of OID must include such OID in income, on
a pro rata basis, as principal payments are made on the Note. It is believed
that any prepayment premium paid as a result of a mandatory redemption will be
taxable as contingent interest when it becomes fixed and unconditionally
payable. A purchaser who buys a Note for more or less than its principal amount
will generally be subject, respectively, to the premium amortization or market
discount rules of the Code.

    A holder of a Note that has a fixed maturity date of not more than one
year from the issue date of such Note (a "Short-Term Note") may be subject to
special rules. An accrual basis holder of a Short-Term Note (and certain cash
method holders, including regulated investment companies, as set forth in Code
Section 1281) generally would be required to report interest income as interest
accrues on a straight-line basis over the term of each interest period. Other
cash basis holders of a Short-Term Note would, in general, be required to report
interest income as interest is paid (or, if earlier, upon the taxable
disposition of the Short-Term Note). However, a cash basis holder of a
Short-Term Note reporting interest income as it is paid may be required to defer
a portion of any interest expense otherwise deductible on indebtedness incurred
to purchase or carry the Short-Term Note until the taxable disposition of the
Short-Term Note. A cash basis taxpayer may elect under Code Section 1281 to

accrue interest income on all nongovernment debt obligations with a term of one year or less, in which case the taxpayer would include interest on the Short-Term Note in income as it accrues, but would not be subject to the interest expense deferral rule referred to in the preceding sentence. Certain special rules apply if a Short-Term Note is purchased for more or less than its principal amount.

Sale or Other Disposition.  If a Noteholder sells a Note, the holder will recognize gain or loss in an amount equal to the difference between the amount realized on the sale and the holder's adjusted tax basis in the Note.

The adjusted tax basis of a Note to a particular Noteholder will equal the holder's cost for the Note, increased by any market discount, acquisition discount, OID and gain previously included by such Noteholder in income with respect to the Note and decreased by the amount of bond premium (if any) previously amortized and by the amount of principal payments previously received by such Noteholder with respect to such Note. Any such gain or loss will be capital gain or loss if the Note was held as a capital asset, except for gain representing accrued interest and accrued market discount not previously included in income. Capital losses generally may be used only to offset capital gains.

96

<PAGE>

Such gain or loss generally will be long-term capital gain or loss if the Note were held for more than one year. Long-term capital gains of non-corporate taxpayers are subject to reduced maximum rates while short-term capital gains are taxable at ordinary rates. The use of capital losses is subject to limitations. Prospective investors should consult their own tax advisors concerning the treatment of capital gains.

Foreign Holders.  Interest payments made (or accrued) to a Noteholder who is a nonresident alien, foreign corporation or other non-United States person (a "foreign person") generally will be considered "portfolio interest", and generally will not be subject to United States federal income tax and withholding tax, if the interest is not effectively connected with the conduct of a trade or business within the United States by the foreign person and the foreign person (i) is not actually or constructively a "10 percent shareholder" of the Trust or the Depositor (including a holder of 10% of the outstanding Certificates) or a "controlled foreign corporation" with respect to which the Trust Fund or the Asset Seller is a "related person" within the meaning of the Code and (ii) provides the Owner Trustee or other person who is otherwise required to withhold U.S. tax with respect to the Notes with an appropriate statement (on Form W-8BEN or a similar form), signed under penalties of perjury, certifying that the beneficial owner of the Note is a foreign person and providing the foreign person's name and address. If a Note is held through a securities clearing organization or certain other financial institutions, the organization or institution may provide the relevant signed statement to the withholding agent; in that case, however, the signed statement must be accompanied by a Form W-8BEN or substitute form provided by the foreign person that owns the Note. If such interest is not portfolio interest, then it will be subject to United States federal income and withholding tax at a rate of 30 percent, unless reduced or eliminated pursuant to an applicable tax treaty.

Any capital gain realized on the sale, redemption, retirement or other taxable disposition of a Note by a foreign person will be exempt from United States federal income and withholding tax, provided that (i) such gain is not effectively connected with the conduct of a trade or business in the United States by the foreign person and (ii) in the case of an individual foreign person, the foreign person is not present in the United States for 183 days or more in the taxable year.

Backup Withholding.  Each holder of a Note (other than an exempt holder such as a corporation, tax-exempt organization, qualified pension and

profit-sharing trust, individual retirement account or nonresident alien who
provides certification as to status as a nonresident) will be required to
provide, under penalties of perjury, a certificate containing the holder's name,
address, correct federal taxpayer identification number and a statement that the
holder is not subject to backup withholding. Should a nonexempt Noteholder fail
to provide the required certification, the Trust Fund will be required to
withhold a portion of the amount otherwise payable to the holder, and remit the
withheld amount to the IRS as a credit against the holder's federal income tax
liability. The backup withholding rate is currently 28%. This rate is scheduled
to adjust for tax years after 2010.

     Possible Alternative Treatments of the Notes.  If, contrary to the opinion
of special counsel to the Depositor, the IRS successfully asserted that one or
more of the Notes did not represent debt for federal income tax purposes, the
Notes might be treated as equity interests in the Trust Fund. If so treated, the
Trust Fund would likely be treated as a publicly traded partnership that would
not be taxable as a corporation because it would meet certain qualifying income
tests. Nonetheless, treatment of the Notes as equity interests in such a
publicly traded partnership could have adverse tax consequences to certain
holders. For example, income to certain tax-exempt entities (including pension
funds) would be "unrelated business taxable income", income to foreign holders
generally would be subject to U.S. tax and U.S. tax return filing and
withholding requirements, and individual holders might be subject to certain
limitations on their ability to deduct their share of the Trust Fund's expenses.

     2.     Tax Consequences to Holders of the Certificates

     Treatment of the Trust Fund as a Partnership.  The Depositor will agree,
and the Certificateholders will agree by their purchase of Certificates, to
treat the Trust Fund as a partnership for purposes of federal and state income
tax, franchise tax and any other tax measured in whole or in part by income,
with

                                       97
<PAGE>

the assets of the partnership being the assets held by the Trust Fund, the
partners of the partnership being the Certificateholders, and the Notes being
debt of the partnership. However, the proper characterization of the arrangement
involving the Trust Fund, the Certificates, the Notes, the Trust Fund and the
Master Servicer is not clear because there is no authority on transactions
closely comparable to that contemplated herein.

     A variety of alternative characterizations are possible. For example,
because the Certificates have certain features characteristic of debt, the
Certificates might be considered debt of the Trust Fund. Any such
characterization would not result in materially adverse tax consequences to
Certificateholders as compared to the consequences from treatment of the
Certificates as equity in a partnership, described below. The following
discussion assumes that the Certificates represent equity interests in a
partnership.

     Indexed Securities, etc.  The following discussion assumes that all
payments on the Certificates are denominated in U.S. dollars, none of the
Certificates are Indexed Securities or Strip Certificates, and that a series of
Securities includes a single class of Certificates. If these conditions are not
satisfied with respect to any given series of Certificates, additional tax
considerations with respect to such Certificates will be disclosed in the
related Prospectus Supplement.

     Partnership Taxation.  As a partnership, the Trust Fund will not be
subject to federal income tax. Rather, each Certificateholder will be required
to separately take into account such holder's allocated share of income, gains,
losses, deductions and credits of the Trust Fund. The Trust Fund's income will
consist primarily of interest and finance charges earned on the Mortgage Loans
(including appropriate adjustments for market discount, OID and bond premium)

and any gain upon collection or disposition of Mortgage Loans. The Trust Fund's deductions will consist primarily of interest accruing with respect to the Notes, servicing and other fees, and losses or deductions upon collection or disposition of Mortgage Loans.

The tax items of a partnership are allocable to the partners in accordance with the Code, Treasury regulations and the partnership agreement (here, the Trust Agreement and related documents). The Trust Agreement will provide, in general, that the Certificateholders will be allocated taxable income of the Trust Fund for each month equal to the sum of (i) the interest that accrues on the Certificates in accordance with their terms for such month, including interest accruing at the Pass-Through Rate for such month and interest on amounts previously due on the Certificates but not yet distributed; (ii) any Trust Fund income attributable to discount on the Mortgage Loans that corresponds to any excess of the principal amount of the Certificates over their initial issue price; (iii) prepayment premiums payable to the Certificateholders for such month; and (iv) any other amounts of income payable to the Certificateholders for such month. Such allocation will be reduced by any amortization by the Trust Fund of premium on Mortgage Loans that corresponds to any excess of the issue price of Certificates over their principal amount. All remaining taxable income of the Trust Fund will be allocated to the Company. Based on the economic arrangement of the parties, this approach for allocating Trust Fund income should be permissible under applicable treasury regulations, although no assurance can be given that the IRS would not require a greater amount of income to be allocated to Certificateholders. Moreover, even under the foregoing method of allocation, Certificateholders may be allocated income equal to the entire Pass-Through Rate plus the other items described above even though the Trust Fund might not have sufficient cash to make current cash distributions of such amount. Thus, cash basis holders will in effect be required to report income from the Certificates on the accrual basis and Certificateholders may become liable for taxes on Trust Fund income even if they have not received cash from the Trust Fund to pay such taxes. In addition, because tax allocations and tax reporting will be done on a uniform basis for all Certificateholders but Certificateholders may be purchasing Certificates at different times and at different prices Certificateholders may be required to report on their tax returns taxable income that is greater or less than the amount reported to them by the Trust Fund.

All of the taxable income allocated to a Certificateholder that is a pension, profit sharing or employee benefit plan or other tax-exempt entity (including an individual retirement account) will constitute "unrelated business taxable income" generally taxable to such a holder under the Code.

98

<PAGE>

An individual taxpayer's share of expenses of the Trust Fund (including fees to the Master Servicer but not interest expense) would be miscellaneous itemized deductions. Such deductions might be disallowed to the individual in whole or in part and might result in such holder being taxed on an amount of income that exceeds the amount of cash actually distributed to such holder over the life of the Trust Fund.

The Trust Fund intends to make all tax calculations relating to income and allocations to Certificateholders on an aggregate basis. If the IRS were to require that such calculations be made separately for each Mortgage Loan, the Trust Fund might be required to incur additional expense but it is believed that there would not be a material adverse effect on Certificateholders.

Discount and Premium.  It is believed that the Loans were not issued with OID, and, therefore, the Trust should not have OID income. However, the purchase price paid by the Trust Fund for the Mortgage Loans may be greater or less than the remaining principal balance of the Loans at the time of purchase. If so, the Loan will have been acquired at a premium or discount, as the case may be. (As indicated above, the Trust Fund will make this calculation on an aggregate

basis, but might be required to recompute it on a Mortgage Loan by Mortgage Loan basis.)

If the Trust Fund acquires the Mortgage Loans at a market discount or premium, the Trust Fund will elect to include any such discount in income currently as it accrues over the life of the Mortgage Loans or to offset any such premium against interest income on the Mortgage Loans. As indicated above, a portion of such market discount income or premium deduction may be allocated to Certificateholders.

Section 708 Termination.  Under Code Section 708, the Trust Fund will be deemed to terminate for federal income tax purposes if 50% or more of the capital and profits interests in the Trust Fund are sold or exchanged within a 12-month period. Pursuant to formal Treasury regulations issued May 8, 1997 under Code Section 708, if such a termination occurs, the Trust Fund (the "old partnership") would be deemed to contribute its assets to a new partnership (the "new partnership") in exchange for interests in the new partnership. Such interests would be deemed distributed to the partners of the old partnership in liquidation thereof, which would not constitute a sale or exchange.

Disposition of Certificates.  Generally, capital gain or loss will be recognized on a sale of Certificates in an amount equal to the difference between the amount realized and the seller's tax basis in the Certificates sold. A Certificateholder's tax basis in a Certificate will generally equal the holder's cost increased by the holder's share of Trust Fund income (includible in income) and decreased by any distributions received with respect to such Certificate. In addition, both the tax basis in the Certificates and the amount realized on a sale of a Certificate would include the holder's share of the Notes and other liabilities of the Trust Fund. A holder acquiring Certificates at different prices may be required to maintain a single aggregate adjusted tax basis in such Certificates, and, upon sale or other disposition of some of the Certificates, allocate a portion of such aggregate tax basis to the Certificates sold (rather than maintaining a separate tax basis in each Certificate for purposes of computing gain or loss on a sale of that Certificate).

Any gain on the sale of a Certificate attributable to the holder's share of unrecognized accrued market discount on the Mortgage Loans would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements. The Trust Fund does not expect to have any other assets that would give rise to such special reporting requirements. Thus, to avoid those special reporting requirements, the Trust Fund will elect to include market discount in income as it accrues.

If a Certificateholder is required to recognize an aggregate amount of income (not including income attributable to disallowed itemized deductions described above) over the life of the Certificates that exceeds the aggregate cash distributions with respect thereto, such excess will generally give rise to a capital loss upon the retirement of the Certificates.

Allocations Between Transferors and Transferees.  In general, the Trust Fund's taxable income and losses will be determined monthly and the tax items for a particular calendar month will be apportioned among the Certificateholders in proportion to the principal amount of Certificates owned by them as of the

99

<PAGE>

close of the last day of such month. As a result, a holder purchasing Certificates may be allocated tax items (which will affect its tax liability and tax basis) attributable to periods before the actual transaction.

The use of such a monthly convention may not be permitted by existing regulations. If a monthly convention is not allowed (or only applies to transfers of less than all of the partner's interest), taxable income or losses of the Trust Fund might be reallocated among the Certificateholders. The Trust Fund's method of allocation between transferors and transferees may be revised

to conform to a method permitted by future regulations.

Section 754 Election.  In the event that a Certificateholder sells its Certificates at a profit (loss), the purchasing Certificateholder will have a higher (lower) basis in the Certificates than the selling Certificateholder had. The tax basis of the Trust Fund's assets will not be adjusted to reflect that higher (or lower) basis unless the Trust Fund were to file an election under Code Section 754. In order to avoid the administrative complexities that would be involved in keeping accurate accounting records, as well as potentially onerous information reporting requirements, the Trust Fund will not make such election. As a result, Certificateholders might be allocated a greater or lesser amount of Trust Fund income than would be appropriate based on their own purchase price for Certificates.

Administrative Matters.  The Trustee is required to keep or have kept complete and accurate books of the Trust Fund. Such books will be maintained for financial reporting and tax purposes on an accrual basis and the fiscal year of the Trust will be the calendar year. The Trustee will file a partnership information return (IRS Form 1065) with the IRS for each taxable year of the Trust Fund and will report each Certificateholder's allocable share of items of Trust Fund income and expense to holders and the IRS on Schedule K-1. The Trust Fund will provide the Schedule K-1 information to nominees that fail to provide the Trust Fund with the information statement described below and such nominees will be required to forward such information to the beneficial owners of the Certificates. Generally, holders must file tax returns that are consistent with the information return filed by the Trust Fund or be subject to penalties unless the holder notifies the IRS of all such inconsistencies.

Under Code Section 6031, any person that holds Certificates as a nominee at any time during a calendar year is required to furnish the Trust Fund with a statement containing certain information on the nominee, the beneficial owners and the Certificates so held. Such information includes (i) the name, address and taxpayer identification number of the nominee and (ii) as to each beneficial owner (x) the name, address and identification number of such person, (y) whether such person is a United States person, a tax-exempt entity or a foreign government, an international organization, or any wholly owned agency or instrumentality of either of the foregoing, and (z) certain information on Certificates that were held, bought or sold on behalf of such person throughout the year. In addition, brokers and financial institutions that hold Certificates through a nominee are required to furnish directly to the Trust Fund information as to themselves and their ownership of Certificates. A clearing agency registered under Section 17A of the Exchange Act is not required to furnish any such information statement to the Trust Fund. The information referred to above for any calendar year must be furnished to the Trust Fund on or before the following January 31. Nominees, brokers and financial institutions that fail to provide the Trust Fund with the information described above may be subject to penalties.

The Company will be designated as the tax matters partner in the related Trust Agreement and, as such, will be responsible for representing the Certificateholders in any dispute with the IRS. The Code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer. Generally, the statute of limitations for partnership items does not expire before three years after the date on which the partnership information return is filed. Any adverse determination following an audit of the return of the Trust Fund by the appropriate taxing authorities could result in an adjustment of the returns of the Certificateholders, and, under certain circumstances, a Certificateholder may be precluded from separately litigating a proposed adjustment to the items of the Trust Fund. An adjustment could also result in an audit of a Certificateholder's returns and adjustments of items not related to the income and losses of the Trust Fund.

100

<PAGE>

Tax Consequences to Foreign Certificateholders. It is not clear whether the Trust Fund would be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-U.S. Persons because there is no clear authority dealing with that issue under facts substantially similar to those described herein. Although it is not expected that the Trust Fund would be engaged in a trade or business in the United States for such purposes, the Trust Fund will withhold as if it were so engaged in order to protect the Trust Fund from possible adverse consequences of a failure to withhold. The Trust Fund expects to withhold on the portion of its taxable income that is allocable to foreign Certificateholders pursuant to Code Section 1446, as if such income were effectively connected to a U.S. trade or business, at a rate equal to the highest rate of tax specified in Code Section 11(b)(i) in the case of foreign holders that are taxable as corporations and equal to the highest rate of tax specified in Code Section 1 in the case of all other foreign holders. Subsequent adoption of Treasury regulations or the issuance of other administrative pronouncements may require the Trust Fund to change its withholding procedures. In determining a holder's withholding status, the Trust Fund may rely on IRS Form W-8BEN, IRS Form W-9 or the holder's certification of nonforeign status signed under penalties of perjury.

Each foreign holder might be required to file a U.S. individual or corporate income tax return (including, in the case of a corporation, the branch profits tax) on its share of the Trust Fund's income. Each foreign holder must obtain a taxpayer identification number from the IRS and submit that number to the Trust Fund on Form W-8BEN in order to assure appropriate crediting of the taxes withheld. A foreign holder generally would be entitled to file with the IRS a claim for refund with respect to taxes withheld by the Trust Fund taking the position that no taxes were due because the Trust Fund was not engaged in a U.S. trade or business. However, interest payments made (or accrued) to a Certificateholder who is a foreign person generally will be considered guaranteed payments to the extent such payments are determined without regard to the income of the Trust Fund. If these interest payments are properly characterized as guaranteed payments, then the interest will not be considered "portfolio interest." As a result, Certificateholders will be subject to United States federal income tax and withholding tax at a rate of 30 percent, unless reduced or eliminated pursuant to an applicable treaty. In such case, a foreign holder would only be enticed to claim a refund for that portion of the taxes in excess of the taxes that should be withheld with respect to the guaranteed payments.

Backup Withholding. Distributions made on the Certificates and proceeds from the sale of the Certificates will be subject to backup withholding tax if, in general, the Certificateholder fails to comply with certain identification procedures, unless the holder is an exempt recipient under applicable provisions of the Code.

New Withholding Regulations. On January 1, 2001 the New Regulations became effective (subject to certain transition rules) which make certain modifications to the withholding, backup withholding and information reporting rules described above. The New Regulations attempt to unify certification requirements and modify reliance standards. Prospective investors are urged to consult their own tax advisors regarding the New Regulations.

TAX TREATMENT OF CERTIFICATES AS DEBT FOR TAX PURPOSES

    1.    Characterization of the Certificates as Indebtedness

If the related Prospectus Supplement indicates that the Certificates will be treated as indebtedness for federal income tax purposes, then based on the application of existing law to the facts as set forth in the Trust Agreement and other relevant documents and assuming compliance with the terms of the Trust Agreement as in effect on the date of issuance of the Certificates, Dechert LLP, special tax counsel to the Depositor ("Tax Counsel"), will deliver its opinion that the Certificates will be treated as debt instruments for federal income tax purposes as of such date.

The Depositor and the Certificateholders will express in the related Trust Agreement their intent that, for applicable tax purposes, the Certificates will be indebtedness secured by the related Assets. The Depositor and the Certificateholders, by accepting the Certificates, and each Certificate Owner by its

101

&lt;PAGE&gt;

acquisition of a beneficial interest in a Certificate, have agreed to treat the Certificates as indebtedness for U.S. federal income tax purposes. However, because different criteria are used to determine the non-tax accounting characterization of the transaction, the Depositor may treat this transaction as a sale of an interest in the related Assets for financial accounting and certain regulatory purposes.

In general, whether for U.S. federal income tax purposes a transaction constitutes a sale of property or a loan, the repayment of which is secured by property, is a question of fact, the resolution of which is based upon the economic substance of the transaction rather than its form or the manner in which it is labeled. While the IRS and the courts have set forth several factors to be take into account in determining whether the substance of a transaction is a sale of property or a secured loan, the primary factor in making this determination is whether the transferee has assumed the risk of loss or other economic burdens relating to the property and has obtained the benefits of ownership thereof. Tax Counsel will analyze and rely on several factors in reaching its opinion that the weight of the benefits and burdens of ownership of the Mortgage Loans will be retained by the Depositor and not transferred to the Certificate Owners.

In some instances, courts have held that a taxpayer is bound by the particular form it has chosen for a transaction, even if the substance of the transaction does not accord with its form. Tax Counsel will advise that the rationale of those cases will not apply to this transaction, because the form of the transaction as reflected in the operative provisions of the documents either accords with the characterization of the Certificates as debt or otherwise makes the rationale of those cases inapplicable to this situation.

    2.    Taxation of Interest Income of Certificate Owners

Assuming that the Certificate Owners are holders of debt obligations for U.S. federal tax purposes, the Certificates generally will be taxable in the following manner. While it is not anticipated that the Certificates will be issued at a greater than de minimis discount, under the OID Regulations it is possible that the Certificates could nevertheless be deemed to have been issued with OID if the interest were not treated as "unconditionally payable" under the OID Regulations. If such regulations were to apply, all of the taxable income to be recognized with respect to the Certificates would be includible in income of Certificate owners as OID, but would not be includible again when the interest is actually received.

    3.    Possible Classification of the Trust Fund as a Partnership or Association Taxable as a Corporation

Based on application of existing laws to the facts as set forth in the Trust Agreement and other relevant documents and assuming compliance with the terms of the Trust Agreement, Tax Counsel will deliver its opinion that the transaction will not be treated as a partnership or an association taxable as a corporation. The opinion of Tax Counsel is not binding on the courts or the IRS. It is possible that the IRS could assert that, for purposes of the Code, the transaction contemplated by this Prospectus Supplement with respect to the Certificates constitutes a sale of the Mortgage Loans (or an interest therein) to the Certificate Owners and that the proper classification of the legal relationship between the Depositor and the Certificate Owners resulting form this transaction is that of a partnership (including a publicly traded

partnership treated as a corporation), or an association taxable as a corporation. Since Tax Counsel will advise that the Certificates will be treated as indebtedness in the hands of the Certificateholders for U.S. federal income tax purposes and that the entity constituted by the Trust will not be a publicly traded partnership treated as a corporation or an association taxable as a corporation, the Depositor will not attempt to comply with U.S. federal income tax reporting requirements applicable to partnerships or corporations as such requirements would apply if the Certificates were treated as indebtedness.

If it were determined that this transaction created an entity classified as a corporation (including a publicly traded partnership taxable as a corporation), the Trust Fund would be subject to U.S. federal income tax at corporate income tax rates on the income it derives form the Mortgage Loans, which would reduce the amounts available for distribution to the Certificate Owners. Cash distributions to the

<div align="center">102</div>

&lt;PAGE&gt;

Certificate Owners generally would be treated as dividends for tax purposes to the extent of such corporation's earnings and profits.

If the transaction were treated as creating a partnership between the Certificate Owners and the Transferor, the partnership itself would not be subject to U.S. federal income tax (unless it were to be characterized as a publicly traded partnership taxable as a corporation); rather, the Depositor and each Certificate Owner would be taxed individually on their respective distributive shares of the partnership's income, gain, loss, deductions and credits. The amount and timing of items of income and deductions of the Certificate Owner could differ if the Certificates were held to constitute partnership interests rather than indebtedness.

    4.    Possible Classification as a Taxable Mortgage Pool

In relevant part, Code Section 7701(i) provides that any entity (or portion of an entity) that is a "taxable mortgage pool" will be classified as a taxable corporation and will not be permitted to file a consolidated U.S. federal income tax return with another corporation. Any entity (or portion of any entity) will be a taxable mortgage pool if (i) substantially all of its assets consist of debt instruments, more than 50% of which are real estate mortgages, (ii) the entity is the obligor under debt obligations with two or more maturities, and (iii) under the terms of the entity's debt obligations (or an underlying arrangement), payments on such debt obligations bear a relationship to the debt instruments held by the entity.

In the case of a Trust Fund containing Mortgage Loans, assuming that all of the provisions of the Trust Agreement, as in effect on the date of issuance, will be complied with, Tax Counsel will deliver its opinion that the arrangement created by the Agreement will not be a taxable mortgage pool under Code Section 7701(i) because only one class of indebtedness secured by the Mortgage Loans will be issued.

The opinion of Tax Counsel is not binding on the IRS or the courts. If the IRS were to contend successfully (or future regulations were to provide) that the arrangement created by the Trust Agreement is a taxable mortgage pool, such arrangement would be subject to U.S. federal corporate income tax on its taxable income generated by ownership of the Mortgage Loans. Such a tax might reduce amounts available for distributions to Certificate Owners. The amount of such a tax would depend upon whether distributions to Certificate Owners would be deductible as interest expense in computing the taxable income of such an arrangement as a taxable mortgage pool.

    5.    Foreign Investors

In general, subject to certain exception, interest (including OID) paid on

a Certificate to a nonresident alien individual, foreign corporation or other non-United States person is not subject to U.S. federal income tax, provided that such interest is not effectively connected with a trade or business of the recipient in the United sates and the Certificate Owner provides the required foreign person information certification.

If the interest of the Certificate Owners were deemed to be partnership interest, the partnership would be required, on a quarterly basis, to pay withholding tax equal to the product, for each foreign partner, of such foreign partner's distributive share of "effectively connected" income of the partnership multiplied by the highest rate of tax applicable to that foreign partner. In addition, such foreign partner would be subject to branch profits tax. Each non-foreign partner would be required to certify to the partnership that it is not a foreign person. The tax withheld from each foreign partner would be credited against such foreign partner's U.S. income tax liability.

If the Trust were taxable as a corporation, distributions to foreign persons, to the extent treated as dividends, would generally be subject to withholding at the rate of 30%, unless such rate were reduced by an applicable tax treaty.

6. Backup Withholding

Certain Certificate Owners may be subject to backup withholding with respect to interest paid on the Certificates if the Certificate Owners, upon issuance of the Certificates, fail to supply the Trustee or

103

<PAGE>

the Certificate Owners' brokers with their respective taxpayer identification numbers, furnish an incorrect taxpayer identification number, fail to report interest, dividends, or other "reportable payments" (as defined in the Code) properly, or, under certain circumstances, fail to provide the Trustee of the Certificate Owners' brokers with certified statements, under penalty of perjury, that they are not subject to backup withholding. The backup withholding rate is currently 28%. This rate is scheduled to adjust for tax years after 2010.

The Trustee will be required to report annually to the IRS, and to each Certificateholder of record, the amount of interest paid (and OID accrued, if any) on the Certificates (and the amount of interest withheld for U.S. federal income taxes, if any) for each calendar year, except as to exempt holders (generally, holders that are corporations, certain tax-exempt organizations or nonresident aliens who provide certification as to their status as nonresidents). As long as the only "Certificateholder" of record is Cede, as nominee for DTC, Certificate Owners and the IRS will receive tax and other information including the amount of interest paid on the Certificates owned from Participants and Indirect Participants rather than from the Trustee. (The Trustee, however, will respond to requests for necessary information to enable Participants, Indirect Participants and certain other persons to complete their reports.) Each non-exempt Certificate Owner will be required to provide, under penalty of perjury, a certificate on IRS Form W-9 containing his or her name, address, correct federal taxpayer identification number and a statement that he or she is not to subject to backup withholding. Should a non-exempt Certificate Owner fail to provide the required certification, the Participants or Indirect Participants (or the Paying Agent) will be required to backup withhold from interest (and principal) otherwise payable to the holder, and remit the withheld amount to the IRS as a credit against the holder's federal income tax liability.

7. New Withholding Regulations

On January 1, 2001, the New Regulations became effective (subject to certain transition rules) which make certain modifications to the withholding, backup withholding and information reporting rules described above. The New Regulations attempt to unify certification requirements and modify reliance

standards. Prospective investors are urged to consult their own tax advisors regarding the New Regulations.

                TAXATION OF CLASSES OF EXCHANGEABLE SECURITIES

GENERAL

     The arrangement pursuant to which the exchangeable securities of a series are created, sold and administered (an "Exchangeable Pool") will be classified as a grantor trust under subpart E, part I of subchapter J of the Code. The interests in the classes of securities that have been exchanged for exchangeable securities will be the assets of the Exchangeable Pool and the classes of exchangeable securities represent beneficial ownership of these interests in the classes of securities.

TAX STATUS

     The classes of exchangeable securities should be considered to represent "real estate assets" within the meaning of Code Section 856(c)(5)(B) and assets described in Code Section 7701(a)(19)(C), and original issue discount and interest accruing on classes of exchangeable securities should be considered to represent "interest on obligations secured by mortgages on real property" within the meaning of Code Section 856(c)(3)(B) in each case to the extent the securities or income on the securities would be qualifying if held directly (although the matter is not entirely clear for Strips, defined below). The classes of exchangeable securities will be "qualified mortgages" under Code Section 860G(a)(3) for a REMIC.

TAX ACCOUNTING FOR EXCHANGEABLE SECURITIES

     A class of exchangeable securities represents beneficial ownership of an interest in one or more classes of securities on deposit in a exchangeable security trust fund, as specified in the related prospectus supplement. If it represents an interest in more than one class of securities, a purchaser must allocate its basis in the class of exchangeable securities among the interests in the classes of securities in accordance

                              104
<PAGE>

with their relative fair market values as of the time of acquisition. Similarly, on the sale of such exchangeable securities, the holder must allocate the amount received on the sale among the interests in the classes of securities in accordance with their relative fair market values as of the time of sale.

     The holder of a exchangeable security must account separately for each interest in a class of securities (there may be only one such interest). Where the interest represents a pro rata portion of a class of securities that are REMIC regular securities, the holder of the exchangeable securities should account for such interest as described under "Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates" above. Where the interest represents beneficial ownership of a disproportionate part of the principal and interest payments on a class of securities (a "Strip"), the holder is treated as owning, pursuant to Code Section 1286, "stripped bonds" to the extent of its share of principal payments and "stripped coupons" to the extent of its share of interest payments on such class of securities. We intend to treat each Strip as a single debt instrument for purposes of information reporting. The Internal Revenue Service, however, could take a different position. For example, the Internal Revenue Service could contend that a Strip should be treated as a pro rata part of the class of securities to the extent that the Strip represents a pro rata portion thereof, and "stripped bonds" or "stripped coupons" with respect to the remainder. An investor should consult its tax advisor regarding this matter.

     A holder of a exchangeable security should calculate original issue discount with respect to each Strip and include it in ordinary income as it

accrues, which may be before the receipt of cash attributable to such income, in accordance with a constant interest method that takes into account the compounding of interest. The holder should determine its yield to maturity based on its purchase price allocated to the Strip and on a schedule of payments projected using a prepayment assumption, and then make periodic adjustments to take into account actual prepayment experience. With respect to a particular holder, Treasury regulations do not address whether the prepayment assumption used to calculate original issue discount would be determined at the time of purchase of the Strip or would be the original prepayment assumption with respect to the related class of securities. Further, if the related class of securities is subject to redemption as described in the related prospectus supplement, Treasury regulations do not address the extent to which such prepayment assumption should take into account the possibility of the retirement of the Strip concurrently with the redemption of such class of securities. An investor should consult its tax advisor regarding these matters. For purposes of information reporting relating to original issue discount, the original yield to maturity of the Strip, determined as of the date of issuance of the series, will be calculated based on the original prepayment assumption.

If original issue discount accruing with respect to a Strip, computed as described above, is negative for any period, the holder may be entitled to offset such amount only against future positive original issue discount accruing from such Strip, and income is reported in all cases in this manner. Although not entirely free from doubt, such a holder may be entitled to deduct a loss to the extent that its remaining basis would exceed the maximum amount of future payments to which the holder is entitled with respect to such Strip, assuming no further prepayments of the Mortgages (or, perhaps, assuming prepayments at a rate equal to the prepayment assumption). Although the issue is not free from doubt, all or a portion of such loss may be treated as a capital loss if the Strip is a capital asset in the hands of the holder.

A holder realizes gain or loss on the sale of a Strip in an amount equal to the difference between the amount realized and its adjusted basis in such Strip. The holder's adjusted basis generally is equal to the holder's allocated cost of the Strip, increased by income previously included, and reduced (but not below zero) by distributions previously received. Except as described below, any gain or loss on such sale generally is capital gain or loss if the holder has held its interest as a capital asset and is long-term if the interest has been held for the long-term capital gain holding period (more than one year). Such gain or loss will be ordinary income or loss (1) for a bank or thrift institution or (2) if the securities are REMIC regular securities to the extent income recognized by the holder is less than the income that would have been recognized if the yield on such interest were 110% of the applicable federal rate under Code Section 1274(d).

                                    105
<PAGE>

If a holder exchanges a single class of exchangeable securities (an "Exchanged Class") for several classes of recombinable securities (each, a "Received Class") and then sells one of the Received Classes, the sale may be subject the investor to the coupon stripping rules of Code Section 1286. The holder must allocate its basis in the Exchanged Class between the part of such class underlying the Received Class that was sold and the part of the Exchanged Class underlying the Received Classes that was retained, in proportion to their relative fair market values as of the date of such sale. The holder is treated as purchasing the interest retained for the amount of basis allocated to such interest. The holder must calculate original issue discount with respect to the retained interest as described above.

Although the matter is not free from doubt, a holder that acquires in one transaction a Combination of classes of exchangeable securities that may be exchanged for a single class of exchangeable securities that is identical to a class of securities that is on deposit in the related exchangeable security trust fund should be treated as owning the relevant class of securities.

EXCHANGES OF EXCHANGEABLE SECURITIES

An exchange of an interest in one or more classes of exchangeable securities for an interest in one or more other related classes of exchangeable securities that are part of the same combination, or vice versa, will not be a taxable exchange. After the exchange, the holder is treated as continuing to own the interests in the class or classes of exchangeable securities that it owned immediately before the exchange.

TAX TREATMENT OF FOREIGN INVESTORS

A foreign holder of a class of exchangeable securities is subject to taxation in the same manner as foreign holders of REMIC regular securities. Such manner of taxation is discussed under the heading "Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates."

BACKUP WITHHOLDING

A holder of a class of exchangeable securities is subject to backup withholding rules similar to those applicable to REMIC regular securities. Such manner of taxation is discussed under the heading "Material Federal Income Tax Consequences--REMICs--Taxation of Owners of REMIC Regular Certificates."

REPORTING AND ADMINISTRATIVE MATTERS

Reports will be made to the Internal Revenue Service and to holders of record of the classes of recombinable securities that are not excepted from the reporting requirements.

DUE TO THE COMPLEXITY OF THE FEDERAL INCOME TAX RULES APPLICABLE TO SECURITYHOLDERS AND THE CONSIDERABLE UNCERTAINTY THAT EXISTS WITH RESPECT TO MANY ASPECTS OF THOSE RULES, POTENTIAL INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX TREATMENT OF THE ACQUISITION, OWNERSHIP, AND DISPOSITION OF THE SECURITIES.

STATE TAX CONSIDERATIONS

In addition to the federal income tax consequences described in "Material Federal Income Tax Considerations," potential investors should consider the state and local income tax consequences of the acquisition, ownership, and disposition of the Offered Securities. State and local income tax law may differ substantially from the corresponding federal law, and this discussion does not purport to describe any aspect of the income tax laws of any state or locality. Therefore, potential investors should consult their own tax advisors with respect to the various state and local tax consequences of an investment in the Offered Securities.

106

<PAGE>

ERISA CONSIDERATIONS

GENERAL

The Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), impose certain restrictions on employee benefit plans, individual retirement accounts and annuities, Keogh plans and collective investment funds and separate accounts in which those plans, accounts or arrangements are invested (collectively, "Plans"), and on persons who are parties in interest or disqualified persons ("Parties In Interest") with respect to such Plans. Certain employee benefit plans, such as governmental plans and church plans (if no election has been made under Code Section 410(d)), are not subject to the restrictions of ERISA and Code Section 4975, and assets of such plans may be

invested in the Securities without regard to the considerations described below, subject to other applicable federal, state and local law ("Similar Law"). However, any such governmental or church plan which is qualified under Code Section 401(a) and exempt from taxation under Code Section 501(a) is subject to the prohibited transaction rules set forth in Code Section 503.

Investments by Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a Plan's investments be made in accordance with the documents governing the Plan.

PROHIBITED TRANSACTIONS

General

ERISA prohibits Parties in Interest with respect to a Plan from engaging in certain transactions involving a Plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Code Section 4975 imposes certain excise taxes and other sanctions (or, in some cases, a civil penalty may be assessed pursuant to Section 502 of ERISA) on Parties in Interest which engage in non-exempt prohibited transactions.

Plan Asset Regulations

The United States Department of Labor ("Labor") has issued regulations (29 C.F.R. Section 2510.3-101) containing rules for determining what constitutes the assets of a Plan (the "Plan Asset Regulations"). The Plan Asset Regulations provide that, as a general rule, the underlying assets and properties of corporations, partnerships, trusts and certain other entities in which a Plan acquires an "equity interest" will be deemed for purposes of ERISA to be assets of the Plan unless certain exceptions apply.

Under the terms of the Plan Asset Regulations, the Trust Fund may be deemed to hold plan assets by reason of a Plan's investment in a Security; such plan assets would include an undivided interest in the Mortgage Assets and any other assets held by the Trust Fund. In such an event, the Asset Seller, the Master Servicer, the Trustee, any insurer of the Loans and other persons, in providing services with respect to the assets of the Trust Fund, may be Parties in Interest, subject to the prohibited transaction provisions of Section 406 of ERISA, Code Section 4975 or Similar Law, with respect to transactions involving such assets unless such transactions are subject to a statutory, regulatory or administrative exemption.

The Plan Asset Regulations contain a de minimis safe-harbor rule that exempts an entity from being deemed to hold plan assets if the aggregate equity investment in such entity by Plans is not significant. Pursuant to Section 3(42) of ERISA, equity investment in the entity will not be significant if immediately after the most recent acquisition of any equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "benefit plan investors." The 25% limitation must be met with respect to each class of certificates, regardless of the portion of total equity value represented by such class, on an ongoing basis. However, pursuant to Section 3(42) of ERISA, an entity shall be considered to hold plan assets only to the extent of the percentage of the equity interest in the entity held by benefit plan investors. "Benefit Plan Investor" means an employee benefit plan subject to Part 4 of Title I of ERISA, a plan to which Section 4975 of the Code applies, and any entity whose underlying assets include assets of any such plan by reason of a plan's investment in the entity.

107

<PAGE>

An exception applies if the interest described is treated as indebtedness under applicable local law and has no substantial equity features. Generally, a profits interest in a partnership, an undivided ownership interest in property

and a beneficial ownership interest in a trust are deemed to be "equity interests" under the Plan Asset Regulations. If Notes of a particular series are deemed to be indebtedness under applicable local law without any substantial equity features, an investing Plan's assets would include such Notes, but not, by reason of such purchase, the underlying assets of the Trust Fund.

Labor has issued final regulations under Section 401(c) of ERISA describing a safe harbor for insurers that issued certain nonguaranteed policies supported by their general accounts to Plans on or before December 31, 1998, and under which an insurer would not be considered an ERISA fiduciary with respect to its general account by virtue of a Plan's investment in such a policy. In general, to meet the safe harbor, an insurer must (i) disclose certain specified information to investing Plan fiduciaries initially and on an annual basis, (ii) allow Plans to terminate or discontinue a policy on 90 days' notice to the insurer, and to elect, without penalty, either a lump-sum payment or annual installment payments over a ten-year period, with interest, and (iii) give Plans written notice of "insurer-initiated amendments" over 60 days before the amendments take effect.

AVAILABILITY OF UNDERWRITER'S EXEMPTION FOR CERTIFICATES

Labor has granted to Merrill Lynch, Pierce, Fenner & Smith Incorporated Prohibited Transaction Exemption ("PTE") 90-29, Exemption Application No. D-8012, 55 Fed. Reg. 21459 (1990), as amended (the "Exemption"), which exempts from the application of certain of the prohibited transaction rules transactions relating to: (1) the acquisition, sale and holding by Plans of certain certificates representing an undivided interest in certain asset-backed pass-through trusts, with respect to which Merrill Lynch, Pierce, Fenner & Smith Incorporated or any of its affiliates is the sole underwriter or the manager or co-manager of the underwriting syndicate; and (2) the servicing, operation and management of such asset-backed pass-through trusts, provided that the general conditions and certain other conditions set forth in the Exemption are satisfied. With respect to a series of Notes, the related Prospectus Supplement will discuss whether the Exemption may be applicable to such Notes.

Section II of the Exemption sets forth the following general conditions which must be satisfied before a transaction involving the acquisition, sale and holding of the Certificates or a transaction in connection with the servicing, operation and management of the Trust may be eligible for exemptive relief thereunder:

- The acquisition of the Certificates by a Plan is on terms (including the price for such Certificates) that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party;

- The rights and interests evidenced by the Certificates acquired by the Plan are not subordinated to the rights and interests evidenced by other certificates of the Trust, unless the Certificates are backed by Trust Fund assets which are residential, home equity, multi-family or commercial loans which are described and defined in the Exemption as designated transactions ("Designated Transactions");

- The Certificates acquired by the Plan have received a rating at the time of such acquisition that is in one of the three (or in the case of a Designated Transaction, four) highest generic rating categories from any of Fitch Inc., Moody's Investors Service, Inc. and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (each, a "Rating Agency");

- The Trustee is not an affiliate of any member of the Restricted Group (consisting of the Underwriter, the Asset Seller, the Master Servicer, any insurer of the Mortgage Loans, any borrower whose obligations under one or more Assets constitute more than 5% of the aggregate unamortized principal balance of the assets in the Trust Fund, or any

of their respective affiliates), other than the Underwriter;

- The sum of all payments made to and retained by the Underwriter in connection with the distribution or placement of the Certificates represents not more than reasonable compensation

<center>108</center>

<PAGE>

for underwriting or placing such Certificates; the sum of all payments made to and retained by the Asset Seller pursuant to the sale of the Assets to the Trust Fund represents not more than the fair market value of such Assets; the sum of all payments made to and retained by the Master Servicer represent not more than reasonable compensation for the Master Servicer's services under the Agreement and reimbursement of the Master Servicer's reasonable expenses in connection therewith; and

- The Plan investing in the Certificates is an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933 as amended.

The Exemption was amended by PTE 97-34 to extend exemptive relief to Certificates issued in transactions using pre-funding accounts whereby a portion of the loans backing the Certificates are transferred to the Trust Fund within a specified period following the closing date (the "Pre-Funding Period") instead of requiring that all such loans be either identified or transferred on or before the closing date. The relief is available provided that the following conditions are met:

- The ratio of the amount allocated to the pre-funding account to the total principal amount of the certificates being offered must not exceed twenty-five percent (25%);

- All loans transferred after the closing date (referred to as "additional loans") must meet the same terms and conditions for eligibility as the original loans used to create the Trust Fund, which terms and conditions have been approved by a Rating Agency;

- The transfer of such additional loans to the Trust Fund during the Pre-Funding Period must not result in the Certificates receiving a lower credit rating from a Rating Agency upon termination of the Pre-Funding Period than the rating that was obtained at the time of the initial issuance of the Certificates by the Trust Fund;

- Solely as a result of the use of pre-funding, the weighted average annual percentage interest rate (the "Average Interest Rate") for all of the loans in the Trust Fund at the end of the Pre-Funding Period must not be more than 100 basis points lower than the Average Interest Rate for the loans which were transferred to the Trust Fund on the closing date;

- Either (i) the characteristics of the additional loans must be monitored by an insurer or other credit support provider which is independent of the Asset Seller or (ii) an independent accountant retained by the Asset Seller must provide the Asset Seller with a letter (with copies provided to the Rating Agency, the Underwriter and the Trustee) stating whether or not the characteristics of the additional loans conform to the characteristics described in the offering documents or the agreement. In preparing such letter, the independent accountant must use the same type of procedures as were applicable to the loans which were transferred as of the closing date;

- The Pre-Funding Period must end no later than three months or 90 days after the closing date or earlier, in certain circumstances, if the

amount on deposit in the pre-funding account is reduced below the
minimum level specified in the agreement or an event of default occurs
under the agreement;

- Amounts transferred to any pre-funding account and/or capitalized
  interest account used in connection with the pre-funding may be
  invested only in investments which are permitted by a Rating Agency,
  and (i) are direct obligations of, or obligations fully guaranteed as
  to timely payment of principal and interest by, the United States or
  any agency or instrumentality thereof (provided that such obligations
  are backed by the full faith and credit of the United States) or (ii)
  have been rated (or the obligor has been rated) in one of the three
  highest generic rating categories by a Rating Agency; and

- Certain disclosure requirements must be met.

                                  109
<PAGE>

        PTE 2000-58 further amended the Exemption to provide that one subset of
Designated Transactions, residential (one-to-four family) and home equity loans
and manufactured housing loans, may be less than fully secured, provided that
(a) the rights and interests evidenced by Certificates issued in such Designated
Transactions are not subordinated to the rights and interests evidenced by
securities of the same Trust Fund, (b) such Certificates have received a rating
from a Rating Agency at the time of such acquisition that is in one of the two
highest generic rating categories, and (c) any loan included in the corpus or
assets of the Trust Fund is secured by collateral whose fair market value on the
closing date of the Designated Transaction is at least equal to 80% of the sum
of (i) the outstanding principal balance due under the loan which is held by the
Trust Fund and (ii) the outstanding principal balance(s) of any other loan(s) of
higher priority (whether or not held by the Trust Fund) which are secured by the
same collateral.

        PTE 2000-58 also permits an interest-rate swap to be an asset of a Trust
Fund which issues Certificates acquired by Plans in an initial offering or in
the secondary market and clarifies the requirements regarding yield supplement
agreements. An interest-rate swap or, if purchased by or on behalf of the Trust
Fund, an interest-rate cap contract (collectively, a "Swap" or "Swap Agreement")
is a permitted Trust Fund asset if it (a) is an "eligible Swap," (b) is with an
"eligible counterparty," (c) is purchased by a "qualified plan investor," (d)
meets certain additional specific conditions which depend on whether the Swap is
a "ratings dependent Swap" or a "non-ratings dependent Swap" and (e) permits the
Trust Fund to make termination payments to the Swap (other than currently
scheduled payments) solely from excess spread or amounts otherwise payable to
the Master Servicer or Asset Seller.

        An "eligible Swap" is one which (a) is denominated in U.S. dollars, (b)
pursuant to which the Trust Fund pays or receives, on or immediately prior to
the respective payment or distribution date for the class of Certificates to
which the Swap relates, a fixed rate of interest or a floating rate of interest
based on a publicly available index (e.g., LIBOR or the U.S. Federal Reserve's
Cost of Funds Index), with the Trust Fund receiving such payments on at least a
quarterly basis and obligated to make separate payments no more frequently than
the counterparty, with all simultaneous payments being netted ("Allowable
Interest Rate"), (c) has a notional amount that does not exceed either: (i) the
principal balance of the class of Certificates to which the Swap relates; or
(ii) the portion of the principal balance of such class represented by
obligations ("Allowable Notional Amount"), (d) is not leveraged (i.e., payments
are based on the applicable notional amount, the day count fractions, the fixed
or floating rates permitted above, and the difference between the products
thereof, calculated on a one-to-one ratio and not on a multiplier of such
difference) ("Leveraged"), (e) has a final termination date that is either the
earlier of the date on which the Trust Fund terminates or the related class of
Certificates are fully repaid and (f) does not incorporate any provision which

could cause a unilateral alteration in the interest rate requirement described above or the prohibition against leveraging.

An "eligible counterparty" means a bank or other financial institution which has a rating at the date of issuance of the Certificates, which is one of the three highest long-term credit rating categories or one of the two highest short-term credit rating categories, utilized by at least one of the Rating Agencies rating the Certificates; provided, that if a counterparty is relying on its short-term rating to establish eligibility hereunder, such counterparty must either have a long-term rating in one of the three highest long-term rating categories or not have a long-term rating from the applicable Rating Agency.

A "qualified plan investor" is a Plan where the decision to buy such class of Certificates is made on behalf of the Plan by an independent fiduciary qualified to understand the Swap transaction and the effect the Swap would have on the rating of the Certificates, and such fiduciary either (i) is a "qualified professional asset manager" under Prohibited Transaction Class Exemption ("PTCE") 84-14, (ii) is an "in-house asset manager" under PTCE 96-23 or (iii) has total assets (both Plan and non-Plan) under management of at least $100 million at the time the Certificates are acquired by the Plan.

In "rating dependent Swaps" (where the rating of a class of Certificates is dependent on the terms and conditions of the Swap), the Swap Agreement must provide that if the credit rating of the counterparty is withdrawn or reduced by any Rating Agency below a level specified by the Rating Agency,

110

<PAGE>

the Master Servicer must, within the period specified under the Swap Agreement: (a) obtain a replacement Swap Agreement with an eligible counterparty which is acceptable to the Rating Agency and the terms of which are substantially the same as the current Swap Agreement (at which time the earlier Swap Agreement must terminate); or (b) cause the Swap counterparty to establish any collateralization or other arrangement satisfactory to the Rating Agency such that the then current rating by the Rating Agency of the particular class of Certificates will not be withdrawn or reduced (and the terms of the Swap Agreement must specifically obligate the counterparty to perform these duties for any class of Certificates with a term of more than one year). In the event that the Master Servicer fails to meet these obligations, Plan certificateholders must be notified in the immediately following periodic report which is provided to certificateholders but in no event later than the end of the second month beginning after the date of such failure. Sixty days after the receipt of such report, the relief provided under the Exemption will prospectively cease to be applicable to any class of Certificates held by a Plan which involves such a ratings dependent Swap.

"Non-ratings dependent Swaps" (those where the rating of the Certificates does not depend on the terms and conditions of the Swap) are subject to the following conditions. If the credit rating of the counterparty is withdrawn or reduced below the lowest level permitted above, the Master Servicer will, within a specified period after such rating withdrawal or reduction: (a) obtain a replacement Swap Agreement with an eligible counterparty, the terms of which are substantially the same as the current Swap Agreement (at which time the earlier Swap Agreement must terminate); (b) cause the counterparty to post collateral with the Trust Fund in an amount equal to all payments owed by the counterparty if the Swap transaction were terminated; or (c) terminate the Swap Agreement in accordance with its terms.

An "eligible yield supplement agreement" is any yield supplement agreement or similar arrangement (or if purchased by or on behalf of the Trust Fund, an interest rate cap contract) to supplement the interest rates otherwise payable on obligations held by the Trust Fund ("EYS Agreement"). If the EYS Agreement has a notional principal amount and/or is written on an International Swaps and Derivatives Association, Inc. form, the EYS Agreement may only be held as an

asset of the Trust Fund with respect to Certificates purchased by Plans on or after April 7, 1998 if it meets the following conditions: (a) it is denominated in U.S. dollars; (b) it pays an Allowable Interest Rate; (c) it is not Leveraged; (d) it does not allow any of the three preceding requirements to be unilaterally altered without the consent of the Trustee; (e) it is entered into between the Trust Fund and an eligible counterparty and (f) it has an Allowable Notional Amount.

If the general conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by ERISA and the Code in connection with the initial acquisition, transfer or holding, and the acquisition or disposition in the secondary market, of Certificates by a Plan. However, no exemption is provided from the restrictions of ERISA for the acquisition or holding of a Certificate on behalf of an "Excluded Plan" by any person who is a fiduciary with respect to the assets of such Excluded Plan. For these purposes, an Excluded Plan is a Plan sponsored by any member of the Restricted Group. Exemptive relief may also be provided for the acquisition, holding and disposition of Certificates by Plans if the fiduciary or its affiliate is the obligor with respect to 5% or less of the fair market value of the loans in the Trust Fund provided that (i) the Plan is not an Excluded Plan, (ii) each Plan's investment in each class of Certificates does not exceed 25% of the outstanding Certificates in the class, (iii) after the Plan's acquisition of the Certificates, no more than 25% of the assets over which the fiduciary has investment authority are invested in Certificates of a Trust Fund containing assets which are sold or serviced by the same entity, and (iv) in the case of initial issuance (but not secondary market transactions), at least 50% of each class of Certificates and at least 50% of the aggregate interests in the Trust Fund are acquired by persons independent of the Restricted Group.

In the event that Offered Certificates (other than REMIC residual Certificates) do not meet the requirements of the Exemption solely because they are subordinated Certificates or fail to meet a minimum rating requirement under the Exemption, insurance companies may be eligible to purchase

111

<PAGE>

Certificates pursuant to Section III of PTCE 95-60 which permits insurance company general accounts (as defined in PTCE 95-60) to purchase such Certificates if they otherwise meet all of the other requirements of the Exemption.

Before purchasing a Certificate, a fiduciary of a Plan should itself confirm (a) that the Certificates constitute "certificates" for purposes of the Exemption and (b) that the specific and general conditions set forth in the Exemption and the other requirements set forth in the Exemption would be satisfied.

Prohibited Transaction Class Exemption 83-1

Labor has issued an administrative exemption, PTCE 83-1, which under certain conditions exempts from the application of certain of the prohibited transaction rules of ERISA and the excise tax provisions of Code Section 4975 transactions involving a Plan in connection with the operation of a "mortgage pool" and the purchase, sale and holding of Certificates which are "mortgage pool pass-through certificates." A "mortgage pool" is defined as a fixed investment pool consisting solely of interest-bearing obligations secured by first or second mortgages or deeds of trust on single-family residential property, property acquired in foreclosure and undistributed cash. A "mortgage pool pass-through certificate" is defined as a Certificate which represents a beneficial undivided interest in a mortgage pool which entitles the holder to pass through payments of principal and interest from the mortgage loans. PTCE 83-1 requires that: (i) the Asset Seller and the Trustee maintain a system of insurance or other protection for the mortgage loans, the property securing such mortgage loans and for indemnifying holders of Certificates against reductions

in pass-through payments due to defaults in loan payments or property damage in an amount at least equal to the greater of (x) 1% of the aggregate principal balance of the mortgage loans or (y) 1% of the principal balance of the largest covered pooled mortgage loans; (ii) the Trustee may not be an affiliate of the Asset Seller; and (iii) the payments made to, and retained by, the Asset Seller in connection with the Trust Fund, together with all funds inuring to its benefit for administering the Trust Fund, represent no more than "adequate consideration" for selling the mortgage loans, plus reasonable compensation for services provided to the Trust Fund. In addition, PTCE 83-1 exempts the initial sale of Certificates to a Plan with respect to which the Asset Seller, the insurer, the Master Servicer or other servicer or the Trustee is a Party In Interest if the Plan does not pay more than fair market value for such Certificates and the rights and interests evidenced by such Certificates are not subordinated to the rights and interests evidenced by other Certificates of the same pool.

PTCE 83-1 also exempts from the prohibited transaction rules any transactions in connection with the servicing and operation of the mortgage pool, provided that any payments made to the Master Servicer in connection with the servicing of the Trust Fund are made in accordance with a binding agreement, copies of which must be made available to prospective Plan investors. In the case of any Plan with respect to which the Asset Seller, the Master Servicer, the insurer or the Trustee is a fiduciary, PTCE 83-1 will only apply if, in addition to the other requirements: (i) the initial sale, exchange or transfer of Certificates is expressly approved by an independent fiduciary who has authority to manage and control those Plan assets being invested in Certificates; (ii) the Plan pays no more for the Certificates than would be paid in an arm's length transaction; (iii) no investment management, advisory or underwriting fee, sales transfer commission or similar compensation is paid to the Asset Seller with regard to the sale, exchange or transfer of Certificates to the Plan; (iv) the total value of the Certificates purchased by such Plan does not exceed 25% of the amount issued; and (v) at least 50% of the aggregate amount of Certificates is acquired by persons independent of the Asset Seller, the Trustee, the Master Servicer and the insurer. Before purchasing Certificates in reliance on PTCE 83-1, a fiduciary of a Plan should confirm that the Trust Fund is a "mortgage pool," that the Certificates constitute "mortgage pool pass-through certificates" and that the conditions set forth in PTCE 83-1 would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in PTCE 83-1, the fiduciary should consider the availability of any other prohibited transaction exemptions. The fiduciary should also consider its general fiduciary obligations under ERISA in determining whether to purchase any Certificates on behalf of a Plan pursuant to PTCE 83-1.

112

<PAGE>

Investor-Based Exemptions

Even if Securities issued pursuant to an offering are not treated as equity investments for purposes of the Plan Asset Regulations, the acquisition or holding of such Securities by or on behalf of a Plan could still be considered to give rise to a prohibited transaction if the Issuers, the Depositor, the Indenture Trustee or any of their respective affiliates is or becomes a party in interest or disqualified person with respect to a Plan or related investment vehicle unless such transaction is subject to one or more statutory or administrative exemptions such as: Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code, which exempt certain transactions with persons who provide services to Plans, PTCE 90-1, which exempts certain transactions involving insurance company pooled separate accounts; PTCE 95-60, which exempts certain transactions involving insurance company general accounts; PTCE 91-38, which exempts certain transactions involving bank collective investment funds; PTCE 84-14, which exempts certain transactions effected on behalf of a Plan by a "qualified professional asset manager;" or PTCE 96-23, which exempts certain transactions effected on behalf of a Plan by certain "in-house" asset managers

(collectively, the "Investor-Based Exemptions"). It should be noted, however, that even if the conditions specified in one or more of the Investor-Based Exemptions are met, the scope of relief provided by such exemption may not necessarily cover all acts that might be construed as prohibited transactions.

Nevertheless, a Plan generally should not purchase such Securities in reliance on any of the Investor-Based Exemptions if the Issuers, the Depositor, the Indenture Trustee or any of their respective affiliates: (a) has investment discretion with respect to the investment of assets of such Plan; (b) has authority or responsibility to give or regularly gives investment advise with respect to assets of such Plan for a fee and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such assets and that such advice will be based on the particular investment needs of such Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in the preceding sentence will generally be construed to be a fiduciary under ERISA with respect to the Plan and any such purchase might result in a non-exempt "prohibited transaction" under ERISA, the Code or Similar Law.

REVIEW BY PLAN FIDUCIARIES

Any Plan fiduciary considering whether to purchase any Securities on behalf of a Plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA, and the Code and Similar Law to such investment. Among other things, before purchasing any Securities, a fiduciary of a Plan subject to the fiduciary responsibility provisions of ERISA or an employee benefit plan subject to the prohibited transaction provisions of the Code should make its own determination as to the availability of the exemptive relief provided in the Exemption, and also consider the availability of any other prohibited transaction exemptions. In particular, in connection with a contemplated purchase of Securities representing a beneficial ownership interest in a pool of single-family residential first mortgage loans, such Plan fiduciary should consider the availability of the Exemption or PTCE 83-1 for certain transactions involving mortgage pool investment trusts.

Purchasers that are insurance companies should consult with their counsel with respect to the United States Supreme Court case interpreting the fiduciary responsibility rules of ERISA, John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank (decided December 13, 1993). In John Hancock, the Supreme Court ruled that assets held in an insurance company's general account may be deemed to be "plan assets" for ERISA purposes under certain circumstances. Prospective purchasers should determine whether the decision affects their ability to make purchases of the Securities. In particular, such an insurance company should consider the exemptive relief granted by Labor for transactions involving insurance company general accounts in Prohibited Transaction Exemption 95-60 and under Section 401(c) of ERISA.

LEGAL INVESTMENT

Each class of Offered Securities will be rated at the date of issuance in one of the four highest rating categories by at least one Rating Agency. The related Prospectus Supplement will specify which

113

<PAGE>

classes of the Securities, if any, will constitute "mortgage related securities" ("SMMEA Securities") for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA"). SMMEA Securities will constitute legal investments for persons, trusts, corporations, partnerships, associations, business trusts and business entities (including, but not limited to, state chartered savings banks, commercial banks, savings and loan associations and insurance companies, as well as trustees and state government employee retirement systems) created pursuant to or existing under the laws of the United States or of any state (including

the District of Columbia and Puerto Rico) whose authorized investments are
subject to state regulation to the same extent that, under applicable law,
obligations issued by or guaranteed as to principal and interest by the United
States or any agency or instrumentality thereof constitute legal investments for
such entities. Alaska, Arkansas, Colorado, Connecticut, Delaware, Florida,
Georgia, Illinois, Kansas, Maryland, Michigan, Missouri, Nebraska, New
Hampshire, New York, North Carolina, Ohio, South Dakota, Utah, Virginia and West
Virginia enacted legislation before the October 4, 1991 cutoff established by
SMMEA for such enactments, limiting to varying extents the ability of certain
entities (in particular, insurance companies) to invest in mortgage related
securities, in most cases by requiring the affected investors to rely solely
upon existing state law, and not SMMEA. Investors affected by such legislation
will be authorized to invest in SMMEA Certificates only to the extent provided
in such legislation. SMMEA provides, however, that in no event will the
enactment of any such legislation affect the validity of any contractual
commitment to purchase, hold or invest in "mortgage related securities," or
require the sale or other disposition of such securities, so long as such
contractual commitment was made or such securities acquired prior to the
enactment of such legislation.

     SMMEA also amended the legal investment authority of federally chartered
depository institutions as follows: federal savings and loan associations and
federal savings banks may invest in, sell or otherwise deal with "mortgage
related securities" without limitation as to the percentage of their assets
represented thereby, federal credit unions may invest in such securities, and
national banks may purchase such securities for their own account without regard
to the limitations generally applicable to investment securities set forth in 12
U.S.C. 24 (Seventh), subject in each case to such regulations as the applicable
federal regulatory authority may prescribe. In this connection, federal credit
unions should review the National Credit Union Administration ("NCUA") Letter to
Credit Unions No. 96, as modified by Letter to Credit Unions No. 108, which
includes guidelines to assist federal credit unions in making investment
decisions for mortgage related securities, and the NCUA's regulation "Investment
and Deposit Activities" (12 C.F.R. Part 703), which sets forth certain
restrictions on investment by federal credit unions in mortgage related
securities.

     Institutions whose investment activities are subject to legal investment
laws or regulations or review by certain regulatory authorities may be subject
to restrictions on investment in certain classes of Offered Securities. Any
financial institution which is subject to the jurisdiction of the Comptroller of
the Currency, the Board of Governors of the Federal Reserve System, the FDIC,
the Office of Thrift Supervision ("OTS"), the NCUA or other federal or state
agencies with similar authority should review any applicable rules, guidelines
and regulations prior to purchasing any Offered Security. The Federal Financial
Institutions Examination Council, for example, has issued a Supervisory Policy
Statement on Securities Activities effective February 10, 1992 (the "Policy
Statement") setting forth guidelines for and significant restrictions on
investments in "high-risk mortgage securities." The Policy Statement has been
adopted by the Comptroller of the Currency, the Federal Reserve Board, the FDIC,
the OTS and the NCUA (with certain modifications), with respect to the
depository institutions that they regulate. The Policy Statement generally
indicates that a mortgage derivative product will be deemed to be high risk if
it exhibits greater price volatility than a standard fixed rate thirty-year
mortgage security. According to the Policy Statement, prior to purchase, a
depository institution will be required to determine whether a mortgage
derivative product that it is considering acquiring is high-risk, and if so that
the proposed acquisition would reduce the institution's overall interest rate
risk. Reliance on analysis and documentation obtained from a securities dealer
or other outside party without internal analysis by the institution would be
unacceptable. There can be no assurance that any classes of Offered Securities
will not be treated as high-risk under the Policy Statement.

                                      114

<PAGE>

The predecessor to the OTS issued a bulletin, entitled, "Mortgage Derivative Products and Mortgage Swaps", which is applicable to thrift institutions regulated by the OTS. The bulletin established guidelines for the investment by savings institutions in certain "high-risk" mortgage derivative securities and limitations on the use of such securities by insolvent, undercapitalized or otherwise "troubled" institutions. According to the bulletin, such "high-risk" mortgage derivative securities include securities having certain specified characteristics, which may include certain classes of Securities. In accordance with Section 402 of the Financial Institutions Reform, Recovery and Enhancement Act of 1989, the foregoing bulletin will remain in effect unless and until modified, terminated, set aside or superseded by the FDIC. Similar policy statements have been issued by regulators having jurisdiction over the types of depository institutions.

In September 1993 the National Association of Insurance Commissioners released a draft model investment law (the "Model Law") which sets forth model investment guidelines for the insurance industry. Institutions subject to insurance regulatory authorities may be subject to restrictions on investment similar to those set forth in the Model Law and other restrictions.

If specified in the related Prospectus Supplement, other classes of Offered Securities offered pursuant to this Prospectus will not constitute "mortgage related securities" under SMMEA. The appropriate characterization of this Offered Security under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase such Offered Securities, may be subject to significant interpretive uncertainties.

The Depositor will make no representations as to the proper characterization of the Offered Certificates for legal investment or financial institution regulatory purposes, or as to the ability of particular investors to purchase any Offered Certificates under applicable legal investment restrictions. The uncertainties described above (and any unfavorable future determinations concerning legal investment or financial institution regulatory characteristics of the Offered Securities) may adversely affect the liquidity of the Offered Securities.

The foregoing does not take into consideration the applicability of statutes, rules, regulations, orders, guidelines or agreements generally governing investments made by a particular investor, including, but not limited to, "prudent investor" provisions, percentage-of-assets limits and provisions which may restrict or prohibit investment in securities which are not "interest bearing" or "income paying."

There may be other restrictions on the ability of certain investors, including depository institutions, either to purchase Offered Securities or to purchase Offered Securities representing more than a specified percentage of the investor's assets. Accordingly, all investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their own legal advisors in determining whether and to what extent the Offered Securities of any class constitute legal investments or are subject to investment, capital or other restrictions.

## PLAN OF DISTRIBUTION

The Offered Securities offered hereby and by the Supplements to this Prospectus will be offered in series. The distribution of the Securities may be effected from time to time in one or more transactions, including negotiated transactions, at a fixed public offering price or at varying prices to be determined at the time of sale or at the time of commitment therefor. If so specified in the related Prospectus Supplement, the Offered Securities will be distributed in a firm commitment underwriting, subject to the terms and conditions of the underwriting agreement, by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acting as underwriter with other

underwriters, if any, named therein. Merrill Lynch is an affiliate of the
Depositor. In such event, the Prospectus Supplement may also specify that the
underwriters will not be obligated to pay for any Offered Securities agreed to
be purchased by purchasers pursuant to purchase agreements acceptable to the
Depositor. In connection with the sale of Offered Certificates, underwriters may
receive compensation from the Depositor or from purchasers of

                                      115

<PAGE>

Offered Securities in the form of discounts, concessions or commissions. The
Prospectus Supplement will describe any such compensation paid by the Depositor.

     Alternatively, the Prospectus Supplement may specify that Offered
Securities will be distributed by Merrill Lynch and/or any other person or
persons named therein acting as agent or in some cases as principal with respect
to Offered Securities that it has previously purchased or agreed to purchase. If
Merrill Lynch or such persons act as agents in the sale of Offered Securities,
they will receive a selling commission with respect to such Offered Securities,
depending on market conditions, expressed as a percentage of the aggregate
principal balance or notional amount of such Offered Securities as of the Cut-
off Date. The exact percentage for each series of Securities will be disclosed
in the related Prospectus Supplement. To the extent that Merrill Lynch or such
persons elect to purchase Offered Securities as principal, they may realize
losses or profits based upon the difference between its purchase price and the
sales price. The Prospectus Supplement with respect to any series offered other
than through underwriters will contain information regarding the nature of such
offering and any agreements to be entered into between the Depositor and
purchasers of Offered Securities of such series.

     This Prospectus may be used, to the extent required, by Merrill Lynch or
any other Underwriter in connection with offers and sales related to market
making transactions.

     The Depositor will indemnify Merrill Lynch and any underwriters against
certain civil liabilities, including liabilities under the Securities Act of
1933, or will contribute to payments Merrill Lynch and any underwriters may be
required to make in respect thereof.

     In the ordinary course of business, Merrill Lynch and its affiliates may
engage in various securities and financing transactions, including repurchase
agreements to provide interim financing of the Depositor's or Asset Seller's
Assets pending the sale of such Assets or interests therein, including the
Securities.

     As to each series of Securities, only those classes rated in an investment
grade rating category by any Rating Agency will be offered hereby. Any
non-investment-grade class may be initially retained by the Depositor or Asset
Seller, and may be sold by the Depositor or Asset Seller at any time.

     Upon receipt of a request by an investor who has received an electronic
Prospectus Supplement and Prospectus from the Underwriter or a request by such
investor's representative within the period during which there is an obligation
to deliver a Prospectus Supplement and Prospectus, the Depositor or the
Underwriter will promptly deliver, or cause to be delivered, without charge, a
paper copy of the Prospectus Supplement and Prospectus.

                                 LEGAL MATTERS

     Certain legal matters in connection with the Securities, including certain
federal income tax consequences, will be passed upon for the Depositor by
Dechert LLP, New York, New York. Certain matters with respect to Delaware law
will be passed upon for the Depositor by Richards, Layton & Finger, P.A.,
Wilmington, Delaware.

FINANCIAL INFORMATION

A new Trust Fund will be formed with respect to each series of Securities and no Trust Fund will engage in any business activities or have any assets or obligations prior to the issuance of the related series of Securities. Accordingly, no financial statements with respect to any Trust Fund will be included in this Prospectus or in the related Prospectus Supplement.

INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

This Prospectus incorporates by reference all documents and reports filed on behalf of the Depositor with respect to a Trust Fund pursuant to Section 13(a), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, prior to the termination of the offering the related Securities. Upon request by

116

<PAGE>

any person to whom this prospectus is delivered in connection with the offering of one or more Classes of Offered Securities, the Depositor will provide or cause to be provided without charge a copy of any of the documents and/or reports incorporated herein by reference, in each case to the extent the documents or reports relate to such Classes of Offered Securities, other than the exhibits to such documents (unless those exhibits are specifically incorporated by reference in such documents). Requests to the Depositor should be directed in writing to: Merrill Lynch Mortgage Investors, Inc., 250 Vesey Street, World Financial Center-North Tower, 10th Floor, New York, New York 10281-1310, Attention: Secretary, telephone number (212) 449-0357. The Depositor has determined that its financial statements are not material to the offering of any Offered Securities.

Investors may read and copy the documents and/or reports incorporated herein by reference at the Public Reference Room of the Securities and Exchange Commission at 100 F Street, NE, Washington, D.C. 20549. Investors may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains a website at http://www.sec.gov containing reports, proxy and information statements and other information regarding issuers, including each Trust Fund, that file electronically with the SEC.

RATINGS

It is a condition to the issuance of any class of Offered Securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by a Rating Agency.

Ratings on asset backed securities address the likelihood of receipt by securityholders of all distributions on the underlying assets. These ratings address the structural, legal and issuer-related aspects associated with such certificates, the nature of the underlying assets and the credit quality of the guarantor, if any. Ratings on asset backed securities do not represent any assessment of the likelihood of principal prepayments by borrowers or of the degree by which such prepayments might differ from those originally anticipated. As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of stripped interest certificates in extreme cases might fail to recoup their initial investments.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating.

Although we anticipate that the Rating Agencies will continue to monitor the rating on any Securities while they are outstanding, there can be no assurance that they will continue to do so.

117

<PAGE>

INDEX OF DEFINED TERMS

<Table>
<S>                                  <C>
1986 Act.............................  74
Accretion Directed..................  18
Accrual Class.......................  21
Accrual Securities..................  17
Accrued Security Interest...........  23
Agreement...........................  33
Allowable Interest Rate.............  110
Allowable Notional Amount...........  110
Amortizable Bond Premium
    Regulations.....................  70
Applicable Amount...................  88
ARM Loans...........................  8
Assets..............................  7
Asset Seller........................  7
Attestation Report..................  46
Available Distribution Amount.......  22
Average Interest Rate...............  109
Book-Entry Securities...............  18
Buydown Mortgage Loans..............  15
Buydown Period......................  15
Cash Flow Agreement.................  12
Cede................................  28
CEDEL...............................  28
CEDEL Participants..................  28
Certificates........................  17
Closing Date........................  78
CMT.................................  8
Code................................  68
CODI................................  9
COFI................................  8
Collection Account..................  36
Companion Class.....................  20
Component...........................  18
Component Securities................  18
Cooperative Loans...................  56
Cooperatives........................  7
Contributions Tax...................  91
COSI................................  9
Covered Trust.......................  53
CPI.................................  9
CPR.................................  14
Credit Support......................  12
Deferred Interest...................  75
Definitive Securities...............  18
Depositaries........................  29
Depositor...........................  7
Designated Transactions.............  108
Determination Date..................  22
DTC.................................  27
Due Period..........................  22
Eligible C Corporation..............  94
ERISA...............................  106
EURIBOR.............................  8
Euroclear...........................  29
Euroclear Cooperative...............  29
Euroclear Operator..................  29
Euroclear Participants..............  29
Exemption...........................  108

| | |
|---|---|
| Exchangeable Certificates | 30 |
| Exchangeable Pool | 102 |
| Exchanged Class | 106 |
| EYS Agreement | 111 |
| FDIC | 36 |
| Fed Funds Rate | 8 |
| FHLB Index | 9 |
| Fixed Rate Class | 20 |
| Floating Rate Class | 20 |
| GBP LIBOR | 8 |
| Government Securities | 7 |
| Home Equity Loans | 10 |
| Home Improvement Contracts | 10 |
| Indenture | 17 |
| Indenture Trustee | 33 |
| Indirect Participants | 28 |
| Insurance Proceeds | 37 |
| Interest-Only Class | 20 |
| Inverse Floating Rate Class | 20 |
| Investor Based Exemptions | 113 |
| L/C Bank | 52 |
| Labor | 107 |
| Legislative History | 72 |
| Leveraged | 110 |
| LIBOR | 8 |
| LIBORSWAP | 8 |
| Liquidation Proceeds | 37 |
| Loan-to-Value Ratio | 9 |
| Lockout Class | 18 |
| Manufactured Housing Contracts | 10 |
| Master REMIC | 77 |
| Merrill Lynch | 115 |
| Mezzanine Securities | 19 |
| Model Law | 115 |
| Mortgage Loan Group | 17 |
| Mortgage Loans | 7 |
| Mortgage Notes | 8 |
| Mortgage Rate | 11 |
| Mortgages | 8 |
| MTA | 8 |
| NAS Class | 18 |
| National Average Contract Mortgage Rate | 9 |
| National Monthly Median COFI | 8 |
| NCUA | 114 |
| New Regulations | 76 |
| Nonrecoverable Advance | 25 |
| Notional Amount Class | 18 |
| OID | 68 |
| OID Regulations | 70 |
| Originator | 8 |
| OTS | 114 |
| PAC | 18 |
| Participants | 28 |
| Parties In Interest | 106 |
| Pass-Through Rate | 23 |
| Payment Lag Certificates | 84 |
| Permitted Investments | 34 |
| Plan Asset Regulations | 107 |
| Planned Amortization Class | 18 |
| Plans | 106 |
| Policy Statement | 114 |
| Pooling and Servicing Agreement | 33 |
| Pre-Funded Amount | 11 |
| Pre-Funding Period | 109 |

</Table>

118

<PAGE>

<Table>
<S>                                              <C>
Prepayment Assumption........................    74
Primary Mortgage Insurance Policy............    42
Prime Rate...................................     8
Principal-Only Class.........................    21
Prohibited Transactions Tax..................    91
Purchase Price...............................    36
PTCE.........................................   110
PTE..........................................   108
Rating Agency................................   108
Received Class...............................   106
Record Date..................................    22
Refinance Loans..............................     9
Related Proceeds.............................    25
Relief Act...................................    64
REMIC Certificates...........................    77
REMIC Regular Certificateholders.............    78
REMIC Regular Certificates...................    77
REMIC Regulations............................    68
REMIC Residual Certificateholder.............    86
REMIC Residual Certificates..................    77
Retained Interest............................    45
Scheduled Amortization Class.................    19
Security.....................................    34
Security Balance.............................    24
Security Owners..............................    28
Senior Securities............................    17
Senior Support Securities....................    19
Sequential Pay Class.........................    19
Servicing Agreement..........................    33
Servicing Standard...........................    40
Short-Term Note..............................    96
SIBOR........................................     8
Similar Law..................................   107
Single Family Mortgage Loan..................     7
Single Family Property.......................     7
SMMEA........................................   113
SMMEA Securities.............................   113
SPA..........................................    14
Step-up Class................................    21
Strip........................................   105
Strip Class..................................    19
Stripped ARM Obligations.....................    75
Stripped Bond Certificates...................    72
Stripped Coupon Certificates.................    72
Stripped Interest Securities.................    17
Stripped Principal Securities................    17
Subordinate Securities.......................    17
Subsequent Assets............................    11
Sub-Servicer.................................    40
Sub-Servicing Agreement......................    40
Subsidiary REMIC.............................    77
Super-Premium Certificates...................    79
Super Senior Securities......................    19
Support Class................................    20
Swap.........................................   110
Swap Agreement...............................   110
TAC..........................................    20
T-Bill.......................................     8

```
Targeted Amortization Class...................    20
Tax Counsel...................................   101
Terms and Conditions..........................    29
Title V.......................................    63
Title VIII....................................    64
Trust Agreement...............................    33
U.S. Person...................................    68
UCC...........................................    28
Value.........................................     9
Variable Rate Class...........................    20
Voting Rights.................................    48
Warranting Party..............................    35
</Table>
```

119

<PAGE>


                    $1,835,617,100 (APPROXIMATE)


         MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST,

                        SERIES 2007-3

              MORTGAGE LOAN ASSET-BACKED CERTIFICATES

              MERRILL LYNCH MORTGAGE INVESTORS, INC.

                           DEPOSITOR

                          ----------

                     PROSPECTUS SUPPLEMENT

                          ----------

                     MERRILL LYNCH & CO.


        You should rely on the information contained or incorporated by reference
in this prospectus supplement and the attached prospectus. We have not
authorized anyone to provide you with different information.

        We are not offering these certificates in any state where the offer is not
permitted.

        We represent the accuracy of the information in this prospectus supplement
and the attached prospectus only as of the dates stated on their respective
covers.

        Dealers will be required to deliver a prospectus supplement and prospectus
when acting as underwriters of these certificates and with respect to their
unsold allotments or subscriptions. In addition, all dealers selling these
certificates will deliver a prospectus supplement and prospectus until ninety
days after the date of this prospectus supplement.

                        May 29, 2007

</TEXT>
</DOCUMENT>